UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

160 Royal Palm, LLC,                                    Case No.  18-19441-EPK

Debtor.                                                 Chapter 11

_____/

**DEBTOR'S MOTION FOR THE ENTRY OF AN ORDER (I) APPROVING BID
PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE
OF SUBSTANTIALLY ALL OF ITS ASSETS, (II) APPROVING THE FORM AND
MANNER OF NOTICE OF SALE, (III) SCHEDULING AN AUCTION AND
SALE HEARING AND (IV) APPROVING THE SALE OF THE ASSETS
<u>FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES</u>**

160 Royal Palm, LLC (the "<u>Debtor</u>"), hereby files this motion (the "<u>Motion</u>") and moves

the Court for an order (I) approving bid procedures and bid protections in connection with the sale

of substantially all of its assets, (II) approving the form and manner of notice of sale, (III)

scheduling an auction and sale hearing and (IV) approving the sale of the assets free and clear of

liens, claims and encumbrances as described herein.  In support of this Motion, the Debtor states

as follows:

**<u>BACKGROUND</u>**

1.      On August 2, 2018 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing

its properties as debtor in possession.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No committees have been appointed or designated.

2.      The Debtor owns real property located at 160 Royal Palm Way, Palm Beach,

Florida 33480 (the "<u>Property</u>").  The Property is a partially-constructed hotel/condominium.

3.      Prior to the Petition Date, the Debtor and/or the Property were involved in various lawsuits, including an action to foreclose on the Property.  The Debtor believes that various parties may allege a secured claim in the Property as described below.

4.      The Debtor has entered into an Asset Purchase Agreement (the "APA") with RREF II Palm House LLC (the "Stalking Horse Bidder") for the sale of the Property and the other personal property set forth in the APA (collectively, the "Assets").  The purchase price is Thirty Two Million Dollars ($32,000,000.00).   The sale will be subject to higher or otherwise better offers and will be exposed to the market through the Debtor's exclusive real estate broker, Cushman & Wakefield U.S., Inc. (the "Broker").  The Debtor submits that the sale of the Assets to the Stalking Horse Bidder, or the highest and best bidder following an auction pursuant to Court approved bidding procedures, is in the best interests of the estate.

5.      The Debtor believes that the best way to maximize the value of the Property for the benefit of the estate is through an auction sale.  To this end, the Court approved the Debtor's retention of the Broker as the Debtor's exclusive real estate broke to market and sell the Property (the "Broker Engagement Order") [ECF No. 66].

## ASSET PURCHASE AGREEMENT

6.      On September 28, 2018, the Debtor entered into the APA with the Stalking Horse Bidder, a copy of which is attached as **EXHIBIT 1**.  Key terms of the APA are summarized below. The following is only a summary of certain material terms set forth in the APA, and to the extent there are any inconsistencies, the executed APA controls:

   i.   **Court Approval**.  This Agreement and the Parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval and the entry of a final non-appealable order, reasonably acceptable to the Buyer, whose approval will not be unreasonably withheld, conditioned or delayed, approving this Agreement and the transaction contemplated herein and containing the findings set forth in Section 8.1 (the "Sale Order"), after notice and a hearing, and subject to higher or otherwise better offers, and the provisions,

requirements and limitations of the Sale Order.  The Seller shall seek said approval of this Agreement within a reasonable time following receipt of the fully executed copy of this Agreement.

ii.   **Sale and Purchase of Property**.  Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall purchase and acquire from Seller, Seller's right, title and interest in and to the following (collectively, the "Assets"): a) the Property, including any improvements thereon and appurtenances belonging thereto or hereafter existing, subject to the Permitted Exceptions (defined below); b) all tangible personal property and equipment, if any, owned by Seller and located on the Property or stored off-site (if any), including, without limitation, those items described on Exhibit "B" to the APA, and to the extent in Seller's actual possession, all books, records, correspondence and documents of Seller related to the design, construction or operation of the Property, including any improvements thereon and appurtenances belonging thereto or hereafter existing, and all plans, specifications, floor plans, drawings and renderings of all or any part of the Property (the "Tangible Personal Property"); c) all transferable development rights, consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely in respect of the Property, all transferable warranties and guaranties, if any, held by Debtor in connection with the Assets (collectively, the "Intangible Personal Property"); and d) to the extent applicable, any insurance or condemnation awards or proceeds under Section 15.

iii.   **Conveyance of Property**.  On the Closing Date, subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Assets to the Buyer free and clear of all liens, claims and encumbrances, including without limitation mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, and conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein (including notices or other registrations in respect of any of the foregoing) affecting title to the Assets or any part thereof or interest therein as permitted under section 363(f) of the Bankruptcy Code (collectively, "Liens"), subject to the Permitted Exceptions with such Liens to attach to the proceeds of sale, on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES, except as expressly set forth in section 13.1 of this Agreement: a) Quitclaim Deed (the "Deed") conveying the Property to Buyer, which shall be free and clear of all Liens in accordance with Section 363(f) of the Bankruptcy Code, and subject to the Permitted Exceptions, and such other matters as approved by Buyer, whose approval shall not be unreasonably withheld, conditioned or delayed; and b) Bill of Sale (the "Bill of Sale") transferring all right, title and interest of

Seller in and to the Tangible Personal Property to Buyer, which shall be free and clear of all Liens in accordance with Section 363(f) of the Bankruptcy Code.

iv.   **Deposit**.  Upon execution of this Agreement by the Buyer and Seller, Buyer shall have deposited the sum of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00) equal to ten percent (10%) of the Purchase Price with Chicago Title Insurance Company (the "<u>Deposit Agent</u>"), in the form of a Federal Reserve System wire-transfer of immediately available funds, to be held in escrow, as Buyer's initial deposit under this Agreement (the "<u>Deposit</u>"), which Deposit shall be held without interest and shall be applied against the Purchase Price at Closing, or (a) returned to Buyer, (as its sole and exclusive remedy), if  (i) the Sale Order is not entered  (ii) this Agreement is not approved by the Bankruptcy Court; (iii) Seller accepts a Competing Bid (as defined below) and such transaction closes; (iv) after written notice and a 14 day cure period (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), Seller breaches the terms of this Agreement in any material respect; (v) the conditions set forth in Section 9 are not satisfied as of the Closing Date or waived by the Buyer; or (v) required in accordance with Section 11.1 or Section 15, provided, however, that nothing herein shall limit or modify Buyer's entitlement, if any, to payment of the Break-Up Fee in accordance with Section 8.4 hereof; or (b) paid to Seller if Buyer breaches the terms of this Agreement or the conditions set forth in Sections 10.2 or 10.3 are not satisfied as of the Closing Date. In the event of such return of the Deposit this Agreement shall terminate and the parties shall be released from any further rights or obligations hereunder except for those which expressly survive termination.

v.   **Purchase Price**.  The purchase price for the Assets shall be Thirty-Two Million and No/100 Dollars ($32,000,000.00) (the "<u>Purchase Price</u>").  At the Closing, Buyer shall pay to Seller the Purchase Price (less the Deposit), and without any other setoff or prorations, by wire transfer of immediately available funds to such account(s) as Seller shall designate.  This is an "All Cash" transaction that is not subject to any financing, other contingencies, or post contract due diligence.

vi.   **Title**.  <u>Commitment for Title Insurance</u>.  Seller and Buyer acknowledge receipt of that certain title commitment Order No. 6754332 Revision No. 6 with Commitment Date  September 27, 2018(the "<u>Title Commitment</u>") issued by Greenberg Traurig, P.A. (the "<u>Title Agent</u>"), as agent for Chicago Title Insurance Company (the "<u>Title Company</u>"), binding the Title Company to issue at Closing an Owner's Policy of Title Insurance pursuant to Section 7.2 insuring the marketability of the title to the Property (ALTA Form B) in the full amount of the Purchase Price, subject to (i) easements, covenants, restrictions, declarations, agreements of record, (ii) laws, regulations, resolutions or ordinances, including, without limitation, building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Property currently or hereinafter imposed by any governmental or quasi-governmental body or authority, including claims associated with construction non-conformities by the

Town of Palm Beach or City of West Palm Beach (iii) imperfections of title or encumbrances which, individually or in the aggregate, do not have a material adverse effect on the Property, (iv) other exceptions, defects, state of facts, and other matters affecting title to the Property as set forth on Exhibit "C" to the APA, (v) any exceptions caused by Buyer, its agents, representatives or employees, and (vi) any other matters affecting title to the Property reasonably acceptable to Buyer whose acceptance will not be unreasonably withheld, conditioned or delayed (the "Permitted Exceptions").   Seller and Buyer further acknowledge receipt of all instruments referenced in Schedule B of the Title Commitment. Buyer shall have the right to (a) object to any new exceptions from the last date of the Title Commitment until the Closing Date which exceptions render title unmarketable in accordance with the standards adopted by The Florida Bar and are not Permitted Exceptions ( a "New Exception") (b) defer Closing up to thirty (30) days ("Outside Date") until such New Exception(s) are deleted or otherwise remedied to the satisfaction of Buyer in its reasonable discretion, and, (c) in the event that such New Exception(s) are not deleted or otherwise remedied to the reasonable satisfaction of Buyer prior to the Outside Date, Buyer may elect to waive such New Exception(s) and proceed to Closing without further claim against Seller and in which case such New Exceptions shall be deemed Permitted Exceptions or Buyer may terminate this Agreement (other than Buyer's obligations under any provision of this Agreement which, by its terms, is to survive termination), and receive the return of the Deposit, which shall operate to release Seller from any and all liability hereunder. Seller shall have no obligation to cure or take corrective action or otherwise incur any expense to remove any New Exception.   Owner's Policy of Title Insurance.   At Closing, the Title Agent shall issue to Buyer, on behalf of the Title Company, at Buyer's expense, a marked commitment or proforma Owner's Policy of Title Insurance (the "Title Policy") covering the Property, in the full amount of the Purchase Price, subject to the Permitted Exceptions.  Buyer shall accept title subject to the Permitted Exceptions.  Seller shall not be obligated to cause the Title Agent to omit any Permitted Exception.  Survey.  Seller and Buyer acknowledge receipt of that certain survey prepared by Wallace Surveyors, dated February 5, 2014, last updated on January 9, 2018, Job No. 11-1284.11 ("Survey").  Buyer at Buyer's expense may elect to have the Survey updated and/or recertified prior to Closing if the updated Survey reveals any material encroachment which renders title unmarketable, same shall be treated as a New Exception as set forth in Section 7.1 above.   Seller shall not be obligated to cure or take corrective action or otherwise incur any expense with respect to any matters reflected on the Survey or any updates thereto.

vii.   **Bankruptcy Court Approval, Competing Transactions, Backup Bid and Break-Up Fee**.

   a.   Bankruptcy Court Approval.   Seller shall use commercially reasonable efforts to obtain the Sale Order from the Bankruptcy Court approving the sale of the Assets to Buyer pursuant to this Agreement, which shall contain the following provisions: a) a finding that Seller prepared and served a motion seeking the Sale Order, and such motion and notice were proper and

sufficient as to all parties entitled thereto, and that all parties in interest entitled to such notice received such notice; b) the sale and transfer of the Assets to the Buyer is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code; c) the sale of the Assets to Buyer pursuant to this Agreement will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds; d) Buyer is not a mere continuation of Seller, there is no continuity of enterprise between Seller and Buyer, Buyer is not a successor to Seller and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or de facto merger of Buyer and Seller; e) Buyer has acted in good faith within the context of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code; f) the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code; g) Buyer is not assuming or acquiring any of the Excluded Assets; h) all Persons who are listed as a creditor in the Seller's bankruptcy schedules or filed a proof of claim in the Seller's bankruptcy case before the entry of the Sale Order, or that otherwise received actual or constructive notice of the relief sought in the sale motion including, without limitation, as a result of publication by the Debtor of notice of the proposed sale free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds in the *Palm Beach Post* not less than once per week for two consecutive weeks, are enjoined from in any way pursuing the Buyer or the Assets by suit or otherwise to recover on any Liens which they may have against Debtor or the Assets as of the Closing Date; and i) the Sale Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(h).

b.  Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids other than from Buyer pursuant to procedures approved by the Bankruptcy Court (each a "Competing Bid").  From the date hereof (and any prior time) and until the completion of the auction contemplated hereby or as otherwise directed by the Bankruptcy Court, Seller is permitted to cause its respective representatives to initiate contact with, solicit or encourage submission of any inquiries proposals or offers by, any Person (in addition to Buyer and its affiliates, agents and representatives) in connection with any sale or other disposition of the Assets.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Assets and perform all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Assets to prospective buyers.

c.  Backup Bid.  In the event any Person other than Buyer is either the successful bidder at the conclusion of the Auction or the Bankruptcy Court has entered a Sale Order approving the sale of all or substantially all of the

Assets to any Person other than Buyer, Buyer shall be deemed a backup bidder (the "Backup Bidder") and this Agreement shall be enforceable until a Closing with a Person other than Buyer shall occur. Accordingly, in accordance with this Section 8.3 and Section 5.1, the Deposit Agent shall retain the Deposit and not refund to Buyer until a Closing takes place with a Person other than Buyer.

d. Break-Up Fee. In the event Buyer is not in default hereunder and has not terminated this Agreement pursuant to the terms hereof and is ready, willing, and able to close on the purchase of the Assets, if Seller accepts an offer to sell all or any portions of the Assets to another buyer ("Alterative Buyer"), which sale is approved by the Bankruptcy Court in the Bankruptcy Case, and such transaction closes and the Buyer is not the Backup Bidder, then Seller agrees that Buyer shall be entitled to receive Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) as a break-up fee to reimburse Buyer for the value of its time, costs, and expenses incurred in connection with this transaction, including Buyer's agreement to serve and participate as the "stalking horse" bidder under the Sale Procedures Order (the "Break-Up Fee"). The Break-Up Fee shall be entitled to status as a super-priority administrative expense and shall be secured by a lien on the deposit of the Alternative Buyer or the closing proceeds in the event the transaction with the Alternative Buyer closes, and, except in the event of a credit bid, shall be paid solely and exclusively from such forfeited deposit or closing proceeds. Any sums becoming payable to Buyer pursuant to this Section 8.4 shall be paid to Buyer promptly after the closing with any such Alternative Buyer approved in the Bankruptcy Case or, if applicable, promptly after the deposit on such transaction is forfeited.

e. Bid Protection. If Buyer has not terminated or materially breached this Agreement, Seller agrees not to accept any offers from Alternative Buyer(s) unless such offer exceeds the Purchase Price by at least Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "Overbid Protection").

viii. **Conditions to Obligations of Buyer**. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer in its sole discretion: a) a Sale Procedures Order shall have been entered by the Bankruptcy Court on or before October 16, 2018, or as soon as reasonably practicable following the sale procedures hearing, subject to the Bankruptcy Court's availability, in a form reasonably acceptable to Buyer, whose approval will not be unreasonably withheld, conditioned or delayed and which shall, among other things, approve this Agreement, the Break Up Fee, and the Overbid Protection; b) the Sale Order shall have been entered by the Bankruptcy Court on or before December 7, 2018, or as soon as reasonably practicable following the sale hearing, subject to the Bankruptcy Court's availability; c) the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though

made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement; d) Seller shall have delivered to Buyer the deliverables set forth in Section 11.3; and If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under Section 16 and any other provision of this Agreement that expressly provides for such survival.

ix.    **Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller: a) the Sale Order shall have been entered by the Bankruptcy Court; b) the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default under the provisions of this Agreement; d) Buyer shall have paid to Seller the Purchase Price (subject to the deduction set forth in Section 6) and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing; and e) Seller shall have entered into (i) the Conditional Settlement Agreement between Seller and the Town of Palm Beach, a municipal corporation (the "Town") in settlement of certain code enforcement actions pending against Seller and (ii) the Conditional Settlement Agreement between Seller and the Town of Palm Beach Code Enforcement Board (the "Enforcement Board") in settlement of certain violation assessments imposed against the Property; such agreements shall be substantially in the form attached hereto as <u>Composite Exhibit "E"</u> (collectively, the "Settlement Agreements"), together with such other and further changes as Seller may determine are necessary or appropriate provided same shall not impose any additional material financial obligations on Buyer which are not reflected in the Settlement Agreements attached hereto and the Settlement Agreements shall be approved by the Bankruptcy Court. The Settlement Agreements shall result in payment obligations to the City and Code Enforcement Board not to exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) which shall be binding upon the Property and shall be paid by Buyer.

x.    **Closing**.  Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place on or before twenty (20) calendar after the Sale Order is entered and becomes final and non-appealable (the "<u>Closing Date</u>").  The Seller and Buyer may agree in writing to proceed to Closing at an earlier date provided that the Sale Order contains a waiver of the 14-day stay period in accordance with Fed. R. Bank. P. 6004(h). Notwithstanding anything herein to the contrary, if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved.  If such postponement is longer than sixty (60) days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case Seller shall return the Deposit to Buyer and neither

Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.  Closing shall be conducted through an escrow arrangement by the Title Company (the "Closing Agent"). Closing shall take place at the offices of Closing Agent  (or such other place as the Parties may designate in writing).   Each Party shall deliver written closing instructions to the Closing Agent consistent with the provisions of this Agreement. At the Closing, Seller shall deliver to Buyer:  (a) the transfer instruments provided for in Section 3; (b) Seller's executed countersignature to the closing statement contemplated in Section 11.4(c) below; (c) a FIRPTA Affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act; (d) such other documents as Buyer or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement; and (e) possession and occupancy of the Property and possession of the Tangible Personal Property.  At the Closing, Buyer shall deliver to Seller: (a) the Purchase Price as provided in Section 6; (b) the transfer instruments provided for in Section 3; (c) a closing statement between Seller and Buyer, reflecting the Purchase Price, the Deposit and all closing costs and other expenses, and (d) such other documents as Seller or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement.  Buyer shall pay, on the Closing Date, all costs of Closing, including, without limitation, the cost of recording the deed and state documentary stamps which are required to be affixed to the instrument of conveyance, the cost of all title examination, lien searches, title commitment, and the issuance of the title insurance policy premium for any owner's title insurance policy (and any loan policy) obtained by Buyer or its lender (if applicable), all costs of any inspections, examinations, reports, and/or Survey updates, or new surveys undertaken by Buyer or on Buyer's behalf, all settlement fees charged by the Person conducting the Closing, the cost of recording any corrective documents, and all other costs and charges of Closing.  Buyer shall also assume and pay any and all costs which are required to be paid to the Town or the Code Enforcement Board under the Settlement Agreements.   Each Party shall pay its own attorneys' and other professionals' fees.

xi.    **Prorations**.  Real property taxes and assessments for the tax year in which the Closing occurs shall be paid by Buyer, except that Buyer shall be entitled to receive a closing credit for 2018 taxes in the amount of FIFTY THOUSAND DOLLARS ($50,000.00). All utility bills shall be apportioned between Buyer and Seller as of the Closing Date, with the Seller's portion of such utility bills being reduced from the Purchase Price as contemplated in Section 6.  If final documentation of any such item is not available at the Closing, the required proration shall be made on the basis of the best available documentation.  Except as contemplated in Section 12.1 of the APA, there shall be no offset, reduction in closing proceeds, or proration of any kind.  Buyer shall be responsible for transferring any and all public utilities on the Closing Date. The Parties agree that, after the Closing Date, each shall hold and shall promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements or other property that they may receive on or after the Closing Date which properly belong to the

other Party, including any insurance proceeds, and shall account to the other for all such receipts.

xii.  **Default and Remedies**.  If the Closing fails to occur because of a default or material misrepresentation or breach of warranty by Buyer, Seller shall have the right to terminate this Agreement by notice to Buyer, and be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property.  In any such event, the parties shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.  If the Closing fails to occur because of a default by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, with 14 days written notice and cure period to Seller (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), then Buyer shall have the right to terminate this Agreement by notice to Seller and Buyer shall be entitled to, as its exclusive remedy, receive a return of the Deposit.

xiii.  **Broker and Broker Commission**.  The Broker is Cushman & Wakefield U.S., Inc. (the "Broker"), subject to Bankruptcy Court approval of the listing agreement [ECF No. 19] (the "Listing Agreement"), a copy of which is attached as Exhibit "D" to the APA.  In accordance with the Listing Agreement, to the extent the Closing occurs, the Broker's fee (the "Commission") in connection with the Closing shall be one and one-half percent (1.5%) of the Purchase Price, but in no event shall exceed FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000.00).  The Commission earned by Broker shall be a cost of sale payable by Buyer at Closing in addition to, and not as part of the Purchase Price, in accordance with the Listing Agreement.  To the extent Closing occurs hereunder, upon Closing, Buyer shall pay the Commission to Broker on Seller's behalf in addition to, and not as part of the Purchase Price.  Except with respect to any Commission due and owing to the Broker and otherwise pursuant to the Listing Agreement, Seller shall not be responsible for any broker's commissions.  Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming through the Buyer, and indemnify and hold the Seller harmless against any and all liability, loss, cost, damage and expense (including, but not limited to, attorneys' fees) Seller shall incur because of any claim by any broker or agent, other than a claim by the Broker, claiming to have dealt with the Buyer, whether or not meritorious, for any commission or other compensation with respect to this Agreement or to the purchase and sale of the Property in accordance with this Agreement.  The provisions of this Section shall survive the Closing and any termination of this Agreement.

