UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

160 Royal Palm, LLC,                          Case No.  18-19441-EPK

Debtor.                                       Chapter 11

_____/

**DEBTOR'S MOTION TO LIMIT CREDIT BIDS WITH RESPECT
TO SALE OF SUBSTANTIALLY ALL OF ITS ASSETS**

    160 Royal Palm, LLC (the "Debtor"), hereby files this *Motion to Limit Credit Bids with Respect to Sale of Substantially All of its Assets* (the "Motion"), and in support thereof, states as follows:

**FACTUAL BACKGROUND**

**A.      The Parties.**

    1.      The Debtor is a Florida limited liability company that filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 2, 2018 (the "Petition Date").  The Debtor's principal asset is a partially completed hotel-condominium project known as the Palm House Hotel (the "Hotel") located at 160 Royal Palm Way, Palm Beach, FL 33480.

    2.      Prior to the Petition Date, the Circuit Court for the Fifteenth Judicial Circuit in and for Palm Beach County, Florida appointed Cary Glickstein ("Mr. Glickstein") as a receiver over the Hotel, and later appointed him as the sole and exclusive manager of the Debtor.  Mr. Glickstein continues to operate the Debtor as a debtor in possession.

    3.      Palm House, LLC (the "Palm House") is a Delaware limited liability company whose sole purpose is to own 100% of the Debtor.  Gerry Matthews owns 99% of Palm House for the benefit of his brother, Robert Matthews ("Mr. Matthews") and Maria "Mia" Matthews ("Mrs.

<u>Matthews</u>"), Mr. Matthew's wife.  The remaining 1% is owned by Ryan Black.[1]  During all relevant periods prepetition, Mr. Matthews effectively controlled Palm House.

4.    Until August 2013, Glenn Straub ("<u>Mr. Straub</u>") owned 100% of the Debtor.  Mr. Straub served as the Debtor's manager and president until September 17, 2013.  On September 17, 2013, Mr. Straub filed a Resignation of Member, Managing Member or Manager from Florida or Foreign Limited Liability Company (the "<u>Resignation</u>") with the Florida Department of State, Division of Corporations.  A copy of the Resignation is attached hereto as **EXHIBIT A**.

5.    Mr. Straub owns and controls KK-PB Financial, LLC ("<u>KK-PB</u>"), a Florida limited liability company with its principal place of business located at 13501 South Shore Boulevard, Suite 103, Wellington, Florida 33414.  KK-PB has alleged it has a secured claim against the Hotel. *See* ECF No. 69.

6.    Palm House Hotel, LLLP ("<u>PHH</u>") is a Florida limited liability partnership, with its principal place of business located at 9100 Belvedere Road, #207, Royal Palm Beach, Florida 33411.  PHH is owned by and/or controlled by Joseph Walsh ("<u>Walsh</u>") through two of his companies, South Atlantic Regional Center, LLC and USREDA Holdings LLC.  The Debtor believes that PHH may assert a secured claim against the Hotel and a right to credit bid.

**B.    Mr. Matthews, KK-PB, Mr. Straub and PHH Are Involved in a Fraudulent Scheme to Defraud Foreign Nationals to Invest Over $50 Million Dollars in a Hotel Project.**

7.    On November 14, 2016, approximately 63 foreign nationals (the "<u>EB-5 Creditors</u>") filed a complaint with the United States District Court for the Southern District of Florida initiating Case No. 9:16-cv-81871-KAM.  On August 30, 2017, the EB-5 Creditors filed an *Amended*

---

[1] In Mr. Matthews' chapter 11 disclosure statement, he explains how his brother holds the beneficial interest of the Palm House in trust for him and Mrs. Matthews.  *See In re Robert Matthews*, Case No.: 17-23426-MAM.  Also, in his Official Form 26 Periodic Report, Mr. Matthews lists: i) a "Joint Equitable/Beneficial interest in 99% membership interest" in Palm House and ii) an "Indirect interest via Palm House LLC, which owns a 100% membership interest in 160 Royal Palm LLC" in the Debtor.  *See* ECF No. 37, 17-23426-MAM.

*Complaint Seeking Damages and Preliminary and Permanent Injunctive Relief* (the "EB-5 Complaint") that names the following parties as defendants: Joseph Walsh, Joseph Walsh, Jr., J. Marcus Payne, David Derrico, South Atlantic Regional Center, LLC, USREDA, LLC, JJW Consultancy, Ltd., Mr. Matthews, Mrs. Matthews, Gerry Matthews, Ryan Black, Palm House, Palm House PB, LLC, Mirabia, LLC, Bonaventure 22, LLC, ALIBI LLC, Alibi Ltd., Nicholas Laudano, New Haven Contracting South, Inc., Botticelli Advisors, LLC, NJL Development Group LLC, Ali Herischi, Herischi & Associates LLC, Eric Erkan Nur, and KK-PB (collectively, the "Bad Actors")[2], along with Leslie Robert Evans, Leslie Robert Evans & Associates, P.A. and PHH (collectively, with the Bad Actors, the "Defendants").[3] A copy of the EB-5 Complaint is attached hereto as **EXHIBIT B**.

8.    The EB-5 Creditors assert that the Bad Actors orchestrated a massive scheme to fraudulently induce them to invest approximately $50 million upon promises of U.S. citizenship in exchange for their investments.

9.    Each of the EB-5 Creditors invested $500,000 (plus an estimated $40,000 administrative fee) in exchange for an alleged first-priority lien on the Hotel through PHH.   The EB-5 Complaint asserts *inter alia* the following factual allegations:

   a.   KK-PB, along with the other Bad Actors, preyed on foreign nationals with minor children desirous of leaving foreign countries, such as China and Iran, to provide their families with the opportunity for a better life in the United States through the EB-5 program, and conspired to fraudulently induce each Plaintiff to invest $500,000, plus a $40,000 "administrative fee," into a purported Palm Beach real estate project, known as the "Palm House Hotel" which was simply a mechanism to steal Plaintiffs' funds and distribute them among the conspirators.

---

[2] The foregoing individuals were defined as the "Bad Actors" in the EB-5 Complaint.  The Debtor does not use that phrase pejoratively and has adopted it herein solely for consistency purposes.

[3] The EB-5 Creditors also named the Debtor as a defendant; however, upon the Debtor filing a suggestion of bankruptcy, the district court entered an order staying the case as to the Debtor [Dist. Ct. ECF No. 312, Case No. 16-81871].

b.   The Bad Actors fraudulently obtained $500,000, plus $40,000-$60,000 in administrative fees, from each foreign investor through the sale of alleged equity interests in PHH that would be involved in the development of the Palm House Hotel, claiming that the investment would qualify them under the EB-5 program administered by United States Citizenship and Immigration Services.

c.   The EB-5 Creditors' funds were supposed to be held in an escrow account unless and until their I-526 immigration petitions were approved by the United States government. If and when the EB-5 Creditors' I-526 petitions were approved, the funds were supposed to be used to create at least 10 full-time jobs for qualifying U.S. workers, in this case by: (a) finishing the renovation and development of an existing luxury hotel structure in Palm Beach; (b) serving Palm Beach County by seeking to create jobs and increase U.S. exports by developing an upscale resort hotel; and (c) creating at least 790 direct and indirect jobs to support the EB-5 guidelines and the number of investors sought.

d.   The EB-5 Creditors' funds were not held in the escrow account.  Instead, contrary to all of the written and oral representations, the EB-5 Creditors' funds were stolen and transferred from the escrow account to other accounts and pillaged for the personal pleasure of the conspirators.

e.   Specifically, once the EB-5 Creditors' funds arrived in the escrow account, most of the money was immediately moved to a second account. From those two accounts, between $10,000,000-$20,000,000 of the EB-5 Creditors' funds were stolen, and never sent to the project or anyone else purportedly associated with the development of the project.  Rather, those funds were "skimmed" right off the top, and used for non-allowable purposes, including personal expenses and investments.

