UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

160 Royal Palm, LLC,                                    Case No.  18-19441-EPK

Debtor.                                                 Chapter 11

_____/

### DEBTOR'S RESPONSE IN OPPOSITION TO KK-PB FINANCIAL, LLC'S MOTION TO ESTIMATE CLAIM FOR PURPOSES OF CREDIT BIDDING PURSUANT TO 11 U.S.C. §§ 502(c) AND 363(K)

160 Royal Palm, LLC (the "Debtor"), hereby files this response (the "Response") in opposition to KK-PB Financial, LLC's Motion to Estimate Claim for Purposes of Credit Bidding Pursuant to 11 U.S.C. §§ 502(c) and 363(K) [ECF No. 133] (the "Estimation Motion"), and in support thereof, states as follows:

### FACTUAL BACKGROUND

1.      In the interest of brevity, the Debtor hereby incorporates by reference the factual background set forth in, and the exhibits attached to, the Debtor's Motion to Limit Credit Bids with Respect to Sale of Substantially All of its Assets (the "Motion to Limit") [ECF No. 103]. Capitalized terms not defined herein shall have the definitions provided for in the Motion to Limit.

2.      On October 10, 2018, KK-PB filed the Estimation Motion, which asserts that it holds a senior mortgage calculated as follows: "(i) prepetition and postpetition indebtedness of $37,337,705.77, plus interest, penalties, and fees and other charges; and (ii) postpetition indebtedness that continues to accrue interest at $7,489.93 per diem." *See* Est. Mot. ¶ 20.  KK-PB alleges in the Estimation Motion that monthly payments commenced on November 1, 2014 and the Debtor defaulted three months later on February 1, 2015. *See id*. ¶ 6.

3.      As of October 15, 2018, the Debtor estimates that there are secured claims totaling approximately $660,000 based on claims of David Campanaro, James Biagi, Richwood's Woodwork, Inc., The Place for Tile, Inc., Town of Palm Beach, TWG Enterprises Waterproofing & Painting and Van Linda Ironworks, Inc.  In addition, the EB-5 Creditors have filed proofs of claim totaling approximately $41,800,000 based upon funds provided in connection with the EB-5 fraud and asserting an equitable lien on the Hotel (collectively, the "EB-5 Claims").  The Debtor further estimates that other unsecured creditors' claims total $2,750,000, including an unsecured claim in the amount of $2,586,813.30 held by the Internal Revenue Service (the "IRS").  *See* ECF No. 107.  The foregoing excludes the claims of KK-PB, PHH and New Haven Contracting South, Inc.

4.      In addition to the foregoing claims, the Securities and Exchange Commission (the "SEC") holds an unsecured claim (the "SEC Claim") against the Debtor for an unknown amount stemming from its August 3, 2018 complaint (the "SEC Complaint") filed  against various defendants in the United States District Court for the Southern District of Florida, Case No. 9:18-cv-81038-DMM styled *Securities and Exchange Commission v. Palm House Hotel LLLP*.  A copy of the SEC Complaint is attached as Exhibit S to the Motion to Limit.

5.      In the SEC Complaint, the SEC alleges that Palm House, South Atlantic Regional Center, LLC, Joseph J. Walsh, Sr., and Mr. Matthews committed various acts of securities fraud beginning in 2012 against the EB-5 Creditors.  Due to the SEC's allegations that the Debtor received investor funds which were diverted by Mr. Matthews in the scheme to defraud investors, the SEC named the Debtor as a relief defendant in this action against which the SEC is seeking a

disgorgement-of-ill-gotten-gains judgment. *See* SEC Compl. ¶¶ 10 and 41 and Wherefore Clause.[1] The SEC recently received a clerk's default against the Debtor in this regard.[2]

6.     Recently, KK-PB, in a continued effort to protect its own interests at the expense of the victims of the EB-5 fraud, has filed objections to all of the EB-5 Claims seeking that they be disallowed and stricken in their entirety because: i) the Debtor has no direct liability or obligation, ii) the claims are unliquidated and contingent because the EB-5 case is still pending before the district court, and iii) the claims are subsumed by PHH's secured claim. *See, e.g.*, Obj. at ECF No. 116.   The Debtor disagrees with such objections because *inter alia* a creditor is permitted to liquidate its claim through the bankruptcy claims allowance process and the Debtor intends to disallow the PHH secured claim as described in the Motion to Limit. *See* Mot. to Limit ¶ 65-67.

7.     Additional facts are set forth below in the interest of brevity.

## LEGAL ARGUMENT

## I.    The Court Should Estimate KK-PB's Claim at $0.00.

8.     Section 502(c) provides that "[t]here shall be estimated for purpose of allowance under this section--(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or (2) any right to payment arising from a right to an equitable remedy for breach of performance."  11 U.S.C. § 502(c). "'Estimation' for the purposes of section 502(c)(1) simply means that the bankruptcy court may

---

[1] "An [SEC] relief defendant . . . may be joined in the lawsuit to aid the recovery of relief. A relief defendant is not accused of wrongdoing, but a federal court may order equitable relief against such a person where that person (1) has received ill-gotten funds, and (2) does not have a legitimate claim to those funds." *In re Wyly*, 526 B.R. 194, 199 (Bankr. N.D. Tex. 2015) (quoting *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009).

