UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                                          Case No. 18-19441-EPK

160 ROYAL PALM, LLC,                                            Chapter 11

      Debtor.

_____/

### NOTICE OF FILING COMPLETE DEPOSITION TRASCRIPT

      Debtor, 160 Royal Palm, LLC, by and through its undersigned counsel, hereby files a copy of the complete November 29, 2018 deposition transcript of Glenn Straub in connection with the *Debtor's Expedited Motion to Compel Testimony* [ECF No. 419].

### ATTORNEY CERTIFICATION

      **I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

### CERTIFICATE OF SERVICE

      **I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing to those parties registered to receive electronic filings in this case on December 28, 2018.

                                  SHRAIBERG, LANDAU & PAGE, P.A.
                                  Attorneys for the Debtor
                                  2385 NW Executive Center Drive, #300
                                  Boca Raton, Florida 33431
                                  Telephone: 561-443-0800
                                  Facsimile: 561-998-0047
                                  Email: ependergraft@slp.law

                                  By: */s/ Eric Pendergraft* _____
                                        Eric Pendergraft
                                        Florida Bar No. 91927

{2234/000/00427206}

```
 1              UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2                WEST PALM BEACH DIVISION

 3
 4                         Case No.  18-19441-EPK

 5
 6   In re:
 7   160 ROYAL PALM, LLC,
 8        Debtor.
     _____/
 9
10
11
12
13
                       PALM BEACH POLO CLUB
14                     11199 Polo Club Road
                        Wellington, Florida
15                 Thursday, November 29, 2018
                      9:47 a.m. to 5:00 p.m.
16
17
                          DEPOSITION
18
                              OF
19
                        GLENN STRAUB
20
                     taken pursuant to notice
21                  on behalf of the Debtor and
                     the EB-5 Investor Group.
22
                         -   -   -   -   -
23
24
25
```

Page 2

APPEARANCES:


GEORGE GESTEN McDONALD, ATTORNEYS AT LAW, by
DAVID J. GEORGE, ESQUIRE
on behalf the EB-5 Investor Group.
dgeorge@4-justice.com


SHRAIBERG, LANDAU & PAGE, P.A., by
PHILIP J. LANDAU, ESQUIRE
on behalf of the Debtor.
plandau@slp.law


SALAZAR LAW, by
LUIS SALAZAR, ESQUIRE
on behalf of KK-PB Financial, LLC.
luis@salazar.law


FRANCK D. CHANTAYAN, P.A., by
FRANCK D. CHANTAYAN, ESQUIRE
co-counsel on behalf of KK-PB Financial, LLC.
franck@chantayan.com


ALSO PRESENT:


MR. CARY GLICKSTEIN


- - - - - -

Page 3

1                          I N D E X
2
WITNESS                              DIRECT     CROSS
3  GLENN STRAUB
      By Mr. George                     4
4     By Mr. Landau                    --
      By Mr. Salazar                              --
5
6           EXHIBITS MARKED FOR IDENTIFICATION
7    NUMBER                                         PAGE
      1, Copy of news article dated 8/25/11        20
8     2, E-mail chain                              55
      3, Wire transfer instructions               74
9     4, Deposition transcript                     89
      5, E-mail chain                             106
10    6, Letter dated 8/28/10                     123
      7, E-mail chain                             129
11    8, Declaration of Glenn Straub              140
      9, Text messages                            154
12   10, Complaint                                179
     11, Letter dated 3/17/14                     189
13   12, Certificate of title 10/26/09            195
     13, Mortgage, Assignment                     214
14   14, Schedule                                 228
     15, Closing statement                        229
15
        (Original exhibits retained by Mr. George.)
16
17
18
19
20
21
22
23
24
25

1    Thereupon:

2                          GLENN STRAUB,

3    after first being duly sworn, was examined and

4    testified under oath as follows:

5                          DIRECT EXAMINATION

6    BY MR. GEORGE:

7        Q    Could you please state your name for the

8    record?

9        A    Glenn F. Straub.

10       Q    Mr. Straub, I know you've been deposed many

11   times.  I'm just going to go over a few things today.

12   I'm going to be asking you some questions.  If you do

13   not understand my question, please let me know, and

14   I'll be happy to repeat it for you.  Fair enough?

15       A    Yeah.  You've seen, I've got a hearing

16   situation, and I'm too stubborn to go out and get a

17   hearing aid, so --

18            MR. SALAZAR:  Speak loud and clear.

19   BY MR. GEORGE:

20       Q    I will speak up.

21       A    If I also look like I'm not understanding

22   what you're saying or I answered you in a funny way,

23   then you need to say, "Did you hear my question"?

24   That would be -- I'm saying, I got a responsibility,

25   you should have a responsibility.

Page 5

1       Q    Okay.  I'll speak up.

2       A    I'm pretty good, but I don't think I'm that

3  bad yet for having a hearing aid.

4       Q    Okay.  So unless -- I will do as you ask, and

5  I will speak up, because I tend to be somewhat soft

6  spoken.

7       A    Yep, there you go.

8       Q    But also if you do not tell me that you don't

9  understand a question, I'm going to assume that you

10  do.  Also if you need to take a break at any time,

11  please let me know, I'll be happy do that.

12            So today is it true that you are here in one

13  sense in your individual capacity, you're testifying

14  as Glenn F. Straub, just in your individual capacity;

15  is that true?

16            MR. SALAZAR:  That is correct, counsel.

17  We'll stipulate to that.

18            MR. GEORGE:  Okay.  And --

19            THE WITNESS:  I have a question.  I'm going

20  to talk to counsel.

21            (Inaudible discussion off the record between

22  Mr. Straub between Mr. Salazar.)

23  BY MR. GEORGE:

24       Q    Are you also here in the capacity as a

25  corporate representative of KK-PB Financial, LLC?

1      A     Correct.  I'm the person with the most

2   knowledge of it, not with all knowledge of it.

3      Q     Okay.  Fair enough.

4            MR. SALAZAR:  Are you going to -- I'm sorry

5   to interrupt, counsel.  Are you going to be

6   overlapping, both at the same time?  I mean, I they

7   were -- I'm not sure if they were scheduled at

8   different start times, or are you going to do both,

9   altogether?

10           MR. GEORGE:  We're going to do both at the

11  same time, and that's the next thing I was going to

12  tell him.

13           MR. SALAZAR:  Okay.

14  BY MR. GEORGE:

15     Q     If there are instances in which you are

16  speaking only for the corporation, I won't know that

17  unless you tell me.  So if there are instances in

18  which you're speaking just for the corporation, please

19  tell me that.  But also, in fairness to you, there

20  will be instances in which I'm asking questions just

21  on behalf of the corporation, and I will tell you that

22  as well.

23     A     Wait a minute, I'm not a lawyer.  I think I

24  got five years reading ability, and I got maybe ten

25  years in spelling.  Nah, the other way, probably seven

Page 7

1    or eight years in spelling.  And I'm saying to you, I

2    wouldn't know the distinction between what is a

3    corporate answer or what I have in my mind, because I

4    don't know when I cross over that bridge into

5    corporate, or your questions are corporate, and I may

6    be answering a question personally.

7        Q    Okay.  Fair enough.

8            (Thereupon, Mr. Glickstein enters the

9    conference room.)

10           MR. GLICKSTEIN:  Good morning.

11   BY MR. GEORGE:

12       Q    Now, isn't it true that as a result of

13   various cases surrounding Palm House that you and I

14   have come to know each other over the course of two

15   years?

16       A    I think so.

17       Q    Now, isn't it true that --

18       A    We haven't known each other taking -- going

19   out to dinners, but we know each in an environment

20   like we're in right now.

21       Q    Okay.  Fair enough.

22           Now, isn't it true that the very first time

23   that you and I interacted together that you made a

24   point of telling me that you barely knew Bob Matthews?

25       A    Yeah, I would say that when -- at the

Page 8

1    beginning, probably -- no, pretty much all the way

2    through now, probably -- I agree.  All the way from

3    the beginning, middle, and now at the end -- now I

4    don't even see the guy hardly.  I think I saw him

5    sitting outside of a deposition here the last couple

6    of days, and that's been about it.  Other than that I

7    don't get to see him.

8            So give me the year, and I'm saying it was --

9    hardly get to know him or hardly know Bob, didn't know

10   who he was before 2000 and, maybe, 9, maybe read

11   something in the paper about a developer, and then

12   maybe after that knew his wife a little bit better.  I

13   think I saw her in more acting careers and stuff.  So

14   at some point 2006 or '7, before that, I don't think I

15   knew Bob.

16       Q   All right.  I'm not sure you understood my

17   question.  So what I'm asking you is simply that when

18   you first met me personally, in the context of this

19   case, you told me at that time that you barely knew

20   Bob Matthews; isn't that true?

21           MR. SALAZAR:  I'm going to objection on the

22   grounds it was asked and answered and as to form of

23   the question.

24           MR. GEORGE:  I'm going to ask you, like we

25   did in the last deposition, to limit your objections

Page 9

1    to objection to form.

2              MR. SALAZAR:  Okay.  I appreciate you asking

3    that, and I'll make objections --

4              THE WITNESS:  What I had said --

5              MR. SALAZAR:  -- that are appropriate at the

6    time.

7              THE WITNESS:  I think you can tell me certain

8    things, but not as to procedural stuff.  I'm not gonna

9    be familiar with the procedure, even though I've had

10   lots and lots and lots of depositions, nobody has been

11   that specific.  They usually just let me talk, and

12   then they take out of it whatever they take, and

13   that's gonna be a lot more comfortable for me, opposed

14   to trying to figure -- in this situation I don't

15   remember talking to you about that specific of an

16   item.  We're always in a room with multiple different

17   people.  I don't ever remember being in a single

18   capacity with you or you interviewing me or anything

19   else.  So, no, I can't remember you using those exact

20   words.

21             But very easy it could happen that based on

22   the friends that I have, I go out with every night,

23   because I'm single for 11 years and married for close

24   to 40 years before that, so he's not in that category

25   of those types of people that I'm with, usually three

1  or four guys every night, or at least six out of seven

2  nights, and -- so I don't remember a conversation with

3  you that would say that I said that -- whatever you

4  just said there about my knowledge of him or being

5  around him or being a friend with him or anything.

6          No, it's always been a little bit an arms'

7  length situation with me, with him.  And he would come

8  with projects, and I listen to everybody, because I'm

9  a big, big lender of money.  That's how I get myself

10  in trouble all time with lending yp minorities and

11  people, monies.  If they got a good explanation, I'm

12  what's called a collateral lender, and I do a lot of

13  this in life.

14          As I accumulated some money, I started

15  lending money on a collateral basis.  Don't care to

16  much what your color skin is, race, what your assets

17  are, this or that.  I'm usually protected by

18  consultants that I would go to and say, "Where in the

19  hell is this case?"  I think I got one in New Jersey a

20  million and a half square feet for a drug company.

21  Hey, if they want to put up a $50 million building,

22  I'll give them $25 million.  In other words, I do it

23  for big boys, and I take it for -- I got a guy

24  floating around here owes me a thousand bucks, and I

25  see him.  I see him at the bar, and eventually I'll

1    get my money, or I'll use him for something, get my

2    thousand dollars out of him.  So it's -- I'm a

3    collateral lender, and so Bob would have been a type

4    of lender, and I know a little bit about my -- people

5    I lend to, so I would probably know something about

6    Bob.

7    BY MR. GEORGE:

8        Q    Mr. Straub, I'm going to ask you today -- and

9    I know that from reading deposition transcripts and

10   from what you just said that, you know, you're used to

11   people just asking you a question and letting you talk

12   and tell whatever story you want to tell.

13            But what I'm going to ask you today is to

14   please focus on just the questions I ask you, because

15   I have 50 documents to show you, and I have questions

16   that I really want answered, and if you tell me a

17   story with every question I ask you, we're going to be

18   here for two or three days.  So what I would like you

19   to do is really try to focus, and out of respect for

20   you, I really don't want to interrupt you or be rude

21   or anything like that, but it's going to double or

22   triple or quadruple the amount of time we're going to

23   spend here, because with respect to that question, all

24   I really asked you is, isn't is true that you've

25   personally told me you barely know Bob Matthews?

1  That's all I asked you.  It's really just a yes or no

2  question.

3      A   No, it's not.  It's not a yes or no to me,

4  the way I run my life.  So it will take as long as it

5  takes, because --

6           MR. SALAZAR:  Agree.

7           THE WITNESS:  -- that's the way I remember

8  things.  I'm 72.  I'm twice your age in a sense, and I

9  I'm trying to tell you, I remember based on putting

10 myself in a predicament by remembering what you're

11 asking me, because obviously you're -- I don't think

12 you try to trick me, but I've been down enough

13 depositions and then on a trial somebody uses some

14 angle against me, and so I want to explain in what

15 structure I'm doing it.

16          So if it takes longer for me to answer a

17 question, get a court order against me and say, "Mr.

18 Straub, you gotta do it," and I'll say, "I'll have to

19 disobey your court order, sir," because that's the wat

20 I am, and that's the way I made a success.  I only

21 have -- I think I got a high school education, maybe,

22 I don't know if I even got one, because that's about

23 as far as I went.  School of hard knocks has been

24 where I been.

25 BY MR. GEORGE:

1     Q    So, Mr. Straub, isn't it true that, in fact,
2  since we've known each other, you've actually told me
3  five or six times that you barely know Bob Matthews?
4     A    I don't think I ever told you I barely know
5  him.
6     Q    Okay.  That's your testimony today under
7  oath?
8     A    Yeah, yeah, that I don't barely know him.  I
9  know enough -- what do you call barely?  I mean, give
10  me a definition of what barely knew him.  I lent the
11  guy money.  I lent his wife money.  I've kind of
12  followed their situation, because they got two
13  daughters.  I have two daughters.  So for me, I feel
14  sympathetic to anybody who is going through the shit
15  that he's going through, and --
16          MR. SALAZAR:  Language.
17          THE WITNESS:  I'm allowed to say "shit,"
18  aren't I?
19          MR. SALAZAR:  Try not to.
20          THE WITNESS:  I think Clinton or somebody
21  else did that.  Well, I guess he was a bad boy too.
22          So I -- they're in an awkward situation.
23  I've kind of looked up to him at certain times in my
24  life, because Bob has never been a -- that I know of,
25  some felon or crook or saw his name in a newspaper or

1    his family.  Kids are great.  I met them three times,

2    four times in my life, and so I remember -- I could be

3    him.  So my sympathy to all kinds of people who got

4    children, is that your wife and children be dragged

5    into the mess of whatever Bob did or didn't do.

6    BY MR. GEORGE:

7        Q    But you have said publicly and the press that

8    you barely know him?

9        A    I have no idea what I said in the press.  I

10   probably -- last weekend I had three different

11   newspapers, "Atlantic Herald," a big article,

12   "Philadelphia Tribune," I think it is, and "Palm Beach

13   Post," and the week before that was the "Shiny Sheet."

14   In other words, I get so much interviews from

15   newspapers for what I do and don't do, I can't

16   remember what everybody said.  Sometimes I don't even

17   get the damn thing.  Somebody sends them to me, and if

18   I have a chance to read them, fine.  if I don't have a

19   chance to read them.  They are usually on the "A"

20   something -- once one picks it up, then they give it

21   to everybody else.

22       Q    Do you remember telling me personally that

23   you never go into a business deal unless you really

24   know who you're doing business with?

25       A    Boy, I would like to have you show me some

1    kind of -- something in writing --

2        Q    No.

3        A    -- because I don't think I've had five

4    conversations with you.  It's more been about how cold

5    it is or this and that.  I don't think you've ever

6    interviewed me or anything.  So where are all these --

7    that's three now, where you said I've told you things.

8    I don't think so.  So I don't think you told me --

9    what was the question?

10       Q    Isn't it true that you --

11       A    That I check people out?

12       Q    -- told me that you never go into a business

13   deal unless you really know who you're doing business

14   with?

15       A    My nature would be to try to.  I can't

16   guarantee that I -- I can guarantee that I haven't

17   always checked them out, because I'm a collateral

18   lender, and if I see they have -- right now there's

19   like five countries that we won't lend money to,

20   because Trump's put them on the list.  I was in one of

21   the three.  In the last ten days, I was in three

22   different countries, and people, lending them money,

23   and they put the one -- while we're at that country,

24   they put them on the medium terrorist list.

25            And so I'm thinking, I don't think I want to

1    make a loan.  Like, two months ago there was one in

2    Turkey, and they don't want to do -- Trump doesn't

3    want us doing business in Turkey.  I was down in

4    Argentina.  Ten days ago I was in -- closer, below

5    Nassau, in the Turks, the beach facility, banking

6    deals.  Colombia, two weeks before that, Cartagena, my

7    passport ran out, so I couldn't go to the other ones

8    two weeks before that, one of the other Colombia

9    things.

10         So this whole concept of me checking people

11   out, I can only check them out so far, until Trump or

12   somebody determines that this is not a good place to

13   put your money.  I'm a collateral lender.  You show me

14   a winery in Argentina, ten days ago, and I'll tell you

15   good deal, but then I find out I need to buy up so

16   many of them -- they are all, like, five acres apiece.

17   I need to buy up 20 of them to make a decent sized

18   company, so -- and then when we find out we got riots

19   in the streets and this and that, I've been going down

20   there for years, you know.  So I can't check everybody

21   out.

22      Q    Did anything that Trump did prevent you from

23   checking out Bob and Mia Matthews before you did

24   business with them?

25              MR. SALAZAR:  Object to form.

1        THE WITNESS:  I can't remember politically.
2  I don't think Trump was around, but I do remember
3  Donald -- Donald?  Okay.  Mr. President always, you
4  know, in the last three months was on a personal call
5  with us and says, "How's Mia," and I was thinking,
6  "How do you know Mia," but I just don't even care.  I
7  think she goes to Mar-A-Lago or she's a member, and he
8  was -- would go around to the tables every night that
9  I was ever there.  I'm not even a member.  I'm there
10  as a guest.  Can't afford it.  He wants a hundred
11  thousand dollars or more.  So he asked about certain
12  people, and you say, "Mr. President, I don't know, but
13  I'll check it out," and so I think that was my answer
14  to him.  It was on a telephone call with Lou Lipton
15  (phonetic), on a call about Giuliani and stuff.
16  BY MR. SALAZAR:
17     Q   Back when you first started doing business
18  with Bob and Mia, was there any circumstance that
19  prevented you from doing due diligence about whether
20  they would be able to pay you back?
21        MR. SALAZAR:  Objection to form.
22        THE WITNESS:  Did I think about how they --
23  no, it's a collateral loan.  In other words, I never
24  looked at any of their financial statements.  I got
25  people that would do that, if they even wanted to.

1          They hopefully kind of keep me out of

2    trouble, as far as, "Glenn, you need to sign this

3    thing in blue ink instead of signing it in black ink,"

4    or the notary has a -- notarizes my signature, "So

5    please go upstairs and get the girl to notarize your

6    signature."  I mean, they try to keep me out of

7    trouble that way, because I just say, "Give them the

8    money," because they put -- they're pledging

9    collateral, and that's what I do.

10          Usually I only get involved with people that

11   have something to do with us, to lend them money,

12   because if I'm selling them a piece of property for

13   $10 and I got $3 in it, then if you come along and

14   give me, ah, $5 as collateral, which might be a car or

15   house or a relative comes in and signs for them,

16   that's collateral lending.  I don't really get into

17   who they are and what they are, because I know enough

18   about them that they're not going to be criminals and

19   I gotta go to their house and collect the money in a

20   sense.  I don't go to houses, but I take them to

21   court.

22          They're liable to kidnap one of my kids and

23   make -- I went through all that stuff for, ah, geez,

24   20-some years before I came down here, they threatened

25   to kidnap all my kids, because I was going into their

Page 19

```
 1   territories, Youngstown, Pittsburgh, all the Mafia
 2   areas.  I ran legitimate companies, and they would
 3   just muscle me, hang me upside-down on bridges and
 4   everything.  So that's what happens.  I'm a collateral
 5   lender.  You bring me $2, I don't too much care who
 6   and what you are, because I might take it back.
 7   BY MR. GEORGE:
 8       Q    So did you do any financial due diligence
 9   with respect to Bob and Mia Matthews before you began
10   doing business with them?
11            MR. SALAZAR:  Objection to form.
12            THE WITNESS:  I probably followed my normal
13   procedure, which I explained what it is.  I try.
14   Maybe we did, but I knew these people indirectly.
15   They're living in a $30 million home on the beach.
16   Trump is buying a $30 million house down the street
17   from them, selling it for a hundred million dollars.
18   Thirty million, then he sells it for a hundred
19   million.  I'm saying they're living in a pretty decent
20   neighborhood, and we probably pledged their house or
21   think that they got the money to come up with, and he
22   had a very -- the guy was worth about 300-some million
23   dollars, supposedly, like I'm worth billions of
24   dollars, supposedly.  Phew, I don't think so.  But
25   anyway, people -- you can draw opinions of who and
```

Page 20

```
 1    what they are.  They got two kids.  They're married.
 2    They're in Palm Beach County.  They're not, like, in
 3    some of these places we have to go to to lend money
 4    outside the country.
 5            MR. GEORGE:  Mark that as 1, please.
 6            (Thereupon, the document referred to was
 7    marked as Exhibit No. 1 for identification.)
 8            MR. SALAZAR:  Thank you.  Can I see -- give
 9    me one second.
10    BY MR. GEORGE:
11        Q   Mr. Straub, do you need to get your glasses?
12    I know that's small print and that you use glasses.
13        A   I think they're downstairs, but I can check
14    and see.  I can generally squint at something and read
15    it.  But whatcha got in mind?
16        Q   Well, I'm going to have a number of questions
17    about this.  So why don't we take a break --
18        A   Five or six.
19        Q   -- so that you can get your reading glasses.
20        A   Okay.
21            MR. GEORGE:  Let's go off the record, please.
22            (Thereupon, a brief recess was taken.)
23            MR. GEORGE:  Can we go back on the record,
24    please.
25    BY MR. GEORGE:
```

Page 21

1      Q    Mr. Straub, I've shown you what we've marked

2   as Exhibit 1 in your deposition, and for the record,

3   it is an article from the "Nantucket Inquirer and

4   Mirror," dated August 25, 2011.

5           Have you ever seen this article before, sir?

6      A    What do you mean by "Mirror"?

7      Q    It's the name of the publication.

8      A    Oh, okay.  So ask that question again.  You

9   got me distracted.

10     Q    Okay.

11     A    Nantucket, I've only been there a couple

12  times in my life, probably two, maybe.

13     Q    Okay.  I was just saying for the record that

14  this is from a newspaper called the "Nantucket

15  Inquirer and Mirror," dated August 25, 2011.

16          Have you ever seen this article --

17     A    No.

18     Q    -- before?

19     A    No.

20     Q    Are you familiar with the Matthews' 11 Cliff

21  Road home in Nantucket?

22          MR. SALAZAR:  I'm going to object on

23  relevance.  I understand you don't think that's a

24  valid objection, but this so off the -- off the

25  reservation in terms of relevancy, I want to put that

Page 22

1    objection on the record.  Thank you.

2          MR. LANDAU:  Lou, please, the speaking

3    objections --

4          MR. SALAZAR:  It's not a speaking objection,

5    but thank you very much.

6          MR. LANDAU:  It is a speaking objection.

7          MR. SALAZAR:  It's entirely irrelevant.

8    Thank you.

9          MR. GEORGE:  Okay.  Since Mr. Salazar insists

10   on making inappropriate objections, I'm going to say

11   for the record that the relevance of all of these

12   questions is that despite Mr. Straub's position that

13   he barely knows the Matthews, that the questions are

14   designed to demonstrate that Mr. Matthews and

15   Mr. Straub, in fact, have a long-term relationship and

16   history and pattern of conducting business

17   transactions that are designed to keep Mr. Matthews'

18   assets out of the hands of creditors, and that this is

19   one of those transactions.

20         It's my preference not to put statements like

21   this on the record, but if Mr. Salazar insists on

22   making relevance objections, then each time he does

23   that, I'm going to discuss and demonstrate why it's

24   relevant.

25         MR. LANDAU:  And I'll add to that, it goes

Page 23

1    directly to the equitable subordination and the --

2             MR. SALAZAR:  I understand that's your

3    position, but I think it's farcical, and I object on

4    the grounds of relevancy.  Let's go.

5             MR. GEORGE:  Same statement.  And please

6    don't tell me what to do.  I'm going to conduct this

7    deposition in the manner --

8             MR. SALAZAR:  Yeah, take as long as you like.

9             MR. GEORGE:  -- in which I see fit.

10            MR. SALAZAR:  Absolutely.

11   BY MR. GEORGE:

12       Q   Have you ever --

13       A   Okay.  Everybody else gets to talk, and I got

14   the flu, my throat is sore, so please, guys, keep -- I

15   know attorneys like to protect everybody, their

16   clients, and have theirs egos fluffed up, their --

17       Q   Mr. Straub, have you seen --

18            MR. SALAZAR:  Let him finish.

19            THE WITNESS:  No, I never --

20            MR. GEORGE:  Have you seen this article --

21            THE WITNESS:  Asked and answered.

22            MR. SALAZAR:  Please don't interrupt --

23            MR. GEORGE:  I'm sorry, there's not a

24   question --

25            MR. SALAZAR:  He's talking, please don't

Page 24

1    interrupt.

2         MR. GEORGE:  He doesn't get to make

3    statements --

4         MR. SALAZAR:  If he's talking, please --

5         MR. GEORGE:  -- unless there's --

6         MR. SALAZAR:  -- do not interrupt him.

7         MR. LANDAU:  He's not answering the question,

8    Lou.

9         MR. SALAZAR:  Thank you for your comments.

10   Please don't interrupt him.

11        THE WITNESS:  I believe if you read it back,

12   I said, no, I've never seen this, and so I didn't know

13   there was a "Mirror" in a name of a newspaper, but

14   I've never seen even any parts of it.

15   BY MR. GEORGE:

16   Q   Okay.  Are you aware that Mia and Robert

17   Matthews owned a home on 11 Cliff Road in Nantucket?

18   A   And if this --

19        MR. SALAZAR:  Wait, sorry.  I don't want to

20   keep objecting on the grounds of relevancy.  So would

21   you be okay, like we did the other day, my stipulating

22   that I believe these are not relevant and not have to

23   repeat that objection.

24        MR. GEORGE:  Yes.  In fact, the law does that

25   with any objections other than form.

Page 25

1              MR. SALAZAR:  I appreciate you saying that.

2    I don't agree.  But if you're okay to stipulate to

3    that, I won't have to make that anymore.

4              MR. GEORGE:  So stipulated.

5              MR. SALAZAR:  Thank you.

6              MR. GEORGE:  Can you read back --

7              THE WITNESS:  No, I've never seen the article

8    and some house -- the two times, maybe, that I might

9    have been there for, knowing me, probably a day, day a

10   half, I never spend anymore time than that in any

11   particular place.  I don't think I've been on vacation

12   my whole life, other than maybe with kids and the

13   wife, sometime, someplace.  We probably didn't last

14   very long, maybe a few days -- that, no, I'm not that

15   familiar with their house up there.  I might have gone

16   up and looked at a -- seems like a hotel that was for

17   sale, or he was in the middle of building or

18   something, and I looked at it, flew in, flew out, and

19   looked at it, and maybe I had dinner with him one

20   time.  But me in Nantucket, it's never been more than

21   a day or two days, maximum, and two different times,

22   and I only remember the second time partly, until you

23   give me something.

24              I'll read the article and see what people

25   have to say about me, but I'm not a celebrity, but the

Page 26

1    little Town of Nantucket is like the little Town of

2    Wellington, you go to the bathroom and somebody hands

3    you a piece of paper for wiping your behind.  So I'm

4    saying, I guess we make news in a very small way in a

5    very small town.  Take me to Fort Lauderdale, and I

6    own big properties in Fort Lauderdale, and I never get

7    my name in a newspaper,.  Or Miami, I think I got it

8    in ten times because of the "Miami Herald" -- or

9    because of owning the Miami Arena.

10   BY MR. GEORGE:

11       Q    Excuse me, Mr. Straub, so do you admit that

12   you know that Mia Matthews and Robert Matthews, in

13   fact, owned a home on Nantucket at 11 Cliff Road?

14       A    I wouldn't know they own it.  I would know

15   that they probably, during me looking at this hotel

16   and making offers on a hotel, that they said was a

17   good deal, that maybe I went through their house,

18   quote, house, and maybe they would try to put it up as

19   collateral or something, so I -- in my own -- I'm my

20   own appraiser, and so I would look at a building, a

21   lot, a house.  I don't verify it.  That's what other

22   people do for me.  They get deeds and titles and look

23   at appraisers' reports and stuff like that to tell me

24   how much something is worth, so they can super

25   collateralize.  And in that case, I probably would

1    have been looking at super collateralization, unless

2    it's cash or a bond or an insurance policy.  Sometimes

3    I go in 50/50.  You bring me in two -- an insurance

4    policy claim that I can verify for $2, I might lend

5    you a dollar on it.

6        Q    Now, did you know that the 11 Cliff Road home

7    was pledged as collateral for construction on the

8    Point Breeze Hotel project that Mr. Matthews is

9    working on in Nantucket?

10       A    I don't know it, but Point Breeze, is the

11   name of a hotel I was talking about?

12       Q    Are you --

13       A    Did I make -- I don't even know if I made a

14   loan to them.  You're saying I made a loan to them?

15       Q    No.  Let me rephrase the question.

16       A    So you're misleading me.  That's what --

17   don't trick me.  Don't try to trick me.  What I --

18       Q    Let me rephrase the question for you,

19   Mr. Straub.

20       A    Mm-hmm.

21       Q    Is the hotel that you went and looked at in

22   Nantucket, was that called the Point Breeze Hotel?

23       A    I have no idea what the name of it was.  I

24   told you I was in town for a day or a day and a half.

25       Q    Do you know whether Robert and Mia Matthews

1   pledged their 11 Cliff Road home as a loan from TD

2   Bank for the development of the Point Breeze property?

3       A   I would never have any idea sitting here

4   today, unless somebody show me some paperwork that is

5   part of the collateral that somebody ran by me.  I

6   don't think I ever even made a loan to them, and so

7   it's definitely gonna be, like, really back there.

8           When people bring me proposals -- I probably

9   get a proposal a month.  I've been around for 55

10  years, so I can't -- and I might get two a month.

11  People bring me in offers and say they have this and

12  have that.  We have them verified, so I need to go

13  down to -- and you need to answer me or I need to

14  research, did I lend money to it?  If I did, there

15  might be a file someplace, if we keep them back that

16  far.  IRS requires seven or eight years, and that's

17  about all we do.  We can't keep track of all of this

18  stuff.

19      Q   Mr. Straub, were you the sole member and 100%

20  owner of a limited -- of an LLC called Point Breeze

21  Holdings?

22      A   I have no idea.  I probably have 500

23  companies during my 55 years that got formed for a

24  specific purpose or not.  So show me some paperwork,

25  and I can go ahead and get one of the lieutenants

1  around here -- or maybe they're dead by now, because

2  we've had chief financial officers drop off the edge

3  of the earth.  I don't know, they went to Mexico one

4  time and never came back, and they had no reason to do

5  that, and they are good straight kids from West

6  Virginia.

7      Q    Mr. Straub, isn't it true that you entered

8  into a purchase and sale agreement to purchase the

9  Point Breeze Hotel in name of Point Breeze Holdings?

10     A    I would have no idea.  You have to get me

11 familiar with it.  I do hundreds of deal.  I have 600-

12 and-some pieces of property, so take 600 pieces of

13 property, there's probably 300 contracts just for the

14 ones we bought.  Now go to the ones we didn't buy or

15 lend money to, that's another hundred or so.

16     Q    Do you know who Keith Mahler, M-A-H --

17     A    No.

18     Q    -- L-E-R?

19     A    No, no.

20     Q    Have you ever met or spoken to him?

21     A    I don't even know who he is.  Show me a

22 picture.

23     Q    Isn't it true, Mr. Straub, that Point Breeze

24 Holdings received an assignment of a $6 million

25 mortgage held by TD Bank from Mr. Mahler for $100,000?

1       A     Guys, here's our problem.  I suffer from

2    major ADD.  My oldest daughter is a lawyer in three

3    states.  She suffers from it.  I'm watching everybody

4    coming in the door and not paying attention.  So I'm

5    gonna try to share stare at your chest, and not even

6    your mouth, and so let's try that.  If not, you're

7    gonna have to reverse with me and look outside,

8    because that's just a field out there, to be honest

9    with you.

10      Q    I'm happy to do that if it'll make it easier.

11      A    Okay.  Let's try it with me doing this.

12            MR. GEORGE:  Okay.  Would you please read the

13   question back for the witness?

14            (Thereupon, the question referred to was read

15   back by the court reporter as recorded above.)

16            THE WITNESS:  All I can say is that must have

17   been a pretty good deal.  That's a -- that's better

18   than Icon (phonetic).  I run an Icon, doing the same

19   thing I do up in Atlantic City all the time.  So a $6

20   million note for a hundred thousand dollars, I

21   probably could.  I've made some good deals in my life.

22   I've made some bad deals in my life.  But I don't know

23   who this Mahler guy is.

24   BY MR. GEORGE:

25      Q    So isn't it true that that happen, that your

1   Point Breeze Holdings got a $6 million mortgage for a

2   hundred thousand dollars?

3        A    No, I don't remember any of -- that sounds

4   like too good a deal, and probably would have

5   remembered that and probably used that in my quote to

6   the younger group of this world.  I bring up a lot of

7   kids.  That's why you see 500 of them behind me,

8   that'll be out here.  That's what I do for life.  When

9   you get to be so old, you help younger ones out.  Go

10  ahead.

