UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

160 Royal Palm, LLC,                    Case No.  18-19441-EPK

      Debtor.                          Chapter 11

_____/

**DEBTOR'S MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT,
AND RELATED ASSET PURCHASE AGREEMENT,
<u>WITH KK-PB FINANCIAL, LLC AND GLENN F. STRAUB</u>**

\* \* \*

**ATTENTION:  THIS MOTION REQUESTS APPROVAL OF AN ORDER BARRING
CLAIMS AND LITIGATION AGAINST CERTAIN THIRD-PARTIES**

\* \* \*

**CONCISE STATEMENT OF SALE TERMS
PURSUANT TO LOCAL RULE 6004-1(B):**

- **Property to Be Sold:  The Real property located at 160 Royal Palm Way, Palm Beach, Florida, together with certain related personal property located on-site and off-site, and development rights. Exhibit B, Sections 2 and 4.**

- **Purchaser:  KK-PB Financial, LLC, which the Debtor contends is an insider[1] of the Debtor by virtue of the fact that its principal, Glenn F. Straub, is the Debtor's former owner and manager.**

- **Price: $10,260,862, consisting of $5,125,000 in cash and a credit of $5,135,862. Exhibit B, Section 6.**

- **Closing Date: Twenty days following Court approval becoming final and non-appealable. Exhibit B, Section 11.**

- **Warranties. Exhibit B, Section 13.**

- **Private sale pursuant to Settlement Agreement; not subject to higher and better offers.**

---

[1]  KK-PB and Straub dispute that KK-PB is an insider as that term is defined under 11 U.S.C. § 101(31).

- **The Debtor does not have a policy of prohibiting the transfer of personally identifiable information, but given the nature of the property being sold, the Debtor does not believe that a consumer privacy ombudsman is required under 11 U.S.C. § 332.**

- **Identity of Known Potential Lienholders:** *See* **Paragraphs 4 through 15 below.**

- **The Debtor will file a separate motion seeking expedited approval of the relief sought in this motion.**

Debtor in Possession, 160 Royal Palm, LLC (the "**Debtor**"), by and through its undersigned counsel and pursuant to Federal Rule of Bankruptcy Procedure 9019 and 11 U.S.C. §§ 105(a) and 363, requests approval of a Settlement Agreement------which includes a bar order enjoining/releasing claims by non-parties against third parties------between the Debtor and KK-PB Financial, LLC ("**KK-PB**") and Glenn F. Straub "**Mr. Straub**"), as well as approval of a related Asset Purchase Agreement (the "**APA**") and sale of the Debtor's real and personal property. A copy of the Settlement Agreement is attached hereto as **Exhibit A**. A copy of the APA is attached hereto as **Exhibit B**.

### BACKGROUND FACTS AND CLAIMS AGAINST ESTATE

1. On August 2, 2018 the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.*

2. The Debtor is managing its assets as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in the case.

3. The Debtor is a Florida limited liability company – currently managed by its former receiver Cary Glickstein – which owns real property consisting of a partially-constructed hotel/condominium located at 160 Royal Palm Way, Palm Beach, Florida (the "**Real**

**Property**"). The Real Property currently generates no income and its maintenance is causing Debtor to incur ongoing administrative costs.

4.     The Palm Beach County Tax Collector filed Claim No. 88 in the sum of $170,342.38, plus 18% in statutory interest (the "**Real Estate Tax Claim**") in this bankruptcy case, which the Palm Beach County Tax Collector asserts is for 2018 *ad valorem* taxes and is secured by the Real Property.

5.     New Haven Contracting South, Inc. ("**New Haven**"), the Debtor's former general contractor, filed Claim No. 72 in the amount of $3,387,855.55 (the "**New Haven Claim**") in this bankruptcy case, which New Haven asserts is secured by the Real Property pursuant to a mechanic's lien recorded in 2013.  New Haven's principal and owner is Nicolas J. Laudano ("**Mr. Laudano**").  The New Haven Claim has since been assigned to KK-PB.

6.     The Real Property is encumbered by a mortgage (the "**Mortgage**") to KK-PB which was recorded in the Official Records of Palm Beach County on March 28, 2014 at O.R. Book 26694, Page 1420.  The Mortgage secures a promissory note (the "**Note**") in the face amount of $27,468,750 made to KK-PB.  KK-PB has filed Claim No. 70-3 in the amount of $39,684,844.73 (the "**KK-PB Claim**"), which KK-PB asserts is secured by the Real Property. The Debtor has objected to the KK-PB Claim [ECF No. 178] (the "**Debtor's Claim Objection**").

7.     Place for Tile, Inc. has filed Claim No. 2 in the sum of $157,004.54 claim in this bankruptcy case, which Place for Tile, Inc. asserts is secured by the Real Property.  The Debtor's search of the public records indicates that Place for Tile, Inc. recorded a Claim of Lien in the Official Records of Palm Beach County, Florida on November 26, 2014 at O.R. Book 27185, Page 0202.

8.     Architectural Precast & Foam, LLC has filed Claim No. 66 in the sum of $8,030.78 in this bankruptcy case, which Architectural Precast & Foam, LLC asserts is secured by the Real Property. The Debtor's search of the public records indicates that Architectural Precast & Foam, LLC recorded a Claim of Lien in the Official Records of Palm Beach County, Florida on January 8, 2016 at O.R. Book 27266, Page 168.

9.     Van Linda Ironworks, Inc. has filed Claim No. 69 in the sum of $104,097.31 claim in this bankruptcy case, which Van Linda Ironworks, Inc. asserts is secured by the Real Property. The Debtor's search of the public records indicates that Van Linda Ironworks, Inc. recorded a Claim of Lien in the Official Records of Palm Beach County, Florida on December 1, 2014 at O.R. Book 27188, Page 1907.

10.    Richard's Woodwork, Inc. has filed Claim No. 86 in the sum of $41,341.59in this bankruptcy case, which Richard's Woodwork, Inc. asserts is secured by the Real Property. The Debtor's search of the public records indicates that Richard's Woodwork, Inc. recorded a Final Judgment in the Official Records of Palm Beach County, Florida on July 25, 2015 at O.R. Book 27694, Page 361.

11.    James F. Biagi, P.E. has filed Claim No. 89 in the sum of $49,391.76 in this bankruptcy case, which James F. Biagi, P.E. asserts is secured by the Real Property. The Debtor's search of the public records indicates that James F. Biagi, P.E. recorded a Final Judgment in the Official Records of Palm Beach County, Florida on July 10, 2015 at O.R. Book 27660, Page 1139.

12.    The Debtor has scheduled a $39,500,000.00 claim of Palm House Hotel, LLLP as disputed on its Schedule D, ECF No. 107, Page 10 of 31, which is purportedly secured by a

mortgage on the Real Property recorded on October 17, 2014 in the Official Records of Palm Beach County, Florida at O.R. Book 27103, Page 0129.

13.    On November 14, 2016, approximately 63 foreign nationals (the "**EB-5 Investors**") filed suit in the United States District Court for the Southern District of Florida against several persons and entities, including the Debtor, KK-PB, New Haven, and Laudano, in Case No. 9:16-cv-81871-KAM (the "**District Court Case**"), alleging that the Real Property had been used to perpetuate common law and securities fraud against the EB-5 Investors. The EB-5 Investors have amended their complaint several times, most recently on October 23, 2018, wherein the EB-5 Investors added claims against KK-PB to avoid the Note and Mortgage as fraudulent transfers pursuant to Sections 726.105 and 726.106 of the Florida Statutes.

14.    The EB-5 Investors have filed Claim Nos. 3 through 65 in this bankruptcy case, totaling $41,743,326.39.

15.    On November 26, 2018, a second group of thirteen foreign nationals (the "**Other EB-5 Creditors**") filed suit in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida against several persons and entities, including KK-PB, New Haven, and Laudano, in Case No. 2018-CA-01481 (the "**Other EB-5 Creditors' State Court Case**"), alleging that the Real Property had been used to perpetuate common law and securities fraud against the Other EB-5 Creditors.

16.    The Other EB-5 Creditors have filed Claim Nos. 73 through 85 in this bankruptcy case, totaling $30,844,346.

17.    The deadline for non-governmental entities to file claims in this bankruptcy case was October 31, 2018, and the deadline for governmental entities to file claims is January 29, 2019. ECF No. 51.

## THE STALKING HORSE BID AND SCHEDULED AUCTION

18.     The Debtor previously entered into an Asset Purchase Agreement (the "**Stalking Horse APA**") with RREF II Palm House LLC (the "**Stalking Horse Bidder**") for the sale of the Real Property for $32,000,000.00, subject to higher and better offers.  In its *Amended Order Granting Debtor's Motion for the Entry of an Order (I) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially All of Its Assets, (II) Approving the Form and Manner of Notice and Sale, (III) Scheduling an Auction and Sale Hearing and (IV) Approving the Sale of the Assets Free and Clear of Liens, Claims and Encumbrances* [ECF No. 273] (the "**Bid Procedures Order**"), the Court approved the Stalking Horse APA and scheduled an auction (the "**Auction**") and hearing to approve the sale to the winning bidder to immediately follow.  The Auction and hearing have been rescheduled to February 5, 2019. ECF No. 520.

19.     Pursuant to Sections 5 and 8.4 of the Stalking Horse APA, the Stalking Horse Bidder's sole recourse should the Debtor fail to close on the sale of the Real Property to the Stalking Horse Bidder and sell the Real Property to a different entity is: (a) return of its $3,200,000.00 deposit; and (b) payment of a $350,000.00 break-up fee (the "**Break-Up Fee**").

## THE SETTLEMENTS WITH THE TOWN OF PALM BEACH

20.     Prior to the commencement of this bankruptcy case, the Town of Palm Beach began assessing fines against the Debtor totaling over $3.9 million (the "**Violation Assessment**").

21.     Prior to the commencement of this bankruptcy case, the Town of Palm Beach Code Enforcement Board began assessing fines against the Debtor totaling over $155,000.00 (the "**Code Enforcement Fine**").

22.     Following the execution of settlement agreements, a motion seeking approval of the same [ECF No. 97], and a hearing to consider approval of the same, the Bankruptcy Court entered its order [ECF No. 204] approving the Debtor's settlements with the Town of Palm Beach and the Town of Palm Beach Code Enforcement Board, which provide a $200,000 payment (the "**$200k Payment**") to the Town of Palm Beach, a $50,000 payment (the "**$50k Payment**") to the Town of Palm Beach Code Enforcement Board, and extensions of a development approval pertaining to the Real Property. Such settlements were conditioned upon payment of the $200k Payment and the $50k Payment, respectively, on or before December 31, 2018.

23.     However, the Debtor has since negotiated an extension of these deadlines to February 28, 2019. *See* Amended Conditional Settlement Agreements attached hereto as **Exhibits C** and **D**.

### THE DEBTOR'S LITIGATION WITH KK-PB

24.     From the outset of this bankruptcy case, the Debtor and KK-PB have been locked in a dispute concerning the Real Property.

25.     In its *Motion to Limit Credit Bids with Respect to Sale of Substantially All of Its Assets* [ECF No. 103] (the "**Motion to Limit Credit Bids**"), as supplemented by ECF No. 163, the Debtor contends KK-PB should be prevented, under 11 U.S.C. § 363(k), from credit bidding the KK-PB Claim at any sale of the Real Property because: (a) the Note and Mortgage, and recording of the Mortgage, were avoidable as actual and constructive fraudulent transfers pursuant to 11 U.S.C. 544 and Sections 726.105 and 726.106 of the Florida Statutes; (b) the Note and Mortgage are unenforceable; (c) the KK-PB Claim should be equitably subordinated pursuant to 11 U.S.C. § 510(c); and (d) the KK-PB Claim should be recharacterized as equity.

The Debtor also raised objections to the amount and extent of the secured claim alleged by KK-PB.

26.     In its *Motion to Estimate Claim for Purposes of Credit Bidding Pursuant to 11 U.S.C. §§ 502(c) and 363(k)* [ECF No. 133] (the "**Motion to Estimate**"), further clarified at ECF No. 164, KK-PB disputes the merits of the Motion to Limit Credit Bids and contends that it should be permitted to credit bid the full amount of the KK-PB Claim at any sale of the Real Property.   Furthermore, in its *Motion to (1) Modify and Terminate Automatic Stay; or (II) Dismiss Chapter 11 Proceeding* [ECF No. 69] (the "**Stay Relief Motion**"), KK-PB seeks relief from the automatic stay and/or dismissal of the bankruptcy case in order to pursue a foreclosure action against the Real Property.

27.     Mr. Straub is the principal and owner of KK-PB.  Craig T. Galle ("**Mr. Galle**") and his law firm, The Galle Law Group, P.A. ("**Galle P.A.**", and with Mr. Galle, "**Galle**") have served as legal counsel to KK-PB and Mr. Straub.  Sal V. Spano ("**Mr. Spano**") has provided bookkeeping services to KK-PB and Mr. Straub.

28.     The Motion to Limit Credit Bids, the Motion to Estimate, and the Stay Relief Motion (together, the "**Contested Matters**") were heavily litigated through multiple motions and responses, multiple hearings, a myriad of discovery, and two (2) days of final evidentiary hearing on January 8, 2019 and January 11, 2019.  On the third day of the final evidentiary hearing, January 18, 2019, the parties pursued settlement negotiations and entered into the Settlement Agreement and APA, subject to the Court's approval.  If approved, the Settlement Agreement and APA will resolve the Contested Matters, the Debtor's Claim Objection, and the dispute between the Debtor and KK-PB.

29.     The parties entered into the Settlement Agreement to avoid the cost, expense, delay, and uncertainty of litigation or other dispute resolution procedures. While the Debtor believes it has meritorious positions regarding the dispute over the Real Property, the Debtor bears enormous risk should the Court rule against it on the Contested Matters, and potential lengthy appeals that could delay the administration of the Debtor's estate and increase the administrative burdens to the estate.

30.     Accordingly, the Debtor, in exercising its business judgment, believes that the Settlement Agreement and the APA are in the best interest of the estate.

<u>**SUMMARY OF MATERIAL TERMS OF THE**</u>
<u>**SETTLEMENT AGREEMENT AND APA**</u>

31.     What follows are the material terms of the Settlement Agreement and the interrelated APA. Such summarized terms are for notice purposes only, and reference should be made to the Settlement Agreement and APA for controlling terms.

a.    **Settlement Payment:**    KK-PB shall pay Debtor $5,125,000.00 (the "**Settlement Payment**"). The Settlement Payment shall be utilized by the Debtor to pay, among other things and if applicable, the Break-Up Fee, broker compensation, the $200k Payment, the $50k Payment, and allowed creditor claims, including the allowed claims of the EB-5 Investors and the Other EB-5 Creditors.

b.    **Debtor to Pay Broker and Town**: Debtor shall be responsible for paying the broker retained by Debtor [ECF Nos. 19 and 66], and Debtor shall be responsible for paying the $200k Payment to the Town of Palm Beach and $50k Payment to the Town of Palm Beach Code Enforcement Board simultaneously with its receipt of the Settlement Payment.

c.    **Transfer of Property to KK-PB:**    In consideration of the Settlement Payment, and a credit of $5,135,862, Debtor shall convey the Real Property, as well as all tangible and intangible personal property and equipment located thereon or off-site including, but not limited to, marble and elevator material and equipment, and all transferable rights, including development rights with respect to the Real Property, to KK-PB or an entity designated by KK-PB. Such conveyance shall be free and clear of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f), pursuant to an order which provides that: (i) KK-PB (or its designee) is not the mere continuation or successor to the Debtor; (ii) KK-PB (or its designee) is entitled to the protections of 11 U.S.C. § 363(m); (iii) the conveyance is

not avoidable pursuant to 11 U.S.C. § 363(n); and (iv) the order approving the conveyance shall be immediately effective pursuant to Federal Rule of Bankruptcy Procedure 6004(h).

d. **Taxes:** KK-PB shall be responsible for the payment of all real property/*ad valorem* taxes relating to the Real Property for tax years 2018 and 2019, including the Real Estate Tax Claim.

e. **Withdrawal of the New Haven Claim:** KK-PB shall withdraw the New Haven Claim and indemnify Debtor and its estate with respect to the New Haven Claim.

f. **Mutual Releases:** *See* Settlement Agreement at Section 11.

g. **Bar Order/Injunction/Third Party Releases:** KK-PB and Mr. Straub's entry into the Settlement Agreement and APA is expressly conditioned upon the Court's entry of an order barring/enjoining/releasing all claims and litigation by the EB-5 Investors, the Other EB-5 Creditors, and any other creditors or potential creditors against KK-PB, Mr. Straub, Galle, Mr. Spano, New Haven, Mr. Laudano, and related parties and professionals, with respect to any and all actions and transactions arising from or relating to Debtor, the Real Property, the investments made by the EB-5 Investors and Other EB-5 Creditors in Palm House Hotel, LLLP, and any and all other matters that were directly or indirectly, or tangentially, related to the Real Property, Debtor, or Debtor's estate.

h. **Findings of Good Faith/No Improper or Unlawful Acts:** *See* Settlement Agreement at Section 9.

