UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                                                                          Case No. 18-19441-EPK

160 ROYAL PALM, LLC,                                                              Chapter 11

    Debtor.
_____/

### EB-5 CLAIMANTS' MEMORANDUM IN OPPOSITION TO DEBTOR'S MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT, AND RELATED ASSET PURCHASE AGREEMENT, WITH KK-PB FINANCIAL, LLC AND GLENN F. STRAUB [DE 523]

    The creditors holding claims 3-1 through 65-1 (the "EB-5 Claimants")[1] object to the "Debtor's Motion for Approval of Settlement Agreement, and Related Asset Purchase Agreement, with KK-PB Financial, LLC and Glenn F. Straub" (the "Motion") [DE 523], and say,

### BACKGROUND FACTS

    The EB-5 Claimants admit the truth of the statements made in the first 30 numbered paragraphs of the Motion except as follows:

    1. In partial response to paragraphs 2 and 3, the EB-5 Claimants deny that the Debtor ever operated a bona fide business. Instead, it was always operated as an instrument of a massive fraud perpetrated against foreign investors seeking to take advantage of the EB-5 Visa program by Joseph Walsh, Sr., Robert Matthews, and others, including KK-PB.

    2. In response to paragraph 5, while the EB-5 Creditors admit that a claim was submitted as Claim 72 in this case by New Haven Contracting, South, Inc., it is contended that such claim is fraudulent and worth nothing.

    3. In response to paragraph 12, while the Debtor may have scheduled a $39,500,000 claim in favor of Palm House Hotel, LLLP purportedly secured by a mortgage on the real

---

[1] The undersigned, as attorney, filed claims 3-1 through 65-1 in this case. Contemporaneously with this opposition, the undersigned is moving to withdraw as counsel for the holders of Claims 04-1, 09-1, 10-1, 14-1, 15-1, 16-1, 19-1, 38-1, 39-1, 41-1, 48-1, 53-1, 54-1, 56-1, 57-1, 58-1, 59-1, 60-1, 62-1 and 63-1. However, since the motion to withdraw has not been granted as of the deadline for filing this opposition, and notwithstanding that the holders of those claims appear to have filed their own objections *pro se*, they are listed as parties represented.

property of the Debtor, Palm House Hotel LLLP was another instrument of the EB-5 Fraud referenced above and its claim is equitably the property of the EB-5 Claimants and others who invested in the Palm House Hotel EB-5 Program.

4. In response to paragraph 13, the EB-5 Claimants admit that they have been in litigation with over 20 perpetrators including KK-PB Financial LLC and the Debtor since November 14, 2016, in Case No 9:16-cv-81871-KAM in the United States District Court, Southern District of Florida (the "District Court Action") but they DENY that they added claims to avoid the KK-PB Note and Mortgage as Fraudulent Transfers under the Uniform Fraudulent Transfer Act in October, 2018. Rather, UFTA claims against KK-PB have been in that case since it was filed in November 2016. *See*, DE 1, 181, 338 and 351 in the District Court Action.

5. In response to paragraph 28, while the EB-5 Claimants acknowledge that there were two days of final evidentiary hearing on January 8 and 11, "the parties" did not engage in settlement. Rather, despite the fact that the EB-5 Claimants had fully joined in the Debtor's opposition to KK-PB's motion relating to credit bidding, DE 174 in this case, and made themselves parties to the litigation, the EB-5 Claimants were excluded from the negotiations. Indeed, counsel for the EB-5 Claimants was not even made aware of the settlement until the morning of January 18, 2019, when he received a call as he was driving to court prepared to take the lead on the third day of the hearing.

6. In response to paragraph 29, the EB-5 Creditors deny that the Debtor faces any risks from the conclusion of the litigation and the Debtor is not going to come out of this Chapter 11 as an operating entity under any circumstances, including under the proposed Settlement. Moreover, if the Debtor prevails, which it most certainly must under the facts of the dispute, the cash auction could be permitted to go forward and the property sold free and clear of liens with the claims of KK-PB to be resolved later, with the full value of the property having been realized.

