UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

IN RE

160 ROYAL PALM LLC,

Debtor.

CASE NO. 18-19441-BKC-EPK

CHAPTER 11

_____/

### REVISED OBJECTION TO DEBTOR'S MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT, AND RELATED ASSET PURCHASE AGREEMENT, WITH KK-PB FINANCIAL, LLC AND GLENN F. STRAUB

Creditors Wang Jue, Wang Jian, Sun Mengyang, Gao Yi, Chen Jun, Zhang Shikun, Cheng Li, Tan Jing, Li Xiang, Liu Danqing, Man Mingyue, Wang Jing and Liu Chenglin (the "Other Palm House Investors"), by and through its undersigned counsel, hereby file this Opposition to Debtor's Motion for Approval of Settlement Agreement, and Related Asset Purchase Agreement, With KK-PB Financial, LLC and Glenn F. Straub (D.E 523), and state the following in support thereof:

### INTRODUCTION

1. On August 2, 2018 the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.*

2. The Other Palm House Investors have filed Claim Nos. 73 through 85 in this bankruptcy case, totaling $30,844,346.

3. On November 26, 2018, the Other Palm House Investors filed suit in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida against several persons and entities, including KK-PB Financial, LLC ("KK-PB"), Glen F. Straub

1

("Straub")[1] , New Haven Contracting South, Inc. ("New Haven"), Nicholas Laudano ("Laudano"), and Debtor Palm House Hotel ("Palm House Hotel") in Case No. 2018-CA-01481 alleging that the Real Property had been used to perpetuate common law and securities fraud against the Other Palm House Investors.[2]

4. The Other Palm House Investors are 13 investors originally from China (one of whom now resides in Palm Beach County, Florida) who are among 90 victims of the Palm House Hotel EB-5 fraud which has been the subject of news stories of predicate acts of wrongdoing, SEC actions and criminal indictments. Over $45 million of funds from EB-5 investors, including over $7 million of that of these Other Palm House Investors, was frittered away in self-dealing and wrongful conduct perpetrated or aided by KK-PB, Straub, New Haven, Laudano, and Palm House Hotel.

5. On January 25, 2019, Debtor filed its Motion for Approval of Settlement Agreement, and Related Asset Purchase Agreement, With KK-PB Financial, LLC and Glenn F. Straub ("Proposed Plan") (D.E. 523).

6. The Proposed Plan puts forward a proposition in which KK-PB will purchase the property located at 160 Royal Palm Way, Palm Beach, Florida ("Real Property") for $5,125,00 in cash and a credit of $5,135,862. [3]

7. As part of the Proposed Plan, the Debtor is to use the $5,125.00 to pay fees, broker compensation, and creditor claims, including the $30,844,346 of claims by the Other Palm House Investors.

---

[1] Straub is the principal and owner of KK-PB
[2] There is a separate pending matter in the Unites States District Court for the Southern District of Florida (Case No. 9:16-cv-81871-KAM) filed by 63 EB-5 investors against, among others KK-PB, New Haven, Laudano, and Palm House Hotel for similar fraud as alleged by the Other Palm House Investors in its action.
[3] Straub, via KK-PB, purchased the Real Property in 2009 for approximately $10 million and sold it in 2013 for approximately $36 million.

8. Specifically, the Proposed Plan's pertinent part regarding the payment states:

> **a. Settlement Payment:** KK-PB shall pay Debtor $5,125,000.00 (the "**Settlement Payment**"). The Settlement Payment shall be utilized by the Debtor to pay, among other things and if applicable, the Break-Up Fee, broker compensation, the $200k Payment, the $50k Payment, and allowed creditor claims, including the allowed claims of the EB-5 Investors and the Other EB-5 Creditors.

*Section 31.a of Proposed Plan*

9. More importantly, the Proposed Plan seeks to bar claims and litigation by creditors, including the Other Palm House Investors against KK-PB, Straub, New Haven, Laudano, and all "related parties and professionals", among others, as a condition of confirmation.