## RELIEF REQUESTED

**A.    Approval of Bidding Procedures and Terms of Sale.**

7.    In order to ensure that the maximum value is received for the Property, the proposed sale will be to the highest and best bidder at auction.  The Debtor seeks to adopt procedures which will foster competitive bidding among potential buyers, without eliminating or discouraging any qualifying bids.  In connection therewith, the Debtor requests that the Court approve the following bidding and sale procedures, which the Debtor believes are likely to maximize the realizable value of the Property (the "Sale Procedures"):

    i.    Participation Requirements:  Unless otherwise ordered by the Court, in order to participate in the bidding process, an interested bidder must:

        a.    (a) wire into the trust account of Greenberg Traurig, P.A., an escrow deposit of ten percent (10%) of the Purchase Price no later than **5:00 p.m. on October 30, 2018** (the "Bid Deadline");

        b.    (b) submit to the Broker, Shraiberg, Landau & Page, P.A. and Greenberg Traurig, P.A. on or before the Bid Deadline: (A) a fully executed asset purchase agreement substantially in the form of the APA to be provided by the Debtor (the effectiveness of such APA being contingent only upon the Qualified Bidder becoming the Successful Bidder pursuant to these procedures, subject only to Bankruptcy Court approval, with no due diligence or financing contingencies), with a purchase price of not less than Thirty Two Million Five Hundred Thousand and No/100 ($32,500,000.00), and (B) a black-lined version of the APA to show any changes made by such bidder; provided that, an APA with any material changes may be rejected by the Debtor in its sole business judgment; and

        c.    (c) submit to the Broker and Shraiberg, Landau & Page, P.A. on or before the Bid Deadline such financial disclosures and documentation which demonstrate, in the Debtor's sole business judgment, the potential bidder's financial and other capabilities to consummate the sale.

A person who timely complies with these requirements shall have submitted a "Qualified Bid" and shall be deemed a "Qualified Bidder".  The list of Qualified Bidders will not be shared with anyone prior to the Auction.  The Stalking Horse Bidder shall be deemed a Qualified Bidder.

    ii.    Waiver of Conflicts: Any person who has submitted a Qualified Bid shall be deemed to have waived any right to claim there is a conflict with respect to an

unrelated transaction for which such person has employed the law firm of Greenberg Traurig, P.A., and the Debtor's employment of Marcia H. Langley and the law firm of Greenberg Traurig, P.A. as real estate transaction counsel and title agent for the sale of the Property and related transactions contemplated herein.

iii.   Auction:  In the event the Debtor receives a timely Qualified Bid, the Debtor will conduct an auction (the "Auction").  The Auction shall take place on **November 5, 2018 beginning at 2:00 p.m.,** at the United States Bankruptcy Court, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, Courtroom B, West Palm Beach, Florida 33401, subject to the Court's availability, or such other time or place as the Debtor shall notify the Qualified Bidders.  In the event the Debtor does not receive a timely Qualified Bid, the Debtor will seek final approval of the sale to the Stalking Horse Bidder at the Sale Hearing on November 5, 2018.

iv.   Auction Procedures:  At the Auction, the Debtor will identify the Qualified Bid which shall serve as the opening bid.

   a.   All Qualified Bidders shall be entitled to make any subsequent bids in increments of not less than $50,000 (a "Subsequent Bid").  Bidding at the Auction shall continue until such time as the highest or best offer is determined by the Debtor in the exercise of its sole business judgment.  The Debtor reserves the right to modify the bidding increments or announce at the Auction additional procedural rules for conducting the Auction in its sole business judgment.

   b.   For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Bidder), the Debtor will, at each round of bidding, give effect to the Break-Up Fee that may be payable to the Stalking Horse Bidder under the APA.

   c.   Each Qualified Bidder's offer shall be irrevocable until the selection of the Successful Bidder and, if applicable, the Back-Up Bidder (as set forth in the APA), provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the of closing of the sale to the Successful Bidder or the Back-Up Bidder.

v.   Broker's Commissions:  All broker commissions shall be in accordance with the terms and conditions of the Broker Engagement Order.  Other than as set forth in the Broker Engagement Order, the Debtor's bankruptcy estate shall not be liable for any commissions.

vi.   Successful Bid:  After the conclusion of the Auction, the Debtor shall submit the highest or best bid that has been accepted (the "Successful Bid") for approval by the Bankruptcy Court at the United States Bankruptcy Court, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, Courtroom B, West Palm Beach, Florida 33401 on **November 5, 2018** following the Auction (the "Sale Hearing").

The Qualified Bidder who has the Successful Bid presented for approval to the Court shall be referred to as the "<u>Successful Bidder</u>."

vii.  <u>Closing Date</u>. The closing of the transaction (the "<u>Closing</u>") shall take place on or before twenty (20) calendar days after the order approving the sale is entered (the "<u>Sale Order</u>") and becomes final and non-appealable (the "<u>Closing Date</u>"), subject to the terms of the APA.  The Successful Bidder must be prepared and must in fact consummate the purchase of the Assets in accordance with the APA.

viii.  <u>Back Up Bid</u>.  Upon the failure of the Successful Bidder to consummate the closing of the purchase of the Assets because of a breach or failure on the part of the Successful Bidder, then the Debtor may elect in its business judgment to close with the next highest or otherwise best Qualified Bidder to be the Successful Bidder (the "<u>Back Up Bidder</u>").  At the Sale Hearing, the Debtor intends to seek approval from the Court for the next highest or best bid (the "<u>Back Up Bid</u>"), which approval shall authorize the Debtor to consummate the Back Up Bid immediately after a default under the Successful Bid without further order of the Court.  Promptly following the conclusion of the Sale Hearing, the Debtor shall return the deposits to each unsuccessful Qualified Bidder (except the Back Up Bidder whose deposit shall either be returned upon the closing of the sale to the Successful Bidder or applied to the purchase price in a closing with such Back Up Bidder).

ix.  <u>As is/where is:</u>  The Assets will be sold in its "as is", "where is" condition and with all faults, with no guarantees or warranties, express or implied.

x.  <u>Credit Bidding:</u> Subject to the limitations requested by the Debtor discussed below and ordered by the Court, only holders of allowed valid secured claims (that are otherwise Qualified Bidders) are permitted to credit bid at the Auction; <u>provided that</u>, in the event any person submits a permitted credit bid and is the Successful Bidder and/or Back Up Bidder, such person shall provide for the payment of the Break-Up Fee, and any commission due to the Broker, in cash on the Closing Date. No party shall be permitted or entitled to credit bid, or attempt to credit bid, any alleged obligation of the Debtor that the Debtor asserts constitutes, or will constitute at some point, a contingent, unliquidated or disputed claim against the Debtor.  The Debtor reserves all rights to contest the propriety of any credit bid pursuant to § 363(k) and § 105 of the Bankruptcy Code.

xi.  <u>Sale Hearing:</u>  The Debtor requests that a final Sale Hearing be scheduled to be held immediately following the Auction on **<u>November 5, 2018</u>**.

**B.    Form and Manner of Notice of Sale Procedures and Sale.**

8.    Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing.  The Debtor has served or

will serve the Motion on the Debtor, all creditors and the Office of the United States Trustee.  In addition, the Debtor will serve upon all creditors and interested parties the Order granting the Motion (the "Sale Procedures Order"), in a form substantially as attached hereto as **EXHIBIT 2**, which shall set forth among other things, the Sale Procedures, and the time, date and place of the Auction and Sale Hearing.

9.      Further, as required under the APA, the Debtor will publish notice of the proposed sale free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds in the *Palm Beach Post* not less than once per week for two consecutive weeks.  Such publication notice will set forth the time, date and place of the Auction and Sale Hearing.

**C.      Approval of Break-Up Fee.**

10.      To compensate the Stalking Horse Bidder for serving as the "stalking horse," thereby subjecting its bid to higher or better offers, the Debtor seeks authority to pay the Break-Up Fee in the amount of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) if the Stalking Horse Bidder is not the Successful Bidder.

11.      The ability of the Debtor to offer the Stalking Horse Bidder the Break-Up Fee benefits the estate because it affords the Debtor the means necessary to induce the Stalking Horse Bidder to submit its bid prior to the Auction, and thereby establish a "floor" and appropriate parameters for the submission of Qualified Bids in connection with the Auction.  Thus, even if the Stalking Horse Bidder is paid the Break-Up Fee because it is not the Successful Bidder, the estate will have benefited from the higher floor established by the Stalking Horse and the certainty that such bid brings to the sale process.  Approval of break-up fees, expense reimbursements and other forms of bidding protection in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code therefore has become an established practice in bankruptcy cases.

*See, e.g., In re Gemini Cargo Logistics, Inc.,* No. 0610870 (Bankr. S.D. Fla. Apr. 17, 2006); *In re Piccadilly Cafeterias, Inc.,* No. 03-27976 (Bankr. S.D. Fla. Sept. 14, 2004).

12.     Moreover, the amount of the Break-Up Fee is approximately 1.09% of the Purchase Price and is consistent with and/or below the range of break-up fees approved by Courts in this District and otherwise. *See In re Protective Products of America, Inc., et al.*, No. 10-10711-JKO (Bankr. S.D. Fla. Jan. 19, 2010) (approving 4% break-up fee and expense reimbursement); *In re Arch Aluminum & Glass Co., Inc.*, 2009 WL 8189448 (Bankr. S.D. Fla. 2009) (approving 1.5% break-up fee plus expense reimbursement up to $800,0000); *In re Tousa, Inc., et al.,* Case No. 08-10928-JKO (Bankr. S.D. Fla. Dec. 21, 2009) (approving 3% break-up fee).

13.     The Debtor believes, in its business judgment, that the Break-Up Fee is reasonable and appropriate in view of, among other things, the size and nature of the transaction contemplated by the APA.  Moreover, the Break-Up Fee was a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the APA.  Accordingly, the Debtor requests that the terms of the APA relating to the Break-Up Fee be approved.

**D.      Sale of Property Free and Clear of Liens, Claims and Encumbrances.**

14.     Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor seeks to sell the Assets to the highest or best bidder following the Auction, free and clear of all liens, claims and encumbrances.

15.     The Debtor seeks the entry of an Order, substantially in the same form as the proposed order attached hereto as Exhibit 2, authorizing the Debtor to sell and convey the Assets free and clear of the Liens, including but not limited to with respect to the interests held by the following parties:

> i.      Palm House LLC, by reason of being the sole member of 160 Royal Palm LLC, and by reason of Palm Beach County Circuit Court Case No. 15-14228;

ii.   Ryan Black, by reason of any interest in 160 Royal Palm LLC, by reason of Palm Beach County Circuit Court Case No, 14-12824, and by reason of Palm Beach County Circuit Court Case No. 15-14228;

iii.  Gerry Matthews, by reason of any interest in 160 Royal Palm LLC, by reason of Palm Beach County Circuit Court Case No, 14-12824, and by reason of Palm Beach County Circuit Court Case No. 15-14228;

iv.   Robert V. Matthews, by reason of any interest in 160 Royal Palm LLC;

v.    Joseph J. Walsh, Sr., by reason of any interest in Palm House Hotel LLLP;

vi.   KK PB Financial LLC, a Florida limited liability company, by reason of the Florida Real Estate Mortgage, Assignment of Leases and Rents and Security Agreement recorded in Official Records Book 26694, Page 1420; and Foreclosure Case 14-11203;

vii.  Palm House Hotel, LLLP, a Florida limited liability company, by reason of the Mortgage and Security Agreement recorded in Official Records Book 27103, Page 129; and Case 14-14382 and Case 15-14480;

viii. James F. Biagi, P.E., by reason of Default Final Judgment filed in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, under case No. CACE 15-005370 (08) recorded in Official Records Book 27660, Page 1139;

ix.   Richard's Woodwork, Inc., a/k/a RFW Cabinetry and Millwork, a Florida profit corporation, by reason of Final Judgment on Default for Plaintiff filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA004303 AB, recorded in Official Records Book 27702, Page 1461;

x.    David Campanaro by reason of Final Judgment filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA005120XXXMBAF, recorded in Official Records Book 28122, Page 196;

xi.   Place For Tile, Inc., by reason of Final Default Judgment Against Defendant 160 Royal Palm, LLC, filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA002935XXXXMB, recorded in Official Records Book 28517, Page 1307 and in Official Records Book 29606, Page 1097;

xii.  TWG Enterprises Waterproofing & Painting, Inc., by reason of Final Judgment filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA012471XXXXMB, recorded in Official Records Book 28038, Page 734;

xiii.   Van Linda Iron Works, Inc., a Florida corporation, by reason of Amended Default Final Judgment filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA013194XXXMB, recorded in Official Records Book 28140, Page 1634;

xiv.   New Haven Contracting South, Inc., by reason of Final Default Judgment Against Defendant 160 Royal Palm, LLC, filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA013244XXXXMB, recorded in Official Records Book 28877, Page 790;

xv.   Architectural Precast & Foam, LLC, by reason of Final Judgment of Foreclosure After Default recorded in Official Records Book 28560, Page 1512, and by reason of Final Judgment for Attorney's Fees and Costs recorded in Official Records Book 28560, Page 1510, and by reason of Consent Final Judgment for Post-Judgment Attorney's Fees and Costs Pursuant to Fla. Stat. 57.115 recorded in Official Records Book 28935, Page 975, all under case No. 2015CA014459XXXXMB, in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida;

xvi.   Xpert Elevator Services, Inc., by reason of the Claim of Lien Renewal recorded in Official Records Book 29442, Page 819, which renewed that certain Claim of Lien Renewal recorded in Official Records Book 28682, Page 78, which renewed that certain Claim of Lien Renewal recorded in Official Records Book 27916, Page 492, which renewed that certain Claim of Lien recorded in Official Records Book 27194, Page 1278;

xvii.   Securities and Exchange Commission by reason of United States District Court, Southern District of Florida, West Palm Beach Division Case No. 18-81038;

xviii.   Edward A. Marod, Esq., attorney for Lan Li, et al, interested parties, as more particularly set forth in the Notice of Appearance and Request for Service in United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division Case No. 18-19441, Docket Entry 31.; and as identified in action pending in U.S. District Court Case No. 16-81871;

xix.   Maria Titova, as purported member of Palm House Hotel LLLP, the holder of a mortgage encumbering the subject property, per Palm Beach County Circuit Court Case No. 16-12723;

xx.   Palm Beach County by reason of action by 160 Royal Palm LLC against Palm Beach County seeking extension of development permits in Palm Beach County Circuit Court Case No, 12-23613; and

xxi.   Daniel Gorman, as to any interest disclosed by Memorandum of Understanding Agreement recorded in Official Records Book 27522 Page 958.

16.     The Debtor requests that the Order further provide that the Liens shall attach to the proceeds of the sale of the Assets in the order of their priority, with the validity, force and effect that they had as of the Petition Date, if any, against the Assets, subject to the rights, claims, defenses and objections of the Debtor and all interested parties with respect to such liens, so that the purchaser of the Assets shall take the Assets free of all the Liens.

17.     Section 363(f) of the Bankruptcy Code authorizes the Debtor to sell property of the estate free and clear of any liens, claims or encumbrances if one of the following is met: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  The language of Section 363(f) is in the disjunctive, so that a sale free and clear of interests can be approved if any of the aforementioned conditions is met.  *In re Heine*, 141 B.R. 185, 189 (Bankr. D.S.D. 1992); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

18.     Based on review of available information, the Debtor believes that the anticipated undisputed and allowed aggregate value of all liens, claims and encumbrances on the Property will be less than the Purchase Price, and the Purchase Price will exceed the aggregate value of all liens on the Property.  As will be set forth in the *Debtor's Motion to Limit Credit Bids with Respect to Sale of Substantially All of its Assets*, the largest alleged secured claims are subject to significant dispute.  Therefore, the sale should be approved, at a minimum, pursuant to Section 363(f)(3) of the Bankruptcy Code.

17.     The Debtor will have provided notice of the sale and the Sale Procedures to all creditors and interested parties and the Broker will have extensively marketed the Assets.  The Debtor submits that as a result of the Auction, the sale will be for a fair and reasonable market

price and, of course, conducted in good faith.  In connection therewith, the submits that Stalking Horse Bidder (or the Successful Bidder) will have acted in good faith and therefore the Debtor requests that the Sale Order provide appropriate findings and protections pursuant to Section 363(m) of the Bankruptcy Code.

18.     Collectively, these factors clearly evidence that the Debtor's proposed sale of the Property to the highest and best bidder at auction, without any further delay, is in the best interest of all creditors of the estates.

**E.     Limitations on Credit Bids.**

17.     As will be set forth in the *Debtor's Motion to Limit Credit Bids with Respect to Sale of Substantially All of its Assets*, the Debtor seeks to restrict the ability of certain alleged secured creditors to credit bid during the Auction.

**F.     Waiver of Stay Period Pursuant to Fed. R. Bankr. P. 6004(h).**

18.     To the extent necessary, the Debtor requests that the Court waive the 14 day stay period pursuant to Fed. R. Bankr. P. 6004(h).

**G.     Scheduling Auction and Final Hearing on Sale Motion.**

19.     The Debtor requests that the Court set the Auction on November 5, 2018, and schedule the Sale Hearing to consider final approval of the sale of the Assets immediately following the Auction on November 5, 2018.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order substantially in the same form as the order attached hereto as Exhibit 2: i) granting the Motion, ii) authorizing the Debtor to schedule an auction sale of the Property, iii) approving the Sale Procedures and Break-Up Fee in connection with auction sale, iv) approving the form and manner of notice of sale, v) scheduling the Auction and Sale Hearing, vi) approving the sale of the Debtor's

interest in the Assets, free and clear of the Liens as set forth herein, and vii) granting the Debtor such other and further relief as is proper.

Respectfully submitted,

SHRAIBERG, LANDAU, & PAGE, P.A.
Attorney for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
blee@slp.law
plandau@slp.law

By: */s/ Bernice C. Lee*_____
        Philip J. Landau
        Florida Bar No. 504017
        Bernice C. Lee
        Florida Bar No. 0073535

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing to those parties registered to receive electronic filings in this case and by First Class U.S. Mail to the parties on the attached Service List and Matrix on October 1, 2018.