f.   After $10,000,000-$20,000,000 of the EB-5 Creditors' funds were immediately stolen, additional transfers of between $20,000,000-$25,000,000 of the EB-5 Creditors' funds were sent to pay the other conspirators in the scheme.  Those funds were used to: (a) purchase multiple homes, investment property, a 151 foot yacht that cost almost $6,000,000, a luxury car, vacations, and other accoutrements of a life of luxury; (b) pay personal debts, including more than $266,000 in personal back taxes; and (c) grease all the wheels that furthered the criminal scheme, including a licensed attorney that helped fraudulently induce the certain victims' investments.

g.   Virtually none of the EB-5 Creditors' funds were used develop the property, no jobs were created, and no EB-5 visas were issued to any of the the EB-5 Creditors. Accordingly, over 90 foreigners are now unable to leave their respective countries and have lost their entire lifesavings.

h.   With respect to KK-PB specifically, while it obtained its mortgage in August 2013, it did not record its mortgage until seven (7) months later, on March 28, 2014, which created the façade that the real property was unencumbered by such debt and that

the EB-5 Creditors would, indeed, obtain a first mortgage on the real property that fully secured their investment once a purported bank loan was paid off.

i.   KK-PB also improperly benefited from the scheme by receiving transfers of the EB-5 Creditors' stolen money.

j.   The EB-5 Creditors have alleged that the certain Bad Actors transferred between $20,000,000-$25,000,000 of the EB-5 Creditors' funds to accounts belonging to KK-PB and six other parties.

k.   Mr. Straub and KK-PB were aware that PHH intended to offer an EB-5 visa program at the Palm House Hotel, and that they intended to obtain foreign investors in the project.

l.   Upon information and belief, Mr. Straub and KK-PB were informed that the foreign investors were told that there was a $29,500,000 bank loan and mortgage against the property, and that those funds were being used to create jobs and continue the construction.

m.   Upon information and belief, Mr. Straub and KK-PB were informed that the foreign investors were told that their investments would be used to pay off the $29,500,000 bank loan, at which time they would receive a first mortgage on the Property.

n.   Upon information and belief, Mr. Straub and KK-PB were informed that the foreign investors would be told that their investments would be fully secured by the Property.

o.   Upon information and belief, Mr. Straub and KK-PB intentionally failed to record the Mortgage for almost seven (7) months to create the façade to potential foreign investors that the Property was unencumbered by his mortgage, which was in excess of $27,000,000.

p.   Upon information and belief, Mr. Straub and KK-PB recorded the Mortgage on March 28, 2014, only after being informed that most of the EB-5 Creditors had already performed their due diligence, signed their documentation, and wired their investments to be used at the Palm House Hotel project.

q.   Mr. Straub and KK-PB conspired with and/or enabled the Bad Actors to fraudulently sell the Palm House investment opportunity to the EB-5 Creditors.

r.   It was never disclosed to the EB-5 Creditors that a prior mortgage in favor of the prior owner/developer existed on the Property.

s.   The Bad Actors represented to the EB-5 Creditors that the only loan on the project was a bank loan, which was being used to create jobs and continue the construction.

t. Further, Mr. Straub and KK-PB impermissibly benefitted from their conduct by collecting payments on the Mortgage from the EB-5 Creditors' funds.

u. With respect to PHH, the EB-5 Creditors were fraudulently induced to each invest $500,000 into PHH in exchange for an interest, the false promises of United States EB-5 visas, and the ultimate return of their investment, with interest.

10.    The EB-5 Complaint also includes fraudulent transfer counts against KK-PB and a claim for an equitable lien against the Hotel.  The case is presently set for jury trial on June 29, 2020.  The EB-5 Creditors have filed proofs of claim in the Debtor's bankruptcy case that appear to allege an equitable lien on the Hotel.

**C.    The Hotel and Most Recent Leveraged Buy-Out Transaction.**

11.    In August 2006, Mr. Matthews purchased the Hotel through a company known as Royal 160, LLC.  Royal 160 defaulted on its mortgage and in 2009 its secured lender initiated a foreclosure proceeding.

12.    Ultimately, the Hotel was sold at auction and Mr. Straub acquired the Hotel (through the Debtor) for $10,000,000.  On October 22, 2009, the state court issued a certificate of title to the Debtor, which Mr. Straub recorded on the same day.  A copy of the recorded certificate of title is attached hereto as **EXHIBIT C**.

13.    In August 2013, when certain of the Bad Actors are alleged to have begun traveling to China and Iran to solicit victims for the fraudulent EB-5 program and Hotel project, Mr. Straub and Mr. Matthews negotiated a sale of Mr. Straub's membership interest in the Debtor to Palm House, which would then be controlled by Mr. Matthews, for the purchase price of $36 million dollars.  EB-5 Compl. ¶¶ 77, 80.  It appears that in 2012, Mr. Straub and the Debtor considered a sale of the Hotel to a company controlled by Mr. Matthews but ultimately to sell Mr. Straub's interest in the Debtor instead.

14.     Through what can best be described as a classic leveraged buyout transaction, Mr. Straub received significant consideration for the purchase of his membership interest in the Debtor and in exchange the Debtor became saddled with substantial debt for no benefit.

15.     Specifically, in August 2013, while serving as the manager and president of the Debtor, Mr. Straub agreed to sell his ownership interest in the Debtor to Palm House.  In exchange, Mr. Straub received:

> a.     A promissory note (the "Note") and mortgage (the "Mortgage") executed by the Debtor in favor of KK-PB for $27,468,750, and
>
> b.     Cash in the amount of approximately $6.9 million, $2.9 million of which came from the accounts of the EB-5 Creditors.

A copy of the Note is attached hereto as **EXHIBIT D**, and a copy of the Mortgage is attached hereto as **EXHIBIT E**.  Copies of the wire transfers from the EB-5 Creditors and related emails are attached hereto as **EXHIBIT F**.

16.     The Debtor, however, received nothing in exchange for the $27 million Mortgage. This fact should be undisputed.

17.     On July 22, 2015, in connection with its defense of the state court foreclosure action, the Debtor took the deposition of Mr. Straub.

18.     Mr. Straub was unable to describe any consideration provided to the Debtor.  For example, when Mr. Straub was asked whether KK-PB wired funds to the Debtor for the transaction, he testified:

> That's a legal question.  I wouldn't be there to receive a wire or anything else that was sent.  I don't know anything about those things.
>
> I have no idea but it might be hearsay anyways, so if somebody would have told me that the wire got done I wouldn't know what the wire was for or what the amount is; it's just the idea that that's clerical work outside of my operations background.

Straub. Depo. Tr. 79:2-79:15, July 22, 2015.  A copy of the Mr. Straub's deposition transcript is attached hereto as **EXHIBIT G**.

When Mr. Straub was asked whether KK-PB ever transferred anything of value to the Debtor, Mr. Straub testified:

> Over my pay scale.  That's not my job to do in the company.  I'm in operations.  If that's what the company did, the company speaks will give you some- some person personally would know that in detail more than I would.  I'm into moving two by fours around, I'm into hiring contractors to put air conditioning in.

Straub. Depo. Tr. 82:4-82:13.

When asked whether KK-PP wrote a check to any third party with respect to the transaction, Mr. Straub testified:

> I wouldn't know right sitting here.  The document reflects that we would have probably been able to answer that, but as far as me sitting here memorizing all these different companies.  So, the question is find a document if a document exists.  That is KK, whatever wrote a check.

Straub. Depo. Tr. 33:18-34:2.

19.    As a result of Mr. Straub's evasive testimony, the following day Alan Burger, foreclosure defense counsel for the Debtor, emailed Alexander Domb ("Mr. Domb"), counsel for Mr. Straub. seeking to narrow the issues and determine what, if any, consideration the Debtor received in exchange for the $27 million Mortgage to KK-PB.  In response, Mr. Domb stated the following:

> I am actually dumbfounded that you are stuck on the question of KK-PB's advance of funds by wire or any other means.  I believe the Assignment of Interest Agreement provides for the fact that Glenn Straub personally was the Seller of 100% of his membership interest in the LLC known as 160 Royal Palm to Buyer Palm House, LLC.  Based on the way in which the transaction was finally structured, Glenn Straub, as the Seller, was entitled to receive the sum of $27,468,750.00 from the purchaser representing the balance of the amount due in payment for his asset.  The only thing the purchaser entity owned of value was its newly acquired interest in 160 Royal Palm which owned the real property, which real property was

pledged as collateral security for the payment of the balance of the purchase price to either Glenn Straub, or an entity of Glenn Straub's choosing.