[2] The undersigned counsel recently spoke with counsel for the SEC, who indicated that the SEC intends to file a claim in the instant bankruptcy case.

exercise is discretionary powers to determine the allowability of claims in bankruptcy in accordance with the principles of equity." *Matter of Ford*, 967 F.2d 1047, 1052 n.3 (5th Cir. 1992). "There is no set procedure to estimate the amount of a claim." *In re Trigeant Holdings Ltd.*, No. 14-29027-EPK, 2015 WL 1514175, at *2 (Bankr. S.D. Fla. Mar. 27, 2015). "The bankruptcy court is bound by the legal rules which govern the ultimate value of the claim, should use whatever method is best suited to the circumstances, and will only be overturned in the event of an abuse of discretion." *Id.* (*quoting In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir.1984)). For example, in a different case, the Court estimated a claim at 0.00 based on arguments, briefs, and evidence submitted including affidavits, depositions, declarations, agreements, court orders, e-mail communications and tables, and determined that the "best approach for estimation in this matter is to multiply the face amount of the Lost Profits Claim by the probability that a trier of fact may find in favor of [the creditor]." *Id.*

9.      Here, the Debtor believes that based upon the arguments and evidence submitted by the Debtor that show that KK-PB's claim should not be allowed, and the slight probability the Court will find in favor of KK-PB, KK-PB's claim should be estimated at $0.00. As set forth herein and in the Motion to Limit Credit Bid, the Debtor has numerous claims against KK-PB, including that the Mortgage and Note are unenforceable, the Mortgage, Notes and recording of the Mortgage are avoidable fraudulent transfers, any allowed claim should be equitably subordinated to the allowed claims of other creditors, and any allowed claim should be recharacterized as equity.

**A.    The Note and Mortgage are Unenforceable.**

10.     The Note and Mortgage are unenforceable for lack of consideration. "It is a fundamental principle of contract law that a promise is not enforceable unless it is supported by consideration." *Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311

(11th Cir. 1998) (*citing* See Restatement (Second) of Contracts § 17 (1981) ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.")). "A mortgage is not valid and binding unless founded upon a bona fide and sufficient consideration." *U.S. v. Morrison*, 28 So. 3d 94, 99 (Fla. 1st DCA 2009). "[T]he inquiry [is whether] a mortgagee . . . parted with anything valuable, surrendered an existing right, incurred a fixed liability, or submitted to a loss or detriment, contemporaneously with the execution of the mortgage, or with the agreement, afterwards performed, to execute the mortgage." *Gable v. Drewry's Limited, U.S.A., Inc.*, 68 So. 2d 372, 374 (Fla. 1953).

11.     Multiple courts have concluded that a mortgage or note was unenforceable for lack of consideration where no value was received. *See Kremser v. Tonokaboni*, 356 So. 2d 1331, 1332 (Fla. 3d DCA 1978) (affirming lower court's decision that no consideration was present and foreclosure should be dismissed, stating that "the mortgagee (Stewart) never suffered a detriment of any kind in that no funds were ever advanced to appellee, as mortgagor" and "[l]ikewise, appellee did not receive a benefit from [the mortgagee]); *In re Rolling Thunder Gas Gathering, L.L.C.*, 348 B.R. 803, 810 (Bankr. D. Kan. 2006) (disallowing proof of claim based on note and mortgage under Colorado law because no consideration was provided to the debtor and stating that "[w]here the payee of a promissory note is unable to establish any exchange of money or anything else of value occurred upon the execution of a note, the note is not supported by consideration and is unenforceable.");[3] *In re Fremont Hosp. Grp., LLC*, No. 13-31005, 2014 WL 4796668, at \*9-10

---

[3] The *Rolling Thunder* court noted that under Colorado law "an agreement not supported by consideration is unenforceable[,]" which is similar to Florida law. 348 B.R. at 810; *see Kaufman v. Harder*, 354 So. 2d 109 (Fla. 3d DCA 1978) (stating that "it is clear that such promise was not based upon any consideration and was entirely unenforceable" and the "law is clear that there can be no indebtedness without legal consideration[.]").

(Bankr. N.D. Ohio Sept. 26, 2014) (concluding that where president of debtor executed note and mortgage by debtor in favor of herself individually and provided no funds to the debtor such individual's claim would be disallowed for lack of any valid consideration which is a complete defense to the enforcement of the note and mortgage); *Sec. & Inv. Corp. of the Palm Beaches v. Droege*, 529 So. 2d 799, 801–02 (Fla. Dist. Ct. App. 1988) (noting that the trial judge "cancelled the note and mortgage on the ground that the note had not been funded" and that "the record sufficiently established in this case that the mortgage note failed because of lack of consideration (a failure in this case to "fund" the $55,000 construction loan)").

12.     Here, the transaction reeks of self-dealing.  The Note and Mortgage place no obligation on KK-PB to provide anything in exchange to the Debtor.  *See* Note, Ex. D of Mot. to Limit; *see* Mortgage, Ex. E to Mot. to Limit.  The Debtor already owned the Hotel; it received nothing in exchange for making the Note and granting the Mortgage, and KK-PB incurred no obligation and no detriment in exchange for receiving the Note and Mortgage.  As a result, the Note and Mortgage are unenforceable; the Court should estimate the claim at $0.00 because KK-PB provided no consideration.

13.     The Note and Mortgage are also unenforceable because they are unconscionable. "To find a contract unconscionable under Florida law, a party must establish that the contract is both procedurally and substantively unconscionable."  *Bentley v. EFN W. Palm Motor Sales, LLC*, 214 F. Supp. 3d 1299, 1303 (S.D. Fla. 2016) (citations omitted).  "The Florida Supreme Court has adopted a balancing approach under which 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'"  *Id.* (*quoting* Basulto v. Hialeah Auto., 141 So.3d 1145, 1159 (Fla. 2014)).  "To determine whether a contract is procedurally unconscionable, a court must

look to the manner in which the contract was entered into and consider factors such as whether the complaining party had a meaningful choice at the time the contract was entered into." *Id.* (quotations omitted). "Under Florida law, substantive unconscionability focuses on the terms of the agreement itself and whether the terms of the contract are 'unreasonable and unfair." *Id.* at 1305 (quotations omitted). "Unconscionability is a common law doctrine that courts have used to prevent the enforcement of contractual provisions that are overreaches by one party to gain an unjust and undeserved advantage which it would be inequitable to permit him to enforce." *Id.* "Substantive unconscionability and procedural unconscionability need not exist in equal amounts for the contract to be unenforceable, but there must at least be a modicum of both." *Bhim v. Rent-A-Ctr., Inc.*, 655 F. Supp. 2d 1307, 1313 (S.D. Fla. 2009).