11       Q    Now, isn't it also true, Mr. Straub, that the

12  same day that your Point Breeze Holdings got an

13  assignment of that $6 million mortgage for a hundred

14  thousand dollars, you turned around through your

15  company, Equipment Leasing International, LLC, and

16  loaned Robert Matthews $775,277?

17       A    I don't remember that at the same time or

18  anything else.  There's been so much depositions I've

19  sat in on or read in newspapers and stuff.  There was

20  a loan -- or I heard in court, in front of the

21  Bankruptcy Judge, the debtor's attorney brought this

22  thing up, and I kind of asked questions of the lawyers

23  and everybody else.  I cant tell you exactly what they

24  told me, which is they'll get back with me, usually

25  what happens, they'll get back with me, that we did

1    lend some money and the guy didn't pay me, which is

2    most likely Matthews, what you're -- I'm piecing all

3    this stuff together, that I lent him some money or her

4    or a company.  Excuse me.  I don't even remember

5    Equipment Leasing, because that's not one of our major

6    companies, and he didn't pay me, and I had to sue him

7    for it and eventually got 800-and-some thousand

8    dollars for it.  That's all I know about the thing.

9    You can ask me 112 more questions.  It's too small on

10   my radar screen to worry about.  Sounds like a good

11   deal.  I'll do it all day long.

12       Q    Well, let me ask a different question.

13            Isn't it true that you are the sole member

14   and 100% owner of Equipment Leasing International,

15   LLC?

16       A    I don't know.  I'm a hundred percent owner on

17   pretty much all companies, and we've been debt-free, I

18   think, since -- 22 years now.  So maybe somebody had

19   lent me money someplace back, beyond 22 years, but I

20   think this is within 22 years, and so I've been a

21   hundred percent owner, and I don't think there's been

22   anybody else that's been a part contingency, like my

23   brother, could have been.  But he died ten years ago,

24   seems like, eight years ago.  So my brother might have

25   taken part of a deal.

1        I would say that company doesn't ring a bell

2  to me, what it all had.  Probably didn't have too

3  much, because I would have remember if it owned a big

4  hotel someplace or a marina or buy-out notes from

5  RTC'S.  You know, some are major deals that I remember

6  more, because I lived with them for years and years

7  and years.  That one, I definitely didn't live with it

8  very long, so if it is and if I was, show me a

9  document and refresh my memory, and I'll be able to

10  tell you yes or no.

11     Q  Well, do you recall that Mia Matthews reached

12  out to you a day before there was going to be a

13  foreclosure on her 11 Cliff Road property asking you,

14  in essence, to bail her out?

15     A  I don't think so.  What's 11 Cliff -- where

16  is that located?

17     Q  That's the Nantucket home that we've been

18  talking about.

19     A  I think I got most of that stuff from Bob.

20  You know, in other words, it seems like Mia and I

21  were -- we've been friend for, as I said yesterday,

22  maybe 20 years or something like that.  Maybe I've

23  known her from social events, because I've been down

24  here for about 27 years, and I think I bumped into her

25  in some social event at that time.  And so I usually

Page 34

1    don't usually get calls from non-business people,

2    usually business people that understand things.  So

3    we've been friends and probably tip my hat to her a

4    few times.  Admire her because she's a working girl,

5    she's an actress of some type.  Makes good money, I

6    understand.

7         Q    So do you recall Robert Matthews calling you

8    and asking you to bail them out because their 11 Cliff

9    Road home was going to be foreclosed on the next day?

10        A    If 11 Cliff is up Nantucket, which I wouldn't

11   know the address -- I remember walking up a hill,

12   phew, and going to some building, and I went to

13   another building, which I think they said was a hotel,

14   and it was half completed or something, and Bob is

15   always they're talking in your ear while I'm walking

16   and sweating and everything else.  As a matter of

17   fact, I think -- I remember getting -- I think I had a

18   boat up in that area, and we wanted to see what

19   Nantucket was all about, because I never venture out,

20   just like I probably haven't been out of the country

21   more -- I don't know, at that time, ten times in my

22   whole life, and it would have been with my mother when

23   I was six or seven years old, to Rome.

24             So Bob was always BS'ing, talking to you,

25   telling you about the next greatest deal in the world.

Page 35

1   You just dealt with Bob, you know, and so I wanted --

2   I think my more concern was, if he didn't owe me money

3   at that time -- I was up there in Boston.  I think I

4   went to Boston.  I remember seeing a polo game, and

5   maybe from Boston to Nantucket is a short jump, so may

6   have had the boat come over and take me over there.

7       Q    The question I asked you is, do you recall

8   that you were asked either by Bob or Mia Matthews to

9   help save their house from being foreclosed upon

10  approximately 24 hours before it was actually going to

11  happen?

12      A    I don't remember those detail, but it's not

13  uncommon for him or anybody else tell me about an

14  emergency, and then I say, "Listen, guys, you know

15  about my procedures."

16          I was shifting from 27 plants and running

17  that on a day-to-day basis and in two helicopters, I'm

18  an helicopter pilot, going back and forth to jobs,

19  biddings and everything else, a hectic life.  So I had

20  probably just sold off -- actually, I gave away to my

21  employees, because I was just tired.

22          And so I don't remember, Bob Matthews or

23  probably Jim Cummins (phonetic).  I think one of the

24  attorneys here was involved with Jim Cummins, and so

25  there was multiple different people I can come up with

1   that are always telling me the bank is moving in on

2   them, they're getting a divorce; they're having some

3   other reason to try to trigger me -- because they knew

4   I had the cash, to go ahead and come up.  It wasn't

5   700 million.  It was 70,000, is what you're telling

6   me?

7       Q   No, I'm sorry, it was 775,000.

8       A   Okay.  I'm sorry, $700,000 is still very

9   nominal for where I was after I got rid of 27 plants

10  that I started when I was 15 years of age, so --

11  because dad left us nothing.  As a matter of fact, the

12  son-of-gun died, gave it to his secretary, and we had

13  to start on our own.

14      Q   So is it your testimony that you have no

15  recollection of having done this?

16      A   Done what?

17      Q   Paying, helping --

18      A   No, that wasn't your question.  You said did

19  you remember them asking me, and I'm saying, I don't

20  remember them asking me.  It's just a normal process.

21  That most likely would be the case --

22      Q   Okay.

23      A   -- because Bob was always somebody that was

24  always needing something.

25      Q   So do you remember actually --

1    A    No, I don't remember.  I'm still saying, I

2    don't remember, but I remember --

3    Q    I'm asking you a different question, sir.

4    A    -- sweating, sweating going up a road and

5    walking into one building and walking into another

6    building, so that was it.

7    Q    Do you recall actually loaning them $775,000

8    within 24 to 48 hours to allow them to avoid

9    foreclosure on --

10   A    No, I don't remember the specifics.  I

11   remember hearing about that in the original bankruptcy

12   statements made by the debtor's lawyer.  I remember

13   him saying something about that, and I'm going, "Boy,

14   I might have check to that out," and I don't

15   remember, because I'm 72 -- let's see, do I remember

16   when I'm 62 that -- the specifics like you're asking

17   me?  No way.  I remember that I verified, through

18   asking our attorneys, what is the -- I can't say what

19   they told me, but --

20          MR. SALAZAR:  Right.

21          THE WITNESS:  -- the sheer fact of saying --

22   I kind of reconstructed that I must have given a loan

23   and got paid back a hundred-and-some-thousand-dollar

24   profit for a very short period of time, but I had to

25   foreclose on everything.

1    BY MR. GEORGE:

2       Q    Okay.  Now, Mr. Straub, you actually were

3    present at Mia Matthews' deposition that was taken --

4       A    Yes.

5       Q    -- earlier in the week, weren't you?

6       A    Yes.

7       Q    And you were there when Mr. Landau took

8    Ms. Matthews through a very lengthy exhibit with a

9    series of text message between the two of you, weren't

10   you?

11      A    Yeah, it was kind of fun to hear what you do

12   when you're teasing or when you're playing around on

13   the telephone and stuff.  You know, a lot of it is

14   humorous.

15      Q    I'm not going to, at this moment, go through

16   all those again, but just so that we don't have to

17   waste a lot of time here, isn't it true that you

18   actually had much more than a friendship with Mia

19   Matthews and that you were pursuing a personal

20   intimate relationship with her for a number of years?

21      A    You can interpret those texts to whatever you

22   want.  You can ask Mia when she can't take the Fifth,

23   and you can ask me.  I never had sex with the girl.

24   I'm saying to you, she always fascinated me that she

25   was a worker like my daughters.  I've been trying to

Page 39

1    get them to work, and that's when they went to -- back

2    to some of the best schools and became, as I say, a

3    lawyer -- lawyers in three states, and want to see

4    them get the federal appointment for a judgeship, not

5    to be on the bench, but for a mediator and stuff.  And

6    the other one runs the foundation and takes care of

7    all these charities and stuff that we deal with.

8          So to me she raised two kids.  She worked,

9    and she is beautiful.  And so am I -- do I turn an

10   eye, turn my head to somebody that walks in the door

11   right now -- which I'm looking at the front door of

12   our business here, and if someone walks in there, I'm

13   gonna check them over.  And so, yeah, I am a male, but

14   an intimate relationship, I'm sorry, I don't know if I

15   could have the time.

16         Read the newspaper and you'll see how many

17   girls I date.  I go out every night and I date

18   multiple girls.  They are either girlfriends or just a

19   girl that is a friend, and Janine (phonetic) just

20   called me here, and we talk about her boyfriend and

21   stuff like that, because I'm a father image to these

22   kids.

23     Q   Well, Mr. Straub, isn't it true that you were

24   pressuring Mia Matthews to leave her husband and come

25   and live with you?

Page 40

1      A    No, not live with me.  Live outside of Bob

2    Matthews.  I do agree that I -- and I'll tell Bob to

3    his face, he should go ahead and for the trouble he's

4    into, he should be -- and that's why I gave him an old

5    car to use and everything.  He's running around in

6    Rolls Royces.  He's under indictment and everything

7    else.  I said, "You're giving the wrong impression,

8    buddy, I'm telling you that you need to go ahead and

9    Mia needs to be separate from you, not -- maybe not

10   divorced, but separate from you," and Bob was -- I saw

11   him bouncing around in a Rolls Royce, and I think he

12   was over at the club here about a year ago, not at my

13   club, but at the -- what do you want to call the

14   property we're talk about here?

15       Q    The Palm House --

16       A    It's on Royal Palm Way.  What's it called?

17   Palm House.

18       Q    Palm House.

19       A    I think I saw him over there driving by or

20   whatever, because my bank is right across the street,

21   Wells Fargo, and we have a lot of involvement with

22   Wells Fargo.  So I'm seeing him with this Rolls Royce,

23   and I'm, like, who in the hell has got a Rolls Royce?

24   And it's an old Rolls Royce.

25            But getting back to -- so I didn't have sex

Page 41

1    with her.  I've known the girl for 20 years.  She's no

2    different than probably the one that was in the

3    newspaper and probably six other girls that I deal

4    with.  I'm their father image.  I'm also -- date some

5    of them on more of an intimate relationship, younger

6    than she is by far.  And I'm not ashamed of what I

7    did.  I've been divorced for ten years.  I was married

8    for almost 39 years, I think, so I wouldn't call that

9    an intimate -- I wouldn't call it an intimate

10   relationship.

11          It is a relationship with a woman that has

12   got herself in trouble through her husband, and she

13   needs to not listen to her lawyers that are

14   probably -- and I don't know what her lawyers told

15   her, but it sounds like there would be no purpose in

16   her living in a $30 million house with him, knowing

17   that he's probably gonna spend some time in prison.

18   She needs to get out of her lifestyle.

19          So I'll tell him that any place I bump into

20   him, depositions or whatever it may be.  If somebody

21   asked me, "What do I" -- maybe she asked me, what do I

22   think?  And I would answer her.  Maybe she didn't ask

23   me that.  Maybe it's just me taking 14 hours on this

24   deposition that somebody else can maybe do in seven.

25   I'm saying, I give my opinion at this age about a lot

Page 42

1    of people.

2          I take care of Louie Lipton's two boys that

3    are 27 and 28.  Sarah's two kids are 27 -- or no, are

4    seven and eight.  I don't know what their age is now.

5    I hired --

6    Q    Excuse me, Mr. Straub --

7    A    -- Janine's son as my --

8    Q    I know you take care of other people, but --

9    A    Yeah, I take care of a lot of people.

10   Q    -- do you pay for Mia Matthews' daughter to

11   go to Columbia College?

12   A    No, I don't pay one penny.  I haven't paid

13   them one penny.  I said to them, "If you guys can't

14   get your two kids' -- because I met their two kids

15   probably twice or three times in my life, and I said,

16   "If you guys aren't gonna be able to give those kids

17   an education, you gotta have an education for them."

18         No different than some other of the girls

19   that I'm friends with, and I said, hey -- right now I

20   got five international kids I take care of that are

21   here playing tennis, take care of all their bills and

22   everything else.  I like kids, because I got, finally,

23   some granddaughters, and I didn't grow up with my

24   children.  I was on the road, I was in a plane, I was

25   in a helicopter and in construction sites for 20 some

Page 43

1    years, and they grew up and I didn't get to see them.

2    And so me seeing kids now is my way of maybe paying

3    that back or getting that enjoyment out of life.

4        Q    Didn't you ask Mia to move to Aspen to live

5    with you and another woman?

6        A    If I did, I was teasing her.  Go ahead.  But

7    that's fine.  I don't say I haven't had threesomes

8    before, but that's -- I don't think -- Mia is

9    definitely not at that class, that I would have a

10   threesome out in Aspen, because I've been there four

11   times in my life or something like that.

12       Q    Just to be clear, I wasn't suggesting that

13   you were asking her to have a threesome.  I was --

14       A    You said living with them, so I would think

15   that -- to me a threesome is -- a threesome sexually,

16   threesomes would be two girls and a guy.

17       Q    Okay.  Isn't it true that, in fact, you

18   called Mia with this other woman on the line to talk

19   about her leaving her husband and moving to Aspen with

20   you and this woman?

21       A    I don't know, but it sounds logical that I

22   would say, "There's nothing wrong Mia for what you're

23   doing, if you want to get the hell out of Palm Beach,"

24   because Palm Beach is really small, and you get a lot

25   of bad publicity, and there she is, an acting career

Page 44

1    and making money out of acting, is she getting hired

2    on the next -- the next -- the next show of some type,

3    "You want to get out there and come to Aspen, I'll go

4    ahead and buy something out in Aspen," because we were

5    all -- all the polo players -- because I've been in

6    Polo for 27 years, playing polo, and sometimes it

7    takes about an hour a day out of a, you know, 17-hour

8    day for me, seven days a week, that there -- the

9    Ganzis, which I lend them money for -- out in Aspen

10   and stuff, and I lend them money back here, the --

11   they're forming polo out there, so I'm trying to get

12   everybody to move out to Aspen instead of here.

13          I sold off all my polo operations, so I'm

14   trying to get people to move to Aspen.  Yeah, probably

15   did, in some -- I don't know who the girl would have

16   been that I was on the phone with, but I wasn't out in

17   Aspen at the time.  Maybe I just -- the sheer fact

18   that I think Mia knows all my girlfriends, friends and

19   friends of girls -- let's come up with another word,

20   girlfriend.

21   Q    Female acquaintances, is that what you're

22   trying to say?

23   A    Okay.  They're female acquaintances -- well,

24   that still gets the tendency of making it sound like

25   I'm going to bed with --

Page 45

1      Q    I understand what you're trying to say.

2           You're trying to say women that you're

3      friends with --

4      A    Right.

5      Q    -- that you're not in relationships with.

6      A    Yes, and --

7      Q    I understand what you're --

8      A    -- give me a phrase for that, so it'll save a

9      lot of time for you and me.

10     Q    How about female friends?

11     A    Okay.  They're female friends, and I could

12     have very easily had a female friend on the phone,

13     saying, you don't worry about, because I'm never out

14     there.  I would go ahead and have a place just for

15     people to hide.  I got three places here that I got

16     him staying at.  I got one of my tenants staying at

17     that -- bought a piece of property, and he's having

18     some trouble with his wife.  So I got multiple

19     different houses and apartments that I let people stay

20     in.

21     Q    So the final question for now about these

22     texts, because I'm not really looking to embarrass you

23     or be salacious --

24     A    Go ahead, shoot, take your shot at me.

25     Q    -- or anything like that.  It's really not --

Page 46

1       A    My stuff is all on board.

2       Q    Okay.  When Mr. Landau was asking Mia

3   questions, he brought up a text where you were talking

4   about the colloquial term you used is "BJs," and it

5   was --

6       A    Everybody asked me about that afterwards.

7       Q    Well, but let me ask you.

8            You know, you're saying that you act as a

9   father figure to many women, so when you're acting as

10  a father figure to women, do you suggest that they

11  should come and give you three BJs for something that

12  you're doing for them?

13      A    I do a lot.  I do a lot of that kind of

14  comments.  To me it's like -- I use also the same

15  comment, your first born child.  I'm telling you if

16  you don't pay me, you owe me your first born child.

17  If you don't pay me, you owe me a BJ.  In other words,

18  that's something very very personal to people.  They

19  will usually pay you the money they owe you or

20  something or introduce you to somebody that -- hey,

21  there's a girl down at the bar here.  I know we're

22  getting a drink, and I have to have somebody to get a

23  meal with, so I could eat meals with different girls,

24  friends of girls --

25            MR. SALAZAR:  Female friends.

1          THE WITNESS:  -- and I'll say, "Hey,

2    introduce me to that girl down there."  It is a lot

3    easier for that girt to introduce me to that girl down

4    at the end of the bar, than me going up to the bar, to

5    the girl, and saying, "Hey, I'm Glenn Straub," and

6    they say, "Big deal, you're an old -- you're an old

7    72-year-old guy," no.  But a girl introduces me to

8    that girl, it makes a little bit more sense to say, he

9    must be a father image and somebody that helps

10   somebody through their life, because a lot times a

11   girl sitting at a bar by herself is there for some

12   reason.  It's not just necessarily for sex, just to

13   meet somebody or to be in -- at the table and laughing

14   with the rest of us that are my friends.

15   BY MR. GEORGE:

16       Q   I misspoke later (sic) when I asked about

17   Ms. Matthews' daughter going to Columbia.  I meant

18   Dartmouth.  Are you paying for her to go through --

19       A   No, neither one of them paying any penny,

20   didn't give them $10 or didn't -- I said, "If you guys

21   can't" -- this is right after I read the newspaper, he

22   got indicted, and called her up.  I hadn't talked to

23   her for probably --  don't hold me to it, but maybe

24   months and months and months, and I said -- I still

25   had her phone in my -- in my -- her phone number in my

Page 48

1    phone, and I said, "If you need something for the kids

2    to go to school, I'll take and do that."  I've got my

3    oldest -- my youngest daughter does that type of work,

4    provides for charities for all kinds of things.  As a

5    matter of fact, she organizes charities, so how they

6    can get through to become 501(c)'s and stuff like

7    that.  That's -- I'm glad that she's doing that, but

8    I'm glad that the other one is having kids, you know,

9    that make me a grandpa.

10       Q   Did you arrange for her daughter to be able

11   to go to Dartmouth?

12       A   No, nothing -- I only met her daughter maybe

13   twice in my life, and -- I don't know her daughter or

14   daughters, and -- maybe three times.  I've been over

15   to the house looking at lending them money here

16   recently, and they gave me some collateral, and I

17   found out later on they didn't give me the proper

18   inventory, and I put the money in escrow for them here

19   in the last couple of months, for their attorney fees,

20   and I lent them money on that, and they send the

21   pleadings here and everything like that.  And I put

22   the money in escrow, to where if they get me

23   collateral -- get me enough collateral, which will be

24   at least two times net worth, market value, then I

25   would go ahead and let the collateral go from

Page 49

1    collateral to their attorneys' pockets, but I wouldn't
2    -- they didn't produce it, so that I declared them in
3    default and sued them in -- sued them in one of the
4    counties here where we had some extra lawyers.  As a
5    matter of fact, a lawyer that looks like you, he's
6    very pleasant, a guy named Al Moore.  He was an
7    attorney up in Tesoro for a while --
8         Q    Are you talking about the St. Lucie County
9    lawsuit --
10        A    St. Lucie --
11        Q    -- you filed?
12        A    -- yeah, yeah.  Because I used him, because
13   everybody else is booked solid right now.
14        Q    Actually didn't you file that lawsuit after
15   Mia told you that she didn't want to have the kind of
16   relationship with you that you wanted?
17        A    No, no way.  Maybe -- maybe one of texts
18   would reflect something like that.  Show it to me --
19        Q    Okay.
20        A    -- I filed the suit because they never
21   furnished the inventory, because I found out later on
22   it was, I think, pledged to the IRS, and I didn't find
23   that out until weeks and weeks later.  But I think we
24   finally brought suit against them to get my money and
25   brought the attorney fees -- attorneys into it, and

1  supposedly we have written documents the attorneys

2  have been approved to release the money to us, because

3  we only shipped it to their escrow.  We did not ship

4  it to pay their bills.

5      Q   Okay.  Well, I'll show you those texts later.

6          And didn't you even tell her, before you

7  filed the suit, that you wouldn't do it if your

8  relationship with her got back on track?

9      A   I wouldn't do what?

10     Q   Sue her in St. Lucie County.

11     A   She wouldn't even know what St. Lucie

12  County -- that's a little trick I got.  To keep things

13  out of the newspaper, I'll sue in other counties.  I

14  did that with my divorce, check my divorce.  My wife

15  and I are the best of friends after ten years, 10-1/2

16  years, because we both filed, and nobody knew we

17  weren't divorced, because it shakes up my company.

18  Oh, Glenn is going through a divorce, now he's gonna

19  get involved with drugs and he's gonna get involved

20  with young people or young girlfriends and stuff.  I

21  don't need my life being out there -- at that time.

22  Shit, since that time, it seems like every newspaper

23  has got her on a quick down list.

24     Q   Please take a look at Page 3 of 5 of that

25  article that I gave you.

1       A     Okay.

2       Q     If you look at the very last -- beginning at

3   the very last sentence, it says in this article,

4   "Despite all the business interactions and the loan

5   agreement between Matthews and his company, ELI" --

6       A     Where are you reading from?

7       Q     The very last -- the very last sentence of

8   Page 3.

9            MR. SALAZAR:  Would you like this one back?

10           It didn't seem very sensitive, but -- can we

11  remark this one?

12           MR. GEORGE:  Yeah.

13           (Thereupon, a clean copy of the document

14  previously marked as Exhibit No. 1 was marked as

15  Exhibit No. 1 for identification, during which there

16  was a discussion off the record.)

17           MR. SALAZAR:  So where are you looking at,

18  counsel, so I can assist him?

19           MR. GEORGE:  I'm looking at the bottom of

20  Page 3.

21           MR. SALAZAR:  So the parts that are, in fact,

22  highlighted?

23           MR. GEORGE:  Yeah, that I highlighted.

24           MR. SALAZAR:  So that was the confusing part.

25  This one is highlighted.

Page 52

1          MR. GEORGE:  It says -- do you want to read
2    it first?
3          THE WITNESS:  Well, I can, but I told you I
4    read at a third grade --
5          MR. GEORGE:  I'll read it and --
6          THE WITNESS:  -- ah, fifth grade, so --
7          MR. GEORGE:  I'm going to read it into the
8    record.  It says, "Despite all the business
9    interactions" --
10          THE WITNESS:  I still don't see that.
11          MR. SALAZAR:  Okay.  This is this last one
12    right here.
13          THE WITNESS:  Oh, okay, down there.
14          MR. GEORGE:  -- "and the loan agreement
15    between Matthews and his company, ELI, Straub said in
16    a phone interview this week that he barely knows
17    Matthews."
18          THE WITNESS:  Pretty much what I just said.
19          MR. GEORGE:  "He was just one of many people
20    Straub's companies had lent money to when the banks
21    would not, Straub said."
22          THE WITNESS:  Yeah, that's me.
23    BY MR. GEORGE:
24     Q   So do you remember earlier when I asked you
25    if you had said in any newspaper interview or in any

1    public interviews that you barely knew Robert Matthews

2    and you didn't recall doing that, does this refresh

3    your recollection?

4        A    Nah, that's --

5             MR. SALAZAR:  Object to form.

6             THE WITNESS:  -- some newspaper -- that's

7    some newspaper guy quoting something, and I talk

8    off-the-cuff a lot.

9    BY MR. GEORGE:

10       Q    I'm just asking you whether you said this or

11   not?

12       A    No, I don't think I did, but that's my normal

13   thing.  I pretty much don't care who people are or

14   what their background is, if you got collateral, bring

15   me your car and I'll give 200 bucks for it.

16       Q    So is it your testimony that the reporter

17   just made that quote up about you?

18       A    Could be, I --

19             MR. SALAZAR:  Object to form.

20             THE WITNESS:  -- don't know at the time what

21   I said or I didn't say.  So it's possible, but a

22   newspaper person -- I don't get them to send me -- I

23   do now, on these last three articles, I make them send

24   me a copy for clerical reasons of what they say or

25   don't say before they print.  If not I'll never talk

Page 54

1    to them again, so that's my -- that's my procedure

2    now.  Back in whatever year this is, I wasn't that

3    smart, because they misquote you.

4         I probably said more than just a one-liner on

5    Page 4, that Straub's companies have lent money to

6    when the banks would not.  I don't say it that way.  I

7    say, you bring me -- I'm a collateral lender, I think

8    I've been saying that word for a long time.

9         So a collateral lender -- banks could

10   possibly lend them money.  Like Ganzi borrowed

11   $500,000 here about a year ago, and it took him much,

12   much longer, but I sold him probably $20 million worth

13   of stuff in the last two years before that, and he

14   needed another 500,000 for a shortfall for something,

15   and he knows I only accept collateral.  So people that

16   come to me have collateral.  They don't -- they could

17   get loans, but they have to pay six percent overseas.

18   They have to pay five percent or something like that,

19   or eight percent.  You can pay me off anytime you want

20   to pay me off.  It's what's called a no prepayment

21   penalty, but I've done a hundred of those loans, and

22   they go out and get other money.

23        It's not because the banks turned them down.

24   It's because my interest rate is usually better than

25   their interest rate, and I give them a right to prepay

1   me if they have to.  They just know they can walk in

2   here and borrow money.  I think in Ganzi's case it was

3   four hours or something like that, for 500,000, to

4   borrow it.  It took me six weeks or six months to get

5   my money, which it was supposed to be, like, pay me

6   back in a few weeks.

7           MR. GEORGE:  Two, please.

8           MR. SALAZAR:  Thank you.

9           (Thereupon, the document referred to was

10  marked as Exhibit No. 2 for identification.)

11          MR. SALAZAR:  You know what, before we launch

12  into this, can we take five?

13          MR. GEORGE:  Sure.

14          (Thereupon, a 20-minute recess was taken.)

15          MR. GEORGE:  Can we go back on the record,

16  please?

17          MR. SALAZAR:  Yes.

18  BY MR. GEORGE:

19      Q   Mr. Straub, I put in front of you what's been

20  marked as Plaintiff's -- I'm sorry, as Exhibit 2 to

21  your deposition, and I'm going to ask you some

22  questions about this document starting with the first

23  page of the document.

24      A   Yeah.

25      Q   It's right in front of you, sir.

1       A    Oh.  Boy, there's some lookers, huh?

2       Q    Do you want to switch seats?

3       A    No, because if I sit --

4            MR. SALAZAR:  Terrible time to ask that

5    question.

6            THE WITNESS:  There's a hundred-fifty agents,

7    and they're 85% women, and they all come in there, and

8    they're all equestrian, and I know some of them, but

9    go ahead.

10   BY MR. GEORGE:

11      Q    Okay.  So if you look at the very top of that

12   document, it says from "Keith@mahlercompany.com."

13           Do you remember me asking you about Keith

14   Mahler and whether you knew him earlier?

15      A    Yeah, I still don't know who he is.

16           Go ahead.

17      Q    And do you see the two -- a portion of that

18   e-mail is addressed to Straubpolo@aol.com?

19      A    Yep.

20      Q    Is that your e-mail address?

21      A    That's my e-mail address.  I've never -- I

22   never turned a computer on in my life.  I never pulled

23   an e-mail off.  I have people who do all that stuff

24   for me --

25      Q    Understood.

1     A    -- and they understand junk mail and

2  everything else, so if they know who it goes to, they

3  send it to them.  They don't give it to me, because

4  I'm not in the office but maybe twice a week, maybe.

5     Q    Underneath your e-mail address, it has as cc

6  to Pololawyer@aol.com.

7          Isn't that Craig Galle's address?

8     A    Yep.

9     Q    And next to that is Bob Matthews -- I'm

10 sorry, Bob@matthewsventures.com.

11         Is that Bob Matthews' e-mail address?

12    A    I don't know.  I never sent it.  I've never

13 opened up a computer in my life, don't know how to

14 type and don't know how they work, and I don't know if

15 that's Bob's e-mail, if they do it that way.  Why

16 wouldn't they put it down below, the next line?

17    Q    I don't know, I didn't write the e-mail.

18         The e-mail says, "Glenn, Bob Matthews has

19 asked that I send this assignment over to you for

20 immediate review.  As Bob has discussed with you

21 previously our entity is the assignee of TD Bank," and

22 underneath that it says, "Mirra (phonetic) Mia, LLC

23 has entered an agreement to purchase this asset, which

24 Bob has suggested assigning to you as collateral on a

25 short-term basis, which I would consent in exchange

Page 58

1    for your immediately funding the reinstatement of the

2    underlying first mortgage of approximately $774,000,

3    which must be concluded by 10:30 a.m. EST, Monday,

4    June 28, 2010."

5            Do you recall that on June 25, 2010 you were

6    getting involved with the potential foreclosure of 11

7    Cliff Road on June 28, 2010?

8        A    Never.  I don't know anything about it.  But,

9    you know, the staff probably took this message and

10   asked me a couple questions, like, "Hey, do you want

11   to give the son-of-a-gun some money," and I'm saying,

12   "Hey, as long as he puts collateral up, you know the

13   procedure."  Yeah, it's not like we -- at that time --

14   let's see, I moved down here -- that's ten -- that was

15   only around eight years ago -- twenty years before, so

16   we'd been doing it for twenty years before that.  So

17   people do things for me.

18           I don't even understand the second paragraph,

19   what he means.  So my intelligence, I don't want to

20   play cute -- but I'm the guy that has stock in the

21   company and benefit by people like me.  I hold three

22   managers' positions out of 50 managers in the company,

23   and I work my ass off, because most all my managers

24   have to work, you know, 12-hour days, and so I'm

25   carrying three of them.

Page 59

1          So I don't even know what they're talking

2    about in this thing.  Never saw it.  Don't know who it

3    is.  Never opened up an e-mail in my life, and

4    somebody in the staff does all these pencil notes down

5    here.  I can tell you what -- whose scribbling this

6    looks like.

7          Q    Isn't that Craig Galle's?

8          A    Yeah, that's Craig's scribbling.  I don't

9    know what it means, so he must have taken care of the

10   whole thing.

11         Q    Did you authorize Craig Galle to represent

12   Bob and Mia Matthews in connection with this

13   transaction?

14         A    No way, I don't -- I don't remember, but I

15   wouldn't care if -- he knows how to -- he's a lawyer.

16   He's been around.  He beat me up in Miami on a case,

17   so that I hired him, so he worked for me for ten, 15

18   years, then he turned around and now he's on his own.

19         Q    Well, when you say --

20         A    So at this time he might have been on his own

21   or starting to be out on his own.

22         Q    When you say you don't care, do you mean you

23   don't care if he represented Bob and Mia Matthews with

24   respect to this transaction?

25         A    Yeah, I don't care what he does.  He's an

Page 60

1    independent attorney, always been an independent

2    attorney.  Even when he worked for me, I think it was

3    a -- what was it -- he doesn't receive a W-2.  He

4    received a -- where we pay outside people, like the

5    guy next to me here, when we pay him, we send those

6    guys a check.  But when they are not an independent

7    lawyer -- which I don't know if he formed his company

8    by that time, he would get a -- something -- it's

9    called a non-W-2, whatever it's called.

10       Q    A 1099?

11       A    A 1099, yeah.  He probably would have

12    received a 1099, because lawyers work for other people

13    all the time.  When he was even working for me a

14    hundred percent of the time, he was always working for

15    other people, because people know how he -- he's a

16    real estate guy.

17       Q    If, in fact, the entity that you owned that

18    was involved in this transaction was Point Breeze

19    Holdings, LLC, would Mr. Galle have represented that

20    entity in this transaction as well?

21       A    I don't know --

22            MR. SALAZAR:  I'm sorry.  Object to form.

23            You can answer.

24            THE WITNESS:  As far as I need to find out

25    who -- what did you say the name of the company was?

Page 61

1          MR. GEORGE:  Point Breeze Holdings, LLC.

2          THE WITNESS:  Okay.  So from listening to all

3     the testimony before me, that must be the company that

4     was up in -- lending money to Matthews, didn't know it

5     was for Nantucket, but kind of -- if you put me back

6     in that time period, I could have very easily gave him

7     $700,000 for something, and I would've, hopefully, put

8     some documentation in courthouses and loan documents

9     and this and that.  Those guys know how to figure

10    those things out, because I wouldn't know a mortgage

11    from a note, if there is such a thing.  Is there a

12    difference between a mortgage and note?  I don't know.

13         But anyway, I trusted people to go ahead and

14    do their paperwork and do their job.  Just like when a

15    dentist digs into your tooth, I hope that -- I got a

16    root canal going on right now, and hopefully he knows

17    when to pull the tooth.  I've finally give up on

18    fighting him, been fighting it for five months now.