## **APPROVAL OF THE SETTLEMENT AGREEMENT**

32.     Through this motion, the Debtor, among other things, requests that this Court enter an order approving the Settlement Agreement to permit the parties to amicably resolve their disputes.

33.     "It is generally recognized that the law favors compromise of disputes over litigation for litigation sake." *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993). Rule 9019(a) grants the bankruptcy court the power to approve settlements. *GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*, 336 B.R. 843, 852 (S.D. Fla. 2005).

34.     Pursuant to Federal Rule of Bankruptcy Procedure 9019, the Court may approve a compromise or settlement after notice and a hearing. Accordingly, it is within the scope of this Court's authority to approve the Settlement Agreement.

35.     When considering settlements for approval, the bankruptcy court is to "determine whether the proposed settlement is fair and equitable." *In re Air Safety Int'l, L.C.*, 336 B.R. at 852.  The Eleventh Circuit Court of Appeals has set forth factors to assist bankruptcy courts in determining whether a settlement proposal meets the appropriate standard.  *Id.*  These factors are as follows: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *See Wallis v. Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990); *see also Romagosa v. Thomas*, 236 Fed. Appx. 498, 504 (11th Cir. 2007) (setting forth *Justice Oaks Factors* and affirming bankruptcy court's approval of settlement agreement).  Moreover, "[t]he bankruptcy court is not required to rule on the merits, and must look only to the probabilities." *Id.*  Settlements or compromises should be approved unless they "fall below the lowest point in the range of reasonableness." *In re Bicoastal Corp.*, 164 B.R. at 1016.

36.     The Justice Oaks Factors weigh in favor of approving the terms of the Settlement Agreement. In negotiating the terms of the Settlement Agreement, Debtor and its counsel carefully evaluated the costs and risks of litigation and the defenses that could be raised in its sound business judgment.

**A.  <u>Paramount Interest of the Creditors.</u>**

16.     The Settlement Agreement will resolve significant, substantial, and high-stakes litigation for which there was no guaranty as to the outcome.  For example, the Settlement Agreement will resolve the Contested Matters, the Debtor's Claim Objection, and the matter of the New Haven Claim, KK-PB's assumption of the liability for 2018 and 2019 real estate/*ad*

*valorem* taxes with respect to the Real Property, KK-PB's payment of $5,125,000 in cash to the Debtor in exchange for the Real Property and personal property. The Settlement Agreement also enables the parties to avoid a lengthy appeal period and permits the Debtor to move forward with administrating the estate and avoid incurring additional administrative costs associated with the litigation expenses and holding costs during an appeal. The Settlement Agreement provides for a specific recovery to the estate in the amount of $5,125,000 in cash, and effectively satisfies the KK-PB's alleged secured claim in the amount of $39,684,844.73 in exchange for the Real Property and personal property.

17.    By entering into the Settlement Agreement, the Debtor is able to ensure it ends costly litigation, avoids a potentially lengthy appeal, while obtaining *inter alia* $5,125,000 in cash and resolving millions of dollars in claims, which will allow a distribution to creditors holding allowed claims. Moreover, the disposition of the Real Property agreed to in the Settlement Agreement will allow the Debtor to cease incurring additional administrative carrying costs, which will benefit creditors holding allowed claims. The Debtor therefore requests approval of the Settlement Agreement, which is fair, reasonable, and in the best interest of the Debtor's estate and its creditors.

**B.    <u>Probability of Success in the Litigation and the Complexity, Expense, Inconvenience and Delay of the Litigation Involved.</u>**

18.    The issues presented in the Contested Matters and the Debtor's dispute with KK-PB were relatively complex, as they involved, among other things: (a) establishing the  Debtor's insolvency and/or possession of unreasonably small capital on key dates; (b) whether Mr. Straub and/or KK-PB provided consideration to the Debtor and whether Mr. Straub and/or KK-PB provided reasonable equivalent value to the Debtor; (c) whether, with respect to the fraudulent transfer claims, the Debtor could either utilize the relation-back provision of Federal Rule of

Civil Procedure 15(c)(1)(B) or an unliquidated claim filed by the Securities and Exchange Commission combined with a pair of obscure federal statutes---28 U.S.C. §§ 2415(a) and 2416---to bring fraudulent transfer claims against KK-PB outside the normal statute of limitations in order to avoid the Note and Mortgage.

19.    The expense of such litigation involved the Debtor's retention of the undersigned counsel, a forensic accountant, and an appraiser specializing in hotels, all of whom worked extremely long hours in the lead up to, and during, the evidentiary hearing on the Contested Matters, all, except in the case of the appraiser, with no guarantee of being fully compensated for such work.  The Debtor anticipates that the expense of an appeal with regard to the Contested Matters would result in additional significant professional fees.

**C.  <u>Difficulties to be Encountered in the Matter of Collection.</u>**

20.    Furthermore, if the Debtor was fully or partially successful in its litigation of the Contested Matters, KK-PB may have appealed the result and thereby caused the Debtor to incur a significant delay before it was able to make distributions to allowed creditors.

21.    Accordingly, the Court should approve the Settlement Agreement as a reasonable exercise of the Debtor's sound business judgment resulting in protection of the best interests of the estate, and in doing so, enter an order containing the provisions and findings set forth in Sections 8 (bar order provisions) and 9 (findings of good faith/no improper or unlawful acts) that KK-PB and Mr. Straub have conditioned the effectiveness of the Settlement Agreement upon.

<u>**APPROVAL OF THE BAR ORDER/INJUNCTION/THIRD-PARTY RELEASES**</u>

22.    As set forth above and in Section 8 of the Settlement Agreement, an integral part of the Settlement Agreement negotiated and agreed to by the parties is the Court's entry of an order barring/enjoining/releasing all claims and litigation by the EB-5 Investors, the Other EB-5

Creditors, and any other creditors or potential creditors against KK-PB, Mr. Straub, Galle, Mr. Spano, New Haven, Mr. Laudano, and related parties and professionals, with respect to any and all actions and transactions arising from or relating to the Debtor, the Real Property, investments made by the EB-5 Investors and Other EB-5 Creditors in Palm House Hotel, LLLP, and any and all other matters that were directly or indirectly, or tangentially, related to the Real Property, the Debtor, or the Debtor's estate.

37.     Pursuant to 11 U.S.C. § 105(a), the Court may enter the bar order requested by the parties as part of the Settlement Agreement by determining that such bar order is fair and equitable, *In re Munford*, 97 F.3d 449, 455 (11th Cir. 1996), and in doing to, may consider "the interrelatedness of the claims that the bar order precludes, the likelihood of [barred parties] to prevail on the barred claim, the complexity of the litigation, and the likelihood of depletion of the resources of the settling defendants." *In re Munford*, 97 F.3d at 455; *see also In re Rothstein Rosenfeldt Adler, P.A.*, 2010 WL 3743885, at *6-7 (Bankr. S.D. Fla. 2010) (summarizing and quoting *Munford* to state that "(i) public policy favors settlements; (ii) the cost of litigation can be burdensome to a bankruptcy estate, and (iii) bar orders pay an integral role in facilitating settlements," and considering factors such as whether the requested bar order "is a critical and required term of the Settlement Agreement," and "is necessary to achieve the complete resolution of the issues contained in the Settlement Agreement, without which the Settling Parties would not proceed with the Settlement Agreement.").

38.     Here, the gravamen of the relevant claims brought by the EB-5 Investors and Other EB-5 Creditors is that the Real Property was utilized by non-released parties to perpetuate a fraud, and that KK-PB, New Haven, and Laudano improperly benefitted from such purported action.  While such claims do not directly reach Galle or Mr. Spano, the claims are sufficiently

interrelated with the Contested Matters that Debtor and KK-PB are seeking to settle.  As such, settlement ensures that holders of allowed claims in this bankruptcy case will see a recovery from the Real Property.

39.     As to Galle and Mr. Spano, no barred parties have asserted claims relating to the matters that would be subject to the Bar Order requested herein.  As to the EB-5 Investors, such claims are pending in the District Court Case, which has not advanced passed the pleading stage.  As to the Other EB-5 Creditors, such claims are pending in the Other EB-5 Creditors' State Court Case, which has not advanced passed the pleading stage.  Accordingly, the likelihood that the barred parties will prevail on claims against KK-PB, Mr. Straub, Galle, New Haven, Mr. Laudano, and Mr. Spano is uncertain.

23.     As the Settlement Agreement makes clear in Section 8, the requested bar order benefitting KK-PB, Mr. Straub, Galle, New Haven, Mr. Laudano, and Mr. Spano is an integral and required term of the Settlement Agreement without which KK-PB and Mr. Straub would not have been willing to enter into the Settlement Agreement resolving the Contested Matters.

24.     Finally, the requested bar order is fair and equitable.  No party has asserted claims against Mr. Straub, Galle, or Mr. Spano that would be barred by the bar order.  As to New Haven and Mr. Laudano, these parties have assisted in facilitating the Settlement Agreement by causing the senior secured New Haven Claim to be assigned to KK-PB, thereby permitting KK-PB to waive the New Haven Claim as part of the Settlement Agreement.  As to KK-PB and its principal, Mr. Straub, such parties are paying the Debtor the Settlement Payment, permitting creditors, including the EB-5 Investors and Other EB-5 Creditors, to obtain a distribution that was otherwise uncertain from the disposition of the Real Property.

40.     Accordingly, the Court should, as part of its entry of an order approving the

Settlement Agreement, enter the bar order set forth in Section 8 of the Settlement Agreement.

## APPROVAL OF THE APA AND CONVEYANCE
## OF THE REAL PROPERTY TO KK-PB

25.    Lastly, pursuant to 11 U.S.C. §§ 363(b), (f), (m), and (n), and Federal Rule of Bankruptcy Procedure 6004(h)  the Debtor, as part of the Settlement Agreement and the related APA, seeks to convey the Real Property (and certain related personal property and rights) to KK-PB (or its designee), free and clear of all liens, claims, encumbrances, and interests, and with specific findings that KK-PB (or its designee) is purchasing the Real Property in good faith, in a non-collusive manner, without successor liability, and with the Court deeming the conveyance effective immediately upon entry of its order.

26.    Section 363(f) of the Bankruptcy Code authorizes the Debtor to sell property of the estate free and clear of any liens, claims or encumbrances if one of the following is met: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  The language of Section 363(f) is in the disjunctive, so that a sale free and clear of interests can be approved if any of the aforementioned conditions is met. *In re Heine*, 141 B.R. 185, 189 (Bankr. D.S.D. 1992); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

27.    The only liens, claims, encumbrances, or interests in the Real Property that are senior to KK-PB's claim are the secured Real Estate Tax Claim and the New Haven Claim.  As to the Real Estate Tax Claim, such claim is expressly assumed by KK-PB in the Settlement Agreement and, regardless cash consideration to be paid by KK-PB to the Debtor – the sum of

$5,125,000 – is greater than the amount – $170,342.38 – of the Real Estate Claim.  Accordingly, Debtor may convey the Real Property free and clear of the Real Estate Tax Claim pursuant to 11 U.S.C. § 363(f)(3).   The New Haven Claim has been assigned to KK-PB and will be waived as part of the Settlement Agreement.

28.     With regard to the several claims secured by liens on the Real Property discussed at the beginning of this Motion, each of those claims are junior to the secured KK-PB Claim. Given that KK-PB is taking a conveyance of the Real Property in exchange for, among other things, a release of the KK-PB Claim and a cash payment of $5,125,000, such junior liens are unsecured by the Real Property and applicable non-bankruptcy law (*i.e.*, Florida mortgage foreclosure law pertaining to the foreclosure of out-of-the-money junior liens by senior foreclosing mortgagees) permits the sale of the Real Property free and clear of such junior liens. Accordingly, the Debtor may convey the Real Property to KK-PB free and clear of the remaining liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f)(1).

29.     Having negotiated, at arms-length, and in the heat of vigorous litigation, the Settlement Agreement and APA with KK-PB, the Debtor believes and submits that KK-PB is purchasing the Real Property in good faith and in a non-collusive manner.  Accordingly, the Court, in approving the APA, should specifically find as such pursuant to 11 U.S.C. §§ 363(m) and (n).

30.     Finally, because it was an essential term of the Settlement Agreement when approving the APA and the Debtor's conveyance of the Real Property to KK-PB under the terms thereof, the Debtor submits that cause exists for the Court to determine that, pursuant to Federal Rule of Bankruptcy Procedure 6004(h), the order approving the same is effective immediately upon entry.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an Order: (a) approving the Settlement Agreement; (b) making the findings requested in Section 9 of the Settlement Agreement; (c) barring the specific claims against KK-PB, Mr. Straub, Galle, New Haven, Mr. Laudano, and Mr. Spano, as well as their related parties and professionals, as set forth in Section 8 of the Settlement Agreement; (d) approving the APA and authorizing the conveyance of the Real Property and personal property specified therein to KK-PB or its designee pursuant to the terms of the APA; (e) retaining jurisdiction over the terms of the Settlement Agreement, the APA, and the parties thereto to interpret and enforce the Settlement Agreement and the APA and the Order related thereto; and (f) granting such other relief as the Court deems just and proper.

Respectfully Submitted,

SHRAIBERG, LANDAU & PAGE, P.A.
Attorneys for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email: plandau@slp.law
Email: blee@slp.law
Email: ependergraft@slp.law


By:  _/s/ Eric Pendergraft_____
        Philip J. Landau
        Florida Bar No. 504017
        Bernice C. Lee
        Florida Bar No. 73535
        Eric Pendergraft
        Florida Bar No. 91927

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on January 25, 2019, via CM/ECF to all parties registered to receive such notice via electronic filing.

*/s/ Eric Pendergraft*
Eric Pendergraft

# EXHIBIT A

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is entered into as of January 18, 2019, by and among: (a) 160 Royal Palm, LLC, on behalf of itself and its chapter 11 bankruptcy estate (the "Estate"); (b) KK-PB Financial, LLC, a Florida limited liability company ("KK-PB"), on behalf of itself or its assigns; and (c) Glenn F. Straub ("Straub"). The Debtor (on behalf of itself and its Estate), KK-PB and Straub are sometimes referred to individually as a "Party" hereto and, together, the "Parties" hereto.