7. In response to paragraph 30, the EB-5 Claimants deny that the entry of the Settlement Agreement was an exercise of good business judgment by the Debtor. The EB-5 Creditors are advised and do believe that evidence already presented in the first two days of evidentiary hearing established, without contradiction that:

    a.    The ownership of the Debtor was transferred from Glenn Straub, individually, to Palm House, LLC, a Delaware Limited Liability Company by KK-PB on August 30, 2013;

    b.    The agreed purchase price for ownership of the Debtor was $36 million with adjustments taking the total to approximately $37 million;

    c.    The only significant asset of the Debtor at the time of the closing of that transaction was real property, improvements and related development rights whose market value on the date of the transfer was $19.2 million as established by an unrebutted retrospective appraisal;

    d.    Unrebutted expert testimony established that the Debtor was insolvent at the time of the closing;

    e.    If the Debtor was not insolvent before the closing, it was definitely insolvent as a result of the closing;

    f.    On March 28, 2014, approximately 7 months after the closing, KK-PB recorded a mortgage securing a debt of $27,468,750;

    g.    The recording of a lien on property of a debtor is, by definition, a "transfer" under 11 USC § 101(54)(A);

    h.    The market value of the property on the date of the recording of the mortgage as established by an unrebutted retrospective appraisal was $19.7 million;

    i.    Unrebutted expert testimony established that the Debtor was insolvent at the time of the recording of the mortgage;

    j.    No consideration was transferred to the Debtor or its parent company from KK-PB at or about the time of the recordation of the mortgage;

    k.    It is a matter of common sense that the recording of a mortgage is the responsibility of the mortgagee, *i.e.*, KK-PB in this case;

    l.    Over $13 million of investments plus additional amounts for administrative fees were made by particular EB-5 Claimants as part of the EB-5 conspiracy described in the District Court Action purportedly to develop a hotel on the property owned by the Debtor between the date of the closing and the date of the recording of the mortgage which would not have occurred if those investors had been aware that there was a mortgage on the property.

8. The EB-5 Claimants further allege that:

    a.    KK-PB filed a claim in this case [Claim 70-1] in the amount of $37,337,705.77 alleged secured by a first mortgage on the property that the Debtor [ECF 178] objected to and that the EB-5 Claimants [ECF 179] separately objected to. KK-PB [ECF 308, 309] responded to those objections but they have never been resolved.

    b.    The Debtor estimates that the proceeds of the proposed settlement will be applied as follows:

| | | |
|---|---|---:|
| i. | Settlement Payment | $5,125,000 |
| ii. | Balance in DIP Account | $235,000 |
| iii. | Total available | **$5,360,000** |
| iv. | Shraiberg Landau Contingent Fee | ($1,793,750) |
| v. | Shraiberg Landau Costs | ($35,726) |
| vi. | Shraiberg Landau Bankruptcy Fee after retainer | ($122,652) |

3

|       |                                                  |              |
|-------|--------------------------------------------------|-------------:|
| vii.  | Stalking horse breakup fee                       | ($250,000)   |
| viii. | Cushman broker fee                               | ($154,000)   |
| ix.   | US Trustee fee                                   | ($51,250)    |
| x.    | Pre/Post Petition fees/costs                     | ($375,000)   |
| xi.   | Yip & Associates fees                            | ($225,000)   |
| xii.  | Town of Palm Beach settlement                    | ($250,000)   |
| xiii. | For distribution after administrative creditors  | **$2,002,622** |

c. The Debtor estimates that the face amounts of the filed claims of unsecured creditors are as follows:

|       |                                                       |              |
|-------|-------------------------------------------------------|-------------:|
| i.    | Non-EB-5 Claimants total                              | $634,317     |
| ii.   | The EB-5 Claimants filing this opposition             | $41,831,839  |
| iii.  | The additional EB-5 Claimants (treble damages)[2]     | $30,844,346  |
| iv.   | Total present unsecured creditors                     | **$73,310,502** |

The Debtor and Claimant KK-PB Investments LLC are engaged in litigation relating to the entitlement *vel non* of KK-PB to credit bid at a sale of substantially all of the assets of the Debtor, or, alternatively for the dismissal of this case or the lifting of the automatic stay to permit KK-PB to foreclose on the mortgage that it purports to hold that is claimed to encumber the real property and improvements owned by the Debtor. Two days of evidentiary hearings have been held with respect to the dispute. Two days are estimated to remain for the conclusion of presentation of evidence in that contested matter, plus a day for argument.