10. Specifically, the Proposed Plan's pertinent part regarding barring claims states:

> **d. Bar Order/Injunction/Third Party Releases:** KK-PB and Mr. Straub's entry into the Settlement Agreement and APA is expressly conditioned upon the Court's entry of an order barring/enjoining/releasing all claims and litigation by the EB-5 Investors, the Other EB-5 Creditors, and any other creditors or potential creditors against KK-PB, Mr. Straub, Galle, Mr. Spano, New Haven, Mr. Laudano, and related parties and professionals, with respect to any and all actions and transactions arising from or relating to Debtor, the Real Property, the investments made by the EB-5 Investors and Other EB-5 Creditors in Palm House Hotel, LLLP, and any and all other matters that were directly or indirectly, or tangentially, related to the Real Property, Debtor, or Debtor's estate.

*Section 31.g of Proposed Plan*

## OBJECTION

11. The standard in this Circuit for approving a bankruptcy settlement requires analyzing the four factors. The factors are: (a) the probability of success in the litigation; (b) the

1187907v.1

difficulties, if any, to be encountered in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interests of the creditors and a proper deference to their reasonable views in the premises. Wallis v. Justice Oaks II, Ltd., F. 2d 1544, 1549 (11th Cir. 1990).

12. When a bankruptcy settlement also seeks entry of a bar order[4], the bankruptcy court must also determine whether the bar order is fair and equitable to the parties whose claims will be barred/enjoined. The proponent of the plan has the burden of establishing that the settlement and bar order meet the standards for approval. In re GunnAllen Fin., Inc., 443 B.R. 908, 915 (Bankr. M.D. Fla. 2011) (bar order and channeling injunction structure rejected where creditors to be precluded from seeking relief from non-debtor defendants apart from bankruptcy estate).

13. This 11th Circuit has held, "Bar orders ought not to be issued lightly, and should be reserved for those *unusual cases* in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all the facts and circumstances. The inquiry is fact intensive in the extreme." In re Seaside Eng'g & Surveying, Inc., 780 F.3d 1070, 1078–79 (11th Cir. 2015). *(italicized for emphasis).*

14. When a bar order seeks to bar creditors pending claims and actions against non-debtors, as is the case here, the Court is to place great weight on the fourth Justice Oaks factor.

---

[4] Bankruptcy court has authority to enter bar orders, barring nonsettling third parties from asserting claims against settling defendant, where such orders are integral to settlement in adversary proceeding. Bankr.Code, 11 U.S.C.A. § 105(a); Fed.Rules Civ.Proc.Rule 16, 28 U.S.C.A.; Fed.Rules Bankr.Proc.Rules 7016, 9019(a), 11 U.S.C.A. Matter of Munford, Inc., 97 F.3d 449 (11th Cir. 1996)

4

Id. at 916. Accordingly, this Court should place the greatest weight on the interest of and defer to reasonable views of the creditors, including the Other Palm House Investors, when evaluating the adequacy of the bar order. Their view is that the proposed settlement is unfair and should be rejected.

15. When determining whether to enter a bar order against non-settling defendants, the court must make a reasoned determination that the bar order is fair and equitable. In making such a determination, courts consider the interrelatedness of the claims that the bar order precludes, the likelihood of non-settling defendants to prevail on the barred claim, the complexity of the litigation, and the likelihood of depletion of the resources of the settling defendants. Matter of Munford, Inc., 97 F.3d 449, 455 (11th Cir. 1996)

16. The proposed bar order is not fair and equitable as the factors in Munford are not met. Further, the bar order is an overly broad in scope and unlimited in any way. A confirmation of this Proposed Plan would provide a blanket immunity to all debtors, insiders, and "and related parties and professionals." Regarding the Munford elements to be met:

- The claims of the Other Palm House Investors against non-settling, non-debtors are separate and apart from those of those now seeking settlement. Namely, the claims of the Other Palm House Investors with regard to KK-PB and Straub deal with the due diligence that performed or not performed on Robert Matthews, of which the Other Palm House Investors were and are intended beneficiaries.