*/s/ Bernice C. Lee*_____
        Bernice C. Lee

## SERVICE LIST

The Palm House, LLC
1010 Pennsylvania Ave
9
Miami Beach, FL 33139

The Palm House, LLC
1010 Pennsylvania Ave
9
Miami Beach, FL 33139

The Palm House, LLC
c/o Paul Varnava
1010 Pennsylvania Ave
Suite 9
Miami Beach, FL 33139

KK-PB Financial, LLC
13501 South Shore Blvd
Suite 103
Wellington, FL 33414

KK-PB Financial, LLC LLC
13501 South Shore Blvd
Suite 103
Wellington, FL 33414

KK-PB Financial, LLC
C/O Craig T. Galle
13501 South Shore Blvd
Suite 103
Wellington, FL 33414

Palm House Hotel, LLLP
9100 Belvedere Rd
# 207
Royal Palm Beach, FL 33411

Palm House Hotel, LLLP
1201 Hays St
Tallahassee, FL 32301

Palm House Hotel, LLLP
Corporation Service Company
1201 Hays St
Tallahassee, FL 32301-2525

James F. Biagi, Inc, P.E., P.S.
1915 Northeast 45th St
#107
Fort Lauderdale, FL 33308

James F. Biagi, Inc, P.E., P.S.
1915 Northeast 45th St
#107
Fort Lauderdale, FL 33308

James F. Biagi, Inc, P.E., P.S.
NRAI Services, Inc
1200 South Pine Island Rd
Plantation, FL 33324

Richard's Woodwork, Inc
1301 53rd St
#2
Mangonia Park, FL 33407

Richard's Woodwork, Inc
1301 53rd St
#2
Mangonia Park, FL 33407

Richard's Woodwork, Inc
Mesa & Pepin, LLC
3418 Poinsettia Ave
West Palm Beach, FL 33407

The Place for Tile, Inc
7957 Northwest 54 St
Doral, Fl 33166

The Place for Tile, Inc
7957 Northwest 54 St
Doral, Fl 33166

The Place for Tile, Inc
c/o David Mazor
7957 Northwest 54 St
Doral, Fl 33166

TWG Enterprises Waterproofing & Painting, Inc
605 Southeast 1st Ave
Suite G
Delray Beach, FL 33444

TWG Enterprises Waterproofing & Painting, Inc
605 Southeast 1st Ave
Suite G
Delray Beach, FL 33444

TWG Enterprises Waterproofing & Painting, Inc
c/o Todd W. Gallo
605 Southeast 1st Ave
Suite G
Delray Beach, FL 33444

Architectural Precast & Foam, LLC
P.O. Box 9944
West Palm Beach, FL 33419

Architectural Precast & Foam, LLC
c/o Brad Jenison
17549 Bridle Ln
Jupiter, FL 33478

New Haven Contracting South, Inc
Alan I. Armour, II, Esq
1645 Palm Beach Lakes Blvd
Suite 1200
West Palm Beach, FL 33401

Architectural Precast & Foam, LLC
3716A Interstate Park Rd N
Riviera Beach, FL 33404

Palm House, LLC
101 Casa Bendita
Palm Beach, FL 33480

Palm House, LLC
Leslie R, Evans, Esq., Registered Agent
214 Brazilian Ave
# 200
Palm Beach, FL 33480

{2234/000/00416869}

## SERVICE LIST

Gerry Matthews
161 Camp Rd
Middlebury, CT 06762

Robert Matthews
101 Casa Bendita
Palm Beach, FL 33480

Joseph J. Walsh, Sr.
South Atlantic Regional Center, LLC
9250 Belvedere Rd
Suite 101
Royal Palm Beach, FL, 33411

Maria Titova
Roman Groysman, Esq.
Law Offices of Roman Groysman, PA
101 Northeast 3rd Ave
Fort Lauderdale, FL 33301

Palm Beach County
Palm Beach County Finance Department
P.O. Box 3977
West Palm Beach, FL 33402-3977

Palm House, LLC
c/o Gerry Matthews, its Managing Member
134 Highland Ave
Waterbury, CT 06708

Ryan Black
3930 North Flagler Dr
# 202
West Palm Beach, FL 33407

Palm Beach County
Board of County Commissioners
Palm Beach County
301 North Olive Ave
West Palm Beach, FL 33401

Ryan Black
1469 South Pine Island Rd
Fort Lauderdale, FL 33328

Joseph Walsh, Sr.
197 South Federal Hwy
Suite 200
Boca Raton, FL 33432

Joseph J. Walsh, Sr.
9250 Belvedere Rd
Suite 101
West Palm Beach, FL 33411-3630

David Campanaro
143 NO Ivy St 11
Branford, CT 06405-6018

David Campanaro
339 Eastern St
New Haven, CT 06513-2463

Edward A. Marod
777 South Flagler Dr
Suite 500 E
West Palm Beach, FL 33401-6121

Xpert Elevator Services, Inc
Dean A. Beckemeyer, Registered Agent
17119 43rd Rd N
Loxahatchee, FL 33470

Xpert Elevator Services, Inc
550 Business Park Way
Bay #8
West Palm Beach, FL 33411-1743

Van Linda Ironworks, Inc
3787 Boutwell Road
Boynton Beach, FL 33435

Securities and Exchange Commission
801 Brickell Ave
Suite 1800
Miami, FL 33131-4901

Maria Titova
7400 Wisteria Ave
Parkland, FL 33076-3914

Daniel Gorman
277 Royal Poinciana Way
Palm Beach, FL 33480-4007

Daniel Gorman
506 North Lakeside Dr
Lake Worth, FL 33460-3119

Daniel Gorman
311 South M St
Lake Worth, FL 33460-4519

Daniel Gorman
631 Lucerne Avenue
Lake Worth, FL 33460

{2234/000/00416869}

Label Matrix for local noticing
113C-9
Case 18-19441-EPK
Southern District of Florida
West Palm Beach
Fri Sep 21 14:25:34 EDT 2018

160 Royal Palm, LLC
1118 Waterway Lane
Delray Beach, FL 33483-7156

Architectural Precast & Foam, LLC
c/o Cristopher S. Rapp, Esq.
Kelley Kronenberg, P.A.
1475 Centrepark Blvd.
Suite 275
West Palm Beach, FL 33401-7446

KK-PB Financial LLC
c/o Salazar Law
2000 Ponce de Leon Blvd., Penthouse
Coral Gables, FL 33134-4422

New Haven Contracting South, Inc
2240 Palm Beach Lakes Blvd
Suite 101
West Palm Beach, FL 33409-3403

Palm Beach County Tax Collector
c/o Orfelia M Mayor
POB 3715
West Palm Beach, FL 33402-3715

Town of Palm Beach
c/o Allen R. Tomlinson, Esq.
Jones, Foster, et al.
P.O. Box 3475
West Palm Beach, FL 33402-3475

Absolute Plumbing, LLC
917 N. Railroad Avenue
West Palm Beach, FL 33401-3303

Adam G. Heffner
1900 NW CORPORATE BLVD/ 301 W
Boca Raton, FL 33431-8502

Adam G. Heffner, Esquire
1900 N.W. Corporate Blvd.
Suite 301-West Building
Boca Raton, FL 33431-8502

Ali Adampeyra
UAE Dubai, downtown, Burj
Khalifa, Unit 5507
Iran

Ali Adampeyra
c/o Edward A. Marod
777 S. Flagler Drive, Ste. 500 E
West Palm Beach, FL 33401-6121

All Star Equipment
6701 Garden Rd #3
Riviera Beach FL 33404-5900

Alliance Contracting Group
3601 N Dixie Highway
Boca Raton, FL 33431-5929

Allied Interiors
6363 Edgewater Drive
Orlando, FL 32810-4711

Baoping Liu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Bei Zhu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Changyue Liu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Chengyu Gu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Chunning Ye
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Connect Auto, Inc.
550 Business Park Way
Suite 6
West Palm Beach, FL 33411-1743

Craig T. Galle, Esquire
The Galle Law Group
13501 South Shore Blvd., Suite 103
Wellington, FL 33414-7211

Cuilian Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Daniel A. Hershman, Esq.
2240 Palm Beach Lakes Blvd.
Suite 101
West Palm Beach, FL 33409-3403

Daqin Weng
c/o Edward Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

David Campanaro
c/o Gary Russo, Esq.
The Russo Law Firm
701 Northpoint Parkway, Suite 315
West Palm Beach, FL 33407-1987

David W. Gorman
631 Lucerne Avenue
Lake Worth, FL 33460-3820

Dongsheng Zhu
c/o Edward Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Feng Guo
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Fernando Wong Outdoor Living Design, Inc
1500 Bay Road, Suite 600
Miami Beach, FL 33139-3220

Florida Department of Revenue
P.O. Box 6668
Tallahassee, FL 32314-6668

Garry Russo, Esquire
The Russo Law Firm
701 Northpoint Parkway, Suite 315
West Palm Beach, FL 33407-1987

HUFCOR Inc. d/b/a HUFCOR Florida Group
1301 Central Park Drive
Sanford, FL 32771-6644


Halil Erseveen
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Hao Lou
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Henry B. Handler, Esquire
Weiss, Handler & Cornwell, P.A.
2255 Glades Road
Suite 218A
Boca Raton, FL 33431-7392


Henry Handler, Esquire
Weiss, Handler & Cornwell, P.A.
One Boca Plaza
2255 Glades Road, Suite 218-A
Boca Raton, FL 33431-7392

Hongru Pan
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Internal Revenue Service
Attn: Special Procedures
P.O. Box 34045
Stop 572
Jacksonville, FL 32202


Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

James F. Biagi PE
555 W Prospect Rd
Oakland Park FL 33309-3931

Jeffrey C. Pepin, Esquire
3418 Poinsttia Avenue
West Palm Beach, FL 33407-4804


John C. Randolph, Esquire
Jones, Foster, Johnson, & Stubbs, P.A.
Post Office Box 3475
West Palm Beach, FL 33402-3475

John C. Randolph, Esquire
Jones, Foster, Johnston & Stubbs, P.A.
Flagler Center Tower
505 South Flagler Drive, Suite 1100
West Palm Beach, FL 33401-5950

Jordana L. Goldstein, Esq.
150 South Pine Island Road., Suite 400
Plantation, FL 33324-2667


Jose D. Sosa, Esquire
Law Office of Jose D. Sosa, P.C.
712 US Highway One, 301-16
North Palm Beach, FL 33408

Juewei Zhou
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Junqiang Feng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121


KK-PB Financial LLC
13501 South Shore Boulevard
Suite 101
Wellington, FL 33414-7211

Kammerer Mariani PLLC
1601 Forum Place, Suite 500
West Palm Beach, FL 33401-8103

Kuang Yaoping
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121


Lan Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Landmark Construction Companies Inc
6555 Garden Rd
Riviera Beach FL 33404-6318

Li Dongsheng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121


Li Zhang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Lili Zhang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Ling Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121


Liyan Feng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

MPC Pools, Inc.
12720 Orange Grove Blvd.
West Palm Beach, FL 33411-8931

Macschmeyer Concrete Company of Florida,
c/o Naomi Stevenson
1142 Watertower Road
Lake Park, FL 33403-2397

McCabe Rabin
1601 Forum Place, Sutie 201
West Palm Beach, FL 33401-8101

McDonald Hopkins Co., LLC
Accounts Receivable
600 Superior Avenue, E
Suite 2100
Cleveland, OH 44114-2690

McIntosh & Schwartz, PL
888 Southeast Third Avenue, Suite 201
Fort Lauderdale, FL 33316-1159

Michael E. O'Connor, Esq.
111 SE 12th St.
Fort Lauderdale, FL 33316-1813

Michael T. Landen, Esquire
Kluger, Kaplan, Silverman, Katzen &
Levine, P.L.
201 S. Biscayne Blvd., 27th Floor
Miami, FL 33131-4332

Min Cui
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Min Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Mohammad Zargar
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Mohammadreza Sedaghat
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Moore Unique Interiors, Inc.
16889 West Secretariat Drive
Loxahatchee, FL 33470-4035

New Haven Contracting South, Inc.
638 Shore Drive
Boynton Beach, FL 33435-2850

Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Office of the US Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130-1614

Palm House Hotel, LLLP
197 S. Federal Highway, Suite 200
Boca Raton, FL 33432-4946

Paul Cleary d/b/a Cleary Plumbing Inc.
925 S. Military Trail D11
West Palm Beach, FL 33415-3976

Peter B. Rowell, Esquire
The Barthet Firm
200 S. Biscayne Blvd., Suite 1800
Miami, FL 33131-5333

Qingyun Yu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Qiong Deng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Qiongfang Zhu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Quality Concrete Pumping, Inc.
1842 NW 85th Drive
Coral Springs, FL 33071-6256

Ran Chen
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Reza Siamak Nia
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Richard's Woodwork, Inc.
1301
53rd St. #2
West Palm Beach, FL 33407-2244

Ruji Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Rujing Wei
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

SEC Headquarters
100 F Street, NE
Washington, DC 20549-2001

Sanaz Salehin
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Sara Salehin
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Securities and Exchange Commission
801 Brickell Ave., Suite 1800
Miami, FL 33131-4901

Sha Shi
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shahriar Ebrahimian
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shaoping Huang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shaoqing Zeng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shu Jiang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shuangyun Wang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

TWG Enterprises Waterproofing & Painting
c/o Adam G. Heffner, Esq.
1900 NW Corporate Blvd.
Suite 301-West Building
Boca Raton, FL 33431-8502

TWG Enterprises Waterproofing & Paintin
1900 N.W. Corporate Boulevard
Suite 301 - West Building
Boca Raton, FL 33431-8502

Tang Cheok Fai
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Tao Xiong
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

The Place for Tile, Inc.
7957 NW 54th Street
Miami, FL 33166-4027

Tingting Sun
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Tonghui Luan
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Town of Palm Beach
345 South County Rd.
Palm Beach, FL 33480-4443

US Attorney Southern District of Florida
500 East Broward Boulevard
Fort Lauderdale, FL 33394-3000

United States Attorney General's Office
US Department of Justice
950 Pennsylvania Avenue
Washington, DC 20530-0001

Van Linda Ironworks, Inc.
3787 Boutwell Road
Boynton Beach, FL 33435

Vivian Doris
155 Brazilian Ave.
Palm Beach, FL 33480-4221

Wallace Surveying Corporation
5553 Village Boulevard
West Palm Beach, FL 33407-7910

Wenhao Zhang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiang Chunhua
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiang Shu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiao Sun
c/o Edward Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiaonan Wang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiaoping Zhang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xpert Elevator Services, Inc.
550 Business Park Way, Bay #8
West Palm Beach, FL 33411-1743

Yajun Kang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yan Chen
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yawen Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yi Zhao
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Ying Fei
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

```
Ying Tan                         Yingjun Yang                     Yuanbo Wang
c/o Edward A. Marod              c/o Edward A. Marod              c/o Edward A. Marod
777 S. Flagler Drive             777 S. Flagler Drive             777 S. Flagler Drive
Suite 500E                       Suite 500E                       Suite 500E
West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121


Yulong Tang                      Zhaohui Li (Chaohui Li)          Zheng Yu
c/o Edward A. Marod              c/o Edward A. Marod              c/o Edward A. Marod
777 S. Flagler Drive             777 S. Flagler Drive             777 S. Flagler Drive
Suite 500E                       Suite 500E                       Suite 500E
West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121


Zhiling Gan                      Ali Adampeyra                    Baoping Liu
c/o Edward A. Marod              c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.
777 S. Flagler Drive             777 S Flagler Dr #500 E          777 S Flagler Dr #500 E
Suite 500E                       West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121
West Palm Beach, FL 33401-6121


Bei Zhu                          Changyue Liu                     Chengyu Gu
c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E          777 S Flagler Dr #500 E          777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121


Chunning Ye                      Cuilian Li                       Daqin Weng
c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E          777 S Flagler Dr #500 E          777 S Flager Dr #500 E
West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121


Dongsheng Zhu                    Eric S Pendergraft               Feng Guo
c/o Gunster, Yoakley & Stewart, P.A.   Shraiberg, Landau & Page, P.A.   c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E          2385 N.W. Executive Center Drive   777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121   Suite 300                        West Palm Beach, FL 33401-6121
                                 Boca Raton, FL 33431-8530


Halil Erseven                    Hao Lou                          Hongru Pan
c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E          777 S Flagler Dr #500 E          777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121


Juewei Zhou                      Junqiang Feng                    Kuang Yaoping
c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E          777 S Flagler Dr #500 E          777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121


Lan Li                           Larry Richey                     Li Dongsheng
c/o Gunster, Yoakley & Stewart, P.A.   Cushman & Wakefield U.S., Inc.   c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E          515 E Las Olas Blvd, #900         777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121   Fort Lauderdale, FL 33301-4203   West Palm Beach, FL 33401-6121


Li Zhang                         Lili Zhang                       Ling Li
c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.   c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E          777 S Flagler Dr #500 E          777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121   West Palm Beach, FL 33401-6121
```

Liyan Feng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Maria M Yip
Yip Associates
1001 Yamato Rd #301
Boca Raton, FL 33431-4403

Min Cui
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Min Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Mohammad Zargar
c/o Gunster, Yoakley & Stewart, P.A.
777 Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Mohammadreza Sedaghat
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Philip J Landau
2385 N.W. Executive Center Dr # 300
Boca Raton, FL 33431-8530

Qingyun Yu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Qiong Deng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Qiongfang Zhu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 #
West Palm Beach, FL 33401-6121

Ran Chen
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, Fl 33401-6121

Reza Siamak Nia
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, Fl 33401-6121

Ruji Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Rujing Wei
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr E#500 E
West Palm Beach, FL 33401-6121

Ryan Black
1615 Forum Place
Suite 200
West Palm Bch, FL 33401-2315

Sanaz Salehin
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #400 E
West Palm Beach, FL 33401-6124

Sara Salehin
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Sha Shi
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Shahriar Ebrahimian
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flager Dr #500 E
West Palm Beach, FL 33401-6121

Shaoping Huang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Shaoqing Zeng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Shu Jiang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Shuangyun Wang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Tang Cheok Fai
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Tao Xiong
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Tingting Sun
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Tonghui Luan
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Wenhao Zhang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiang Chunhua
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiang Shu
 c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiao Sun
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiaonan Wang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiaoping Zhang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flager Dr #500 E
West Palm Beach, FL 33401-6121

Yajun Kang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Yan Chen
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flager Dr #500 E
West Palm Beach, FL 33401-6121

Yawen Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Yi Zhao
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Ying Fei
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Ying Tan
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Yingjun Yang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Yuanbo Wang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr E#500 E
West Palm Beach, FL 33401-6121

Yulong Tang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Zhaohui Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Zheng Yu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Zhiling Gan
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)West Palm Beach

(d)Architectural Precast & Foam, LLC
c/o Cristopher S. Rapp, Esq.
Kelley Kronenberg, P.A.
1475 Centrepark Blvd., Ste. 275
West Palm Beach, FL 33401-7446

(d)McDonald Hopkins LLC
Accounts Receivable
600 Superior Avenue, E.
Suite 2100
Cleveland, OH 44114-2690

(d)McDonald Hopkins, LLC
Accounts Receivable
600 Superior Avenue, E
Suite 2100
Cleveland, OH 44114-2690

(u)Place for Tile, Inc

(d)Town of Palm Beach
345 South County Road
Palm Beach, FL 33480-4443

End of Label Matrix
Mailable recipients    194
Bypassed recipients      6
Total                  200

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

160 Royal Palm, LLC,                             Case No.  18-19441-EPK

Debtor.                                          Chapter 11

_____/

**ORDER GRANTING DEBTOR'S MOTION FOR THE ENTRY OF AN ORDER (I)
APPROVING BID PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH
THE SALE OF SUBSTANTIALLY ALL OF ITS ASSETS, (II) APPROVING THE
FORM AND MANNER OF NOTICE OF SALE, (III) SCHEDULING AN AUCTION
AND SALE HEARING AND (IV) APPROVING THE SALE OF THE ASSETS
<u>FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES</u>**

      **THIS MATTER** came before the Court for hearing on October \_\_\_, 2018, upon the motion

of 160 Royal Palm, LLC (the "<u>Debtor</u>") seeking an entry of an order (I) approving bid procedures

and bid protections in connection with the sale of substantially all of its assets, (II) approving the

form and manner of notice of sale, (III) scheduling an auction and sale hearing and (IV) approving

the sale of the assets free and clear of liens, claims and encumbrances (the "<u>Motion</u>") [ECF No.

\_\_\_\_].  The Court, having reviewed the Motion, having heard the arguments of counsel, and being

otherwise fully advised in the premises, hereby:

**FINDS AND DETERMINES THAT:**

A.       The Court has jurisdiction over this matter and over the property of the Debtor pursuant to 28 U.S.C. §§ 157(a) and 1334, venue is proper in this district pursuant to 28 U.S.C. § 1408, and this is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.       Good and sufficient notice of the relief sought in the Motion has been given in accordance with Bankruptcy Rule 2002, and no other or further notice is or shall be required.  A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all parties-in-interest.

C.       The Sale Procedures[1] and proposed notice set forth in the Motion are appropriate and reasonably calculated to provide all interested parties with timely and proper notice thereof.

D.       The Sale Procedures set forth herein are fair, reasonable, and appropriate and are designed to maximize the recovery on the proposed sale of the Assets.

E.       The bidding and sale process described in the Motion is fair and reasonable, and designed to fully expose the Assets to the market.

F.       The entry of this Order is in the best interests of the Debtor, its estate, creditors, and all other parties-in-interest.

**ORDERS AND ADJUDGES THAT:**

1.       The Motion is **GRANTED** as set forth herein.

2.       The Sale Procedures set forth in the Motion are hereby **APPROVED**.

3.       The Debtor is hereby **AUTHORIZED** to consummate and carry out the actions reasonably necessary to consummate and carry out the Sale Procedures and Auction.

---

[1] Capitalized terms not defined herein shall have the definitions provided for in the Motion.

4.     The findings and conclusions set forth above constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

5.     The Sale Procedures with respect to the Auction and the sale of the Assets are as follows:

     i.     <u>Participation Requirements</u>:  Unless otherwise ordered by the Court, in order to participate in the bidding process, an interested bidder must:

        a.     (a) wire into the trust account of Greenberg Traurig, P.A., an escrow deposit of ten percent (10%) of the Purchase Price no later than **5:00 p.m. on October 30, 2018** (the "<u>Bid Deadline</u>");

        b.     (b) submit to the Broker, Shraiberg, Landau & Page, P.A. and Greenberg Traurig, P.A. on or before the Bid Deadline: (A) a fully executed asset purchase agreement substantially in the form of the APA to be provided by the Debtor (the effectiveness of such APA being contingent only upon the Qualified Bidder becoming the Successful Bidder pursuant to these procedures, subject only to Bankruptcy Court approval, with no due diligence or financing contingencies), with a purchase price of not less than Thirty Two Million Five Hundred Thousand and No/100 ($32,500,000.00), and (B) a black-lined version of the APA to show any changes made by such bidder; provided that, an APA with any material changes may be rejected by the Debtor in its sole business judgment; and

        c.     (c) submit to the Broker and Shraiberg, Landau & Page, P.A. on or before the Bid Deadline such financial disclosures and documentation which demonstrate, in the Debtor's sole business judgment, the potential bidder's financial and other capabilities to consummate the sale.