No money changed hands. An asset changed hands (100% of the membership interest in 160) for which the entire purchase price was not paid by the Buyer, and so in exchange for the promise to pay the balance of the purchase price for the asset at a later date (promissory note to KK-PB), which was secured by a mortgage on the dirt owned by 160 Royal Palm, an asset owned by the acquiring entity, Palm House, LLC.

In the circumstance, there is no wire, no transfer of funds, nor a check for $27,468,750.00. Can we move on to the next issue?

A copy of the July 23, 2015 emails between Mr. Burger and Mr. Domb is attached hereto

as **EXHIBIT H.**

## D.    KK-PB Initiates a Suspect Foreclosure Action Against the Debtor and Hotel that Sheds Further Light on the Overreaching and Inequitable Nature of the Leveraged Buy-Out Transaction.

20.    KK-PB appears to have received three monthly payments on account of the Note and Mortgage from funds provided by the EB-5 Creditors. The Notice of Default attached to KK-PB's *Third Amended Complaint* (the "KK-PB Complaint") as Exhibit 4 states in part that "the Borrower made monthly payments due November 1, 2014, December 1, 2014 and January 1, 2015." A copy of the KK-PB Complaint is attached hereto as **EXHIBIT I**. Deposition testimony of Mr. Matthews suggests that the three mortgage payments came from Mr. Walsh and thus would likely be funds from the EB-5 Creditors. Matthews Depo. Tr. 77:6 – 77:18, May 12, 2016. A copy of Mr. Matthews deposition transcript is attached hereto as **EXHIBIT J**.

21.    Approximately a year after the closing, on September 12, 2014, KK-PB initiated a foreclosure action against the Debtor initially based only on alleged waste, and filed a *Third Amended Complaint* on March 23, 2015 (the "KK-PB Complaint"), a copy of which is attached hereto as **EXHIBIT K**. The KK-PB Complaint alleges that six months after the transaction closed,

the Debtor failed to make the monthly payment due on February 1, 2015 and subsequent payments. *See* KK-PB Compl. ¶ 13.

22.     The Debtor filed an *Answer to Fourth Amended Complaint, Second Amended Affirmative Defense and Second Amended Counterclaims*, a copy of which is attached hereto as **EXHIBIT L**, that raises counts of quiet title, rescission of note, tortious interference with advantageous business relationship, breach of fiduciary duty, indemnity and negligent misrepresentation (the "Counterclaims").

23.     The KK-PB Complaint and foreclosure action are suspect for a number of reasons, and further shed light on the overreaching and inequitable nature of the above-referenced leveraged buy-out transaction.  For example:

a.  The KK-PB Complaint only names two defendants, despite the existence of numerous judgment and construction lien creditors.

b.  KK-PB does not record a *lis pendens*.

c.  The parties have an inordinately difficult time determining what happened during the closing and who received what funds, which should be a straightforward task.

d.  The closing statement, a copy of which is attached hereto as **EXHIBIT M**, makes little sense and has numerous errors, including identifying the "seller" as Palm House and the "buyer" as the Debtor when the Debtor already owned the Hotel and was not buying anything through the transaction, and the seller was Mr. Straub, who was selling his membership interest in the Debtor.

e.  During a deposition on October 19, 2015, Leslie Evans, Esq. ("Mr. Evans"), the closing attorney for the transaction who has since been indicted by a federal grand jury in Connecticut in connection with his involvement in the EB-5 fraud,[4] testified in part that:

> [t]his was one of the craziest, sloppiest closings that I've ever had in 40 years and I'm not sure what the hell went on with some of it. All I know is that there were certain agreements between some of the principles [sic].

---

[4] A copy of the recently unsealed indictment is attached hereto as **EXHIBIT N**.  Mr. Evans has also been sued in various civil actions for his involvement in the EB-5 fraud discussed above.

Evans Depo. Tr. 37:1-37:12, October 19, 2015. A complete copy of Evans deposition transcript is attached hereto as **EXHIBIT O**.

f.  Mr. Evans testified throughout his deposition that many (if not all) of the dollar amounts listed in the closing statement were inaccurate. For example, the closing statement provides that the "seller" was to receive $6,220,920.86 in cash at closing. But as of August 29, 2013, Evans testified that he was allegedly holding only $3,090,000.00 in trust. *See* Evans Depo. Tr. 23-27. When asked why he would have signed the closing statement knowing that it was inaccurate, Mr. Evans stated "[t]he reason being is that this was being directed in large part out of Connecticut. It was late at night. They said sign it, we understand what it is; sign it. And I signed it." *Id*. at 33:2-34:2.

g.  It is unclear why Mr. Evans, as the closing attorney, was taking direction from a Connecticut law firm, but the deposition transcript clearly reveals that Mr. Evans allowed himself to be used as a puppet. At one point, Mr. Evans testified that "I did what I was told by Connecticut, in conjunction with Craig Galle . . . ." *Id*. at 38:9-38:10.

h.  Evans even testified that there were several side deals going on here. Specifically, when questioned about some of the discrepancies in the closing statement, Evans testified that:

> That's what the document says but there were some negotiations going on there between the various representatives and the attorney, Craig Galle, and the attorney up at Rogin Nassau that it was what it was. I never receive[d] the $744,402.00, per se, from the seller that's described in the escrow agreement from Glenn Straub. The seller here is Palm House, LLC, so there's a difference. **There were some side agreements and discussions amongst themselves and nobody objected to any of this until recently**.

*Id*. at 30:7-30:17 (emphasis added).

**E.    Mr. Straub Fails to Timely Construct the Hotel, Encumbers the Property with a Town Fine, and Fails to Provide the Agreed Upon Payment for Such Fine.**

24.     Prior to August 2013, while Mr. Straub owned and controlled the Debtor and Hotel, he committed to the Town of Palm Beach (the "Town") to complete the construction of the improvements on the Hotel by February 14, 2013. An Amendment and a Second Amendment to Declaration of Use Agreement was recorded against the Hotel that provides that if such improvements were not timely concluded, the Hotel owes the Town a $2,000 daily fee for

noncompletion.  Mr. Straub failed to complete the improvements and the Town imposed the daily

fee commencing on February 15, 2013.

25.     While the Town daily fine was accruing, Mr. Straub sold his ownership interest in

the Debtor to Palm House.  As part of the transaction, Mr. Straub and Palm House entered into an

Escrow Agreement dated August 30, 2013, a copy of which is attached hereto as **EXHIBIT P**,  which

provided that Mr. Straub would deposit $744,442 with an escrow agent to address the Town fine

and other violations, and if such violations were not resolved within a few months, the funds would

be released to Palm House.

26.     The Town fine remained unresolved as of the Petition Date.  In violation of the

Escrow Agreement, the $744,442 was never paid to Palm House or the Debtor.  Nor were any of

the violations resolved with the Town.  The Debtor, however, has been negotiating with the Town

to resolve such fine, and to such end filed the *Debtor's Motion for Approval of Settlements with*

*the Town of Palm Beach* [ECF No. 97].

**F.    A Federal Grand Jury in Connecticut Indicts Mr. and Mrs. Matthews, and Mr.**
**Straub Pays for Their Legal Defense, and the Securities and Exchange Commission**
**Sues Mr. Matthews, Palm House and Other Parties.**

27.     In March 2018, the U.S. Attorney for the District of Connecticut charged Mr.

Matthews with a twenty-nine count indictment relating to the fraud perpetuated against the EB-5

Creditors, including *inter alia* tax claims of evasion, wire fraud and bank fraud.[5]  Mr. Matthews

was released on a $500,000 bond.

---

[5] The U.S. Attorney also charged Gerry Matthews and Nick Laudano (the principal of the Hotel's contractor) for
similar crimes.  Gerry Matthews and Nick Laudano have both plead guilty, Gerry Matthews to a charge of wire fraud
and Nick Laudano to charges of bank fraud and illegal monetary transactions.  Both men are awaiting sentencing.  A
copy of the transcript from Gerry Matthews' plea hearing is attached hereto as **EXHIBIT Q**.  The transcript clearly
articulates Mr. Matthews' and Gerry Matthews' involvement in the scheme to defraud the EB-5 Creditors.