14.    Procedural unconscionability exists here because Mr. Straub was on every side of the transaction. The Note and Mortgage were executed by the Debtor in favor of KK-PB while Mr. Straub controlled KK-PB and was the Debtor's manager and president. *See* Mot. to Limit ¶ 4-5. Mr. Straub controlled the Debtor directly at the time the deal was negotiated, and then later, indirectly through his control of the Debtor's subsequent principal, Mr. Matthews, as discussed in detail in the Motion to Limit, and the Debtor had no real bargaining power in the transaction. Mr. Straub facilitated a transaction under which his company, KK-PB, received significant advantages and the Debtor received nothing, in violation of his fiduciary duties to the Debtor. Substantive unconscionability exists because the Debtor's agreement to be saddled with more than $27 million dollars in debt secured by the Mortgage on its primary asset, in exchange for no consideration, is unreasonable and unfair. The Court should find that the Note and Mortgage are unconscionable in order to prevent the enforcement of the Note and Mortgage, which was obtained in a deal where

KK-PB overreached, and gained an unjust and undeserved advantage, to the detriment of the Debtor's legitimate creditors.

**B.    The Note, Mortgage and Recording of the Mortgage are Avoidable Fraudulent Transfers.**

15.    The making of the Note and the granting of the Mortgage, as well as the recording of the Mortgage seven months later, are fraudulent transfers that the Debtor may avoid pursuant to 11 U.S.C. § 544(b)(1) and §§ 726.105(1)(a), 726.105(1)(b), and 726.106(1) of the Florida Statutes.  The undisputed facts establish that at all relevant times, KK-PB and the Debtor were insiders of each other.  At all relevant times, Mr. Straub owned and controlled KK-PB.  *See* Mot. to Limit ¶ 5.  Mr. Straub also owned the Debtor from October 22, 2009 through August 2013.  *See id.* at ¶ 4.  Further, Mr. Straub was the manager and president of the Debtor until September 17, 2013.  *See id.*

16.    In August 2013, while Mr. Straub was in control of, and the president of, the Debtor, he sold his 100% ownership interest in the Debtor to Palm House through a transaction that resembles a leveraged buyout.[4]  *See id.* at ¶ 4, 13-15.  While Mr. Straub was still the president of the Debtor, the Debtor executed in favor of Mr. Straub's company, KK-PB, the Note for

---

[4] "In a conventional [leveraged buyout or LBO], an investor buys the stock of a corporation from the stockholders with the proceeds of a loan secured by the corporation's own assets." *Boyer v. Crown Distribution, Inc.*, 587 F.3d 787, 791-92 (7th Cir. 2009).  Such transactions are subject to particular fraudulent transfer scrutiny if the purchased corporation later files for bankruptcy protection.  As stated by the Seventh Circuit in *Boyer*:

> Should the acquired company be doomed to go broke after and because of the LBO—if the burden of debt created by the transaction was so heavy that the corporation had no reasonable prospect of surviving—the payment to the shareholders by the buyer of the corporation is deemed a fraudulent conveyance because in exchange for the money the shareholders received they provided no value to the corporation but merely increased its debt and by doing so pushed it over the brink.

587 F.3d at 792.  Here, there was no legitimate, arm's length, third-party lender.  The ultimate beneficiary of the KK-PB Mortgage is Mr. Straub.

$27,468,750 and the Mortgage on the Hotel to secure payment of the Note. *See id*. Through this transaction, the Debtor incurred $27,468,750 in secured debt under the Note and Mortgage but received nothing and was rendered insolvent as a result of the August 30, 2013 transaction which resulted in Mr. Straub selling his 100% ownership interest in the Debtor to Palm House, pocketing approximately $6.9 million in cash at (or oddly after) closing, Mot. to Limit at ¶15, and having his company, KK-PB receive the Note and Mortgage. The Affidavit of Marcie D. Bour, the Debtor's forensic accountant, which opines of the Debtor's insolvency in Paragraph 36, is attached hereto as **EXHIBIT 6**. Furthermore, KK-PB intentionally concealed and delayed recording the Mortgage for seven months while the EB-5 Creditors were performing due diligence to induce them to invest in the EB-5 investment described herein and in the Motion to Limit. When the Mortgage was finally recorded on March 28, 2018, the Debtor was still insolvent. Ex. 6, ¶36. Therefore, KK-PB's claim, including the Note and Mortgage, is subject to avoidance.

### i.      Section 726.105(1)(a).

17.      In order to prevail under section 726.105(1)(a), a plaintiff must demonstrate that a debtor made a transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor[.]" Fla. Stat. § 726.105(1)(a). Section 726.105(2) sets forth a nonexclusive list of factors a court may consider, including that: the transfer was to an insider, the transfer was concealed, the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred, the transfer was of substantially all of the debtor's assets, the debtor was insolvent or became insolvent shortly after the transfer was made, and the transfer occurred shortly before or shortly after a substantial debt was incurred. Fla. Stat. § 726.105(2). These factors are commonly referred to as "badges of fraud". "While a single badge of fraud may amount only to a suspicious

circumstance, a combination of badges will justify a finding of fraud." *In re Aqua Clear Techs., Inc.*, 361 B.R. 567, 579 (Bankr. S.D. Fla. 2007).