19    Q    Okay.  So if your entity was involved in this

20    transaction, Craig Galle would have been that entity's

21    lawyer, correct?

22    A    Oh, I don't know.  He could -- the people --

23    this company you just mentioned, Point Breeze,

24    probably had their own attorneys.  He probably

25    wouldn't be the attorney for them too, but I guess I

1    trust him.  We all trust him.

2            Scott Swerdlin is that way right now.  The

3    guy that has 41 veterinarians.  He comes in all the

4    time.  Yesterday we were interrupted that Craig was

5    trying to buy 92 Rolex watches and ten horses.

6    Federal government is foreclosing on them or something

7    like that, one of the Mafia guys out of Mexico that

8    the government confiscated all their stuff out West.

9    We got a lotta interesting people here in Wellington.

10       Q    If you can look at the next paragraph, it

11   says, "Please discuss the details immediately with Bob

12   and Craig Galle.  Any party may reach me over the

13   weekend.  For your convenience my cell is" -- and I'm

14   not going to read the cell phone for the record.

15       A    That's not me.

16       Q    Well, this e-mail is directed to you.

17       A    But I told you that --

18       Q    And he's telling you to discuss this.

19            Did you discuss this transaction with Craig

20   Galle?  Without telling me what you discussed, did you

21   discuss this with Craig Galle?

22       A    Oh, I'm sure that the preliminary stuff, I

23   must -- what you're trying to say -- I'm putting two

24   and two together.  I must have been up in Nantucket.

25   We'll have to look at the date of Exhibit No. 1 and

Page 63

1    see if this date is afterwards, probably when I got

2    back.  They're asking to borrow money, didn't know

3    what it was for, don't too much care.  I would have to

4    look at the collateral, and I might have had some

5    discussions with him, or he called me on the telephone

6    and asked me certain questions, and I'd say, "Hey, if

7    you can make it happen, fine.  If you guys got the

8    time, fine."

9        Q   So Mr. Galle would have been your lawyer in

10   connection with this transaction?

11       A   He usually is.  He's the secretary of most of

12   these corporations, so most likely.  He knows real

13   estate, and if it had something to do with real

14   estate, mostly like Craig would have been involved

15   with it.  I can't guarantee you that Larry or Al or

16   Alex or, you know, Anthony -- I can name all the

17   lawyers that get involved with these projects.

18       Q   Do you know what the meaning of the notes on

19   the bottom are that are written in Craig Galle's

20   handwriting?

21       A   Nope, don't know.  I can try to make them out

22   here.  Let me see.  Nope, I don't -- assignment of

23   insurance proceeds --

24       Q   If you don't know, that's fine.  I don't want

25   you to speculate.  If you could --

Page 64

1          A     Well, it might be that something might

2     refresh my memory.

3          Q     Okay.  You go ahead and take your time, let

4     me know.

5          A     Nope, this is not helping me.  The insurance

6     company at the end -- I think eventually we got paid

7     by insurance on that one, proceeds.  Maybe that's what

8     this loan was all about, that he got -- he had some

9     insurance coming in, and it didn't come in fast

10    enough.  I'm just -- really, I'm guessing.

11         Q     Would you turnaround -- I'm sorry, turn to

12    the next page of that document when you have a moment,

13    please.

14         A     Sorry, guys, for coughing.  I don't want to

15    spread it around.

16              MR. SALAZAR:  The next page, is it?

17              MR. GEORGE:  Yes.

18    BY MR. GEORGE:

19         Q     Just so we're clear on the record, this has

20    been previously Bates labeled as Document No. 000195

21    through 000225, and I do not know who put those Bates

22    labels on.

23              MR. SALAZAR:  You anticipated my question.

24    It's a mystery.

25    BY MR. GEORGE:

Page 65

1        Q    So I am looking now at Bates label 000196?

2        A    I can tell you that's probably what that is.

3   There was a lawsuit --

4        Q    Could you let me ask a question, please, if

5   you don't mind?

6        A    That's why those numbers are there, probably.

7        Q    Oh, okay, I'm sorry.

8             If you look at the very top of this e-mail,

9   there's a From, and it says "From:

10  Miamatthews@mac.com."

11            Is that Mia Matthews' e-mail address?

12       A    I don't see the word "from."

13       Q    Right before the -- oh, I'm sorry, you have

14  to take the paperclip off.

15       A    Okay, okay, I see.  From Mia, I don't know if

16  that's her e-mail or not, and then it's going to me,

17  supposedly, at my -- but I never -- I've never once

18  turned on my e-mail.  People receive my e-mails,

19  multiple ones, and they give them to whoever they

20  think it pertains to.

21       Q    I understand that's what your testimony is.

22       A    It's also what it is.

23            Go ahead.

24       Q    This is dated Sunday, June 27, 2010, correct?

25  Do you see that?

1     A    Yes.

2     Q    Now, you've testified several times today in

3    your deposition that you've known Mia Matthews for 20

4    years; is that correct?

5     A    I don't know, ball bark.  I've known her --

6    I've seen her on plays, and I've seen her -- maybe not

7    personally knew her, but I go to some of the arts, and

8    she's -- she always does that cartwheel, and I've seen

9    that cartwheel for 20 years.  So it's her name --

10   claim to fame is that she does a cartwheel, perfect

11   cartwheel, on the stage.  So I know that.

12    Q    So by this time, in 2010, according to your

13   math, you've known her approximately ten years; is

14   that correct?

15    A    Known of her.

16    Q    Known of her.

17    A    Yeah.

18    Q    So did you actually know her personally back

19   in June of 2010?

20    A    I don't know.  Maybe I shook her hand after a

21   play or something like that.  I could have done more.

22   Who knows?

23    Q    Okay.  Do you recall --

24    A    Not more sexually, but done more, like kissed

25   her both sides of the cheeks like everybody does

Page 67

1    nowadays, even them.

2        Q    Okay.  You hadn't asked her to move in with

3    you back then, had you?

4        A    I hadn't -- I didn't -- wasn't close enough

5    to her to tease her, you know, "Hey, young lady, you

6    want to move in with me?"

7        Q    You're asking me?

8        A    No.  That's about how I do it.

9        Q    All right.  So this e-mail is talking about

10   insurance proceeds and the possible -- strike that.

11            Let me just read it.  It says, "Dear Glenn,

12   here is the letter from the insurance adjuster for all

13   personal items in the house in Connecticut.  The

14   insurance policy is in my name, and I feel confident

15   the claim will more than satisfy the loan.  As

16   additional collateral I am willing to assign my

17   insurance proceeds up to the amount of your loan.  I'm

18   very sorry (and embarrassed) for the speed in which we

19   are asking you to deliver, but this is an extremely

20   crucial situation for us.  Please let me know if I can

21   provide you with anything additional, and thank you so

22   much for your consideration.  I am beyond grateful."

23   Warm Regards, Mia.

24            Does this refresh your recollection about

25   this transaction and what was going on --

1    A    No.

2    Q    -- with respect to -- nothing?

3    A    This letter -- if it came in, it came in and

4  got put in a file someplace.  Some way you got it, and

5  it is what it is.  I don't -- I talk on the telephone

6  to people.  I mean, I just can't spell enough to text

7  them, and I definitely wouldn't do it in writing, as

8  far as -- because I don't know how to send an e-mail.

9  So if it came in, it wouldn't mean anything to me,

10  anything special to me.  It's just anybody else

11  borrowing money.

12        One thing I will remember, my philosophy is

13  always that people are hurting in life -- I work with

14  them everyday, people, and if they get themselves

15  upside-down, short-term problems, as far as money

16  goes -- yeah, it happens all the time.

17    Q    Would you, please, Mr. Matthews -- or

18  Mr. Straub, turn to the page that's Bates labeled

19  00199?

20    A    Go ahead.

21    Q    Now, for the record this is labeled 00199

22  through 00201, and it's a letter dated June 25, 2010

23  from Stanton & Davis to Mr. Robert V. Matthews, and

24  the regarding section is "Full reinstatement, Chase

25  loan number," and I'm not going to read the number

Page 69

1    into the record.  It says, "Mortgagors, Robert V.

2    Matthews," and it says, "Property Address, 11 Cliff

3    Road, Nantucket, Massachusetts," and then it goes on

4    from there.

5         Now, Mr. Straub, do you see in the second

6    paragraph in that letter, it says, "As of June 24,

7    2010, the amount required to cure your loan deficiency

8    is $773,277.41"?

9    A    Yes.

10   Q    Now, isn't that the amount that was due and

11   owing on the 11 Cliff Road mortgage on the Nantucket

12   home?

13   A    I wouldn't know, but I guess I can always

14   take previous letters, read them, and come up with an

15   assumption on my part, but I don't know.

16   Q    Isn't that the amount you actually loaned to

17   Mr. Matthews in order to pay off that mortgage and

18   avoid foreclosure of his Nantucket home?

19   A    All of the -- all I know is I lent him around

20   $700,000.  If it turns out to be seven-seventy-three

21   and some other pennies -- or on Nantucket -- I need to

22   look at the collateral, and the collateral looks like

23   it must have been insurance proceeds and making

24   personal guarantees on things and stuff.  Maybe back

25   in those days, we might have skipped a few things.  We

Page 70

1   maybe -- people made me put titles up in escrow, so we

2   don't have to go through this foreclosure shit that

3   we're getting --

4           MR. SALAZAR:  Language.

5           THE WITNESS:  -- in trouble with in Florida.

6   We make them sign off on the foreclosure -- or titles

7   first.

8   BY MR. GEORGE:

9       Q   Would you please turn to document Bates

10  labeled 000202.

11          MR. SALAZAR:  It's 202.

12          THE WITNESS:  Go ahead.

13  BY MR. GEORGE:

14      Q   Now, that's an e-mail from Craig Galle to

15  Keith@mahlercompany.com, and Mahler is M-A-H-L-E-R,

16  and it's cc'd to Mia Matthews and Bob Matthews, dated

17  June 28, 2010, and it says, "Keith, attached are the

18  following documents, assignment of second mortgage, an

19  assignment of loan documents, and transfer of debt and

20  liens."

21          Now, does this refresh your recollection as

22  to whether Craig Galle took responsibility for

23  drafting the documents necessary to complete the TD

24  Bank transaction?

25      A   Well, it looks like from the papers it is.  I

Page 71

1    have no idea.  I don't tell Craig what to do.  He kind

2    of gives me -- I give him an idea, and then he

3    figures -- he's been around me 20 years or part of

4    that 20 before that time period.

5        Q   Did you consent to Craig Galle representing

6    both you and the Matthews in this transaction?

7        A   Asked --

8            MR. SALAZAR:  Object to form.

9            THE WITNESS:  Asked and answered.

10           I told you Craig is an independent attorney.

11   I don't know what they're allowed to do before there

12   becomes a conflict of interest, but I figure your Bar

13   codes protect people like me from having them do stuff

14   like that.

15   BY MR. GEORGE:

16       Q   Did he inform you that there could be a

17   conflict of interest --

18       A   He --

19           MR. SALAZAR:  Wait, wait, wait.

20           MR. GEORGE:  Let me finish the question,

21   please.

22   BY MR. GEORGE:

23       Q   Did he inform you that there could be a

24   conflict of interest between him representing both you

25   and the Matthews on this transaction?

1     A    Any --

2          MR. SALAZAR:  Wait, wait.  Pardon me.

3          I object to the form, and I object on the

4     grounds of attorney/client privilege, and I direct you

5     don't answer.

6     BY MR. GEORGE:

7     Q    Did you waive any potential conflicts of

8     interest with respect to this transaction?

9          MR. SALAZAR:  Object to form.

10         THE WITNESS:  Well, since I'm not a lawyer, I

11    don't know what the words -- what did you say there

12    were?

13    BY MR. GEORGE:

14    Q    Did you waive --

15    A    Object -- did I waive?  Oh, that's even

16    worse.  That's even worse.  Waive what?

17    Q    Any potential conflicts of interest from

18    Mr. Galle representing both you and the Matthews in

19    this same transaction.

20         MR. SALAZAR:  Objection to form.

21         THE WITNESS:  Didn't know that there -- what

22    you're even talking about.  I would have to get an

23    attorney to tell me what that means, and then I would

24    go ahead and say if he or she can explain to me what

25    you just said, waiving conflicts of interest, I don't

Page 73

1   know what you guys have in your bar.  If there's

2   something -- I protect myself by saying I think it's

3   been done a million times before, attorneys can have

4   other clients.  I know that we usually have engagement

5   letters, this and that.  I don't even think I have

6   engagement letters from him, because he's been around

7   here 20 years prior to that time, or ten years.

8   BY MR. GEORGE:

9       Q   So as you sit here today, you don't know

10  whether or not you waived any potential conflicts of

11  interest, do you?

12          MR. SALAZAR:  Object to form.

13          THE WITNESS:  I don't remember ever, for as

14  long as he's been here, waiving a conflict of

15  interest, because I would hope that he would know what

16  the law is or not.  And if he's done something wrong,

17  come down on him, and I think I've done that already

18  with something I told you guys.  Hey, if one of my

19  attorneys did something wrong, slap their hands.  I'm

20  going after Bob -- Bob Matthews' attorney right now,

21  because --

22  BY MR. GEORGE:

23      Q   There's no pending question, Mr. Straub.

24      A   Okay.  I'm just reminding myself when I read

25  this that I went after a complaint --

Page 74

1      Q    There's no pending question, Mr. Straub.   I

2  would ask you to wait until I ask you one.   Thank you.

3           THE WITNESS:   Now, that there's been a gap, I

4  can remember --

5           MR. SALAZAR:   Wait for --

6           THE WITNESS:   Yeah, but I can remember

7  something that happened, and he just asked me a

8  question.

9           MR. SALAZAR:   All right.

10           THE WITNESS:   So should I say it on the

11  record, that I -- there's been a gap of about a minute

12  and a half, and I just remembered that I signed 500

13  signatures and I don't know what all the paperwork is,

14  and if I did give him some kind of whatever you're

15  talking about --

16           MR. GEORGE:   Waiver of conflict.

17           THE WITNESS:   -- waiver of conflict, I could

18  have done it, and I might not have done it, because

19  they bring in 500 different documents that I sign

20  every day.

21           MR. GEORGE:   Mark that, please.

22           (Thereupon, the document referred to was

23  marked as Exhibit No. 3 for identification.)

24           MR. SALAZAR:   So this is exhibit what, now?

25           MR. GEORGE:   Three.

Page 75

1    BY MR. GEORGE:

2        Q    Mr. Straub, I'm showing you what has been

3    marked as Exhibit 3 to your deposition, and it's Bates

4    labeled 000281, and this is -- it says, "Account wire

5    transfer instructions for Glenn F. Straub," dated June

6    27, 2010 from Sal Spano, Vice President to Bank of

7    America to Beau Breckenridge."

8             Have you ever seen this document before?

9        A    Probably at the time.

10       Q    If you see towards the bottom, there's a

11   signature line, and it says, "Glenn F. Straub," is

12   that your signature?

13       A    Yes.

14       Q    Now, the amount of that wire was $773,277.41,

15   do you see that?

16       A    Yes.

17       Q    And that's the exact same amount of the

18   default that was listed in that previous letter that I

19   showed you with respect to the 11 Cliff Road property,

20   correct?

21       A    The word "default" is just a coincidence.  I

22   wouldn't know I was lending them the money.

23       Q    I'm asking you whether that's the same amount

24   of money that was listed on the letter I showed you

25   just a few minutes ago?

Page 76

1     A   Looks like it is.

2     Q   Now, if you look at -- under where it says,

3 "To Bank of America," I'm back on the single page

4 document, and it says -- it has an ABA number, and

5 then it says an account name, and it says, "Glenn F.

6 Straub Trust, Private Banking."

7         Is that your private account number -- I'm

8 sorry, private banking account, personal banking

9 account?

10    A   I have no idea.  Some other people take care

11 of -- everything flows through me, that's why I sign

12 500 different documents and authorize things, because

13 I own companies and they're -- I can't tell you if

14 they're like partners or they're members or what I am

15 to all of them, but I'm the guy that all the money

16 flows through.

17    Q   Okay.  But this has your name on it.  It

18 doesn't say that there's a name of a corporation or an

19 LLP or anything else?

20    A   I agree.  But everything I said runs through

21 me.

22    Q   I understand.

23    A   It's through my income tax return.  They

24 don't have individual tax returns or anything, that I

25 know, but I don't do the tax work.  That's outside

Page 77

1    CPAs.

2         Q    Okay.  So --

3         A    But I know it's all one company and

4    everything goes through my accounts.

5         Q    So is it your testimony that this is a

6    corporate bank account, as opposed to a personal bank?

7         A    I don't know what --

8              MR. SALAZAR:  Object to form.

9              THE WITNESS:  -- whatever, the document

10   speaks for itself, but whatever the document is doing,

11   it did it, and if it goes through my account,

12   ultimately it sifts down to that, to me.  Individual

13   companies make out thousands and thousands of

14   documents.  I had 10,000 employees at one time, you

15   know, so every paycheck, everything else, there might

16   be different accounts set up, but they're to the point

17   to where everything flows through my taxes.  So that

18   means that everything doesn't -- whatever they do,

19   they do for my benefit and not the IRS's benefit.

20   Everything is done through my tax return.

21   BY MR. GEORGE:

22        Q    So was this $773,277.41 a personal loan from

23   you to either Robert Matthews or Mia Matthews?

24             MR. SALAZAR:  Object to form.

25             THE WITNESS:  I don't think so.  I would say

Page 78

1   no.  The corporate would have lent Bob the money, but
2   the money comes from me.  All of these companies is
3   me.  It's not a double-breasted -- they've already
4   tested that.  They've tested that, it's -- always try
5   to pierce the corporate veil.  It's never won.  We
6   have lots and lots of cases that says the way we do it
7   is the way we do it.  The cash is put in my name, so I
8   can go ahead and have some kind of security, because
9   they talk to me on the telephone before they transfer
10  money out.  So before this could be transferred out,
11  they would have had to contact me.
12  BY MR. GEORGE:
13      Q   And the account that this was sent to was
14  Stanton & Davis Conveyance Account IV, correct?
15      A   I have no idea.  I wouldn't have --
16      Q   Well, that's what it says here, doesn't it?
17      A   I don't care what it says.  I mean says they
18  could send it to Saudi Arabia, I wouldn't know.  I
19  don't make these things out.  I've never opened up a
20  computer, and I've never printed one of these pieces
21  of paper.  Somebody else on the staff does it.
22      Q   Do you have any reason to believe that any of
23  the information on this document is incorrect?
24      A   No, I don't any information to disbelieve
25  that -- that's the procedure we have around here.  I

1    don't know if it's correct or not.

2         Q    If you could go back to that larger document.

3         A    I'm going down fast, keep going, buddy.  My

4    throat is getting sorer again.  Keep rattling them

5    out.

6         Q    Please look at what's been Bates labeled as

7    00207.

8         A    Go ahead.

9         Q    And it goes through 00218.

10             Have you ever seen this document before, sir?

11             MR. SALAZAR:  Just give me a moment to --

12             THE WITNESS:  Could've.

13   BY MR. GEORGE:

14        Q    Do you see at the top of the first page --

15        A    Wait, wait, I thought it I had my signature.

16   I didn't get back there.  I usually know it if it has

17   my signature, and it doesn't have my signature, so --

18   I see Larry Zink's (phonetic) brother, which was a

19   partner with me in oil and gas wells.  It's Zink, Zink

20   & Zink, so Jeff would have signed it.  so that's why

21   I'm not familiar with any of this kind of stuff,

22   because Jeff was partners in oil and gas wells up in

23   Ohio, and that's why the equipment company threw me

24   off.  I don't remember an equipment company.  So we

25   must have gone through a whole different group of

Page 80

1    people, lawyers up in Canton, Ohio, and I don't

2    remember the document, because Jeff signed it.  I

3    didn't sign it.

4        Q    Okay.  Do you recall earlier that I showed

5    you a series of e-mails demonstrating that Craig Galle

6    prepared the documents in connection with this

7    transaction?

8        A    I think that's what you did, but I'm -- when

9    it gets into legal, I kind of back off.  I'm good at

10   moving dirt, jumping on a bulldozer and digging a

11   hole --

12       Q    Okay.

13       A    -- and running up to 10,000 people.

14       Q    Did you --

15       A    I'm an operations people.

16       Q    Okay.  On the top of the loan agreement on

17   Page 1, it says, "The loan agreement is made and

18   entered into on this 28th day of June 2010 by and

19   between Robert V. Matthews, borrower, and Equipment

20   Leasing National, LLC, a Florida limited liability

21   company."

22            Is it your testimony that anyone besides you

23   is an owner in Equipment Leasing International, LLC?

24       A    I don't think there is.  I think I'm a

25   hundred percent owner on everything that I do, but

1   Jeff was -- either handled the oil and gas division

2   and maybe it had equipment in it.  Remember, 26

3   plants, 300 trucks, bidding hundreds and hundreds of

4   millions of dollars worth of jobs, I don't know what

5   went on in the company.  I'm the guy that kind of put

6   the thumbprint when it was all said and done.  Did I

7   know what was going in?  No.  I buy companies that

8   have employees, and I usually rely on them.  So, yeah,

9   Jeff could have been an owner.  Jeff could have been

10  the person making this loan.

11       Q    Did Mr. Zink have -- Mr. Jeffrey Zink, who

12  signed this document as the manager of Equipment

13  Leasing International, LLC, have the authority to loan

14  money to Bob Matthews without you telling him he could

15  do it?

16       A    Probably, for that small amount of money.

17  Each one of the wells cost more money than that, and I

18  know we did a lot of wells, so -- all my quarries and

19  stuff, so all my farm areas.

20            Did he have authority?  I'd have to go back

21  and see if he had written authority or he just -- his

22  brother was my personal attorney and takes care of all

23  the estates, Larry.  He's still around me.  Everybody

24  else has died or not in good health.  So Jeff could

25  have probably at certain times, maybe even ten years

Page 82

1   ago, had the authority to do anything he wanted to do

2   in a company.  That's the way these businesses run.

3        Q    But as you testified earlier, it was you who

4   gave the green light to loan this money to Robert

5   Matthews, correct?

6        A    I was one of those people, yeah, one of them.

7        Q    Who would the other people have been?

8        A    Maybe it'd been Jeff or maybe his brother or

9   maybe his father, Zink, Zink & Zink, you know, so I

10  didn't remember the name of the company, now I'm

11  figuring it out.  I didn't remember Equipment Leasing.

12  We probably have to pull a file, if we still have it,

13  but, again, we only keep files seven years by the IRS

14  standard.

15       Q    So is it your testimony that one of the

16  lawyers at Zink, Zink, & Zink authorized the loan to

17  Bob Matthews instead of you?

18            MR. SALAZAR:  Object to form.

19            THE WITNESS:  He could have been the official

20  person, just like I don't act as a -- I'm a president,

21  but there's secretaries, and there's chief

22  financial -- or, no, there are -- what else?  There's

23  three -- usually three corporate heads, counsel.  So

24  he could have been counsel.  He probably could have

25  had authority, yeah.  Sounds like I had him signing --

1    that's why I wasn't too familiar with this, and kind

2    of surprising, and I was sitting in on things and

3    saying, "We did what?  We lent them $700,000?"  But

4    then somebody says, "Hey, we got 800-and-some thousand

5    dollars back, plus our attorney fees."

6    BY MR. GEORGE:

7        Q   Mr. Straub, isn't it true that every penny of

8    money that you loan to people, you know about and

9    authorize?

10           MR. SALAZAR:  Object to form.

11           THE WITNESS:  I would hope so.  I would hope

12   so, but that's -- obviously in this case, it must not

13   be the case, and there's things that -- people come in

14   the office all the time, managers.  They go out on

15   their own.  Boat captains they go and buy things, so,

16   you know, there's -- we go through quite a few

17   hundreds of millions of dollars every year, so I don't

18   get involved with everything we do.  I'm one of 50 --

19   I'm three of 50 managers.

20   BY MR. GEORGE:

21       Q   But in this case I showed you the e-mails --

22   an e-mail from Mia Matthews to you personally talking

23   about this loan and her thanking you for doing it,

24   right?

25       A   I might have never seen that, and it's a good

Page 84

1   chance I wouldn't have seen something that small at my

2   level.  I'm out bidding jobs, towns, airports.

3   Somebody's gotta go do it and say, "Hey, guys, we're

4   either interested or not."  We're interested in buying

5   the RTC.  What year is this?  2010, oh, boy, the Miami

6   Arena, I think we were tearing -- I was on CNN blowing

7   up the Miami Arena and taking five acres of -- or five

8   blocks in downtown Miami.  I think I was busy doing

9   that kind of stuff.

10       Q   Now, earlier you testified that you never

11  been on a computer.  Was that literally true?

12       A   I have never turned one on.  I never turned

13  one off.  I don't know how to do it.

14       Q   I'm not asking you about turning it on or

15  turning it off.

16       A   Never have, never have.

17       Q   You've never been --

18       A   No --

19       Q   -- on a computer at all?

20       A   -- no, never been on a computer.

21       Q   Now, but you've testified before in

22  depositions, haven't you, that you actually are

23  capable of looking on your phone and reading e-mail

24  messages, right?

25       A   No, they don't do e-mails.  I only do texts.

Page 85

1    I can't do e-mails on a phone.

2        Q    Okay.  But you --

3        A    I do three things with computers, talk to a

4    cell phone, and it's only in the last couple of years.

5    I can make a call.  I can receive a call, and I can

6    text.  And that's it.  All this other kind of apps and

7    stuff --

8            MR. SALAZAR:  I question all three of those

9    capabilities.  I'm not sure about those three as a

10   matter of fact.

11           THE WITNESS:  I don't have any ability to do

12   WhatsApp.  WhatsApp is when I was on the boat, and we

13   have satellite phones, because we never know when the

14   world is gonna blow up and I gotta meet the kids at

15   Pier No. 52 and this and that.  They all have

16   satellite phones, because we know we're never going to

17   be able to talk to each other on a cell phone, so

18   that's me.  I'm security to the company.

19   BY MR. GEORGE:

20       Q    Do you have your phone on you right now?

21       A    Yes.

22       Q    Would you just show me -- I don't want to

23   look at any of your private things.  I just want you

24   to show me -- and I know this won't be reflected on

25   the record, but what mean you by texting.

Page 86

1      A    All these things.

2           MR. SALAZAR:  No, you're not going to do

3    that.  You can ask what he means by that, but he's not

4    going to show you his phone.

5           MR. GEORGE:  Well, he's --

6           MR. SALAZAR:  Put that away, please.

7           MR. GEORGE:  Well, he's testified before --

8           MR. SALAZAR:  He's not going to show you the

9    phone, counsel.  Please sit --

10          MR. GEORGE:  Don't tell me to sit down.  I

11   can stand up if I want to.

12          MR. SALAZAR:  You can stand if you'd like.

13          MR. GEORGE:  What he's testified before is

14   that he calls everything texting.  So I want to know

15   what texting means to him, whether it means truly just

16   texting, or whether it means something beyond texting,

17   and that's why I'm asking, and it's not unreasonable

18   to do that.

19          MR. SALAZAR:  I appreciate you feel that way.

20   You're not going to see his phone, and I don't want

21   you on this side of the table leaning over him while

22   you do that.

23          MR. GEORGE:  So you're instructing him --

24          MR. SALAZAR:  Yes.

25          MR. GEORGE:  -- not show me what he does?

1          MR. SALAZAR:  Yes, I'm asking him not to show

2  you his phone.

3          MR. GEORGE:  Okay.  So I'm going to --

4          THE WITNESS:  Under advice of counsel,

5  whatever it is, I can say what I have, and then you

6  can always pull from the cloud whatever I do, and you

7  can get it.

8          MR. SALAZAR:  No, no, that's not true at all.

9          MR. GEORGE:  No, I can't.  That would require

10  me --

11          MR. SALAZAR:  Just let him ask his question

12  and you can answer it.  Just put your phone away.

13          THE WITNESS:  They did it with me.

14          MR. SALAZAR:  Put the phone away.

15          THE WITNESS:  They did it with me.

16          MR. SALAZAR:  It's going be distracting, put

17  it away.

18          MR. GEORGE:  Here's what I'm going to do, for

19  the record, I've asked as part of this deposition for

20  Mr. Straub to show me what he means by texting,

21  because he's previously testified in deposition that

22  he calls everything that he does with his phone

23  texting.  So I don't know whether he's truly talking

24  about sending texts from a text application on his

25  phone, or if he's talking about something different

Page 88

1    that would include reading e-mails.  And so I've asked

2    for him to demonstrate for me what he's talking about,

3    and his lawyer has instructed him not to do that.

4           So I'm going to move to compel Mr. Straub to

5    demonstrate that to me, so that I can understand what

6    he's talking about.

7           MR. SALAZAR:  And naturally I object to that

8    statement, and I don't think it's accurate.

9           MR. GEORGE:  What don't you think is

10   accurate?

11          MR. SALAZAR:  I don't you've established that

12   he ever testified in that way.  I don't think you

13   asked him to demonstrate.  I think you ask him to show

14   you his phone, and it's inappropriate for you to look

15   at his phone.  Period.  It's not a document.  If you'd

16   like a document, you can ask for it.

17          You're welcome to ask him a question about

18   what his understanding is of those two things, but you

19   asked him to show you the phone to demonstrate that,

20   and that's not what he should be doing in a

21   deposition.  Please, let's --

22          MR. LANDAU:  And, Lou, as a witness, I will

23   put on the record that as Mr. George said it is

24   exactly what happened.

25          MR. SALAZAR:  Okay.  Well, the record is

Page 89

1   going to speak for itself, guys.

2            MR. GEORGE:  Well, let me actually make the

3   record clear.  I do not want to look at anything

4   personal on Mr. Straub's phone.  I do not want to look

5   at a text.  I do not want to look at an e-mail.  I

6   simply want to know from a procedural standpoint what

7   he does.  He can open up something blank.  I have no

8   need to look at anything personal on his phone.

9            MR. SALAZAR:  Okay.  We thank you for that.

10           Can you put it away?  It's distracting.

11           THE WITNESS:  It's turned off.

12           MR. GEORGE:  Let's take a break.

13           (Thereupon, a brief recess was taken, during

14   which a document was marked as Exhibit No. 4 for

15   identification.)

16           MR. GEORGE:  Back on the record, please.

17   BY MR. GEORGE:

18       Q   I'm showing you what's been marked as Exhibit

19   4 to your deposition.  It's a transcript of the

20   Videotaped Deposition of Glenn Straub, taken on behalf

21   of the defendant, July 22, 2015, 11:05 a.m. to 4:09

22   p.m., and it was taken here, and I'd ask you to turn

23   to Page 18 of that deposition.  I've highlighted it

24   for you to save some time.

25           MR. SALAZAR:  I'm sorry, what page?

Page 90

1              MR. GEORGE:  Eighteen.

2              THE WITNESS:  Got it.

3              MR. SALAZAR:  Is this the deposition you were

4    referring to before?

5              MR. GEORGE:  Yes.

6              MR. SALAZAR:  I thought you said you had

7    taken that deposition.

8              MR. GEORGE:  No, I said I "read" a

9    deposition.

10             MR. SALAZAR:  So Page 28, hold on, just a

11   moment, please.

12             THE WITNESS:  Is this a state case?

13             MR. SALAZAR:  I don't know what it is.  Oh,

14   it's the one against Royal Palm.

15             THE WITNESS:  Yeah, it's the state case.

16             MR. SALAZAR:  Just a second, hold on.

17   BY MR. GEORGE:

18        Q    Actually, Mr. Straub, I highlighted a few

19   lines too low.  I'm going to start you on Line 14.

20        A    Go ahead, keep going.  Are you gonna read

21   them to me, please.

22             MR. GEORGE:  I'm waiting for your lawyer.

23             MR. SALAZAR:  Yeah, I'm looking.  He's going

24   to read it to you.  I just want to see exactly what

25   this is from or what it's about.

Page 91

1        Okay.  Yes, go ahead.

2   BY MR. GEORGE:

3     Q    Okay.  So I'm going to read to you from this

4   deposition starting on Page 18 at Line 14.

5        It says, "Do you have an AOL e-mail account?"

6   That's the question.

7        Answer:  "Straubpolo@aol.com."

8        Question:  "Are you telling me that you don't

9   use that AOL account for anything?"

10       Answer:  "I call that texting.  I don't know.

11  I've never sent an e-mail out.  I always have somebody

12  else sitting down, and they monitor what is junk mail,

13  because 80% of that stuff you get nowadays is junk

14  mail."

15       Question:  "So you're saying, I want to make

16  sure we're clear, that if somebody got an e-mail from

17  Straubpolo@aol.com that it would not have been from

18  you?"

19       Answer:  "No, I don't think I can send out an

20  e-mail.  Send out texts by phones.  That's the only

21  thing I never sat down at a computer and typed up.  If

22  that is an e-mail, if something you can send from a

23  computer.  If he can send it from his phone, that's

24  called a text to me, and I can send out, respond to

25  texts to somebody or meet me at 12:30.  In other

Page 92

1    words, I consider an e-mail, but consider it a text."

2            Do you remember that testimony, sir?

3    A    Yeah.

4    Q    So all I'm trying to figure out --

5    A    Let me help you.

6    Q    Go ahead.

7    A    I don't know how to send an e-mail from my

8    phone.  I don't -- I only can send a text, because on

9    your phone, you have to go ahead and push a text.  I

10   don't know how you even get to an e-mail to send it

11   out.  So if I can sent anything to anybody, I never

12   use it.  My texts are back and forth, so texting.

13   Q    Okay.

14   A    Sorry to say, I made it in this generation

15   without being able to e-mail, and usually yell into

16   somebody else and they'll e-mail on their text or

17   their e-mail account or something.  If we can't get

18   them on a text, which I don't know if I've ever -- I

19   just leave messages on texts.