### RECITALS

WHEREAS, 160 Royal Palm, LLC ("160 Royal Palm") is a debtor and debtor in possession (the "Debtor") in the Bankruptcy Case, having filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 2, 2018 (the "Petition Date");

WHEREAS, 160 Royal Palm owns real property located at 160 Royal Palm Way, Palm Beach, Florida 33480 (the "Property"). The Property is a partially constructed hotel/condominium;

WHEREAS, on or about August 30, 2013, Straub sold the Property to Palm House, LLC for $36,625,000, with seller financing. About 20% of the purchase price was paid at the closing, and Straub – through his wholly owned limited liability company, KK-PB – took back the balance as a $27,468,750.00 mortgage;

WHEREAS, the Debtor executed and delivered to KK-PB certain loan documents securing the financing of the Property, including (i) a Promissory Note dated August 30, 2013 in the principal amount of Twenty-Seven Million Four Hundred Sixty-Eight Thousand Seven Hundred Fifty and 00/100 Dollars ($27,468,750.00); and (ii) a Florida Real Estate Mortgage, Assignment of Leases and Rents and Security Agreement dated August 30, 2013 (together with the Promissory Note, the "Loan Documents");

WHEREAS, pursuant to the terms of the Loan Documents, payments of principal and interest were due to commence on November 1, 2014 and a balloon payment was due on August 30, 2018 (the "Maturity Date"). The Debtor defaulted on the loan by failing to pay the full principal and interest on the Maturity Date. Under the terms of the Promissory Note and the Mortgage, the Debtor's failure to pay all principal and interest by the Maturity Date constituted an Event of Default. As of the Petition Date, KK-PB is holding a secured claim in the amount of $37,337,705.77, plus interest, penalties, fees and other charges;

WHEREAS, on or about September 12, 2014, KK-PB filed an action for foreclosure against 160 Royal Palm, seeking to foreclose on the mortgage that 160 Royal Palm issued in favor of KK-PB as a result of 160 Royal Palm failure to pay amounts due and owing to KK-PB pursuant to the Loan Documents;

WHEREAS, the Debtor commenced its Bankruptcy Case on the Petition Date, in part, to forestall the Foreclosure Action;

1

WHEREAS, the Debtor has decided to sell substantially all of its assets, including the Property, and related assets (collectively, the "Assets") in a sale pursuant to Bankruptcy Code Section 363 (the "363 Sale");

WHEREAS, on September 13, 2018, KK-PB filed its Secured Creditor KK-PB Financial, LLC's Motion to (i) Modify and Terminate Automatic State; or (ii) Dismiss Chapter 11 Proceeding (the "Stay Relief Motion") [EFC 69] seeking among other things relief from the automatic stay to continue with the Foreclosure Action;

WHEREAS, on or about September 27, 2018, the Debtor has entered into an Asset Purchase Agreement with RREF II Palm House LLC (the "Stalking Horse Bidder") for the sale of the Assets for a purchase price of Thirty-Two Million Dollars ($32,000,000.00), subject to higher or otherwise better offers;

WHEREAS, on October 1, 2018, the Debtor filed its Motion for the Entry of an Order (i) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially All of Its Assets, (ii) Approving Form and Manner of Notice of Sale, (iii) Scheduling an Auction and Sale Hearing and (iv) Approving the Sale of the Assets Free and Clear of Liens, Claims and Encumbrances (the "Bid Procedures Motion") [DE 92];

WHEREAS, on October 5, 2018, the Debtor filed its Debtor's Motion to Limit Credit Bids with Respect to Sale of Substantially All of Its Assets (the "Credit Bid Motion") [EFC 103], whereby the Debtor sought to, among other things, limit and/or deny KK-PB's ability to credit bid its secured claim at an auction sale for the Assets or, alternatively, to equitably subordinate or re-characterize KK-PB's secured claim;

WHEREAS, on October 10, 2018, KK-PB filed its Secured Creditor Motion to Estimate Claim for Purpose of Credit Bidding Pursuant to 11 U. S. C. §§ 502(c) and 363(k) (the "Estimation Motion") [EFC 133], seeking among other things to allow KK-PB's secured claim for the purpose of credit bidding at an auction sale for the sale of the Assets;

WHEREAS, on October 10, 2018, the Bankruptcy Court held a hearing on the Stay Relief Motion, Bid Procedures Motion, and the Credit Bid Motion, at which time the court set a briefing schedule for October 17, 2018, whereby the Parties had to provide responsive pleadings to the Estimation Motion, and the Credit Bid Motion, and rescheduled a preliminary hearing on the Stay Relief Motion, Bid Procedures Motion, Credit Bid Motion, and the Estimation Motion for October 24, 2018;

WHEREAS, on October 17, 2018, KK-PB filed a proof of claim in the amount of $37,337,705.77 as a claim secured by the Property, which KK-PB amended on October 23, 2018, for an amended secured claim in the amount of $37,348,229.27 and further amended on December 26, 2018 for a second secured claim in the amount of $39,684,844.73 (the "KK-PB Claim") [Claim No. 70];

WHEREAS, on October 24, 2018, the Bankruptcy Court held a hearing on the Credit Bid Motion and the Estimation Motion and determine that it would require an evidentiary hearing on various matters before any scheduled Auction for the sale of the Debtor's Assets;

2

WHEREAS, on January 8 and 11, 2019, the Bankruptcy Court conducted a portion of the evidentiary hearing on the Credit Bid Motion and the Estimation Motion, with January 18, 28 and 29, 2019 set aside to continue and conclude the hearing.

WHEREAS, the Parties have determined to enter into this Settlement Agreement in order to avoid the uncertainties and further expense of continuing the evidentiary hearing involving the issues in the Credit Bid Motion, and the Estimation Motion; and

WHEREAS, the Parties each have consulted with their respective counsel in connection with the matters subject hereto and have negotiated the terms and conditions of this Agreement in good faith and at arms' length while represented by counsel; and

WHEREAS, the Parties have agreed to the final compromise and settlement to resolve all matters arising from and relating to KK-PB's claims asserted against the Debtor and the Debtor's Estate, and to resolve all matters arising from and relating to the claims asserted against KK-PB and Straub by the Debtor and the Debtor's Estate, and those described elsewhere in this Agreement, all subject to, conditioned upon, and in accordance with the terms hereof;

NOW, THEREFORE, in consideration of the recitals hereto, the mutual promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.  **Recitals Incorporated.**  The recitals and prefatory phrases and paragraphs set forth above are hereby incorporated in full, and made a part of, this Settlement Agreement.

2.  **Definitions.**  Capitalized terms not otherwise defined in the Preamble and Recitals above shall have the following definitions:

  a.  "Auction" means any auction of the Assets to be conducted by the Debtor in connection with the 363 Sale.

  b.  "Bankruptcy Case" means, collectively, the chapter 11 cases captioned *In re 160 Royal Palm, LLC,* case number 18-19441 (EPK) pending before the Bankruptcy Court.

  c.  "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division.

  d.  "Bankruptcy Code" means title 11 of the United States Code.

  e.  "Bar Order" means an order of the Bankruptcy Court barring the EB5 Investors and other creditor or potential creditors from commencing or proceeding with any litigation against KK-PB, Straub, The Galle Law Group, P.A., Craig T. Galle, Sal V. Spano, Nicholas J. Laudano, and/or New Haven Contracting South, Inc.

  f.  "Bidding Procedures" means the procedures governing the 363 Sale and Auction approved by order of the Bankruptcy Court dated October 16, 2018 [DE 154].

3

g.  "Closing" means the closing and consummation of the 363 Sale.

h.  "Contested Matters" means the Credit Bid Motion, the Estimation Motion, and any other contested matter between the Debtor and KK-PB and related parties that the Bankruptcy Court may consider.

i.  "EB5 Claims" means the claims of the EB5 Investors that investment funds were given to Palm House Hotel LLLP for the benefit of 160 Royal.

j.  "EB5 Investors" means the foreign nationals that invested in Palm House Hotel LLLP in order to obtain visas for entry into the United States pursuant to the EB5 visa program including, without limitation, the EB5 Investors that are parties to the EB5 Litigation.

k.  "EB5 Litigation" means the actions filed by (i) Lan Li, Ying Tan, Tao Xiong, and others in the case styled *Lan Li, et al. v. Joseph Walsh, et al.*, Case No. 9:16-cv-91871-KAM, pending in the United States District Court for the Southern District of Florida; and (ii) *Wang Jue et al. v. Joseph Walsh, et al.*, Case No. 18-CA-014081, pending the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida

l.  "Effective Date" means the first business day upon which all conditions to the effectiveness of this Settlement Agreement are satisfied.

m.  "Estate Released Parties/Estate Releasors" means the Debtor, its Estate, Cary Glickstein, the Debtor's managers, officers, affiliates and subsidiaries, and their respective employees, representatives, agents, attorneys, affiliates, predecessors, successors, and/or assigns.

n.  "KK-PB Released Parties/KK-PB Releasors" means KK-PB, Straub, The Galle Law Group, P.A., Craig T. Galle, Sal V. Spano, KK-PB's managers, officers, affiliates and subsidiaries, and their respective employees, representatives, agents, attorneys, affiliates, predecessors, successors, and/or assigns.

o.  "New Haven" means New Haven Contracting South, Inc., a Florida corporation that was administratively dissolved in September 2016, and its principal Nicholas J. Laudano, that obtained a judgment against 160 Royal Palm in the amount of $3,387,855.55.

p.  "New Haven Claim" means the proof of claim and judgment lien claim in the amount of $3,387,855.55 of New Haven Contracting South, Inc./Nicholas J. Laudano in connection with a judgment obtained against 160 Royal Palm.

q.  "Property Tax Amount" means any unpaid personal property taxes owed by the Debtor at Closing with respect to the Business Operations.

4

r.   "RREF II Break-Up Fee" means the bid protections in the amount of $350,000 to be paid to the Stalking Horse Bidder under certain circumstances if it is not the successful bidder for the Assets in the 363 Sale.

s.   "Settlement Motion" means the Debtor's motion seeking to shorten the notice period for the approval of the Settlement, and to approve the terms of this Settlement Agreement.

t.   "Settlement Order" means the order of the Bankruptcy Court approving this Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3.   **Settlement Amount.**   KK-PB agrees to pay the Debtor $5,125,000 (the "Settlement Amount"), said payment to be made by KK-PB to the Debtor by wire transfer within three (3) business days of the Bankruptcy Court's entry of the Settlement Order and Bar Order. The Debtor shall use the Settlement Amount received from KK-PB to pay towards any and all administrative claims, RREF II Breakup Fee, broker's commissions, the Town of Palm Beach fines and code penalties, creditor claims, including the EB5 Claims and any general unsecured claims; provided, however, the Settlement Amount shall not be used to pay the New Haven Claim or the KK-PB Claim.   KK-PB agrees to execute the Asset Purchase Agreement (the "APA") attached hereto as Exhibit A.   The terms of the APA are incorporated into this Settlement Agreement.   In the event of a conflict between the terms of this Settlement Agreement and the terms of the APA, the terms of the APA shall control.   In the event KK-PB fails to timely pay the Settlement Amount to the Debtor and/or fails to attend the Closing or give its consent to the disbursement of the Settlement Amount by the Closing Agent to the Debtor, KK-PB shall be entitled to three (3) days' written notice to cure such default and, in the event that the default is not cured within this time period, KK-PB shall be deemed to have forfeited the Settlement Amount.

4.   **Transfer of the Property to KK-PB.**   In exchange for the payment of the Settlement Amount, pursuant to the terms of the APA, the Debtor shall deed the Property to KK-PB or an entity designated by KK-PB to take title to the Property in full satisfaction of the KK-PB Claim and the New Haven Claim. The Parties agree that the transfer of the Property from the Debtor to KK-PB shall be recorded at a transfer price of $10,260,862, which sum is the current assessed value and the current appraised value of the Property.   As a part of the transfer of the Property pursuant to this Settlement Agreement, KK-PB has elected not to obtain a title insurance policy insuring the transfer or its fee simple ownership of the Property.   Any fees, costs or sums incurred or due for previously conducted title searches, title review, abstracts, surveys and/or title commitments shall be the obligation of the Debtor and not an obligation of KK-PB.

5.   **Real Estate Commission.**   The Debtor shall be responsible to pay Cushman & Wakefield ("C&W") the real estate commission set forth in the Debtor's Listing Agreement with C&W.

6.   **Town of Palm Beach Negotiated Fines.**   **The Debtor** shall be responsible for fulfilling the financial obligations under the Amended Conditional Settlement Agreement dated

as of January 8, 2019 described in Section 10.4 of the APA, including but not limited to, paying the Town of Palm Beach and the Town of Palm Beach Code Enforcement (i) the $200,000 negotiated and agreed upon violation assessment and (ii) the $50,000 negotiated and agreed upon code enforcement fine, code enforcement order and code enforcement lien. Debtor shall be obligated to pay these amounts to the Town of Palm Beach simultaneously with the payment of the Settlement Amount by KK-PBand Bar Order. Debtor assigns and transfers to KK-PB any and all of its rights, without representation or warranty, to the amended conditional settlement agreements described in Section 10.4 of the APA.

7.    **Claim of New Haven Contracting South, Inc./Nicholas J. Laudano.** KK-PB, as the successor and assignee of the New Haven Claim, agrees to withdraw, with prejudice, the New Haven Claim within three (3) business days of the Bankruptcy Court's entry of the Settlement Order and Bar Order. KK-PB agrees to indemnify the Debtor and its Estate with respect to the New Haven Claim provided that the Debtor obtains the Settlement Order and Bar Order.

8.    **Bar Order.** KK-PB's and Straub's entry into this Settlement Agreement is expressly conditioned upon the entry of a Bar Order, which the Parties acknowledge is an integral part of the settlement. In the event the Bankruptcy Court does not enter the Bar Order as set forth below, or if the Bankruptcy Court enters the Bar Order but appellate review is sought and on such review the Bar Order is vacated, modified or reversed, then this Settlement Agreement shall be terminated, unless this provision is waived, in writing, by KK-PB and Straub. On or before January 25, 2019, the Debtor shall seek entry of a Bar Order by the Bankruptcy Court barring the EB5 Investors and any other creditor or potential creditors from commencing or proceeding with any litigation against the KK-PB, Straub, The Galle Law Group, P.A., Craig T. Galle, Sal V. Spano, New Haven Contracting South, Inc., Nicholas J. Laudano, and related parties and professionals, with respect to any and all transactions arising from or relating to Debtor 160 Royal Palm, LLC and the real property located at 160 Royal Palm Way in Palm Beach, Florida, the investments made by the EB5 Investors in Palm House Hotel, LLLP, and any and all other matters that were directly, indirectly or tangentially related to the Property, the Debtor and/or the Estate.

9.    **Good Faith/No Improper or Unlawful Acts.** KK-PB's and Straub's entry into this Settlement Agreement is expressly conditioned upon the entry of the Settlement Order by the Bankruptcy Court and the Parties agree and acknowledge that the Bankruptcy Court's issuance of the Settlement Order approving the Agreement and containing certain provisions set forth in this paragraph is a material inducement to entering into and of the Settlement Agreement: (i) approving this Settlement Agreement, (ii) finding that the Parties have entered into the Settlement Agreement and the proposed settlement and releases contemplated thereby in good faith; (iii) finding that proper, sufficient, and adequate notice of the Motion seeking approval of the Settlement Agreement and hearing thereon has been provided in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and no other or further notice is necessary; (iv) finding that KK-PB and Straub or their assigns are good faith purchasers under Section 363(m) of the Bankruptcy Code and as such, KK-PB and Straub or their assigns are entitled to all of the protections afforded under Section 363(m); (v) finding that the Settlement Agreement and the terms and conditions of proposed Settlement set forth herein, including, without limitation, the

agreements, stipulations, and releases set forth herein, are approved and authorized in all respects in accordance with Sections 105 and 363(b), (k), and (m) of the Bankruptcy Code, Rules 6004, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure, and other applicable law and authority cited in the Motion seeking approval of this Settlement Agreement; (vi) finding that there was no fraud, wire fraud, bank fraud, illegal monetary transactions, collusion, aiding or abetting, conspiracy or other improper or unlawful acts on the part of KK-PB, Straub, The Galle Law Group, P.A, Craig T. Galle or Sal V. Spano with, involving or related to the Debtor, Robert V. Matthews, Maria "Mia" Matthews, Joseph Walsh, Palm House Hotel, LLLP, South Atlantic Regional Center, LLC, Leslie Evans, Leslie Robert Evans & Associates, P.A., New Haven, Nicholas J. Laudano, NJL Development Group Inc. or Palm House, LLC, which the Parties acknowledge is an integral part of the settlement. In the event the Bankruptcy Court does not enter the Settlement Order as set forth above, or if the Bankruptcy Court enters the Settlement Order but appellate review is sought and on such review the Settlement Order is vacated, modified or reversed, then this Settlement Agreement shall be terminated, unless this provision is waived, in writing, by KK-PB and Straub. On or before January 25, 2019, the Debtor shall seek entry of a Settlement Order by the Bankruptcy Court containing the findings and rulings set forth above in this paragraph.

10. **Time is of the Essence.** Time is of the essence with respect to all dates and time periods set forth in this Settlement Agreement.