If the Debtor prevails in the contested matters it will necessarily establish that KK-PB is, at best, an unsecured creditor and that the Debtor's real property could be sold for cash to the highest bidder. Inquiries concerning the property recently suggest that there are multiple bidders, including the stalking horse bidder, prepared to bid between $32 million and $40 million for the property. Whatever is received, after payment of the costs of sale and priority creditors,

---

[2] The EB-5 Claimants will object to the trebling of these claims, or, alternatively, the trebling of their own claims.

4

between $29 million and $40 million would be available for apportionment among approximately $100 million of unsecured creditors[3] (29% to 40% dividend)[4].

If KK-PB prevails, KK-PB will be allowed to credit bid an amount of up to the amount of its claim including postpetition interest - perhaps $39 million, without making a penny available to the unsecured creditors or even the priority creditors (0% dividend).

In either "non-settlement" scenario, the EB-5 Claimants would retain their separate claims[5] against KK-PB and numerous others that have been pending in the United States District Court, Southern District of Florida, since 2016 that have been prosecuted by them at substantial expense.

If the settlement is approved, the estate would receive $5.125 million from KK-PB, which would be distributed first to secured creditors other than KK-PB and New Haven South Contracting, then to priority creditors, with approximately $2 million available for distribution to approximately $60 million of unsecured creditors (approximately 3 1/3% dividend) but all the separate claims against KK-PB and affiliates will be barred and numerous alleged co-conspirators of KK-PB, its affiliates and the Debtor, will be handed an opportunity to further obfuscate the claims against them.  Adding salt to that wound, the proposed settlement agreement also requires the order approving it to contain factual findings exonerating KK-PB, Glenn Straub, Craig Galle, Esq., The Galle Law Group, P.A., and Sal V. Spano (Straub's Chief Financial Officer), on numerous issues that were not directly before the Court with respect to the contested matter being settled, for which there was no evidence offered, that could be argued to

---

[3] In this eventuality, KK-PB would be added to the pool of unsecured creditors and its claim would be reduced to eliminate postpetition interest as it would have no security interest to support its award.
[4] This number is based upon the total of claims referenced above, the KK-PB claim recharacterized and the other EB-5 claims reduced
[5] To the extent that the claims in the District Court are duplicative of the claims in this case, they would be lost.

be binding on the EB-5 Claimants and cripple their efforts to litigate the separate claims that are not properly before this Court.  Proposed Settlement Agreement, ¶ 9(vi).

## ARGUMENT

**A.     The Proposed Settlement is not within the Standards for Settlements**

In deciding whether to approve or disapprove a proposed settlement, a bankruptcy court must consider the four factors set forth by the Eleventh Circuit in *In re Justice Oaks II, Ltd.,* 898 F.2d 1544 (11th Cir.1990): (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *Id.* at 1549.  A bankruptcy court does not abuse its discretion in approving a settlement agreement unless the agreement "fall[s] below the lowest point in the range of reasonableness." *In re Martin,* 490 F.3d 1272, 1275 (11th Cir.2007).

The Debtor's opposition to the Motion of KK-PB that has been the subject of a contested matter in this case contained multiple arguments.  However, analysis of the claims under the Florida version of the Uniform Fraudulent Transfer Act alone shows that the likelihood of the Debtor prevailing is extremely strong.  Clearly, if KK-PB's mortgage lien is invalidated, the property purportedly encumbered by that mortgage can be sold at a public auction at which all bidders will be required to pay cash.  Since there is a stalking horse bidder in place willing to pay $32 million, and, even if its claim is allowed as an unsecured claim, KK-PB would receive no more than half of that money.