- The Other Palm House Investors reasonably believe that they are likely to prevail in their claims against non-debtors (a) KK-PB and Straub concerning

5

due diligence on Matthews prior to the mortgage transaction, (b) New Haven and Laudano given his guilty plea in federal court criminal proceedings in Connecticut and (c) all others, based on the weight of the evidence and facts known to date.

- While the preponderance of litigation in this matter is complex, the litigation against KK-PB and Straub by the Other Palm House Defendants is not. In particular, Straub's sole due diligence on the financial condition of Robert Matthews prior to engaging in the mortgage has been stated under oath as merely seeing he lives in a nice house in a nice neighborhood. (See Straub deposition at page 19, line 8 -25 and page 20, line 1-4). (Complete transcript filed as D.E 420 and cited portion attached hereto as Exhibit "A"). Further, Straub testified he had knowledge Matthews had taken EB-5 investment funds regarding the Real Property project (See Straub deposition from Palm Beach County Case No. 502014CA011203XXXXMBAN at page 147, line 17 -25 and page 148, line 1-17 attached hereto as Exhibit "B")

- There is no likelihood of depletion of resources of settling defendants. Straub, in particular, has resources to litigate and is collectible.

17. The proposed bar order is intended for the benefit of debtor's insiders and "related parties and professionals" in that the Other Palm House Investors' pending claims for fraud and self-dealing against non-debtors will be permanently enjoined and extinguished without any potential for recovery.

18. This 11th Circuit, citing In re Airadigm Communications, Inc., 519 F.3d 640, 657–58 (7th Cir. 2008), frowns upon overly broad blanket bars of creditors actions against

nondebtor defendants and debtor insiders. See Seaside Eng'g & Surveying, Inc., 780 F.3d at 1081. In that matter, this Court approved a bar order that was narrowly limited in scope to claims arising out of the Chapter 11 case and did not include barring claims arising out of fraud, gross negligence, or willful misconduct of nondebtors. Id.

19. The proposed bar order here would not only bar claims arising out of the Real Property in question in the bankruptcy but would permanently extinguish Other Palm House Investors' claims against KK-PB, Straub, New Haven, Laudano, and all "related parties and professionals" for fraud, gross negligence, and willful misconduct which are part of pending litigation.

20. In addition, Debtor's Proposed Plan is presented in bad faith as debtor has made no attempt whatsoever to negotiate or communicate the Proposed Plan with counsel for the Other Palm House Investors in any manner. See 11 U.S.C.A. § 1129(a)(3). In re Scrubs Car Wash, Inc., 527 B.R. 453 (Bankr. D. Colo. 2015).

21. The Other Palm House Investors join in on objections to the Proposed Plan filed by Unites States Trustee, Securities and Exchange Commission, and EB-5 Claimants.

## CONCLUSION

22. Debtor's Proposed Plan is to convey the Real Property to insider KK-PB for cash and credit considerations well below the market value of the Real Property. In addition, the debtor requests this Court to confirm the Proposed Plan barring the Other Palm House Investors or any other proposed creditor from bringing or maintaining claims against debtor, KK-PB, Straub, New Haven, Laudano, and all "related parties and professionals" for their fraud, gross negligence, and willful misconduct perpetuated against these Other Palm House Investors. The debtor has failed to meet its burden of

establishing the Proposed Plan and bar order meet the Justice Oaks factors, in particular the fourth and overriding factor that interests of the creditors are paramount and the Court must provide a proper deference to their reasonable views. Rather, the Proposed Plan is self-serving to the debtor insiders and related parties and not fair and equitable to the creditors. Lastly, the proposed bar order is not narrowly tailored in any regard and debtor has put forth no evidence this case rises to the level of an "unusual case" in which bar orders may be confirmed. Should the Proposed Plan be confirmed, the absurd result would occur in which the Other Palm House Investors would be permanently enjoined from maintaining its claims for fraud while Straub and others could maintain their claims related to the same transactions and occurrences.