A person who timely complies with these requirements shall have submitted a "<u>Qualified Bid</u>" and shall be deemed a "<u>Qualified Bidder</u>".  The list of Qualified Bidders will not be shared with anyone prior to the Auction.  The Stalking Horse Bidder shall be deemed a Qualified Bidder.

     ii.     <u>Waiver of Conflicts</u>: Any person who has submitted a Qualified Bid shall be deemed to have waived any right to claim there is a conflict with respect to an unrelated transaction for which such person has employed the law firm of Greenberg Traurig, P.A., and the Debtor's employment of Marcia H. Langley and the law firm of Greenberg Traurig, P.A. as real estate transaction counsel and title agent for the sale of the Property and related transactions contemplated herein.

     iii.     <u>Auction</u>:  In the event the Debtor receives a timely Qualified Bid, the Debtor will conduct an auction (the "<u>Auction</u>").  The Auction shall take place on **November 5,**

**2018 beginning at 2:00 p.m.**, at the United States Bankruptcy Court, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, Courtroom B, West Palm Beach, Florida 33401, subject to the Court's availability, or such other time or place as the Debtor shall notify the Qualified Bidders. In the event the Debtor does not receive a timely Qualified Bid, the Debtor will seek final approval of the sale to the Stalking Horse Bidder at the Sale Hearing on November 5, 2018.

iv.  Auction Procedures:  At the Auction, the Debtor will identify the Qualified Bid which shall serve as the opening bid.

    a.  All Qualified Bidders shall be entitled to make any subsequent bids in increments of not less than $50,000 (a "Subsequent Bid").  Bidding at the Auction shall continue until such time as the highest or best offer is determined by the Debtor in the exercise of its sole business judgment.  The Debtor reserves the right to modify the bidding increments or announce at the Auction additional procedural rules for conducting the Auction in its sole business judgment.

    b.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Bidder), the Debtor will, at each round of bidding, give effect to the Break-Up Fee that may be payable to the Stalking Horse Bidder under the APA.

    c.  Each Qualified Bidder's offer shall be irrevocable until the selection of the Successful Bidder and, if applicable, the Back-Up Bidder (as set forth in the APA), provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the of closing of the sale to the Successful Bidder or the Back-Up Bidder.

v.  Broker's Commissions:  All broker commissions shall be in accordance with the terms and conditions of the Broker Engagement Order.  Other than as set forth in the Broker Engagement Order, the Debtor's bankruptcy estate shall not be liable for any commissions.

vi.  Successful Bid:  After the conclusion of the Auction, the Debtor shall submit the highest or best bid that has been accepted (the "Successful Bid") for approval by the Bankruptcy Court at the United States Bankruptcy Court, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, Courtroom B, West Palm Beach, Florida 33401 on **November 5, 2018** following the Auction (the "Sale Hearing"). The Qualified Bidder who has the Successful Bid presented for approval to the Court shall be referred to as the "Successful Bidder."

vii.  Closing Date. The closing of the transaction (the "Closing") shall take place on or before twenty (20) calendar days after the order approving the sale is entered (the "Sale Order") and becomes final and non-appealable (the "Closing Date"), subject to the terms of the APA.  The Successful Bidder must be prepared and must in fact consummate the purchase of the Assets in accordance with the APA.

viii.   <u>Back Up Bid</u>.  Upon the failure of the Successful Bidder to consummate the closing of the purchase of the Assets because of a breach or failure on the part of the Successful Bidder, then the Debtor may elect in its business judgment to close with the next highest or otherwise best Qualified Bidder to be the Successful Bidder (the "<u>Back Up Bidder</u>").  At the Sale Hearing, the Debtor intends to seek approval from the Court for the next highest or best bid (the "<u>Back Up Bid</u>"), which approval shall authorize the Debtor to consummate the Back Up Bid immediately after a default under the Successful Bid without further order of the Court.  Promptly following the conclusion of the Sale Hearing, the Debtor shall return the deposits to each unsuccessful Qualified Bidder (except the Back Up Bidder whose deposit shall either be returned upon the closing of the sale to the Successful Bidder or applied to the purchase price in a closing with such Back Up Bidder).

ix.   <u>As is/where is:</u>  The Assets will be sold in its "as is", "where is" condition and with all faults, with no guarantees or warranties, express or implied.

x.   <u>Credit Bidding:</u> Subject to the limitations requested by the Debtor discussed below and ordered by the Court, only holders of allowed valid secured claims (that are otherwise Qualified Bidders) are permitted to credit bid at the Auction; <u>provided that</u>, in the event any person submits a permitted credit bid and is the Successful Bidder and/or Back Up Bidder, such person shall provide for the payment of the Break-Up Fee, and any commission due to the Broker, in cash on the Closing Date.  No party shall be permitted or entitled to credit bid, or attempt to credit bid, any alleged obligation of the Debtor that the Debtor asserts constitutes, or will constitute at some point, a contingent, unliquidated or disputed claim against the Debtor.  The Debtor reserves all rights to contest the propriety of any credit bid pursuant to § 363(k) and § 105 of the Bankruptcy Code.

xi.   <u>Sale Hearing:</u>  The Debtor requests that a final Sale Hearing be scheduled to be held immediately following the Auction on **November 5, 2018**.

3.    The Debtor is authorized to act in accordance with the Sale Procedures, which shall be binding upon all parties-in-interest in these cases.

4.    The Asset Purchase Agreement (the "<u>Stalking Horse APA</u>") entered into between the Debtor and the RREF II Palm House LLC (the "<u>Stalking Horse Bidder</u>") is approved, subject to the Sale Hearing and entry of the Sale Order.

5.    The Break-Up Fee in the amount of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) set forth in the Stalking Horse APA is approved.  As set forth in the Stalking Horse APA, the Break-Up Fee shall be entitled to status as a super-priority administrative expense

and shall be secured by a lien on the deposit of the Alternative Buyer or the closing proceeds in the event the transaction with the Alternative Buyer closes, and, except in the event of a credit bid, shall be paid solely and exclusively from such forfeited deposit or closing proceeds.

6.      The Overbid Protection set forth in the Stalking Horse APA is approved, and if the Stalking Horse Bidder has not terminated or materially breached the Stalking Horse APA, the Debtor agrees not to accept any offers from an Alternative Buyer unless such offer exceeds the Purchase Price by at least Five Hundred Thousand and No/100 Dollars ($500,000.00).

7.      The Debtor is authorized and permitted to sell the Assets to the highest or best bidder following the Auction, free and clear of all liens, claims and encumbrances, including without limitation mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, and conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein (including notices or other registrations in respect of any of the foregoing) affecting title to the Assets or any part thereof or interest therein (collectively, the "Liens"), with such Liens to attach to the proceeds of sale.  The Liens include without limitation, the interests held by the following parties:

    i.    Palm House LLC, by reason of being the sole member of 160 Royal Palm LLC, and by reason of Palm Beach County Circuit Court Case No. 15-14228;

    ii.    Ryan Black, by reason of any interest in 160 Royal Palm LLC, by reason of Palm Beach County Circuit Court Case No, 14-12824, and by reason of Palm Beach County Circuit Court Case No. 15-14228;

    iii.    Gerry Matthews, by reason of any interest in 160 Royal Palm LLC, by reason of Palm Beach County Circuit Court Case No, 14-12824, and by reason of Palm Beach County Circuit Court Case No. 15-14228;

    iv.    Robert V. Matthews, by reason of any interest in 160 Royal Palm LLC;

    v.    Joseph J. Walsh, Sr., by reason of any interest in Palm House Hotel LLLP;

vi.   KK PB Financial LLC, a Florida limited liability company, by reason of the Florida Real Estate Mortgage, Assignment of Leases and Rents and Security Agreement recorded in Official Records Book 26694, Page 1420; and Foreclosure Case 14-11203;

vii.  Palm House Hotel, LLLP, a Florida limited liability company, by reason of the Mortgage and Security Agreement recorded in Official Records Book 27103, Page 129; and Case 14-14382 and Case 15-14480;

viii. James F. Biagi, P.E., by reason of Default Final Judgment filed in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, under case No. CACE 15-005370 (08) recorded in Official Records Book 27660, Page 1139;

ix.   Richard's Woodwork, Inc., a/k/a RFW Cabinetry and Millwork, a Florida profit corporation, by reason of Final Judgment on Default for Plaintiff filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA004303 AB, recorded in Official Records Book 27702, Page 1461;

x.    David Campanaro by reason of Final Judgment filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA005120XXXMBAF, recorded in Official Records Book 28122, Page 196;

xi.   Place For Tile, Inc., by reason of Final Default Judgment Against Defendant 160 Royal Palm, LLC, filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA002935XXXXMB, recorded in Official Records Book 28517, Page 1307 and in Official Records Book 29606, Page 1097;

xii.  TWG Enterprises Waterproofing & Painting, Inc., by reason of Final Judgment filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA012471XXXXMB, recorded in Official Records Book 28038, Page 734;

xiii. Van Linda Iron Works, Inc., a Florida corporation, by reason of Amended Default Final Judgment filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA013194XXXMB, recorded in Official Records Book 28140, Page 1634;

xiv.  New Haven Contracting South, Inc., by reason of Final Default Judgment Against Defendant 160 Royal Palm, LLC, filed in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, under case No. 2015CA013244XXXXMB, recorded in Official Records Book 28877, Page 790;

xv.   Architectural Precast & Foam, LLC, by reason of Final Judgment of Foreclosure After Default recorded in Official Records Book 28560, Page 1512, and by reason of Final Judgment for Attorney's Fees and Costs recorded in Official Records

Book 28560, Page 1510, and by reason of Consent Final Judgment for Post-Judgment Attorney's Fees and Costs Pursuant to Fla. Stat. 57.115 recorded in Official Records Book 28935, Page 975, all under case No. 2015CA014459XXXXMB, in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida;

xvi.   Xpert Elevator Services, Inc., by reason of the Claim of Lien Renewal recorded in Official Records Book 29442, Page 819, which renewed that certain Claim of Lien Renewal recorded in Official Records Book 28682, Page 78, which renewed that certain Claim of Lien Renewal recorded in Official Records Book 27916, Page 492, which renewed that certain Claim of Lien recorded in Official Records Book 27194, Page 1278;

xvii.   Securities and Exchange Commission by reason of United States District Court, Southern District of Florida, West Palm Beach Division Case No. 18-81038;

xviii.  Edward A. Marod, Esq., attorney for Lan Li, et al, interested parties, as more particularly set forth in the Notice of Appearance and Request for Service in United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division Case No. 18-19441, Docket Entry 31.; and as identified in action pending in U.S. District Court Case No. 16-81871;

xix.   Maria Titova, as purported member of Palm House Hotel LLLP, the holder of a mortgage encumbering the subject property, per Palm Beach County Circuit Court Case No. 16-12723;

xx.   Palm Beach County by reason of action by 160 Royal Palm LLC against Palm Beach County seeking extension of development permits in Palm Beach County Circuit Court Case No, 12-23613; and

xxi.   Daniel Gorman, as to any interest disclosed by Memorandum of Understanding Agreement recorded in Official Records Book 27522 Page 958.

8.   Any Liens shall attach to the proceeds of the sale of the Assets in the order of their priority, with the validity, force and effect that they had as of the Petition Date, if any, against the Assets, subject to the rights, claims, defenses and objections of the Debtor and all interested parties with respect to such liens, so that the purchaser of the Assets shall take the Assets free of all Liens.

9.   The Auction will be held on **November 5, 2018 at 2:00 p.m.** at the United States Bankruptcy Court, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, Courtroom

B, West Palm Beach, Florida 33401.  The Auction may be adjourned or rescheduled without notice other than by an announcement of such adjournment at the Auction.

10.     The Sale Hearing to consider final approval of the sale of the Assets will be held immediately following the Auction on **November 5, 2018** at the United States Bankruptcy Court, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, Courtroom B, West Palm Beach, Florida 33401.  The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of such adjournment at the Sale Hearing.

11.     Objections, if any, to the proposed sale, must: a) be in writing, b) set forth the nature of the objector's claims against or interest in the Debtor's estates, and the basis for the objection and the specific grounds therefore; c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Florida and all Orders of this Court; d) be filed with the Court and served upon the Debtor, the Stalking Horse Bidder, and the United States Trustee for the Southern District of Florida, so as to be received no later than 5:00 p.m. two (2) business days prior to the Sale Hearing (the "Objection Deadline").  Only timely filed and served responses and objections will be considered by the Court during the Sale Hearing.  The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the proposed sale or the consummation and performance with respect to the proposed sale.

12.     The Debtor has served the Motion on the Debtor, all creditors and the Office of the United States Trustee.  The Debtor shall serve this Order upon all creditors and interested parties. The foregoing form and manner of notice of the Auction and proposed sale is approved.

13.     As required under the Stalking Horse APA, the Debtor will publish notice of the proposed sale free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds in the *Palm Beach Post* not less than once per week for

two consecutive weeks. Such publication notice will set forth the time, date and place of the Auction and Sale Hearing.

14.      Notice of the Sale Procedures, the Auction, the Sale Hearing and the remainder of the relief requested in the Motion, as described in the Motion, shall be good and sufficient notice thereof, and any requirements for other or further notice shall be waived and dispensed with pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9007 and pursuant to the Court's powers under section 105 of the Bankruptcy Code.

15.      Any stays that may be imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure with respect to the Motion are waived.

16.      The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

# # #

Submitted by:

Bernice C. Lee
Counsel for the Debtor
2385 N.W. Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Telephone: (561) 443-0800
Facsimile: (561) 998-0047
Email: blee@sfl-pa.com

*Copy to:* Bernice C. Lee, Esq., 2385 NW Executive Center Dr., Suite 300, Boca Raton, FL 33431. [Attorney Lee is directed to serve a copy of this Order upon all interested parties.]

# EXHIBIT 2

*EXECUTION VERSION*

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of the 27th day of September, 2018 between **160 ROYAL PALM, LLC**, a Florida limited liability company (the "Seller") and **RREF II PALM HOUSE LLC**, a Delaware limited liability company (the "Buyer"), recites and provides:

## RECITALS

Seller is the owner of certain real property located at 160 Royal Palm Way, Palm Beach, Florida, which real property is described on **Exhibit "A"** attached hereto, together with all improvements thereon (the "Property"). Seller desires to sell the Property to Buyer and Buyer desires to purchase the Property from Seller on the terms and conditions set forth herein.

Seller filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") on August 2, 2018 thereby initiating Case No. 18-19441-EPK (the "Bankruptcy Case"). The bankruptcy estate of the Seller is referred to herein as the "Estate."

Seller believes that it is in the best interests of the Estate to sell the Assets (defined below) to Buyer, and Buyer wishes to purchase the Assets from Seller, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and Buyer agree as follows:

1. **Court Approval**. This Agreement and the Parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval and the entry of a final non-appealable order, reasonably acceptable to the Buyer, whose approval will not be unreasonably withheld, conditioned or delayed, approving this Agreement and the transaction contemplated herein and containing the findings set forth in Section 8.1 (the "Sale Order"), after notice and a hearing, and subject to higher or otherwise better offers, and the provisions, requirements and limitations of the Sale Order. The Seller shall seek said approval of this Agreement within a reasonable time following receipt of the fully executed copy of this Agreement.

2. **Sale and Purchase of Property**. Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall

purchase and acquire from Seller, Seller's right, title and interest in and to the following (collectively, the "<u>Assets</u>"):

      2.1    the Property, including any improvements thereon and appurtenances belonging thereto or hereafter existing, subject to the Permitted Exceptions (defined below);

      2.2    all tangible personal property and equipment, if any, owned by Seller and located on the Property or stored off-site (if any), including, without limitation, those items described on **Exhibit "B"** hereto, and to the extent in Seller's actual possession, all books, records, correspondence and documents of Seller related to the design, construction or operation of the Property, including any improvements thereon and appurtenances belonging thereto or hereafter existing, and all plans, specifications, floor plans, drawings and renderings of all or any part of the Property (the "<u>Tangible Personal Property</u>");

      2.3    all transferable development rights, consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely in respect of the Property, all transferable warranties and guaranties, if any, held by Debtor in connection with the Assets (collectively, the "<u>Intangible Personal Property</u>"); and

      2.4    to the extent applicable, any insurance or condemnation awards or proceeds under Section 15.

      3.    **Conveyance of Property**.  On the Closing Date, subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Assets to the Buyer free and clear of all liens, claims and encumbrances, including without limitation mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, and conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein (including notices or other registrations in respect of any of the foregoing) affecting title to the Assets or any part thereof or interest therein as permitted under section 363(f) of the Bankruptcy Code (collectively, "<u>Liens</u>"), subject to the Permitted Exceptions with such Liens to attach to the proceeds of sale, on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES, except as expressly set forth in section 13.1 of this Agreement:

      3.1    Quitclaim Deed (the "<u>Deed</u>") conveying the Property to Buyer, which shall be free and clear of all Liens in accordance with Section 363(f) of the Bankruptcy Code, and subject to the Permitted Exceptions, and such other matters as approved by Buyer, whose approval shall not be unreasonably withheld, conditioned or delayed; and

      3.2    Bill of Sale (the "<u>Bill of Sale</u>") transferring all right, title and interest of Seller in and to the Tangible Personal Property to Buyer, which shall be free and clear of all Liens in accordance with Section 363(f) of the Bankruptcy Code.

4.    **Excluded Assets**.  The term "Excluded Assets" means the following assets of the Seller, all of which are excluded from the purchase and sale transaction provided for in this Agreement:

4.1    the Purchase Price and all cash, cash equivalents, bank accounts or similar types of investments:

4.2    all tax returns and all tax credits, tax benefits and claims for refunds in respect of any federal, state, local, and/or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real estate, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, severance, estimated or other taxes, including any interest or addition thereto, for periods ending on or before the Closing Date;

4.3    subject to Section 15, any and all right, title and interest in any insurance policy(ies) in connection with the ownership or operation of the Property by the Seller and any and all amounts claimed and/or collected pursuant to such insurance policy(ies);

4.4    all rights and properties not owned by the Debtor;

4.5    the membership interests and any other ownership interests in the Debtor, and the company minute books, transfer records, and all other company documents of Debtor;

4.6    all contract rights, rights of action, claims for damages, rights of setoff, rights of recoupment, claims, demands, actions, causes of action, judgments, and pending litigation;

4.7    all rights, claims, defenses and other matters that relate to any construction contracts affecting the Property; notwithstanding anything herein to the contrary, any construction defect or related claims which arose prior to Closing shall be an Excluded Asset;

4.8    all rights, claims, causes of action, defenses and other matters that relate or belong to the Debtor, including without limitation and any claims, or causes of action which are property of the estate under section 541 of the Bankruptcy Code including those arising under or in connection with Chapter 5 of the Bankruptcy Code;

4.9    any prepaid expenses, advance payments, security deposits, rents and other items related to the Assets that are applicable to the period prior to Closing, or that relate to executory contracts or unexpired leases that are not being assumed by the Seller and assigned to the Buyer.

4.10    any bonds held with or in favor of the Town of Palm Beach relating to the Property;

4.11    the Debtor's accounts receivable; and

4.12    any asset not specifically included in the definition of "Assets".

5.      **Deposit**.  Upon execution of this Agreement by the Buyer and Seller, Buyer shall have deposited the sum of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00) equal to ten percent (10%) of the Purchase Price with Chicago Title Insurance Company (the "Deposit Agent"), in the form of a Federal Reserve System wire-transfer of immediately available funds, to be held in escrow, as Buyer's initial deposit under this Agreement (the "Deposit"), which Deposit shall be held without interest and shall be applied against the Purchase Price at Closing, or (a) returned to Buyer, (as its sole and exclusive remedy), if  (i) the Sale Order is not entered  (ii) this Agreement is not approved by the Bankruptcy Court; (iii) Seller accepts a Competing Bid (as defined below) and such transaction closes; (iv) after written notice and a 14 day cure period (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), Seller breaches the terms of this Agreement in any material respect; (v) the conditions set forth in Section 9 are not satisfied as of the Closing Date or waived by the Buyer; or (v) required in accordance with Section 11.1 or Section 15, provided, however, that nothing herein shall limit or modify Buyer's entitlement, if any, to payment of the Break-Up Fee in accordance with Section 8.4 hereof; or (b) paid to Seller if Buyer breaches the terms of this Agreement or the conditions set forth in Sections 10.2 or 10.3 are not satisfied as of the Closing Date.  In the event of such return of the Deposit this Agreement shall terminate and the parties shall be released from any further rights or obligations hereunder except for those which expressly survive termination.

6.      **Purchase Price**.  The purchase price for the Assets shall be Thirty-Two Million and No/100 Dollars ($32,000,000.00) (the "Purchase Price").  At the Closing, Buyer shall pay to Seller the Purchase Price (less the Deposit), and without any other setoff or prorations, by wire transfer of immediately available funds to such account(s) as Seller shall designate.  This is an "All Cash" transaction that is not subject to any financing, other contingencies, or post contract due diligence.

7.      **Title**.