28.     Subsequently, a federal grand jury in Connecticut indicted Mrs. Matthews last month.  The government charged Mrs. Matthews with tax evasion, and she was released on a $100,000 bond.  The charges relating to Mrs. Matthews further outline how the Matthews used the Debtor as a vehicle to defraud the EB-5 Creditors and also defraud the IRS by using the Debtor to shield themselves from income that would otherwise be taxable.

29.     Despite being allegedly owed over $37 million, Mr. Straub funded the retainer for the Matthews' criminal defense attorneys.  In a recent lawsuit against the Connecticut law firm of Wiggin & Dana, LLP, Mr. Straub describes in detail how he (through Palm Beach Polo, Inc., another Straub entity) paid for Mr. Matthews' retainer in the criminal matter.  A copy of the complaint against Wiggin & Dana, LLP is attached hereto as **EXHIBIT R**.

30.     On August 3, 2018, the Securities and Exchange Commission filed a complaint against Palm House, Mr. Matthews and other parties for violating the antifraud provisions of the federal securities laws relating to the EB-5 fraud.  A copy of such complaint is attached hereto as **EXHIBIT S**.

31.     The SEC complaint further outlines how the Matthews used EB-5 Creditor monies to fund their lavish lifestyle.  Nonetheless, as described in greater detail *infra,* for reasons unknown to the Debtor, Mr. Straub has continued to aid the Matthews' efforts in defrauding their creditors.

**G.     Mr. Straub and the Matthews' Tangled Financial and Personal History.**

32.     Mr. Straub and the Matthews have a long and tangled history involving financial (and potentially non-financial) dealings that are highly unusual and unlike any debtor-creditor relationship the Court has likely ever seen.  Mr. Straub has repeatedly acted in a manner unlike any legitimate, arm's length lender.

33.    Mr. Straub has been keenly aware of Mr. Matthews' prior financial troubles and the many serious allegations of financial fraud made against Mr. Matthews since as early as 2009.

34.    Despite the knowledge that Mr. Matthews was an extremely poor credit risk, Mr. Straub has continued to "lend" the Matthews money and engage in unconventional business deals with them.

35.    Mr. Straub views Mr. Matthews as a "hustler."  During Mr. Straub's deposition, he testified that:

> [Mr. Matthews] didn't lose that house.  I know some way that son of a gun still holding on to I don't know $16 million house on the ocean without paying anybody anything so I know Bob is a hustler and if you're going to bet on somebody.  If he's a hustler someway he's going to convince the next guy to come up with the money, get a hold of Koch and bring Koch down and get a hold of Green and bring Green down.  There are people in Palm Beach that are a lot riskier than what I am and can afford to write it off.
>
> If I lose -- if I lose this case based on the fact I didn't follow the proper procedures then that just goes to prove to teach me that I'm in a riskier business because I believe I look at the person, that I give them loans based on the person not on something else so I guess normal bankers wouldn't touch him because he wouldn't qualify.  In my case he's a hustler and I'm not saying right or wrong but he's a hustler and he obviously convinced your clients to come up with some money and then he moved that money around besides just to get them the money move the money around.  So that proves this kid is a hustler.  Now maybe you guys will go after criminal means or whatever it may be or whatever agreements that's up to you guys I don't follow with the time period but the guy had proven that me lending him money if he did it once before he maybe come up the third time to pay me off, who knows.  If get paid off.  Then I was right, if I was wrong I would eat it both ways.  I would take the damn thing back and come down there and run some operation that needs another year and a half work done. A year and a half to me, I am 68.  That's a long time to take someone else's five years when they're at age 40.

Straub. Depo. Tr. 152:19-154:11.

36.    The Debtor has only begun its investigation into the extent of below board transactions between the Matthews and Mr. Straub.  While the Debtor believes that the examples set forth in the Motion may only the tip of the iceberg, based upon the complete lack of

consideration for the Mortgage and inequitable conduct, KK-PB should not be permitted to credit bid at the sale of the Hotel.

**H.      Mr. Straub and Mr. Matthews's Prior Dealings.**

> **i.      The Nantucket Scheme.**

37.      Mr. Straub and Mr. Matthews have previously used the legal system to defraud legitimate creditors of Mr. Matthews and to benefit Mr. Straub.  A newspaper article from the Inquirer and Mirror in Nantucket outlining Mr. Matthews' and Mr. Straub's financial dealings is attached hereto as **EXHIBIT T**.

38.      In or around 2009, Mr. Matthews was involved in another failed hotel project in Nantucket, Massachusetts (the "Point Breeze Hotel") and he owed millions to creditors.  Several creditors obtained judgements against Mr. Matthews and sought to collect against his assets, including a house in Nantucket (the "Nantucket Property").  These judgment creditors filed a verified complaint in the Nantucket Superior Court against *inter alia* Mr. Matthews and Equipment Leasing International ("ELI"), an entity owned by Mr. Straub (the "Nantucket Complaint") seeking to unwind the various fraudulent transfers pursuant to the Massachusetts Uniform Fraudulent Transfer Act.  A copy of the Nantucket Complaint is attached hereto as **EXHIBIT U.**

39.      As set forth in the Nantucket Complaint, about one month before the judgment creditors obtained and recorded a writ of attachment in order to execute on the Nantucket Property, Mr. Matthews permitted a $6,000,000 mortgage assignment to be recorded by Mr. Straub's company, on the Nantucket Property (the "Nantucket Mortgage"), presumably with the intent to thwart the subordinate judgment creditors' collection efforts.  Nantucket Compl. ¶ 19-30.  Then, pursuant to a "loan agreement" between Mr. Straub's company and Mr. Matthews, Mr. Straub transferred $773,000 to J.P. Morgan Chase, the holder of the first mortgage on the Nantucket home.

A copy of the loan agreement is attached hereto as **EXHIBIT V.** The loan agreement provided that after the payment to J.P. Morgan Chase, Mr. Matthews was to sell the Nantucket Property and "utilize the proceeds from the sale of the Nantucket home to fund a Trust to be formed for the benefit of Mia Matthews and her two (2) daughters as beneficiaries." The loan agreement further provided that only Mr. Straub could select the trustee under this trust.

40.     Not surprisingly, Mr. Matthews "defaulted" under the loan agreement and in October of 2010, Mr. Straub filed a lawsuit against Mr. Matthews in the Palm Beach County Circuit Court seeking to foreclose the Nantucket Mortgage. In such action, Mr. Straub alleged that the Matthews were transferring money out of their names to third parties. The net result of these machinations was that Mr. Straub successfully alienated whatever equity Mr. Matthews had in the Nantucket Property beyond the reach of Mr. Matthews' legitimate creditors and yet Mr. Matthews remained in possession of Nantucket Home for many years to come.

41.     On July 6, 2009, the judgment creditors filed an involuntary bankruptcy against PB Realty Holdings, LLC ("PB Realty Holdings"), a Massachusetts entity owned by Mr. Matthews that was the owner of the Point Breeze Hotel, thereby initiating *In re PB Realty Holdings, LLC*, Bankruptcy Case No. 09-16389-WCH, Eastern District of Massachusetts (the "PB Realty Bankruptcy"). The chapter 7 trustee in the PB Realty Bankruptcy (the "Trustee") filed an adversary complaint against Mr. Matthews and other parties alleging that Mr. Matthews misappropriated and fraudulently transferred over $50 million in loan proceeds that were meant for the Point Breeze Hotel project, and how he used multiple corporate entities, including Royal 160, LLC (the predecessor entity to the Debtor herein), as alter egos and vehicles to defraud creditors. A copy of the adversary complaint is attached hereto as **EXHIBIT W.**

42.   Ultimately, on November 16, 2012, the Trustee entered into a settlement with Mr. Matthews whereby Mr. Matthews bought his way out of that case for a payment of $600,000 and the purchase of over $36 million in creditor claims (including the claims of the judgment creditors who filed the Nantucket Complaint).