18.    The undisputed facts establish numerous badges of fraud.  KK-PB is an insider of the Debtor because at the time of the transaction, Mr. Straub was both the owner, president and manager of the Debtor, and the sole owner of KK-PB.  The transfers were made for the benefit of insiders.  The transfers occurred at a time when the EB-5 Creditors had been and were being defrauded.  The Debtor received no consideration in exchange for the Note, Mortgage and recording of the Mortgage.  The Debtor became insolvent after the transfer was made.  The transfers were essentially transfers of substantially all assets of the Debtor, and the transfers occurred shortly before a substantial debt was incurred.  The transfers were concealed because KK-PB failed to record the Mortgage for nearly seven months, preventing the EB-5 Creditors from being able to discover the indebtedness when conducting their due diligence and prior to providing their investments.  Indeed, as demonstrated by the PHH ledger that was recently obtained by the Debtor, and which is attached hereto as **EXHIBIT 3**, the EB-5 Creditors invested at least $10,400,000 in the scheme during the seven-month gap period that the Mortgage was unrecorded by KK-PB.

19.    While KK-PB has attempted to dispute the reason for the delay in the recording of the Mortgage, basically pointing its finger at the closing attorney, the Debtor does not believe such dispute needs to be resolved for the Court to find that sufficient badges of fraud exist to set aside the Mortgage and estimate KK-PB's claim at $0.00.  Further, KK-PB's excuse for not timely recording the Mortgage is not credible.  Specifically, KK-PB's representation to the Court that the late recording of the Mortgage was entirely the fault of KK-PB's counsel, Mr. Evans, is implausible given Mr. Straub's knowledge of Mr. Matthew's prior financial failures elsewhere,

his significant unpaid creditors, coupled with the fact that he lost this exact collateral to foreclosure previously.

20.    Given that the Hotel was an active construction project, it defies logic and common sense that Mr. Straub (through KK-PB), an experienced investor in distressed real estate,  did not record the Mortgage immediately upon closing unless the goal was to conceal the financing. *See* Affidavit of Cary Glickstein, ¶¶ 8-13, attached hereto as **EXHIBIT 4**.   Mr. Straub clearly understands the importance of timely recording a mortgage.  When Mr. Straub first acquired the Hotel through the foreclosure auction in October 2009, he recorded the certificate of title the same day it was entered by the state court.  *See* Mot. to Limit ¶ 12.

### ii.    Section 726.105(1)(b).

21.    In order to prevail under section 726.105(1)(b), a plaintiff must demonstrate that a debtor made a transfer:

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105(1)(b).

22.    As discussed above, the undisputed facts establish that the Debtor, while under the control of Mr. Straub, made the transfer of the Mortgage, Note and recording of the Mortgage to an insider, KK-PB, without receiving reasonably equivalent value, and the Debtor was insolvent and unable to pay its debt as they became due.  Further, it is undisputed that at the time of the transfers, the Debtor had incurred, and reasonably should have believed that it would incur, debts

beyond its ability to pay as they became due.  After the transfers, the Debtor was unable to pay the indebtedness under the Note, and KK-PB initiated the foreclosure action on the Hotel.  As alleged by KK-PB in the Motion, monthly payments commenced on November 1, 2014 and the Debtor defaulted ***three months*** later on February 1, 2015.  *See* Mot. ¶ 6.  That is, through the leveraged buyout, the Debtor was left insolvent and/or left with such unreasonably small capital that default, receivership, and bankruptcy were "both likely and foreseeable," *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009), the Debtor was left "naked to any financial storms that might assail it," and thus the Note and Mortgage may be avoided as fraudulent transfers *Id.* at 795.[5]

### iii.    Section 726.106(1).

23.    Under section 726.106(1), a plaintiff must demonstrate that a debtor made a transfer, after the plaintiff's claim arose "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."  Fla. Stat. § 726.106 (1).  As discussed above, after the SEC, the IRS, the Town of Palm Beach and many of the EB-5 Creditors' claims arose, the Debtor made the transfer with respect to the Note, Mortgage and the recording of the Mortgage without receiving equivalent value, and while it was insolvent or with the result that it was rendered insolvent.

### iv.    The Debtor Did Not Receive Any Indirect Benefit.

24.    The Debtor believes that any argument that might be raised by KK-PB that the Debtor received an indirect benefit because Mr. Straub transferred his ownership interest in the

---

[5] The length between a leveraged buyout and the purchased company's collapse is "pertinent evidence.  The longer the interval, the less likely that the collapse was fated at the" time of the transaction. *Boyer*, 587 F.3d at 795.

Debtor to Palm House would be invalid and unpersuasive. The Debtor already owned the Hotel. The transfer of the ownership interest of the Debtor to Palm House provided no benefit to the Debtor. KK-PB and Mr. Straub did not provide any monies to the Debtor, either directly or indirectly through Palm House, in exchange for the Note and Mortgage. Even if KK-PB is able to allege that some indirect benefit was provided to the Debtor (which it was not), such indirect benefit would not constitute reasonably equivalent value. *See In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir. 2012) ("We decline to decide whether [the indirect benefit of] the possible avoidance of bankruptcy can confer 'value' because the bankruptcy court found that, even if all the purported benefits of the transaction were legally cognizable, they did not confer reasonably equivalent value."). Nor could such alleged indirect value be "automatically inferred." *In re St. George Island, Ltd.*, 131 B.R. 197, 201 (Bankr. N.D. Fla. 1991). Rather, the Debtor was left in a far *worse* position as a result of the leveraged buyout compared to what its position would have been if Mr. Straub had simply retained formal ownership of the Debtor and utilized EB-5 Creditor financing to complete construction of the Hotel.

**vi.    The Fraudulent Transfer Claims Are Timely.**

25.    The Debtor's fraudulent transfer claims are timely based on three grounds. First, pursuant to § 544(b)(1) of the Code, the Debtor can "step into the shoes" of the EB-5 Creditors who, prepetition, timely raised claims against KK-PB in their original district court complaint.