20   Q    Mr. Straub, do you have -- do you use an

21   iPhone or some sort of other phone?

22   A    I had --

23            MR. SALAZAR:  Object to form.

24            You can answer.

25            THE WITNESS:  I had an iPhone up until about

Page 93

1    they came out with these wristwatches, and I like the

2    round wristwatches, so I went to Samsung, instead of

3    Apple, and I hate myself for that.  It's been about

4    five months ago.  Lost the phone, didn't even get to

5    put it on my wrist, and -- but they want a

6    replacement, like three or $400 to replace it.  I said

7    it's not worth it.  So I use Samsung now, and I used

8    Apple phones, which I was getting a little bit more

9    familiar with.  I could -- that program for Apple is

10   so much better for me than what Samsung is.  I think

11   it's the Japanese won't spend the money to put

12   conveniences, like BlackBerry.  I never used

13   Blackberry.  Never turned one on or anything else, but

14   it was more for other type of things.  I think Samsung

15   I'm with now.

16   BY MR. GEORGE:

17        Q    The phone you have right now --

18        A    Yeah --

19        Q    -- is a Samsung?

20        A    -- Samsung, for the last six months, maybe.

21   After that it was always Apple.  I had AT&T and

22   Verizon, different -- because I got in an argument

23   with AT&T on overseas calls or something like that.

24        Q    Can you turn, now, back to Exhibit 2 and turn

25   to Bates label Page 210.

Page 94

1            MR. SALAZAR:  Exhibit 2 is -- hold on, hold

2   on.

3            MR. GEORGE:  Yeah, that's it.

4            MR. SALAZAR:  Yeah, I just want to make sure

5   he's got it in the right order.  I think it's not in

6   the right order, but here.  What page?

7            MR. GEORGE:  Page 210.

8            MR. SALAZAR:  All right.  Hold on.

9            THE WITNESS:  Got it.

10            MR. SALAZAR:  Get this out of the way.

11   BY MR. GEORGE:

12     Q    And I'm going to refer you to Paragraph 7

13   where it says, "A material inducement to lender

14   agreeing to loan monies to borrower under the note and

15   to enter this agreement is the representation,

16   warranty, promise and agreement to borrower to, 1,

17   list for sale and to sell his home located at 11 Cliff

18   Road, Nantucket, Massachusetts (the Nantucket home),

19   within six months of the date of this agreement, and,

20   2, to utilize the proceeds from the sale of the

21   Nantucket home, after deduction all third-party

22   expenses of the sale, to fund a trust to be formed for

23   the benefit of Mia Matthews and her two daughters as

24   beneficiaries.  Borrower unequivocally and

25   unconditionally agrees that the trustee under the

Page 95

1    aforementioned trust shall be appointed by Glenn F.

2    Straub, and no substitute trustee may be appointed

3    under the trust without Glenn F. Straub's express

4    written consent."

5          Do you see that paragraph, sir?

6    A    Yes.

7    Q    Did you require that that paragraph be

8    included if the loan before you agreed to make it?

9    A    Which loan is this?  Help me out here.

10   Q    This is the loan --

11   A    The $700,000 loan?

12   Q    Yes, sir.

13   A    Okay.  So now let me read it before and after

14   to see -- bring me into what context that we're even

15   doing here.  These are what?

16   Q    Just for your reference, the loan document

17   begins on 207.

18   A    I don't think I've ever seen any of this

19   language, because I look back on number A, Page No.

20   208, it's talking about a $40 million something, so I

21   would recognize something like that.  I know numbers.

22   That's what I'm good at, numbers.

23          Now two or three pages into this thing,

24   talking about multiple different types of banks, and

25   this paragraph -- seven is after six, let's see -- I

Page 96

1    don't know if any of these questions have anything

2    pertinent to our lawsuit in bankruptcy, but I'll keep

3    playing around with your rules, I guess, for the time

4    being, until I get legal counsel to say what the hell

5    has this got to do with me.

6        Q    It's not --

7        A    So I'm just making a statement.  I'm down to

8    seven now, and did you read the whole thing?

9        Q    Yes, I did.

10       A    Okay.  I don't think the person writing this

11   would have any knowledge of what is in Paragraph 7,

12   unless I would have checked that, to say, "Hey, Bob,"

13   because I think that who I'm talking to at this time

14   in this agreement, "Bob, you need to take care of

15   these kids," and so I think that's what we're doing

16   here, for Mia and the kids, because what is it?  The

17   money is going to pay to them?  I don't know what

18   Paragraph 7 really says.  Something about a trust is

19   gonna be set up, and all 700,000 -- I can't believe

20   I'm making a loan for funding $700,000 to Mia and the

21   kids.  I don't think that paragraph says that.  So

22   that could be wrong, if I was doing that.

23            But the document speaks for itself, whatever

24   the document is saying.  Did I ever -- I would never

25   interject that we're giving the money.  If they're

1   borrowing 700,000 from me and they are going to pay me

2   back, it's not going to go to a trust if that's what

3   the damn thing says.  Do I try to look out for kids --

4        Q    All I'm asking you --

5        A    -- I don't know.

6        Q    -- Mr. Straub, is whether you were the one

7   who required this provision to be put into the loan

8   that you made to Bob Matthews?

9        A    Whatever the paragraph says, no, I don't

10  remember, if that's what I'm saying this paragraph

11  says.  I need to get a lawyer, because I would never

12  read these things.  This is not what I do.  I don't

13  read whatever this thing is.  It's a loan agreement.

14  I wouldn't read the details of the loan agreement.  I

15  would verbally talk to people, and they would

16  hopefully put something together, or the other side

17  would put something together.

18           So if that paragraph says that they are gonna

19  borrow 700, and the money going back to me is going to

20  the kids' account and Mia's account, no, I wouldn't

21  have participated.  Sounds like they screwed up, so I

22  don't think that that's what that paragraph says.  So

23  maybe I can take a second here, and not 15 minutes,

24  and ask the attorney sitting next to me, "What does

25  that paragraph say to you for legal reasons, that

1    that's what I'm doing?"

2           MR. GEORGE:  Would you like to take a break

3    and talk to your attorney?

4           THE WITNESS:  One minute, yeah.

5           (Thereupon, a brief recess was taken.)

6           THE WITNESS:  Can you ask the question again,

7    please, or have her re-read it.

8           MR. GEORGE:  See if you can read the

9    question.

10          (Thereupon, the question referred to was read

11   back by the court reporter as recorded above.)

12          THE WITNESS:  No, I don't believe I would

13   have.  It was signed by Jeff Zink, and, again, I was

14   probably with him 20 years, and Jeff knows how I am.

15   I always want a kicker, and a kicker might be, take

16   care of the kids, Bob, because it sounds like you

17   didn't take care of the kids here, so I was telling

18   them to start taking care of the kids.

19          My job later in life -- after I retired at

20   age 40, that I was down to a 12-hour day after that,

21   and now I'm up to 17-hour days after age 72.  I never

22   seem to get away from this, but that's what me and my

23   wife didn't agree to when the economy was in the

24   shitter.

25          MR. SALAZAR:  Language.

1        THE WITNESS:  So I don't remember adding a

2   paragraph that -- looks like, now that it's been read

3   very slowly to me, that Bob needs to get his act

4   together because that's been the whole theory in

5   getting his family organized in their life and still I

6   would get them organized.  I think in some of these

7   settlement negotiations we've been just trying to get

8   this --

9        MR. SALAZAR:  Yeah --

10        THE WITNESS:  -- whole mess behind him.

11        MR. SALAZAR:  Yeah, don't add -- don't

12   discuss that.

13   BY MR. GEORGE:

14   Q   So it's your testimony that the idea to put

15   this provision in this loan agreement was Jeffrey

16   Zink's?

17        MR. SALAZAR:  Objection to form.

18        THE WITNESS:  Well, I don't know that it was

19   Jeff's opinion or just them writing back.  You'd have

20   to get copies of this agreement.  I'm sure there's

21   drafts, and he would talk to me on the telephone.  I

22   give my people pretty much authority to go ahead and

23   be my conscience, because I'm not real good about my

24   conscience.  In other words, I don't know, unless you

25   give me the set of facts, how I'm going to react.

1    Right now if you become nasty, I'll become nasty too.

2    I'm a reactionary.

3            So Jeff, through drafts of contracts prior to

4    this time, maybe got the impression I want a kicker,

5    so I want these kids to be taken care of.  I'm going

6    to help this family out, I want Bob, it looks like

7    from this thing, and Mia to take care of a trust and

8    I'm gonna control it, so he's not gonna control it.

9    That's the truth.  And so Jeff could have interjected

10   with those words.  They could have put it in there,

11   because I would've said, "Guys, I'm not going to make

12   a loan until you give me a kicker," and they said,

13   "Well, I'm gonna take care of my kids," and I said

14   okay.

15   BY MR. GEORGE:

16      Q   Where does Jeffrey Zink reside if I need to

17   depose him?

18      A   I don't know.  I talk to him like every -- I

19   get a Christmas card once in a while.  His brother

20   would know.  His brother is involved in the federal

21   case, and I think you're involved in the federal case,

22   so just ask him where Jeff is.  He's had -- he got

23   some kind of medical thing, where he had to quit being

24   the attorney, and he came an investor in oil and gas

25   and other kind of things.  He asked me about this

1   place out here, do I want to buy the Mushroom

2   restaurant down here, he said, "One of my clients," so

3   I think he maybe still is a lawyer.

4       Q    And did you actually name a trustee of this

5   trust, like this provision said that you would.

6           MR. SALAZAR:  Object to form.

7           THE WITNESS:  Was I named as one?

8           MR. GEORGE:  No, sir.

9   BY MR. GEORGE:

10      Q    In here it says, "The trustee under the

11  aforementioned trust shall be appointed by Glenn F.

12  Straub and no trustee may be appointed under the trust

13  without Glenn F. Straub's expressed written consent."

14          Did you actually appointed a trustee?

15          MR. SALAZAR:  Object to form.

16          THE WITNESS:  I don't remember.  Anything

17  that I -- that paragraph is one of 50 paragraphs in

18  that agreement, and I didn't even sign it, so you can

19  see how important it was in my life.  It was something

20  that Jeff signed.  I don't know why Jeff is even

21  involved with the thing, because Jeff is usually

22  involved with oil and gas.

23  BY MR. GEORGE:

24      Q    Now, I showed you that article from the

25  newspaper in and around this time where you were

1    quoted as saying that you barely knew Bob Matthews and
2    we went all about that, so --
3        A   I couldn't hear you.  Say it again.
4        Q   Okay.  I had showed you the article from the
5    Nantucket newspaper earlier in your deposition where
6    you were quoted as saying you barely knew Bob
7    Matthews, and we talked about that.
8            So do you agree that back then you barely
9    knew Bob Matthews?
10           MR. SALAZAR:  Pardon me, I'm going to object
11   to the form.
12           THE WITNESS:  Whatever it is I said, I said,
13   and I'm saying to you that's not the interpretation of
14   what I just said, is that I knew Bob.  He was a
15   high-end flyer over in Palm Beach, because I come to
16   town 27 years ago, and this is 2018, so it's gonna be
17   before this time period of this, so I knew of Bob
18   Matthews.
19   BY MR. GEORGE:
20       Q   Okay.
21       A   Did I have any dealings with him before?
22   Nothing that I can recall, but shit --
23           MR. SALAZAR:  Language, please.
24           THE WITNESS:  -- people bump into me all the
25   time.

1    BY MR. GEORGE:

2        Q    So back at this time, in June of 2010, your

3    relationship with him and his family was such that you

4    felt compelled to make provisions for his family in

5    this loan agreement, you were that close?

6            MR. SALAZAR:  Object to form.

7            THE WITNESS:  That's my kicker.  Yeah, that's

8    my kicker.  See I'm only charging these guys six

9    percent.  It's prime plus two, no less -- we finally

10   put in there, and I don't know when that occurred, no

11   less than six percent, because we never thought when

12   things were coming down from 12% to four percent or

13   something like that -- so we finally, sometime in the

14   last ten years, I put in there, no less than six.

15           But six percent I'm giving these people loans

16   for.  They got theirselves (sic) in trouble on a

17   short-term basis, just like the Ganzis borrowing

18   500,000 when his wife is a Potamkin, and if you know

19   anything about the Potamkin family from Miami, which I

20   do, they are worth hundreds and hundreds of millions

21   of dollars.  So daddy and mommy would have bailed

22   Melissa out, which is the wife of Mark Ganzi.  So if

23   Mark wants to borrow money, I go give him the money on

24   a short-term basis, which was supposed to be for three

25   days, turned out to be three months by the time we got

Page 104

1   our money back or something.
2   BY MR. GEORGE:
3       Q    So your kicker in this deal was making sure
4   Bob Matthews and his family were taken care of?
5       A    Well, I'll tell you, I can do a lot worse
6   than that.
7           MR. SALAZAR:  Object to form.  Sorry.
8           THE WITNESS:  I go ahead and do it for
9   charities.  I give the money to -- not to first
10  responders.  That's my new one, but to Camillus House
11  in Miami, give it to -- I let them name the charity,
12  but it has to be a big 501(c), is I'll give the
13  interest in it to them.  I mean, I do it all the time.
14  BY MR. GEORGE:
15      Q    I understand your philanthropic endeavors.
16      A    Yeah.
17      Q    So this was a philanthropic endeavor for you?
18          MR. SALAZAR:  Object to form.
19          THE WITNESS:  Probably.  It was more of
20  saying, "Geez guys, you're -- you guys are getting in
21  bad shape here, start taking care of these kids,
22  because I don't want to take care of these kids,"
23  meaning, maybe not going to be adopted by me, but I'm
24  going to have to pay for their education.  I have to
25  pay for everything else.

1          Just like I pay for all these kids across the

2     street here, international -- out of Argentina,

3     Brazil, Poland, all the bad places in the world, I

4     bring them over and pay for a lot, a lot, a lot of

5     things for them.  They don't pay for anything, just

6     get the hell out of their country.  So that's my

7     little kicker after I retired at age 40.

8     BY MR. GEORGE:

9        Q    And this is when they were living in a $31

10    million house on Palm Beach, right?

11       A    Yeah, exactly.  If they were living in 31 --

12    why don't you go to your bank and borrow some more

13    money, I guess.  I don't know what the answer was, but

14    they were asking me to borrow money.

15       Q    Okay.

16       A    Guys, you're not going to -- you can keep

17    going there.  There's nothing there.  I'm not into --

18    don't know everything about Bob and what they are

19    doing.  It's not -- why do I want to sell to him?

20          MR. SALAZAR:  All right.  Done with that

21    group?

22          MR. GEORGE:  Yeah.

23          THE WITNESS:  Put the paperclip on it.

24          MR. SALAZAR:  Yeah.

25          (Thereupon, a document was marked as Exhibit

1  No. 5 for identification, during which there was a

2  discussion off the record.)

3  BY MR. GEORGE:

4      Q   Mr. Straub, I know you're not feeling well.

5          Are you okay to continue?

6      A   Yeah, I'm okay --

7      Q   I've shown you --

8      A   -- for the time being.

9          Go ahead.

10     Q   I put in front of you, what's been --

11     A   Got a sore throat.

12         Go ahead.

13     Q   -- marked as Exhibit 5 to this deposition,

14 and it's an e-mail from Craig Galle to Mia Matthews,

15 Bob -- and it has cc on it, Bob Matthews at two

16 different e-mail addresses, and then

17 Aarmour@nasonyeager.com and then a bcc also to

18 Mr. Galle, and it says, "Mia, further to our telephone

19 conversation yesterday, and as you and Glenn

20 previously discussed, attached please find various

21 correspondence regarding the loan and its default.

22 Glenn wanted you to have these documents, so that you

23 understand the current status of matters.  His

24 preference is not to have me involved unless

25 absolutely necessary, so the additional attorneys'

1  fees are not incurred.  If you have any questions,

2  please call Glenn directly.  Thank you."

3          I take it you've never seen this e-mail

4  before, correct?

5      A   No, that's correct.  No.

6      Q   Okay.

7      A   If it came through the stack every day I have

8  downstairs of maybe 25 different e-mails that people

9  send in that I don't have time to read, and so I think

10  he's doing what he's supposed to be doing, and Craig

11  is probably saying, "If you guys want us to hire an

12  attorney, Craig is expensive, you're going to pay

13  Craig's bill, if you guys want to do this stuff

14  yourselves, then so be it."

15          Is this before or after the loan?

16      Q   This is dated September 30, 2010, so it would

17  have been after.

18      A   Okay.  So they must not have been paying

19  their bills or something and probably saying, you want

20  to save your attorney fees -- no.  Yeah, it says the

21  word "default."  You underlined it.  So it must have

22  been afterwards.

23      Q   Now, we talked earlier about the possibility

24  that Mr. Galle represented both the lender and them in

25  connection with all of these transactions.

1          So at this point, Mr. Galle is clearly

2   representing your interests, correct?

3          MR. SALAZAR:  Object to form.

4          THE WITNESS:  I don't know what the -- the

5   document speaks for itself, who represents who.  I

6   don't know.

7   BY MR. GEORGE:

8      Q   Okay.  Well, he's --

9      A   And I don't know that I gave him permission

10  to represent the other side.  It's just attorneys do

11  much better writing letters and agreements than what

12  laymans do.  So if I had to write this out, this loan

13  agreement, it'd have been scratched on a piece of

14  napkin, and somebody would say, "Glenn, you can't do

15  it that way."  So I think he representing her.  Sounds

16  like he's just the person that puts the pencil to a

17  piece of paper, and I don't think that makes him

18  represent them.  You know, maybe an attorney always --

19  maybe they can sue him if it was messed up, and -- but

20  I was just -- I always try to say, "You can use one of

21  these guys," because I think at that time he was still

22  more here, just like Alex is back here in that back

23  office right now, and these guys are kind of in-house

24  counsel, but they also handled their own clients too.

25  And so is there a conflict, that's something you have

1    to argue.

2        Q    But clearly here in this e-mail he's writing

3    to Mia about the default of that loan that you made in

4    connection with the 11 Cliff Road property, right?

5        A    I can't possibly -- if that's your

6    interpretation, so be it.  There might be all kinds of

7    things there.  Ask him.

8        Q    All right.  Well, look at the first line of

9    that e-mail, it says, "Further to our telephone

10   conversation yesterday and as you and Glenn previously

11   discussed, attached please find various correspondence

12   regarding the loan and its default status."

13           Did you talk to Mia Matthews about the

14   default status of that loan?

15       A    Probably did.  Probably said, "Hey, Mia, read

16   your documents, you owe me the money."  I think there

17   was a time period that they had to pay the money back,

18   and so we probably said, "Are you going to pay?"

19       Q    Now, we just looked a minute ago --

20       A    I don't know, maybe -- probably we can go

21   back and check and see if she owned the house or if

22   she owned it or if she had something to do with it.

23   Mia is not an innocent little spouse.  She's somebody

24   that was involved with a lot of this kind of detail,

25   and that's probably why I said things to other people.

Page 110

1    Mia acts like a spouse, but she's also involved with

2    some of this stuff.  I saw her name on all kinds of

3    loans.  Is she that smart?  I don't know.

4        Q    Now, we looked at the loan agreement for this

5    loan, and it was a loan to Bob Matthews, not Mia

6    Matthews, right?

7        A    It's like my wife.  Everything I did, she

8    was -- had her dour interest in my estate.  That's why

9    I gave her -- when I got a divorce, I gave her my

10   check, said, "Fill it out, honey."

11       Q    Right.  But I'm asking you, you're a

12   businessman.  You saw the loan agreement.

13            The money was going to Bob Matthews, correct?

14       A    Again, that would be a legal interpretation

15   on what you have.  I don't know.  You can say it's

16   made out to her.  Maybe the fact that they're a

17   spouse, they might have some obligations in there.

18   It's either Bob couldn't put anything in his name,

19   maybe.  I don't know.

20       Q    That's the loan agreement, right, Mr. Straub?

21       A    I think I've already testified to Document

22   207.

23       Q    And who is the borrower there?  Who is

24   defined as the borrower?  Isn't that Robert Matthews?

25       A    That's what it says.

Page 111

1      Q    Doesn't say Mia Matthews, does it?

2      A    Well, because she's his wife, I would think

3  that she --

4      Q    All I'm asking you, sir, is, is Mia Matthews'

5  name on that document?

6      A    No.  Mia Matthews' name is not on there, but

7  I'm not a lawyer to tell if there's any obligation for

8  us to talk to Mia.

9      Q    So why were you talking to Mia if she wasn't

10 the borrower on that loan?

11          MR. SALAZAR:  Objection, form.

12          THE WITNESS:  Probably because Bob was maybe

13 not returning my calls.  So maybe I was calling Mia

14 and saying, "Hey, guys, read your agreement."  Some

15 way we were trying to put pressure on her, and that's

16 what I said all along.  A wife can put a lot of

17 pressure on Bob, and if you've been around Bob, you'll

18 know what I mean.  She's the -- she's the heavy

19 hitter.  Whatever mommy wants, daddy ends up doing.

20 BY MR. GEORGE:

21     Q    Isn't it true that the reason that Mr. Galle

22 is sending this e-mail to Mia and the reason you were

23 talking to Mia is that you were using the threat of a

24 lawsuit on the loan to Mr. Matthews in order to

25 leverage Mrs. Mia Matthews to have a personal

1   relationship with you that was beyond friendship?

2          MR. SALAZAR:  Objection to form.

3          THE WITNESS:  I think you're stretching it.

4   I always wanted her to be polite to me and stuff.

5   It's nice to have girl friends, not girlfriends, and

6   so she, among, well, as I said, four or five others --

7   and "The Post" picked it up and everybody else, and

8   "The Atlantic" has picked it up, I probably have seven

9   or eight girl friends, that they usually make $200,000

10  or more, so they don't try to hit me up for money, and

11  I'm kind of like their father.  Do I ever get a little

12  fresh with them?  Yeah, probably did.  But I get fresh

13  with guys, not for being gay, but I get fresh with

14  them by telling them dirty jokes and stuff.  You know,

15  what's a guy like to hear about?  Sports game, what

16  the score was last night.  You want to try to take me

17  on in tennis.  I do all that kind of stuff.

18      Q   Okay.  So is that a yes, you were using this

19  lawsuit as a threat to get Mia Matthews, I guess in

20  your words, to be polite to you?

21          MR. SALAZAR:  Objection, form, asked and

22  answered.

23          THE WITNESS:  Since I really didn't know too

24  much about her before then, probably I used the loan,

25  as a collateralized loan, and if I can get a kicker,

Page 113

1    which I already told you what a kicker was, it was,

2    like, women rely on the children more than the guys

3    do, and -- because they bring them into the world,

4    they take care of them until they're a hundred-and-

5    fifty years old or whatever.

6            So my concept is that if I deal against their

7    children, I can get a woman to convince the husband to

8    do whatever they have to do.  I'm just trying to get

9    paid here.  In 2010 I'm just trying to get paid.  So

10   I'm going to use some influence that would be maternal

11   influences on that particular woman, not to go to bed

12   with me, but to probably entice what -- what I can see

13   is going on here, sounds like I tried to form trusts

14   for their children, because it sound like Bob didn't

15   set up any trusts and take care of the kids.  And I

16   probably put some influence on her to get her husband

17   to pay the friggin' amount of money, so that's my

18   intent.

19           I've always had a lot of girlfriends after I

20   got divorced.  I didn't get divorced because I didn't

21   have any girlfriends before that, because my wife

22   would come in here and explain, "Glenn was always on

23   the road, he didn't have time for girlfriends."

24   BY MR. GEORGE:

25       Q   So your kicker here, you already testified,

Page 114

```
 1   was this trust, you know, a philanthropic trust, for
 2   the benefit of the Matthews family.
 3          I'm talking about here whether you were
 4   trying to leverage Mia so that she would be a
 5   paramour?  That's what was really happening here,
 6   wasn't it?
 7          MR. SALAZAR:  Object to form, asked and
 8   answered.
 9          THE WITNESS:  Asked and answered.  I told you
10   what my intentions are.  I do ways of trying to get
11   people -- give me your first born child, I said --
12   every time I say that.  I'm going to make you
13   pledge -- if you're gonna take and borrow money from
14   me, I want your first born child.  Well, that would be
15   the last thing that person will not pay me, before
16   paying somebody else, is that I'm going to  make --
17   I'm going to take their first born child.  I can't
18   personally, but that's why I get involved with a lot
19   of their families and their kids, and I play polo
20   against the Ganzis.  I mean, I can go against Sarah,
21   dealing with their education, their kids.
22   BY MR. GEORGE:
23      Q   You never told Mia Matthews you wanted her
24   first born child, did you?
25      A   I positively would say that.  I would
```

Page 115

1    guarantee you, say, "Hey, if you're gonna borrow money

2    from me, you better realize that I will -- I want the

3    first born child," and they're going to say, you

4    never -- "You'll get paid," because everybody is going

5    to pay you when they borrow the money.  It's what

6    happens to them afterwards, that somebody else attacks

7    them, health, whatever it may be, or find out about

8    their husband, what all the things are worth, because

9    their husband is going to pay me back.

10        Q    That Exhibit No. 5, please turn to Page 296.

11        A    Got it.

12        Q    It's a letter dated October 7, 2010 on

13   Equipment Leasing International, LLC letterhead to Mia

14   Matthews and Robert Matthews from you.

15             Do you remember writing this letter?

16        A    Nah, I -- first of all, I never typed a

17   letter out in my life, so I don't -- I can't even

18   type.  That's why my texting takes me for ever, and

19   don't even still know how to do it verbally, because I

20   have to think very slowly, so my texts take forever,

21   so you'll find out my texts are very minimal, compared

22   to a person in today's world.

23             Sorry to make this more complicated, I know

24   you said just answer the friggin --

25             MR. SALAZAR:  No, no, it's just funny because

Page 116

1    it's true.  I know how you --

2    BY MR. GEORGE:

3        Q    So do you recall --

4        A    No, I didn't type -- I never sent this

5    letter, never sent a letter in my life.

6        Q    Your testimony is that you didn't send this

7    letter to the Matthews?

8        A    No.  I sign them.  I have somebody else put

9    them together.  I give them a concept, whoever is

10   available at the time.

11       Q    So your concept -- I'm sorry, your testimony

12   is that you told somebody about the concept of this

13   letter and had them draft it for you?

14       A    Probably so.  Let me read the letter first.

15       Q    Please do.

16            MR. SALAZAR:  While he's doing that, go off

17   the record.

18            (Discussion off the record.)

19            MR. GEORGE:  Let's go back on the record,

20   please.

21   BY MR. GEORGE:

22       Q    Could you please repeat what you just said

23   Mr. Straub?

24       A    Yeah, I said, I know I didn't write this

25   letter because, one, I never write a letter, and,

1   number two, there's a word in here, E-L-I-C-I-T-I-N-G,

2   I don't know what it means, how to pronounce it, or

3   anything else, so I couldn't have used it.  So I

4   probably told the concept to somebody, send her a

5   personal letter, here's what I can say, they lied to

6   me up 'til now.  It's so many days after the time

7   period, and I'm gonna go after them for more money or

8   go after them for maybe more than just one thing.

9           So I think I know what the letter says.  I

10  don't know who did it, but it took me, what, ten

11  minutes to read a -- you guys can probably read in it

12  in two minutes, and I read it in ten minutes.  I have

13  to read it out loud to myself.

14     Q   In the first paragraph, and I accept what you

15  just said, in the first paragraph, this letter says,

16  "When you needed me the last minute to save your

17  Nantucket home, I was there."

18     A   Mm-hmm.

19     Q   Is that a true statement?

20     A   I don't know that it was the last minute, but

21  it would have been -- it seems like what I'm saying

22  there or somebody is saying there, and they probably

23  checked the date, that it was very close to a

24  foreclosure sale, and they needed the $700,000.  I

25  don't know if that happened or not, but I'm saying

1    that's what this person remembered it to be, because I

2    do not write letters, because I can't spell words.

3        Q    Well, is there any way of you knowing who

4    would write a letter like this for you back then?

5            Did you have a secretary?

6        A    Maybe a girlfriend, you know, maybe a

7    girlfriend, maybe Larry Zink, Jeff Zink.  I probably

8    had still five lawyers at that particular time,

9    because we were in a process of doing -- whoever had a

10   typewriter available could go ahead and do it, a

11   secretary, could be a comptroller, could be an office

12   manager, could be anybody, and they would have given

13   it to me, and before I signed it, I would have read

14   it.  But they used a word that I didn't know what the

15   word meant.

16       Q    Understood.  The next sentence says, "On the

17   last Sunday in June, the day before the foreclosure

18   sale, I dropped what I was doing and had loan

19   documents drawn up throughout the night so that the

20   loan could fund on Monday morning before the 10:00

21   a.m. foreclosure sale."  Is that a true statement?

22       A    I'm pretty sure it was, but it would be --

23   we'd have to go back and check the dates and see -- it

24   might have been a day before.

25       Q    But did you drop everything that you were

Page 119

1    doing, so that this could get done, you, personally,

2    Glenn Straub?

3        A    I probably always have something going on.  I

4    told you how many hats I wear, so most likely I had to

5    give this to somebody to get a check made out.  Yeah,

6    so I had to tell three or four different people,

7    because you don't just get a check out of this company

8    without going through my security procedures.

9        Q    And for you, giving your holdings and your

10   businesses and who you are, this is a microscopic deal

11   in your eyes, correct, for $775,000?

12           MR. SALAZAR:  Object to form.

13           MR. GEORGE:  Whatever the amount is.

14           THE WITNESS:  It's getting close to I would

15   pay attention to it, and it's not $20,000 and it's not

16   seven million, so it's probably some -- falls within

17   that category.  If I had another better deal, I would

18   have done business again, "Guys, take care of it," or

19   if they got themselves in trouble and I couldn't get

20   them out, then so be it.

21   BY MR. GEORGE:

22       Q    Well, didn't you tell me in the course of our

23   conversations about this case that the 27 to $37

24   million that you have in this project is not even a

25   significant sum of money for you?

Page 120

1              MR. SALAZAR:  Object to form.

2              THE WITNESS:  I think you're talking

3    settlement negotiations.  I --

4              MR. GEORGE:  I'm not --

5              THE WITNESS:  -- I never talked to you.  That

6    would be in settlement negotiations up to now.  So why

7    would you want to quote something out of the

8    settlement negotiations?

9    BY MR. GEORGE:

10        Q    Mr. Straub, with all due respect, you and I

11   have had number a conversations that had nothing to do

12   with settlement.  You like to talk to me outside of

13   hearings and in the courthouse --

14        A    You're wrong --

15        Q    -- and I enjoy your conversations.

16        A    -- you're wrong.  I talk to you concerning

17   settlement and saying, is this a real good choice of

18   times?  I'm starting to learn more about the

19   bankruptcy rules, and there's things called "taking a

20   haircut" and doing other things.  I bought three or

21   four major things in bankruptcy.  Never had anything

22   close to judges determining insolvency and stuff like

23   that.  So I'm learning something here.

24        Q    For the record I have never disclosed

25   anything that Mr. Straub has told me in the context of

Page 121

1    settlement negotiations, nor would I, and the

2    conversation that I'm talking about occurred outside

3    of any settlement negotiations, in personal

4    conversations.

5         A    Well, you're wrong.  I'm putting it on the

6    record too.  You're a hundred percent wrong.  That's

7    when I talk to other people who -- I'm not allowed to

8    even talk to you guys without having a lawyer present,

9    so tell me what lawyer was there when I made that

10   statement.

11        Q    Mr. Domb was there.

12        A    Okay.  Well, get Alex upstairs, he's at his

13   office less than 50 feet away from this office here.

14        Q    Okay.  I'll depose him next.

15        A    Okay.  What was the statement now?  You got

16   me so worked up.  What was the statement?

17             MR. SALAZAR:  I don't know.

18             THE WITNESS:  Something about what I said.

19             MR. SALAZAR:  Let's him ask a question.

20             THE WITNESS:  So get Alex in here.

21   BY MR. GEORGE:

22        Q    So on a deal that was only $775,000 --

23        A    How much money it is?

24        Q    -- you were -- I'm sorry, let me get the

25   exact amount.

Page 122

1          On a deal that was only $737,277.44, for

2    people that you've already testified you barely knew,

3    you dropped everything and worked throughout the night

4    in order to help them stave off a foreclosure; is that

5    right?

6          MR. SALAZAR:  Object to form.

7          THE WITNESS:  No.  My letter here is saying

8    to that girl, "I did something.  Now, you do

9    something.  Get my damn money paid, without going

10   through a lawsuit."  It cost me about five grand just

11   to do the simple closure, and I probably have -- not

12   foreclosure, a simple collection, and I probably have

13   300 at any one time that people owe me, from their

14   country club memberships, their employees that get

15   loans from the company, and, you know, name it.  I had

16   too, too, too many of them.  So this is my trying to

17   say -- this is how I collect the money, is to get her

18   to put some pressure on whoever has got the money to

19   pay me probably.  More than 300.

20          What time is it?

21          MR. SALAZAR:  1:45 (sic).

22          THE WITNESS:  Oh, it's after one o'clock.

23          MR. SALAZAR:  Yeah.

24          THE WITNESS:  Okay.  We're going to take a

25   break at 2:00.

1          MR. SALAZAR:  You sure you want to go that

2    long?

3          THE WITNESS:  I don't care.  Let's see where

4    he's going, what direction.

5          MR. SALAZAR:  Maybe we'll get to the

6    bankruptcy now.

7          THE WITNESS:  Whenever you get to a new

8    category, we're going to take a lunch break,

9    everybody.

10          MR. GEORGE:  Whenever you'd like a break,

11    that's fine.