11. **Releases.**

   a. <u>KK-PB Released Parties</u>: Subject to and conditioned upon the occurrence of the Effective Date and the occurrence of the Closing, each of the Estate Releasors shall, and shall be conclusively deemed to have, unconditionally, absolutely, and irrevocably released, discharged and forever waived any and all actions, causes of action, rights, liabilities, obligations, suits, debts, accounts, promises, warranties, damages and consequential damages, judgments, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature, whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate, or matured, in law or in equity, arising in connection with or relating to the Loan Documents, any act or omission relating to any transaction in connection with the Loan Documents, the Bankruptcy Case, the Contested Matters, and the 363 Sale, which each of the Estate Releasors have or ever had against the KK-PB Released Parties on or at any time prior to the Effective Date; provided, however, that nothing contained in this <u>Section 11</u> shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of this Settlement Agreement.

   b. <u>Estate Released Parties</u>: Subject to and conditioned upon the occurrence of the Effective Date and the occurrence of the Closing, each of the KK-PB Releasors shall, and shall be conclusively deemed to have, unconditionally, absolutely, and irrevocably released, discharged and forever waived any and all actions, causes of action, rights, liabilities, obligations, suits, debts, accounts, promises, warranties, damages and consequential damages, judgments, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature, whether known

or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate, or matured, in law or in equity, arising in connection with or relating to the Loan Documents, the Bankruptcy Case, the Contested Matters and the 363 Sale, which each of the KK-PB Releasors have or ever had against the Estate Released Parties on or at any time prior to the Effective Date, including without limitation the KK-PB Claim; provided, however, that nothing contained in this Section 11 shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of this Settlement Agreement.

12. **Conditions to Effectiveness.** The effectiveness of all terms and conditions of this Settlement Agreement is subject to the occurrence of the following conditions precedent:

    a. This Settlement Agreement shall have been fully executed and delivered by all of the Parties;

    b. The APA shall have been fully executed and delivered by all of the Parties;

    c. The Bankruptcy Court shall have entered the Bar Order and the Settlement Order;

    d. KK-PB shall have paid the Settlement Amount and withdrawn the New Haven Claim and the KK-PB Claim; and

    e. Transfer of the Property to KK-PB or an entity designated by KK-PB to take title to the Property.

13. **Jurisdiction and Governing Law.** The Parties agree that the Bankruptcy Court shall retain jurisdiction to the fullest extent possible over the interpretation and enforcement of this Settlement Agreement, and over any dispute between them in any way related to this Settlement Agreement. The Parties further agree that this Settlement Agreement shall be construed and governed by the laws of the State of Florida, irrespective of its choice of law rules.

14. **Entire Agreement.** This Settlement Agreement and the APA collectively constitute the entire agreement of the Parties as to the subject matter hereof and is the final and complete expression of their intent, and supersedes and renders moot any previous term sheets regarding the terms of this Settlement Agreement. The undersigned acknowledge that there are no communications or understandings, oral or written, contrary, different, or which in any way restrict this Settlement Agreement or the APA. Except as provided in the APA, the undersigned further acknowledge that all prior agreements, communications, and understandings within the scope of the subject matter of this Settlement Agreement are, upon execution of this Settlement Agreement, superseded, null and void. This Settlement Agreement can only be changed, modified or discharged if consented to in writing executed by the Parties hereto and, if applicable, approved by order of the Bankruptcy Court.

15. **Counterparts.** This Settlement Agreement may be executed in one or more counterparts, via facsimile or electronic means; each counterpart to be considered an original portion of this Settlement Agreement.

16.   **Advice of Counsel.**   The Parties acknowledge that the matters being settled hereby have been subject to contention and the opportunity for discovery, and that each Party has had the opportunity to make an investigation of the facts pertaining to this Settlement Agreement and all matters pertaining thereto, as it deems necessary.   The Parties further acknowledge: (a) each Party is represented by experienced counsel; (b) each Party has read this Settlement Agreement and understands its contents; and (c) each Party is entering into this Settlement Agreement voluntarily and without duress, and with a full understanding of its terms.   The Parties agree that no Party shall later seek to overturn or invalidate any aspect of this Settlement Agreement on grounds of unconscionability, oppression or any similar reason.

17.   **No Admissions, Representations or Warranties.**   Nothing contained in this Settlement Agreement shall be deemed to be an admission, by either Party, of any fact, matter, claim or defense previously in dispute.   Each Party is aware that it may hereafter discover claims or facts in addition to or different from those it now knows or believes to be true.   Nevertheless, it is the intention of the Parties to fully, finally, and forever settle and release any and all controversies among themselves, and all claims relative thereto, that do now exist or heretofore have existed between them.   In furtherance of such intention, the releases given herein shall be and remain in effect as full and complete releases of all such matters, notwithstanding the discovery or existence of any additional or different claims or facts relative thereto.

18.   **Covenant of Further Assurances.**   The Parties covenant and agree that, from and after the execution and delivery of this Settlement Agreement, they shall, execute, deliver and file any and all documents and instruments as are reasonably necessary or requested by the other Party to obtain approval of or implement the terms of this Settlement Agreement, and shall not take any action to directly or indirectly oppose the approval of the Settlement Agreement.

19.   **Authority.**

    a.   Subject to and conditioned on the Bankruptcy Court's entry of the Settlement Order, the Debtor has the authority to execute and deliver the Settlement Agreement on its behalf, and to perform fully its obligations hereunder and to consummate the transactions contemplated hereby.   The Debtor has duly executed and delivered this Settlement Agreement.   Subject to and conditioned on the Bankruptcy Court's entry of the Settlement Order, this Settlement Agreement is a legal, valid and binding obligation of each of the Debtor, and the Estate, enforceable against such Debtor, and the Estate in accordance with its terms.

    b.   KK-PB has the corporate power and authority to execute and deliver this Settlement Agreement, to perform fully its obligations hereunder, and to consummate the transactions contemplated hereby.   The execution and delivery of this Settlement Agreement by KK-PB, and the consummation of the transactions contemplated hereby, have been duly authorized by all requisite corporate action of KK-PB.   KK-PB has duly executed and delivered this Settlement Agreement. This Settlement Agreement shall constitute a legal, valid and binding obligation of KK-PB, enforceable against it in accordance with its terms, upon full execution hereof.

20. **Notices.** Any and all notices required or permitted under this Settlement Agreement and any and all correspondence shall be in writing and shall be personally delivered or mailed by registered or certified mail, return receipt requested, or by overnight delivery to the Parties at the addresses designated with their respective signatures below, unless and until a different address has been designated by written notice to the other Parties.

**IN WITNESS WHEREOF**, the Parties hereto, each by persons duly authorized, have caused the Settlement Agreement to be executed as of the day and year first written above.

| **160 Royal Palm, LLC** | **KK-PB Financial, LLC** |
|---|---|
| By: _____ | By: _____ |
| Its: Court Appointed Manager of 160 Royal Palm LLC and not individually | Its: MANAGER |
| | **Glenn F. Straub** |
| | _____ |
| | Glenn F. Straub |

11

# EXHIBIT B

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of the 18th day of January, 2019 between **160 ROYAL PALM, LLC**, a Florida limited liability company (the "Seller") and **KK-PB FINANCIAL, LLC**, a Florida limited liability company (the "Buyer"), recites and provides:

### RECITALS

Seller is the owner of certain real property located at 160 Royal Palm Way, Palm Beach, Florida, which real property is described on **Exhibit "A"** attached hereto, together with all improvements thereon (the "Property"). Seller desires to sell the Property to Buyer and Buyer desires to purchase the Property from Seller on the terms and conditions set forth herein.

Seller filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") on August 2, 2018 thereby initiating Case No. 18-19441-EPK (the "Bankruptcy Case"). The bankruptcy estate of the Seller is referred to herein as the "Estate."

Buyer seeks to acquire the Assets (defined below) through a private sale approved pursuant to 11 U.S.C. Section 363and submits this Agreement to be considered by the Seller.

Seller believes that it is in the best interests of the Estate to sell the Assets (defined below) to Buyer, and Buyer wishes to purchase the Assets from Seller, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and Buyer agree as follows:

1. **Court Approval**. This Agreement and the Parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval and the entry of a final non-appealable order, approving this Agreement and the transaction contemplated herein and containing the findings set forth in Section 8.1 (the "Sale Order"), after notice and a hearing, and subject to higher or otherwise better offers, and the provisions, requirements and limitations of the Sale Order.

2. **Sale and Purchase of Property**. Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall purchase and acquire from Seller, Seller's right, title and interest in and to the following (collectively, the "Assets"):

{2234/000/00430848}

2.1    the Property, including any improvements thereon and appurtenances belonging thereto or hereafter existing, subject to the Permitted Exceptions (defined below);

2.2    all tangible personal property and equipment, if any, owned by Seller and located on the Property or stored off-site (if any), including, without limitation, those items described on **Exhibit "B"** hereto, and to the extent in Seller's actual possession, all books, records, correspondence and documents of Seller related to the design, construction or operation of the Property, including any improvements thereon and appurtenances belonging thereto or hereafter existing, and all plans, specifications, floor plans, drawings and renderings of all or any part of the Property (the "Tangible Personal Property");

2.3    all transferable development rights, consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely in respect of the Property, all transferable warranties and guaranties, if any, held by Debtor in connection with the Assets (collectively, the "Intangible Personal Property"); and

2.4    to the extent applicable, any insurance or condemnation awards or proceeds under Section 15.

3.    **Conveyance of Property**.  On the Closing Date, subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Assets to the Buyer free and clear of all liens, claims and encumbrances, including without limitation mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, and conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein (including notices or other registrations in respect of any of the foregoing) affecting title to the Assets or any part thereof or interest therein as permitted under section 363(f) of the Bankruptcy Code (collectively, "Liens"), subject to the Permitted Exceptions with such Liens to attach to the proceeds of sale, on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES, except as expressly set forth in section 13.1 of this Agreement:

3.1    Quitclaim Deed (the "Deed") conveying the Property to Buyer, which shall be free and clear of all Liens in accordance with Section 363(f) of the Bankruptcy Code, and subject to the Permitted Exceptions; and

3.2    Bill of Sale (the "Bill of Sale") transferring all right, title and interest of Seller in and to the Tangible Personal Property to Buyer, which shall be free and clear of all Liens in accordance with Section 363(f) of the Bankruptcy Code.

4.    **Excluded Assets**.  The term "Excluded Assets" means the following assets of the Seller, all of which are excluded from the purchase and sale transaction provided for in this Agreement:

4.1    the Purchase Price and all cash, cash equivalents, bank accounts or similar types of investments:

4.2    all tax returns and all tax credits, tax benefits and claims for refunds in respect of any federal, state, local, and/or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real estate, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, severance, estimated or other taxes, including any interest or addition thereto, for periods ending on or before the Closing Date;

4.3    subject to Section 15, any and all right, title and interest in any insurance policy(ies) in connection with the ownership or operation of the Property by the Seller and any and all amounts claimed and/or collected pursuant to such insurance policy(ies);

4.4    all rights and properties not owned by the Debtor;

4.5    the membership interests and any other ownership interests in the Debtor, and the company minute books, transfer records, and all other company documents of Debtor;

4.6    all contract rights, rights of action, claims for damages, rights of setoff, rights of recoupment, claims, demands, actions, causes of action, judgments, and pending litigation;

4.7    all rights, claims, defenses and other matters that relate to any construction contracts affecting the Property; notwithstanding anything herein to the contrary, any construction defect or related claims which arose prior to Closing shall be an Excluded Asset;

4.8    all rights, claims, causes of action, defenses and other matters that relate or belong to the Debtor, including without limitation and any claims, or causes of action which are property of the estate under section 541 of the Bankruptcy Code including those arising under or in connection with Chapter 5 of the Bankruptcy Code;

4.9    any prepaid expenses, advance payments, security deposits, rents and other items related to the Assets that are applicable to the period prior to Closing, or that relate to executory contracts or unexpired leases that are not being assumed by the Seller and assigned to the Buyer.

4.10    the Debtor's accounts receivable; and

4.11    any asset not specifically included in the definition of "Assets".

5.    **Deposit**.  Upon execution of this Agreement by the Buyer and Seller, Buyer shall have deposited the sum of Five Million One Hundred Twenty Five Thousand and 00/100 Dollars ($5,125,000.00) with Chicago Title Insurance Company (the "Deposit Agent"), in the form of a Federal Reserve System wire-transfer of immediately available funds, to be held in escrow, as Buyer's deposit under this Agreement (the "Deposit"), which Deposit shall be held without interest and shall be applied against the Purchase Price at Closing, or: (a) returned to Buyer, (as its sole and exclusive remedy), if (i) the Sale Order is not entered, (ii) this Agreement is not approved by the Bankruptcy Court,  (iii) after written notice and a 14 day cure period (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), Seller breaches

the terms of this Agreement in any material respect, (iv) the conditions set forth in Section 9 are not satisfied as of the Closing Date or waived by the Buyer, or (v) required in accordance with Section 11.1 or Section 15; or (b) paid to Seller if Buyer breaches the terms of this Agreement or the conditions set forth in Sections 10.2 or 10.3 are not satisfied as of the Closing Date.  In the event of such return of the Deposit this Agreement shall terminate and the parties shall be released from any further rights or obligations hereunder except for those which expressly survive termination.

6.    **Purchase Price**.

6.1    The purchase price for the Assets shall be Ten Million Two Hundred and Sixty Thousand Eight Hundred and Sixty Two and 00/100 Dollars ($10,260,862.00) (the "Purchase Price").  At the Closing, Buyer shall pay to Seller the Purchase Price (less the Deposit and Settlement Adjustment pursuant to Section 6.3), and without any other setoff or prorations, by wire transfer of immediately available funds to such account(s) as Seller shall designate.  This is an "All Cash" transaction that is not subject to any financing, other contingencies, or post contract due diligence.

6.2    In addition to the Purchase Price, the Buyer represents that it (or its affiliates or assigns) has already purchased proof of claim number 72 filed in the Bankruptcy Case by New Haven Contracting South, Inc. in the amount of $3,387,855.55 (the "New Haven Claim").  The Buyer agrees to assume and satisfy any liability the Seller may have to New Haven Contracting South, Inc. on account of the New Haven Claim and the Buyer further agrees to waive any right to receive a distribution from the Seller and/or the bankruptcy estate on account of the New Haven Claim.  Similarly, the Buyer agrees to take title to the Property in full satisfaction of its claims in the Bankruptcy Case.

6.3    In accordance with that certain Settlement Agreement as defined herein, the Buyer and Seller agree that the Buyer shall be entitled to a credit under this Agreement of $5,135,862 (the "Settlement Adjustment") such that the Buyer shall not be required to deliver to the Seller more than $5,125,000 at Closing.

7.    **Title**.

7.1 [Intentionally Deleted].
7.1    Owner's Policy of Title Insurance.  Seller and Buyer acknowledge that Seller makes no representation or warranty to Buyer of any kind or nature concerning the marketability or insurability of title to the Property and at Buyer's request, Buyer will not be obtaining a title commitment, title report, lien search, survey or title insurance policy insuring marketability of title to the Property and Buyer will accept the Property in its "As Is; Where Is" Condition and with all faults. .

7.2    [Intentionally Deleted].

8.    **Bankruptcy Court Approval and Competing Transactions**.

8.1     Bankruptcy Court Approval.  Seller shall use commercially reasonable efforts to obtain the Sale Order from the Bankruptcy Court approving the sale of the Assets to Buyer pursuant to this Agreement, which shall contain the following provisions:

(a)     a finding that Seller prepared and served a motion seeking the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled thereto, and that all parties in interest entitled to such notice received such notice;

(b)     the sale and transfer of the Assets to the Buyer is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;

(c)     the sale of the Assets to Buyer pursuant to this Agreement will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds;

(d)     Buyer is not a mere continuation of Seller, there is no continuity of enterprise between Seller and Buyer, Buyer is not a successor to Seller and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or de facto merger of Buyer and Seller;

(e)     Buyer has acted in good faith within the context of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code;

(f)     the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(g)     Buyer is not assuming or acquiring any of the Excluded Assets; and

(h)     the Sale Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(h).

8.2     **[Intentionally deleted.]**

8.3     **[Intentionally deleted.]**

9.     **Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer in its sole discretion:

9.1     **[Intentionally deleted.]**

9.2     the Sale Order shall have been entered by the Bankruptcy Court as soon as reasonably practicable following the sale hearing, subject to the Bankruptcy Court's availability;

9.3     the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such

date, and Seller shall not be in default in any material respect under the provisions of this Agreement;

        9.4     Seller shall have delivered to Buyer the deliverables set forth in Section 11.3; and

If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under Section 16 and any other provision of this Agreement that expressly provides for such survival.