The Debtor clearly has the right to pursue such claims under 11 USC § 544(b)(1).  The EB-5 Claimants filed claims against KK-PB and others under the UFTA in 2016, well within the four year statute of limitations for both fraudulent and constructively fraudulent transfer claims.

They have all filed claims here and their claims are clearly allowable against eh Debtor under 11 USC 502.  Moreover, there were other creditor claims extant at all relevant times as well.  The testimony to date shows that the Debtor was insolvent at the time of the recording of the mortgage and the property was worth less than the face amount of the mortgage at that time.  While the control of the property was allegedly transferred to the Debtor's parent corporation in an arm's length transaction 7 months before the mortgage was recorded, that should make no difference at all.

It should make no difference because the unrebutted testimony to date is that the Debtor was insolvent at the time of that transfer and the property was not worth what was purportedly paid for it at that time, so the transfer was a fraudulent transfer then mush as the recording of the mortgage was a separate fraudulent transfer.  More importantly, as a matter of bankruptcy law, the definition of a "transfer" includes "the creation of a lien."  11 USC § 101(54)(A).  Thus, the *recording* of the mortgage was a "transfer."  Moreover, under Florida law, no mortgage" is good and effectual against creditors or subsequent purchasers for value "unless the same be recorded according to law."  § 695.01(1), Fla. Stat.  Furthermore, since the mortgage itself purports to have been made or executed under power of attorney, in the absence of proof that the power of attorney was likewise recorded, the mortgage has no effect whatsoever.  *Id.*

The argument that there was "reasonably equivalent value" given in exchange for the creation of the lien also must fail.  What value was given was given approximately 7 months before the creation of the lien.  The absence of additional consideration at the time of the transfer caused by the recording of the lien is fatal to that argument.  *See, e.g., In re Unglaub*, 332 B.R. 303 (Bankr. N.D. Ill 2005) (failure to give value contemporaneous with recording of mortgage 24 months after date of loan was constructively fraudulent transfer, even though mortgage was

apparently executed contemporaneously with loan).  Furthermore, as noted, the "value" given at the time of the closing was approximately $19 million value of the property, less a $6 million down payment, so that the net "value" given at the closing was only approximately $13 million, which is hardly reasonably equivalent in value to the $27 million face amount of the mortgage that was converted into a lien on recording 7 months later.

The matter of difficulties in collection is not an issue because avoidance of the mortgage lien guarantees the Debtor's recovery of a substantial amount of cash, at least the amount of the stalking horse bid, that it would otherwise not have.

The litigation remaining is not complex.  This Court resolves UFTA claims on a regular basis and is familiar with the issues.  The bona fide unsecured creditors (the EB5 Claimants, the so-called "Other EB5 Claimants" and the Securities and Exchange Commission) are all opposed to this settlement.[6] The EB-5 Claimants alone have unsecured claims of more than $41 million, and the Other EB-5 Claimants, even if their treble damage claims are reduced to single damages, are over $10 million.  Their dividends under this plan will be next to nothing, while conclusion of the litigation offers them the possibility of a dividend in the neighborhood of 50%.

The biggest downside to the litigation is the potential cost of litigating with a highly litigious opponent.  However, once this hearing is over, all that would be left would be appeals, and there are no obvious appellate issues that have been presented.

### B.   The Proposed Bar Order is neither Fair and Equitable nor within the Jurisdiction of the Court to Grant

When, as here, a settlement agreement contains a bar order and a requirement for fallacious factual findings that are tantamount to a bar order, the court must also decide whether the bar order is "fair and equitable." *In re Munford, Inc*., 97 F.3d 449, 455 (11th Cir.1996)*.*  In making

---

[6] The EB-5 Claimants' objections are reflected here and in the purported pro se objections filed by or on behalf of 20 of the EB-5 Claimants, and the Other EB-5 Claimants are also expected to object.

such a determination, the bankruptcy court should consider: (1) the interrelatedness of the claims that the bar order precludes; (2) the likelihood of nonsettling defendants to prevail on the barred claim; (3) the complexity of the litigation; and (4) the likelihood of depletion of the resources of the settling defendants. *Id*

In *Munford*, the Eleventh Circuit explicitly found that the bankruptcy court had jurisdiction to enter a bar order that affected nonsettling defendants' state law contribution and indemnity claims. *Matter of Munford, Inc.,* 97 F.3d 449, 454 (11th Cir. 1996). This is not a case like *Munford* where one of several co-defendants is offering to settle and "buy peace" and fears a continuation of the settled litigation by the other co-defendants seeking contribution or indemnity.