Respectfully Submitted,

By: */s/ Gavin N.L. White*
    Gavin N.L. White, Esquire (FBN 537853)
    gavin.white@wilsonelser.com
    Steven C. Jones, Esquire (FBN 107516)
    steven.jones@wilsonelser.com
    **WILSON, ELSER, MOSKOWITZ,**
    **EDELMAN & DICKER, LLP**
    3800 Miami Tower
    100 Southeast Second Street
    Miami, Florida 33131
    Telephone:   305-374-4400
    Facsimile:   305-579-0261
    ***Attorneys for "Other Palm House Investors"***

1187907v.1

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that on this 6th day of February 2019, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of the above styled Court using CM/ECF Notice of Electronic Filing to all parties registered to receive electronic noticing in this case.

By:    */s/Gavin N.L. White*
           GAVIN N.L. WHITE
           Florida Bar No.: 537853
           gavin.white@wilsonelser.com
           STEVEN C. JONES
           Florida Bar No. 107516
           steven.jones@wilsonelser.com

# EXHIBIT A

Page 19

1  territories, Youngstown, Pittsburgh, all the Mafia
2  areas.  I ran legitimate companies, and they would
3  just muscle me, hang me upside-down on bridges and
4  everything.  So that's what happens.  I'm a collateral
5  lender.  You bring me $2, I don't too much care who
6  and what you are, because I might take it back.
7  BY MR. GEORGE:
8      Q    So did you do any financial due diligence
9  with respect to Bob and Mia Matthews before you began
10 doing business with them?
11          MR. SALAZAR:  Objection to form.
12          THE WITNESS:  I probably followed my normal
13 procedure, which I explained what it is.  I try.
14 Maybe we did, but I knew these people indirectly.
15 They're living in a $30 million home on the beach.
16 Trump is buying a $30 million house down the street
17 from them, selling it for a hundred million dollars.
18 Thirty million, then he sells it for a hundred
19 million.  I'm saying they're living in a pretty decent
20 neighborhood, and we probably pledged their house or
21 think that they got the money to come up with, and he
22 had a very -- the guy was worth about 300-some million
23 dollars, supposedly, like I'm worth billions of
24 dollars, supposedly.  Phew, I don't think so.  But
25 anyway, people -- you can draw opinions of who and

Page 20

1    what they are. They got two kids. They're married.
2    They're in Palm Beach County. They're not, like, in
3    some of these places we have to go to to lend money
4    outside the country.
5         MR. GEORGE: Mark that as 1, please.
6         (Thereupon, the document referred to was
7    marked as Exhibit No. 1 for identification.)
8         MR. SALAZAR: Thank you. Can I see -- give
9    me one second.
10   BY MR. GEORGE:
11       Q    Mr. Straub, do you need to get your glasses?
12   I know that's small print and that you use glasses.
13       A    I think they're downstairs, but I can check
14   and see. I can generally squint at something and read
15   it. But whatcha got in mind?
16       Q    Well, I'm going to have a number of questions
17   about this. So why don't we take a break --
18       A    Five or six.
19       Q    -- so that you can get your reading glasses.
20       A    Okay.
21       MR. GEORGE: Let's go off the record, please.
22       (Thereupon, a brief recess was taken.)
23       MR. GEORGE: Can we go back on the record,
24   please.
25   BY MR. GEORGE:

# EXHIBIT B

Straub, Glenn   07-22-2015

**Page 146**

1   A   It was after but he seemed to have a lot of
2   money. I was seeing him show up all over the place.
3   Q   Did Bob give you a business plan before he
4   closed your deal with him on the Palm House?
5   A   No, sorry. I probably should have read up
6   there but I wouldn't understand. I already had a
7   business plan. It was there, it was in the building. He
8   did it, he was going to complete it, I went and got in
9   and jumped in there and take it around my own time
10  period and because I started to change things like do
11  you want to buy--
12  Q   What gave you confidence that Bob could do the
13  job?
14  A   Because it was always going to be worth what I
15  sold him to him for because I had another guy that was
16  willing to pay me the same amount of money. I know
17  Florida real-estate because I've gone through hundreds
18  of hundreds of millions of dollar, it never seemed to go
19  down, it always seemed to go up. Trouble is when you
20  get yourself into this government that has to approve
21  things that's when it fails because they'll hold you up,
22  hold you up, hold you up so you have to have enough
23  money withstand that lull period until you get - I think
24  that's what they are going over now supposedly making a
25  liar, another lie saying we're going to complete and go