7.1      Commitment for Title Insurance.  Seller and Buyer acknowledge receipt of that certain title commitment Order No. 6754332 Revision No. 6 with Commitment Date September 27, 2018(the "Title Commitment") issued by Greenberg Traurig, P.A. (the "Title Agent"), as agent for Chicago Title Insurance Company (the "Title Company"), binding the Title Company to issue at Closing an Owner's Policy of Title Insurance pursuant to Section 7.2 insuring the marketability of the title to the Property (ALTA Form B) in the full amount of the Purchase Price, subject to (i) easements, covenants, restrictions, declarations, agreements of record, (ii) laws, regulations, resolutions or ordinances, including, without limitation, building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Property currently or hereinafter imposed by any governmental or quasi-governmental body or authority, including claims associated with construction non-conformities by the Town of Palm Beach or City of West Palm Beach (iii) imperfections of title or encumbrances which, individually or in the aggregate, do not have a material adverse effect on the Property, (iv) other exceptions, defects, state of facts, and other matters affecting title to the Property as set forth on **Exhibit "C"**, (v) any exceptions caused by Buyer, its agents, representatives or employees, and (vi) any other matters affecting title to the Property reasonably acceptable to Buyer whose acceptance will not be unreasonably withheld,

conditioned or delayed (the "Permitted Exceptions"). Seller and Buyer further acknowledge receipt of all instruments referenced in Schedule B of the Title Commitment. Buyer shall have the right to (a) object to any new exceptions from the last date of the Title Commitment until the Closing Date which exceptions render title unmarketable in accordance with the standards adopted by The Florida Bar and are not Permitted Exceptions ( a "New Exception") (b) defer Closing up to thirty (30) days ("Outside Date") until such New Exception(s) are deleted or otherwise remedied to the satisfaction of Buyer in its reasonable discretion, and, (c) in the event that such New Exception(s) are not deleted or otherwise remedied to the reasonable satisfaction of Buyer prior to the Outside Date, Buyer may elect to waive such New Exception(s) and proceed to Closing without further claim against Seller and in which case such New Exceptions shall be deemed Permitted Exceptions or Buyer may terminate this Agreement (other than Buyer's obligations under any provision of this Agreement which, by its terms, is to survive termination), and receive the return of the Deposit, which shall operate to release Seller from any and all liability hereunder. Seller shall have no obligation to cure or take corrective action or otherwise incur any expense to remove any New Exception.

       7.2   Owner's Policy of Title Insurance. At Closing, the Title Agent shall issue to Buyer, on behalf of the Title Company, at Buyer's expense, a marked commitment or proforma Owner's Policy of Title Insurance (the "Title Policy") covering the Property, in the full amount of the Purchase Price, subject to the Permitted Exceptions. Buyer shall accept title subject to the Permitted Exceptions. Seller shall not be obligated to cause the Title Agent to omit any Permitted Exception.

       7.3   Survey. Seller and Buyer acknowledge receipt of that certain survey prepared by Wallace Surveyors, dated February 5, 2014, last updated on January 9, 2018, Job No. 11-1284.11 ("Survey"). Buyer at Buyer's expense may elect to have the Survey updated and/or recertified prior to Closing if the updated Survey reveals any material encroachment which renders title unmarketable, same shall be treated as a New Exception as set forth in Section 7.1 above. Seller shall not be obligated to cure or take corrective action or otherwise incur any expense with respect to any matters reflected on the Survey or any updates thereto.

    8.   **Bankruptcy Court Approval, Competing Transactions, Backup Bid and Break-Up Fee**.

       8.1   Bankruptcy Court Approval. Seller shall use commercially reasonable efforts to obtain the Sale Order from the Bankruptcy Court approving the sale of the Assets to Buyer pursuant to this Agreement, which shall contain the following provisions:

       (a)   a finding that Seller prepared and served a motion seeking the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled thereto, and that all parties in interest entitled to such notice received such notice;

       (b)   the sale and transfer of the Assets to the Buyer is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;

(c)     the sale of the Assets to Buyer pursuant to this Agreement will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds;

(d)     Buyer is not a mere continuation of Seller, there is no continuity of enterprise between Seller and Buyer, Buyer is not a successor to Seller and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or de facto merger of Buyer and Seller;

(e)     Buyer has acted in good faith within the context of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code;

(f)     the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(g)     Buyer is not assuming or acquiring any of the Excluded Assets;

(h)     all Persons who are listed as a creditor in the Seller's bankruptcy schedules or filed a proof of claim in the Seller's bankruptcy case before the entry of the Sale Order, or that otherwise received actual or constructive notice of the relief sought in the sale motion including, without limitation, as a result of publication by the Debtor of notice of the proposed sale free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds in the *Palm Beach Post* not less than once per week for two consecutive weeks, are enjoined from in any way pursuing the Buyer or the Assets by suit or otherwise to recover on any Liens which they may have against Debtor or the Assets as of the Closing Date; and

(i)     the Sale Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(h).

8.2     <u>Competing Transaction</u>.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids other than from Buyer pursuant to procedures approved by the Bankruptcy Court (each a "<u>Competing Bid</u>").  From the date hereof (and any prior time) and until the completion of the auction contemplated hereby or as otherwise directed by the Bankruptcy Court, Seller is permitted to cause its respective representatives to initiate contact with, solicit or encourage submission of any inquiries proposals or offers by, any Person (in addition to Buyer and its affiliates, agents and representatives) in connection with any sale or other disposition of the Assets.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Assets and perform all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Assets to prospective buyers.

8.3     <u>Backup Bid</u>.  In the event any Person other than Buyer is either the successful bidder at the conclusion of the Auction or the Bankruptcy Court has entered a Sale Order approving the sale of all or substantially all of the Assets to any Person other than Buyer, Buyer shall be deemed a backup bidder (the "<u>Backup Bidder</u>") and this Agreement shall be enforceable until a Closing with a Person other than Buyer shall occur.  Accordingly, in

accordance with this Section 8.3 and Section 5.1, the Deposit Agent shall retain the Deposit and not refund to Buyer until a Closing takes place with a Person other than Buyer.

        8.4    <u>Break-Up Fee</u>.  In the event Buyer is not in default hereunder and has not terminated this Agreement pursuant to the terms hereof and is ready, willing, and able to close on the purchase of the Assets, if Seller accepts an offer to sell all or any portions of the Assets to another buyer ("<u>Alterative Buyer</u>"), which sale is approved by the Bankruptcy Court in the Bankruptcy Case, and such transaction closes and the Buyer is not the Backup Bidder, then Seller agrees that Buyer shall be entitled to receive Three Hundred Fifty Thousand and No/100 Dollars  ($350,000.00) as a break-up fee to reimburse Buyer for the value of its time, costs, and expenses incurred in connection with this transaction, including Buyer's agreement to serve and participate as the "stalking horse" bidder under the Sale Procedures Order (the "<u>Break-Up Fee</u>"). The Break-Up Fee shall be entitled to status as a super-priority administrative expense and shall be secured by a lien on the deposit of the Alternative Buyer or the closing proceeds in the event the transaction with the Alternative Buyer closes, and, except in the event of a credit bid, shall be paid solely and exclusively from such forfeited deposit or closing proceeds.  Any sums becoming payable to Buyer pursuant to this Section 8.4 shall be paid to Buyer promptly after the closing with any such Alternative Buyer approved in the Bankruptcy Case or, if applicable, promptly after the deposit on such transaction is forfeited.

        8.5    <u>Bid Protection</u>.  If Buyer has not terminated or materially breached this Agreement, Seller agrees not to accept any offers from Alternative Buyer(s) unless such offer exceeds the Purchase Price by at least Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "<u>Overbid Protection</u>").

        9.    **Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer in its sole discretion:

        9.1    a Sale Procedures Order shall have been entered by the Bankruptcy Court on or before October 16, 2018, or as soon as reasonably practicable following the sale procedures hearing, subject to the Bankruptcy Court's availability, in a form reasonably acceptable to Buyer, whose approval will not be unreasonably withheld, conditioned or delayed and which shall, among other things, approve this Agreement, the Break Up Fee, and the Overbid Protection;

        9.2    the Sale Order shall have been entered by the Bankruptcy Court on or before December 7, 2018, or as soon as reasonably practicable following the sale hearing, subject to the Bankruptcy Court's availability;

        9.3    the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement;

9.4     Seller shall have delivered to Buyer the deliverables set forth in Section 11.3; and

If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under Section 16 and any other provision of this Agreement that expressly provides for such survival.

10.     **Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller:

10.1     the Sale Order shall have been entered by the Bankruptcy Court;

10.2     the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default under the provisions of this Agreement; and

10.3     Buyer shall have paid to Seller the Purchase Price (subject to the deduction set forth in Section 6) and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing.

10.4     Seller shall have entered into (a) the Conditional Settlement Agreement between Seller and the Town of Palm Beach, a municipal corporation (the "Town") in settlement of certain code enforcement actions pending against Seller and (b) the Conditional Settlement Agreement between Seller and the Town of Palm Beach Code Enforcement Board (the "Enforcement Board") in settlement of certain violation assessments imposed against the Property; such agreements shall be substantially in the form attached hereto as Composite Exhibit "E" (collectively, the "Settlement Agreements"), together with such other and further changes as Seller may determine are necessary or appropriate provided same shall not impose any additional material financial obligations on Buyer which are not reflected in the Settlement Agreements attached hereto and the Settlement Agreements shall be approved by the Bankruptcy Court.  The Settlement Agreements shall result in payment obligations to the City and Code Enforcement Board not to exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) which shall be binding upon the Property and shall be paid by Buyer.

11.     **Closing**.

11.1     Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place on or before twenty (20) calendar after the Sale Order is entered and becomes final and non-appealable (the "Closing Date").  The Seller and Buyer may agree in writing to proceed to Closing at an earlier date provided that the Sale Order contains a waiver of the 14-day stay period in accordance with Fed. R. Bank. P. 6004(h).  Notwithstanding anything herein to the contrary, if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved.  If such postponement is longer than sixty (60) days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case Seller

8

shall return the Deposit to Buyer and neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.

11.2    Closing shall be conducted through an escrow arrangement by the Title Company (the "Closing Agent").  Closing shall take place at the offices of Closing Agent  (or such other place as the Parties may designate in writing).  Each Party shall deliver written closing instructions to the Closing Agent consistent with the provisions of this Agreement.

11.3    At the Closing, Seller shall deliver to Buyer:  (a) the transfer instruments provided for in Section 3; (b) Seller's executed countersignature to the closing statement contemplated in Section 11.4(c) below; (c) a FIRPTA Affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act; (d) such other documents as Buyer or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement; and (e) possession and occupancy of the Property and possession of the Tangible Personal Property.

11.4    At the Closing, Buyer shall deliver to Seller: (a) the Purchase Price as provided in Section 6; (b) the transfer instruments provided for in Section 3; (c) a closing statement between Seller and Buyer, reflecting the Purchase Price, the Deposit and all closing costs and other expenses, and (d) such other documents as Seller or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement.

11.5    Buyer shall pay, on the Closing Date, all costs of Closing, including, without limitation, the cost of recording the deed and state documentary stamps which are required to be affixed to the instrument of conveyance, the cost of all title examination, lien searches, title commitment, and the issuance of the title insurance policy premium for any owner's title insurance policy (and any loan policy) obtained by Buyer or its lender (if applicable), all costs of any inspections, examinations, reports, and/or Survey updates, or new surveys undertaken by Buyer or on Buyer's behalf, all settlement fees charged by the Person conducting the Closing, the cost of recording any corrective documents, and all other costs and charges of Closing.  Buyer shall also assume and pay any and all costs which are required to be paid to the Town or the Code Enforcement Board under the Settlement Agreements.   Each Party shall pay its own attorneys' and other professionals' fees.

12.    **Prorations**.

12.1    Real property taxes and assessments for the tax year in which the Closing occurs shall be paid by Buyer, except that Buyer shall be entitled to receive a closing credit for 2018 taxes in the amount of FIFTY THOUSAND DOLLARS ($50,000.00). All utility bills shall be apportioned between Buyer and Seller as of the Closing Date, with the Seller's portion of such utility bills being reduced from the Purchase Price as contemplated in Section 6.  If final documentation of any such item is not available at the Closing, the required proration shall be made on the basis of the best available documentation.

12.2    Except as contemplated in Section 12.1, there shall be no offset, reduction in closing proceeds, or proration of any kind.  Buyer shall be responsible for transferring any and all public utilities on the Closing Date.

12.3    The Parties agree that, after the Closing Date, each shall hold and shall promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements or other property that they may receive on or after the Closing Date which properly belong to the other Party, including any insurance proceeds, and shall account to the other for all such receipts.

13.    **Representations and Warranties**.

13.1    Seller represents and warrants to Buyer that Seller, subject to the entry of the Sale Order without any stay being obtained by any party in interest within the requisite period, has the power to convey the Assets to Buyer pursuant to this Agreement and subject to and in accordance with the provisions of the Sale Order.  Seller makes no other representations and warranties in connection with this Agreement.

13.2    As of the date hereof, Buyer hereby represents and warrants to Seller which representations and warranties shall survive Closing for a period of one (1) year:

(a)    At the time of closing, Buyer will be a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware.

(b)    The execution, delivery and performance by Buyer of this Agreement and the other documents and instruments contemplated hereby are within the power of Buyer and have been duly authorized by all necessary action by Buyer.  This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

(c)    Buyer and the entities or persons signing this Agreement on its behalf are authorized to execute this Agreement and bind Buyer to the terms hereof without the consent or joinder of any other person or entity.

(d)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, nor any rules, regulations, permits, licenses and orders promulgated thereunder.

(e)    Buyer is not insolvent and is able to pay its debts as they mature. No proceeding in bankruptcy or for the appointment of any receiver for all or any portion of Buyer's property, real or personal, has been filed by or against Buyer in any federal or state court.

(f)    There is no litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which would have any material adverse effect on Buyer's ability to perform its obligations under this Agreement.

(g)    The execution of this Agreement and the consummation of the transaction contemplated hereby does not and shall not violate the terms of any agreement or court order which is binding upon Buyer.

(h)    Except as expressly set forth in Section 13.1 of this Agreement, that any and all information (whether expressed, implied oral or past, present or future) provided or made available to Buyer or Buyer's agents or representatives including, without limitation, all marketing and informational materials in connection with the Property or this Agreement are not to be construed by Buyer as a representation or warranty of Seller of any kind, and Buyer has specifically not relied on any such information.  Except as expressly set forth in Section 13.1 of this Agreement, Seller is not liable or bound in any manner by any verbal or written statement, representations or information pertaining to the Property or the operation thereof, furnished by any attorney, real estate broker, agent, employee, servant or any other person.

(i)    That Buyer has made its own independent investigation of the accuracy and completeness of any and all information (whether in writing or verbal) provided or made available to Buyer and Buyer is satisfied with all aspects of the Property and Assets which Buyer deems material to its purchase thereof, including, without limitation:  marketability and insurability of title to the Property (including, without limitation) any Liens running with the land (other than any liens under Section 363(f) of the Bankruptcy Code); all municipal and other legal requirements (including, without limitation, taxes, assessments, zoning, use permit requirements and building permits); the condition and physical aspects of all buildings and structures located on the Property (including, without limitation, the interior, exterior, structure, basement, parking, paving, utilities, operating equipment, plans and specifications for the Property and all other physical and functional aspects of the Property); the condition of the Property (including, without limitation, any easements, access or use rights or similar matters affecting the Property) and; the availability of utilities, sanitary facilities, permits and other governmental approvals (including, without limitation, the government approvals for Buyer's intended use of the Property and the suitability of the Property for Buyer's intended use.

(j)    That Buyer acknowledges and agrees Seller has not made, did not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements, or guarantees of any kind whatsoever (except as specifically set forth in Section 13.1 of this Agreement) whether expressed or implied, oral or past, present or future, of, as to, concerning or with respect to:  the value, nature, quality or condition of the Property; the profit or income believed to be derived from the Property; the suitability of the Property; the compliance of or by the Property with the laws, rules, ordinances or regulations of any applicable governmental authority or body; the habitability, merchantability, marketability, profitability, or fitness for a particular purpose of the Property; the nature or quality of the soils or geology of the Property; the manner, quality, state of repair or lack of repair, of the Property, or any other matter with respect to the Property; the environmental matters or hazards that my affect the Property of any kind of nature; marketability of title including, without limitation, liens running with the land; and the future actions or inactions of any governmental agency in connection with any approvals, permits, entitlements or zoning of the Property after the date of Closing.

13.3    BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT (I) THE ASSETS ARE SOLD,

11

ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER IN "AS-IS" CONDITION ON A "WHERE-IS" BASIS WITH ALL FAULTS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT, (II) BUYER HAS UNDERTAKEN ALL SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BUYER DEEMS NECESSARY OR APPROPRIATE UNDER THE CIRCUMSTANCES AS TO THE CONDITION OF THE PROPERTY AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE, AND BASED UPON SAME, BUYER IS AND WILL BE RELYING STRICTLY AND SOLELY UPON SUCH INSPECTIONS AND EXAMINATIONS AND THE ADVICE AND COUNSEL OF ITS OWN AGENTS, LEGAL COUNSEL AND OFFICERS; (III) SELLER IS NOT MAKING AND HAS NOT MADE ANY WARRANTY OR REPRESENTATION WITH RESPECT TO ANY MATERIALS OR OTHER DATA PROVIDED BY SELLER TO BUYER OR THE SKILLS, COMPETENCE OR DILIGENCE OF THE PREPARERS THEREOF OR THE PHYSICAL CONDITIONS OR OF ANY OTHER ASPECT OF ALL OR ANY PART OF THE PROPERTY AS AN INDUCEMENT TO BUYER TO ENTER INTO THIS AGREEMENT AND THEREAFTER TO PURCHASE THE PROPERTY OR FOR ANY OTHER PURPOSE; AND (IV) BY REASON OF ALL OF THE FOREGOING, BUYER, SUBJECT TO SELLER'S REPRESENTATIONS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT AND THE PERFORMANCE BY SELLER OF ITS OBLIGATIONS UNDER THIS AGREEMENT, ASSUMES THE FULL RISK OF ANY LOSS OR DAMAGE OCCASIONED BY ANY FACT.  UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS AND, UPON CLOSING, BUYER HEREBY KNOWINGLY AND VOLUNTARILY WAIVES, RELINQUISHES AND RELEASES SELLER FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AT ANY TIME BY REASON OF OR ARISING OUT OF ANY PHYSICAL OR ENVIRONMENTAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS AND ANY AND ALL OTHER MATTERS REGARDING THE PROPERTY EXCLUDING MATTERS WHICH ARE THE SUBJECT OF EXPRESS REPRESENTATIONS OF SELLERS AS SET FORTH IN THIS AGREEMENT.  BUYER SHALL ACCEPT THE PROPERTY IN ITS "AS IS; WHERE IS" CONDITION AND WITH ALL FAULTS.

      14.    **Default and Remedies**.

        14.1    If the Closing fails to occur because of a default or material misrepresentation or breach of warranty by Buyer, Seller shall have the right to terminate this Agreement by notice to Buyer, and be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property.  In any such event, the parties shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

14.2    If the Closing fails to occur because of a default by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, with 14 days written notice and cure period to Seller (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), then Buyer shall have the right to terminate this Agreement by notice to Seller and Buyer shall be entitled to, as its exclusive remedy, receive a return of the Deposit.

15.    **Risk of Loss**.  Risk of loss to the Property or any part thereof from damage or destruction by fire or other casualty or by reason of condemnation shall remain upon Seller until the Closing.  If, between the date hereof and the Closing, any portion of the Property shall be damaged or destroyed by fire or other casualty or be subject to any claim of condemnation, Seller shall notify Buyer in writing of said damage, destruction, casualty or loss and the extent thereof or of such condemnation claim as the case may be.  If the cost to repair any such damage exceeds ONE MILLION DOLLARS ($1,000,000.00), or in the event of any such claim for condemnation, Buyer shall have the option, exercisable by notice to Seller given within ten days after Seller's notice to Buyer of said damage, destruction, casualty, loss or condemnation, to either:  (a) terminate this Agreement, whereupon the Deposit Agent shall forthwith refund the Deposit to Buyer and upon such refund this Agreement shall terminate and neither party shall have any further liability to the other hereunder (except for any rights and obligations arising under this Agreement which by their terms survive such termination); or (b) elect to proceed with this Agreement and pay the full Purchase Price, in which case Seller shall assign to Buyer any insurance or condemnation proceeds to which Seller or its successors may be entitled as a result of such damage, destruction, condemnation, loss or casualty without Seller replacing or repairing any such damage and Seller will have no further obligations to Buyer in respect of such loss or damage.  If Buyer fails to give such written notice, Buyer shall be conclusively deemed to have chosen option (b).  If the cost to repair any such damage is equal to or less than ONE MILLION DOLLARS ($1,000,000.00), Buyer shall proceed to Closing, in which event Seller agrees to pay to Buyer at the Closing all insurance or condemnation proceeds which Seller has received as a result of the same, if any, and assign to Buyer all insurance proceeds payable as a result of the same without Seller replacing or repairing such damage, and Seller will have no further obligations to Buyer in respect of such loss or damage.