43.   Upon information and belief, Mr. Straub provided the funds and purchased the claims necessary to resolve Mr. Matthews litigation with the Trustee.

44.   Two years after foreclosing on the Nantucket Property, Mr. Straub funded an unknown amount of money to effectuate Mr. Matthews' settlement with the Trustee.  Why would any legitimate arm's length lender fund this settlement?  Would Citibank fund such a settlement?  The answer to those questions is quite obvious.

45.   Notably, Mr. Straub funded this bankruptcy settlement roughly a year prior to his decision to "finance" Mr. Matthews' re-purchase of the Hotel; the decision to fund this settlement occurred approximately two years before Mr. Straub sought to foreclose his Mortgage on the Hotel.

**ii.      Mr. Straub and the Matthews Orchestrate a Friendly Foreclosure of the Lot Behind the Hotel.**

46.   In September 2014, Mr. Matthews used his company, Mirabia, LLC ("Mirabia"), to purchase a lot located behind the Hotel for $5.8 million dollars.  Upon information and belief, the funds used to purchase the lot were diverted funds provided by the EB-5 Creditors.  Mr. Matthews is the owner and manager of Mirabia.   In or around 2015, Mirabia and an entity called Medici Finanza, LLC ("Medici") entered into a Deed in Lieu of Foreclosure dated March 24, 2015 (the "Deed"), and such deed is recorded on May 26, 2016.  The Deed is signed by Les Evans, the Debtor's pre-petition attorney, and witnessed by Craig Galle, Mr. Straub's attorney and registered agent for Medici.

47.    On January 27, 2017, the parties recorded a Corrected Deed in Lieu of Foreclosure, which stated that it was being recorded to correct the notary and witness acknowledgment, and is signed by Ms. Matthews on behalf of Mirabia.

48.    On February 1, 2017, Medici sold the property to Timothy & Gayle DeVries for $5 million dollars, and Craig Galle signed the deed as the manager of Medici.  Upon information and belief, the Debtor believes that Mr. Straub is affiliated with Medici and Timothy & Gayle DeVries, especially in light of his attorney signing the pertinent documents on behalf of such entities.

**I.     Mr. Straub and the Matthews' Continued Dealings.**

49.    As discussed *supra,* despite being purportedly owed over $37 million, Mr. Straub continues to provide significant financial resources to the Matthews.

50.    For example, on June 6, 2018, in order to gain access to Mr. Matthews who was prohibited from speaking to witnesses in the Criminal Case, Mr. Straub filed a *Declaration of Glenn F. Straub* (the "Straub Declaration") in the Criminal Case stating *inter alia* that he considers himself "an acquaintance of Robert Matthews, and a close friend of his wife, Maria Matthews[,]" and "[f]rom time-to-time, I socialize with the Matthews' family, including their two daughters."[6] *See* Straub Decl. ¶ 1.  A copy of the Declaration is attached hereto as **EXHIBIT X**.  The Straub Declaration also states that Mr. Straub loaned Mr. Matthews a car, and he seeks the ability to speak to Mr. Matthews in order to provide support and comfort to the Matthews' family.  *See id*. at ¶ 2-4.

51.    Despite representations in Mr. Matthews' individual Chapter 11 case to the contrary, recent court papers filed by Palm Beach Polo, Inc. ("Palm Beach Polo") indicate that

---

[6] Based on the Straub Declaration, on June 22, 2018, the court issued a *Ruling and Order on Motion to Modify Conditions of Release* permitting Mr. Matthews to communicate with Mr. Straub regarding ongoing business matters not the subject of the prosecution.

Palm Beach Polo, Inc. (through Mr. Straub) loaned Mr. Matthews the $150,000 retainer necessary to retain criminal defense counsel.

52.     As noted in Exhibit R, on September 11, 2017, Palm Beach Polo filed an odd complaint in the federal district court against the Connecticut law firm of Wiggin & Dana, LLP, seeking to recoup the retainer paid to the firm on Mr. Matthews' behalf.

53.     Notably, the complaint highlights Mr. Matthews' and Mr. Straub's business dealings and apparent fallout in July, 2018.  *See* Complaint at Para. 12.

54.     Also, Mr. Straub has paid for the real estate taxes for the Hotel not through KK-PB, but through a different entity.  Specifically, the Palm Beach County Tax Collector's website shows that Arena Ventures LLC paid the Debtor's 2015 real estate taxes in the amount of $212,586.30 on August 17, 2016, and 2016 real estate taxes in the amount of $225,713.93 on August 17, 2016.  A copy of the 2015 tax payment information is attached hereto as **EXHIBIT Y**. A copy of the 2016 tax payment information is attached hereto as **EXHIBIT Z**.  The Florida Department of State, Division of Corporations information regarding Arena Ventures LLC shows that its manager is Mr. Straub, a copy of which is attached hereto as **EXHIBIT AA**.

55.     Mr. Straub's use of a separate entity to satisfy the past due real estate taxes is especially suspect given his prior predilection for orchestrating friendly forecloses that seem to ultimately benefit both the Matthews and Mr. Straub to the detriment of Mr. Matthews' legitimate creditors.

**J.     Mr. Straub's Relationship with Mrs. Matthews.**

56.     Quite possibly the reason why Mr. Straub has formed trusts for the benefit of Mrs. Matthews daughters and altruistically bailed Mr. Matthews out from his litigation in Boston is that Mr. Straub is, in reality, more than just a business associate of the Matthews.

57.     Upon information and belief, Mr. Straub and Mrs. Matthews had and may continue to have a close and intimate relationship.

58.     Ryan Black, the 1% owner of Palm House, has informed the Debtor that in November of 2014 at a business meeting in Mr. Straub's office, when asked why Mr. Straub hadn't declared a default or started to foreclose on the Mortgage, Mr. Straub stated that he would give Mr. Matthews an extension, "every time Bob [Mr. Matthews] let him sleep with Mia [Mrs. Matthews]." An email from Ryan Black confirming these allegations is attached hereto as **EXHIBIT BB**.

59.     More recently; however, it appears that the relationship between Mr. Straub and Mrs. Matthews may have soured.

60.     On July 5, 2018, an entity controlled by Mr. Straub, West Coast Investors, LLC ("WCI"), filed a complaint against the Matthews in the circuit court for St. Lucie County.

61.     The complaint alleges claims of fraudulent inducement with respect to a loan, breach of a loan agreement, promissory estoppel, and unauthorized use of a credit card (the "St. Lucie Complaint"). A copy of the St. Lucie Complaint is attached hereto as **EXHIBIT CC**.

62.     The St. Lucie Complaint shows that WCI's predecessor-in-interest, Palm Beach Polo, Inc., made a $150,000 loan to Mrs. Matthews for the benefit of Mr. Matthews in May 2018, and a second $150,000 loan to Mrs. Matthews for the benefit of Mr. Matthews on May 28, 2018.

63.     An Assignment Agreement dated July 3, 2018 is attached to the St. Lucie Complaint as Exhibit 1 and shows that Palm Beach Polo, Inc. assigned the loans and credit card use claims to WCI, and that Mr. Straub, as president, signed on behalf of both entities. Would Citibank loan one of its commercial borrowers a car or freely let it use a credit card? Obviously not.

64.    Mr. Straub has a history of suing his prior paramours and was being investigated by the Broward State Attorney's Office in that regard.  On two recent occasions, Mr. Straub's company, Palm Beach Polo, Inc. has filed lawsuits seeking to impose liens, obtain judgments and/or foreclose upon the homes of his ex-girlfriends.  A copy of an August 16, 2017 SunSentinel article outlining the allegations of these lawsuits is attached hereto as **EXHIBIT DD.**

## K.    PHH Records a Mortgage on the Hotel Unsupported by Consideration.

65.    Turning to PHH, on or about January 21, 2013, PHH and Palm House entered into a transaction under which PHH would loan Palm House between $500,000 and $39,500,000, and Palm House executed a loan and security agreement in favor of PHH, a promissory note in favor of PHH.  Upon information and belief, the Bad Actors used PHH as the alleged investment company in which the EB-5 Creditors would have an equity interest in in exchange for their investments.