26.    The EB-5 Creditors filed their original complaint on November 14, 2016, within four years of the date of the transfers relating to the Note, Mortgage and recording of the Mortgage. A copy of the original complaint, without exhibits, is attached hereto as **EXHIBIT 1**.

27.    In the original complaint, the EB-5 Creditors allege that:

a.  KK-PB conspired with the other defendants to fraudulently induce the EB-5 Creditors to each invest over $500,000 into a purported hotel project on the Hotel, Original Comp. ¶¶ 2, 12;

b.  The EB-5 Creditors were induced to make such investments with representations that their investments would be collectively secured by a first position mortgage on the Hotel, *id*. at ¶¶12(xi), 31, 45, 478, 479;

c.  The EB-5 Creditors were given interests in Palm House Hotel, LLLP, which was supposed to loan the money invested by the EB-5 Creditors to an entity called Palm House, LLC so that Palm House, LLC could develop the hotel project located on the Hotel, *id*. at ¶¶ 31, 45;

d.  In return, the EB-5 Creditors, through Palm House Hotel, LLLP, were to obtain a first mortgage on the Hotel, *id*;

e.  160 Royal Palm, LLC is a defendant named in the Original Complaint, *see* Original Compl.;

f.  Glenn Straub was the former owner of 160 Royal Palm, LLC until August 2013 when Straub sold his interest to Palm House, LLC.  In this transaction, 160 Royal Palm, LLC obligated itself on a $27,468,750 note to Straub's company, KK-PB, and 160 Royal Palm, LLC granted a mortgage on the Hotel in favor of KK-PB to secure this note, *id*. at ¶¶50, 59, 470, 472;

g.  To perpetuate the scheme to defraud the EB-5 Creditors, KK-PB intentionally failed to record its mortgage on the Hotel for seven months in order to induce the EB-5 Creditors to make their investments, which the EB-5 Creditors believed would be secured by a first mortgage on the Hotel, *id*. at ¶¶26, 50, 59, 473-483; and

h.  KK-PB benefited from the scheme to defraud the EB-5 Creditors by receiving transfers of funds diverted from the investments of the EB-5 Creditors, *id*. at ¶¶249(b), 486, 487.

28.  As a result, the EB-5 Creditors alleged in count XVII of the original complaint a claim for unjust enrichment against KK-PB for the value of the benefits obtained in the fraudulent scheme and also sought the imposition of an equitable lien in favor of the EB-5 Creditors superior to the Mortgage in count XXIV of the original complaint.

29.  Under Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure, amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or

defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading.  Fed. R. Civ. P. 15(c)(1)(B); *In re Tabor*, 2016 WL 3598643, at *4 (Bankr. S.D. Fla. 2016) ("In order to meet their burden in the Motion, the Plaintiffs must show that the facts necessary to support the claims contained in the Amended Complaint were alleged in the Original Complaint in such a way as to give notice that such claims might be pled, and that facts alleged for the first time in the Amended Complaint relate to the same conduct, transactions, or occurrences as those alleged in the Original Complaint.").

30.    Here, the Debtor's fraudulent transfer claims would relate back to the original filing date because the allegations within the original complaint clearly put KK-PB on notice that the transaction and KK-PB's conduct therein was in dispute.    The facts relating to the Debtor's fraudulent transfer claims relate to the same conduct, transaction or occurrences alleged in the original complaint.

31.    The fraudulent transfer claims relate to the Mortgage and Note, the insider status of Mr. Straub and KK-PB, the lack of consideration provided to the Debtor and the insolvency of the Debtor as a result of the transfers.  These facts relate to the fraudulent scheme and involve the same parties, Note and Mortgage as addressed in the original complaint, which alleges unjust enrichment against KK-PB for the value of the benefits obtained in the fraudulent scheme in count XVII, and seeks the imposition of an equitable lien in favor of the EB-5 Creditors superior to the Mortgage in count XXIV.

32.    Even more importantly, on September 27, 2018, the district court entered a text-only order granting the EB-5 Creditors an extension of time through October 29, 2018 to amend their complaint and bring additional claims against KK-PB as of right. *See* Case No. 9:16-cv-81871-KAM, Southern District of Florida, ECF No. 322.

33.     Because the EB-5 Creditors presently have the ability to bring fraudulent transfer claims against KK-PB, so does the Debtor.  Pursuant to 11 U.S.C. 544(b)(1), the Debtor holds the power to avoid any transfer of an interest of the debtor that is voidable under state or federal non-bankruptcy law by a creditor holding an unsecured claim. *In re Kaufman & Roberts, Inc.*, 188 B.R. 309, 312 (Bankr. S.D. Fla. 1995).

34.     Because the EB-5 Creditors are not time-barred from bringing the fraudulent transfer claims as of the Petition Date, the Debtor is not time barred.  *In re Hill*, 332 B.R. 835, 839 n.3 (Bankr. M.D. Fla. 2005) ("As the Trustee's rights in this action are derivative of Doughty's, this action is not time-barred if Doughty's rights to bring avoidance actions were viable at the time Hill's bankruptcy petition was filed.").  Further, if the petition date occurs outside of an applicable statute of limitations, but an unsecured creditor timely brought an action within the statute of limitations and such action is pending as of the petition date, the avoidance action is preserved as a timely action, and a debtor in possession may intervene in such action or bring its own bankruptcy avoidance adversary proceeding.  *See In re Anderson*, 166 B.R. 516, 522-523 (Bankr. D. Conn. 1994) ("It is apparent from the plain language of § 544(b) that if a creditor has a cause of action which is not time barred, the trustee's derivative action under § 544(b) is likewise not time barred."); *In re Zwirn*, 362 B.R. 536, 541-42 (Bankr. S.D. Fla. 2007)  ("Finally, because Day appears to have timely filed the Danjo Claim and the Trustee could move to intervene as a party plaintiff in New York state court or file his own claim in this District, the statute of limitations was preserved by Day for the benefit of the estate and its creditors when he filed his action in 2001.").