12          MR. SALAZAR:  Well, you want to keep going

13    until one o'clock?

14          MR. GEORGE:  Whatever is convenient for

15    Mr. Straub.

16          THE WITNESS:  It's quarter 'til, so we can

17    break now -- we can go to a new category, other than

18    me and Mia, whatever that means, and personalities --

19    I'm telling you, you're going in the wrong direction.

20          MR. GEORGE:  This will be quick.

21          (Thereupon, a document was marked as Exhibit

22    No. 6 for identification.)

23    BY MR. GEORGE:

24      Q   Mr. Straub, I'm handing what's been marked as

25    Exhibit 6 in your deposition, and it's a letter dated

Page 124

1   August 28, 2010 --

2      A    Look at the date.

3           MR. SALAZAR:  October 7th.

4           THE WITNESS:  This is before, okay.

5   BY MR. GEORGE:

6      Q    -- from you on Equipment Leasing

7   International letterhead to Robert Matthews, and I'm

8   going to dispense with the question about whether you

9   wrote this and all of that, given your answers to the

10  last one.

11          If you would just look at the last paragraph

12  of the letter, which says, "On a separate note, I

13  looked at my calendar and noted that Monday, August

14  30, 2010 is the deadline to work something out on Elm

15  Street.  I can act spontaneously once in a while, but

16  this seems to be an every day occurrence with you.

17  Please take care of your family, as it seems like that

18  is the only thing that counts in the end."

19          What are you talking about when you say,

20  "August 30, 2010 is the deadline to work something out

21  on Elm Street"?

22     A    If Elm Street is the $700,000 loan, help me

23  out there, because I don't --

24     Q    Elm Street --

25     A    -- maybe I made other loans.

1       Q    No, you're talking --  it appears to me that

2  you're talking about something else.  You first start

3  out in this letter talking about the Nantucket home,

4  and then you say, there's also a deadline coming up on

5  Elm street.

6       A    Wow, I don't know, unless you tell me what

7  state or something is Elm Street.

8       Q    I don't know.  That's why I'm asking you the

9  question.

10       A    Did I make more loans to them?  I don't know.

11  You know, Bob, I told you, he was always talking about

12  the next deal, so --

13       Q    So you have no recollection of doing any kind

14  of deal with Mr. Matthews in connection with a

15  property on Elm Street?

16       A    Not unless I made a mistake and Elm Street is

17  the Nantucket property or something, because I don't

18  remember -- he's not on Elm Street.  I think that

19  house of is in Casa de Campo or Casa something over in

20  Palm Beach.  And the hotel?  I don't know, I think he

21  went through a whole phase of foreclosures and stuff

22  like that.  He was a big hitter when I knew him, and

23  so I don't remember Elm Street.  So, again, whatever

24  I'm saying there, somebody will have to explain to me

25  what is Elm street, and I can act spontaneous, which

Page 126

1    must mean outward -- or up, like that --

2       Q    Have you -- sorry?

3       A    "Once in a while, but this seems to be an

4    everyday occurrence."  What does?  "Please take care

5    of your family."  That's me.  "As it seems like" --

6    we're still friends today, you know.  In other words,

7    I saw him, he didn't punch me, I didn't punch him.

8    The son-of-a-bitch cost me 30-some million dollars and

9    I should probably punch him, but -- that's how we did

10   things in West Virginia.  Here I guess you just sue

11   people, and you have to bring a third party in, called

12   lawyers, but "Please take care of your family, as it

13   seems like that is the only thing that counts."

14          Okay.  So this is before the other letter,

15   and so I'm saying to him, pay me the money.

16      Q    If you don't specifically recall what Elm

17   Street is talking about, have you recalled doing other

18   deals with Bob Matthews besides the 11 Cliff Road deal

19   that we're talking about and the Palm House Hotel

20   property?

21      A    If I did I would say it to you, but I can't

22   remember right now.  I mean, that's been eight years

23   ago, and I'm not trying to be cute, I just can't

24   remember, so he must have -- whatever he did, must

25   have paid me.  Maybe he borrowed some money on a place

1    called Elm Street.  Don't know.

2        Q    If we wanted to find out what Elm Street was

3    and the terms of that transaction, who would we ask?

4        A    I'll find -- Craig.

5        Q    Craig Galle?

6        A    -- but Sal's been here for probably 20 years,

7    and he worked for Disney for 20 years, and I stole him

8    off of Disney, so I can ask around during lunch and

9    find out if they remember.  It might just be a

10   misprint.

11       Q    Okay.

12       A    Or did I have any -- better question, why

13   don't you ask me, I tell people how to get to this

14   brain of mine, is ask me, is there any other loans I

15   made to Bob for -- or loans or security or -- I don't

16   know, drop a name for him or something like that,

17   introduce him to somebody, that might help out a

18   little bit more, because you're trying to prove my

19   relationship with Bob, and I guess Mia is a little bit

20   closer than my normal thing.

21            So why don't you ask me the right kind of

22   question, instead of just asking -- then you come back

23   and say -- I don't know what.  I'm trying to tell you,

24   I don't know what Elm Street is.  Nobody knows what

25   Elm sheet is.

1           I have to probably ask the bigger question to

2    my troops of what is -- is there anything I did for

3    Bob.  I maybe got him tickets for one of the sports

4    games at the arena, because he ran the arena for eight

5    or ten years or something.  So everybody was always

6    bugging me about arena football and everything else or

7    climbing up on the top of the thing, where the bums

8    fall off and die.

9           MR. SALAZAR:  I'm not aware of any other

10   deals, counsel, by the way.  Go ahead.

11          THE WITNESS:  They did, they climbed up on

12   the top to stay warm, and people from New York would

13   help me out with Camillus House.  We'd take care of

14   700-and-some unwed mothers, and we'd take care of

15   about 2,000 -- feed 2,000 people that damn New York

16   sends down here all time.

17          MR. SALAZAR:  Answer his question.

18          THE WITNESS:  Okay.  I'll find it.

19          MR. GEORGE:  This is a good place to take a

20   break.

21          (Thereupon, upon a lunch recess was taken at

22   12:50 p.m. until 1:30 p.m.)

23          MR. GEORGE:  Shall we go back on the record,

24   please.  Just for purposes of time, I want the record

25   to reflect that we're going back on the record at

Page 129

1    1:48.

2           MR. SALAZAR:  Great.

3           (Thereupon, a document was marked as Exhibit

4    No. 7 for identification.)

5    BY MR. GEORGE:

6      Q   Mr. Straub, I'm going to show what's been

7    marked as Exhibit 7 to your deposition.

8      A   It's important, because we needed that too.

9      Q   Okay.  It's an e-mail -- again, this is

10   Exhibit 7 to your deposition, and it's Bates labeled

11   00523 through 00528, and on the very top of that page

12   it says, "Regarding HIGH DOLLAR," all in caps, "115

13   Lower Church Hill," and then it has some numbers after

14   that, and it's an e-mail from Craig Galle to -- it

15   looks like -- well, I'm just going to read the e-mail

16   address.  It's Rvmatt22@gmail.com.

17          Do you know whether that is an e-mail address

18   for Bob Matthews?

19     A   I have no idea.

20     Q   Isn't it true that Bob Matthews' full name is

21   Robert V. Matthews?

22     A   I have no idea.  Bob Matthews is what -- Bob

23   I've always called him.  I don't know he had -- if he

24   goes by Robert or V or victory or anything else.

25     Q   Okay.  Now, if you look a little further down

1    the page after the confidentiality notice, there's

2    another e-mail, and it says from Bob Matthews, and it

3    has the e-mail address Rvmatt22@gmail.com.

4         Do you see that?

5    A    Yes.

6    Q    So would you agree with me that that is an

7    e-mail address for Bob Matthews?

8         MR. SALAZAR:  Object to form.

9         THE WITNESS:  I have no idea.

10   BY MR. GEORGE:

11   Q    And you'll see that's to Craig Galle, that's

12   Craig Galle's e-mail address, correct?

13   A    Pololawyer at -- I've heard him say that.

14   Yeah, I've heard him say, "Send it to

15   Pololawyer@aol.com."  I've heard him say that.

16   Q    Now, do you know where the 115 Lower Church

17   Hill property is?

18   A    No.  Does it say there what state?

19   Q    It doesn't.

20   A    Hmm.

21   Q    Are you familiar with a 115 Lower Church Hill

22   property that was owned by Robert and Mia Matthews in

23   Nantucket?

24   A    No.  I said I walked up a road from -- seems

25   like the docks.  It was as hot as a sun-of-a-gun, and

1   we went into one building, and then we went into the

2   hotel.  It was half completed or something or it was

3   under remodeling.  That's about all I remember.

4       Q    Now, you mentioned earlier your understanding

5   that Bob Matthews had been indicted.

6            What's your understanding of why he's been

7   indicted?

8       A    He had some shenanigans to where he borrowed

9   some money or wire transfers or did something -- I

10  think he, as I understand, stole it out of monies that

11  were supposed to be coming in to who financed him, and

12  spent that money up there.  And so I don't know if

13  they're going after him for that stealing or for the

14  fact that he had some shenanigans up in Connecticut.

15  I don't know if -- I don't think Connecticut is in

16  Nantucket, don't even know how that works.  So the

17  Connecticut is hearsay.  I read the article that he

18  did some wire transfers to pay off money, and now that

19  we see that he's being sued by or something about the

20  SEC, it's something to do with that, or something to

21  do -- let me see.  I really -- that's about it.

22           You can kind of refresh my memory.  I heard

23  all kind of things about Matthews, that he has done

24  wrong things.  He got, like, 300 years of indictments,

25  so it must mean that they -- he did something wrong up

1    there.  I don't know if it was Nantucket or

2    Connecticut, but it seems like it has something to do

3    with Connecticut, and that's when Nick got involved

4    with it, and I think Nick was his go between or

5    something.

6         Q    When you say "Nick," you're referring to Nick

7    Laudano?

8         A    Laudano, yeah.  He was a -- but from what I

9    understand, they are all single counts except for

10   Bob's, so Bob must have been the ring leader.

11        Q    Okay.  Now, I misspoke, and let me correct

12   myself for the record and for you, 115 Lower Church

13   Hill is actually in Connecticut, not Nantucket.

14        A    Oh, okay.

15        Q    So, now, Nick Laudano, has Nick Laudano --

16   well, let me back up a minute and rephrase.

17             You spoke about Bob -- in your answer just

18   then, you spoke about Bob Matthews getting financing.

19             Were you talking about financing for the Palm

20   House Hotel project?

21        A    Getting financing?  No, you were asking me

22   about this -- you said was he in trouble, and I said,

23   "I hear that he got himself in trouble about

24   Connecticut," and that he made somebody mad, like a

25   governor or something, and they're pushing the

1  criminal thing against him for doing something.
2  That's all I know.
3      Q    Okay.  In the context of your answer, I
4  thought I also heard you say that you thought that the
5  indictments related to spending money that was
6  supposed to be used to finance the Palm House --
7      A    Yeah, I'm just assuming that.  I'm just
8  putting two and two together.  During this
9  investigation I started finding -- sitting in the
10  depositions and the claims your clients have been
11  bringing in a federal lawsuit, that you're trying to
12  educate me -- you're not trying to.  You're educating
13  me that it had something to do with the hotel, and I
14  think the indictments were something to do with
15  Connecticut, and I'm not sure -- then I started seeing
16  something here.  Your counterparts were asking
17  questions about, isn't it true that he took money to
18  and paid off his house, because we all sit back and
19  wonder how in the hell can somebody sit in that house,
20  when he wasn't paying anybody, as we understand,
21  and -- people ask me that all the time, how does he
22  stay in that house, when he's got no income coming in?
23  I'm saying, the guy is either the smartest or he's the
24  luckiest person in the world.
25           And then he took money and bought a yacht.  I

Page 134

1   said that's crazy, because I'm in the yacht business,

2   they didn't ask me one question about yachts, or I

3   could have told them how much to pay for yachts and

4   stuff, and that he paid -- he got some money from

5   someplace, which I guess is out of the financing of

6   this thing, for something up in Connecticut, that he

7   paid off his mother's house or something, maybe it's

8   this Elm Street thing, mother's house, which I never

9   checked out, and where did he come up with the money

10  to do that?  And then I guess it went under right

11  afterwards.  They ran it through Nick or something.

12  That's all I know about it.  Just hearsay.

13      Q   So let's take a look at this e-mail again.

14  Now, the e-mail, toward the middle of the page, that's

15  going to Craig Galle, on February 11, 2014, was Craig

16  Galle still your lawyer?

17      A   He's always been my lawyer from -- 20 some

18  years probably.

19      Q   So this e-mail says, "Dear Craig, please send

20  me the --

21      A   He's one of many lawyers.  Okay.

22      Q   It says, "Dear Craig, please send me the

23  resolution as specified below.  That way we can bypass

24  the operating agreements.  Thank you so much for

25  helping out with this.  Bob."

1          Do you have any idea what he's asking -- Bob

2     Matthews is asking Craig Galle to do here?

3          A    No, I don't.  Something about an operating

4     agreement.  I don't even know what an operating -- I

5     never had any operating agreements with people, but

6     maybe the guys that do the legal stuff around here

7     made an operating agreement with somebody.

8          Q    Okay.  And from the top --

9          A    I thought Bob bought the place or he bought a

10    company that we had or something like that.  What's it

11    got to do with operating agreements?

12         Q    Okay.  Well, we'll find out.

13         A    Yeah.

14         Q    So the subject of the e-mail in the middle,

15    it also says, "High Dollar, 115 Lower Church Hill,"

16    doesn't it?

17         A    That's what it says.

18         Q    Now, underneath that last e-mail I read, it

19    says, "Nick, here is the info required by our entity

20    team to allow us to use your company on the contract."

21    It says, "We need a resolution from Botticella

22    Advisors, LLC on their company letterhead authorizing

23    Nicholas to sign on behalf of the buying entity, NJL

24    Development, LLC.  This resolution will need to be

25    signed by Craig as the manager of Botticella Advisors,

1   LLC.  This would allow us to bypass both operating

2   agreements.  This will also eliminate the tiered

3   signature block on the purchase agreement, as Nicholas

4   will be considered an authorized signatory for the

5   buying entity."  Do you see that it says that there?

6       A   I see what you just read.

7       Q   Do you know what it means?

8       A   I have no idea what it means.  Never seen

9   anything, no one ever asks me about that stuff.

10      Q   Do you know whether Craig Galle was involved

11  with Botticella Advisors?

12      A   I don't know who Botticella is.  I don't know

13  if Craig was involved with them or anything else, even

14  hearsay.  Maybe there's something happening in

15  attorney/client privilege, that I'm sitting in an

16  office with five other attorneys, I'm preparing for

17  here, preparing for your international -- your federal

18  case, and somebody said who Botticella is, I don't

19  know.  Never stood out in my mind.

20      Q   Is it your testimony that you've never heard

21  about the 115 Lower Church Hill property prior to

22  today?

23      A   I know nothing, where that is.  You'll need

24  to help me by saying what state it is, and I don't

25  think I've ever been to what I understood was Bob

1    Matthews' mother's house or Nick Laudano's house that

2    he got in trouble with or Mia or Bob or anybody else.

3    If there is -- what the federal people are going

4    after, I'll be getting deposed someplace or interviews

5    and stuff.  I've talked to everybody.  I tell them

6    exactly what I know.

7        Q    Okay.  So what I'm asking you is, as you sit

8    here today, is it your --

9        A    I don't know who Bonacelli (phonetic) is.

10       Q    That's not my question, sir.

11       A    All right.

12       Q    What I'm asking you is, as you sit here today

13   is it your testimony that you never heard about the

14   115 Lower Church Hill property before today?

15            MR. SALAZAR:  Object, asked and answered.

16            THE WITNESS:  Not as 115 Elm street or

17   anything like that.  I don't know those numbers.  If

18   you tell me what it is, is it a house, an apartment

19   house, the hotel in Nantucket, what it is, what is at

20   that address, and then I can tell if I've ever been

21   there, because I said to you I haven't been to any of

22   them, other than that time I walked up the pathway in

23   Nantucket and went into two different buildings, and I

24   think we left the next day or something.

25   BY MR. GEORGE:

1     Q    This isn't Nantucket.

2     A    Okay.  Well, then you gotta tell me where

3  it's at.  What's so big a secret about?

4     Q    I told you it's in Connecticut?

5     A    Well, I don't think I've been in Connecticut

6  in my life, other than Boston -- is Boston in

7  Connecticut?

8     Q    No.  Boston is in Massachusetts.

9     A    Okay.  I think we left Boston and went over

10  there and came back.  Okay.  It's in Massachusetts.  I

11  don't think I've been in Connecticut in my life.

12          MR. SALAZAR:  You haven't missed anything.

13          THE WITNESS:  It's very cold.

14  BY MR. GEORGE:

15     Q    Do you know who Jade Yu is?

16     A    Who?

17     Q    Jade Yu?

18     A    No, not me.  I'm GS.  Who is GU?

19          MR. SALAZAR:  No, it's a name he's saying.

20  It's Jade Yu -- how is it spelled?

21          MR. GEORGE:  Y-U.

22          MR. SALAZAR:  Y-U.  It's two names, Jade Yu.

23          THE WITNESS:  I have no idea.

24          At the time, tell me what year it was, and

25  maybe someone -- I asked somebody across the hallway

1    and they said, "Ah, yeah, that's Jimmy's company," or

2    something.

3    BY MR. GEORGE:

4        Q    If you turn to the page Bates labeled 525 of

5    that document --

6        A    Go ahead.

7        Q    -- at the top of the document, it's an e-mail

8    from Craig Galle to Jade@palmhouse@gmail.com, among

9    other people, and the subject is regarding NJL

10   Development Group, LLC, broad POA, and then it says,

11   "Jade, see the attached power of attorney, let me know

12   if it is okay, then I will sign, Craig."

13           Do you know who Jade Yu is?

14       A    No, no.  I have no idea.  Maybe it's a time

15   somebody told me.  I don't think -- I didn't see the

16   piece of paper, 525.  It would have been an e-mail.  I

17   wouldn't have sent it.

18           MR. SALAZAR:  Are you done with your

19   questions on this thing?

20           MR. GEORGE:  Yes, I'm done with it.

21           THE WITNESS:  Good investigation, guys, but

22   I'm not sure how this ties to what we're doing here,

23   but keep running your bill up here.  I'm gonna take

24   and at some point have to decide you're not even -- or

25   trying to get information that has nothing to do with

Page 140

1  this case, but keep going.

2          MR. GEORGE:  Move to strike.

3          Could you please mark that.

4          (Thereupon, the document referred tow as

5  marked as Exhibit No. 8 for identification.)

6          MR. SALAZAR:  Thank you.

7  BY MR. GEORGE:

8      Q   Mr. Straub, I'm showing you what's been

9  marked Exhibit 8 to your deposition.  It was a

10 document that was filed in the case United States of

11 America versus Robert Matthews in the United States

12 District Court, District of Connecticut, and it's

13 entitled Declaration of Glenn F. Straub.

14     A   Okay.

15     Q   Do you recognize that document?

16     A   No, but I'll probably -- by my signature

17 being on there, maybe it's one of the hundreds of

18 things that come in every day to me.

19     Q   Would you look at the second page of the

20 document for me, please?

21     A   Yeah, I got it.

22     Q   Is that your signature, sir?

23     A   Yep, that's my signature.

24     Q   Why don't you take a minute to read that,

25 since you don't recall it, and then I'll ask you a

Page 141

1   question.

2       A    It'll -- say take "five" minutes and read it,

3   because I'm not --

4       Q    Okay.  Take as long --

5           MR. SALAZAR:  As quickly as you can.

6           THE WITNESS:  -- good at reading.

7           Read it as quick as I can, okay.  So my eyes

8   don't jump to the second line I gotta put a piece

9   paper underneath of it, so -- and it's better if

10  somebody reads me things, because 90% of the things,

11  they get read to me, and I don't have to sit here and

12  read it.

13          MR. SALAZAR:  Well, go through it.

14          (Inaudible discussion off the record between

15  Mr. Salazar and Mr. Chantayan.)

16          THE WITNESS:  Geez, something is wrong there.

17  I'm not 51, I'm 55 years in business.

18          MR. GEORGE:  Are you ready for me to ask you

19  questions about the document, sir?

20          THE WITNESS:  Mm-hmm.

21  BY MR. GEORGE:

22      Q    Okay.  So now that you've read the document,

23  does is refresh your recollection as to whether or not

24  you've seen it before?

25      A    Yep.

1      Q    So you did see it before?

2      A    Been months ago, it seems like.  It had to be

3 months ago, yeah.

4      Q    Is there anything in this declaration that's

5 not correct that you would like to correct at this

6 time?

7      A    I think that one down there in five, I think

8 I've been around for 55 years, so I appreciate the

9 government trying to protect me, but harassment by

10 Mr. Matthews -- I guess that's what they are

11 protecting me, by not letting him communicate, but I

12 feel that after 51 years of business and being 71

13 years old, that I can handle myself in an appropriate

14 manner, and I think I've been around more than 51

15 years, 51-plus years, it should be.  Oh, I do have a

16 plus, okay.  So it's correct.

17      Q    So why did you file this in a federal case of

18 Mr. Matthews where he's been indicted on a project --

19      A    Document speaks --

20      Q    -- where you're standing to lose all of this

21 money?

22      A    Document speaks for itself.  I've obviously

23 said what I was trying to do.  I wanted to maybe ask

24 him questions about what was his intentions with this

25 building as far as, were they gonna make a hotel?

1    Were they gonna make condos?  Were they gonna go ahead

2    and do an AirBNB?  We're they gonna -- did they have

3    any clients as far as the restaurants go, trying to

4    find out what they were going to do, so I don't have

5    to go out and beat the bushes.  People are still

6    asking me about that piece of property, every night I

7    go out, somebody says, "What are you doing with the

8    hotel, what are you doing in the newspaper?"  I can't

9    answer their questions.

10       Q    Other than that reason that you just

11   described for filing this declaration in a federal

12   case where Mr. Matthews is being sued, or, I'm sorry,

13   is -- let me rephrase the question.

14            Other than the reason you just articulated

15   for signing that document, are there any other reasons

16   why you filed that in the United States --

17       A    Each --

18       Q    -- versus Bob Matthews matter?

19       A    -- each paragraph says what I'm trying to do.

20   It says, "I don't care if" -- I can handle myself.  I

21   want to talk to the guy, and -- I want to talk to the

22   guy.

23       Q    Okay.  So let's go --

24       A    I guess he can't -- I must have tried to talk

25   to him, and I was either informed by his attorneys or

1    by him or something that the government doesn't want

2    me talking to you, and I'm saying, okay, that -- this

3    thing is for harassment, that he's going to harass me.

4    I'm a big boy.  You can call me anything you want to,

5    whenever he does it.  So, I guess, look at what

6    happened at this, the federal government says, "Yeah,

7    you can talk to Straub."  I don't know if we ever

8    talked, that's the trouble.  I don't think we ever

9    talked after that.

10        Q   Let's look at Paragraph 1, it says, "I am an

11   acquaintance of Robert Matthews."

12        A   Yeah.

13        Q   So despite the fact that we've been talking

14   today about transactions that go back ten years and

15   you're helping them save their house in Nantucket and

16   you've testified that you've known Mia Matthews for 20

17   years, it's your position that --

18        A   Knew of her.  There's a lotta difference

19   between knew her and knew of her.

20        Q   -- that as of June 5, 2018 when you filed

21   this, you were just an acquaintance of Robert

22   Matthews?

23            MR. SALAZAR:  Object to form.

24            THE WITNESS:  Well, it's my determination of

25   what the word "acquaintance" is.  I know the guy.  I

1   never -- again, they told me don't joke.  But I never

2   slept with the guy, meaning that I wasn't smoking a

3   peace pot (sic) with him.  I wasn't -- you know, back

4   in the old days, we would -- I hadn't even had but

5   twice marijuana in my life, and they'd say, did you

6   ever smoke -- the polo players use a material called

7   Mahtay (phonetic).  I think it's a form of marijuana,

8   but they all sip the damn thing at the polo field, and

9   you have your buddies, and you let each buddy sip out

10  of a Mahtay pipe.  I never had that with Bob.  Bob was

11  an acquaintance, and I think I say in there that Mia

12  was a longer term friend or something.  I saw her, not

13  that I was ever -- I was on her radar screen or she

14  was on my radar screen.

15          MR. GEORGE:  Can you read back just the last

16  sentence of that answer?

17          (Thereupon, the portion of the answer

18  referred to was read back by the court reporter as

19  recorded above.)

20  BY MR. GEORGE:

21      Q   It's your testimony that she was never on

22  your radar screen and you were never on her radar

23  screen, that's your testimony?

24          MR. SALAZAR:  Objection to form.

25          THE WITNESS:  For 20 years.  Probably ten

1    years of that 20 years, I knew of her, because she was

2    an actress, and I saw her on different events, and

3    she'd do that cartwheel.  That's about all I knew of

4    Mia.  Never went to school with her.  She never did

5    anything else with me.

6    BY MR. GEORGE:

7        Q    So Paragraph No. 2, "Mr. Matthews recently

8    asked to borrow a car from me."

9             Isn't it true that --

10       A    About the what, car?

11       Q    "Mr. Matthews recently asked to borrow a car

12   from me."  Isn't true that you --

13       A    I don't want to push that.  I said, "Tell

14   that husband of yours, if he doesn't have a car, I'll

15   lend him a damn car."  There must be seven cars down

16   there right now I brought back from the casino, don't

17   have a home for them, and he can borrow one of our

18   cars if he wants to, but it doesn't look good to guys

19   to have him running around in a Rolls Royce.

20       Q    I understand.  So you offered to let him

21   borrow a car --

22       A    Yeah.

23       Q    -- he didn't actually ask to do it?

24       A    No, I don't think he called me and asked me.

25   I probably said to Mia -- because I was -- remember, I

1    told you, I talked to her, that if you guys worry

2    about the kids going to school, we have foundations

3    that will go ahead and do that.  Our first responder

4    foundation will be a 300-and-some-million-dollar

5    foundation before she's done.

6        Q    I understand.

7        A    And so I'm saying there's foundations here

8    that can help people out.  It's not like I have to do

9    it for my own personal needs.  So him driving around

10   with a broken down Rolls Royce, and he's stuck at

11   home.  I guess he was under -- I don't know if it's

12   home arrest or whatever was going on.  I'm reading the

13   newspaper like everybody else.  I said, "Hey, don't

14   worry about the kids.  Take and fight your battle,

15   don't worry about your kids.  If they gotta go to

16   school, I'll send them to school."  We got -- we help

17   out a hell of a lot more people than just their two

18   kids.

19       Q    Can you look at the second page of that

20   again, please?

21       A    Go ahead.

22       Q    Do you see above your signature, it says, "I

23   declare under the penalty of perjury that the

24   foregoing is true and correct pursuant to 28 U.S.C.

25   Section 1746"?

1          A    Yeah, I don't know what 28 Section --

2          Q    Well, that's fine, but you understand what it

3     means to declare under the penalty of perjury that

4     something is true and correct, right?

5          A    Hell, yeah, guarantee it, I know what perjury

6     is.  President Kennedy -- President Kennedy?

7     President Trump has got all kinds of problems, all his

8     staff and everything like that.

9          Q    Okay.  So --

10         A    I sent this to the government.  If they want

11    to do something with me, go ahead.  That's why

12    probably we're being interviewed by the FBI again,

13    saying, hey, how do you know all this kind of stuff?

14    I said, "You guys can pick out whatever you want to

15    know," so they have a complete affidavit on me and

16    this and that and everything else, because I know

17    enough about what's going on in this case, and they --

18    what do you call it, interview me.  They interviewed

19    me.  I gave them everything I knew about the case.  So

20    get a copy of that.  You guys need to --

21         Q    You gave an affidavit to the FBI?

22         A    No, it wasn't an affidavit, but a

23    conversation with them.

24         Q    Is there a transcript of that conversation?

25         A    I'm sure there is.

Page 149

1      Q    Do you have a copy of it?

2      A    Yeah.

3      Q    I'm sorry, yes?

4      A    Yes.  I just got one, about two days ago.

5           MR. GEORGE:  Counsel, are you going to

6      produce a copy that to us pursuant to --

7           THE WITNESS:  If he knew -- if he knew I had

8      it.  I don't know if he knew I had it.

9           MR. GEORGE:  Okay.  Well, are you going to

10     produce a copy of that to us pursuant to the requests

11     for production that are outstanding, as a supplement?

12          MR. SALAZAR:  So I don't know what requests

13     for production are outstanding.  I don't know if

14     they're responsive to any of your requests.  If you're

15     asking for me to produce it and if it actually exists,

16     I'll take a look at it, and I'll produce it if it's

17     appropriate.  I'm not convinced that there's a

18     transcript of that, but that --

19          THE WITNESS:  I didn't even read about it

20     all.  I didn't read the whole thing, so I gotta read

21     the whole thing.

22          MR. SALAZAR:  Yes.

23          THE WITNESS:  They said this just came in --

24          MR. SALAZAR:  All right.  Wait until he has a

25     question.  I think he's thinking of something else.  I

Page 150

1    apologize.

2            MR. GEORGE:  For the record, we are formally

3    requesting a copy of the transcript that Mr. Straub

4    just referred to, and we believe that it is covered

5    within the documents that have already been subpoenaed

6    in the case --

7            THE WITNESS:  Couldn't be -- no, no --

8            MR. GEORGE:  -- or requested in the case.

9            THE WITNESS:  -- no, it wasn't -- I only got

10    a copy a couple days ago.

11            MR. SALAZAR:  Well, wait until there's a

12    question.

13    BY MR. GEORGE:

14        Q    So the question is, with respect to Paragraph

15    2, you just testified that it was not true that

16    Mr. Matthews asked you to borrow a car.

17            So that's an untrue statement in this sworn

18    declaration, correct?

19        A    Hmm.  More I'm refreshed, it's probably him

20    saying, "I can't drive the car."  Oh, because, wait a

21    minute, because look at the intent of this whole

22    thing --

23        Q    Sir, I'm just asking you whether --

24        A    Well, I'm saying -- don't ever fucking

25    interrupt me.  Jesus, I don't even get a chance to --

Page 151

1          MR. SALAZAR:  Language.

2          THE WITNESS:  -- complete a sentence.  If you

3     don't like my answers, take it to the Judge.

4     BY MR. GEORGE:

5          Q    I actually do like your answers, a lot.

6          A    I'm saying to you look at what the intent is.

7     So in context of what the intent of this letter is, is

8     that we're dealing with an affidavit about he is

9     wanting to talk to me.  It doesn't say me wanting to

10    talk to him.  So he's wanting to get a hold of me, he

11    must have.  Before they indicted him, he could talk

12    with me.  I talked to him before he got indicted,

13    because I had to get an education as to whether this

14    piece of property is being worked or not and how

15    much -- how far did they get, and I may even pay for

16    knowledge.

17              And so he said, "Hey, you got a car, because

18    I can't get there?"  I think this says that he

19    couldn't make a meeting with me before, and so I'm

20    saying -- and he's saying, "Do you have an old car?"

21    And I'm saying, "Yeah, I got an old car, an old

22    security car from the casino," because we just sold

23    the casino, and I took two of the security cars out of

24    the 12 that was up there.  And I said, "Yeah, go ahead

25    and use that particular" -- it's a GMC, whatever GMC

1  makes, Escalades or something -- not Escalades.  They

2  make GMC Yukons, and that's what that was.

3      He needed to get permission to carry on those

4  conversations with me, because I think during that

5  time period, he got cut off from talking to anybody,

6  because he got indicted, and I said this is a logical

7  concept.  So there's no perjury there.  He probably

8  did ask me that -- to borrow a car during that

9  conversation.

10     Q    Now, you're saying he "probably" did.

11     A    Yeah.

12     Q    A couple of minutes ago, you said that wasn't

13  the case, now you're saying it "probably" was.

14          Are you speculating that that's what

15  happened, or are you swearing under oath now's that's

16  what happened?

17          MR. SALAZAR:  Objection to form.

18          THE WITNESS:  I would say with the rest of

19  this piece of paper, Exhibit No. 8, it reminds me of

20  specifics.  Specifics is that he is saying, "I can't

21  make it to someplace.  The car is broke down."

22  Something about the front end or something like that.

23  So I'm saying he asked me for transportation, because

24  I have to read what else is going on here at the time.

25  Taking something out of context, you're not going to

1    get me on perjury on that.  Ask him.

2            MR. SALAZAR:  Are you okay?

3            THE WITNESS:  Well, that's bull trying to say

4    perjury.  You're going to scare me with perjury.

5            MR. SALAZAR:  There's no question.

6            Are you okay with the sun right there?

7            THE WITNESS:  I'm getting a little hot right

8    now.  I'm looking right up at the sun.  I told you

9    before this building -- this thing gets hot.  Try to

10   open those doors if you don't mind.

11           MR. CHANTAYAN:  Does this fan work?

12           THE WITNESS:  The fan could work, yeah.

13           (Thereupon, a brief recess was taken.)

14   BY MR. GEORGE:

15       Q   Mr. Straub, have you allowed, in the past,

16   Robert Matthews to use your personal credit cards?

17       A   If you want to take your sweater off like

18   everybody else just took their sweaters off, you're

19   welcome to do that.  I can't control -- we turned the

20   air conditioning on.  I can't control it.

21           MR. CHANTAYAN:  I'm sorry, turn it off?

22           THE WITNESS:  No, no, leave it on.  I'm

23   saying, I'm trying to be courteous to everybody being

24   in this room.  It's like on the outside.  I'm sitting

25   in the sun.  They're not.

1          So have I let him use my credit card?  No, I

2     don't think Bob has ever asked me to use my credit.