    10.    **Conditions to Obligations of Seller**. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller:

        10.1     the Sale Order shall have been entered by the Bankruptcy Court;

        10.2     the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default under the provisions of this Agreement; and

        10.3     Buyer shall have paid to Seller the Purchase Price (subject to the deduction set forth in Section 6) and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing.

        10.4     Seller shall have entered into (a) the Amended Conditional Settlement Agreement between Seller and the Town of Palm Beach, a municipal corporation (the "Town") in settlement of litigation between the Seller and the Town, a declaration of use agreement violation assessment imposed against the Property and for the preservation of development approvals for the Property and (b) the Amended Conditional Settlement Agreement between Seller and the Town of Palm Beach Code Enforcement Board (the "Enforcement Board") in settlement of a certain code enforcement violation, fine and lien pending against the Property; such agreements shall be substantially in the form attached hereto as Composite **Exhibit "E"** (collectively, the "Settlement Agreements"), together with such other and further changes as Seller may determine are necessary or appropriate provided same shall not impose any additional material financial obligations on Buyer which are not reflected in the Settlement Agreements attached hereto and the Settlement Agreements shall be approved by the Bankruptcy Court. The Settlement Agreements shall result in payment obligations to the Town and Code Enforcement Board not to exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) which shall be binding upon the Property and shall be paid by Buyer.

    11.    **Closing**.

        11.1     Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place on or before twenty (20) calendar days after the Sale Order is entered and becomes final and non-appealable (the "Closing Date"). The Seller and Buyer may agree in writing to proceed to Closing at an earlier date provided that the Sale Order contains a waiver of the 14-day stay period in accordance with

Fed. R. Bank. P. 6004(h). Notwithstanding anything herein to the contrary, if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved. If such postponement is longer than sixty (60) days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case Seller shall return the Deposit to Buyer and neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.

11.2    Closing shall be conducted by the Title Company (the "Closing Agent"). Closing shall take place at the offices of Closing Agent (or such other place as the Parties may designate in writing). Each Party shall deliver written closing instructions to the Closing Agent consistent with the provisions of this Agreement.

11.3    At the Closing, Seller shall deliver to Buyer: (a) the transfer instruments provided for in Section 3; (b) Seller's executed countersignature to the closing statement contemplated in Section 11.4(c) below; (c) a FIRPTA Affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act; (d) such other documents as Buyer or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement; and (e) possession and occupancy of the Property and possession of the Tangible Personal Property.

11.4    At the Closing, Buyer shall deliver to Seller: (a) the Purchase Price as provided in Section 6; (b) the transfer instruments provided for in Section 3; (c) a closing statement between Seller and Buyer, reflecting the Purchase Price, the Deposit and all closing costs and other expenses, and (d) such other documents as Seller or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement.

11.5    Buyer shall pay, on the Closing Date, all costs of Closing, including, without limitation, the cost of recording the deed and state documentary stamps which are required to be affixed to the instrument of conveyance   Each Party shall pay its own attorneys' and other professionals' fees.

12.    **Prorations**.

12.1    Real property taxes and assessments for the 2018 tax year, and 2019 tax year (if applicable) through Closing, shall be paid by Buyer. All utility bills shall be apportioned between Buyer and Seller as of the Closing Date, with the Seller's portion of such utility bills being reduced from the Purchase Price as contemplated in Section 6. If final documentation of any such item is not available at the Closing, the required proration shall be made on the basis of the best available documentation.

12.2    Except as contemplated in Section 12.1, there shall be no offset, reduction in closing proceeds, or proration of any kind. Buyer shall be responsible for transferring any and all public utilities on the Closing Date.

12.3    The Parties agree that, after the Closing Date, each shall hold and shall promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements or other property that they may receive on or after the

Closing Date which properly belong to the other Party, including any insurance proceeds, and shall account to the other for all such receipts.

13.    **Representations and Warranties**.

13.1    Seller represents and warrants to Buyer that Seller, subject to the entry of the Sale Order without any stay being obtained by any party in interest within the requisite period, has the power to convey the Assets to Buyer pursuant to this Agreement and subject to and in accordance with the provisions of the Sale Order.  Seller makes no other representations and warranties in connection with this Agreement.

13.2    As of the date hereof, Buyer hereby represents and warrants to Seller which representations and warranties shall survive Closing for a period of one (1) year:

(a)    At the time of closing, Buyer will be a Florida limited liability company, duly organized, validly existing and in good standing under the laws of Florida.

(b)    The execution, delivery and performance by Buyer of this Agreement and the other documents and instruments contemplated hereby are within the power of Buyer and have been duly authorized by all necessary action by Buyer.  This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

(c)    Buyer and the entities or persons signing this Agreement on its behalf are authorized to execute this Agreement and bind Buyer to the terms hereof without the consent or joinder of any other person or entity.

(d)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, nor any rules, regulations, permits, licenses and orders promulgated thereunder.

(e)    Buyer is not insolvent and is able to pay its debts as they mature.  No proceeding in bankruptcy or for the appointment of any receiver for all or any portion of Buyer's property, real or personal, has been filed by or against Buyer in any federal or state court.

(f)    There is no litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which would have any material adverse effect on Buyer's ability to perform its obligations under this Agreement.

(g)    The execution of this Agreement and the consummation of the transaction contemplated hereby does not and shall not violate the terms of any agreement or court order which is binding upon Buyer.

(h)    Except as expressly set forth in Section 13.1 of this Agreement, that any and all information (whether expressed, implied oral or past, present or future) provided or made available to Buyer or Buyer's agents or representatives including, without limitation, all

marketing and informational materials in connection with the Property or this Agreement are not to be construed by Buyer as a representation or warranty of Seller of any kind, and Buyer has specifically not relied on any such information. Except as expressly set forth in Section 13.1 of this Agreement, Seller is not liable or bound in any manner by any verbal or written statement, representations or information pertaining to the Property or the operation thereof, furnished by any attorney, real estate broker, agent, employee, servant or any other person.

      (i)     That Buyer has made its own independent investigation of the accuracy and completeness of any and all information (whether in writing or verbal) provided or made available to Buyer and Buyer is satisfied with all aspects of the Property and Assets which Buyer deems material to its purchase thereof, including, without limitation:  marketability and insurability of title to the Property (including, without limitation) any Liens running with the land (other than any liens under Section 363(f) of the Bankruptcy Code); all municipal and other legal requirements (including, without limitation, taxes, assessments, zoning, use permit requirements and building permits); the condition and physical aspects of all buildings and structures located on the Property (including, without limitation, the interior, exterior, structure, basement, parking, paving, utilities, operating equipment, plans and specifications for the Property and all other physical and functional aspects of the Property); the condition of the Property (including, without limitation, any easements, access or use rights or similar matters affecting the Property) and; the availability of utilities, sanitary facilities, permits and other governmental approvals (including, without limitation, the government approvals for Buyer's intended use of the Property and the suitability of the Property for Buyer's intended use.

      (j)     That Buyer acknowledges and agrees Seller has not made, did not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements, or guarantees of any kind whatsoever (except as specifically set forth in Section 13.1 of this Agreement) whether expressed or implied, oral or past, present or future, of, as to, concerning or with respect to:  the value, nature, quality or condition of the Property; the profit or income believed to be derived from the Property; the suitability of the Property; the compliance of or by the Property with the laws, rules, ordinances or regulations of any applicable governmental authority or body; the habitability, merchantability, marketability, profitability, or fitness for a particular purpose of the Property; the nature or quality of the soils or geology of the Property; the manner, quality, state of repair or lack of repair, of the Property, or any other matter with respect to the Property; the environmental matters or hazards that my affect the Property of any kind of nature; marketability of title including, without limitation, liens running with the land; and the future actions or inactions of any governmental agency in connection with any approvals, permits, entitlements or zoning of the Property after the date of Closing.

      13.3    BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT (I) THE ASSETS ARE SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER IN "AS-IS" CONDITION ON A "WHERE-IS" BASIS WITH ALL FAULTS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT, (II) BUYER HAS UNDERTAKEN ALL SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BUYER DEEMS

NECESSARY OR APPROPRIATE UNDER THE CIRCUMSTANCES AS TO THE CONDITION OF THE PROPERTY AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE, AND BASED UPON SAME, BUYER IS AND WILL BE RELYING STRICTLY AND SOLELY UPON SUCH INSPECTIONS AND EXAMINATIONS AND THE ADVICE AND COUNSEL OF ITS OWN AGENTS, LEGAL COUNSEL AND OFFICERS; (III) SELLER IS NOT MAKING AND HAS NOT MADE ANY WARRANTY OR REPRESENTATION WITH RESPECT TO ANY MATERIALS OR OTHER DATA PROVIDED BY SELLER TO BUYER OR THE SKILLS, COMPETENCE OR DILIGENCE OF THE PREPARERS THEREOF OR THE PHYSICAL CONDITIONS OR OF ANY OTHER ASPECT OF ALL OR ANY PART OF THE PROPERTY AS AN INDUCEMENT TO BUYER TO ENTER INTO THIS AGREEMENT AND THEREAFTER TO PURCHASE THE PROPERTY OR FOR ANY OTHER PURPOSE; AND (IV) BY REASON OF ALL OF THE FOREGOING, BUYER, SUBJECT TO SELLER'S REPRESENTATIONS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT AND THE PERFORMANCE BY SELLER OF ITS OBLIGATIONS UNDER THIS AGREEMENT, ASSUMES THE FULL RISK OF ANY LOSS OR DAMAGE OCCASIONED BY ANY FACT. UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS AND, UPON CLOSING, BUYER HEREBY KNOWINGLY AND VOLUNTARILY WAIVES, RELINQUISHES AND RELEASES SELLER FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AT ANY TIME BY REASON OF OR ARISING OUT OF ANY PHYSICAL OR ENVIRONMENTAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS AND ANY AND ALL OTHER MATTERS REGARDING THE PROPERTY EXCLUDING MATTERS WHICH ARE THE SUBJECT OF EXPRESS REPRESENTATIONS OF SELLERS AS SET FORTH IN THIS AGREEMENT. BUYER SHALL ACCEPT THE PROPERTY IN ITS "AS IS; WHERE IS" CONDITION AND WITH ALL FAULTS.

14. **Default and Remedies**.

14.1    If the Closing fails to occur because of a default or material misrepresentation or breach of warranty by Buyer, Seller shall have the right to terminate this Agreement by notice to Buyer, and be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, the parties shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

14.2    If the Closing fails to occur because of a default by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, with 14 days written notice and cure period to Seller (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), then Buyer shall have the right to terminate this Agreement by notice to Seller and Buyer shall be entitled to, as its exclusive remedy, receive a return of the Deposit.

15.    **Risk of Loss**.  Risk of loss to the Property or any part thereof from damage or destruction by fire or other casualty or by reason of condemnation shall remain upon Seller until the Closing.  If, between the date hereof and the Closing, any portion of the Property shall be damaged or destroyed by fire or other casualty or be subject to any claim of condemnation, Seller shall notify Buyer in writing of said damage, destruction, casualty or loss and the extent thereof or of such condemnation claim as the case may be.  If the cost to repair any such damage exceeds ONE MILLION DOLLARS ($1,000,000.00), or in the event of any such claim for condemnation, Buyer shall have the option, exercisable by notice to Seller given within ten days after Seller's notice to Buyer of said damage, destruction, casualty, loss or condemnation, to either:  (a) terminate this Agreement, whereupon the Deposit Agent shall forthwith refund the Deposit to Buyer and upon such refund this Agreement shall terminate and neither party shall have any further liability to the other hereunder (except for any rights and obligations arising under this Agreement which by their terms survive such termination); or (b) elect to proceed with this Agreement and pay the full Purchase Price, in which case Seller shall assign to Buyer any insurance or condemnation proceeds to which Seller or its successors may be entitled as a result of such damage, destruction, condemnation, loss or casualty without Seller replacing or repairing any such damage and Seller will have no further obligations to Buyer in respect of such loss or damage.  If Buyer fails to give such written notice, Buyer shall be conclusively deemed to have chosen option (b).  If the cost to repair any such damage is equal to or less than ONE MILLION DOLLARS ($1,000,000.00), Buyer shall proceed to Closing, in which event Seller agrees to pay to Buyer at the Closing all insurance or condemnation proceeds which Seller has received as a result of the same, if any, and assign to Buyer all insurance proceeds payable as a result of the same without Seller replacing or repairing such damage, and Seller will have no further obligations to Buyer in respect of such loss or damage.

16.    **Broker and Broker Commission**.  The Broker is Cushman & Wakefield U.S., Inc. (the "Broker"), subject to Bankruptcy Court approval of the listing agreement [ECF No. 19] (the "Listing Agreement"), a copy of which is attached as **Exhibit "D"** hereto.  In accordance with that certain Settlement Agreement entered into as of January 18, 2019, by and among: (a) the Seller; (b) the Buyer, on behalf of itself or its assigns; and (c) Glenn F. Straub ("Straub"), the Buyer and Seller agree that the Seller shall be obligated to pay the Broker.  The provisions of this Section shall survive the Closing and any termination of this Agreement.

17.    **Parties' Access to Records after Closing**.  Each Party agrees to preserve until the earlier of the second anniversary of the Closing Date or the date the Debtor's Estate is closed, all records in its possession relating to any of the Assets.  Buyer shall permit the Seller or its representatives to gather and prepare such information as the Seller may reasonably require for preparing its tax returns for periods prior to the Closing Date.  If either Party needs access to records in the possession of the other Party relating to any of the Assets for purposes of preparing income tax returns or for complying with any audit request, subpoena or other investigative demand by any governmental authority or for any civil litigation or for any other legitimate purpose not injurious to the other Party, the other Party shall allow representatives of such Party access to such records, including reasonable use of office space and facilities, during regular business hours at the other Party's place of business for the sole purpose of obtaining information for use as provided for in this Section and shall permit such Party to make extracts and copies thereof as may be necessary or convenient.

18.    [**Intentionally deleted**.]

19.    **Further Assurances**.  Each Party shall cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

20.    **Deposit Agent Provisions**.

20.1    If conflicting demands relating to this Agreement are made upon the Deposit Agent, the Parties hereto expressly agree that the Deposit Agent shall have the absolute right to do either or both of the following:  (a) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (b) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the Parties to interplead and litigate in such court their several claims and rights amongst themselves.  Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the patties under this Agreement, the Deposit Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

20.2    In no event shall Deposit Agent be liable for any act or omission under or in respect of this Agreement except where Deposit Agent's acts or omission is the result of its gross negligence or willful misconduct.  Accordingly, Deposit Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Deposit Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Deposit Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

20.3    Buyer and Seller reserve the right, at any time and from time to time, by mutual agreement, to substitute a new escrow agent in place of Deposit Agent. In addition, Deposit Agent reserves the right to resign from its role as escrow agent by giving the Seller and the Buyer written notice of such resignation.  If Seller and Buyer have jointly designated a successor escrow agent in writing, then Deposit Agent shall deliver any funds held by Deposit Agent under this Agreement to such successor escrow agent.  However, if no such successor escrow agent is designated by Seller and Buyer in writing within ten (10) days after any notice of resignation from Deposit Agent, then Deposit Agent may deliver any such funds to the Bankruptcy Court and interplead Buyer and Seller in connection therewith.

20.4    Buyer acknowledges that the Deposit Agent may also serve as Seller's legal counsel in connection with this Agreement, and both Seller and Buyer consent to Deposit Agent serving in such dual capacity.  In the event of any actual dispute or adversity between Seller and Buyer, Deposit Agent shall be entitled to resign as Deposit Agent and to represent Seller in such dispute or adversity, and in such case shall deliver any funds held by Deposit Agent pursuant to

this Agreement the funds either to a successor escrow agent designated by Seller and Buyer as provided above, or to a court of competent jurisdiction as provided for above.

21. **Certain Definitions:  Rules of Construction**.

21.1    The following terms have the following meanings in this Agreement:

(a)    [Intentionally Deleted].

(b)    "Legal Costs" means court costs and attorneys' fees and costs, including the costs of paralegals, whether or not any mediation, arbitration or legal proceeding is filed, or if any mediation, arbitration or legal proceeding is filed, then all such costs incurred at any point in such mediation, arbitration or legal proceeding, including trial and all levels of appeal.

(c)    "Party" or "Parties" mean Seller and/or Buyer, as the context may require.

(d)    "Person" means any individual or any corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or other legal entity or a government or governmental entity.