Instead, this case is more like *In re Fontainebleau Las Vegas Holdings, LLC,* No. 09-21481-BKC-AJC, 2014 Bankr. LEXIS 3505 (Bankr. S.D. Fla. July 11, 2014), in which the bar order purported to release claims that had been pending in another court for "more than three years and have been diligently prosecuted (at a cost of millions of dollars)," and were "based on specific misrepresentations allegedly made." As Judge Cristol explained:

> The issue of whether "truly independent claims" can be enjoined by a bar order entered in a Chapter 7 case, without the consent and over the objection of an affected claimant, is an issue of first impression in the Eleventh Circuit. The Eleventh Circuit's decisions in which bar orders were affirmed are factually distinguishable, inapposite and involved either cross-claims for indemnity and contribution among co-defendants, *e.g., Munford v. Munford, Inc. (In re Munford, Inc.)*, 97 F.3d 449, 455 (11th Cir. 1996), or were otherwise based upon the barred entity's liability to a plaintiff in the settled case, *e.g., In re United States Oil & Gas*, 967 F.2d 489, 495-96 (11th Cir. 1992), *In re Healthsouth Corp. Sec. Litig.*, 572 F.3d 854, 865 (11th Cir. 2009).
>
> The Eleventh Circuit consistently has shown a reluctance to approve a bar order that ventures beyond the narrow authority that exists to enjoin claims for indemnity and contribution. *E.g., In re U.S. Oil & Gas*, 967 F.2d at 496 (quoting *S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1433 (D.S.C. 1990)) (approving bar order that applied to claims for fraud and negligence, but only after making clear

9

> that the claims were "nothing more than claims for contribution or indemnification with a slight change in wording."); *AAL High Yield Bond Fund v. Deloitte & Touche LLP*, 361 F.3d 1305, 1311-12 (11th Cir. 2004) (confirming that *U.S. Oil & Gas* did not approve a bar of "truly independent claims"); *In re Healthsouth*, 572 F.3d at 864-65 (affirming a bar order of a contractual claim for advancement of attorneys' fees incurred by a non-settling defendant to defend against suits brought against him because such fees were "paid on account of liability to the underlying plaintiffs or the risk thereof", and thus found to be "so close to the nature of the claims which established case law holds are appropriately barred that our application of that case law here constitutes a minimal and reasonable extension thereof").

*Id*, \*10-\*11. The claims sought to be barred here include exactly the types of claims that the Eleventh Circuit is reluctant to grant such treatment.

The EB-5 Claimants are not co-defendants in claims brought by the Debtor against KK-PB and them. There is no danger of the filing of cross-claims for indemnity or contribution by the EB-5 Claimants against anyone. The EB-5 Claimants are plaintiffs in every pending claim sought to be barred. Specifically, they are the plaintiffs in an action seeking to recover over $40 million from the perpetrators of a massive fraud. Indeed, the Debtor here is a defendant in that litigation (and is within the statute of limitations on its UFTA claims only by virtue of tacking its claims to the claims first brought by the EB-5 Claimants in 2016). While the constructive fraudulent transfers at issue here duplicate a count in the federal litigation (District Court Action, Count XV, all iterations), there is much more there. Even before this Chapter 11 was filed, in the Amended Complaint filed in 2017 (District Court Action DE 181) the EB-5 Claimants alleged against multiple defendants multiple independent claims. In that Amended Complaint, KK-PB was defined as a "Bad Actor," along with the Debtor. Preamble. In the general allegations KK-PB was alleged to have intentionally withheld the filing of its alleged mortgage in order to assist in the perpetration of the fraud, *id*., ¶ 56, that it received from the principal organizers of the EB-5 Fraud over $20 million of the EB-5 Claimants' Funds, *id*., ¶265, and that it was a co-