**Page 147**

1   back to the old ways of the old CO and I'm saying duh,
2   that was the same thing I thought you guys were going to
3   do anyway but they get carried away with richy ideas and
4   try and put money in the things that didn't make sense.
5   I don't take a projects on based on due diligence I
6   don't think take a project - it's is a feel, it's a
7   smell of the project and if it's going to be right or
8   not because so many experts have told him buy, buy when
9   the market is going like that three months later so Bo.
10  I don't know if he had the expertise but as long as he
11  is following what I had just worked on the last three
12  years it seemed like it was a good idea to do that and
13  when the property value would go up I just assumed what
14  do I got to lose, I get 25 percent down payment and he's
15  going to be improving the property and he's going to be
16  opened up in nine months, how long can that be?
17  Q   What did Bob demonstrate to you that convinced
18  you that he had the wherewithal, he had the economic
19  means with which to finish the project which he didn't?
20      MR. DOMB: Form.
21  A   I didn't see his checking account balance.
22  Bob's bullshit is he's got all this money in the world
23  and he's going to complete it and I'm saying what's the
24  worse he's going to do foreclose on a property that's
25  going to be worth 10, $20 million more money, hopefully

**Page 148**

1   Florida real estate won't drop down below what it was.
2   It was already pretty low when he got it. But you make
3   a bastard out of it, it's still a bastard, I don't care
4   what it is, and that's what that thing became. So cut
5   up you and you lose the whole floor, he said we're going
6   to move them up, the restaurants on the second floor
7   aren't like restaurants on the first floor, and you got
8   the older people over they're going to come with their
9   little wheelchair and their little electric carts and he
10  was he was never in that business but as long as he had
11  some money, he had to have some money because he came up
12  with a deposit -- I know he didn't have any money from a
13  year before or a day before that so he had the money and
14  his BS was telling me had had some Chinese money DB5 and
15  this and that and I'm thinking I've heard these words
16  before, so what's the worst that can happen to me but I
17  learned.
18  Q   Did Bob introduce you to Nick Ladano before
19  you closed with them?
20  A   Well, Nick I knew him from before. He was --
21  Nick was the one that I had -- Nick was the construction
22  personnel, whatever shenanigans they would have done
23  between the previous projects we just chopped it up and
24  said, hey, small potatoes, who cares. We got Palm House
25  back after we foreclosed on it and whatever Nick could -

**Page 149**

1   - used phrases like knocked down on or whatever it may
2   be because sometimes people -- I've got an energy client
3   right now and they get paid 15% because their an energy
4   plan they get paid 15% of the gross business no matter
5   how bad the energy is they have a monopoly but they
6   found out that their bankruptcy was regulated and non-
7   regulated so their non-regulated cannot take down 15% so
8   I've participated in knocking money down which nothing
9   more than a markup on something, so Nick probably got a
10  markup on his cost plus and the more cost plus he could
11  have so be it.
12  Q   Did Bob tell you before he closed with you
13  that Nick was going to be the contractor on site?
14  A   I don't think Bob and I had that many
15  conversations. I bet you I don't have more than one
16  every two months, maybe, hey Glenn, how's everything I'm
17  going to do this, I'm going to do that bye-bye. It's a -
18  - in other words, he is just a good salesman and so I
19  don't think we asked Bob anything because you're not
20  going to get a reply you're going to get, hey the kids
21  are doing well, I went to church this morning, I went to
22  church this afternoon, I went to church tonight, that's
23  just Bob he just never answers your question.
24  Q   Let me just understand that before you closed
25  with Bob --