16.    **Broker and Broker Commission**.  The Broker is Cushman & Wakefield U.S., Inc. (the "Broker"), subject to Bankruptcy Court approval of the listing agreement [ECF No. 19] (the "Listing Agreement"), a copy of which is attached as **Exhibit "D"** hereto.  In accordance with the Listing Agreement, to the extent the Closing occurs, the Broker's fee (the "Commission") in connection with the Closing shall be one and one-half percent (1.5%) of the Purchase Price, but in no event shall exceed FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000.00).  The Commission earned by Broker shall be a cost of sale payable by Buyer at Closing in addition to, and not as part of the Purchase Price, in accordance with the Listing Agreement.  To the extent Closing occurs hereunder, upon Closing, Buyer shall pay the Commission to Broker on Seller's behalf in addition to, and not as part of the Purchase Price.  Except with respect to any Commission due and owing to the Broker and otherwise pursuant to the Listing Agreement, Seller shall not be responsible for any broker's commissions.  Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming

through the Buyer, and indemnify and hold the Seller harmless against any and all liability, loss, cost, damage and expense (including, but not limited to, attorneys' fees) Seller shall incur because of any claim by any broker or agent, other than a claim by the Broker, claiming to have dealt with the Buyer, whether or not meritorious, for any commission or other compensation with respect to this Agreement or to the purchase and sale of the Property in accordance with this Agreement.  The provisions of this Section shall survive the Closing and any termination of this Agreement.

17.     **Parties' Access to Records after Closing**.  Each Party agrees to preserve until the earlier of the second anniversary of the Closing Date or the date the Debtor's Estate is closed, all records in its possession relating to any of the Assets.  Buyer shall permit the Seller or its representatives to gather and prepare such information as the Seller may reasonably require for preparing its tax returns for periods prior to the Closing Date.  If either Party needs access to records in the possession of the other Party relating to any of the Assets for purposes of preparing income tax returns or for complying with any audit request, subpoena or other investigative demand by any governmental authority or for any civil litigation or for any other legitimate purpose not injurious to the other Party, the other Party shall allow representatives of such Party access to such records, including reasonable use of office space and facilities, during regular business hours at the other Party's place of business for the sole purpose of obtaining information for use as provided for in this Section and shall permit such Party to make extracts and copies thereof as may be necessary or convenient.

18.     [**Intentionally deleted**.]

19.     **Further Assurances**.  Each Party shall cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

20.     **Deposit Agent Provisions**.

20.1     If conflicting demands relating to this Agreement are made upon the Deposit Agent, the Parties hereto expressly agree that the Deposit Agent shall have the absolute right to do either or both of the following:  (a) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (b) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the Parties to interplead and litigate in such court their several claims and rights amongst themselves.  Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the patties under this Agreement, the Deposit Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

20.2     In no event shall Deposit Agent be liable for any act or omission under or in respect of this Agreement except where Deposit Agent's acts or omission is the result of its gross negligence or willful misconduct.  Accordingly, Deposit Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal

counsel given with respect to any questions relating to the duties and responsibilities of the Deposit Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Deposit Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

20.3    Buyer and Seller reserve the right, at any time and from time to time, by mutual agreement, to substitute a new escrow agent in place of Deposit Agent.  In addition, Deposit Agent reserves the right to resign from its role as escrow agent by giving the Seller and the Buyer written notice of such resignation.  If Seller and Buyer have jointly designated a successor escrow agent in writing, then Deposit Agent shall deliver any funds held by Deposit Agent under this Agreement to such successor escrow agent.  However, if no such successor escrow agent is designated by Seller and Buyer in writing within ten (10) days after any notice of resignation from Deposit Agent, then Deposit Agent may deliver any such funds to the Bankruptcy Court and interplead Buyer and Seller in connection therewith.

20.4    Buyer acknowledges that the Deposit Agent may also serve as Seller's legal counsel in connection with this Agreement, and both Seller and Buyer consent to Deposit Agent serving in such dual capacity.  In the event of any actual dispute or adversity between Seller and Buyer, Deposit Agent shall be entitled to resign as Deposit Agent and to represent Seller in such dispute or adversity, and in such case shall deliver any funds held by Deposit Agent pursuant to this Agreement the funds either to a successor escrow agent designated by Seller and Buyer as provided above, or to a court of competent jurisdiction as provided for above.

21.    **Certain Definitions:  Rules of Construction**.

21.1    The following terms have the following meanings in this Agreement:

(a)    "Auction" shall have the meaning set forth in the Sale Procedures Order.

(b)    "Legal Costs" means court costs and attorneys' fees and costs, including the costs of paralegals, whether or not any mediation, arbitration or legal proceeding is filed, or if any mediation, arbitration or legal proceeding is filed, then all such costs incurred at any point in such mediation, arbitration or legal proceeding, including trial and all levels of appeal.

(c)    "Party" or "Parties" mean Seller and/or Buyer, as the context may require.

(d)    "Person" means any individual or any corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or other legal entity or a government or governmental entity.

15

(e)    "<u>Sale Procedures Order</u>" means an order entered by the Bankruptcy Court in the Bankruptcy Case approving those procedures to be authorized and approved which shall govern the manner of the marketing and sale of the Assets.

21.2    As used in this Agreement:  (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "<u>hereof</u>", "<u>herein</u>" and "<u>herewith</u>" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "<u>including</u>" and words of similar import when used in this Agreement, shall mean "<u>including, without limitation</u>," unless otherwise specified, and (vii) the word "<u>or</u>" shall not be exclusive.

21.3    Each Party and its counsel have reviewed this Agreement.  The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

22.    **<u>Miscellaneous</u>**.

22.1    This Agreement and the schedules and exhibits to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

22.2    This Agreement, together with any exhibits, schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

22.3    All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or delivered by a recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

**If to Buyer, addressed to:**

RREF II Palm House LLC
Michael Winston, Authorized Signatory
60 Columbus Circle
New York, NY 10023
Tel:           (212) 801-1000
Email:        MWinston@Related.com

**With a copy to:**

Jay Sakalo, Esq.
Jeffrey I. Snyder, Esq
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, 23rd Floor
Miami, FL 33131
Tel:          (305)374-7580
Fax:          (305)351-2253
Email:          jsakalo@bilzin.com & jsnyder@bilzin.com

**If to Seller, addressed to:**

Cary Glickstein, Manager
160 Royal Palm LLC
1118 Waterway Lane
Delray Beach, FL 33483
Tel:          (561)279-8942
Fax:          (561)279-0440
Email:          cg@ironwoodproperties.com

**With a copy to:**

Marcia H. Langley, Esq.
Greenberg Traurig, P.A.
5100 Town Center Circle
Suite 400
Boca Raton, FL 33486
Tel:          (561) 955-7604
Fax:          (561) 388-7099
Email:          langleym@gtlaw.com

**With a copy to:**

Philip J. Landau, Esq.
Shraiberg, Landau & Page, P.A.
2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Tel:          (561) 443-0800
Fax:          (561) 998-0047
Email:          plandau@slp.law

**If to Title Company, Deposit Agent or Closing Agent:**

Michelle M. Clapp
Senior Commercial Escrow Officer

17

Fidelity National Title Group
13800 NW 14th Street, Suite 190
Sunrise, FL 33323
Direct: 954-308-3231
Fax:  954-971-2050
Email:          michelle.clapp@fnf.com

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

22.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile signatures shall be accorded the same enforcement rights as an original. Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement.

22.5    Time is of the essence with respect to each Party's obligations hereunder.

22.6    This Agreement shall not be recorded by Buyer and, if recorded by Buyer, Seller may immediately terminate all of its obligations under this Agreement, and Buyer shall pay Seller's Legal Costs in removing this Agreement of record.  The provisions of this Section shall survive the Closing.

22.7    If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Palm Beach County, Florida are open for business, but in no case will the extension be for more than three days.  For purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in Florida, are closed or are authorized to be closed, including all legal holidays.

22.8    Notwithstanding any other provision of this Agreement, any representation, warranty or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

22.9    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from county public health units.

22.10  The Buyer understands and agrees that Cary D. Glickstein has executed this Agreement as the court approved sole and exclusive manager for the Seller, not in his

18

personal capacity, and there shall be no recourse to Cary D. Glickstein personally for any of the representations, warranties, covenants, communications of any kind, and/or promises or undertakings of any type made by "Seller" herein or in connection with this Agreement, but only against the Estate and only to the extent permitted herein and by the Sale Order.

22.11   The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision herein were not included herein.

22.12   No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right.  The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

22.13   This Agreement may not be assigned by Buyer, without Seller's prior written consent, which may be withheld in Seller's sole discretion and subject to approval by the United States Bankruptcy Court for the Southern District of Florida West Palm Beach Division. Any assignment of this Agreement shall not serve to release Buyer from its obligations hereunder.  This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the Parties hereto.  The Parties neither intend to confer any benefit hereunder on any Person other than the Parties hereto or shall any such third party have any rights hereunder.

22.14   This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles.  Each Party:  (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

22.15   BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

23.   **Property Investigations**.  Buyer and/or Buyer's employees, representatives, agents, contractors and any Person acting by, under or through Buyer (collectively, "Buyer's Representatives") shall have access to the Property at all reasonable times subsequent to the date of this Agreement and prior to the Closing or earlier termination of this Agreement with full right to: (a) inspect the Property, and (b) to conduct any and all inspections, investigations and tests thereon, including, but not limited to, hazardous waste studies, as Buyer may deem reasonably necessary.  All costs and expenses in connection with Buyer's investigations of the Property shall

be at the sole cost of Buyer.  In conjunction with entry upon the Property by Buyer and/or Buyer's Representatives, Buyer shall:

23.1    Fully comply with all laws applicable to the activity to be performed upon the Property and all other activities undertaken in connection therewith;

23.2    Take all actions and implement all protections reasonably necessary to ensure that all actions taken, and the equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, cause no damage to other property of Seller or other persons;

23.3    Promptly repair any damage to the Property caused by the acts or omissions of Buyer and/or Buyer's Representatives and restore the Property to the condition that existed prior to entry thereon by Buyer and/or Buyer's Representatives, at Buyer's sole cost and expense;

23.4    Prior to Buyer and/or Buyer's Representatives' first entry on the Property, maintain or cause to be maintained, throughout the term of this Agreement, at Buyer's expense, a policy of comprehensive general liability insurance, with a broad form contractual liability endorsement covering Buyer's indemnification obligations under Section 23.6, and with a combined single limit of not less than One Million Dollars ($1,000,000.00) insuring Buyer and naming Seller as an additional insured, against any injuries or damages to persons or property that may result from or are related to (i) Buyer's and/or Buyer's Representatives' entry upon the Property, and (ii) any and all other activities undertaken by Buyer and/or Buyer's Representatives on or in connection with the Property, in such form and with an insurance company acceptable to Seller and deliver a copy of such insurance policy to Seller prior to the first entry on the Property along with a certificate of insurance confirming that the premium has been paid in full for a period of not less than one (1) year, that the policy will not be terminated, canceled or modified without at least thirty (30) days prior written notice to Seller, and designating Seller as an additional insured thereunder;

23.5    Not allow the activities undertaken by Buyer or Buyer's Representatives to result in any Liens being filed or recorded against the Property or any portion thereof, or any other property of Seller or of its affiliates, and Buyer shall, at its sole cost and expense, promptly discharge of record or escrow with Seller, on terms acceptable to Seller, funds to discharge such Liens that are filed or recorded (including, without limitation, liens for services, labor or materials furnished); and

23.6    Defend and indemnify Seller and its respective employees, agents, partners, members, managers, officers, directors, tenants and invitees (collectively, "Seller's Affiliates"), and hold same harmless from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, Attorneys' Fees (as hereinafter defined) and disbursements, suffered or incurred by same and arising out of or in connection with (i) the entry upon the Property by Buyer and/or Buyer's Representatives, including but not limited to any bodily injury or death of any person or property damage arising out of or in conjunction with same; (ii) any activities conducted thereon by Buyer and/or Buyer's Representatives; (iii) any Liens filed or recorded against the Property or any portion thereof, or

any other property of Seller or of Seller's Affiliates, as a consequence of activities undertaken by Buyer and/or Buyer's Representatives; provided, however, that Buyer shall not be required to defend and indemnity Seller and/or Seller's Affiliates for any loss arising out of or in connection with any pre-existing conditions on the Property or the gross negligence, best faith or willful misconduct of Seller or any of Seller's Affiliates.

Any entry upon the Property in conjunction with the foregoing and all activities related thereto shall be at the sole risk and expense of Buyer and Buyer's Representatives. In no event shall Buyer conduct a Phase II or more invasive inspection or testing of the Property unless recommended by an environmental consultant reasonably acceptable to Seller or otherwise required by Buyer's lender, if any and when Buyer shall obtain Seller's prior written consent. Subject to the requirements of applicable law, in the event Buyer obtains a Phase II environmental site assessment on the Property, the contents of the Phase II environmental site assessment shall not be disclosed in whole or in part by Buyer to any person other than its directors, officers, employees, representatives (including legal and financial advisers, architects, engineers, consultants and lenders) who need to know the information for the purpose of evaluating the acquisition of the Property, and each such person shall be informed of the confidential nature of the contents of any Phase II environmental site assessment. Buyer shall cause such persons to keep the contents of any Phase II environmental site assessment strictly confidential and otherwise to comply with this Agreement with respect to same.

Buyer shall provide to Seller, at Buyer's sole cost and expense, copies of all inspection reports and other items of due diligence including, without limitation, soil tests, environmental audits, surveys and traffic studies obtained by Buyer in connection with its investigation of the Property within five (5) business days after Buyer's receipt of same ("Inspection Reports"). All items of due diligence that are customarily certified to a buyer, seller, lender or title company in a commercial real estate transaction in South Florida shall be certified to both Buyer and Seller. The provisions of this Section 23 shall survive the Closing and any termination of this Agreement.

24.     **Seller's Covenants**. From the date hereof until the Closing (or earlier termination of this Agreement), Seller covenants and agrees as follows:

24.1     Seller shall cooperate with Buyer's reasonable requests, from time to time, for access to the Property and for access to and/or copies of information and documents related to the Property, including without limitation information as to title matters, parking matters, licenses, permits and zoning, and construction matters; and

24.2     Seller shall continue to maintain insurance on the Property of the amounts and type in place as of the date hereof.

SEE SIGNATURES ON FOLLOWING PAGE

21

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year last below written.

**BUYER:**

**RREF II PALM HOUSE LLC,**
a Delaware limited liability company

By: _____
　　　Michael Winston, Authorized Signatory

Date:　September 27, 2018

**SELLER:**

**160 ROYAL PALM, LLC,**
a Florida limited liability company

By: _____
　　　Cary D. Glickstein, solely as Manager of
　　　160 ROYAL PALM, LLC, a Florida limited
　　　liability company, and not individually

Date:　September 27, 2018

## EXHIBIT "A"

## LEGAL DESCRIPTION

Lots 31, 32, and 33, Block F, Revised Map of Royal Park Addition to Palm Beach, Florida, according to the Plat thereof, as recorded in Plat Book 4, Page 1, of the Public Records of Palm Beach County, Florida.

## EXHIBIT "B"

## PERSONAL PROPERTY

Substantially all of the personal property now located on the Property which is shown in Receiver's Initial Inventory dated as of August 17, 2015 without representation or warranty of any kind or nature and subject to the continuing right to remove same at the reasonable discretion of Seller in the ordinary course for safety or security and to avoid further damage to the Property.

# EXHIBIT "C"

# PERMITTED EXCEPTIONS

1. Taxes and assessments for the year 2018 and subsequent years, which are not yet due and payable.

2. Taxes or assessments which are not shown as existing liens in the public records.

3. Any outstanding assessments in favor of Palm Beach County, Florida, any special taxing district and any municipality

4. All matters relating to Code Enforcement Lien as set forth in the Order Assessing Fine in favor of the Town of Palm Beach and against 160 Royal Palm, LLC, recorded in Official Records Book 27315, Page 1368

5. Any lien provided by County Ordinance or by Chapter 159, Florida Statutes, in favor of any city, town, village or port authority for unpaid service charges for service by any water, sewer or gas system supplying the insured land.

6. Utility easement as shown on the Plat of REVISED MAP OF ROYAL PARK ADDITION TO PALM BEACH, FLORIDA, recorded in Plat Book 4, Page 1, as conveyed to the Town of Palm Beach, Florida, in Deed Book 173, Page 158.

7. Reservations for sewer and transmission line Rights-of-Way contained in Deeds recorded in Deed Book 22, Page 381; Deed Book 48, Page 50; and Deed Book 182, Page 237.

8. Easement in favor of West Palm Telephone Company set forth in instrument recorded in Deed Book 22, Page 113, as assigned to Southern Bell Telephone and Telegraph Company in Deed Book 124, Page 430.

9. Easement in favor of Florida Power & Light Company set forth in instrument recorded in Official Records Book 575, Page 534.

10. Easement in favor of Florida Power & Light Company set forth in instrument recorded in Official Records Book 17907, Page 1647.

11. Stormwater Management Agreement recorded in Official Records Book 19421, Page 1785.

12. .Neighbor Agreement between Royal 160, LLC, a Delaware limited liability company, and Vivian P. Dorris recorded in Official Records Book 21843, Page 896.

13. Declaration of Use Agreement between the Town of Palm Beach, Florida, and Royal 160, LLC recorded in Official Records Book 21987, Page 499, as amended by the Amendment to Declaration of Use Agreement recorded in Official Records Book 25694, Page 633 and by the Second Amendment to Declaration of Use Agreement recorded in Official Records Book 26251, Page 78.

14. Heart of Palm Beach Hotel Construction Management Agreement between Royal 160, LLC and the Town of Palm Beach, Florida, recorded in Official Records Book 21987, Page 510.

15. Any rights, interests or claims arising from the following matters shown on the survey prepared by Wallace Surveyors, dated February 5, 2014, last updated on January 9, 2018, known as Job No. 11-1284.11:

a.     AT&T pad and FPL transformer pad lying on both sides of the southern boundary line of the subject property.
b.     Electric box lying partially outside of easement in the southeastern portion of the subject property.

NOTE:  Survey must be signed and sealed.

NOTE: 2017 real property taxes were assessed under Property Control Number 50-43-43-23-05-026-0310, in the gross amount of $168,273.50, and were paid on February 16, 2018, in the amount of $166,590.77.

# EXHIBIT "D"

# LISTING AGREEMENT

## LISTING AGREEMENT
## FOR SALE

**160 ROYAL PALM, LLC** (the "Owner") appoints **Cushman & Wakefield U.S., Inc.** ("C&W") as its sole agent and grants to C&W the exclusive right to sell the real property located at **Palm House, 160 Royal Palm Way, Palm Beach, Florida 33480** (the "Property") as provided below.

1.        <u>Term</u>. The term of this agreement will commence on **July 31, 2018** and will expire on **January 30, 2019.**

2.        <u>Services</u>. C&W will use its efforts to obtain a satisfactory purchaser for the Property at a sale price to be determined by the Owner and on such other terms as are acceptable to the Owner and further defined in **Exhibit A** hereto. C&W will negotiate the business terms of any purchase and sale agreement on behalf of the Owner and in the Owner's best interest, subject to the Owner's review and final approval, except as otherwise directed by the Owner. C&W will cooperate with other licensed real estate brokers.

3.        <u>Intentionally Omitted</u>

4.        <u>Referrals</u>. During the term of this agreement, the Owner will refer to C&W all inquiries and offers received by the Owner with respect to the Property, regardless of the source of such inquiries or offers.

5.        <u>Commission</u>. If, during the term hereof, the Owner sells any interest in the Property, the Owner will pay to C&W a commission in accordance with the attached Schedule of Commissions. Within 10 days after the end of the term, C&W will provide to the Owner a list of prospective purchasers to whom the Property was submitted by any party during the term. If a prospective purchaser, appearing on the list, enters into a purchase and sale agreement within 180 days after the end of the term, and thereafter the sale is closed, the Owner will pay a commission to C&W as provided above. The Owner agrees that such 180-day period will be extended for so long as negotiations with a prospective purchaser are continuing. If, during the term hereof, the Owner sells part, all or any interest in the Property; or contributes or conveys part, all or any interest in the Property to a corporation, partnership, joint venture or other business entity, the Owner will pay to C&W a commission in accordance with the attached Schedule of Commissions.  Notwithstanding anything in this paragraph 5 to the contrary, any terms of sale or agreement for the sale or conveyance of title to the Property shall include or provide that any commission earned hereunder shall be a cost of sale payable by the purchaser at closing, in addition to and not as part of the purchase price.

6.        <u>Bankruptcy Court Approval</u>. On   8 | 2 | 18   , the Debtors filed for bankruptcy relief pursuant to chapter 7 of the Bankruptcy Code (the "Bankruptcy Action"). C&W acknowledges that the bankruptcy court (the "Court") in the Bankruptcy Action must approve the terms of this Agreement between the Owner and C&W. C&W further acknowledges and agrees that once the Court approves the Agreement and C&W is notified of said approval, this Agreement shall become immediately effective.