66.    Approximately 20 months later, in September 2014, PHH and the Debtor entered into a Mortgage and Security Agreement (the "PHH Mortgage") under which the Debtor granted PHH  lien on the Hotel to secure a payment of $39,500,000.  The PHH Mortgage, a copy of which is attached hereto as **EXHIBIT EE**, was signed by Ryan Black as the managing member of Palm House.  PHH recorded the PHH Mortgage on October 17, 2014.  PHH did not provide a loan in the amount of $39,500,000 to the Debtor.  Upon information and belief, PHH provided no consideration to the Debtor in exchange for the PHH Mortgage.  Further, upon information and belief, at the time Ryan Black signed the PHH Mortgage, he had been ousted as manager and lacked authority to bind the Debtor.

67.    A few months later, on December 2, 2014, PHH initiated case no.: 2014CA014382 against Palm House by filing a complaint with one count for a breach of promissory note and a

second count for money lent (the "PHH Complaint"), a copy of which is attached hereto as **EXHIBIT FF**.  PHH states that it "advanced at least [$31,800,000] to [Palm House]."  PHH Compl. ¶ 8.  The Debtor is not a party to this suit, and PHH has not sued the Debtor under the PHH Mortgage or otherwise.

## H.    The Proposed Bankruptcy Sale of the Hotel and Mr. Straub's Post-Petition Interference with the Sale Process.

68.    The Debtor is in the process of marketing the sale of the Hotel and has filed a *Motion for the Entry of an Order (I) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially All of its Assets, (II) Approving the Form and Manner of Notice and Sale, (III) Scheduling an Auction and Sale Hearing and (IV) Approving the Sale of the Assets Free and Clear of Liens, Claims and Encumbrances* [ECF No. 92] (the "Bid Procedures Motion"), which includes a proposed asset purchase agreement with a stalking horse bidder for a purchase price of $32,000,000.

69.    Following the Petition Date, on September 6, 2018, Mr. Straub visited the Hotel on two occasions and interfered with the Debtor's meetings with parties interested in the Hotel who may become potential bidders.  The Debtor believes that Mr. Straub has a reputation of being litigious, and his presence on the Hotel would interfere with the marketing of the sale of the Hotel. A potential broker interviewed by the Receiver was reluctant to be involved with the sale of the Hotel based on Mr. Straub's reputation.

70.    The Debtor believes that KK-PB may assert a secured claim and right to credit bid in the amount of $37,000,000 or more, and PHH may assert a secured claim and right to credit bid in the amount of $39,000,000 or more.  Through this Motion, the Debtor seeks to prevent KK-PB and PHH from credit bidding with respect to the sale of the Hotel.

## LEGAL ARGUMENT

**I.     The Court's Power to Limit a Creditor's Right to Credit Bid.**

71.     Pursuant to section 363(k), the Court has the power to limit a creditor's right to credit bid for cause.  Section 363(k) states that:

> (k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11. U.S.C. § 363(k) (emphasis added).

72.     "[O]nly an allowed claim under § 502 is entitled to "credit bid" at § 363(b) sale." *In re RML Dev., Inc.*, 528 B.R. 150, 154 (Bankr. W.D. Tenn. 2014).  While a secured creditor has the right to credit bid, the "law is equally clear, as Section 363(k) provides, that the Court may for cause order otherwise."  *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014) (quotations and citations omitted).  Further, section 105(a) states that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

73.     "The term 'cause' is not defined in the Bankruptcy Code and is left to the courts to determine on a case-by-case basis."  *In re Old Prairie Block Owner, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011).  Various courts have limited credit bid rights where a creditor's allowed secured claim is in dispute, the creditor engaged in inequitable conduct and/or limiting a creditor's right to credit bid would foster a competitive bidding environment.  For example, in *In re Daufuskie Island Properties, LLC*, the court determined that William R. Dixon ("Dixon") would not have the right to credit bid because his secured claim was disputed.  441 B.R. 60, 63 (Bankr. D.S.C. 2010).  The chapter 11 trustee had sought to avoid Dixon's mortgage as a preference but

dismissed such case without prejudice pending determination of the value of the property and to avoid costs. *Id*. at 63. Also, a secured creditor filed a complaint to invalidate and/or subordinate Dixon's mortgage and claim, and the court had determined that such creditor's mortgage had priority over Dixon's mortgage. *Id*. The court held that "Dixon cannot credit bid his asserted mortgage under § 363(k)" and even if he were allowed to credit bid he would be required to "pay the mortgages and liens (if any) which have priority senior to its mortgage." *Id*. at 64.

74.     Also, in *In re RML Dev., Inc.*, the debtor owned two residential apartment complexes. 528 B.R. 150, 152 (Bankr. W.D. Tenn. 2014). A lender asserted a first priority secured claim, and an individual creditor asserted a secured claim in the amount of $3,860,000 under a constructive trust theory that arose prior to the lender's financing arrangement. *Id*. After two pending sales failed to close, the lender sought to amend the sale orders to permit it to credit bid. *Id*. at 153. The debtor argued that the credit bid should be limited to the undisputed portion of the lender's claim, and objected to the lender's interest calculation and payment reconciliation. *Id*. at 156. The court ruled that the lender's right to credit bid would be limited to the undisputed amount of its claim. *Id*.

75.     In *In re The Free Lance-Star Publ'g Co. of Fredericksburg, VA*, the debtors sought to sell its assets through an auction. 512 B.R. 798, 799-800 (Bankr. E.D. Va. 2014). Around the same time, the lender initiated an adversary for declaration that it had a valid and perfected lien on substantially all of the debtor's assets. *Id*. at 800. The court held an evidentiary hearing and determined that the lender did not have a valid lien on certain assets and could not credit bid its claim against such assets. *Id*. The court also determined that the lender had engaged in inequitable conduct that required the court to limit the lender's right to credit bid in order to foster a robust auction because: i) the lender purchased the loan from BB&T and pressed the debtor "'to walk

hand in hand' with it through an expedited bankruptcy sale process" in a "classic loan-to-own scenario[,]" ii) when the lender learned that it did not have a lien on certain assets it made the "unilateral decision to expand the scope of its security interest" when its "overt requests for the Debtors to grant such liens on the Tower Assets failed[,]" iii) the lender did not disclose the filing of such financing statements to expand such scope of its security interest when the lender asked the court to grant it a lien on such assets during the cash collateral hearing, and iv) the lender pressured the debtor to shorten its marketing period and added language in the marketing materials that conspicuously advertise the lender's alleged 39 million dollar credit bid rights to frustrate the competitive bidding process. *Id*. at 803, 806. The court reduced the lender's right to credit bid from 39 million dollars to 13.9 million dollars for assets on which it had a valid lien. *Id*. at 808.

76.     In *Fisker*, Hybrid Tech Holdings, LLC ("Hybrid") purchased a 168.5 million dollar senior loan facility for 25 million dollars. 510 B.R. at 57. The debtors and Hybrid entered into an asset purchase agreement under which Hybrid would purchase the debtors' assets for a 75 million dollars credit bid with no competitive auction process. *Id*. at 57. The debtors, who were non-operating, filed for bankruptcy and insisted that the sale hearing be held with only a 24-business day objection period, despite the court's "repeated admonition that the timing of the Sale Motion was troublesome." *Id*. at 60. The creditors' committee opposed the sale, opposed Hybrid's right to credit bid, and proposed an auction with Wanxing America Corporation ("Wanxing") as a bidder. *Id*. at 60-61. Wanxing made clear it would not participate in an auction if Hybrid was permitted to bid more than 25 million dollars. *Id*. at 60-61. The court limited Hybrid's right to credit bid to 25 million dollars because: i) without the cap, not only would there the bidding be chilled, but there would be no bidding by Wanxing, ii) Wanxiang has a vested interest in purchasing *Fisker* because it recently purchased the primary component of Fisker electric cars for

$300 million through a bankruptcy, iii) "Hybrid's rush to purchase and to persist in such effort is inconsistent with the notions of fairness in the bankruptcy process," and iv) the debtors and creditors committee agreed that Hybrid's claim is partially secured, partially unsecured and of uncertain status for the remainder. *Id.* at 60-61.