35.     A second reason the fraudulent transfer claims will be timely is because the Debtor can also step into the shoes of the SEC, and utilize a six-year lookback period available to governmental agencies.  Pursuant to 11 U.S.C. 544(b)(1), the Debtor can employ 28 U.S.C. §§

2415(a) and 2416, which hold that the United States and its agencies are not bound by statutes of limitation contained in various state Uniform Fraudulent Transfer Acts, but instead have six years, from the date the material facts giving rise to the right of action are known or should be known by the government, to bring actions under an applicable state's Uniform Fraudulent Transfer Act. *In re U.S. v. Moore*, 968 F.2d 1099, 1101 (11th Cir. 1992) (stating that while "fraudulent conveyance actions are generally governed by state law, when brought by the United States, the limitation must be determined by referenced to section 2415." (internal quotation marks omitted).

36.    In bankruptcy cases involving the United States or one of its agencies as an unsecured creditor, the trustee or debtor in possession may bring a Uniform Fraudulent Transfer Act claim and utilize the 6-year lookback period provided under 28 U.S.C. §§ 2415(a) and 2416. *In re Tronox Inc.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013). In *Tronox*, the United Stated held several environmental cost and tort claims against the Debtors, *id.* at 248, and the post-confirmation litigation trust brought avoidance claims under the Oklahoma Uniform Fraudulent Transfer Act. *Id.* at 248 and 263. Some of these claims fell outside the four-year statute of limitations contained in that act. *Id.* at 273. However, the *Tronox* Court determined that the sections 2415(a) and 2416 6-year lookback period applied as "applicable law" under section 544(b)(1), and that the litigation trust could utilize the 6-year lookback period to pursue its Oklahoma Uniform Fraudulent Transfer Act claims. *Id.* at 273-74.

37.    Because the SEC is an unsecured creditor of the Debtor, the Debtor may pursue fraudulent transfers under sections 726.105 and 726.106 of the Florida Statutes as to transfers

dating back to at least August 2, 2012,[6] which would include the August 30, 2013 and March 28, 2014 transfers set out above.[7]

38.     Third, the Debtor's fraudulent transfer claims are timely because the Debtor is able to step into the shoes of the IRS as an unsecured creditor and utilize a ten-year-from-tax-assessment period set forth in 26 U.S.C. § 6502(a)(1) to pursue state law avoidance actions. *In re Klipnis*, 555 B.R. 877 (Bankr. S.D. Fla. 2016) (in case where IRS is unsecured creditor, determining that bankruptcy trustee may utilize ten-year § 6502(a)(1) period to prosecute avoidance actions regardless of state statute of limitations).

39.     The Debtor scheduled the IRS's claim as an unsecured claim in the amount of $2,586,813.30.  Such claim is based on an analysis performed by the Debtor's forensic accountant, Hylton Wynick of Yip Associates, whose affidavit is attached hereto as **EXHIBIT 2** (the "Accountant Affidavit").

40.     As set forth in the Accountant Affidavit, the IRS has such claim based on Mr. Matthews' beneficial ownership interest in the Debtor and its federal tax lien against Mr. Matthews for an unpaid balance of $2,586,813.30 based on a November 10, 2008 assessment.

### C.     KK-PB's Claim Should be Equitably Subordinated to the Claims of Other Creditors and Not Allowed as a Secured Claim.

41.     Assuming *arguendo* that KK-PB is determined to have any allowed claim, the Debtor believes that such claim should be subordinated to the allowed claim of all other creditors,

---

[6] August 2, 2012 is six years prior to the Petition Date.

[7] The Debtor further notes that, whatever the size of the SEC Claim or other triggering unsecured claims, the Debtor may avoid the *entire* Note and Mortgage. *See In re Aqua Clear Technologies*, 361 B.R. 567, 584 (Bankr. S.D. Fla. 2007) ("Once the Trustee has established that an identified transfer is avoidable, the Trustee may recover the entire fraudulent transfer under § 550(a).").

including the EB-5 Claims.  As a result, KK-PB's allowed secured claim would be $0.00 and KK-PB would have no right to credit bid.

42.     Section 510(c) states that after notice and a hearing, the Court may "(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."  11 U.S.C. § 510(c).  "[A] secured claim can be equitably subordinated to unsecured claims[.]"  *In re Emergency Monitoring Technologies, Inc*., 366 B.R. 476, 505 (Bankr. W.D. Penn. 2007) (stating that "11 U.S.C. § 510(c) permits subordination of claims, even secured claims") (quotations omitted).  "[M]oreover, 11 U.S.C. § 510(c)(2), which provides for the recapture by a bankruptcy estate of any security interest—i.e., any lien—that secures a subordinated claim, operates to aid in the equitable subordination of a secured claim to unsecured claims."  *Id*.

43.     "Proper exercise of the equitable subordination power can take place only where three elements are established: (1) The claimant must have engaged in some type of inequitable conduct, (2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, (3) Subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.  *In re Rich Capitol, LLC*, 436 B.R. 224, 232 (Bankr. S.D. Fla. 2010) (citing *In re Lemco Gypsum, Inc.,* 911 F.2d 1553, 1556 (11th Cir.1990).  "The inequitable conduct need not be related to the acquisition or assertion of the claim."  *Lemco*, 911 F.2d at 1556 (citation omitted).