3     BY MR. GEORGE:

4          Q    Have you allowed -- I'm sorry, I didn't mean

5     to interrupt.  Go ahead.

6          A    There was a time, it seems like, for some

7     reason I gave Mia the credit card to do something.  I

8     heard you guys ask her the question a couple days ago,

9     and I'm thinking to myself what would she be using my

10    credit card for?  Hmm, don't remember right now, but I

11    could go back, and I don't know if she ever did.  I

12    guess an emergency, just like taking care of kids.  It

13    might have been an emergency purpose.

14         Q    So you're not denying that you let her use

15    your credit card?

16         A    If I ever gave the credit card to her, I'm

17    just saying, I hear other things from other people,

18    and if they can remember better than I can, then maybe

19    so.  I don't know if I ever did give her my credit

20    card.  I'll have to go ahead and see if I have any

21    charges on my credit card.  Yeah, pull out what you

22    asked her or your counterpart.

23              (Thereupon, a document was marked as Exhibit

24    No. 9 for identification, during which there was a

25    discussion off the record.)

Page 155

1   BY MR. GEORGE:

2       Q    Mr. Straub, I'm handing you what's now been

3   marked as Exhibit 9 to your deposition, which are --

4   I'll represent to you, are the same text messages that

5   were marked as Exhibit 14 to Mia Matthews' deposition

6   and they are Bates labeled MM0001 through MM00105.

7   I'm not going to ask you about all of those, but I'd

8   ask you -- well, hold on, let me find it.

9       A    What's 105?

10          MR. SALAZAR:  Yeah, these numbers here, the

11  last page is 105.

12          THE WITNESS:  Yep.

13  BY MR. GEORGE:

14      Q    Sorry, I'm just trying to locate it.  Oh, I

15  got it.  So if you'd turn, please, to MM7.

16      A    Go ahead.  Good.  We already spent 5-1/2

17  hours on this thing, but that's good --

18      Q    There's not a --

19      A    -- this credit bid has a lot to do with this

20  thing, I'm sure.

21          Go ahead.

22      Q    All right.  If you look at the message from

23  May 9, 2018 at 5:56 p.m., it's the larger highlighted

24  box, the first message, do you see that?  It says, "I

25  offered a car to Bob last night, so he could drive

Page 156

1    something other than the four-door, if you want the

2    Escalade or the new" -- I assume it says Porsche --

3    "let me know."  Do you see that text message?

4        A    Yep, I see it.

5        Q    And you sent that?

6        A    I sent that.  It's not the conversation

7    between Bob and me, but it is a conversation between

8    Mia and me.

9        Q    Right.  And aren't you conveying there that

10   you offered a car to would Bob Matthews, as opposed to

11   him asking you for one?

12           MR. SALAZAR:  Object to form.

13           THE WITNESS:  No.  I just explained to you,

14   there's a conversation between me and Bob before this,

15   so this is May the 9th, and this thing is what date?

16   June.  So my offer to Bob -- not my offer.  Bob had

17   mentioned that he couldn't be with me, because his car

18   broke down or had a mechanical problem, and I'm

19   saying, I'm trying to get some information together,

20   because at that time, there's no indictments, there's

21   no anything else, that I know of.  And I'm trying to

22   talk with Bob, and he's saying, "I can't even make it

23   to a meeting with you," and so I'm saying to her --

24   because she's the power player, as far as I'm

25   concerned, Mia is the one that's on all these papers

1  and everything else.  She's the one I officially have

2  to talk to.  Bob has skirted his responsibilities by

3  putting everything through his brother's name, through

4  his wife's name, through everything else.  So he's not

5  gonna talk to me, but I say, "I offered a car to Bob,"

6  because they needed transportation.

7  BY MR. GEORGE:

8      Q    When you say that Mia was the "power

9  player" --

10     A    Yeah --

11     Q    -- are you referring to --

12     A    -- that's what I told the FBI people too.

13     Q    Are you referring with respect to the Palm

14  House Hotel as well?

15     A    I'm expecting everything.  A wife controls a

16  husband.  A husband goes out and robs banks, because

17  the wife needs money for the kids and the house and

18  everything else.  I'm saying, a wife controls the

19  family.

20     Q    If you could turn to Page MM9, I would like

21  to refer you to a text at May 16, 2018 at 3:44 p.m.

22  It's halfway down the middle of the page, and it's a

23  text from Mia Matthews to you that says, "Forgot I had

24  your credit card, LOL."  Do you see that?

25     A    Let me read before.

1          Okay.  I don't see -- what's the time period?

2          MR. SALAZAR:  Here.

3          THE WITNESS:  Oh, here.

4          Okay.  I maybe gave -- I said, already

5   testified to it, try to get me on perjury, look back

6   about three minutes ago, and I said, I don't know if I

7   gave her something for emergency.  I probably gave her

8   a credit card for emergency.

9   BY MR. GEORGE:

10     Q    I'm just asking you if this text message

11  refreshes your recollection as to the fact that you

12  let Mia Matthews use your credit card?

13     A    Well, you asked me about Bob Matthews.  So

14  you're confusing me.  Which one is it that five

15  minutes ago you said did I give Bob Matthews my credit

16  card?

17     Q    I actually asked you both questions, and I'm

18  not trying to confuse you.  So I'll stick to just this

19  piece of paper.

20     A    So now you're asking me a new credit -- or

21  asking a new question to me.  It's not Bob Matthews.

22  I gave it to Mia Matthews for emergency, because

23  obviously Bob was not giving her money.

24     Q    What was the emergency?

25     A    Anything, the kids.  They are stuck

1    someplace.  She doesn't have enough money -- I don't

2    think she had any sources of money, and Bob was on

3    house arrest or something by that time.  So I'm

4    saying, "Hey, guys, you got an emergency, I'll take

5    care of the kids, and here's a credit card for

6    emergencies."

7        Q    So this was more just a philanthropic act on

8    your part?

9        A    That's pretty much what I do with her.  Yeah,

10   with her and probably 25 other people that I go ahead

11   and put monies available for them, from their father's

12   die, they're going to lose their house, and they had

13   to have my head of construction -- I put it together

14   where I have a head of construction to go in and I

15   give him the money to take care of the girl, because

16   the girl had worked with us for a lot of years, and I

17   feel sorry for her.  Her father died, and I go ahead

18   and give them three, four, $500,000, because she can't

19   buy in government guarantees.  She can't buy her

20   father's house, but the father's house was worth

21   money.  So I gave money to David for Tara, so they can

22   buy the house together, and they are not married

23   because she's still married to a guy that has cancer,

24   but she brought him in from Canada.  That's the

25   complicated life down there.

Page 160

1     Q   When you say "Tara," is that Tara Lordi?

2     A   Yeah, that's Tara Lordi.  I rented her a

3 house, oh, for a year and a half maybe or something

4 like that, because I don't always stay here.  This is

5 before I bought these units that I stay here now.

6     Q   Is she in New York?

7         MR. SALAZAR:  I'm sorry, who?

8         THE WITNESS:  She eas --

9         MR. GEORGE:  Tara Lordi.

10        THE WITNESS:  I would say right now I haven't

11 talked to her for probably two weeks.  I saw her at a

12 traffic light.  She has a big pickup truck.  She runs

13 her husband's -- which has terminally ill cancer, half

14 his throat is removed.  We all know him.  He runs Sea

15 Doo, I think it's called Sea Doo.  It's a

16 manufacturing facility down the street here.  She runs

17 that for him and her, but also dates my construction

18 manager up in Atlantic City, and she was going to lose

19 her house, so I know what he was worth to me.  He's

20 like a Nick Laudano, they're construction people.  I

21 talk their language, and so I go ahead and lend them

22 money to buy some asset, and they give me first

23 security on it, and the asset is worth -- it's five

24 acres in New York.  So I don't know if she's up there

25 now or not.  I don't think so.  She's usually down

Page 161

1   here making money off equestrian or running Sea Doo.

2   BY MR. GEORGE:

3       Q    Okay.  When she --

4       A    They're all professional girls that I back.

5       Q    When she stays here in Wellington, where does

6   she live?

7       A    At her husband --

8           MR. SALAZAR:  Wait a minute.  "She," are we

9   still talking about the same lady?

10          MR. GEORGE:  Yes.  All of the "shes" I'm

11  referring to in this round of questions is Tara Lordi.

12          THE WITNESS:  She always stays at her

13  husband's house, which he's terminally ill and has

14  been that way for a long time.  They keep cutting on

15  him, and so that's what I think she does.  When she's

16  here, she stays there.

17  BY MR. GEORGE:

18      Q    What's her husband's --

19      A    When she's here, John Grimes is his name,

20  Canadian, and he -- I don't know if he ever got his

21  passport or not.  He's been here for -- I've known him

22  for 20 years.  I think they were married for ten or 15

23  years.

24      Q    Would you please turn to --

25      A    Another one of those girl friends, friends

1    that are girls.

2        Q    -- MM11?

3        A    Okay.

4        Q    The May 17, '18 text at 11:49 a.m. from you

5    to Mia, it's at the top of the page, and you say,

6    "Need to look and experience a spa treatment today or

7    tomorrow, so bring something appropriate.  Old unsent

8    text three hours ago, ETA today it's raining.

9            Are you asking Mia to come to a spa with you?

10       A    I need to read it.  I just found out where

11   you are, hold one second, I'll catch up.  "Need to --

12   old unsent text three hours ago -- it's raining."

13           Wow, that one is really confusing.  I don't

14   know it has something to with -- I didn't send a text,

15   so I probably have to read beyond that and see how --

16   the first part of it, it looks like it didn't get sent

17   from a previous time period, and then she must have

18   been meeting me, but I don't even know that.  ETA

19   today.  Let me read beyond that.

20       Q    I can probably make it easier for you,

21   Mr. Straub.

22       A    Yeah.

23       Q    Do you go to spas with Mia Matthews?

24       A    Not that I know of.

25       Q    Never been to a spa with her?

Page 163

1     A    Not unless she's checking out the quality of

2   something, because that's what I was gonna use her

3   for, consulting like I do with Janine, Tara.  I mean,

4   I can give you five other girls that are in control of

5   when I'm buying something or taking something over --

6   like the Palm House, I needed to advance the spa,

7   because I guess Bob was not going to do it.  He was

8   not going to spend his money on the spa, and I'm

9   saying, "Hey, spas work in Palm Beach."  If they're

10  gonna work anyplace, one in Palm Beach would work.

11          "How can you save me time.  Sounds good

12  tonight.  Tomorrow like you to meet the lady that has

13  a" -- I think that's the other girl.  She got a $200

14  million inheritance from when her husband had died.

15  She's here on property.  She --

16    Q    Are you reading the next text?  I'm sorry,

17  you're started to talk about something, and I want to

18  know --

19    A    Yeah, because it must have something to do

20  with that whole time when I'm having her be introduced

21  to other types of businesses.  If Bob is gonna be in

22  jail, she can get involved with spas and she get can

23  involved with other things.

24    Q    Okay.  Just let me read for the record that

25  text.  It's sent by you on May 17, 2018 at 11:51, and

1    it says, "Sounds good tonight or tomorrow, like you to

2    meet the lady that has money, trying to have her meet

3    judge." I actually wasn't going to ask about that, but

4    I will since you brought it up.

5            Who is the judge that you're referring to?

6        A    I don't think you need to know.  It's some

7    judge.

8            MR. SALAZAR:  You have to answer, if you

9    know.

10           THE WITNESS:  Well, actually as a matter of

11   fact, she's about my age, and so there's about three

12   judges I meet up at the Rybovich, there's a little

13   club there where they park the boats, and they like it

14   because it's free, so they meet there and they talk,

15   and I'm there with Steve Rothman, which is a big law

16   firm here in Palm Beach County.

17   BY MR. GEORGE:

18       Q    I'm just asking you who this judge was.

19       A    Well, I'm saying it could have been any one

20   of those three, and I don't know all their names.

21       Q    Okay.  I'm sorry, then, what names do you

22   remember of judges?

23       A    Judge Colbath, chief justice for here.  He

24   introduced me to everybody else.

25       Q    Thank you.

Page 165

1              If you'd look at MM13, please.

2              Mr. Straub, have you ever sent a text to

3    Robert Walsh -- I mean to Robert Matthews?

4         A    Could I?  I don't think so.

5         Q    What about to --

6         A    I just pick up the phone and call, he --

7    until the judge or his attorney told him not -- that

8    the judge said don't talk to -- don't intimidate these

9    people, and so once he told me that, then I said you

10   better get somebody here, because I need -- you might

11   be able to make some money on the side educating me,

12   as to how far were you guys along in this -- making a

13   decision, is it gonna be a condo, an AirBNB, a

14   commercial site, as far as these restaurants go and

15   stuff.  I was trying to get him to bring me up to

16   date.

17        Q    I understand.  Did you ever send --

18        A    And maybe he can make some money.  I might

19   give him some money on the thing.

20             THE COURT REPORTER:  I'm sorry, I'm really

21   having trouble hearing you, probably because of --

22             MR. SALAZAR:  Yeah, we'll try if off for a

23   little bit.

24             (Discussion off the record.)

25   BY MR. GEORGE:

Page 166

1      Q    Did you ever send texts that --

2      A    Do you want to ask her to read back what I

3  said so far, because I'm not done.

4      Q    All I asked was whether you sent texts to

5  Robert, and you've answered that.

6           My next question is, have you ever sent any

7  texts to Joseph Walsh?

8      A    No, I don't -- he's not on -- I don't even

9  have his telephone number.

10     Q    If you would look at --

11     A    So if --

12          MR. SALAZAR:  That's the answer.  Wait for

13  another question.

14          THE WITNESS:  Did someone borrow my phone in

15  a conversation and use my phone?  I don't think so.

16  Did I ever talk with Joe?  Twice, I think he came and

17  talked to us, him and Black, and other than that, I

18  don't think I ever had his number to text him or

19  anything else.  Not me.

20          Could somebody have borrowed a phone from me

21  at a table like this and say, "My phone is dead, let

22  me have your phone"?  Could have been, but it would

23  have been pretty much impossible.

24  BY MR. GEORGE:

25     Q    Do you have a recollection of somebody

1   borrowing your phone to text --

2        A    All the time.  I mean, it's like I borrow

3   everybody's phone.

4        Q    You didn't let me finish my question.

5        A    Okay.

6        Q    All I'm asking is, do you have a specific

7   recollection of allowing someone to borrow your phone

8   to text Bob Matthews?

9        A    Not that I can recall easily.  He's not on my

10  thing.  I just pick up the phone and call Bob and I

11  talk with him.

12       Q    Okay.

13       A    And the same way with this Joe Walsh guy.

14  I've only seen him, I think, twice in my life, way

15  after all this fuck --

16            MR. SALAZAR:  Language.

17            THE WITNESS:  -- all this stuff went down the

18  road, all the time this damn thing went down the road.

19  it was a simple mortgage, selling a hotel, and now all

20  the sudden Black comes in.  I didn't know who he was.

21  He owned one percent of the company, and Joe Walsh

22  came in and started telling us all these crazy things

23  that Bob did.  We didn't believe him at the time, but

24  he wasn't paying me, you know.  So after he didn't pay

25  us our fourth payment, we threatened him and said,

1  "Hey, we're gonna take you to suit."  Never got our

2  money.

3  BY MR. GEORGE:

4      Q    Page MM13 --

5      A    So I don't remember ever going -- to answer

6  your question, I don't ever -- remember ever texting

7  Joe.  But at tables all the time, somebody's phone

8  goes bad, so I don't want to have somebody come up and

9  say, "Well, you know, you did this," I'm saying, "Hey,

10  somebody borrowed my phone for Pete sake," and the

11  same goes with Bob Matthews, could have borrowed it.

12  I just picked up the phone and talked to these people.

13      Q    There's a picture, the first picture on that

14  page, there's a text below that that was sent by you

15  at 11:25 a.m. on May 19, '18.  It says, "I just read

16  your last text at the same time.  I was asking Kim

17  about who was the minority that was always on the TV

18  next to Prince Charles.  Then Kim told me.  I felt

19  like my philosophy on minorities stinks.  Then saw

20  your picture, wow, and Kim says the Royal Family likes

21  her."

22          What did you mean when you said, "I felt like

23  my philosophy on minorities stinks"?

24      A    I didn't think the Royal Family -- I didn't

25  know who this gorgeous girl was, marrying a prince,

1    was a minority, her parents.  One was a minority.  One

2    wasn't.  I don't know if that makes her a minority,

3    and I was asking everybody this question, I'm

4    saying -- I'm on TV, watching TV, I watch it 24 hours

5    around the clock.  TVs are always on where I'm at.

6    And I saw this girl marrying there, and I said, "That

7    guy did a nice job marrying this girl," and then

8    someone told me that her mother that was sitting there

9    while they're being married, the black lady, was her

10   mother, and I said, boy, that is something for the

11   Royal Family to allow something like that to happen.

12   Maybe we got a chance, because the United States

13   already does that.  Germany won't do it.  Germany is

14   still fighting like me and my ancestors, they're --

15   just yesterday they're in there doing Heil-Hitler-type

16   things, you know.

17       Q    Well, you said, "I felt like my philosophy on

18   minorities stinks."

19            What's your philosophy on minorities --

20       A    I mean if that's --

21       Q    -- that you said -- that you're saying here,

22   you say, your words, "I felt like my philosophy on

23   minorities stinks."

24            Why are you saying that you felt like your

25   philosophy on minorities stinks?

Page 170

1            MR. SALAZAR:  Objection to form.

2            THE WITNESS:  I don't know even know what I

3    was saying at the time.  I need to read everything

4    else that's there.

5            MR. GEORGE:  Well, go ahead.

6            THE WITNESS:  I'll go back and try to

7    remember.  That's this year, guys, that's only --

8    that's five months ago.

9            My philosophy about -- sometimes I use words

10   that are not proper words.  In other words, you gotta

11   remember, that's one of the reasons I don't text.  I

12   don't know how -- my vocabulary is 300 words.  My

13   daughter's is 3 -- 30,000 words, because she's in

14   Germany, and I call her up and ask her how to spell

15   things, what would be an alternative.  You've got

16   spellchecks on these phones, but a lot of time I don't

17   use the right word, so the word "philosophy" probably

18   went in my mind at the time.  So let me just think.

19   BY MR. GEORGE:

20       Q   Would you like to take a little break?

21       A   No, no, no, come on.  This is so simple.

22   This is so asinine that you're asking me about what my

23   philosophy about minorities is.

24           Okay.  So it'd be women, a prince marrying --

25   that they would have done the total research on who he

1   was marrying, that she's got a black ancestor to her.

2   So my philosophy is that I would never think the Royal

3   Family would ever come off their high haunches and let

4   a minority -- without talking to Prince Charles or

5   Prince Philip or whatever the prince's name is --

6   allow them to have him marry a minority.  So that's my

7   philosophy.

8        Q    And why are you saying it stinks?

9        A    Well, because I'm wrong, that they did.  So

10  it's -- my philosophy that the Royal Family would

11  never let somebody intrude in that, quote, white --

12  white 200-year-old, 500-year-old family, that they

13  would ever let a minority get into that bloodstream,

14  so -- because the black minority would come out in the

15  children, because I think it's the dominant gene, so

16  they're going to have somebody like that.  So the

17  Royal Family -- I guess that philosophy of mine stinks

18  that they would never let something like that happen.

19  I don't care.

20            I tell me youngest daughter -- I go to New

21  York once every month and a half to see her, and I'm

22  saying, "Honey, you just gotta find somebody."  Twelve

23  million people up here in New York, you would think

24  you'd find -- I don't care if they're black, white, or

25  21, or actually it's the saying -- and she already

Page 172

1    corrected me, because it was in the "New York Times,"

2    black, white, or Indian chief, and she said, "Boy,

3    dad, you went after the Indians and you went after

4    blacks, because you made a statement in the 'New York

5    Times' about 'Don't care who my youngest daughter

6    marries, black, white, or Indian chief."  I think it's

7    something -- doctor, lawyer, or Indian chief, that's

8    what I did, and she said I stepped on two of the

9    minorities there, so she tries to correct me.

10        Q    All right.  If you could turn to MM 15 --

11             MR. SALAZAR:  Pardon me, just a moment.

12             Madam court reporter, can I have a copy of

13   that entire section, from the beginning of this

14   question about minorities until this last question

15   printed tonight, in time for tomorrow morning's

16   hearing, can you do that, just that one page?

17             THE COURT REPORTER:  Yes.

18             MR. SALAZAR:  Thank you.

19   BY MR. GEORGE:

20        Q    Can you look at the top of Page MM15, please?

21        A    Got it.

22        Q    So there's a text message on May 20, '18 at

23   11:29, it says -- and this is from you to Mia

24   Matthews, it says, "Haha land at three, have car

25   there.  Might set up to look at a yacht that I always

1    wanted, but the owner was a prick, so knowing me I

2    made it tough on him in the bank (bad me) and now

3    they're on my terms, either hunter at four o'clock or

4    five o'clock any interest in a dinner and sleepover

5    party."  And then Mia responds to you, "I have church

6    at five.  Could do dinner after, but no sleepovers

7    yet.  You anxious boy."

8            So are these the kinds of text you have with

9    women for whom you're a father figure?

10   A    Oh, hell yeah.

11           MR. SALAZAR:  Objection to form.

12           THE WITNESS:  For sure.  I mean, to their

13   boyfriends, I even use the BJ joke to them, "Hey, they

14   owe me two right now," to their boyfriends, and I'm

15   the guy who set them up with the guy from Switzerland,

16   and Janine will come in and testify, and it's just the

17   way I talk.

18   BY MR. GEORGE:

19   Q    So this isn't you asking Mia to come over and

20   spend the night with you --

21   A    Oh, I'd love to --

22   Q    -- in a romantic way?

23   A    I'd have love to have her stay, spend some

24   time with me, but she was always coy.  That's why we

25   never had sex.  She's been a player from day one.  She

Page 174

1    knows how to make people feel good, pat them on the

2    back and say, "Boy, that haircut of yours looks good."

3    I don't even have any hair half the time.  She's good.

4    That's why I call her the instigator.

5         Q    Let's put these away for now.

6              (Discussion off the record between

7    Mr. Salazar and the witness.)

8    BY MR. GEORGE:

9         Q    Mr. Straub, did you loan money to Mia

10   Matthews to pay Bob Matthews' criminal attorney's

11   fees?

12        A    I think the wording in the agreements are

13   something similar to that, but that was not the intent

14   if that came out that way.  I was giving money to -- I

15   wasn't.  I was having Palm Beach -- one of my

16   companies send money to their criminal lawyers for

17   escrow, until I could work out some details with those

18   law firms, and now I guess the law firm are finally

19   giving the money back, because they realized after we

20   had to bring them into things and go after and file --

21   file something in the ethics things for lawyers, and

22   they're investigating it right now, and they admit --

23   as a matter of fact, they have a law firm down here.

24   They admit that that's what was done, and so now they

25   are just saying, "Well, we wanted to wait until the

1   case was over with," and I'm saying, "Guys, I'm gonna

2   go after you for attorney fees," and they're finally

3   giving the money back.

4       Q   Okay.

5       A   So I didn't.  The company did, and the

6   company sent it to their escrows to show that they can

7   probably come up the monies, but they would have to

8   fill out all kinds -- I'd want to go over the bills.

9   I'd want to have an agreement.  I'd have to have

10  everything else.  It just shows they're not some

11  flunky walking into their office, instead of having a

12  public defender.

13      Q   When you say "the companies and not you," I

14  mean, you've testified already that you are the sole

15  member and hundred percent owner of all of your

16  companies, right?

17      A   Could be.  But they are all set up for a

18  purpose, and I don't really have complete control

19  over all of them.  In other words, some of these

20  companies are set up for specific purposes and that

21  way you can only sue that company for that particular

22  amount of money.

23      Q   Oh, I understand the corporate veil and all

24  of that, and I'm not trying to pierce anything --

25      A   That's what it is.

1      Q   -- but when you say "not you" and the

2  companies, you're the one who makes the decisions

3  about what money gets loaned out or not, right?

4      A   No, no, no, no, people can do -- look what

5  Jeff did.  I guess Jeff made an entire contract up,

6  and Jeff knows my attorney, his brother, as to my

7  wills, to my everything else, what happens after I die

8  and this and that.  So I give these guys a lot of

9  authority, because I could die tomorrow morning.  I'm

10 72, so there are some controls that are given to these

11 people.

12     Q   Okay.  Did you make the decision to loan Mia

13 Matthews money to pay for Robert Matthews' criminal

14 defense, or did someone else --

15     A   I didn't -- I didn't -- that's not what

16 happened.

17     Q   What happened?

18     A   Bob and Mia, at different times, I don't

19 think it's together, asked me for money because they

20 didn't have any money to buy something more than a

21 court-appointed attorney for a criminal case.  I said,

22 at the spur of the moment, the only thing I can do is

23 to show them that you have the ability to come up with

24 money, and I will go ahead and send it to their escrow

25 accounts, but there will have to be agreements.  There

1    will have to all kinds of other things, collateral.

2    They have to give me collateral, and they have to

3    produce these collaterals -- I did see, they're giving

4    me two times.  I always said it's gotta be two times

5    whatever value it is.  They're going to have to come

6    up with $300,000, and I think Bob has got all kinds of

7    money.

8            Come on, guys, the guy had over $300 million

9    ten years ago in property.  I don't care if Murphy's

10   law went bad all the time, he's gotta have money

11   stashed someplace, so I figure Bob will always come up

12   with money.  He's been around money.  He's got to have

13   enough sense to store money someplace, but so far it

14   hasn't shown up.

15           He hasn't given any money to her, so he's

16   convinced her to go work herself, and that's what she

17   does.  She works as these movie actress on these

18   shows.  I don't know if she makes 2,000 or $20,000 a

19   show, but they run them pretty long.  They run ten or

20   12 weeks, and I think she's got three contracts right

21   now as I understand.  So their history has been pretty

22   good about -- hers, about getting a job.

23           Bob, I'm saying, I think he stashed money all

24   over the place, but I don't have any indication that

25   he did.  And so far they are living pretty good in a

1    $30 million house.  So someway that's pretty damn

2    good.  Somebody is paying for food and taxes and

3    paying payments, other than just stealing it from

4    other people.

5         Q    You're not going to help him get out of that

6    one, are you?

7         A    Now, you're talking settlement negotiations.

8    Look at your settlement negotiations.  See if he was

9    or was not included in those settlement negotiations.

10   That would probably answer that kind of question.  I'm

11   not going to tell you what was in the settlement

12   negotiation, because you have your privilege to that.

13        Q    I'm not talking about any kind of settlement.

14   I'm asking you whether you're going to assist Bob

15   Matthews in having his house on Palm Beach not be

16   foreclosed on?

17        A    You want me to go ahead and say what -- the

18   terms and conditions of some those settlement

19   negotiations I had with you guys.

20        Q    No.  I don't want you --

21        A    Okay.  If you don't want it --

22        Q    Because I'm not aware of any settlement

23   negotiations that have anything to do with Bob

24   Matthews' house?

25        A    It would, it would -- certain people get

1   released from certain things.

2           MR. GEORGE:  Can you mark that, please.

3           THE WITNESS:  That's a settlement

4   negotiation.

5           (Thereupon, the document referred to was

6   marked as Exhibit No. 10 for identification.)

7   BY MR. GEORGE:

8       Q   Mr. Straub, I'm showing you what's been

9   marked as Exhibit 10 to your deposition.

10          Do you recognize that complaint?

11      A   I think that's the one up in -- you gotta

12  help me out, I don't know -- I never made up one of

13  these things, but if this is one up in that other

14  county?

15      Q   You mean St. Lucie County?

16      A   Yeah.  Is that what this is?

17      Q   That's -- well, for the record, this is a

18  complaint in Case No. 56 2018 CA 001224AXXXHC in the

19  Circuit Court of the 19th Judicial Circuit in and for

20  St. Lucie County, Florida, and it is has been filed by

21  West Coast Investors, LLC against Robert Matthews and

22  Maria Matthews, a/k/a Mia Matthews.

23          Sir, is West Coast Investors, LLC your

24  company?

25      A   I probably own the stock in it, but I don't

Page 180

1    know if you can characterize any of my companies as my

2    companies, because they run through my tax return,

3    which has nothing to do with the legal terms of it --

4         Q    All right.  I asked --

5         A    -- because instead of having a tax return for

6    ten different companies, you have one company, because

7    Uncle Sam is only interested in money.  They're not

8    interested in having more paperwork.

9         Q    Is West Coast Investors, LLC a limit

10   liability company for which you are the sole member?

11        A    I have no idea.  They could be a corporate --

12   they could be some form of a management company.  I

13   don't know what they are.

14        Q    It says it's a limited liability company --

15        A    Well, I don't know what that means.  I mean,

16   I'm not a lawyer.  So what is a limited liability

17   company?  I don't know.

18        Q    Well, to your knowledge does anyone else have

19   an ownership interest in West Coast Investors, LLC

20   besides you?

21        A    The kids maybe.  I don't know, I have a lotta

22   companies running around here that manage for the

23   kids.  They own their own company.  So every so often

24   we -- when we get money off the other companies they

25   own, they'll go in and buy their own companies, so

1   they could own a hundred percent of something.  But so

2   far I've been answering that I'm either the managing

3   partner or the hundred percent owner.

4        Q    Who would know that answer definitively as --

5        A    Interrogatory to us, just like we've given

6   you hundreds of other answers and document requests

7   and stuff.  I'm sure there's somebody in the company

8   that can pull it up in ten seconds, who is West Coast

9   Investors?  It might be a d/b/a even.

10       Q    Okay.  Look at the first paragraph, that

11  first numbered paragraph there.  It says, "West Coast

12  Investors, LLC is a Florida limited liability company

13  that transacts business in St. Lucie County, Florida

14  and throughout the State of Florida and is the

15  assignee of certain loans made by Palm Beach Polo,

16  Inc., Polo, to Robert Matthews and/or Maria S.

17  Matthews and is the claimant for unauthorized use of

18  credit card and monies lent.  The assignment agreement

19  is attached here to as Exhibit 1."

20            Are you the owner of Palm Beach Polo, Inc.?

21       A    Yeah, I'm definitely in Palm Beach Polo, Inc.

22       Q    Now, in that paragraph it refers to

23  unauthorized use of credit cards.

24            Are you saying that Robert Matthews used your

25  credit cards in an unauthorized way?

Page 182

1       A    I don't know, I don't know.  This was made up

2   by some attorney up in St. Lucie County, so he

3   probably put it together based on talking to somebody

4   else down here.  I don't --

5       Q    So you don't remember -- I'm sorry, go ahead.

6       A    I don't remember them using a credit card,

7   but they obviously did some research and maybe they

8   came with up it or assumed they did.  That's a

9   different case.

10      Q    Okay.  So as you sit here today, you don't

11  know one way or another as to whether or not Bob

12  Matthews used your credit cards in an unauthorized

13  manner, do you?

14      A    Not in my capacity.  I've said I'm the person

15  with the most knowledge, but not all knowledge.  So

16  there's a good answer to you.  Somebody in this

17  company would know to give it to that attorney, that

18  they did or did not use the credit card.  I'm not

19  going to say that they did or they didn't.  It's a

20  claim that they brought about for that particular

21  suit.

22      Q    Well, you testified a littler earlier that

23  you gave Mia Matthews use of your credit card for, and

24  I believe this was your testimony, anything for some

25  period of time.

Page 183

1      A    No, I didn't say that.  I said for emergency.

2  That's all I said.

3      Q    Okay.  Did she ever --

4           MR. SALAZAR:  Object to form.

5  BY MR. GEORGE:

6      Q    Did Mia Matthews ever use your credit cards

7  in an unauthorized way?

8      A    Not that I know of.

9           MR. SALAZAR:  Object to form.

10          THE WITNESS:  Somebody said something about a

11  $50 -- no, that wasn't even it -- a $50 haircut.  I

12  said girls don't get a haircut cut for $50.  It

13  must've been Bob, and I don't think it was my credit

14  card.  I think it was where you guys were picking

15  apart Bob's breakdown for his companies or something,

16  expenses that are approved for his company.  We all

17  laughed that about, women don't get their hair cut for

18  50 bucks.

19  BY MR. GEORGE:

20     Q    And Paragraph 2 of that complaint, it's on

21  Page 2, it's plead here that, "On information and

22  belief both Robert V. Matthews and Maria S. Matthews

23  have a pattern and practice of falsely and

24  fraudulently making false and misleading statements

25  for their own personal benefits, such as is alleged in

Page 184

1    a certain case in the United States District Court,

2    Southern District of Florida, 16-CV-818171 that Maria

3    S. Matthews stole several million dollars of EB-5

4    foreign investors' money to purchase for her personal

5    use and benefit a 150-foot yacht, which they named the

6    vessel Alibi."

7         Do you have personal knowledge of a pattern

8    and practice of falsely and fraudulently -- I'm sorry,

9    of false and misleading statements made by the

10   Matthews for their own personal benefit?

11       A    I believe that so many people are saying the

12   world is circular, I would start believing that,

13   because I never ran around the world and looked to see

14   if the world is round or flat, so if enough people

15   tell me that, geologists and schools and education.

16   The same thing, I heard so much that they bought a

17   yacht and I'm in the yachting business, and I'm saying

18   to myself, are you kidding me, why would they buy a

19   yacht, when they're having -- don't even have the

20   facility to run it, and I heard their story was,

21   because they were going to do promotions on it.  I

22   said, go lease a lot (sic), to myself, I said, go

23   lease a yacht.  They don't have to own a yacht, but

24   more practice to them, if they can get away with this

25   kind of stuff, whom am I to care.  As long as we get

1    paid, I don't care.  I'm a collateral lender.