(e)    "Settlement Agreement" means that certain Settlement Agreement entered into as of January 18, 2019, by and among: (a) 160 Royal Palm, LLC, on behalf of itself and its chapter 11 bankruptcy estate (the "Estate"); (b) KK-PB Financial, LLC, a Florida limited liability company ("KK-PB"), on behalf of itself or its assigns; and (c) Glenn F. Straub ("Straub") in order to avoid the uncertainties and further expense of continuing the evidentiary hearing involving the issues in the "Credit Bid Motion," and the "Estimation Motion" as those terms are defined therein, a copy of which is attached hereto as Exhibit F.

21.2    As used in this Agreement:  (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

21.3    Each Party and its counsel have reviewed this Agreement.  The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

22. **Miscellaneous**.

22.1    This Agreement and the schedules and exhibits to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

22.2    This Agreement, together with any exhibits, schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

22.3    All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or delivered by a recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

**If to Buyer, addressed to:**

Glenn F. Straub
KK-PB Financial, LLC
11199 Polo Club Road
Wellington, FL 33414

**With a copy to:**

Craig Galle, Esq.
The Galle Law Group, P.A.
13501 Southshore Blvd., Suite 103
Wellington, FL 33414
Tel: 561-798-1708
Fax: 561-798-1709
Email: Craig@gallelaw.com

**If to Seller, addressed to:**

Cary Glickstein, Manager
160 Royal Palm LLC
1118 Waterway Lane
Delray Beach, FL 33483
Tel:        (561)279-8942
Fax:       (561)279-0440
Email:     cg@ironwoodproperties.com

**With a copy to:**

Marcia H. Langley, Esq.
Greenberg Traurig, P.A.
5100 Town Center Circle
Suite 400
Boca Raton, FL 33486
Tel:           (561) 955-7604
Fax:           (561) 388-7099
Email:         langleym@gtlaw.com

**With a copy to:**

Philip J. Landau, Esq.
Shraiberg, Landau & Page, P.A.
2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Tel:           (561) 443-0800
Fax:           (561) 998-0047
Email:         plandau@slp.law

**If to Title Company, Deposit Agent or Closing Agent:**

Michelle M. Clapp
Senior Commercial Escrow Officer
Fidelity National Title Group
13800 NW 14th Street, Suite 190
Sunrise, FL 33323
Direct: 954-308-3231
Fax:  954-971-2050
Email:         michelle.clapp@fnf.com

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

22.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures and scanned and electronic signatures shall be accorded the same enforcement rights as an original. Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement.

22.5    Time is of the essence with respect to each Party's obligations hereunder.

22.6    This Agreement shall not be recorded by Buyer and, if recorded by Buyer, Seller may immediately terminate all of its obligations under this Agreement, and Buyer shall pay Seller's Legal Costs in removing this Agreement of record. The provisions of this Section shall survive the Closing.

22.7    If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Palm Beach County, Florida are open for business, but in no case will the extension be for more than three days. For purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in Florida, are closed or are authorized to be closed, including all legal holidays.

22.8    Notwithstanding any other provision of this Agreement, any representation, warranty or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

22.9    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from county public health units.

22.10    The Buyer understands and agrees that Cary D. Glickstein has executed this Agreement as the court approved sole and exclusive manager for the Seller, not in his personal capacity, and there shall be no recourse to Cary D. Glickstein personally for any of the representations, warranties, covenants, communications of any kind, and/or promises, acts, undertakings or omissions, of any type or at any time, made by "Seller" herein or in connection with or arising from this Agreement, the Property or any actions, claims, litigation or proceedings concerning the Seller or the Property, but only against the Estate and only to the extent permitted herein and by the Sale Order.

22.11    The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

22.12    No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

22.13    This Agreement may be assigned by Buyer, without Seller's prior written consent. This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the Parties hereto. The Parties neither intend to confer any benefit

hereunder on any Person other than the Parties hereto or shall any such third party have any rights hereunder.

22.14   This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

22.15   BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

23.   **Property Investigations**.    Buyer and/or Buyer's employees, representatives, agents, contractors and any Person acting by, under or through Buyer (collectively, "Buyer's Representatives") shall have access to the Property at all reasonable times subsequent to the date of this Agreement and prior to the Closing or earlier termination of this Agreement with full right to: (a) inspect the Property, and (b) to conduct any and all inspections, investigations and tests thereon, including, but not limited to, hazardous waste studies, as Buyer may deem reasonably necessary. All costs and expenses in connection with Buyer's investigations of the Property shall be at the sole cost of Buyer. In conjunction with entry upon the Property by Buyer and/or Buyer's Representatives, Buyer shall:

23.1   Fully comply with all laws applicable to the activity to be performed upon the Property and all other activities undertaken in connection therewith;

23.2   Take all actions and implement all protections reasonably necessary to ensure that all actions taken, and the equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, cause no damage to other property of Seller or other persons;

23.3   Promptly repair any damage to the Property caused by the acts or omissions of Buyer and/or Buyer's Representatives and restore the Property to the condition that existed prior to entry thereon by Buyer and/or Buyer's Representatives, at Buyer's sole cost and expense;

23.4   Prior to Buyer and/or Buyer's Representatives' first entry on the Property, maintain or cause to be maintained, throughout the term of this Agreement, at Buyer's expense, a policy of comprehensive general liability insurance, with a broad form contractual liability endorsement covering Buyer's indemnification obligations under Section 23.6, and with a combined single limit of not less than One Million Dollars ($1,000,000.00) insuring Buyer and naming Seller as an additional insured, against any injuries or damages to persons or property that may result from or are related to (i) Buyer's and/or Buyer's Representatives' entry upon the Property, and (ii) any and all other activities undertaken by Buyer and/or Buyer's Representatives on or in connection with the Property, in such form and with an insurance company acceptable to

Seller and deliver a copy of such insurance policy to Seller prior to the first entry on the Property along with a certificate of insurance confirming that the premium has been paid in full for a period of not less than one (1) year, that the policy will not be terminated, canceled or modified without at least thirty (30) days prior written notice to Seller, and designating Seller as an additional insured thereunder;

        23.5    Not allow the activities undertaken by Buyer or Buyer's Representatives to result in any Liens being filed or recorded against the Property or any portion thereof, or any other property of Seller or of its affiliates, and Buyer shall, at its sole cost and expense, promptly discharge of record or escrow with Seller, on terms acceptable to Seller, funds to discharge such Liens that are filed or recorded (including, without limitation, liens for services, labor or materials furnished); and

        23.6    Defend and indemnify Seller and its respective employees, agents, partners, members, managers, officers, directors, tenants and invitees (collectively, "Seller's Affiliates"), and hold same harmless from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, Attorneys' Fees (as hereinafter defined) and disbursements, suffered or incurred by same and arising out of or in connection with (i) the entry upon the Property by Buyer and/or Buyer's Representatives, including but not limited to any bodily injury or death of any person or property damage arising out of or in conjunction with same; (ii) any activities conducted thereon by Buyer and/or Buyer's Representatives; (iii) any Liens filed or recorded against the Property or any portion thereof, or any other property of Seller or of Seller's Affiliates, as a consequence of activities undertaken by Buyer and/or Buyer's Representatives; provided, however, that Buyer shall not be required to defend and indemnify Seller and/or Seller's Affiliates for any loss arising out of or in connection with any pre-existing conditions on the Property or the gross negligence, bad faith or willful misconduct of Seller or any of Seller's Affiliates.

        Any entry upon the Property in conjunction with the foregoing and all activities related thereto shall be at the sole risk and expense of Buyer and Buyer's Representatives. In no event shall Buyer conduct a Phase II or more invasive inspection or testing of the Property unless recommended by an environmental consultant reasonably acceptable to Seller or otherwise required by Buyer's lender, if any and when Buyer shall obtain Seller's prior written consent. Subject to the requirements of applicable law, in the event Buyer obtains a Phase II environmental site assessment on the Property, the contents of the Phase II environmental site assessment shall not be disclosed in whole or in part by Buyer to any person other than its directors, officers, employees, representatives (including legal and financial advisers, architects, engineers, consultants and lenders) who need to know the information for the purpose of evaluating the acquisition of the Property, and each such person shall be informed of the confidential nature of the contents of any Phase II environmental site assessment. Buyer shall cause such persons to keep the contents of any Phase II environmental site assessment strictly confidential and otherwise to comply with this Agreement with respect to same.

        Buyer shall provide to Seller, at Buyer's sole cost and expense, copies of all inspection reports and other items of due diligence including, without limitation, soil tests, environmental audits, surveys and traffic studies obtained by Buyer in connection with its investigation of the Property within five (5) business days after Buyer's receipt of same ("Inspection Reports"). All

items of due diligence that are customarily certified to a buyer, seller, lender or title company in a commercial real estate transaction in South Florida shall be certified to both Buyer and Seller. The provisions of this Section 23 shall survive the Closing and any termination of this Agreement.

24.    **Seller's Covenants**.  From the date hereof until the Closing (or earlier termination of this Agreement), Seller covenants and agrees as follows:

24.1    Seller shall cooperate with Buyer's reasonable requests, from time to time, for access to the Property and for access to and/or copies of information and documents related to the Property, including without limitation information as to title matters, parking matters, licenses, permits and zoning, and construction matters; and

24.2    Seller shall continue to maintain insurance on the Property of the amounts and type in place as of the date hereof.

25.    **Limited Confidentiality**.  Seller shall not be permitted to communicate with any third parties including, but not limited to, members of the media on any matters arising out of or pertaining to this Agreement and the Settlement Agreement, except as may otherwise be required by law.

SEE SIGNATURES ON FOLLOWING PAGE

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year last below written.

<u>**BUYER:**</u>

**KK-PB FINANCIAL, LLC,**
a Florida limited liability company

By:_____
     Glenn F. Straub, Authorized Signatory

Date:_____

<u>**SELLER:**</u>

**160 ROYAL PALM, LLC**,
a Florida limited liability company

By:_____
     Cary D. Glickstein, solely as Manager of
     160 ROYAL PALM, LLC, a Florida limited
     liability company, and not individually

Date:_____

## EXHIBIT "A"

## LEGAL DESCRIPTION

Lots 31, 32, and 33, Block F, Revised Map of Royal Park Addition to Palm Beach, Florida, according to the Plat thereof, as recorded in Plat Book 4, Page 1, of the Public Records of Palm Beach County, Florida.

## EXHIBIT "B"

## PERSONAL PROPERTY

Substantially all of the personal property now located on the Property which is shown in Receiver's Initial Inventory dated as of August 17, 2015 without representation or warranty of any kind or nature and subject to the continuing right to remove same at the reasonable discretion of Seller in the ordinary course for safety or security and to avoid further damage to the Property.

{2234/000/00430848}

**EXHIBIT "C"**

**[INTENTIONALLY DELETED]**

**EXHIBIT "D"**

**LISTING AGREEMENT**

## COMPOSITE EXHIBIT "E"

## SETTLEMENT AGREEMENTS

# EXHIBIT C

## AMENDED CONDITIONAL SETTLEMENT AGREEMENT

This Amended Conditional Settlement Agreement ("Settlement Agreement") is entered into as of January 8, 2019 between the Town of Palm Beach, a Florida municipal corporation, 360 South County Road, Palm Beach, Florida 33480 ("Town") and 160 Royal Palm, LLC, a Florida limited liability company, 160 Royal Palm Way, Palm Beach, Florida 33480 ("Owner") (Town and Owner are hereafter collectively referred to as the "Parties").

WHEREAS, on July 30, 2007, Town and Royal 160, LLC ("Former Owner"), the prior Owner of the Land, as hereinafter defined, entered into a Declaration of Use Agreement, recorded in the Official Public Records Book 21987, Page 499, of the Public Records of Palm Beach County, Florida (the "Agreement"), and a Heart of Palm Beach Construction Management Agreement, recorded in the Official Records Book 21987, Page 510, of the Public Records of Palm Beach County, Florida (the "CMA"), concerning the conditional use of the land described in Exhibit A to the Agreement (the "Land") as a hotel and accessory uses consistent with and subject to the conditions for the 'Approval,' including, among other conditions, a liquidated amount of $2,000 per violation per day remedy (the "Violation Assessment"), as specifically set forth in the Agreement;

WHEREAS, the Land is described in **Exhibit A**, attached hereto, it is located within the municipal limits of Town and title to the Land is held by Owner;

WHEREAS, Town and Owner entered into an Amendment to Declaration of Use Agreement made on December 28, 2012 and recorded in the Official Public Records Book 25694, Page 633, of the Public Records of Palm Beach County, Florida (the 'Amendment'), modifying the Agreement for the conditional use of the Land as a hotel and accessory uses and for operation on the Land of the Palm House Hotel ('Hotel') consistent with and subject to the conditions for the 'Approval' including, among other conditions, a February 14, 2013 deadline for the completion of construction of the Hotel (the "Completion Deadline"), as more specifically set forth in the Amendment;

WHEREAS, Owner commenced a civil action in December 2012 in the Fifteenth Judicial Circuit of Palm Beach County, Florida, styled *160 Royal Palm, LLC v. Town of Palm Beach*, Case No.: 502012CA023613XXXXMB (the "Litigation"), seeking a declaratory judgment concerning the Completion Deadline, which action remains pending but currently stayed based on the Bankruptcy Action, as hereinafter defined;

WHEREAS, effective February 15, 2013, Town commenced assessment of the Violation Assessment based on Owner's failure to complete construction of the Hotel by the Completion Deadline, despite Owner's contention that the Completion Deadline had been extended for two years, as alleged in the Litigation;

WHEREAS, Town and Owner entered into a Second Amendment to Declaration of Use Agreement made on August 13, 2013 and recorded in the Official Public Records Book 26251, Page 78, of the Public Records of Palm Beach County, Florida (the 'Amendment')(hereinafter the

"Second Amendment" for clarity), modifying the Agreement for the conditional use of the Land as a hotel and accessory uses and for Owner's operation on the Land of the Palm House Hotel ('Hotel') consistent with and subject to the conditions for the 'Approval,' including, among other conditions, the Completion Deadline, as specifically set forth in the Second Amendment;

WHEREAS, in 2014, the Town of Palm Beach Police Department, Code Enforcement Office initiated a code enforcement action, Case # CE-14-1212, 160 Royal Palm Way, 160 Royal Palm LLC, against the Land for unauthorized construction of the Hotel by Owner.  Owner failed to satisfy or correct the code enforcement violation resulting in the entry of an Order Assessing Fine and Order Imposing Lien by the Town of Palm Beach Code Enforcement Board of the Town of Palm Beach ("Town Code Enforcement") in the amount of $250 a day, commencing January 10, 2015 (the "Code Enforcement Fine"), which is recorded in Official Records Book 27315, page 1368 of the Public Records of Palm Beach County, Florida (the "Code Enforcement Lien") to enforce compliance with the code enforcement order (the "Code Enforcement Order") requiring the removal of all unpermitted work done beyond the scope of Owner's approved variances and building permits and passing all inspections;

WHEREAS, in 2014 construction of the Hotel was terminated and abandoned without completion or compliance with the Code Enforcement Order and the building permit for construction of the Hotel expired;

WHEREAS, on or about December 15, 2014 a civil action was commenced in the Fifteenth Judicial Circuit of Palm Beach County, Florida, styled as *Ryan Black v. Gerry Matthews*, et al, Case No.: 502014CA014846XXXXMB AG (the "Receivership Action") by Ryan Black, as a member and former managing member of Palm House, LLC, a Delaware limited liability company and the sole member of Owner, seeking appointment of a receiver for Owner;

WHEREAS, on or about July 20, 2015 the court in the Receivership Action entered an Amended Agreed Order on Plaintiff's Motion to Appoint Receiver (the "Receivership Order") whereby Cary Glickstein (the "Receiver") was appointed as Receiver for the real and personal property of Owner, including the Land and the partially constructed Hotel, and directed by the Receivership Order to pursue completion of the Hotel, upon securing construction financing, as approved by Town;

WHEREAS, in November 2015, Receiver applied for and on January 13, 2016, the Town Council granted the Receiver approval of Site Plan # 1-2016 with Special Exception for construction of the Hotel (the "Development Approval"), imposing conditions of approval in order to regulate the use, mitigate any adverse impacts of the use, and insure that said use shall not be adverse to the public interest, including, in part, correction of the unauthorized  construction underlying the Code Enforcement Lien, which approval was to be further memorialized in a Third Amendment to Declaration of Use Agreement (the "Third Amendment"), which has not been executed nor has the work commenced, as authorized by the Development Approval, by application for a building permit revision;