10

conspirator in stealing the funds of the EB-5 Claimants. *Id.* ¶ 295. The Amended Complaint includes many independent claims. KK-PB was named in at least the following claims: Conversion, Count III; Unjust Enrichment, Count XIX; FDUTPA violations, Count XX; Civil Conspiracy, Count XXII. Constructive Fraud, Count XXIII. These are all separate and independent claims from any claims the Debtor has brought or even could have brought.[7] The EB-5 Claimants have spent more than $1 million prosecuting that case. KK-PB seeks to avoid all of those independent claims by paying $5.125 million to the Debtor, largely for the benefit of priority claimants including counsel for the Debtor, leaving a pittance for the EB-5 Claimants. This would also put the property back in the hands of one of the alleged perpetrators, eliminate many claims against it, it make it possible for the fraud to continue without concern about the existing claims.

The likelihood of the EB-5 Claimants as "non-settling defendants" prevailing in the barred litigation is a total non sequitur as the EB-5 creditors are PLAINTIFFS seeking recovery of losses suffered due to the misconduct of KK-PB and others in the litigation sought to be barred. They are not co-defendants. However, insofar as the constructive fraudulent transfer claim here is any indication, the likelihood of the EB-5 Claimants prevailing is high. Of course, that means the setting defendants would have their assets depleted, but it would be deservedly so, if it turns out they are guilty of the independent misconduct of which they are accused.

The litigation sought to be barred is quite complex, with more than 20 defendants, 63 plaintiffs in federal court in the District Court Action, 13 plaintiffs in state court in Palm Beach County, multiple criminal prosecutions under way in Connecticut [USA v. G. Matthews, Case No. 3:18-CR-43, USA v. Laudano, Case No. 3:18-CR-47 and USA v. R. Matthews, Case No.

---

[7] The EB-5 Claimants also have a claim for imposition of an equitable lien that the Debtor could not have brought, as well as the three UFTA claims that it had not brought until this case was filed.

3:18-CR-48], an SEC enforcement proceeding pending in which the Debtor is a "relief defendant" [SEC v. Palm House, LLLP, et al., Case No. 9:18-cv-81038] and multiple criminal investigations under way.  To allow KK-PB to exonerate itself and all the other individuals to be favored with bar orders under the proposed settlement for the pittance offered would put Alexander's cutting of the Gordian knot to shame.

## CONCLUSION

Since the *Justice Oaks* factors are not met, the Motion should be denied outright and the parties order to conclude the pending contested matter.  Even if the settlement agreement could be approved under *Justice Oaks*, the bar order provisions and fallacious fact findings of the proposed settlement order must be removed except to the extent that they relate to claims that are clearly properly the subject of the contested matter, to wit, Counts XIII-XV and XXXV of the District Court Action.  The trial of the contested matter should continue to its conclusion.

                                        */s/       Edward A. Marod*
                                        Edward A. Marod
                                        Florida Bar No. 238961
                                        **GUNSTER, YOAKLEY & STEWART, P.A.**
                                        777 S. Flagler Drive, Suite 500 East
                                        West Palm Beach, FL 33401
                                        Telephone: (561) 650-0660
                                        Facsimile:  (561) 671-2519
                                        E-mail: emarod@gunster.com

                                        *and*

                                        */s/       David J. George*
                                        David J. George
                                        Florida Bar No. 898570
                                        **GEORGE GESTEN MCDONALD, PLLC**
                                        9897 Lake Worth Road, Suite 302
                                        Lake Worth, FL 33467
                                        Telephone: (561) 232-6002
                                        Facsimile:  (888) 421-4173
                                        ***Pro Hac Vice Attorney for EB-5 Creditors***

WPB_ACTIVE 9170803.1