7.        <u>Cooperating Brokers</u>. C&W and the Listing Team are authorized to solicit and cooperate with other real estate brokers, including Non-Listing Team Agents, who represent prospective purchasers for the Property ("Cooperating Brokers"). C&W shall be responsible to pay the fee or commission due to any such Cooperating Broker, provided such Cooperating Broker (i) represents the prospective purchaser pursuant to a written agreement, a copy of which is furnished to C&W, (ii) executes and delivers to C&W a confidentiality agreement, if required by the Owner and on the Owner's form, and (iii) executes and delivers C&W's standard form Cooperating Brokerage Agreement.

8.        <u>Representation of Purchasers</u>. Owner acknowledges and agrees that C&W may represent potential purchasers and consents to such dual representation, provided C&W timely discloses any such dual representation to Owner.

LISTING AGREEMENT FOR SALE

9. <u>Fees and Expenses</u>. If either party commences litigation against the other party to enforce its rights under this agreement, the prevailing party will be entitled to recover from the other party the costs and expenses (including reasonable attorneys' fees) incurred.

10. <u>Authority</u>. Owner represents that it is in fact the Owner of the Property and has the right to sell the Property. The individuals signing below represent that they are authorized to sign this agreement on behalf of the entity indicated.

11. <u>Professional Advice</u>. C&W recommends that the Owner obtain legal, tax or other professional advice relating to this agreement and the proposed sale of the Property as well as the condition and/or legality of the Property, including, but not limited to, the Property's improvements, equipment, soil, tenancies, title, environmental aspects and compliance with the Americans with Disabilities Act. C&W will have no obligation to investigate any such matters unless expressly otherwise agreed to in writing by Owner and C&W. Owner further agrees that in determining the financial soundness of any prospective purchaser, Owner will rely solely upon Owner's own investigation and evaluation, notwithstanding C&W's assistance in gathering any financial information.

12. <u>OFAC</u>. Each party represents and warrants to the other party that it, and all persons and entities owning (directly or indirectly) an Ownership interest in it: (a) are not, and will not become, a person or entity with whom a party is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order 13224 Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action; and (b) are not knowingly engaged in, and will not knowingly engage in, any dealings or transactions or be otherwise associated with such persons or entities described in clause (a) above.

13. <u>Miscellaneous</u>. This agreement shall be governed by the laws of the State of Florida, without giving effect to principles of conflicts of law. This agreement constitutes the entire agreement between the parties regarding the subject matter herein, and no amendments, changes or modifications may be made to this agreement without the express written consent of each of the parties. If any term or provision of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms and provisions of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. No failure or delay by a party in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or prohibit any other or further exercise of any right hereunder. This agreement shall benefit and be binding upon the parties and their respective successors and assigns. This agreement may be executed and delivered (including by facsimile, "pdf" or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

**160 ROYAL PALM, LLC**

By: _____
Name: _____ Cory Glickstein
Title: _____ Manager
Date: _____ 8/9/16

**CUSHMAN & WAKEFIELD, U.S., INC**

By: _____
Name: _____ Wanda Riley
Title: _____ Director of Brokerage Services,
Date: _____ Florida     8/9/16

[Schedule of Commissions Follows]

## SCHEDULE OF COMMISSIONS FOR SALE

**Rate:** 1.5% of the total sales proceeds capped at $450,000.

**Alternative Transactions:** If a proposed transaction covered by the Agreement to which this Schedule is annexed turns into any other transaction, including, but not limited to, an exchange, option to purchase, right of first refusal, ground lease or lease, then C&W will automatically, without the necessity of any further acts by Owner or C&W or an amendment to the Agreement to which this Schedule is annexed, be Owner's sole and exclusive agent for such transaction and will be entitled to a commission on such transaction under the terms of the Agreement.

**Time of Payment:** The commission shall be paid in full at the time of the closing or transfer of title to the Property, except in the case of an installment purchase contract, in which case the commission shall be paid in full at the time of full execution and delivery of the installment purchase contract between Owner and purchaser.

**Computation of Total Sales Price:** The commission shall be computed in accordance with the above rates based upon the gross sales price, which shall include any mortgages, loans or other obligations of Owner which may be assumed by purchaser or which purchaser takes title "subject to," and any purchase money loans or mortgages taken back by Owner.

**Purchase Option:** If Owner grants a purchase option, C&W will be paid a commission at the above rate on the option price as and when amounts are payable for the option (and for extensions thereof). Upon closing of the sale, C&W will be paid a commission at the above rate on the total sales price (excluding any amount paid for the option and applied to the sales price).

**Broker Regulatory or Statutory Provisions:** Owner acknowledges that C&W may represent potential purchasers and consents to such dual representation. It is unlawful for either Owner or C&W to discriminate against any persons because of their race, color, religion, national origin, sex, handicap or family status.

**Disclosure:** The Florida Commercial Real Estate Sales Commission Lien Act provides that when a broker has earned a commission by performing licensed services under a brokerage agreement with Owner, the broker may claim a lien against Owner's net sales proceeds for the brokers' commission. The broker's lien rights under the act cannot be waived before the commission is earned.

LISTING AGREEMENT FOR SALE

## EXHIBIT A

### The Marketing Plan

The general terms of the proposed Sale are as follows:

a) The Owner will offer the property for sale to prospective buyers commencing on the date that an order is entered approving this agreement and authorizing C&W to market and sell the Property;

b) To permit due diligence to occur through TBD;

c) Accept non-refundable deposits with any qualifying bids by TBD;

d) To approve qualified bidders no later than TBD;

e) To conduct an auction by TBD;

f) To conduct a hearing to approve the Sale by TBD; and,

g) To complete a closing on the Property on or before TBD, in the context of a final order approving the sale of the Property.

# COMPOSITE EXHIBIT "E"

# SETTLEMENT AGREEMENTS

## CONDITIONAL SETTLEMENT AGREEMENT

This Conditional Settlement Agreement ("Settlement Agreement") is entered into between the Town of Palm Beach, a Florida municipal corporation, 360 South County Road, Palm Beach, Florida 33480 ("Town") and 160 Royal Palm, LLC, a Florida limited liability company, 160 Royal Palm Way, Palm Beach, Florida 33480 ("Owner") (Town and Owner are hereafter collectively referred to as the "Parties").

WHEREAS, on July 30, 2007, Town and Royal 160, LLC ("Former Owner"), the prior Owner of the Land, as hereinafter defined, entered into a Declaration of Use Agreement, recorded in the Official Public Records Book 21987, Page 499, of the Public Records of Palm Beach County, Florida (the "Agreement"), and a Heart of Palm Beach Construction Management Agreement, recorded in the Official Records Book 21987, Page 510, of the Public Records of Palm Beach County, Florida (the "CMA"), concerning the conditional use of the land described in Exhibit A to the Agreement (the "Land") as a hotel and accessory uses consistent with and subject to the conditions for the 'Approval,' including, among other conditions, a liquidated amount of $2,000 per violation per day remedy (the "Violation Assessment"), as specifically set forth in the Agreement;

WHEREAS, the Land is described in **Exhibit A**, attached hereto, it is located within the municipal limits of Town and title to the Land is held by Owner;

WHEREAS, Town and Owner entered into an Amendment to Declaration of Use Agreement made on December 28, 2012 and recorded in the Official Public Records Book 25694, Page 633, of the Public Records of Palm Beach County, Florida (the 'Amendment'), modifying the Agreement for the conditional use of the Land as a hotel and accessory uses and for operation on the Land of the Palm House Hotel ('Hotel') consistent with and subject to the conditions for the 'Approval' including, among other conditions, a February 14, 2013 deadline for the completion of construction of the Hotel (the "Completion Deadline"), as more specifically set forth in the Amendment;

WHEREAS, Owner commenced a civil action in December 2012 in the Fifteenth Judicial Circuit of Palm Beach County, Florida, styled *160 Royal Palm, LLC v. Town of Palm Beach*, Case No.: 502012CA023613XXXXMB (the "Litigation"), seeking a declaratory judgment concerning the Completion Deadline, which action remains pending but currently stayed based on the Bankruptcy Action, as hereinafter defined;

WHEREAS, effective February 15, 2013, Town commenced assessment of the Violation Assessment based on Owner's failure to complete construction of the Hotel by the Completion Deadline, despite Owner's contention that the Completion Deadline had been extended for two years, as alleged in the Litigation;

WHEREAS, Town and Owner entered into a Second Amendment to Declaration of Use Agreement made on August 13, 2013 and recorded in the Official Public Records Book 26251, Page 78, of the Public Records of Palm Beach County, Florida (the 'Amendment')(hereinafter the

"Second Amendment" for clarity), modifying the Agreement for the conditional use of the Land as a hotel and accessory uses and for Owner's operation on the Land of the Palm House Hotel ('Hotel') consistent with and subject to the conditions for the 'Approval,' including, among other conditions, the Completion Deadline, as specifically set forth in the Second Amendment;

WHEREAS, in 2014, the Town of Palm Beach Police Department, Code Enforcement Office initiated a code enforcement action, Case # CE-14-1212, 160 Royal Palm Way, 160 Royal Palm LLC, against the Land for unauthorized construction of the Hotel by Owner.  Owner failed to satisfy or correct the code enforcement violation resulting in the entry of an Order Assessing Fine and Order Imposing Lien by the Town of Palm Beach Code Enforcement Board of the Town of Palm Beach ("Town Code Enforcement") in the amount of $250 a day, commencing January 10, 2015 (the "Code Enforcement Fine"), which is recorded in Official Records Book 27315, page 1368 of the Public Records of Palm Beach County, Florida (the "Code Enforcement Lien") to enforce compliance with the code enforcement order (the "Code Enforcement Order") requiring the removal of all unpermitted work done beyond the scope of Owner's approved variances and building permits and passing all inspections;

WHEREAS, in 2014 construction of the Hotel was terminated and abandoned without completion or compliance with the Code Enforcement Order and the building permit for construction of the Hotel expired;

WHEREAS, on or about December 15, 2014 a civil action was commenced in the Fifteenth Judicial Circuit of Palm Beach County, Florida, styled as *Ryan Black v. Gerry Matthews*, et al, Case No.: 502014CA014846XXXXMB AG (the "Receivership Action") by Ryan Black, as a member and former managing member of Palm House, LLC, a Delaware limited liability company and the sole member of Owner, seeking appointment of a receiver for Owner;

WHEREAS, on or about July 20, 2015 the court in the Receivership Action entered an Amended Agreed Order on Plaintiff's Motion to Appoint Receiver (the "Receivership Order") whereby Cary Glickstein (the "Receiver") was appointed as Receiver for the real and personal property of Owner, including the Land and the partially constructed Hotel, and directed by the Receivership Order to pursue completion of the Hotel, upon securing construction financing, as approved by Town;

WHEREAS, in November 2015, Receiver applied for and on January 13, 2016, the Town Council granted the Receiver approval of Site Plan # 1-2016 with Special Exception for construction of the Hotel (the "Development Approval"), imposing conditions of approval in order to regulate the use, mitigate any adverse impacts of the use, and insure that said use shall not be adverse to the public interest, including, in part, correction of the unauthorized  construction underlying the Code Enforcement Lien, which approval was to be further memorialized in a Third Amendment to Declaration of Use Agreement (the "Third Amendment"), which has not been executed nor has the work commenced, as authorized by the Development Approval, by application for a building permit revision;

2

WHEREAS, in November 2016, the Receiver sought and on December 14, 2016, the Town Council granted the Receiver's request for a conditional, temporary abatement of the Violation Assessment accruing since February 15, 2013, which abatement remains conditionally and temporarily in effect;

WHEREAS, on or about November 17, 2016, the Receiver applied for and the Town Code Enforcement Board granted the Receiver's request for a conditional, temporary abatement of the Code Enforcement Fine accruing since January 10, 2015, which abatement remains conditionally and temporarily in effect.  Among the conditions imposed for the continued abatement of the Code Enforcement Fine was payment to the Town of the Code Enforcement Fine amount accruing before the abatement date, which amount was paid in full;

WHEREAS, because the work authorized by the Development Approval could not be commenced within 12 months from the date of Town Council approval, in December 2016, Receiver applied for and in January 2017 the Town Council granted the Receiver's request to extend the Development Approval for one year through January 13, 2018;

WHEREAS, because the work authorized by the Development Approval could not be commenced within 12 months from the date of Town Council approval, in or about December 2017, Receiver applied for and in January 2018 the Town Council granted the Receiver's second request to extend the Development Approval for one year through January 9, 2019;

WHEREAS, on July 3, 2018, an order was entered by the Court in the Receivership Action expanding the Receiver's powers and making the Receiver the sole and exclusive manager of Owner, among other powers;

WHEREAS, on August 2, 2018, Owner, by and through the Receiver as the sole and exclusive manager of Owner ("Manager"), filed a petition for Chapter 11 bankruptcy relief in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach, styled *In re: 160 Royal Palm, LLC*, Case No.: 18-19441-EPK (the "Bankruptcy Action");

WHEREAS, Manager believes the sale of the Land and the Hotel (collectively, the "Property" or "Project") to a qualified buyer is in the best interests of Owner's creditors, Town and interested parties and represents a final opportunity for the Manager to accomplish what the Receiver could not by completion of the Hotel as approved by Town;

WHEREAS, Owner, under the direction of Manager and subject to court approval in the Bankruptcy Action, intends to sell the property to a qualified buyer who will complete construction of the Hotel as approved by Town consistent with the Development Approval, a revised CMA and building permit revision, as described below;

WHEREAS, the Violation Assessment, Code Enforcement Fine, Code Enforcement Order, Code Enforcement Lien and impending expiration of the Development Approval in January 2019 separately and collectively create uncertainty in any prospective buyer's evaluation of the Land and the Hotel for acquisition purposes and that uncertainty materially and adversely affects the marketability of the Property and viability of the Project;

3

WHEREAS, the Town's interests are furthered by the sale of the Property to a qualified buyer who will complete the Project in accordance with the Development Approval; and

WHEREAS, further to the above objectives, the Parties desire to conditionally compromise and settle all claims, demands, rights, and causes of action with respect to the Violation Assessment and impending expiration of the Development Approval and Owner is simultaneously seeking by a separate conditional settlement agreement with Town Code Enforcement (the "CEB Settlement Agreement") to settle all claims, demands, rights, and causes of action with respect to the Code Enforcement Order, Code Enforcement Fine and Code Enforcement Lien.

**NOW THEREFORE**, in consideration of the mutual promises, premises and covenants set out in this Settlement Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby expressly acknowledged, and upon the terms and subject to the conditions contained herein, the Parties expressly agree and covenant as follows:

**Section 1: <u>Incorporation of Recitals</u>**

The Parties expressly incorporate the recitals of this Settlement Agreement as a part hereof.

**Section 2.  <u>Continued Abatement of Violation Assessment</u>.**

Town agrees to reinstate, if necessary, and conditionally abate accrual of the Violation Assessment for an abatement period through April 30, 2019.  Upon timely payment of the Settlement Amount, as defined in Section 3 below, by a "Qualified Buyer," as defined in Section 7 below, the foregoing abatements shall continue and remain in force and effect conditioned on completion of construction of the Hotel in accordance with the requirements for extension of the Development Approval in Section 4 below.

**Section 3: <u>Settlement Amount; Payment</u>**

Town agrees to accept payment of $200,000 (the "Settlement Amount") from a Qualified Buyer, as hereinafter defined, in full and final settlement of the Violation Assessment accruing through April 30, 2019 provided such payment is delivered to Town on or before the earliest of (1) thirty days from the closing on the sale of the Property or (2) December 31, 2018.  Payment shall be made in a single payment payable to Town of Palm Beach and delivered to Town at 360 South County Road, Palm Beach, Florida 33480.  Timely payment of the Settlement Amount shall be an express condition precedent to the abatement of the Violation Assessment through the abatement period set forth in Section 2.

**Section 4: <u>Extension of Development Approval</u>**

Upon timely payment of the Settlement Amount, Town agrees to extend the Development Approval through April 30, 2019, provided on or before April 30, 2019 the Qualified Buyer: (i) makes application for and upon Town approval thereafter executes and delivers the Third Amendment consistent with the Development Approval; (ii) makes application for and upon Town approval thereafter executes and delivers a revised CMA consistent with the Development Approval; (iii) makes application for a building permit revision for construction of the Hotel

4

consistent with the Development Approval; and (iv), if required by Town, concurrent with the Qualified Buyer's application for Third Amendment and revised CMA, and solely to approve the change in ownership of the Land from Owner to the Qualified Buyer, makes application for and receives Town approval for a modification to special exception for construction and operation of the Hotel, consistent with the Development Approval, or as otherwise requested by the Qualified Buyer and approved by the Town.

**Section 5: <u>Satisfaction and Discharge of Violation Assessment</u>**

Upon timely completion of the Hotel, as provided in the Third Amendment, the revised CMA and building permit revision, the Violation Assessment shall be deemed fully satisfied and discharged. Nothing contained herein shall prevent Town and the Qualified Buyer from agreeing to an alternative protocol for the timing of the satisfaction and discharge of the Violation Assessment.

**Section 6. <u>Dismissal of Litigation</u>**

On or before closing on the sale of the Property to a Qualified Buyer following entry of a court order approving this Settlement Agreement in the Bankruptcy Action and the execution and delivery of this Settlement Agreement by the Parties, the Litigation shall be dismissed with prejudice.

**Section 7: <u>Qualified Buyer</u>**

For purposes of this Settlement Agreement, a Qualified Buyer ("Qualified Buyer") shall be the purchaser of the Property pursuant to a fully performed contract and sale approved by court order in the Bankruptcy Action, excluding Owner, Former Owner, Palm House, LLC, any current or former manager or member of Owner, Former Owner or Palm House, LLC, and any other party to the Receivership Action or any other pending civil action in which Owner is a party, other than Town. While this Settlement Agreement is expressly intended for the benefit of a Qualified Buyer, nothing in this Agreement shall prevent Town, in Town's discretion, from extending the benefits conferred under this Settlement Agreement to a buyer who is not a Qualified Buyer hereunder.

**Section 8: <u>Conditional Settlement</u>**

This Settlement Agreement shall be of no force or effect unless it and the CEB Settlement Agreement are executed and delivered by the respective Parties and approved by a court order duly entered in the Bankruptcy Action. In the event (1) payment of the Settlement Amount is not timely paid to Town; (2) a Third Amendment to Declaration of Use Agreement is not timely executed by and delivered to Town by the Qualified Buyer or (3) construction of the Hotel is not timely completed by the Qualified Buyer in accordance with the Third Amendment, revised CMA and building permit revision, then the Development Approval shall expire. Unless otherwise extended by Town, the Violation Assessment abatement shall terminate and the assessment and fine shall be reinstated as if the abatement had never been granted, less payments received by Town, if any. If the Bankruptcy Action is dismissed before the sale of the Property or if Owner is otherwise prevented or unable to sell the Property to a Qualified Buyer, Owner reserves all of its rights,

5

claims and defenses as asserted in the Litigation and/or that are or as may be available to Owner in the Bankruptcy Action with regard to the Property, the Violation Assessment, the Code Enforcement Fine and/or the Code Enforcement Lien.

### Section 9: No Admission of Liability or Fault

This Agreement is a compromise of a disputed claim and the execution of this Settlement Agreement is not, and should not be construed to be, as an admission of liability or fault on the part of any party, their respective successors, assigns, subsidiaries, affiliates, agents, managers, members, partners, and employees, and by executing this Settlement Agreement the Parties expressly deny any liability or fault.

### Section 10: Governing Law

This Settlement Agreement shall be interpreted, construed and enforced pursuant to and in accordance with the laws of the State of Florida.

### Section 11: Attorneys' Fees and Costs

In the event of litigation to enforce the terms of this Settlement Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs from the non-performing party. Except as specifically provided in this Settlement Agreement, the Parties shall bear their own respective attorneys' fees and costs incurred in connection with the Litigation and the negotiation and performance of this Settlement Agreement.

### Section 12: Time is of the Essence

Time is of the essence for all dates and time periods expressed herein.

### Section 13: Choice of Law and Forum Selection

The Parties agree that this Settlement Agreement is made and entered into in the State of Florida, and shall in all respects be interpreted, enforced and governed under the laws of the State of Florida without applying conflict of laws principles, and shall be subject to the exclusive jurisdiction of the courts of Florida. The sole and exclusive venue for any litigation arising out of, or relating to this Settlement Agreement shall be in Palm Beach, Florida, to the exclusion of any and all other venues.

### Section 14: Interpretation of Settlement Agreement

The Parties have been represented by counsel, and have reviewed this Settlement Agreement through their respective attorneys or have had the opportunity to do so. None of the Parties (nor any attorney for any of the Parties) shall be deemed to be the drafter of this Settlement Agreement. Any rule of construction under Florida law requiring that ambiguities be resolved against the drafting party shall not be employed in the interpretation of this Settlement Agreement. The Parties further agree that all parts of this Settlement Agreement shall in all cases be construed as a whole according to its fair meaning.

**Section 15:  <u>Successors and Assigns</u>**

This Settlement Agreement shall apply to the Parties, as well as to each of their predecessors, successors and assigns.