77.     Other courts have also concluded that a creditor's right to credit bid could be limited to foster a competitive bidding environment. *See In re The Free Lance-Star Publ'g Co. of Fredericksburg, VA*, 512 B.R. 798, 805 (Bankr. E.D. Va. 2014) (stating that "limiting the amount of the credit bid in this case will restore enthusiasm for the sale and foster a robust bidding process" and "[m]aximizing the value debtors might be able to realize from the sale of their assets is an important policy advanced by the Bankruptcy Code."); *see also In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 316 n.14 (3d Cir. 2010), *as amended* (May 7, 2010) (stating that a "court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.").

**II.     The Court Should Not Permit KK-PB to Credit Bid.**

> **a.     KK-PB Does Not Have an Allowed Claim and Any Claim Filed by KK-PB Would be Subject to Significant Dispute.**

78.     As an initial matter, the Debtor listed KK-PB in its schedule as holding a disputed claim. *See* ECF No. 1.  KK-PB has not filed a proof of claim.  As a result, KK-PB presently does not have any allowed claim.  On this basis alone, KK-PB does not have the right to credit bid.

79.     To the extent KK-PB files a proof of claim, such claim will be subject to significant dispute.  For example, the Debtor intends to initiate an adversary proceeding raising various claims against KK-PB, including but not limited to: i) KK-PB and Mr. Straub provided no consideration to the Debtor and thus the Mortgage and Note are invalid; ii) the Note and Mortgage are avoidable fraudulent transfers because *inter alia* no consideration was provided to the Debtor and Mr. Straub

was an insider of the Debtor at the time he sold his interest to Palm House and obtained the Mortgage and Note for KK-PB;[7] iii) any allowed claim of KK-PB should be equitably subordinated to the claims of other creditors, including those of the EB-5 victims, because, as discussed in greater detail *supra*, Mr. Straub orchestrated the leveraged buy-out described above while he was an insider of, and owed a fiduciary duty, to the Debtor, Mr. Straub engaged in significant self-dealing with respect to such transaction, Mr. Straub received $2.9 million dollars from the accounts of the EB-5 Creditors, Mr. Straub likely received three payments relating to the Mortgage and Note from the EB-5 Creditors, KK-PB and Mr. Straub were involved in the EB-5 fraud, Mr. Straub has an inordinate amount of influence over the Matthews, Mr. Straub and Mr. Matthews have been involved in prior schemes that were used to thwart the legitimate interests of creditors and benefit Mr. Straub;[8] iv) any allowed claim of KK-PB should be recharacterized as equity because even assuming *arguendo* that KK-PB and Mr. Straub provided monies or other consideration to the Debtor (which they did not), the Debtor was under-capitalized at the outset

---

[7] The Debtor believes that such claims would be timely because *inter alia* the Debtor has already asserted the Counterclaims, and the Debtor can stand in the shoes of the EB-5 Creditors who have alleged fraudulent transfer claims against KK-PB and an equitable lien on the Hotel in the EB-5 Complaint, timely placed KK-PB on notice of such claims, and hold unsecured claims against the Debtor.  Moreover, the Debtor believes that the Internal Revenue Service may have an unsecured claim against the Debtor, and therefore, the Debtor would also be able to step into the shoes of the IRS and utilize a ten-year lookback period. *See* EB-5 Compl. at ¶¶ 393-424, 507-529; *see In re Klipnis*, 555 B.R. 877 (Bankr. S.D. Fla. 2016).

[8] Section 510(c) states that after notice and a hearing, the Court may "(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c).  "Proper exercise of the equitable subordination power can take place only where three elements are established: (1) The claimant must have engaged in some type of inequitable conduct, (2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, (3) Subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *In re Rich Capitol, LLC*, 436 B.R. 224, 232 (Bankr. S.D. Fla. 2010) (citing *In re Lemco Gypsum, Inc.,* 911 F.2d 1553, 1556 (11th Cir.1990).

based on the leveraged buyout discussed above and any alleged loan was provided when no disinterested lender would have extended credit.[9]

> **b.  Additional Cause Exists for the Court to Limit KK-PB's Right to Credit Bid Because It Engaged in Inequitable Conduct and Permitting KK-PB to Credit Bid Would Chill the Auction Process.**

80.     In addition to the aforementioned arguments relating to the allowance, extent, priority and validity of KK-PB's claim, the Court should restrict KK-PB's right to credit bid because KK-PB and Mr. Straub have engaged in significant inequitable conduct.

81.     First, Mr. Straub, while serving as the manager and president of the Debtor, negotiated the leveraged buy-out transaction where he engaged in significant self-dealing and overreaching.  Mr. Straub and KK-PB received the Mortgage and Note, and $2.9 million dollars misappropriated from the EB-5 Creditors.  Palm House and Mr. Matthews received the ownership interest in the Debtor.  The Debtor, however, received nothing and, like the EB-5 Creditors, was ultimately fleeced.  The above described testimony of Mr. Straub and email from Alexander Domb confirm that no consideration was provided to the Debtor.  Further, Mr. Straub and KK-PB appear to have received three payments relating to the Mortgage and Note from funds provided by EB-5 Creditors.

82.     Second, KK-PB and Mr. Straub are alleged to have been involved in the fraud perpetrated on the EB-5 Creditors.  As set forth in the EB-5 Complaint: i) KK-PB and Mr. Straub knew that the hotel project would be used as an alleged EB-5 visa program and that the foreign

---

[9] "The issue to be determined in recharacterization is whether a transaction created a debt or equity relationship from the outset." *In re First NLC Fin. Servs., LLC*, 415 B.R. 874, 879 (Bankr. S.D. Fla. 2009) (citations omitted). "Recharacterization prevents an equity investor from labeling its contribution as a loan, and subverting the Bankruptcy Code's critical priority system by guaranteeing itself a higher priority-and a larger recovery-should the debtor file for bankruptcy." *Id.* (quotations omitted). "In recognizing the power of courts to recharacterize debt, the Eleventh Circuit stated the following test: 'Shareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial under-capitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit.'" *Id.* (quoting *In re N & D Properties, Inc.*, 799 F.2d 726, 733 (11th Cir. 1986)).

investors would want a mortgage on the Hotel to secure their investments, *see* EB-5 Compl. ¶ 513-515, ii) KK-PB and Mr. Straub knew that potential investors were likely to perform due diligence and ascertain whether the Hotel provided adequate security for their investments, *see id*. at ¶ 516, iii) although KK-PB and Mr. Straub received the Mortgage from the Debtor on or about August 30, 2013, they did not record it for nearly seven months until March 29, 2014, *see* Mort. 1, iv) KK-PB and Mr. Straub's delay in recording created the façade that the Hotel was unencumbered by such debt, and the EB-5 Creditors would be able to obtain a first position mortgage on the Hotel, *see* EB-5 Compl. ¶ 520, v) by the time KK-PB and Mr. Straub recorded the Mortgage, the EB-5 Creditors had already wired their investments to be used for the hotel project, *see id*. at ¶ 421.    KK-PB is further alleged to have received funds from the defrauded EB-5 Creditors as fraudulent transfers. *See id*. at ¶ 393-424.    Given Mr. Matthew's history elsewhere and his significant unpaid creditors, coupled by losing this exact collateral to foreclosure previously, it defies logic and common sense that KK-PB did not record the mortgage immediately upon closing unless the goal was to conceal the financing.

83.    Third, as described above, KK-PB initiates a suspect foreclosure action in an effort to maintain control over the Hotel, and the parties are unable to determine basic information regarding the closing during discovery in the foreclosure case, including who received what, if any funds and whether or not payments required to be made, were in fact paid.    The closing statement has numerous errors, makes little sense and clearly does not accurately or truthfully reflect the transaction that took place.    The closing attorney, who has been indicted for his involvement in the EB-5 fraud, testified that "[t]his was one of the craziest, sloppiest closings that I've ever had in 40 years and I'm not sure what the hell went on with some of it."    Evans Depo. Tr. 37:1-37:12.    Mr. Straub was unable to articulate whether he or KK-PB transferred any funds with respect to the

transaction and dodged questions by stating "That's a legal question[,]" "I don't know anything about those things[,]" "[o]ver my pay scale[,]" and "[t]hat's not my job to do in the company." *See* Straub. Depo. Tr. 79:2-79:15, 82:4-82:13.