44.     The Eleventh Circuit has articulated a burden shifting approach when dealing with claims of insiders.  First, the movant presents material evidence of unfair conduct, the then the

"insider-claimant can rescue its claims from subordination only by proving the good faith and fairness of its dealings with the debtor." *Id*. at 1557 (citation omitted). "[T]he court must subject the insider-claimant's dealings with the debtor to special scrutiny, examining them with a large measure of watchful care." *Id*. (citations omitted). Courts, including the Eleventh Circuit, have subordinated an insider's secured claim to those of unsecured claims due to the unfair conduct of the insider. *See Estes v. N & D Properties, Inc., Sofa Galleries on Paces, Cranshaw (In re N & D Properties, Inc.)*, 799 F.2d 726, 733 (11th Cir. 1986) (subordinating a secured claim to those of consumer and trade creditors because insider-claimant breached fiduciary duty to creditors and noting that claimant obtained secured claim on the eve of bankruptcy when she knew of misrepresentations to creditors and that debtor was insolvent and about to file a petition and "[c]learly, this was a breach of fiduciary duty toward all creditors and the claim must be fully subordinated.); *see also White v. Coon (In re Purco)*, 76 B.R. 523, 531 (Bankr. W.D. Pa. 1987) (subordinating the secured claim of an insider to those of unsecured creditors because he conveyed to himself a blanket security interest in virtually all of the debtor's assets at a time when the debtor was hopelessly insolvent).

45.     In this case, the undisputed facts satisfy the Debtor's burden to present material evidence of unfair conduct that warrants subordination of KK-PB's claims to those of all other creditors. KK-PB will not be able to prove good faith and fairness in its dealings with the Debtor. It is undisputed that KK-PB was an insider of the Debtor at the time it obtained the Note and Mortgage. At all relevant times, Mr. Straub owned and controlled KK-PB. Mr. Straub also owned the Debtor from October 22, 2009 through August 2013. *See* Mot. to Limit ¶ 4-5. Further, Mr. Straub was the manager and president of the Debtor until September 17, 2013. *See id*. In August 2013, while Mr. Straub was in control of, and the president of, the Debtor, he sold his 100%

ownership interest in the Debtor to Palm House, and the Debtor executed the Note and Mortgage in favor of KK-PB. *See id.* at ¶ 4, 13-14. Through this transaction, the Debtor incurred $27,468,750 in secured debt and received nothing.

46.    During his deposition, Mr. Straub was unable to describe any consideration provided to the Debtor, and the email from Alexander Domb confirms that no consideration was provided to the Debtor. *See id.* at ¶ 18 and 19. Further, KK-PB and Mr. Straub knew, or should have known, that the Debtor did not have the ability to service the debt under the Note and Mortgage. Not surprisingly, shortly after the transaction closed and monthly payments began, the Debtor defaulted under the Note. KK-PB alleges in the Estimation Motion that monthly payments commenced on November 1, 2014 and the Debtor defaulted three months later on February 1, 2015. *See* Est. Mot. ¶ 6. The transaction was a breach of Mr. Straub's fiduciary duty towards all creditors and based on the foregoing undisputed facts, the Debtor will request that the Court fully subordinate KK-PB's claim.

47.    The Debtor believes that there is additional material evidence of unfair conduct. Mr. Straub and KK-PB appear to have received three payments relating to the Mortgage and Note from funds provided by EB-5 Creditors. As set forth in the EB-5 Complaint: i) KK-PB and Mr. Straub are alleged to have known that the hotel project would be used as an alleged EB-5 visa program and that the foreign investors would want a mortgage on the Hotel to secure their investments, *see* EB-5 Compl. ¶ 513-515, ii) KK-PB and Mr. Straub knew that potential investors were likely to perform due diligence and ascertain whether the Hotel provided adequate security for their investments, *see id.* at ¶ 516, iii) although KK-PB and Mr. Straub received the Mortgage from the Debtor on or about August 30, 2013, they did not record it for nearly seven months until March 28, 2014, *see* Mort. 1, iv) KK-PB and Mr. Straub's delay in recording created the façade

that the Hotel was unencumbered by such debt, and the EB-5 Creditors would be able to obtain a first position mortgage on the Hotel, *see* EB-5 Compl. ¶ 520, v) by the time KK-PB and Mr. Straub recorded the Mortgage, the EB-5 Creditors had already wired their investments to be used for the hotel project, *see id*. at ¶ 421.  KK-PB is further alleged to have received funds from the defrauded EB-5 Creditors as fraudulent transfers.  *See id*. at ¶ 393-424.

48.    The PHH ledger discussed previously and attached hereto as Exhibit 3 corroborates this point by showing that, in the seven-month gap period that the Mortgage remained unrecorded, at least $10,400,000 was invested by the EB-5 Creditors in the scheme.  Further, other financials recently obtained by the Debtor indicate that Mr. Straub was an active participant in the scheme to defraud the EB-5 Creditors *beyond* intentionally failing to record the Mortgage to induce the investments.  Specifically, a PHH ledger, as well as the ledger of Mr. Evans, attached hereto as **COMPOSITE EXHIBIT 5,** show millions of dollars in funds from the EB-5 scheme flowing through the trust account of Mr. Straub's attorney, Craig Galle.

49.    To add insult to injury, KK-PB recently filed objections to all of the proofs of claims filed by the EB-5 Creditors.

50.    KK-PB initiated a suspect foreclosure action in an effort to maintain control over the Hotel, and the parties are unable to determine basic information regarding the closing during discovery in the foreclosure case, including who received what, if any funds and whether or not payments required to be made, were in fact paid.  The closing attorney, who has been indicted for his involvement in the EB-5 fraud, testified that "[t]his was one of the craziest, sloppiest closings that I've ever had in 40 years and I'm not sure what the hell went on with some of it."  Evans Depo. Tr. 37:1-37:12.  Mr. Straub was unable to articulate whether he or KK-PB transferred any funds with respect to the transaction and dodged questions by stating "That's a legal question[,]" "I don't

know anything about those things[,]" "[o]ver my pay scale[,]" and "[t]hat's not my job to do in the company." *See* Straub. Depo. Tr. 79:2-79:15, 82:4-82:13.