2        Q    Well, didn't you, in fact, talk to Maria

3    Matthews about the yacht and --

4        A    Never, never.

5        Q    You never --

6        A    Never --

7            MR. SALAZAR:  Let him finish the question.

8    BY MR. GEORGE:

9        Q    -- texted her about it?

10       A    No.  Texted her about it?  Afterwards, yeah,

11   after I heard the story.  I like to hear their side of

12   story, why would it be.  So the fact that they talked

13   to me beforehand, no way.  All the sudden, I don't

14   know if it was six months or a year later, I hear that

15   they sold a yacht, and I'm saying, how did they get a

16   yacht to sell a yacht?  And that's where I understand

17   they got the $3 million in the bank or $2 million in

18   bank to spend for all this -- fighting the state court

19   action.

20       Q    Didn't you tell her that you thought she was

21   a clever girl, because she figured out a way to get a

22   yacht to replace their old yacht?

23       A    Yeah, that's very mind teasing, yeah, that

24   probably sounds like me, but I don't know, show me

25   where I said that.  I would probably say it today.

1   She's pretty clever.  I told them, the FBI, I said,

2   "Hey, guys, I think she's an instigator" -- or not an

3   instigator -- "I think she's a ring leader," because

4   she seems to know everything.  She's got everything in

5   her name, more power to women.

6       Q    That paragraph goes on to say, "It's been

7   alleged that additional EB-5 investors' money was

8   taken by Robert V. Matthews in the amount of

9   approximately $6 million to pay Deutsche Bank to avoid

10  imminent foreclosure on the multi-million-dollar ocean

11  front residence, in which Robert Matthews and Maria S.

12  Matthews reside in the State of Florida."

13          What do you know about that?

14      A    I don't know what you're reading.  I got

15  distracted from everybody walking behind you.

16          Something about Deutsche Bank I heard, so our

17  attorney must have put this together, to where he

18  talked to some of the Craig Galles of the world, read

19  the different things that Larry Zink sent him, talked

20  to Larry Zink, because he's in the charge of the suit

21  that you're suing for damages.  Everybody's got five

22  suits against us right now, so we just sit back and

23  try to get our documents in, try to have you guys

24  waste your money and waste your time, and we're gonna

25  see who comes out on top, so --

1    Q   Did you ever talk to Mia Matthews about her

2    and her husband using $6 million of EB-5 investment

3    money?

4    A   No, I never talked to them, but you can read

5    it in all the newspapers, and newspapers, people

6    sending them from Connecticut.  I sold -- or I didn't

7    sell.  I leased part of casino hotel, 2,000 rooms, to

8    Bob Lendino (phonetic), very close to Nick Laudano,

9    very close to the spelling, from Connecticut and he

10   sends me all the articles up in that area, and so I

11   read all these articles coming in.  That's where I get

12   all this information, and those guys talk to lawyers

13   and talk to newspapers.  So I get all this information

14   about somebody accused the Matthews -- where in the

15   hell did they come up with $6 million, sorry, again,

16   for swearing, hell.  But they took it from their

17   source of money -- they took it from sources of money

18   that was supposed to be financing the project, and so

19   I'm -- I've heard that, and I never talk with Bob and

20   Mia about it.  It's always in the newspaper.

21   Q   Isn't it true that on August 30, 2013, you

22   sold your interests in 160 Royal Palm, LLC to Robert

23   Matthews, such that he became the owner again of the

24   Palm House Hotel?

25             MR. SALAZAR:  Object to form.

Page 188

1          THE WITNESS:  I don't know now that I sold it

2    to him or her, to some company.  What date was this?

3          MR. GEORGE:  August 30, 2013.

4          MR. SALAZAR:  Renew the objection.

5          THE WITNESS:  I think that was the -- maybe

6    that was a second contract, or it seems like there was

7    two contracts.  One was we sold them the interest in a

8    company that had 160, so that's a better way to ask me

9    a question, as opposed to trying to mislead me,

10   because, hey guys, I've been going on for six hours

11   now and got the flu.  I'm sitting in the sun.  You

12   guys are sitting in the shade.  So go ahead.

13         MR. SALAZAR:  Yeah, I was going to ask.

14         Is now a good time -- we've been going for

15   about an hour and a half or so, and it is really

16   oppressive on this side.  I understand we asked to

17   come here, but I would love to walk outside a little

18   bit, if you're okay doing that.

19         MR. GEORGE:  I'm happy to take a break, and

20   I'm more than happy to switch seats.  The sun doesn't

21   bother me, so if that makes things easier for

22   Mr. Straub we can that too.

23         (Thereupon, a 20-minute recess was taken.)

24   BY MR. GEORGE:

25      Q   All right.  Go back on the record, please.

Page 189

1          Mr. Straub, are you familiar with a company

2   called Palm Beach Reality Holdings that was owned by

3   Bob Matthews?

4       A   No, never heard of it.

5       Q   Are you aware of the fact that that entity

6   also went through bankruptcy?

7       A   No, didn't know.

8       Q   Did you ever file a claim on behalf of your

9   companies in that bankruptcy?

10      A   Not that I know of.

11      Q   Did you ever buy any judgments through any of

12  your companies that then filed a claim in that

13  bankruptcy?

14      A   No.

15          (Thereupon, a document was marked as Exhibit

16  No. 11 for identification.)

17          MR. SALAZAR:  Thank you.

18  BY MR. GEORGE:

19      Q   Mr. Straub, I'm showing you what's been

20  marked as Exhibit 11 to your deposition.  It's dated

21  March 17, 2014.  It is a letter to the U.S. C.I.S.,

22  Attention, EB-5 RC proposal, and the regarding section

23  is Response to RFE for Sark -- (phonetic) O-F -- I'm

24  sorry, Sark 04-001, and then a name that I'm not going

25  to read.  It's Bates labeled Robert Matthews 007553

Page 190

1    through 07556.

2         Have you ever seen this document before, sir?

3    A    No.

4    Q    Please turn to Bates labeled 7555.

5    A    Go ahead.

6    Q    I want to direct you to Paragraph 5 of that

7    document, and it's entitled Property History and

8    Ownership, and I would ask you to take whatever amount

9    of time you need to read Paragraph 5, so that I can

10   ask you some questions about it.

11   A    I'm reading five only, is that the one?

12   Q    Yes, sir.

13   A    Okay.  Go ahead.

14   Q    So if you start at the first sentence of that

15   paragraph which says, "Royal 160, LLC (owned by

16   current developer, Robert Matthews) purchased the

17   property for $29 million in August 2006 and carried a

18   mortgage on the property."

19        Is that a true statement?

20   A    I don't know who Royal 160, LLC is, most

21   likely our company, owned by the current developer,

22   no.  No.  No, you got different time lines, and

23   purchased the property for 29 million in 2006, carried

24   a mortgage.  Who carried a mortgage?  And purchased

25   the property for 29 -- in August and carried a

1    mortgage on the property.  So I don't understand

2    Paragraph 1.

3        Q    Okay.  Just so you don't think I'm trying to

4    confuse you, I'll make some representations to you.

5    The first entity you see there, Royal 160, LLC was Bob

6    Matthews' entity --

7        A    Okay.

8        Q    -- your entity is 160 Royal Palm, LLC?

9        A    Okay.

10       Q    So the first sentence is saying that Bob

11   Matthews' entity purchased the Palm House Hotel for

12   $29 million in August 2006 and carried a mortgage on

13   the property.

14            Do you know whether that's a true statement?

15       A    No, he didn't.  I think he signed a

16   contract or something, or there was something, because

17   obviously he didn't buy it.  He had a contract and

18   didn't pay for it, and we had to kick him out of there

19   after so long, and then we had other people that

20   wanted to pay the same amount of money, you know, and

21   it went to Phase II.  So this is all totally wrong.

22       Q    Okay.  Let's look at the second paragraph, it

23   says, "In 2009 due to the housing and economic

24   downturn, Royal 160, LLC enlisted the help of a

25   business associate to buy out the note on the property

1    in a 'friendly deal,' wherein construction could

2    continue on the property, and Robert Matthews could

3    repurchase the property once economic conditions

4    improved."

5            Is that a true statement?

6        A    No, nothing close to it.  I don't know that

7    there's any agreements we have with him.  I went and

8    put $18 million in that place, lived over there, and,

9    you know, so none of that -- we didn't -- I don't know

10   if it was the economic downturn.  I just go along and

11   do what I have to do, and it's -- whoever this

12   associate is, business association, to buyout the

13   note?  There's s contract.  I sell it to somebody.  I

14   had other people, they were going to pay me, I think,

15   the same amount of money, and we had the name of the

16   company, we had the contract, we had them signed, and

17   I gave Bob the opportunity -- without going back and

18   bumping that guy and then bumping Bob, I just went and

19   said, Bob had some familiarity with the project, so he

20   got selected, instead of Minsky (phonetic) or

21   something like that.  I'd have to look at the contract

22   name.  They're out of Miami.  They were going to buy

23   the property for the 30 -- it's very close to the same

24   amount of money.  In other words, I went back and

25   forth, because they came out of the woodwork, and I

1    had to make that decision, after I put $18 million in
2    the property, after they had put $14 million in the
3    property, and I foreclosed it and got -- they put a
4    roof -- when I came in, they had -- the roof was
5    redone, they had everything done to the property as
6    far as the nine or ten -- I don't know, I said 14
7    million.  Let's just say it was nine or $10 million.
8    I saw that they improved the property on the first
9    guys, I think it was Braverman, was the people we
10   brought from.
11       Q   Okay.  So --
12       A   He cried, but, you know, he had to take a
13   loss.
14           MR. LANDAU:  I apologize, I didn't hear what
15   you --
16           THE WITNESS:  He cried.
17           MR. LANDAU:  No.  Did you say Minsky?
18           THE WITNESS:  Yeah, I'll get you the company,
19   get you the name.  There's a copy of the contract.  We
20   have to dig it out.
21   BY MR. GEORGE:
22       Q   So isn't it true that in 2019  --
23       A   '19?
24       Q   I'm sorry, 2009, the Palm House Hotel
25   property was going into foreclosure and that's when

1   you came in and bought the property at a foreclosure

2   sale?

3      A    I could probably pull out a time line that as

4   long as you don't get copies of, because I have pencil

5   marks all over the stuff.  Instead of just going

6   memory on every damn thing, I can probably pull a time

7   line out and tell when our boys -- because you can

8   see, I'm not involved with the everyday business.  I'm

9   the person with the most knowledge, but not the person

10  with all knowledge.  People do other kind of things.

11  I can give you time lines, if it was 2009, 2010,

12  September March.  I can give you the exact time

13  periods.  So we'd have to stipulate to -- that you're

14  not going to take my time line.

15          MR. SALAZAR:  I don't think we dispute -- if

16  you want to state it as a fact and move on to some

17  other questions --

18          MR. LANDAU:  No, actually, Lou, I mean, that

19  would be something we would have asked for in

20  discovery.

21          MR. SALAZAR:  No, it's not --

22          THE WITNESS:  It's just made up.

23          MR. SALAZAR:  Right.  It's an attorney/client

24  communication with my client.

25          MR. LANDAU:  No.  Why would it be privileged,

Page 195

1  a time line?

2          THE WITNESS:  It was just made up yesterday,

3  last night.

4          MR. LANDAU:  Oh, I'm sorry.  Okay.

5          (Thereupon, a document was marked as Exhibit

6  No. 12 for identification, during which there was a

7  discussion off the record between Mr. Salazar and the

8  witness.)

9  BY MR. GEORGE:

10    Q   Mr. Straub, I've shown you what's been marked

11  as Exhibit 12 in your deposition, and that is a

12  certificate of title that is dated October 26, 2009,

13  and it was recorded -- if you look at the top there,

14  it was recorded in OR Book 23506 Page 1148 on October

15  2, 2009.  Now, if you go down, it says that the

16  property was sold to 160 Royal Palm, LLC, whose

17  address is 11198 Polo Club Road, Wellington, Florida

18  33414 and that sale took place on September 17, 2009.

19          Does that refresh your recollection as to

20  when you acquired the property?

21    A   No, you're -- the question before that was

22  the next level of purchases back and forth between

23  Matthews and me.

24    Q   It actually wasn't, but let's talk about

25  this.

Page 196

1          Does this certificate of title --

2     A    You're starting all over again?  We'll start

3 all over again.

4     Q    Does this certificate of title reflect when

5 160 Royal Palm, LLC acquired the Palm House Hotel out

6 of foreclose in 2009?

7     A    I don't know what the procedure is.  All I

8 know is that I bought their note, and then we

9 proceeded with the foreclosure, and this might be the

10 time period.  So that's what I'm saying, you're making

11 me guess as to when -- I think I remember this 11 --

12 1/11 debt is the Braverman people that had it before,

13 that when Bob and those guys spent eight to $10

14 million on the property -- because when I walked in,

15 there was a lot of new stuff.  They gutted the whole

16 property.  They did -- there were millions and

17 millions of dollars spent on the property.  So I

18 bought the note for ten -- you guys always say ten

19 million.  It's ten million two-fifty, I think it is,

20 and I bought whatever I bought from them, the note,

21 probably, and then followed the foreclosure, and I

22 eventually got the property out from the courthouse on

23 an auction, that that's how it went down on the first

24 guy.

25     Q    Do you see on the side of this paper here

1   there's some numbers written down, and it says $10

2   million and underneath that it says $70,000.70?

3        A    Mm-hmm.

4        Q    Does that refresh your recollection as to how

5   much you paid at the auction for this property?

6        A    No.  To me it was ten million two-fifty.

7   Somebody brought up something about 70,000, but I

8   think that was, like, closing costs or something, and

9   so maybe there's some bills outstanding.  I don't know

10  what it was.  I think it was ten million two-fifty.

11       Q    Now, isn't it true that Bob Matthews

12  approached you and asked you to buy this property out

13  of foreclosure, so that he could eventually buy it

14  back from you?

15       A    No, the last part of your sentence is

16  completely wrong, so he can buy it back from me.  How

17  could he buy it back if he's losing it the first time?

18  I'm buying a piece of property, period.  That's what I

19  tell everybody.  Guys, don't tie me down to something

20  to the future.  It's only what I do now, and so if you

21  want to come to me at any time, because I own

22  something -- I tell that to hundreds of people.  You

23  can buy that piece property behind your back, and you

24  come up -- I don't have time to appraise every one of

25  my hundreds and hundreds of properties.  So if you

1    want to come to me, then I'll take the time, and I
2    want to see earnest money before you do it.  I told
3    Bob the same thing.  So there's no, "Oh, yeah, Bob,
4    I'm just gonna be -- I'm just gonna buy this property,
5    and I'm gonna let you buy it from me," I'm not -- it's
6    not going to happen.
7            So give me the option.  It's called an
8    option.  So show me the option that I've done that.
9    People pay me $2 million a month for options, and I've
10   got that for eight months in a row from some people.
11   I go down as low as $35,000 a month on just people --
12   a piece of property across the street for four months.
13   I make everybody pay for options.
14       Q    Okay.  But did Bob Matthews approach you and
15   ask you to buy this hotel out of foreclosure?
16       A    No, I don't know if he did or not.  I don't
17   know.  I probably read enough in the newspaper, and he
18   might have said I'm more of the gentlemen to maybe
19   complete the property, compared to whoever else he was
20   borrowing his money from.
21       Q    Didn't you attend the auction of this
22   property yourself personally?
23       A    Oh, I'm sure I did.
24       Q    And weren't you sitting actually with Bob
25   Matthews when the property was being sold at auction?

1    A    Yeah, he said -- he always has a joke, and so

2   it could be that I could have sat with him.  I don't

3   know.

4    Q    And weren't the two of you, during that

5   auction, talking about how much you should pay for it?

6    A    Sorry, no, don't say that.  Hell no, he don't

7   control me.

8    Q    Now, going back to Exhibit 11, Paragraph 5,

9   the next sentence says, so we read that, it said, "In

10  2009, 160 Royal Palm, LLC, owned by Matthews' business

11  associate, Glenn Straub, purchased the note for

12  $10,100,000 and gained ownership of the property."

13          Now, aside from whether you paid 10,100,000

14  or $10,250,000 that sentence is true, isn't it?

15   A    No, nothing is true in that, because he's not

16  a business associate of mine, so the whole -- whoever

17  made this form -- is it a government form or

18  something?  South Atlantic Regional Center.  I don't

19  know who is making all this stuff.  Get them over here

20  and let them -- it's like tell me about false news

21  from what Trump is so mad about, people print things.

22   Q    So prior to this transaction you never had

23  any business dealings with Bob Matthews?

24   A    He's never been an associate of mine.  I

25  wouldn't be around Bob.  Why would I have somebody

Page 200

1   who's got a foreclosure on theirselve?  We have a

2   clean record here, debt free, owe nobody, take on

3   projects and we complete them.  Show me one bankruptcy

4   I've gone through.  Nothing.

5       Q    Now, the next sentence says, "Under Matthews'

6   guidance and direction construction continued on the

7   property."  Is that a true statement?

8       A    No, he don't know anything about

9   construction.  I forgot more than he knows.  I forgot

10  more than he even knows.  So why would I ever go to

11  him to do any construction.  I was there.  I ran the

12  project.  I'm the person with the knowledge.  I got,

13  at that time, 25 years of knowledge of construction

14  businesses.

15      Q    Did Mr. Matthews after 2009, while you owned

16  the property, have anything to do with the

17  construction at the hotel property?

18      A    He knows nothing about construction, nothing.

19  I would get that from me talking to an architect,

20  talking to an engineer, talking to my knowledge, to my

21  people.  Hey, I probably put my people in that thing

22  for -- I probably have seven or $8 million worth of my

23  people working on that project, people that I trust.

24      Q    Did you allow Mr. Matthews to have a key to

25  the project after you bought it?

1        A    A key?

2        Q    Yeah, so he could --

3        A    I don't know what you mean by key.  I don't

4   know if we had keys.  I mean, it's a construction

5   project.  It's opened to everybody.  We had a night

6   watchman, is probably more of a question.  Was he

7   allowed on property?  Well, Bob could have come on

8   property.  He was a salesman.  He would try to come up

9   with people that he was talking with.  That's one of

10  the reasons I've already testifying that he had

11  knowledge of who -- customers might go ahead and buy

12  or lease or whatever it may be.  He had that

13  knowledge, and it turned out he didn't have anything.

14  He didn't have any knowledge.  It took me ten years to

15  figure that or eight years to figure out that the guy

16  knows nothing.  He's a salesman.

17       Q    Okay.

18       A    He doesn't have any experience whatsoever in

19  construction.

20       Q    So back then in 2009, once you took the

21  property over, you had concluded that he didn't really

22  have the wherewithal to finish construction on the

23  property, because he didn't know anything about --

24       A    I never got involved with him.  The fact that

25  he's hanging out over there -- I can hang -- I had a

Page 202

1   lot of people hanging out, that they are going to come

2   in and work on the spa, then we decided no spa.  That

3   guy down there forgot more stuff than what Bob

4   Matthews knows.

5        Q    You're pointing to Mr. Carry Glickstein?

6        A    Yeah.

7        Q    So I'm just asking you, you had no confidence

8   that he could complete the project?

9        A    Well, they're saying that he was an associate

10  and that I used him in any way or shape or form, no,

11  he knew nothing.  I was dealing with diamonds with

12  him.  These people come in there some day after the

13  sale occurred, some woman came in with a boxload of

14  diamonds, and I was sitting there next to him waiting

15  to get in to see Nick, I think it was.  Nick knows a

16  little bit about construction.  He's not GC, but I

17  think his girlfriend is a GC.

18       Q    As you sit here today, do you still think Bob

19  Matthews knows nothing about construction?

20       A    Hundred percent, knows nothing about

21  construction.

22       Q    So why did you sell the hotel back to him and

23  leave it in his --

24       A    Because you don't need to --

25       Q    -- hands to complete it?

1      A    -- know about -- if you're a salesman, you

2  can sell things.  He can go out and raise money, do

3  whatever he wants to do.  All I know is that, you

4  bring me money, I'm a collateral lender, so I'll let

5  people walk in the door.  So you want to buy my car

6  outside, I'll tell you what, you come in with two

7  dollars for the dollar you're trying to borrow from

8  me, put 33% down or as low as 20%, I'll sell it to

9  you, and I'll probably get it back.  That's usually

10  what ends up happening with some of those things.

11  But, you know, it is what it is.  I make money on

12  people.

13      Q    Was --

14      A    Somebody like your clients, that's foolish

15  enough to give people money, wow, they better do some

16  better due diligence.  You weren't the attorney for

17  them.

18      Q    When you say "my clients," you mean the EB-5

19  investors?

20      A    Yeah.  The EB-5 guys, they come in someplace,

21  as I found out later on.

22      Q    And you just think they were foolish?

23      A    Oh, I positively read their pamphlet, what do

24  you guys call the flyer --

25      Q    The brochure --

1      A   -- brochure or something.

2      Q   -- you're referring to a brochure?

3      A   I finally got a copy of that thing here about

4  six months or so, and I said, "Guys, I'm not going to

5  read it," because I wouldn't be able to read it

6  anyway.  But one of my attorneys, I think one is in

7  the office over here, Alex, that works on the state

8  case, worked on the state foreclosure sale.

9          MR. SALAZAR:  Don't share the communications

10  you had with him.  They're privileged.

11          THE WITNESS:  Okay.  I just told him, "You,

12  read it," and he gets back with me.

13  BY MR. GEORGE:

14      Q   And you concluded, based upon whatever

15  analysis you did, that my clients were just foolish,

16  and that's why they were taken advantage of?

17      A   Well, I'll tell you, I'll battle you guys

18  until hell freezes over.  The attorneys, the people,

19  they wanted a passport.  That's all they wanted.  I'm

20  savvy.  I hire people all the time in and out of

21  countries and stuff.  They wanted to come in here, and

22  it was a gift, and they should've got it out of the

23  way.  And if they gave 41 million, they should have

24  gave 82 million to get a passport, them and their

25  families.  I've never seen that happen.  That's why

1    the government finally grew up and decided that was

2    too good of a deal for them.  Yeah, so everybody was

3    dumb not to put that deal together.

4         Q    So they were --

5         A    But I didn't find out about it until after

6    the thing starting blowing up, and I started saying,

7    phew, where do I go for these people that got the

8    money into this project?

9         Q    So they were dumb?

10        A    Oh, a hundred percent.

11        Q    So they deserved --

12        A    Foolish, foolish and dumb.

13        Q    -- to have their money taken from them?

14        A    No, I don't care about what they did that

15   way.  I'm saying to them, in business, if you get

16   yourself in trouble, you get yourself in trouble.  I'm

17   not going to put them there.  If people put them

18   there, they should go to jail.

19        Q    After --

20        A    And their advisors, just like, what was the

21   guy that went to prison, it was -- and they went back

22   after John -- or Goodman over here in town, lost $600

23   million, it was Murray Goodman, was Madoff.  They

24   should go after the Madoff people, the people behind

25   the scenes.

1        Q    After you bought the property in 2009, did

2   Nicholas Laudano of NJL Development manage the hotel

3   for you?

4             THE WITNESS:  Do me a favor write that down,

5   who are the people --

6             MR. SALAZAR:  Sure.

7             THE WITNESS:  -- that advised his clients.

8   They should go after those people.

9             MR. SALAZAR:  Got it.

10            THE WITNESS:  Like the Madoff people.

11            Go ahead.

12            MR. GEORGE:  Can you read it back, please.

13            (Thereupon, the question referred to was read

14   back by the court reporter as recorded above.)

15            THE WITNESS:  No.

16  BY MR. GEORGE:

17       Q    Was he the construction manager at the hotel

18   for you?

19       A    No, he wasn't a construction manager.  He

20   advised me.  I had him under some form of

21   compensation.  He was -- would take work at my

22   discretion, if I needed something, because he, before

23   that, had spent six or $8 million, and so he was the

24   person with the most knowledge of it.  Just like Bob

25   was the person with the most knowledge of it at that

1   time as to who these customers could be.  So I hire

2   people on a day-to-day basis, and that's what -- they

3   have no contracts with me or anything else, so I paid

4   them, probably gave them a 1099 for giving me

5   knowledge, and I start I finding out Bob knows

6   nothing.

7        Q    Okay.  Did --

8        A    They never -- there never was any kind of

9   obligation on my part or manager or anything like

10  that.  Nick had some construction people, and he had

11  an AIA contract he had given, which was a joke, $36

12  million or something.  I think we sold an AIA contract

13  that they were running it through him, and he's not a

14  general contractor.  His girlfriend is the general

15  contractor, and -- she's so sharp, but I don't even

16  know how much construction she even knew, because she

17  was sleeping with him.

18       Q    So could you give me a sense of how much work

19  he actually did for you on the hotel once you bought

20  it out of foreclosure?

21       A    Him?

22       Q    Nicholas Laudano or his company.

23            How much work he did for you once you bought

24  the hotel?

25       A    No.  He did all the work after Bob took it

1   back over again.  He had some bigger -- I saw a four

2   or $5 million AIA project that they still owe him

3   money on, and for me, he was just there for answering

4   questions and would he hire me some -- I think his

5   employees.  I remember two of their guys' name.  He

6   only had, like, two or three employees, and I didn't

7   even think they had -- Gino was one of them.  He

8   doesn't have a license.  He's not a citizen, and so

9   Nick had those kind of people working for him.  I

10  said, "Are they covered if they fall off the roof," or

11  something like that, and all he was was

12  subcontractors, so -- for, like, what was it?  I was

13  over there three or four years.  So how far was he

14  during my reign?  He was around to go ahead and do

15  things that I needed to have him -- I'd say, "Go get

16  three quotes and roofing material," I'm the guy that

17  was running the project.

18      Q   Were you acting as the general contractor at

19  the project?

20      A   No, no, not to be acting as general

21  contractor.  You don't need to be a general

22  contractor.  The city approved whoever it was to go

23  ahead and work.  They inspected us every day.  We had

24  to go through the architects.  They hired architects

25  and everything else.  Those are the people that dealt

Page 209

1    with being the accreditation for the city.

2        Q    Who was the general contractor at the project

3    while you owned it?

4        A    Don't know.  I don't know.  I don't know that

5    we had one, other than what was there before.  It

6    wasn't Bob Matthews.  That's for sure.

7        Q    Who would know the answer to that question?

8        A    I don't know, you have to do your research.

9    I'm not going to help you.  Go to the city and find

10   out from the city, who were the GCs?  You probably --

11   Nick Laudano's girlfriend might have been the GC from

12   before.  That's a guess.  That's a wild guess.  And I

13   don't know if they really required it.  They'll tell

14   you, "Oh, yeah, we always had this person," but the

15   cities do that all the time.  They just want the

16   project done, and then they got into that, "Oh, you

17   gotta get it done by a certain time."  We went to the

18   governor, and the governor gave us two more years

19   extension, so they ran a fine up that they didn't even

20   -- they couldn't even collect, because they didn't

21   know that the governor has -- supercedes their

22   authority on time extensions.

23       Q    Does someone within your organization --

24       A    You guys must be having fun taking -- hearing

25   all this stuff.  I know you heard your own stories,

1  but it's kind of fun to look at your eyes and you kind
2  of look through me and saying "Oh, shit, where did" --
3          MR. SALAZAR:  Language.
4          THE WITNESS:  There's a real story.
5          MR. GEORGE:  Motion to strike.
6  BY MR. GEORGE:
7      Q   Does someone within your organization have
8  records as to who your general contractor was --
9      A   No, we don't --
10     Q   -- when you owned the property?
11     A   -- do that, we don't -- that's not our -- the
12  city has to determine that.  It's some credential the
13  city has to have.  I don't have to have that.  I know
14  me, and I know I can build that building upside down.
15     Q   And, in fact, you spoke about the Town of
16  Palm Beach.
17         There was a multi-million-dollar fine levied
18  by the town, wasn't there?
19     A   It wasn't no fine.
20         MR. SALAZAR:  Object to form.
21         MR. GEORGE:  What was it?
22         THE WITNESS:  I just told you the
23  explanation, the governor gave us an extension, not
24  the fine that they gave.
25  BY MR. GEORGE:

1    Q    But there was a fine that the town --

2    A    No, no, no, they didn't fine us, because we

3  didn't recognize it.  You can't fine somebody when I

4  have authority from the governor to extend it by two

5  years.

6    Q    I'm not saying whether you recognized it or

7  what you did with the governor.

8         I'm saying, isn't it true that the Town of

9  Palm Beach actually levied a $2,000 a day fine,

10  because that hotel wasn't --

11    A    My answer --

12    Q    completed  --

13    A    -- my answer --

14    Q    -- on time?

15    A    -- my answer is that they tried to --

16    Q    Okay.

17    A    -- without listening to our side of the

18  story.  They just was trying to put a pressure on us,

19  keep working on the project, so they tried --

20    Q    Okay.  So what amount --

21    A    -- and I had a little problem with the city

22  over there, because they didn't like the idea of

23  somebody said, "Well, they got a $2,000 fine."  You

24  saw they just got it settled for not even ten cents on

25  the dollar, by just walking in.  That guy is pretty

Page 212

1    sharp down there.  He went in talked to probably the

2    mayor or somebody, I'll depose him and find out who he

3    walked in and saw.  They reduce it from three or $4

4    million or something down to 250,000.  So that's how

5    credible it was.  It wasn't even worth the time, and

6    that's after the two years ran for the -- two years

7    for the time extension.  So the $2,000 a day, and then

8    somebody got a stay on the thing, but he was sharp

9    enough to tell them, legally you don't win on those

10   things, so -- Wellington is the same way.

11       Q   So whether you acknowledge it or not, the

12   Town of Palm Beach claimed that they had a

13   multi-million dollar fine against the property because

14   of the fact that it wasn't finished on time, correct?

15       A   They didn't --

16           MR. SALAZAR:  Object to form.

17           THE WITNESS:  -- sue us.  They didn't put a

18   lien on it.

19   BY MR. GEORGE:

20       Q   That's not what I'm asking, sir.

21       A   Well, I don't care.  I'm not a --

22       Q   I'm asking you whether or not it was there.

23       A   It's a legal question.

24       Q   No, it's not --

25       A   Yes, it is.

1    Q    -- it's a factual question.

2    A    No, it's not factual.  I don't know -- they

3  didn't talk to me.  They talked to my lawyers, so if

4  they did say those things -- I read things in the

5  newspaper all the time that they were -- they're gonna

6  make us work harder.  Hey, we're working around the

7  clock.

8    Q    When you sold your interest in 160 to Royal

9  Palm, LLC, didn't you, in fact, agree to pay those

10  fines and escrow monies for their payment?

11        MR. SALAZAR:  Object to form.

12        THE WITNESS:  I'd have to pull out the

13  contract and see what it is.  We escrowed everything I

14  think, anything that was pending.

15  BY MR. GEORGE:

16    Q    Didn't you actually sue the Town of Palm

17  Beach with respect to those fines?

18    A    Probably did.

19    Q    Did you win?

20    A    I don't think anybody ever came to the trial.

21  I think it's still sitting there.  It's one of those

22  real lengthy things that never happened.  I got one

23  that's 13 years old right now.  Judicial system in

24  Broward and Palm Beach County is not the fastest,

25  obviously, look how long it took for the foreclosure,

Page 214

1    whew.

2              THE WITNESS:  Did you put that down,

3    "Obviously, look how long it took on the foreclosure"?

4              THE COURT REPORTER:  Yes.

5              MR. GEORGE:  Move to strike.  There's not a

6    pending question.

7              THE WITNESS:  No, that was an answer to the

8    previous question.  You guys don't like the answers.

9              MR. GEORGE:  Actually I really like your

10   answers, sir.

11             THE WITNESS:  Okay.  That's a challenge.

12   Tell you what, rip up that settlement proposal.

13   That's crazy.  I spent all that time last night.  Rip

14   the friggin' thing up.  I get an attitude like this,

15   I'll tell you what it's all about.  Seriously rip it

16   up.

17             MR. SALAZAR:  Okay.

18             (Thereupon, a document was marked as Exhibit

19   No. 13 for identification.)

20   BY MR. GEORGE:

21     Q   Mr. Straub, I'm showing you what's been

22   marked as Exhibit 18 -- I'm sorry, 13 to your

23   deposition, which for the record is a Florida Real

24   Estate Mortgage, Assignment of Leases and Rents, and

25   Security Agreement, which was recorded on March 28,

Page 215

1    2014 between 160 Royal Palm, LLC as the mortgagor and

2    KK-PB Financial, LLC as the mortgagee.

3         Do you recognize that document?

4    A    No, no, I wouldn't -- I don't get involved

5    with any of the paperwork.

6    Q    Never seen this --

7    A    No, even in this litigation, I don't get

8    involved with that detail.

9    Q    Okay.  If you look at the first paragraph

10   under the title of the document, it says, "The Florida

11   Real Estate Mortgage, Assignment of Leases and Rents,

12   and Security Agreement, the Mortgage, is made and

13   entered into as of the 30th of August 2013."

14        Do you see that?

15   A    Yes.

16   Q    Isn't it true that the closing of this

17   transaction took place on August 30, 2013?

18   A    Not looking at this paper, just what I can

19   remember of my boiler -- or my time -- time sheets or

20   time references when we filled them out is around

21   August of 2013 that there was -- the closing occurred.

22   So if that's what this piece of paper says, so be it.

23   I don't know what pieces of paper -- the lawyers take

24   care of this stuff, and it's signed by some guy that

25   wasn't even -- I think he's a one percent owner of the

Page 216

1  company, Black, it looks like, that nobody has

2  recognized him as being even the person of authority.

3      Q   When you're talking about the signatures, if

4  you turn to the last page on the document, under

5  mortgagor, where it says "160 Royal Palm, LLC," the

6  signature under that document, it says, "Ryan Black,

7  by Leslie Robert Evans, Power of Attorney."

8          Is that the signature that you were referring

9  to?