2

WHEREAS, in November 2016, the Receiver sought and on December 14, 2016, the Town Council granted the Receiver's request for a conditional, temporary abatement of the Violation Assessment accruing since February 15, 2013, which abatement remains conditionally and temporarily in effect;

WHEREAS, on or about November 17, 2016, the Receiver applied for and the Town Code Enforcement Board granted the Receiver's request for a conditional, temporary abatement of the Code Enforcement Fine accruing since January 10, 2015, which abatement remains conditionally and temporarily in effect.  Among the conditions imposed for the continued abatement of the Code Enforcement Fine was payment to the Town of the Code Enforcement Fine amount accruing before the abatement date, which amount was paid in full;

WHEREAS, because the work authorized by the Development Approval could not be commenced within 12 months from the date of Town Council approval, in December 2016, Receiver applied for and in January 2017 the Town Council granted the Receiver's request to extend the Development Approval for one year through January 13, 2018;

WHEREAS, because the work authorized by the Development Approval could not be commenced within 12 months from the date of Town Council approval, in or about December 2017, Receiver applied for and in January 2018 the Town Council granted the Receiver's second request to extend the Development Approval for one year through January 9, 2019;

WHEREAS, on July 3, 2018, an order was entered by the Court in the Receivership Action expanding the Receiver's powers and making the Receiver the sole and exclusive manager of Owner, among other powers;

WHEREAS, on August 2, 2018, Owner, by and through the Receiver as the sole and exclusive manager of Owner ("Manager"), filed a petition for Chapter 11 bankruptcy relief in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach, styled *In re: 160 Royal Palm, LLC*, Case No.: 18-19441-EPK (the "Bankruptcy Action");

WHEREAS, Manager believes the sale of the Land and the Hotel (collectively, the "Property" or "Project") to a qualified buyer is in the best interests of Owner's creditors, Town and interested parties and represents a final opportunity for the Manager to accomplish what the Receiver could not by completion of the Hotel as approved by Town;

WHEREAS, Owner, under the direction of Manager and subject to court approval in the Bankruptcy Action, intends to sell the property to a qualified buyer who will complete construction of the Hotel as approved by Town consistent with the Development Approval, a revised CMA and building permit revision, as described below;

WHEREAS, the Violation Assessment, Code Enforcement Fine, Code Enforcement Order, Code Enforcement Lien and impending expiration of the Development Approval in January 2019 separately and collectively create uncertainty in any prospective buyer's evaluation of the Land and the Hotel for acquisition purposes and that uncertainty materially and adversely affects the marketability of the Property and viability of the Project;

3

WHEREAS, the Town's interests are furthered by the sale of the Property to a qualified buyer who will complete the Project in accordance with the Development Approval; and

WHEREAS, further to the above objectives, the Parties desire to conditionally compromise and settle all claims, demands, rights, and causes of action with respect to the Violation Assessment and impending expiration of the Development Approval and Owner is simultaneously seeking by a separate amended conditional settlement agreement with Town Code Enforcement (the "Amended CEB Settlement Agreement") to settle all claims, demands, rights, and causes of action with respect to the Code Enforcement Order, Code Enforcement Fine and Code Enforcement Lien.

**NOW THEREFORE**, in consideration of the mutual promises, premises and covenants set out in this Settlement Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby expressly acknowledged, and upon the terms and subject to the conditions contained herein, the Parties expressly agree and covenant as follows:

### Section 1: Incorporation of Recitals

The Parties expressly incorporate the recitals of this Settlement Agreement as a part hereof.

### Section 2.  Continued Abatement of Violation Assessment.

Town agrees to reinstate, if necessary, and conditionally abate accrual of the Violation Assessment for an abatement period through May 31, 2019.  Upon timely payment of the Settlement Amount, as defined in Section 3 below, by a "Qualified Buyer," as defined in Section 7 below, the foregoing abatements shall continue and remain in force and effect conditioned on completion of construction of the Hotel in accordance with the requirements for extension of the Development Approval in Section 4 below.

### Section 3: Settlement Amount; Payment

Town agrees to accept payment of $200,000 (the "Settlement Amount") from a Qualified Buyer, as hereinafter defined, in full and final settlement of the Violation Assessment accruing through May 31, 2019 provided such payment is delivered to Town on or before the earliest of (1) thirty days from the closing on the sale of the Property or (2) ~~January 31~~ February 28, 2019. Payment shall be made in a single payment payable to Town of Palm Beach and delivered to Town at 360 South County Road, Palm Beach, Florida 33480.  Timely payment of the Settlement Amount shall be an express condition precedent to the abatement of the Violation Assessment through the abatement period set forth in Section 2.

### Section 4: Extension of Development Approval

The Development Approval shall continue in force and effect pending and subject to timely performance of this Settlement Agreement. Upon timely payment of the Settlement Amount, Town agrees to extend the Development Approval through May 31, 2019, provided on or before May 31, 2019 the Qualified Buyer: (i) makes application for and upon Town approval thereafter executes and delivers the Third Amendment consistent with the Development Approval; (ii) makes application for and upon Town approval thereafter executes and delivers a revised CMA consistent

with the Development Approval; (iii) makes application for a building permit revision for construction of the Hotel consistent with the Development Approval; and (iv), if required by Town, concurrent with the Qualified Buyer's application for Third Amendment and revised CMA, and solely to approve the change in ownership of the Land from Owner to the Qualified Buyer, makes application for and receives Town approval for a modification to special exception for construction and operation of the Hotel, consistent with the Development Approval, or as otherwise requested by the Qualified Buyer and approved by the Town.

<strong>Section 5:  <u>Satisfaction and Discharge of Violation Assessment</u></strong>

Upon timely completion of the Hotel, as provided in the Third Amendment, the revised CMA and building permit revision, the Violation Assessment shall be deemed fully satisfied and discharged.  Nothing contained herein shall prevent Town and the Qualified Buyer from agreeing to an alternative protocol for the timing of the satisfaction and discharge of the Violation Assessment.

<strong>Section 6.  <u>Dismissal of Litigation</u></strong>

On or before closing on the sale of the Property to a Qualified Buyer following entry of a court order approving this Settlement Agreement in the Bankruptcy Action and the execution and delivery of this Settlement Agreement by the Parties, the Litigation shall be dismissed with prejudice.

<strong>Section 7:  <u>Qualified Buyer</u></strong>

For purposes of this Settlement Agreement, a Qualified Buyer ("Qualified Buyer") shall be the purchaser of the Property pursuant to a fully performed contract and sale approved by court order in the Bankruptcy Action, excluding Owner, Former Owner, Palm House, LLC, any current or former manager or member of Owner, Former Owner or Palm House, LLC, and any other party to the Receivership Action or any other pending civil action in which Owner is a party, other than Town.  While this Settlement Agreement is expressly intended for the benefit of a Qualified Buyer, nothing in this Agreement shall prevent Town, in Town's discretion, from extending the benefits conferred under this Settlement Agreement to a buyer who is not a Qualified Buyer hereunder.

<strong>Section 8:  <u>Conditional Settlement</u></strong>

This Settlement Agreement shall be of no force or effect unless it and the Amended CEB Settlement Agreement are executed and delivered by the respective Parties and approved by a court order duly entered in the Bankruptcy Action.  In the event (1) payment of the Settlement Amount is not timely paid to Town; (2) a Third Amendment to Declaration of Use Agreement is not timely executed by and delivered to Town by the Qualified Buyer or (3) construction of the Hotel is not timely completed by the Qualified Buyer in accordance with the Third Amendment, revised CMA and building permit revision, then the Development Approval shall expire.  Unless otherwise extended by Town, the Violation Assessment abatement shall terminate and the assessment and fine shall be reinstated as if the abatement had never been granted, less payments received by Town, if any.  If the Bankruptcy Action is dismissed before the sale of the Property or

5

if Owner is otherwise prevented or unable to sell the Property to a Qualified Buyer, Owner reserves all of its rights, claims and defenses as asserted in the Litigation and/or that are or as may be available to Owner in the Bankruptcy Action with regard to the Property, the Violation Assessment, the Code Enforcement Fine and/or the Code Enforcement Lien.

### Section 9: No Admission of Liability or Fault

This Agreement is a compromise of a disputed claim and the execution of this Settlement Agreement is not, and should not be construed to be, as an admission of liability or fault on the part of any party, their respective successors, assigns, subsidiaries, affiliates, agents, managers, members, partners, and employees, and by executing this Settlement Agreement the Parties expressly deny any liability or fault.

### Section 10: Governing Law

This Settlement Agreement shall be interpreted, construed and enforced pursuant to and in accordance with the laws of the State of Florida.

### Section 11: Attorneys' Fees and Costs

In the event of litigation to enforce the terms of this Settlement Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs from the non-performing party. Except as specifically provided in this Settlement Agreement, the Parties shall bear their own respective attorneys' fees and costs incurred in connection with the Litigation and the negotiation and performance of this Settlement Agreement.

### Section 12: Time is of the Essence

Time is of the essence for all dates and time periods expressed herein.

### Section 13: Choice of Law and Forum Selection

The Parties agree that this Settlement Agreement is made and entered into in the State of Florida, and shall in all respects be interpreted, enforced and governed under the laws of the State of Florida without applying conflict of laws principles, and shall be subject to the exclusive jurisdiction of the courts of Florida. The sole and exclusive venue for any litigation arising out of, or relating to this Settlement Agreement shall be in Palm Beach, Florida, to the exclusion of any and all other venues.

### Section 14: Interpretation of Settlement Agreement

The Parties have been represented by counsel, and have reviewed this Settlement Agreement through their respective attorneys or have had the opportunity to do so. None of the Parties (nor any attorney for any of the Parties) shall be deemed to be the drafter of this Settlement Agreement. Any rule of construction under Florida law requiring that ambiguities be resolved against the drafting party shall not be employed in the interpretation of this Settlement Agreement. The Parties further agree that all parts of this Settlement Agreement shall in all cases be

construed as a whole according to its fair meaning.

**Section 15:  Successors and Assigns**

This Settlement Agreement shall apply to the Parties, as well as to each of their predecessors, successors and assigns.

**Section 16:    Declaration of Use Agreement, the Amendment and the Second Amendment**

The Declaration of Use Agreement, the Amendment to Declaration of Use Agreement and the Second Amendment to Declaration of Use Agreement remain in full force and effect, subjection to further modification by a Third Amendment to Declaration of Use Agreement between Town and a Qualified Buyer, as generally described herein.

**Section 17:  Authority to Execute Settlement Agreement**

Each of the Parties, and those persons executing this Settlement Agreement on behalf of the Parties, warrants to the other that each has full power, authority and capacity to execute this Settlement Agreement.  In addition, the Parties warrant and represent that they are the owner of the claims asserted against the other and have not transferred or assigned any claim, in whole or in part.

**Section 18: Town Cooperation**

In connection with Owner's sale of the Property to a Qualified Buyer as authorized and approved in the Bankruptcy Action,  Town agrees to cooperate with the settlement, title or closing agent, Owner and the Qualified Buyer, at no expense to Town, and use its best reasonable efforts to timely review and comply with written requests for information, acknowledgements and confirmations further to Owner's conveyance of title, confirmation of Qualified Buyer status, and verification of the recitals set forth in this Settlement Agreement as of the Closing Date.

**Section 19:  Headings**

All sections, titles or captions contained in this Settlement Agreement are for convenience only and shall not be deemed to be a part of this Settlement Agreement, and shall not affect the meaning or interpretation of this Settlement Agreement.

**Section 20:  Amendment to Conditional Settlement Agreement; Merger**

Upon execution by the Parties, this Amended Conditional Settlement Agreement shall amend and replace the Conditional Settlement Agreement executed by the Parties on October 9, 2018. There have been no written or oral representations made, or relied upon, by the Parties as inducement for the execution of this Settlement Agreement that are not expressly stated herein. The terms of this Settlement Agreement are contractual, not mere recitals, and may

7

be enforced by a court of competent jurisdiction.  No changes in or additions to this Settlement Agreement shall be valid, enforceable or recognized, unless made in a writing and signed by all of the Parties.

### Section 21: <u>Execution in Counterparts</u>

This Settlement Agreement may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one and the same instrument. Additionally, the different counterparts of this Settlement Agreement may be executed separately by each signatory, and all such separately executed counterparts, when taken together, shall  be treated as and constitute one and the same instrument. Any signature delivered by electronic or facsimile transmission shall be treated in all manner and respect as an original document.

IN WITNESS WHEREOF the Parties have hereunto set their hands and seals the day and year first above written.

SIGNATURES ON FOLLOWING PAGE

8

Signed, sealed and delivered
in the presence of:

TOWN OF PALM BEACH,

By: _____
Gail Coniglio

By: _____
Kirk Blouin
Town Manager

APPROVED AS TO LEGAL FORM AND
SUFFICIENCY

_____
John C. Randolph
Town Attorney

160 ROYAL PALM, LLC, a Florida limited
liability company

By: _____
Cary Glickstein, as Manager for 160 Royal
Palm, LLC, and not individually

9

**EXHBIT A**

**Legal Description for the Land:**

Being Lots 31, 32 and 33, Block F, Royal Park Addition, a subdivision in the Town of Palm Beach, Palm Beach, Florida, as recorded in Plat Book 4, Page 1, Public Records of Palm Beach County, Florida

# EXHIBIT D

J O N E S
F O S T E R

January 18, 2019

*Via U.S. Mail & Email (cg@ironwoodproperties.com)*
Cary Glickstein
Receiver, Palm House, 160 Royal Palm Way, West Palm Beach, FL
1118 Waterway Lane
Delray Beach, Florida 33483

Re:     160 Royal Palm , LLC – Amended Conditional Settlement Agreement

Dear Cary:

Enclosed please find the amended settlement agreements.  I have stricken Kirk's name, as it is unnecessary.  My signature does not require witnesses.  Please have your signature witnessed and provide the Town with fully executed copies.

Sincerely,

JONES, FOSTER, JOHNSTON & STUBBS, P.A.

By _John C. Randolph (JCR)_
John C. Randolph
JCR/jcl
Enclosures
cc:  Gregg Glickstein (via email)

P:\DOCS\13156\00008\LTR\1WR7352.DOCX

jrandolph@jonesfoster.com

561-650-3000 T
561-650-5300  F

505 S. Flagler Drive
Suite 1100

West Palm Beach
Florida 33401

E S T .
1 9 2 4

## AMENDED CONDITIONAL SETTLEMENT AGREEMENT

This Amended Conditional Settlement Agreement ("Settlement Agreement") is entered into as of January 17, 2019, between the Town of Palm Beach Code Enforcement Board ("Town Code Enforcement") of the Town of Palm Beach ("Town"), a Florida municipal corporation, 360 South County Road, Palm Beach, Florida 33480 and 160 Royal Palm, LLC, a Florida limited liability company, 160 Royal Palm Way, Palm Beach, Florida 33480 ("Owner") (Town Code Enforcement and Owner are hereafter collectively referred to as the "Parties").