**Section 16:    <u>Declaration of Use Agreement, the Amendment and the Second Amendment</u>**

The Declaration of Use Agreement, the Amendment to Declaration of Use Agreement and the Second Amendment to Declaration of Use Agreement remain in full force and effect, subjection to further modification by a Third Amendment to Declaration of Use Agreement between Town and a Qualified Buyer, as generally described herein.

**Section 17:  <u>Authority to Execute Settlement Agreement</u>**

Each of the Parties, and those persons executing this Settlement Agreement on behalf of the Parties, warrants to the other that each has full power, authority and capacity to execute this Settlement Agreement.  In addition, the Parties warrant and represent that they are the owner of the claims asserted against the other and have not transferred or assigned any claim, in whole or in part.

**Section 18: <u>Town Cooperation</u>**

In connection with Owner's sale of the Property to a Qualified Buyer as authorized and approved in the Bankruptcy Action, Town agrees to cooperate with the settlement, title or closing agent, Owner and the Qualified Buyer, at no expense to Town, and use its best reasonable efforts to timely review and comply with written requests for information, acknowledgements and confirmations further to Owner's conveyance of title, confirmation of Qualified Buyer status, and verification of the recitals set forth in this Settlement Agreement as of the Closing Date.

**Section 19:  <u>Headings</u>**

All sections, titles or captions contained in this Settlement Agreement are for convenience only and shall not be deemed to be a part of this Settlement Agreement, and shall not affect the meaning or interpretation of this Settlement Agreement.

**Section 20: <u>Merger</u>**

There have been no written or oral representations made, or relied upon, by the Parties as inducement for the execution of this Settlement Agreement that are not expressly stated herein. The terms of this Settlement Agreement are contractual, not mere recitals, and may be enforced by a court of competent jurisdiction.  No changes in or additions to this Settlement Agreement shall be valid, enforceable or recognized, unless made in a writing and signed by all of the Parties.

7

**Section 21: <u>Execution in Counterparts</u>**

This Settlement Agreement may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one and the same instrument. Additionally, the different counterparts of this Settlement Agreement may be executed separately by each signatory, and all such separately executed counterparts, when taken together, shall be treated as and constitute one and the same instrument. Any signature delivered by electronic or facsimile transmission shall be treated in all manner and respect as an original document.

IN WITNESS WHEREOF the Parties have hereunto set their hands and seals the day and year first above written.

SIGNATURES ON FOLLOWING PAGE

8

Signed, sealed and delivered
in the presence of:

TOWN OF PALM BEACH,

_____

_____        By:_____
                                         Gail Coniglio

_____

_____        By:_____

                                         _____
                                         Town Council

_____

_____        By:_____
                                         Kirk Blouin
                                         Town Manager

                                         APPROVED AS TO LEGAL FORM AND
                                         SUFFICIENCY

_____

_____        _____
                                         John C. Randolph
                                         Town Attorney

                                         160 ROYAL PALM, LLC, a Florida limited
                                         liability company

_____

_____        By:_____
                                         Cary Glickstein, as Manager for 160 Royal
                                         Palm, LLC, and not individually

9

**EXHBIT A**

**Legal Description for the Land:**

Being Lots 31, 32 and 33, Block F, Royal Park Addition, a subdivision in the Town of Palm Beach, Palm Beach, Florida, as recorded in Plat Book 4, Page 1, Public Records of Palm Beach County, Florida

## CONDITIONAL SETTLEMENT AGREEMENT

This Conditional Settlement Agreement ("Settlement Agreement") is entered into between the Town of Palm Beach Code Enforcement Board ("Town Code Enforcement") of the Town of Palm Beach ("Town"), a Florida municipal corporation, 360 South County Road, Palm Beach, Florida 33480 and 160 Royal Palm, LLC, a Florida limited liability company, 160 Royal Palm Way, Palm Beach, Florida 33480 ("Owner") (Town Code Enforcement and Owner are hereafter collectively referred to as the "Parties").

WHEREAS, on July 30, 2007, Town and Royal 160, LLC ("Former Owner"), the prior Owner of the Land, as hereinafter defined, entered into a Declaration of Use Agreement, recorded in the Official Public Records Book 21987, Page 499, of the Public Records of Palm Beach County, Florida (the "Agreement"), and a Heart of Palm Beach Construction Management Agreement, recorded in the Official Records Book 21987, Page 510, of the Public Records of Palm Beach County, Florida (the "CMA"), concerning the conditional use of the land described in Exhibit A to the Agreement (the "Land") as a hotel and accessory uses consistent with and subject to the conditions for the 'Approval,' including, among other conditions, a liquidated amount of $2,000 per violation per day remedy (the "Violation Assessment"), as specifically set forth in the Agreement;

WHEREAS, the Land is described in **Exhibit A**, attached hereto, it is located within the municipal limits of Town and title to the Land is held by Owner;

WHEREAS, Town and Owner entered into an Amendment to Declaration of Use Agreement made on December 28, 2012 and recorded in the Official Public Records Book 25694, Page 633, of the Public Records of Palm Beach County, Florida (the 'Amendment'), modifying the Agreement for the conditional use of the Land as a hotel and accessory uses and for operation on the Land of the Palm House Hotel ('Hotel') consistent with and subject to the conditions for the 'Approval' including, among other conditions, a February 14, 2013 deadline for the completion of construction of the Hotel (the "Completion Deadline"), as more specifically set forth in the Amendment;

WHEREAS, Owner commenced a civil action in December 2012 in the Fifteenth Judicial Circuit of Palm Beach County, Florida, styled *160 Royal Palm, LLC v. Town of Palm Beach*, Case No.: 502012CA023613XXXXMB (the "Litigation"), seeking a declaratory judgment concerning the Completion Deadline, which action remains pending but currently stayed based on the Bankruptcy Action, as hereinafter defined;

WHEREAS, effective February 15, 2013, Town commenced assessment of the Violation Assessment based on Owner's failure to complete construction of the Hotel by the Completion Deadline, despite Owner's contention that the Completion Deadline had been extended for two years, as alleged in the Litigation;

WHEREAS, Town and Owner entered into a Second Amendment to Declaration of Use Agreement made on August 13, 2013 and recorded in the Official Public Records Book 26251,

1

Page 78, of the Public Records of Palm Beach County, Florida (the 'Amendment')(hereinafter the "Second Amendment" for clarity), modifying the Agreement for the conditional use of the Land as a hotel and accessory uses and for Owner's operation on the Land of the Palm House Hotel ('Hotel') consistent with and subject to the conditions for the 'Approval,' including, among other conditions, the Completion Deadline, as specifically set forth in the Second Amendment;

WHEREAS, in 2014, the Town of Palm Beach Police Department, Code Enforcement Office initiated a code enforcement action, Case # CE-14-1212, 160 Royal Palm Way, 160 Royal Palm LLC, against the Land for unauthorized construction of the Hotel by Owner.  Owner failed to satisfy or correct the code enforcement violation resulting in the entry of an Order Assessing Fine and Order Imposing Lien by Town Code Enforcement in the amount of $250 a day, commencing January 10, 2015 (the "Code Enforcement Fine"), which is recorded in Official Records Book 27315, page 1368 of the Public Records of Palm Beach County, Florida (the "Code Enforcement Lien") to enforce compliance with the code enforcement order (the "Code Enforcement Order") requiring the removal of all unpermitted work done beyond the scope of Owner's approved variances and building permits and passing all inspections;

WHEREAS, in 2014 construction of the Hotel was terminated and abandoned without completion or compliance with the Code Enforcement Order and the building permit for construction of the Hotel expired;

WHEREAS, on or about December 15, 2014 a civil action was commenced in the Fifteenth Judicial Circuit of Palm Beach County, Florida, styled as *Ryan Black v. Gerry Matthews*, et al, Case No.: 502014CA014846XXXXMB AG (the "Receivership Action") by Ryan Black, as a member and former managing member of Palm House, LLC, a Delaware limited liability company and the sole member of Owner, seeking appointment of a receiver for Owner;

WHEREAS, on or about July 20, 2015 the court in the Receivership Action entered an Amended Agreed Order on Plaintiff's Motion to Appoint Receiver (the "Receivership Order") whereby Cary Glickstein (the "Receiver") was appointed as Receiver for the real and personal property of Owner, including the Land and the partially constructed Hotel, and directed by the Receivership Order to pursue completion of the Hotel, upon securing construction financing, as approved by Town;

WHEREAS, in November 2015, Receiver applied for and on January 13, 2016, the Town Council granted the Receiver approval of Site Plan # 1-2016 with Special Exception for construction of the Hotel (the "Development Approval"), imposing conditions of approval in order to regulate the use, mitigate any adverse impacts of the use, and insure that said use shall not be adverse to the public interest, including, in part, correction of the unauthorized  construction underlying the Code Enforcement Lien, which approval was to be further memorialized in a Third Amendment to Declaration of Use Agreement (the "Third Amendment"), which has not been executed nor has the work commenced, as authorized by the Development Approval, by application for a building permit revision;

2

WHEREAS, in November 2016, the Receiver sought and on December 14, 2016, the Town Council granted the Receiver's request for a conditional, temporary abatement of the Violation Assessment accruing since February 15, 2013, which abatement remains conditionally and temporarily in effect;

WHEREAS, on or about November 17, 2016, the Receiver applied for and the Town Code Enforcement Board granted the Receiver's request for a conditional, temporary abatement of the Code Enforcement Fine accruing since January 10, 2015, which abatement remains conditionally and temporarily in effect.  Among the conditions imposed for the continued abatement of the Code Enforcement Fine was payment to the Town of the Code Enforcement Fine amount accruing before the abatement date, which amount was paid in full;

WHEREAS, because the work authorized by the Development Approval could not be commenced within 12 months from the date of Town Council approval, in December 2016, Receiver applied for and in January 2017 the Town Council granted the Receiver's request to extend the Development Approval for one year through January 13, 2018;

WHEREAS, because the work authorized by the Development Approval could not be commenced within 12 months from the date of Town Council approval, in or about December 2017, Receiver applied for and in January 2018 the Town Council granted the Receiver's second request to extend the Development Approval for one year through January 9, 2019;

WHEREAS, on July 3, 2018, an order was entered by the Court in the Receivership Action expanding the Receiver's powers and making the Receiver the sole and exclusive manager of Owner, among other powers;

WHEREAS, on August 2, 2018, Owner, by and through the Receiver as the sole and exclusive manager of Owner ("Manager"), filed a petition for Chapter 11 bankruptcy relief in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach, styled *In re: 160 Royal Palm, LLC*, Case No.: 18-19441-EPK (the "Bankruptcy Action");

WHEREAS, Manager believes the sale of the Land and the Hotel (collectively, the "Property" or "Project") to a qualified buyer is in the best interests of Owner's creditors, Town, Town Code Enforcement and interested parties and represents a final opportunity for the Manager to accomplish what the Receiver could not by completion of the Hotel as approved by Town;

WHEREAS, Owner, under the direction of Manager and subject to court approval in the Bankruptcy Action, intends to sell the property to a qualified buyer who will comply with the Code Enforcement Order, complete construction of the Hotel as approved by Town consistent with the Development Approval;

WHEREAS, the Code Enforcement Order, Code Enforcement Fine, Code Enforcement Lien, Violation Assessment and impending expiration of the Development Approval in January 2019 separately and collectively create uncertainty in any prospective buyer's evaluation of the Land and the Hotel for acquisition purposes and that uncertainty materially and adversely affects the marketability of the Property and viability of the Project;

3

WHEREAS, Town Code Enforcement's and Town's interests are furthered by the sale of the Property to a qualified buyer who will comply with the Code Enforcement Order and complete the Project in accordance with the Development Approval;

WHEREAS, Owner and Town are entering into a separate Conditional Settlement Agreement ("Town Settlement Agreement") to conditionally compromise and settle all claims, demands, rights and causes of action with respect to the Violation Assessment and the impending expiration of the Development Approval; and

WHEREAS, further to the above objectives, the Parties desire to conditionally compromise and settle all claims, demands, rights, and causes of action with respect to the Code Enforcement Order, Code Enforcement Fine and Code Enforcement Lien.

**NOW THEREFORE**, in consideration of the mutual promises, premises and covenants set out in this Settlement Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby expressly acknowledged, and upon the terms and subject to the conditions contained herein, the Parties expressly agree and covenant as follows:

**Section 1: <u>Incorporation of Recitals</u>**

The Parties expressly incorporate the recitals of this Settlement Agreement as a part hereof.

**Section 2.  <u>Continued Abatement of Code Enforcement Fine</u>.**

Town Code Enforcement agrees to reinstate, if necessary, and conditionally abate accrual of the Code Enforcement Fine for an abatement period through April 30, 2019.  Upon timely payment of the Settlement Amount, as defined in as defined in the Section 3 below, by a "Qualified Buyer," as defined in Section 5 below, the foregoing abatement shall continue and remain in force and effect conditioned on completion of construction of the Hotel in accordance with the Developer Approval and building permit revision, as may be modified by agreement of Town and the Qualified Buyer.

**Section 3: <u>Settlement Amount; Payment</u>**

Town Code Enforcement agrees to accept payment of $50,000.00 (the "Settlement Amount") to Town from a Qualified Buyer, as hereinafter defined, in full and final settlement of the Code Enforcement Fine accruing through April 30, 2019 provided such payment is delivered to Town on or before the earliest of (1) thirty days from the closing on the sale of the Property or (2) December 31, 2018.  Payment shall be made in a single payment payable to Town of Palm Beach and delivered to Town at 360 South County Road, Palm Beach, Florida 33480.  Timely payment of the Settlement Amount shall be an express condition precedent to the abatement of the Code Enforcement Fine through the abatement period set forth in Section 2.

**Section 4: <u>Satisfaction and Discharge of Code Enforcement Lien</u>**

Upon the first to occur of: (i) Town Code Enforcement inspection and verification of compliance with the Code Enforcement Order to the reasonable satisfaction of Town Code

4

Enforcement, or (ii) Qualified Buyer's timely completion of the Hotel, as provided in the Third Amendment, a revised CMA and building permit revision, Town Code Enforcement shall prepare, execute and record a recordable satisfaction of the Code Enforcement Lien.

### Section 5:  Qualified Buyer

For purposes of this Settlement Agreement, a Qualified Buyer ("Qualified Buyer") shall be the purchaser of the Property pursuant to a fully performed contract and sale approved by court order in the Bankruptcy Action, excluding Owner, Former Owner, Palm House, LLC, any current or former manager or member of Owner, Former Owner or Palm House, LLC, and any other party to the Receivership Action or any other pending civil action in which Owner is a party, other than Town.  While this Settlement Agreement is expressly intended for the benefit of a Qualified Buyer, nothing in this Agreement shall prevent Town Code Enforcement, in Town Code Enforcement's discretion, from extending the benefits conferred under this Settlement Agreement to a buyer who is not a Qualified Buyer hereunder.

### Section 6:  Conditional Settlement

This Settlement Agreement shall be of no force or effect unless it and the Conditional Settlement Agreement between Owner and Town are both executed and delivered by the respective Parties and approved by a court order duly entered in the Bankruptcy Action.  In the event (1) payment of the Settlement Amount is not timely paid to Town Code Enforcement; (2) a Third Amendment to Declaration of Use Agreement is not timely executed by and delivered to Town by the Qualified Buyer or (3) construction of the Hotel is not timely completed by the Qualified Buyer in accordance with the Third Amendment to Declaration of Use Agreement and building permit revision, then the Development Approval shall expire. Unless otherwise extended by Town, the Code Enforcement Fine abatement shall terminate and the assessment and fine shall be reinstated, respectively, as if the abatements had never been granted, less payments received by Town Code Enforcement, and the Code Enforcement Lien shall remain in force and effect until satisfied in accordance with the Code Enforcement Lien. If the Bankruptcy Action is dismissed before the sale of the Property or if Owner is otherwise prevented or unable to sell the Property to a Qualified Buyer, Owner reserves all of its rights, claims and defenses as asserted in the Litigation and/or that are or as may be available to Owner in the Bankruptcy Action with regard to the Property, the Violation Assessment, the Code Enforcement Fine and/or the Code Enforcement Lien.

### Section 7: No Admission of Liability or Fault

This Agreement is a compromise of a disputed claim and the execution of this Settlement Agreement is not, and should not be construed to be, as an admission of liability or fault on the part of any party, their respective successors, assigns, subsidiaries, affiliates, agents, managers, members, partners, and employees, and by executing this Settlement Agreement the Parties expressly deny any liability or fault.

### Section 8: Governing Law

5

This Settlement Agreement shall be interpreted, construed and enforced pursuant to and in accordance with the laws of the State of Florida.

### Section 9: Attorneys' Fees and Costs

In the event of litigation to enforce the terms of this Settlement Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs from the non-performing party. Except as specifically provided in this Settlement Agreement, the Parties shall bear their own respective attorneys' fees and costs incurred in connection with the Litigation and the negotiation and performance of this Settlement Agreement.

### Section 10: Time is of the Essence

Time is of the essence for all dates and time periods expressed herein.

### Section 11: Choice of Law and Forum Selection

The Parties agree that this Settlement Agreement is made and entered into in the State of Florida, and shall in all respects be interpreted, enforced and governed under the laws of the State of Florida without applying conflict of laws principles, and shall be subject to the exclusive jurisdiction of the courts of Florida. The sole and exclusive venue for any litigation arising out of, or relating to this Settlement Agreement shall be in Palm Beach, Florida, to the exclusion of any and all other venues.

### Section 12: Interpretation of Settlement Agreement

The Parties have been represented by counsel, and have reviewed this Settlement Agreement through their respective attorneys or have had the opportunity to do so. None of the Parties (nor any attorney for any of the Parties) shall be deemed to be the drafter of this Settlement Agreement. Any rule of construction under Florida law requiring that ambiguities be resolved against the drafting party shall not be employed in the interpretation of this Settlement Agreement. The Parties further agree that all parts of this Settlement Agreement shall in all cases be construed as a whole according to its fair meaning.

### Section 13: Successors and Assigns

This Settlement Agreement shall apply to the Parties, as well as to each of their predecessors, successors and assigns.

### Section 14: Declaration of Use Agreement, the Amendment and the Second Amendment

The Declaration of Use Agreement, the Amendment to Declaration of Use Agreement and the Second Amendment to Declaration of Use Agreement remain in full force and effect, subjection to further modification by a Third Amendment to Declaration of Use Agreement between Town and a Qualified Buyer, as generally described herein.

6

**Section 15:  Authority to Execute Settlement Agreement**

Each of the Parties, and those persons executing this Settlement Agreement on behalf of the Parties, warrants to the other that each has full power, authority and capacity to execute this Settlement Agreement.  In addition, the Parties warrant and represent that they are the owner of the claims asserted against the other and have not transferred or assigned any claim, in whole or in part.

**Section 16: Town Code Enforcement Cooperation**

In connection with Owner's sale of the Property to a Qualified Buyer as authorized and approved in the Bankruptcy Action, Town Code Enforcement agrees to cooperate with the settlement, title or closing agent, Owner and the Qualified Buyer, at no expense to Town Code Enforcement, and use its best reasonable efforts to timely review and comply with written requests for information, acknowledgements and confirmations further to Owner's conveyance of title, confirmation of Qualified Buyer status, and verification of the recitals set forth in this Settlement Agreement as of the Closing Date.

**Section 17:  Headings**

All sections, titles or captions contained in this Settlement Agreement are for convenience only and shall not be deemed to be a part of this Settlement Agreement, and shall not affect the meaning or interpretation of this Settlement Agreement.

**Section 18:  Merger**

There have been no written or oral representations made, or relied upon, by the Parties as inducement for the execution of this Settlement Agreement that are not expressly stated herein. The terms of this Settlement Agreement are contractual, not mere recitals, and may be enforced by a court of competent jurisdiction.  No changes in or additions to this Settlement Agreement shall be valid, enforceable or recognized, unless made in a writing and signed by all of the Parties.

**Section 19: Execution in Counterparts**

This Settlement Agreement may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one and the same instrument. Additionally, the different counterparts of this Settlement Agreement may be executed separately by each signatory, and all such separately executed counterparts, when taken together, shall be treated as and constitute one and the same instrument. Any signature delivered by electronic or facsimile transmission shall be treated in all manner and respect as an original document.

IN WITNESS WHEREOF the Parties have hereunto set their hands and seals the day and year first above written.

Signed, sealed and delivered
in the presence of:

                                         TOWN OF PALM BEACH CODE
ENFORCEMENT BOARD OF THE
TOWN OF PALM BEACH

_____

_____       By:_____
Anthony Natalie
Code Enforcement Board Chair

_____

_____       By:_____
Kirk Blouin
Town Manager

APPROVED AS TO LEGAL FORM AND
SUFFICIENCY

_____

_____       _____
John C. Randolph
Town Attorney

160 ROYAL PALM, LLC, a Florida limited
liability company

_____

_____       By:_____
Cary Glickstein, as Manager for 160 Royal
Palm, LLC, and not individually

**EXHBIT A**

**Legal Description for the Land:**

Being Lots 31, 32 and 33, Block F, Royal Park Addition, a subdivision in the Town of Palm Beach, Palm Beach, Florida, as recorded in Plat Book 4, Page 1, Public Records of Palm Beach County, Florida