84.     Fourth, Mr. Straub, has had and may continue to have a bizarre and influential relationship over the Debtor, Mr. Matthews and Mrs. Matthews, and should be considered an insider of the Debtor after his resignation as manager and president of the Debtor in September 2013.  Against all logic, Mr. Straub has provided extensive financial support to the Matthews.  He, directly or through his companies, has paid for real estate taxes for the Hotel, loaned Mr. Matthews a car, and in May 2018, provided loans totaling $300,000 to Mrs. Matthews for the benefit of Mr. Matthews.  *See* Straub Decl. ¶ 1; *see* St. Lucie Complaint.  Mr. Straub has also funded the retainer for the Matthews' criminal defense attorneys.  Mr. Straub has described himself as "a close friend of his wife, Maria Matthews."  *See* Straub Decl. ¶ 1.  As discussed above, Ryan Black, the 1% owner of Palm House, has informed the Debtor that in November of 2014 at a business meeting in Mr. Straub's office, when asked why Mr. Straub hadn't declared a default or started to foreclose on the Mortgage, Mr. Straub stated that he would give Mr. Matthews an extension, "every time Bob [Mr. Matthews] let him sleep with Mia [Mrs. Matthews]."  Such a close and intimate relationship between Mr. Straub and Mrs. Matthews further establishes that KK-PB and Mr. Straub are insiders of the Debtor.  *See, e.g., In re McIver*, 177 B.R. 366, 370 (Bankr. N.D. Fla. 1995) (defining an insider relationship to exist when "the relationship between the Debtor and Defendant would cause the Defendant to be able to gain an advantage similar to one arising from affinity.").

85.     Fifth, Mr. Straub and Mr. Matthews have prior dealings that are suspect, including the above described Nantucket scheme, and friendly foreclosure of the lot behind the Hotel.

86.    Sixth, Mr. Straub has continued to attempt to exert control over the Debtor and the Hotel.  For example, in order to obtain access to Mr. Matthews after he was indicted, Mr. Straub filed the Straub Declaration stating that "I would like to have the ability to speak with Mr. Matthews from time-to-time because of his knowledge of the history of the PHH property, all of which can be useful for future sales of the hotel/condo units" and that having no contact with Mr. Matthews would "inhibit my ability to provide the support and comfort to the Matthews' family that I would prefer to give, and hamper my ongoing business dealings with the PHH Hotel property."  Straub Decl. ¶ 3-4.   Also, on September 6, 2018, Mr. Straub visited the Hotel on two occasions, unannounced and interfered with the Debtor's meetings with parties interested in the Hotel who may become potential bidders. The Debtor believes that Mr. Straub has a reputation of being litigious, and his presence on the Hotel would interfere with the marketing of the sale of the Hotel.  A potential broker interviewed by the Receiver was reluctant to be involved with the sale of the Hotel based on Mr. Straub's reputation.

87.    Restricting KK-PB's right to credit bid will facilitate the Debtor's ability to sell the Hotel through the proposed auction and administer the estate's assets for the benefit of its legitimate creditors through this chapter 11 case.   Permitting KK-PB to credit bid, on the other hand, may derail the auction process and chill bidding.

88.    The Debtor has filed the Bid Procedure Motion, requested an auction to be scheduled in early November, and has entered into an asset purchase agreement with a stalking horse bidder for the purchase price of $32,000,000.  Also, as of August 24, 2018, forty-two people have executed confidentiality agreements relating to the potential purchase of the Hotel.  The Debtor is concerned that interested parties will be confused by the status of KK-PB's lien, how the

auction process might proceed, and be less likely to participate in the auction process if KK-PB is permitted to credit bid.

89.    Limiting KK-PB's right to credit bid would help restore and encourage a competitive bidding environment.  Moreover, if KK-PB is permitted to credit bid without providing value to the estate and other creditors, and without providing for the payment of the break-up fee, the Debtor may not be able to proceed with the sale of the Hotel.

**III.    The Court Should Not Permit PHH to Credit Bid Because It Does Not Have An Allowed Claim, Any Claim It Filed Would be Subject to Significant Dispute, It Engaged in Inequitable Conduct, and Permitting PHH To Credit Bid Would Chill the Bidding Process.**

90.    As an initial matter, PHH does not have an allowed claim and on that basis alone, it is not permitted to credit bid.  The Debtor has listed PHH on its schedule as holding a disputed claim.  *See* ECF No. 1.  PHH has not filed a proof of claim.

91.    To the extent PHH files a proof of claim, such claim will be subject to significant dispute.  For example, the Debtor intends to initiate an adversary proceeding raising various claims against PHH, including but not limited to: i) PHH provided no consideration to the Debtor and thus the PHH Mortgage is invalid; ii) the PHH Mortgage is an avoidable fraudulent transfer because *inter alia* no consideration was provided to the Debtor, iii) any allowed claim of PHH should be equitably subordinated to the claims of other creditors because, as discussed in greater detail *supra*, PHH provided no consideration and was involved in the EB-5 fraud,  iv)  any allowed claim of PHH should be recharacterized as equity because even assuming *arguendo* that PHH provided monies or other consideration to the Debtor (which it did not), the Debtor was under-capitalized at the outset based on the leveraged buyout discussed above and the alleged loan was provided when no disinterested lender would have extended credit.

92.     In addition, the Court should restrict PHH's right to credit bid because it engaged in significant inequitable conduct.    In addition to obtaining the PHH Mortgage for no consideration, as set forth in the EB-5 Complaint, PHH was used by the Bad Actors to obtain the investment funds from the EB-5 Creditors by allegedly selling them a limited number of 79 equity interests in PHH, a company that would be used in the development of the hotel and hold a mortgage on the Hotel, in exchange for $500,000 and an administrative fee of $40,000-$60,000. *See* EB-5 Compl. ¶ 13(a), (c).  "PHH was not a legitimate EB-5 project, but rather a façade and vehicle pursuant to which a group of conspirators stole over $40,000,000 from over 90 foreign nationals seeking EB-5 visas and a better life for their families in the United States." *Id*. at ¶ 218. In count II of the EB-5 Complaint, the EB-5 Creditors have sought dissolution of PHH as members of PHH and to remove the Bad Actors from management and pursuing legal claims on behalf of PHH in an effort to cleanse their own criminal wrongdoing and settle claims with no benefit to the fraud victims.  *Id*. at ¶ 303-314.

93.     Permitting PHH to credit bid would chill the bidding process.  The Debtor has filed the Bid Procedures Motion, requested an auction, and entered into an asset purchase agreement with the stalking horse bidder for the purchase price of $32,000,000.   Also, as of August 24, 2018, forty-two people have executed confidentiality agreements relating to the potential purchase of the Hotel.  The Debtor is concerned that interested parties may be confused as to the status of PHH's lien, how the auction process might proceed, and be less likely to participate in the auction process if PHH is permitted to credit bid.  Limiting PHH's right to credit bid would help restore a competitive bidding environment.

94.     The Debtor reserves the right to supplement the Motion following the conclusion of discovery.

## CONCLUSION

95.     In conclusion, KK-PB and PHH should not be permitted to credit bid because they do not have allowed claims, and any secured claim they might assert would be subject to significant dispute.  Further, KK-PB and PHH engaged in significant inequitable conduct.  The Debtor should be permitted to sell the Hotel through a competitive auction process, and hold the net sale proceeds in escrow, pending resolution of the claims of KK-PB, PHH and EB-5 victims.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an Order: i) granting the Motion, ii) providing that KK-PB and PHH are not permitted to credit bid with respect to the sale of the Hotel, and iii) granting the Debtor any other and further relief the Court deems equitable and just.

Respectfully submitted,

SHRAIBERG, LANDAU, & PAGE, P.A.
Attorney for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
plandau@slp.law
blee@slp.law

By: */s/  Philip J. Landau*
Philip J. Landau
Florida Bar No. 504017
Bernice C. Lee
Florida Bar No. 0073535

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on October 5, 2018, via CM/ECF to all parties registered to receive such notice via electronic filing.

*/s/ Philip J. Landau*