51.      As set forth in the Motion to Limit, Mr. Matthews and the Debtor have engaged in various prior dealings that are similarly suspect, including the Nantucket scheme and the friendly foreclosure of the lot behind the Hotel also discussed below.  *See* Mot. to Limit ¶ 37-48.

52.      It also appears that KK-PB included $438,312.73 for the payment of 2015 and 2016 real estate taxes in the total amount of its asserted claim.  *See* Mot. Ex. B.  As set forth in the Motion to Limit, however, such amounts appear to have been paid by Arena Ventures LLC and not by KK-PB.  *See* Est. Mot. to Limit ¶ 54.  Thus, such amounts are not appropriately included in the claim of KK-PB, and if allowed should be subordinated to the allowed claims of other creditors.

53.      Additionally, as set forth in greater detail in the Motion to Limit, Mr. Straub, has had and may continue to have a bizarre and influential relationship over the Debtor, Mr. Matthews and Mrs. Matthews, including i) paying for real estate taxes for the Hotel, ii) loaning Mr. Matthews a car, iii) providing loans totaling $300,000 to Mrs. Matthews for the benefit of Mr. Matthews in May 2018, iv) funding the retainer for the Matthews' criminal defense attorneys, and v) engaging in a romantic relationship with Mrs. Matthews."[8]  *See* Mot. to Limit ¶ 49-64.

54.      The foregoing examples indicate that Mr. Straub continued to have significant control over, and remained an insider of the Debtor, after his resignation as president.  *See, e.g., In re McIver*, 177 B.R. 366, 370 (Bankr. N.D. Fla. 1995) (defining an insider relationship to exist

---

[8] Further, there are a number of suspicious transactions involving Mr. Matthews and Mr. Straub's attorney that the Debtor is presently investigating and seeking discovery on, *see* ECF Nos. 149, 150, and 151, and the Debtor reserves its right to bring actions and seek relief based on such transactions.

when "the relationship between the Debtor and Defendant would cause the Defendant to be able to gain an advantage similar to one arising from affinity.").

55.      As a result, any allowed claim KK-PB may have should be subordinated to the allowed claims of the Debtor's other legitimate creditors.

**D.      KK-PB's Claim Should be Recharacterized as Equity and Not Allowed as a Secured Claim.**

56.      Assuming *arguendo* that KK-PB has any allowed claim based on monies provided to the Debtor (which it did not), the Debtor believes that such allowed amount should be recharacterized as equity.  "The issue to be determined in recharacterization is whether a transaction created a debt or equity relationship from the outset."  *In re First NLC Fin. Servs., LLC*, 415 B.R. 874, 879 (Bankr. S.D. Fla. 2009) (citations omitted). "Recharacterization prevents an equity investor from labeling its contribution as a loan and subverting the Bankruptcy Code's critical priority system by guaranteeing itself a higher priority-and a larger recovery-should the debtor file for bankruptcy."  *Id.* (quotations omitted).  "In recognizing the power of courts to recharacterize debt, the Eleventh Circuit stated the following test: 'Shareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial under-capitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit.'"  *Id.* (*quoting In re N & D Properties, Inc.*, 799 F.2d 726, 733 (11th Cir. 1986)).

57.      While the test articulated by the Eleventh Circuit is disjunctive, in this case, both circumstances are present.  Assuming *arguendo* that KK-PB provided funds to the Debtor in exchange for the Note and Mortgage (which it did not), the Debtor was under-capitalized at the outset based on the leveraged buyout discussed above.  It should be undisputed that that the Debtor was unable to service the Note and Mortgage, and KK-PB foreclosed shortly after monthly

payments began coming due.  As alleged by KK-PB in the Motion, monthly payments commenced on November 1, 2014 and the Debtor defaulted three months later on February 1, 2015.  *See* Mot. ¶ 6.  Also, the Debtor believes that to the extent any monies were provided as a loan by KK-PB to the Debtor, such loans were provided when no disinterested lender would have extended credit due to the EB-5 fraud and various pending liens.

58.     In his deposition testimony, Mr. Straub made it clear that he viewed Mr. Matthews as a "hustler" and his decision to finance Mr. Matthews' risky projects was premised on that belief. Mr. Straub's decision to invest with such a person should not be to the detriment of true creditors of the Debtor.  As such, any monies advanced by Mr. Straub (through KK-PB) that were lost in the "hustle" should be recharacterized as equity investments and not debt.

59.     To the extent necessary, the Debtor further supplements the Motion to Limit with the factual and legal arguments set forth herein.  The Debtor reserves the right to raise additional arguments through an objection to claim and adversary proceeding upon the conclusion of discovery.

## II.    Conclusion

60.     The Court should estimate KK-PB's claim at $0.00 because the Note and Mortgage are unenforceable due to lack of consideration and unconscionability, and equally, the Note, Mortgage and recording of the Mortgage are subject to avoidance as fraudulent transfers.  Further, to the extent KK-PB has any allowed claim, such claim should be subordinated to all other allowed claims and/or recharacterized as equity.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an Order: i) denying the requested relief in the Estimation Motion, ii) estimating the claim of KK-PB at $0.00 and iii) granting the Debtor any other and further relief the Court deems equitable and just.

Respectfully submitted,

SHRAIBERG, LANDAU, & PAGE, P.A.
Attorney for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
plandau@slp.law
blee@slp.law
ependergraft@slp.law

By:  */s/  Philip J. Landau*
       Philip J. Landau
       Florida Bar No. 504017
       Bernice C. Lee
       Florida Bar No. 0073535
       Eric Pendergraft
       Florida Bar No. 91927

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on October 17, 2018, via CM/ECF to all parties registered to receive such notice via electronic filing.

*/s/  Philip J. Landau*