10     A   Yeah.

11     Q   So that's actually signed by Leslie Robert

12  Evans and not Ryan Black?

13     A   I guess that's the way you want to interpret

14  it, but I'm not a lawyer, so I don't know, but I do

15  know that the sale occurred around August of 2013, and

16  I don't know who the people and power of attorney and

17  what the company was or anything else that this guy

18  named Black must have been an officer, I don't know.

19  Bob was pretty cute.  He never had his name on

20  anything, you know, so it looks like Bob did another

21  cute thing.

22     Q   Were you physically at this closing?

23     A   No.

24     Q   Who was there on your behalf, if anyone?

25     A   Don't know, probably Craig.

1      Q    Craig Galle?

2      A    Probably.  I don't know.  Could have been any

3  one of our officers or an assigned officer.  Maybe

4  there's not a type of closing that way, you know,

5  might not meet together, unless there's a stack of

6  money on the table, we would have got a check, and

7  they would have had that, but whoever it was, was.

8      Q    And do you know Les Evans?

9      A    No.  I think I might have met him one time, I

10 don't know.  I understood he had a pretty good

11 reputation before, because he was, I thought, involved

12 with Huizenga or something to do with Miami and the

13 Dolphins or something, but that's just hearsay.

14     Q    But do you know him to be an attorney?

15     A    Les Evans, yeah, I think he's an attorney,

16 but I don't know.  Maybe you're questioning that.

17 Man, I better write that down, if you're telling me he

18 might not be an attorney.  I guess he don't have to be

19 an attorney to sign this thing.

20     Q    Are you questioning whether the person who

21 signed this mortgage actually had authority to do it?

22     A    I'm just saying Black turned out to be a one

23 percent owner, and if he had the power, so be it.  If

24 he didn't have the power, so be it.  You know, I don't

25 know what it is.  All I know is I turned over control,

Page 218

1    and they paid money, and we went down to -- we went

2    down the -- here's another one right here.

3             MR. SALAZAR:  Oh, here, you want some water?

4             We have another bottle here if you want some?

5             THE WITNESS:  I'm sorry that they're all

6    warm.

7             So never checked that out.  If you guys need

8    to question it, we'll follow it through and find out

9    if they had the power to do it and how does that

10   reflect on -- all I know is that we went through a

11   closing.

12   BY MR. GEORGE:

13        Q    Do you know whether or not any of the EB-5

14   investors invested in the Palm House Hotel project

15   prior to August 30, 2013?

16        A    No way, I wouldn't even know who they were.

17        Q    Did Bob --

18        A    I heard it from the Judge, but you guys were

19   arguing, something about dates and times and stuff,

20   when your clients got involved with it.  I don't know

21   who your client are.  Never knew they were your

22   clients.  I know there's a guy named Black that

23   supposedly is coming up with a number, and I didn't

24   know his name was even Black, didn't too much care.

25   They were going to put money up, and I told you, I'm a

1   collateral lender.  The worse that's going to happen,

2   what are they gonna do, take my hotel and take it to

3   California or to Bermuda?  I don't think so.  I think

4   it's going to stay there.

5       Q   So your only concern in making the loan was

6   that it was collateralized by the hotel?

7       A   More than just the hotel, their down payment.

8   That thing was probably worth $50 million at the time.

9   I had people come out the gazoo trying to buy it from

10  me.  I had contracts with other people and everything

11  else.  I just -- who's gonna get to the starting booth

12  first.

13      Q   Were you concerned at all prior to the time

14  that you sold your interest in 160 whether Bob

15  Matthews had the financial capability of completing

16  the hotel and getting it open?

17      A   Didn't care what Bob Matthews could do or

18  not.  He's the guy that pulls rabbits out of his hat.

19  He obviously got somebody to give him $6 million, so I

20  guess he had bought some other stuff that -- I never

21  saw the guy work, in other words.  So a guy that

22  doesn't work must have the ability to go to the church

23  and pray and have God give him some ways out.  Like

24  me, I bought this place with -- because I did some

25  favors for the U.S. government, pretty bad favors,

Page 220

1  took care of teamsters and put them in jail and did a

2  lot of other things with my life at risk, and all the

3  sudden, I end up with this kind of facility, with, I

4  think, nothing down.

5      Q   When is the first time you learned that the

6  Palm House Hotel was financed with foreign investment

7  money?

8      A   I have no idea, must have been way down the

9  road, probably when Black came into us, and I'm not

10  even sure Black and this guy named Joe -- after they

11  kicked Bob out of the place, I'm thinking that's a

12  year later from March or April 2013, it had to be

13  around -- that's what I'm saying, let me look at my

14  time lines, and I'll tell you when they came in and

15  saw us, but, no, you want to be cute and want to try

16  to guess, and then you're gonna try to -- "Oh, you got

17  perjury because it was April, and it wasn't March."

18  I'm saying sometime around a year later then when all

19  these games started being played, these games were

20  less -- didn't file the darn stuff.

21      Q   Mr. Straub, I'm more than happy to look at

22  your time line if your lawyer let's us.

23          MR. SALAZAR:  I would prefer we don't --

24          MR. GEORGE:  I'm not trying --

25          MR. SALAZAR:  -- look at the time line --

1          MR. GEORGE:  I would love to have a time line
2     of what you say occurred, so I'm not --
3          THE WITNESS:  You're not going to see it.
4     I'm saying I need to see it, because I have a bunch of
5     pencil notes, like, call my girlfriend tonight, tennis
6     game at four o'clock.
7          MR. GEORGE:  Well, we can take a break if you
8     want to look at.  I'm not trying to play games at all
9     it.
10         THE WITNESS:  Okay.  I'm saying I have to see
11    if it's April.
12         MR. SALAZAR:  Was there a question?
13         MR. GEORGE:  No, I'm just saying if he'd like
14    to look at his time line, he can.
15         MR. SALAZAR:  I don't think it will
16    necessarily make things go faster, but do you want to
17    ask a question and see if it becomes, like, more
18    necessary for him to look at it?
19         MR. GEORGE:  I'm done with that document.
20         MR. SALAZAR:  Okay.  Well, why don't we keep
21    going and see where you go next, and then we'll see if
22    he needs the time line.
23         MR. LANDAU:  Well, Lou, he said he wants to
24    look at it.
25         MR. SALAZAR:  I don't -- I'm happy to do it,

Page 222

1    I think --

2            THE WITNESS:  Since he's hesitating, I know

3    it's must be April of 2014.

4            MR. SALAZAR:  Wait a minute, no, let's look

5    at a time line.

6            (Thereupon, a brief recess was taken.)

7    BY MR. GEORGE:

8        Q    Mr. Straub, the last question that I had

9    asked you is when you learned that Bob Matthews had

10   obtained foreign money, EB-5 money, for purposes of

11   completing the hotel and you asked -- you said you

12   wanted to consult a time line.

13           Have you had an opportunity to do that?

14       A    Correct.

15       Q    Would you like to answer that question in any

16   different way, now that you've consulted your time

17   line?

18       A    Well, I didn't answer it.

19       Q    Would you like to answer it?

20       A    Yeah, that's a better question.

21       Q    Okay.

22       A    I know it had to be after.  I don't know

23   exactly when I heard it, but it had to be after late

24   November, much later than late November, it'd be,

25   probably, December of 2014, because we started hearing

Page 223

1    Black and this guy named Joe come in and tell us the

2    horror stories of Bob spending all this money on

3    different other projects.  And I'm saying, "Phew, all

4    I know is that the payments are still coming," so if

5    the payments are still coming in, I have to look to

6    when the payments stopped, and I had to look at when

7    the payments stopped, which was like November 2014.  I

8    mean, those are things that we can actually prove.

9         As far as it had to be after that did I hear

10   that Bob was involved with EB-5 people, because I

11   didn't care up to that time.  I'm a collateral lender,

12   and they're paying their bills.  So if they're paying

13   their bills, I don't really need to care about -- so

14   somebody telling me about him using money, I don't

15   think they got into how they got the money.  It was

16   Black and -- no, Black didn't have any money in it.  I

17   think he was the one percent owner, but Joe, the other

18   guy, spoken English, and he had the money.  How he got

19   the money, don't know, still don't know.  You tell me

20   how he got the money.  I read things in the paper,

21   like you do, that EB-5 got involved with it, and I

22   know there's a program out there about people getting

23   passports for coming up with money that had nothing to

24   do with equity, but had something to do with jobs.

25        Q    When this transaction was closed, was there

Page 224

1   sufficient cash brought to closing to actually close

2   the transaction on August 30th?

3        A   I would hope so, but I didn't take care of

4   the closing.  That's what Craig does for me.  So he

5   probably took promises and got the monies and, you

6   know, he goes on with his thing.  Believe me, I'm into

7   running major things at that time.

8        Q   Did you get --

9        A   I can find out my kinds of transaction, what

10  type was I doing in 2000 and -- last part of August of

11  '13, of '13, what I was involved with, because I

12  probably didn't go to the closing.  That's how

13  important it is to me in my life, because I'd have to

14  take care of things day-to-day on operations.  It

15  might be dealing in fighting with the city, something

16  at -- paying bills, daughters get married, I don't

17  know, just all kind of things.

18       Q   As we sit here today, do you know whether

19  there was sufficient funds to close the transaction on

20  August 30, 2013?

21       A   Had to be --

22            MR. SALAZAR:  Object to form.  Sorry.

23            THE WITNESS:  Had to be.  I would think so,

24  yes.  I mean, and Craig would probably inform me.

25  BY MR. GEORGE:

Page 225

1      Q    You tell --

2      A    And I would have to approve it.  It's not

3   like we don't -- so they must have had the money -- or

4   they had the money to close the transaction, because I

5   was giving them back money, a note for the difference.

6      Q    What do you mean by that, you were giving

7   them back money, a note for the difference?

8      A    I gave them a mortgage, like I always do.

9   When I said to you, I'm an asset lender.  That's --

10  I'm doing part of the financing for them.

11     Q    I understand.  So you didn't actually --

12  KK-PB Financial didn't actually give any money to

13  160 --

14     A    No, no, no.  I'm saying that the other people

15  that was gonna pay us the money out of Miami and the

16  contract we had signed, sealed, and delivered, I had

17  to make a decision who I believe is going to be the

18  person that's going to pay me off.  I guessed wrong.

19  I don't know maybe Minsky guessed wrong -- or maybe

20  Minsky couldn't come up with it.  I don't know where

21  they are down in Miami right now, but I understand

22  they're big, big hitters.

23     Q    Now --

24     A    And that might not be the correct spelling,

25  but Minskys, but I -- the contract speaks for itself.

1      Q    Now, earlier you testified in your deposition

2  that you were your own appraiser, remember saying

3  that?

4      A    No, I'm an estimator.

5      Q    Okay.  Maybe I made a --

6      A    I estimate every tunnel job, every airport

7  project, every highway job.  That was my job for 20

8  some years, deciding is it worth it or not worth it to

9  surrender my years of service in running a company and

10 having thousands of employees in 26 plants, to go

11 ahead and bid jobs for my U.S. government that I bid,

12 for cleaning the rivers up, to keeping all the barge

13 traffic running from Cincinnati to -- I don't know

14 what we did -- it was Pittsburgh probably.

15     Q    All right.  Thank you for correcting that.  I

16 didn't want to get the wrong impression.

17          So when you said that you thought --

18     A    But I'm an -- an estimator.  Okay.  What did

19 you say?

20     Q    No, no, I appreciate you correcting me on

21 that.  I used the wrong term.

22     A    What term did you use?

23     Q    Appraiser?

24     A    No, I'm not an appraiser.  But buying, owning

25 hundreds and hundreds and hundreds pieces of property,

Page 227

1    I'm about as good as anybody is gonna get of an

2    appraiser.  For me to buy something, I have to

3    appraise it myself.

4         Q    Understood.

5         A    So on real estate I think I'm there.

6              MR. GEORGE:  Sorry, I was distracted.

7              THE WITNESS:  Now, you know what it's like.

8              (Informal discussion off the record.)

9    BY MR. GEORGE:

10        Q    So earlier you said that you thought that the

11   Palm House Hotel at the time you sold your interest in

12   160 was worth around $50 million?

13        A    Yeah.

14        Q    So why did you sell --

15        A    It's worth probably more than that right now,

16   even though it's not done.

17        Q    So why did you sell it for $36 million if --

18        A    I just got tired --

19        Q    -- it was worth 50?

20        A    -- I make so much money a year, I had to take

21   and worry, what am I gonna do.  Everybody in my family

22   died at age 50.  Everybody.  And so here I am on

23   borrowed time, and here I am spending time in some

24   hotel, trying to do some hotel for the guys over in

25   Palm Beach.

1          It'd be different if I'm working in Miami in

2    the ghetto or working out here in Wellington to turn

3    this -- it was all plywood and torn down and

4    everything else, but that's why my government uses me.

5    So they always call and give me an opportunity to take

6    on something.  I said, I'm so tired, so that's why.

7          I am an investor, but I need to be an

8    appraiser besides an investor for projects against

9    time.

10          Anybody want the air-conditioning on?

11          (Thereupon, there was an informal discussion

12   off the record, during which a document was marked as

13   Exhibit No. 14 for identification.)

14          THE WITNESS:  Okay.

15   BY MR. GEORGE:

16     Q   Mr. Straub, I've showed you what's been

17   marked as Exhibit 14 to your deposition which is Bates

18   labeled Robert Matthews 007599 and ask you if you

19   recognize that document?

20     A   I have no idea.  Never seen it.

21     Q   Down at the bottom left-hand corner of the

22   document, the very bottom, do you see where that says,

23   "Balance of contracts unpaid and remaining work"?

24     A   Yep.

25     Q   Was this a schedule that was prepared by 160

Page 229

1    Royal Palm, LLC before you sold your interests in that

2    company to Bob Matthews?

3        A    I don't know.  You'd have to give me the

4    closing document and see if this number coincidentally

5    works with the closing documents, to see how much

6    money was left in escrow.  It wouldn't be in the

7    original contract.

8        Q    Pardon me?

9        A    It wouldn't be in the original contract,

10   because we probably had to take this from the date.

11       Q    These are my notes, sir?

12       A    Oh, okay.

13       Q    I'm not looking at the contract.  Sorry.

14       A    I thought you were.

15       Q    That's okay?

16       A    August the 29th, which would be about the day

17   of closing, so it's probably tied to the day of

18   closing.

19           (Thereupon, a document was marked as Exhibit

20   No. 15 for identification.)

21   BY MR. GEORGE:

22       Q    Mr. Straub, I'm showing you what's been

23   marked as Exhibit 15 to your deposition.

24           Do you recognize that as the closing

25   statement from the August 30, 2013 closing of your

Page 230

1    sale of your interest in 160 Royal Palm, LLC?

2        A    I wouldn't know -- I'm looking for one -- one

3    amount of money.  I don't know.  That's all the

4    closing statement was.  That seems like a pretty junky

5    looking thing with all the scribbling on it.  So I

6    don't see the 752, like there was existing bills.

7    Maybe I added up some of these things, escrows.  Let

8    me add up some of the escrows.

9        Q    Mr. Straub, maybe I can help you with that if

10   you'd like?

11       A    Go ahead.

12       Q    If you look at -- may I lean over?

13            MR. SALAZAR:  Of course.

14   BY MR. GEORGE:

15       Q    If you look here, sir, these three escrow

16   items together --

17       A    That's what I was doing right now.

18       Q    -- they add up to $774,442.

19       A    That's what I was doing, just going to the

20   escrows.  So these must have been bills that were

21   still outstanding.  I told you I paid 18 million

22   before this, and we gave a copy of every one of our

23   vouchers.  They're still downstairs, and you're

24   welcome to --

25            (Thereupon, someone enters the conference

1  room, and there was an informal discussion off the

2  record.)

3          THE WITNESS:  Sorry for the interruption.

4          MR. GEORGE:  That's okay.  Thank you.

5          THE WITNESS:  So I think it's a ball park,

6  that seven-forty-four put in escrows is similar to the

7  seven-fifty-two.  At the time maybe somebody didn't

8  have the actual amount.

9  BY MR. GEORGE:

10     Q   Now, you said that prior to this you had put

11  $18 million into the hotel, and --

12     A   Yeah.

13     Q   -- I know that's a ball park figure.

14     A   No, it's close.  I think they checked it.

15     Q   Are there records of --

16     A   Yeah, down --

17     Q   -- who that money was paid to?

18     A   Positively.  I think we already gave it to

19  you.

20          MR. SALAZAR:  We did.

21          THE WITNESS:  But they're downstairs.

22  They're in a filing cabinet, and they have all the

23  bills that have been paid.  Not counting my bills.  In

24  other words, we had staff in there, worked with me

25  that we paid that had nothing to do with the bills

1    that we were writing out to vendors.  Those are just

2    18 million worth of vendors.  That's why -- you asked

3    me why I got fed up with the place and sold it, out of

4    the woodwork, I thought I spent a lot less, but, you

5    know, you just kinda get carried away.

6    BY MR. GEORGE:

7        Q    Now, did 160 Royal, LLC obtain -- I'm sorry,

8    I have a habit of pointing my pen -- obtain a releases

9    of liens for all the vendors listed on the list?

10       A    I think we're smart enough to do that.  I

11   think we did.

12       Q    And --

13       A    No, not on this, because this is the one we

14   escrowed.  When they would have paid that money,

15   hopefully they would have got releases of lien.  I'm

16   talking about the 18 million we would have releases of

17   lien.

18       Q    Understood.  So with respect to this list

19   that you say was escrowed, would you have gotten

20   releases of liens -- would 160 have gotten releases of

21   liens when those were paid off after closing?

22       A    I don't think we're that clever, you know.

23   In other words, it's not like this was the fiftieth

24   hotel.  This was number one, and after that I got into

25   2,000 room hotels and everything else.  So I go into

Page 233

1   more things after I started getting experience.  So is

2   our staff going to get smart enough, after we sell --

3   or after we give them the money and put it in there,

4   we go by honesty I think.

5        I think the honesty of Les Evans came into

6   play, that he was going to pay these people.  It was

7   put in escrow.  You see the word escrow.  I thought

8   escrow was a real important thing, but it looks like

9   it wasn't.  He took the money and, as I understand,

10  gave it to Bob or something or took it himself or

11  something else.  I don't know if anyone has ever

12  yelled at us, but they went through some of this --

13  all these documents.  I heard that they spent another

14  14 million or something on the property after I was

15  there.  So in the 14 million, maybe there's $700,000

16  they paid these people.

17       Q   But you don't know one way or another --

18       A   I didn't get dragged into it, so if I didn't

19  get dragged into a lawsuit, they must have paid the

20  bills, or my companies.  You guys gotta heck of a

21  claim against a lot people, lot of claims.

22       Q   Let's talk a little bit more about this

23  document, please.

24       Do you see under sum due from buyer, there's

25  a sum of $96,140.63 for doc stamps on the mortgage?

Page 234

1      A    Yep.

2      Q    And then there's 54,937.50 for intangible tax

3   on the note?

4      A    Yep.

5      Q    And then there's a hundred and twenty-five

6   dollars for recording fees.

7           Do you see those numbers?

8      A    Yep.

9      Q    Were those numbers -- I'm sorry.  Were those

10  dollars paid out of closing so that the mortgage could

11  be recorded and --

12     A    No, I don't think they do it that way.  I've

13  never been involved with a closing in my life, and

14  I've sold hundreds of pieces of property just here in

15  Palm Beach County.

16     Q    Mm-hmm.

17     A    So I don't do it.  Craig does it.  You have

18  to ask somebody like a Craig.  But I would think at

19  the time of closing, you wouldn't have them pay those

20  amounts.  You're asking the escrow agent with these

21  arithmetics that go up and down, is that they were

22  gonna go ahead and pay them.  Find out later on, I

23  don't know if those things got paid or not.

24     Q    So were those monies there, those three items

25  for the doc stamps on the mortgage, the intangible tax

1   on the note, and recording fees, were those monies

2   escrowed as well at closing?

3       A   I don't know, that's way out of my head.  I

4   don't know how they do that.  They just subtract it,

5   and I would think the rest of the calculations here

6   would tell them how you came out with what we got and

7   what they got.  I just -- our boys, after doing

8   hundreds of these things, would have done it the right

9   way.  But find out later on, somebody slipped through.

10      Q   So if --

11      A   I think there's a con -- something in there

12  that Les, when he -- Craig started asking Les and --

13          THE COURT REPORTER:  Can he --

14          MR. SALAZAR:  Oh, you need to speak up.

15  Sorry.

16          THE WITNESS:  That someplace later on Les

17  sends an e-mail to Craig saying that his office F'ed

18  up.

19  BY MR. GEORGE:

20      Q   So if Les Evans testified that those monies

21  were never escrowed, so that he was incapable of

22  recording the mortgage, would that be a lie?

23          MR. SALAZAR:  Objection to form.

24          THE WITNESS:  I don't know, what somebody

25  else told you, I have no idea.

1    BY MR. GEORGE:

2        Q    I'm saying if he said that he couldn't record

3    the mortgage because you didn't give him the money to

4    do that, would that be a lie?

5              MR. SALAZAR:  Object to form.

6              THE WITNESS:  Well, we wouldn't be giving him

7    the money.  It says, "Sum due from buyer."  I'm not

8    the buyer.  I'm the seller.  So I don't think I'd have

9    anything -- it's what the contract reads that says who

10   is responsible for it.  So the closing agent, which he

11   was, had to make sure that those monies were either

12   there or not.  It's not for us to check it out, as I

13   understand.

14   BY MR. GEORGE:

15       Q    Under the seller's deductions that are over

16   here --

17       A    Mm-hmm.

18       Q    -- who was the broker on this deal?

19       A    They gotta lot of money whoever it was.

20   You know, it's usually you pay -- remember I'm one of

21   the bigger closing agents out here, with my

22   operations.  We usual do three to six percent,

23   depending on what it is.  So let's say -- I didn't

24   list it with anybody, so there's no -- they shouldn't

25   have got three percent of the listing, but the selling

1  agent should have got three percent.  I just know the

2  technical terms of the thing.  So somebody was

3  probably entitled to three percent of $30 million,

4  which is about a million bucks, so maybe there was

5  some other finder's fees in there.  I don't know.

6      Q   Do you know whether it was 160 Royal Palm,

7  LLC that engaged the broker, or how did this broker

8  get to the deal?

9          MR. SALAZAR:  Objection to form.

10         THE WITNESS:  I don't know how many brokers

11  there were.  It's not my thing.  I just sold it to him

12  with a contract, and it's up to the bills to be paid,

13  and they subtract it from my money.

14  BY MR. GEORGE:

15     Q   When you say you "showed" it to him with the

16  contract, who are you talking about?

17     A   I don't know what -- if I said that, it's

18  wrong.  I sold it to him.

19     Q   Oh.

20         MR. SALAZAR:  Sold it.

21         THE WITNESS:  I just sold -- I didn't show it

22  to a broker.  I just showed it -- Bob knew about the

23  thing.  The Minsky people -- and we should, before

24  everybody goes home, I need to get the spelling of

25  what their company is and where that contract is.

1        MR. SALAZAR:  May I provide that, I guess, if

2   they want -- would you like me to provide that?

3        THE WITNESS:  Yeah, just provide it to them

4   so they can ask me questions now, and we can see who

5   the name is.  You can call them and see how big they

6   are.  From what I understand they are really big, like

7   Related, big, big time.

8        So whatever I was saying, it's not my job to

9   do his job, and he would probably have insurance and

10  he would probably have other -- his malpractice

11  insurance, title insurance.  There would be all kind

12  of things in a closing.  So he would have to pay

13  whoever was bringing the claim up.  If there was

14  nobody that claimed on it, I guess that's between him

15  and -- they should have got back to us, so maybe it

16  was overstated.  Maybe our closing might have been

17  overstated.  They shouldn't have deducted that from

18  us.  So we probably need to send an interrogatory.

19  Man, they got so much money they can go after.

20  BY MR. GEORGE:

21  Q    I'm sorry if you feel like I asked this

22  before, I just want to clarify --

23  A    That's okay.

24  Q    -- for my own understanding.

25  A    It's okay.

1        Q    Do you know how that broker became part of

2   this deal at all?

3             MR. SALAZAR:  Objection to form.

4             THE WITNESS:  I don't remember a broker, a

5   particular person.  Maybe Bob had a company.  He had

6   all kinds of companies.  Maybe he had a company that

7   did the commission -- or what do you call it, the

8   broker on the thing.

9   BY MR. GEORGE:

10       Q    Do you know how much of that $1,831,250 was

11  actually paid to a broker?

12       A    No, I don't --

13            MR. SALAZAR:  Objection to form.

14            THE WITNESS:  -- know.  I didn't follow

15  through.  Bad enough we found out six months later

16  that someone didn't even record the documents.  We

17  took for granted, I guess -- our company took granted

18  that they -- the closing agent was doing their job,

19  and it sounds like the closing agent didn't do their

20  job.

21  BY MR. GEORGE:

22       Q    Do you know if any of that $1.8 million was

23  paid to a broker?

24       A    No, I --

25            MR. SALAZAR:  Objection to form.

Page 240

1          THE WITNESS:  -- don't know.  If you have

2   some information, let me know.  It saves me the time

3   to start finding out and bringing a claim in this

4   thing, because obviously it has a lot to do with your

5   valuation thing that you have for your -- your expert.

6   You know, so if you have more money, then it would --

7   they weren't insolvent.  Thank you.  But we have so

8   many other things on your expert.

9   BY MR. GEORGE:

10     Q    Now, if you go down a little further of the

11  seller's deductions, one, two, three, four, there's

12  $586,000, it says "Escrow $2,000 per day."

13          Is that referring to the fines that were

14  being levied by --

15     A    Yeah, that must --

16     Q    -- the Town of Palm Beach?

17     A    -- have been the current dollar figure.

18     Q    Was that money actually escrowed at closing?

19     A    I would hope so, but we don't have access to

20  the escrows.  The closing agent would have the

21  responsibility to escrow it.  If not, we're gonna do

22  what you guys are gonna do, we're going to go after

23  his firm, the whole firm, for having him hold himself

24  out as whatever, as a -- whatever he was, I guess, I

25  hate to say the word that gets me sued, but a crook.

1   Looks like he didn't do things, so he would be on the
2   wrong side of the law.
3       Q    So in addition to the escrow for the fines,
4   this money here for these vendors was supposed to be
5   escrowed as well?
6       A    Correct.
7            MR. SALAZAR:  Objection to form.
8            THE WITNESS:  And whatever broker commission
9   would be, that it's not in escrow, but I would think
10  it would be to pay the broker, because I didn't have
11  any contract with the broker.  I couldn't tell you who
12  the broker was.
13           MR. GEORGE:  Can we take two minutes, and I'm
14  going to try to finish up?
15           MR. SALAZAR:  Yes.
16           (Thereupon, a brief recess was taken.)
17           MR. GEORGE:  Back on the record.
18           We're still on the closing statement,
19  Mr. Straub.
20           MR. SALAZAR:  Yes, here, Glenn.
21  BY MR. GEORGE:
22      Q    Mr. Straub, do you recognize the handwriting
23  on the numbers, you know, the handwriting on that
24  closing statement?
25      A    No, I honestly don't know who did the

Page 242

1    handwriting in there, some way of getting your pals.

2         Q    All right.  And under Palm House, LLC a

3    Florida limited liability company, do you see that

4    signature there at the bottom?

5         A    Okay.

6         Q    Is that your signature?

7         A    Yes.

8         Q    So since you've testified that you weren't at

9    the closing, would you have signed this prior to

10   closing?

11        A    Probably, before or afterwards.  I don't

12   know.

13        Q    Now, under the sum due to the seller at

14   closing, it says $6,220,920.86, and then underneath

15   it, someone has written $5,180,000.

16             Do you know whether you got $6,220,920.86 at

17   closing?

18        A    I think we got a little over $6 million.  I

19   don't know -- I can make a call, probably verify it.

20   I think we got around $6 million.  I don't know what

21   the five million -- maybe they had a deposit.

22   Somebody had $2 million -- no, that's a $2 million

23   brokerage commission.  I think there was a deposit of

24   $2 million on this thing someplace.

25        Q    (Indicating.)

Page 243

1       A    No, it says, "Brokerage commission."

2       Q    That's the other side.

3       A    Oh, okay, here.  We must've got $9 million,

4   $2 million seller's financing, doc stamps, and 29 --

5   okay.  Some way nine million, somebody expressed nine

6   million in here.  What did we get?  We must've got --

7   well, I guess we got six million, plus we got $2

8   million.  So we must've got $7 million, because there

9   must've been a $2 million deposit, and at the time of

10  closing, we got $6 million, but I can go ahead and

11  make a call.

12      Q    Okay.  That won't be necessary, but thank

13  you.

14           All right.  I don't have any more questions

15  about this document, so if there's going to be an

16  ending spot until we take this up again, this is a

17  proper spot to do it.

18           (Discussion off the record.)

19           MR. GEORGE:  Let's go back on the record.

20           Go ahead.

21           MR. SALAZAR:  No, you guys go ahead.  I'm

22  saying want to cut it off and try to continue another

23  day.

24           MR. GEORGE:  We're going to adjourn the

25  deposition.  I am -- I have a lot more questions to

1  ask.  I'm willing to continue doing this deposition as

2  late as it needs to in order to finish today, so I'm

3  here and can do that.  I understand Mr. Straub has had

4  a long day and doesn't feel well, and that's fine.

5  But it's our intention that this deposition is not

6  over and that we're going to take, at the very least,

7  another day to finish the questioning.

8          MR. LANDAU:  And for the record, the debtor

9  hasn't even had an opportunity to ask any questions.

10          MR. SALAZAR:  I understand.

11          THE WITNESS:  I understand.  I'm in and out

12  of the country a lot.

13          MR. SALAZAR:  It has been a long day, so I

14  think eight hours is long enough for a depo.  We don't

15  necessarily agree that we need to go another couple

16  days, but we can deal with that at another time.

17          MR. GEORGE:  The deposition didn't start

18  until ten o'clock.  We took an hour for lunch.  We

19  haven't been here for eight hours, and as I said at

20  the very beginning of this deposition, with the types

21  of answers that have been given, a lot of time was

22  taken up, and I'm fine with that, but we are going to

23  need to finish the deposition.  There's a lot of

24  substantive topics left to be covered, the least of

25  which is creditors that existed at the time of the

Page 245

1   closing of the transaction.

2          MR. SALAZAR:  Well, listen you spent a lot of

3   time on things that were not relevant.  That's where

4   you should have started, okay, instead of asking him

5   about e-mails and minorities.

6          Yes, he'll read.

7          (Whereupon, the deposition was concluded.)

8

9                    _____

                         GLENN F. STRAUB

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 246

1  _____

STATE OF FLORIDA:

2  COUNTY OF PALM BEACH:

3  The foregoing instrument was acknowledged before me
   this _____ day of _____, 2018, by

4  _____, who is personally known
   to me or who has produced _____ as

5  identification and who did (did not) take an oath.
   _____, Notary Public

6  My commission expires:
   Commission #:

7  _____

                        ERRATA SHEET

8

   Page/Line                              Correction

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 247

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:
     COUNTY OF PALM BEACH:

4

5           I, Anna M. Meagher, Shorthand Reporter and

6    Notary Public, State of Florida, certify that GLENN

7    STRAUB personally appeared before me on the 29th day

8    of November 2018 and was duly sworn.

9

10          Signed this 14th day of December 2018.

11

12                         _____

13   My Commission Expires:   Anna M. Meagher,
     January 9, 2021          Notary Public

14   Commission #GG060693     State of Florida

15

16

17                     Personally known:    X
                 OR Produced Identification:

18          Type of Identification Produced:

19

20

21

22

23

24

25

Page 248

1                          CERTIFICATE

2    STATE OF FLORIDA:
     COUNTY OF PALM BEACH:

3

4          I, Anna M. Meagher, Shorthand Reporter, do

5    hereby certify that I was authorized to and did

6    stenographically report the deposition of GLENN

7    STRAUB, in the cause, at the time and place, and in

8    the presence of counsel as stated in the caption

9    hereto; that reading and signing of the transcript was

10   not waived, and that the foregoing pages, numbered 1

11   through 249 constitute a true record of my

12   stenographic notes.

13         I further certify that I am not of counsel, I

14   am not related to, nor employed by any attorney in

15   this case, nor am I financially interested in the

16   action.

17         Dated this 14th day of December 2018.

18

19                     _____

                       Anna M.  Meagher,
20                     Shorthand Reporter

21

22

23

24

25

Page 249

```
  1              OUELLETTE & MAULDIN COURT REPORTERS
                     1550 South Dixie Highway
  2                  Suite 205 - Riviera Plaza
                  Coral Gables, Florida  33146
  3                      (305)358-8875
  4
                                    December 14, 2018
  5
  6  MR. GLENN STRAUB
     c/o SALAZAR LAW
  7  2000 Ponce De Leon Blvd.
     Coral Gables, Florida
  8
     Re:  160 ROYAL PALM, LLC, DEBTOR
  9       CASE NO. 18-19441-EPK
 10
     Dear Mr. Straub,
 11
 12       Please be advised that your Deposition taken by
     our offices on November 29, 2018 has been transcribed
 13  and is ready to be read and signed by you.
 14       The transcript will be filed with or without your
     signature in 30 (thirty) days or at the time of trial,
 15  whichever comes first.
 16       Our office hours are 9:00 a.m. to 4:30 p.m. Monday
     through Friday.
 17
          If you have any questions regarding this letter,
 18  please feel free to contact us at the above number.
 19
                                    Yours very truly,
 20
 21
                                    Anna M. Meagher
 22                                 Court Reporter
 23  cc:  DAVID J. GEORGE, ESQUIRE
 24
 25
```