WHEREAS, on July 30, 2007, Town and Royal 160, LLC ("Former Owner"), the prior Owner of the Land, as hereinafter defined, entered into a Declaration of Use Agreement, recorded in the Official Public Records Book 21987, Page 499, of the Public Records of Palm Beach County, Florida (the "Agreement"), and a Heart of Palm Beach Construction Management Agreement, recorded in the Official Records Book 21987, Page 510, of the Public Records of Palm Beach County, Florida (the "CMA"), concerning the conditional use of the land described in Exhibit A to the Agreement (the "Land") as a hotel and accessory uses consistent with and subject to the conditions for the 'Approval,' including, among other conditions, a liquidated amount of $2,000 per violation per day remedy (the "Violation Assessment"), as specifically set forth in the Agreement;

WHEREAS, the Land is described in **Exhibit A**, attached hereto, it is located within the municipal limits of Town and title to the Land is held by Owner;

WHEREAS, Town and Owner entered into an Amendment to Declaration of Use Agreement made on December 28, 2012 and recorded in the Official Public Records Book 25694, Page 633, of the Public Records of Palm Beach County, Florida (the 'Amendment'), modifying the Agreement for the conditional use of the Land as a hotel and accessory uses and for operation on the Land of the Palm House Hotel ('Hotel') consistent with and subject to the conditions for the 'Approval' including, among other conditions, a February 14, 2013 deadline for the completion of construction of the Hotel (the "Completion Deadline"), as more specifically set forth in the Amendment;

WHEREAS, Owner commenced a civil action in December 2012 in the Fifteenth Judicial Circuit of Palm Beach County, Florida, styled *160 Royal Palm, LLC v. Town of Palm Beach*, Case No.: 502012CA023613XXXXMB (the "Litigation"), seeking a declaratory judgment concerning the Completion Deadline, which action remains pending but currently stayed based on the Bankruptcy Action, as hereinafter defined;

WHEREAS, effective February 15, 2013, Town commenced assessment of the Violation Assessment based on Owner's failure to complete construction of the Hotel by the Completion Deadline, despite Owner's contention that the Completion Deadline had been extended for two years, as alleged in the Litigation;

WHEREAS, Town and Owner entered into a Second Amendment to Declaration of Use Agreement made on August 13, 2013 and recorded in the Official Public Records Book 26251,

1

Page 78, of the Public Records of Palm Beach County, Florida (the 'Amendment')(hereinafter the "Second Amendment" for clarity), modifying the Agreement for the conditional use of the Land as a hotel and accessory uses and for Owner's operation on the Land of the Palm House Hotel ('Hotel') consistent with and subject to the conditions for the 'Approval,' including, among other conditions, the Completion Deadline, as specifically set forth in the Second Amendment;

WHEREAS, in 2014, the Town of Palm Beach Police Department, Code Enforcement Office initiated a code enforcement action, Case # CE-14-1212, 160 Royal Palm Way, 160 Royal Palm LLC, against the Land for unauthorized construction of the Hotel by Owner. Owner failed to satisfy or correct the code enforcement violation resulting in the entry of an Order Assessing Fine and Order Imposing Lien by Town Code Enforcement in the amount of $250 a day, commencing January 10, 2015 (the "Code Enforcement Fine"), which is recorded in Official Records Book 27315, page 1368 of the Public Records of Palm Beach County, Florida (the "Code Enforcement Lien") to enforce compliance with the code enforcement order (the "Code Enforcement Order") requiring the removal of all unpermitted work done beyond the scope of Owner's approved variances and building permits and passing all inspections;

WHEREAS, in 2014 construction of the Hotel was terminated and abandoned without completion or compliance with the Code Enforcement Order and the building permit for construction of the Hotel expired;

WHEREAS, on or about December 15, 2014 a civil action was commenced in the Fifteenth Judicial Circuit of Palm Beach County, Florida, styled as *Ryan Black v. Gerry Matthews*, et al, Case No.: 502014CA014846XXXXMB AG (the "Receivership Action") by Ryan Black, as a member and former managing member of Palm House, LLC, a Delaware limited liability company and the sole member of Owner, seeking appointment of a receiver for Owner;

WHEREAS, on or about July 20, 2015 the court in the Receivership Action entered an Amended Agreed Order on Plaintiff's Motion to Appoint Receiver (the "Receivership Order") whereby Cary Glickstein (the "Receiver") was appointed as Receiver for the real and personal property of Owner, including the Land and the partially constructed Hotel, and directed by the Receivership Order to pursue completion of the Hotel, upon securing construction financing, as approved by Town;

WHEREAS, in November 2015, Receiver applied for and on January 13, 2016, the Town Council granted the Receiver approval of Site Plan # 1-2016 with Special Exception for construction of the Hotel (the "Development Approval"), imposing conditions of approval in order to regulate the use, mitigate any adverse impacts of the use, and insure that said use shall not be adverse to the public interest, including, in part, correction of the unauthorized construction underlying the Code Enforcement Lien, which approval was to be further memorialized in a Third Amendment to Declaration of Use Agreement (the "Third Amendment"), which has not been executed nor has the work commenced, as authorized by the Development Approval, by application for a building permit revision;

WHEREAS, in November 2016, the Receiver sought and on December 14, 2016, the Town Council granted the Receiver's request for a conditional, temporary abatement of the Violation Assessment accruing since February 15, 2013, which abatement remains conditionally and temporarily in effect;

WHEREAS, on or about November 17, 2016, the Receiver applied for and the Town Code Enforcement Board granted the Receiver's request for a conditional, temporary abatement of the Code Enforcement Fine accruing since January 10, 2015, which abatement remains conditionally and temporarily in effect. Among the conditions imposed for the continued abatement of the Code Enforcement Fine was payment to the Town of the Code Enforcement Fine amount accruing before the abatement date, which amount was paid in full;

WHEREAS, because the work authorized by the Development Approval could not be commenced within 12 months from the date of Town Council approval, in December 2016, Receiver applied for and in January 2017 the Town Council granted the Receiver's request to extend the Development Approval for one year through January 13, 2018;

WHEREAS, because the work authorized by the Development Approval could not be commenced within 12 months from the date of Town Council approval, in or about December 2017, Receiver applied for and in January 2018 the Town Council granted the Receiver's second request to extend the Development Approval for one year through January 9, 2019;

WHEREAS, on July 3, 2018, an order was entered by the Court in the Receivership Action expanding the Receiver's powers and making the Receiver the sole and exclusive manager of Owner, among other powers;

WHEREAS, on August 2, 2018, Owner, by and through the Receiver as the sole and exclusive manager of Owner ("Manager"), filed a petition for Chapter 11 bankruptcy relief in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach, styled *In re: 160 Royal Palm, LLC*, Case No.: 18-19441-EPK (the "Bankruptcy Action");

WHEREAS, Manager believes the sale of the Land and the Hotel (collectively, the "Property" or "Project") to a qualified buyer is in the best interests of Owner's creditors, Town, Town Code Enforcement and interested parties and represents a final opportunity for the Manager to accomplish what the Receiver could not by completion of the Hotel as approved by Town;

WHEREAS, Owner, under the direction of Manager and subject to court approval in the Bankruptcy Action, intends to sell the property to a qualified buyer who will comply with the Code Enforcement Order, complete construction of the Hotel as approved by Town consistent with the Development Approval;

WHEREAS, the Code Enforcement Order, Code Enforcement Fine, Code Enforcement Lien, Violation Assessment and impending expiration of the Development Approval in January 2019 separately and collectively create uncertainty in any prospective buyer's evaluation of the Land and the Hotel for acquisition purposes and that uncertainty materially and adversely affects the marketability of the Property and viability of the Project;

3

WHEREAS, Town Code Enforcement's and Town's interests are furthered by the sale of the Property to a qualified buyer who will comply with the Code Enforcement Order and complete the Project in accordance with the Development Approval;

WHEREAS, Owner and Town are entering into a separate Amended Conditional Settlement Agreement ("Town Settlement Agreement") to conditionally compromise and settle all claims, demands, rights and causes of action with respect to the Violation Assessment and the impending expiration of the Development Approval; and

WHEREAS, further to the above objectives, the Parties desire to conditionally compromise and settle all claims, demands, rights, and causes of action with respect to the Code Enforcement Order, Code Enforcement Fine and Code Enforcement Lien.

**NOW THEREFORE**, in consideration of the mutual promises, premises and covenants set out in this Settlement Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby expressly acknowledged, and upon the terms and subject to the conditions contained herein, the Parties expressly agree and covenant as follows:

### Section 1: Incorporation of Recitals

The Parties expressly incorporate the recitals of this Settlement Agreement as a part hereof.

### Section 2. Continued Abatement of Code Enforcement Fine.

Town Code Enforcement agrees to reinstate, if necessary, and conditionally abate accrual of the Code Enforcement Fine for an abatement period through May 31, 2019. Upon timely payment of the Settlement Amount, as defined in as defined in the Section 3 below, by a "Qualified Buyer," as defined in Section 5 below, the foregoing abatement shall continue and remain in force and effect conditioned on completion of construction of the Hotel in accordance with the Developer Approval and building permit revision, as may be modified by agreement of Town and the Qualified Buyer.

### Section 3: Settlement Amount; Payment

Town Code Enforcement agrees to accept payment of $50,000.00 (the "Settlement Amount") to Town from a Qualified Buyer, as hereinafter defined, in full and final settlement of the Code Enforcement Fine accruing through May 31, 2019 provided such payment is delivered to Town on or before the earliest of (1) thirty days from the closing on the sale of the Property or (2) February 28, 2019. Payment shall be made in a single payment payable to Town of Palm Beach and delivered to Town at 360 South County Road, Palm Beach, Florida 33480. Timely payment of the Settlement Amount shall be an express condition precedent to the abatement of the Code Enforcement Fine through the abatement period set forth in Section 2.

### Section 4: Satisfaction and Discharge of Code Enforcement Lien

Upon the first to occur of: (i) Town Code Enforcement inspection and verification of compliance with the Code Enforcement Order to the reasonable satisfaction of Town Code

4

Enforcement, or (ii) Qualified Buyer's timely completion of the Hotel, as provided in the Third Amendment, a revised CMA and building permit revision, Town Code Enforcement shall prepare, execute and record a recordable satisfaction of the Code Enforcement Lien.

### Section 5: Qualified Buyer

For purposes of this Settlement Agreement, a Qualified Buyer ("Qualified Buyer") shall be the purchaser of the Property pursuant to a fully performed contract and sale approved by court order in the Bankruptcy Action, excluding Owner, Former Owner, Palm House, LLC, any current or former manager or member of Owner, Former Owner or Palm House, LLC, and any other party to the Receivership Action or any other pending civil action in which Owner is a party, other than Town. While this Settlement Agreement is expressly intended for the benefit of a Qualified Buyer, nothing in this Agreement shall prevent Town Code Enforcement, in Town Code Enforcement's discretion, from extending the benefits conferred under this Settlement Agreement to a buyer who is not a Qualified Buyer hereunder.

### Section 6: Conditional Settlement

This Settlement Agreement shall be of no force or effect unless it and the Amended Conditional Settlement Agreement between Owner and Town are both executed and delivered by the respective Parties and approved by a court order duly entered in the Bankruptcy Action. In the event (1) payment of the Settlement Amount is not timely paid to Town Code Enforcement; (2) a Third Amendment to Declaration of Use Agreement is not timely executed by and delivered to Town by the Qualified Buyer or (3) construction of the Hotel is not timely completed by the Qualified Buyer in accordance with the Third Amendment to Declaration of Use Agreement and building permit revision, then the Development Approval shall expire. Unless otherwise extended by Town, the Code Enforcement Fine abatement shall terminate and the assessment and fine shall be reinstated, respectively, as if the abatements had never been granted, less payments received by Town Code Enforcement, and the Code Enforcement Lien shall remain in force and effect until satisfied in accordance with the Code Enforcement Lien. If the Bankruptcy Action is dismissed before the sale of the Property or if Owner is otherwise prevented or unable to sell the Property to a Qualified Buyer, Owner reserves all of its rights, claims and defenses as asserted in the Litigation and/or that are or as may be available to Owner in the Bankruptcy Action with regard to the Property, the Violation Assessment, the Code Enforcement Fine and/or the Code Enforcement Lien.

### Section 7: No Admission of Liability or Fault

This Agreement is a compromise of a disputed claim and the execution of this Settlement Agreement is not, and should not be construed to be, as an admission of liability or fault on the part of any party, their respective successors, assigns, subsidiaries, affiliates, agents, managers, members, partners, and employees, and by executing this Settlement Agreement the Parties expressly deny any liability or fault.

### Section 8: Governing Law

This Settlement Agreement shall be interpreted, construed and enforced pursuant to and in accordance with the laws of the State of Florida.

### Section 9: Attorneys' Fees and Costs

In the event of litigation to enforce the terms of this Settlement Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs from the non-performing party. Except as specifically provided in this Settlement Agreement, the Parties shall bear their own respective attorneys' fees and costs incurred in connection with the Litigation and the negotiation and performance of this Settlement Agreement.

### Section 10: Time is of the Essence

Time is of the essence for all dates and time periods expressed herein.

### Section 11: Choice of Law and Forum Selection

The Parties agree that this Settlement Agreement is made and entered into in the State of Florida, and shall in all respects be interpreted, enforced and governed under the laws of the State of Florida without applying conflict of laws principles, and shall be subject to the exclusive jurisdiction of the courts of Florida. The sole and exclusive venue for any litigation arising out of, or relating to this Settlement Agreement shall be in Palm Beach, Florida, to the exclusion of any and all other venues.

### Section 12: Interpretation of Settlement Agreement

The Parties have been represented by counsel, and have reviewed this Settlement Agreement through their respective attorneys or have had the opportunity to do so. None of the Parties (nor any attorney for any of the Parties) shall be deemed to be the drafter of this Settlement Agreement. Any rule of construction under Florida law requiring that ambiguities be resolved against the drafting party shall not be employed in the interpretation of this Settlement Agreement. The Parties further agree that all parts of this Settlement Agreement shall in all cases be construed as a whole according to its fair meaning.

### Section 13: Successors and Assigns

This Settlement Agreement shall apply to the Parties, as well as to each of their predecessors, successors and assigns.

### Section 14: Declaration of Use Agreement, the Amendment and the Second Amendment

The Declaration of Use Agreement, the Amendment to Declaration of Use Agreement and the Second Amendment to Declaration of Use Agreement remain in full force and effect, subjection to further modification by a Third Amendment to Declaration of Use Agreement between Town and a Qualified Buyer, as generally described herein.

6

### Section 15: Authority to Execute Settlement Agreement

Each of the Parties, and those persons executing this Settlement Agreement on behalf of the Parties, warrants to the other that each has full power, authority and capacity to execute this Settlement Agreement. In addition, the Parties warrant and represent that they are the owner of the claims asserted against the other and have not transferred or assigned any claim, in whole or in part.

### Section 16: Town Code Enforcement Cooperation

In connection with Owner's sale of the Property to a Qualified Buyer as authorized and approved in the Bankruptcy Action, Town Code Enforcement agrees to cooperate with the settlement, title or closing agent, Owner and the Qualified Buyer, at no expense to Town Code Enforcement, and use its best reasonable efforts to timely review and comply with written requests for information, acknowledgements and confirmations further to Owner's conveyance of title, confirmation of Qualified Buyer status, and verification of the recitals set forth in this Settlement Agreement as of the Closing Date.

### Section 17: Headings

All sections, titles or captions contained in this Settlement Agreement are for convenience only and shall not be deemed to be a part of this Settlement Agreement, and shall not affect the meaning or interpretation of this Settlement Agreement.

### Section 18: Amendment to Conditional Settlement Agreement; Merger

Upon execution by the Parties, this Amended Conditional Settlement Agreement shall amend and replace the Conditional Settlement Agreement executed by the Parties on October 18, 2018 and approved by Town Code Enforcement in that certain Order of Temporary Fine Suspension in Case# CE 14-1212, dated October 18, 2018. There have been no written or oral representations made, or relied upon, by the Parties as inducement for the execution of this Settlement Agreement that are not expressly stated herein. The terms of this Settlement Agreement are contractual, not mere recitals, and may be enforced by a court of competent jurisdiction. No changes in or additions to this Settlement Agreement shall be valid, enforceable or recognized, unless made in a writing and signed by all of the Parties.

### Section 19: Execution in Counterparts

This Settlement Agreement may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one and the same instrument. Additionally, the different counterparts of this Settlement Agreement may be executed separately by each signatory, and all such separately executed counterparts, when taken together, shall be treated as and constitute one and the same instrument. Any signature delivered by electronic or facsimile transmission shall be treated in all manner and respect as an original document.

IN WITNESS WHEREOF the Parties have hereunto set their hands and seals the day and year first above written.

Signed, sealed and delivered
in the presence of:

TOWN OF PALM BEACH CODE
ENFORCEMENT BOARD OF THE
TOWN OF PALM BEACH

By: _____
Matthew Natale
Code Enforcement Board Chair

By: _____
Kirk Blouin
Town Manager

APPROVED AS TO LEGAL FORM AND
SUFFICIENCY

_____
John C. Randolph
Town Attorney

160 ROYAL PALM, LLC, a Florida limited
liability company

By: _____
Cary Glickstein, as Manager for 160 Royal
Palm, LLC, and not individually

8

**EXHBIT A**

**Legal Description for the Land:**

Being Lots 31, 32 and 33, Block F, Royal Park Addition, a subdivision in the Town of Palm Beach, Palm Beach, Florida, as recorded in Plat Book 4, Page 1, Public Records of Palm Beach County, Florida