UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

160 Royal Palm, LLC,                                   Case No.  18-19441-EPK

      Debtor.                                   Chapter 11

_____/

***EXPEDITED* MOTION TO APPROVE (I) PRIVATE SALE OF
REAL PROPERTY TO LR U.S. HOTELS HOLDINGS, LLC AND (II) AUTHORIZE
DEBTOR'S ADVANCE OF $250,000 TO THE TOWN OF PALM BEACH ON
BEHALF OF BUYER OF DEBTOR'S ASSETS**

**\*\* Expedited Hearing Requested on or Before February 28, 2019 \*\***

**The Debtor respectfully requests that the Court set this matter for hearing on or before February 28, 2019.  As the Court is aware, the Debtor presently has a deadline of February 28, 2019 to pay $250,000 to the Town of Palm Beach pursuant to the court approved settlement between the Town and the Debtor.  In addition to seeking authority to approve the private sale set forth in this motion, the Debtor seeks authority to advance $250,000 on behalf of the Buyer to timely satisfy the conditions of the Town settlement, which is a condition of closing.  The EB-5 Creditors represented by David George and Edward Marod (the largest group of the Debtor's creditors) are in support of the relief sought within this motion.**

Debtor in Possession, 160 Royal Palm, LLC (the "Debtor"), pursuant to 11 U.S.C. § 363(b)

and (f), respectfully requests entry of an order (A) authorizing the sale of certain real property and

related assets free and clear of all liens, claims and encumbrances to LR U.S. Hotels Holdings,

LLC (the "Buyer" or "LR"); and (B) authorizing the Debtor to advance $250,000 on behalf of the

ultimate buyer to satisfy the settlement payment due to the Town of Palm Beach.  In support of

this request the Debtor states:

## FACTUAL BACKGROUND

1.      The Debtor is a Florida limited liability company that filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code on August 2, 2018 (the "Petition Date").  Pursuant

to §§ 1107 and 1108 of the Code, the Debtor is a debtor in possession and possesses all of the powers, functions and duties of a trustee.

2.     The Debtor's principal asset is a partially completed hotel-condominium project known as the Palm House Hotel (the "Hotel" or "Property"), which is located at 160 Royal Palm Way, Palm Beach, FL 33480.

3.     Upon information and belief, the fair market value of the Hotel exceeds $30 million. For example, on November 9, 2018 the Court entered an amended order, *inter alia*, approving a stalking horse bid of the Hotel to RREF II Palm House LLC ("RREF") for $32 million.  *See* ECF No. 273.

4.     As of the Petition Date, the Hotel was encumbered by a mortgage in favor of KK-PB Financial, LLC ("KKPB") in an asserted amount exceeding $39 million.  *See* Proof of Claim No. 70.  However, on February 22, 2019, following several days of trial, the Court issued an oral ruling estimating the claim at $0 for all purposes.  As such, KKPB no longer holds a security interest in the Hotel.

5.     Additionally, the Town of Palm Beach (the "Town") asserts a security interest in the Hotel in the approximate amount of $4 million, based on alleged use agreements and code enforcement fines.  *See* Proof of Claim No. 90.  However, pursuant to a settlement agreement between the Debtor and Town, which has been approved by the Court, the Town will accept $250,000 in satisfaction of its claims from a purchaser of the Hotel (the "Town Settlement Payment") if it receives that payment by February 28, 2019.  *See* ECF Nos. 97, 112, 204, 536 and 543.

6.     As stated, the Court previously approved RREF as a stalking horse bidder.  *See* ECF No. 273.  Pursuant to the terms of the contract between the Debtor and RREF, RREF is

entitled to a breakup fee of $350,000, which fee, *inter alia*, is entitled to status as a super-priority administrative expense in the event the Debtor sells the Hotel to a separate party (the "Breakup Fee"). *See* ECF No. 273 ¶¶ 12–13 (citing RREF Contract § 8.4).

7.    The Debtor has received an offer from the Buyer to purchase the Assets (defined herein) in a **private sale** pursuant to the terms of an asset purchase agreement (the "APA"), a copy of which is attached as **EXHIBIT "A"**.  The principal terms of the APA include:[1]

- The cash purchase price for the Assets (the term "Assets" includes the Hotel; any improvements and fixtures thereon; all tangible personal property and equipment owned by the Debtor and located on the Property or stored off-site; and all transferable development rights, consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency) is Thirty Nine Million and Six Hundred Thousand Dollars ($39,600,000.00).

- In addition to the Purchase Price, Buyer shall assume the following obligations to be funded by Buyer at closing: (i) settlement fees in the amount of $250,000 to the Town of Palm Beach (or if, and to the extent, such settlement fees are paid to the Town of Palm Beach by Seller before Closing, such settlement fees shall be reimbursed to Seller by Buyer at Closing); (ii) any unpaid ad valorem property taxes for 2018 and 2019, as provided in Section 12.1; (iii) real estate brokerage commissions approved by the Court related to the sale up to the amount of $450,000; (iv) any recording and transfer fees owed to any governmental entity associated with the sale of the Property (the "Assumed Obligations").

- The Debtor is authorized to accept competing purchase offers from RREF for the Assets in an amount not less than (i) Forty Million and Six Hundred Thousand Dollars ($40,600,000.00) in cash; and (ii) assumption of the Assumed Obligations. Any competing bids must be received by the Debtor and Buyer on or before 4:30 P.M. on March 4, 2019 ("Competing Bids").

- In the event the Debtor receives and accepts a Competing Bid, the Buyer shall have the exclusive right of first refusal to submit an offer greater than such bid.  The Buyer shall have through and including 4:30 p.m. EST on March 7, 2019 (the "Right of First Refusal Deadline") to exercise this right of first refusal.

- The Debtor shall withdraw its Motion for Entry of an Order (I) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially All of its Assets, (II) Approving the Form and Manner of Notice of Sale, (III) Scheduling

---

[1]    Certain terms of the APA are set forth herein for notice purposes only.  To the extent the APA conflicts with the summary in this Motion, the APA shall control.

{2234/000/00435099}

an Auction and Sale Hearing and (IV) Approving the Sale of the Assets Free and Clear of Liens, Claims and Encumbrances filed as Document Number 92 in the Bankruptcy Case.

- The Court shall set a final hearing to approve the ultimate purchaser of the Assets pursuant to this APA. The parties presently contemplate that the Court would set the hearing for March 8, 2019, the date previously scheduled for the auction and sale hearing.

8.      The difference in value between the Buyer's bid—$39.6 million, plus the Assumed Obligations—and the bid of RREF—$32 million—exceeds $8 million. Thus, even if the estate closes with the Buyer, not RREF, and becomes liable for the Breakup Fee of $350,000, its net benefit from the transaction will exceed $8 million.

9.      Through the reasonable exercise of its business judgment, the Debtor has determined that it is in the best interest of the estate to accept the Buyer's offer instead of conducting the previously scheduled public auction.

10.       The Debtor has no direct or indirect interest in, or control over, the Buyer. The parties negotiated the APA in good faith and at arm's length. Specifically, the APA was negotiated over several weeks with material term input from the parties that have been referred to in this case as the EB-5 Investors. Neither RREF nor the Buyer are in any way connected to the Debtor or any prior owner of the Hotel. Nor are RREF or the Buyer a current or former manager or member of the Debtor, KKPB, or Palm House, LLC. Nor are RREF or the Buyer a current former manager or member of any party: (a) to the Debtor's Receivership Action in state court that preceded this bankruptcy case; nor (b) to any other pending civil action in which the Debtor is a party.

11.      Through this Motion, the Debtor respectfully requests that the Court (a) approve the APA; (b) authorize and approve the sale of the Hotel to the Buyer, or alternately, to RREF, pursuant to the terms of the APA, and free and clear of all liens, claims and encumbrances (the "Sale"); (c) authorize the Debtor to withdraw its Motion for Entry of an Order (I) Approving Bid

{2234/000/00435099}

Procedures and Bid Protections in Connection with the Sale of Substantially All of its Assets, (II) Approving the Form and Manner of Notice of Sale, (III) Scheduling an Auction and Sale Hearing and (IV) Approving the Sale of the Assets Free and Clear of Liens, Claims and Encumbrances filed as Document Number 92 in the Bankruptcy Case; and (d) schedule a final hearing to approve the Sale contemplated herein.

12.    Additionally, the Debtor respectfully requests authority to advance on behalf of either LR or RREF, $250,000 to satisfy the settlements with the Town of Palm Beach that were previously approved by the Court. *See* ECF Nos. 97, 112, 204, 536 and 543. The Debtor believes it is an appropriate exercise of the Debtor's business judgment to make this payment in order to satisfy a $4 million obligation of the estate.[2]  In turn, the ultimate buyer of the property will reimburse the Debtor at closing.

## RELIEF REQUESTED

A.    **The Court Should Approve the Sale Under 11 U.S.C. § 363(b).**

13.    Section 363(b) of the Bankruptcy Code permits the use, sale or lease, "other than in the ordinary course of business," of property of the estate.  11 U.S.C. § 363(b).  In evaluating proposed uses of property under § 363(b), courts employ the business judgment rule, which "is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges." *In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005) (quotation omitted).  "Courts should approve an exercise of a debtor's business judgment unless it is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim or caprice." *Friedman's*, 336 B.R. at 895 (quotation

---

[2] The Debtor presently has approximately $238,000 in its DIP Account, undersigned counsel is holding $30,000 in its trust account from its initial retainer in this case and will advance the additional funds needed to satisfy the settlement payment.

omitted); *see In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Lionel Corp.*, 722 F.2d 1063 (2nd. Cir. 1983).

14.    Courts interpreting § 363(b) have approved non-ordinary course sales of substantially all of a debtor's assets.  *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2nd. Cir. 1983); *In re Parkstone Med. Info. Sys.*, 2001 Bankr. LEXIS 1356 (Bankr. S.D. Fla. 2001); *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984).  As *Lionel* states:

> Resolving the apparent conflict between Chapter 11 and section 363(b) does not require an all or nothing approach.  Every sale under 363(b) does not automatically short-circuit or side step Chapter 11; nor are the two statutory provisions to be read as mutually exclusive. Instead, if a bankruptcy judge is to administer a business reorganization successfully under the Code, then… some plan for the operation of both 363(b) must be allowed for. …The rule we adopt requires that a judge determining a section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.

722 F.2d at 1070–71.

15.    The Debtor respectfully submits that all of the factors demonstrating its sound business judgment are met, and that the Sale should be approved.  The Sale appears to be the best manner in which to maximize value for the estate; there are administrative costs associated with the continued operation of the Debtor in bankruptcy; and the settlement with the Town contains various deadlines that expire in early 2019.  *See* ECF No. 536.  Moreover, the potential liability of the Breakup Fee is easily outweighed by the $8 million-plus difference between the RREF bid and the Buyer's offer.

16.    Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (a) the sale price is fair and reasonable; (b) the debtor in possession has provided interested parties with adequate and reasonable notice; and (c) the purchaser is proceeding in good faith.  *See In re Abbotts Dairies of Pennsylvania*, 788 F.2d 143,

{2234/000/00435099}

147 (3d Cir. 1986) (noting that the phrase "good faith" encompasses one who purchases in good faith and for value); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). All of the factors are or will be satisfied in this matter.

### 1.    The Purchase Price is Fair and Reasonable.

17.    First, the purchase price—$39.6 million—is fair and reasonable. The Debtor estimates the value of the Property to be in excess of $30 million, and the Court has previously approved a stalking horse bid for $32 million. The offer by the Buyer easily exceeds both figures. Additionally, by permitting a Competing Bid from RREF, the Debtor is ensuring that the estate realizes the highest and best possible value for the Hotel. If the offer by the Buyer understates the value of the Hotel—and again, the Debtor believes that the offer represents fair market value— then RREF may submit a higher offer in an amount equal to or exceeding $40.6 million.

### 2.    Adequate and Reasonable Notice.

18.    The Debtor shall provide by e-mail; facsimile and/or U.S. Mail written notice of this Motion: (a) those persons who contacted the Debtor or any of its representatives regarding the sale of the Hotel; (b) the U.S. Trustee; (c) the Internal Revenue Service; (d) parties to executory contacts and leases with the Debtor; (e) all other parties who have filed a notice of appearance; and (f) all other creditors.[3]

19.    The Debtor submits that such notice constitutes good and sufficient notice of the Sale and related matters and that no further notice need be given.

### 3.    The Buyer is a Good Faith Purchaser.

---

[3] It should be noted that after months of extensive marketing, the only party that has submitted a qualified bid, other than RREF, is the Buyer.

{2234/000/00435099}

20.     The ultimate buyer will be a good faith purchaser, as the Sale will be negotiated at arms' length and will be subject to higher and better offers via the Competing Bids.  As such, the Debtor requests that the Court find that the Buyer or RREF, as the case may be, constitutes a good faith purchaser of the Assets pursuant to 11 U.S.C. § 363(m) such that the reversal or modification on appeal of the sale of the Assets shall not affect the validity of the Sale, whether or not the purchaser of the Assets knew of the pendency of the appeal.  *See, e.g.*, 11 U.S.C. § 363(m) (reversal or modification on appeal of a transaction authorized under § 363(b) of the Bankruptcy Code does not affect the validity of the sale to an entity that acquired the property in good faith); *In re Adamson Co., Inc.*, 159 F.3d 896 (4th Cir. 1998.); *In re Stadium Management Corp.*, 895 F.2d 845 (1st Cir. 1990).

**B.     The Court Should Approve the Sale Free and Clear of All Liens, Claims and Encumbrances Under 11 U.S.C. § 363(f).**

21.     Section 363(f) of the Bankruptcy Code permits the trustee (or debtor in possession) to sell property of the estate free and clear of any third-party interests in such property if certain conditions are satisfied, including the consent of the affected parties.  *See* 11 U.S.C. § 363(f)(1)–(5).  Here, the Debtor requests that the Property be transferred free and clear of all liens, claims and encumbrances because, *inter alia*, (a) KKPB does not possess a security interest in the Hotel; (b) the Town's asserted security interest in the Hotel shall be satisfied at the closing of the Sale via the Town Settlement Payment; (c) the secured claim of New Haven Contracting South that has allegedly been assigned to KKPB is subject to a *bona fide* dispute and will be objected to by the Debtor, but for the time being there will be adequate proceeds from the sale to satisfy any remaining allowed amount of this claim should the Debtor not prevail on its claim objection.

22.     Any claimants who are properly secured in the Assets shall, by operation of law, have their liens attach to the proceeds of the sale of the Assets in the order of their priority, with the validity, force and effect that they had as of the Petition Date, if any, against the Assets, subject to the rights, claims, defenses and objections of the Debtor and all interested parties with respect to such liens, so that the purchaser of the Assets shall take the Assets free of all the Liens. ___*For avoidance of doubt, such attachment shall not apply to Claim No. 70-3 filed by KKPB, nor shall such attachment apply to the note or mortgage underlying such claim, due to the fact that the Court estimated this claim at $0 for all purposes in this bankruptcy case, and determined that KKPB no longer has a lien on the Debtor's real property*___. ECF No. 603.

**C.     Waiver of Stay Period Pursuant to Fed. R. Bankr. P. 6004(h).**

23.     To the extent necessary, the Debtor requests that the Court waive the 14 day stay period pursuant to Fed. R. Bankr. P. 6004(h).

**D.     Scheduling a Final Hearing on the Sale Motion.**

24.     The Debtor requests that the Court schedule the final hearing to approve the Sale for March 8, 2019, the date previously scheduled for the auction and Sale Hearing.

**E.     Payment of the Town Settlement Payment is in the Best Interest of the Estate.**

25.     Likewise, the Debtor believes that its proposed payment of the $250,000 Settlement Amount is a sound exercise of the Debtor's business judgment and thus permissible pursuant to Section 363(b) of the Bankruptcy Code.  Specifically, the Debtor proposes to advance on behalf of the Buyer $200,000 to the Town of Palm Beach and $50,000 to the Town of Palm Beach Code Enforcement Board pursuant to the Amended Settlement Agreements that have been previously approved by this Court.   *See* ECF Nos. 97, 112, 204, 536 and 543.  Those payments will then be reimbursed by the Buyer at the closing of the sale of the Assets.

26.     As the Amended Settlement Agreements require the payment to be made by a "Qualified Buyer" (a defined term under the Amended Settlement Agreements) and the Debtor will be making the payments on behalf of what it believes would be a Qualified Buyer, the Debtor respectfully requests the Court: (a) find that both RREF and the Buyer are Qualified Buyers under the Amended Settlement Agreements; and (b) make a finding that the payments on behalf of the successful Qualified Buyer, whether RREF or the Buyer, satisfy the Debtor's obligations under each of the Amended Settlement Agreements.  Such a finding is appropriate, as neither RREF nor the Buyer are in any way connected to the Debtor or any prior owner of the Hotel.  Nor are RREF or the Buyer a current or former manager or member of the Debtor, KKPB, or Palm House, LLC. Nor are RREF or the Buyer a current former manager or member of any party: (a) to the Debtor's Receivership Action in state court that preceded this bankruptcy case; nor (b) to any other pending civil action in which the Debtor is a party.

**WHEREFORE**, the Debtor respectfully requests the entry of an Order (a) approving the APA; (b) authorizing and approving the sale of the Hotel to the Buyer, or alternately, to RREF, pursuant to the terms of the APA, and free and clear of all liens, claims and encumbrances (the "Sale"); (c) authorizing the Debtor to withdraw its Motion for Entry of an Order (I) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially All of its Assets, (II) Approving the Form and Manner of Notice of Sale, (III) Scheduling an Auction and Sale Hearing and (IV) Approving the Sale of the Assets Free and Clear of Liens, Claims and Encumbrances filed as Document Number 92 in the Bankruptcy Case; (d) scheduling a final hearing to approve the Sale contemplated in this motion; (e) finding that both RREF and the Buyer are Qualified Buyers under the Amended Settlement Agreements and authorizing the Debtor to advance the payments on behalf of the Qualified Buyer to the Town of Palm Beach in the amount of $200,000

and to the Town of Palm Beach Code Enforcement Board in the amount of $50,000 pursuant to

the Amended Settlement Agreements; and (f) such further relief the Court deems just and proper.

Respectfully submitted,

SHRAIBERG, LANDAU, & PAGE, P.A.
Attorneys for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
 Facsimile: 561-998-0047
 Email: plandau@slp.law
 Email: blee@slp.law
 Email: ependergraft@slp.law


By:  /s/ Philip J. Landau
          Philip J. Landau
          Florida Bar No. 504017
          Bernice C. Lee
          Florida Bar No. 0073535
          Eric Pendergraft
          Florida Bar No. 91927

{2234/000/00435099}

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on February 26, 2019 via CM/ECF notice of electronic filing to all parties registered to receive electronic noticing in this case, by email to Palm House Hotel, LLLP c/o Henry B. Handler, Esq., at hbh@whcfla.com, jn@whcfla.com, and filing@whcfla.com, and by Fed Ex International First Service to the parties listed below.  Additional service being furnished on February 27, 2019 by First Class U.S. Mail to the parties on the attached Matrix and Service List, which, in addition to others, lists the following interested parties for notice:

| | | | | |
|---|---|---|---|---|
| (i) | Palm House LLC; | | (xiii) | Van Linda Iron Works, Inc.; |
| (ii) | Ryan Black; | | (xiv) | New Haven Contracting South, Inc.; |
| (iii) | Gerry Matthews; | | | |
| (iv) | Robert V. Matthews; | | (xv) | Architectural Precast & Foam, LLC; |
| (v) | Joseph J. Walsh, Sr.; | | | |
| (vi) | KK-PB Financial, LLC; | | (xvi) | Xpert Elevator Services, Inc.; |
| (vii) | Palm House Hotel, LLLP; | | (xvii) | Securities and Exchange Commission; |
| (viii) | James F. Biagi, P.E.; | | | |
| (ix) | Richards Woodwork, Inc.; | | (xviii) | Edward A. Marod, Esq. |
| (x) | David Campanaro; | | (xix) | Maria Titova; |
| (xi) | Place for Tile, Inc.; | | (xx) | The Town of Palm Beach; and |
| (xii) | TWG Enterprises Waterproofing & Painting, Inc.; | | (xxi) | Daniel Gorman. |

*/s/ Philip J. Landau*

Philip J. Landau

**Served Via Fed Ex International First Service:**

Baoping Liu
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Qingyun Yu
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Shaoqing Zeng
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Shaoping Huang
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Ruji                                                                                                    Li
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Xiaoping Zhang
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Ling Li
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Yi Zhao
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Min Cui
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Daqin Weng
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Liyan Feng
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Yingjun Yang
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Changyu Liu
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Feng Guo
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Tingting Sun
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Zhen Yu
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Xiao Sun
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Yawen Li
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Li Zhang
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

Tonghui Luan
c/o Annie Huang, Shenzhen Huamei Venture Investment Consultant Co., Ltd.
Room 503, Tower 2, Phase 1 of Excellence City, No. 128 ZhongKang Road
Shenzhen City, Guangdong Province, China 518048

## SERVICE LIST

Xpert Elevator Services, Inc
550 Business Park Way
Bay #8
West Palm Beach, FL 33411-1743

Daniel Gorman
311 South M St
Lake Worth, FL 33460-4519

The Palm House, LLC
c/o Paul Varnava
1010 Pennsylvania Ave
Apt 9
Miami Beach, FL 33139

KK-PB Financial, LLC
13501 South Shore Blvd
Suite 103
Wellington, FL 33414

Arena Ventures, LLC
721 Arena Blvd
Miami, FL 33136

KK-PB Financial, LLC
c/o Craig T. Galle
13501 South Shore Blvd
Suite 103
Wellington, FL 33414

Palm House Hotel, LLLP
9100 Belvedere Rd
# 207
Royal Palm Beach, FL 33411

Palm House Hotel, LLLP
1201 Hays St
Tallahassee, FL 32301

Palm House Hotel, LLLP
c/o South Atlantic Regional Center, LLC
9250 Belvedere Road
Suite 101
Royal Palm Beach, FL 33432

Edward A. Marod
777 South Flagler Dr
Suite 500 E
West Palm Beach, FL 33401-6121

Van Linda Ironworks, Inc
3787 Boutwell Road
Lake Worth, FL 33461

Securities and Exchange Commission
801 Brickell Ave
Suite 1800
Miami, FL 33131-4901

Richard's Woodwork, Inc
1301 53rd St
#2
Mangonia Park, FL 33407

Daniel Gorman
277 Royal Poinciana Way
Palm Beach, FL 33480-4007

James F. Biagi, Inc, P.E., P.S.
NRAI Services, Inc
1200 South Pine Island Rd
Plantation, FL 33324

The Place for Tile, Inc
7957 Northwest 54 St
Doral, Fl 33166

Arena Ventures, LLC
c/o Craig T. Galle, Registered Agent
11198 Polo Club Road
Wellington, FL 33414

Richard's Woodwork, Inc
Mesa & Pepin, LLC
3418 Poinsettia Ave
West Palm Beach, FL 33407

TWG Enterprises Waterproofing & Painting, Inc
605 Southeast 1st Ave
Suite G
Delray Beach, FL 33444

Daniel Gorman
506 North Lakeside Dr
Lake Worth, FL 33460-3119

The Place for Tile, Inc
c/o David Mazor
7957 Northwest 54 St
Doral, Fl 33166

Architectural Precast & Foam, LLC
P.O. Box 9944
West Palm Beach, FL 33419

Architectural Precast & Foam, LLC
c/o Brad Jenison
17549 Bridle Ln
Jupiter, FL 33478

TWG Enterprises Waterproofing & Painting, Inc
c/o Todd W. Gallo
605 Southeast 1st Ave
Suite G
Delray Beach, FL 33444

Xpert Elevator Services, Inc
Dean A. Beckemeyer, Registered Agent
17119 43rd Rd N
Loxahatchee, FL 33470

Palm House, LLC
101 Casa Bendita
Palm Beach, FL 33480

New Haven Contracting South, Inc
Alan I. Armour, II, Esq
1645 Palm Beach Lakes Blvd
Suite 1200
West Palm Beach, FL 33401

{2234/000/00419687}

## SERVICE LIST

Gerry Matthews
161 Camp Rd
Middlebury, CT 06762

Robert Matthews
101 Casa Bendita
Palm Beach, FL 33480

Palm House, LLC
Leslie R, Evans, Esq., Registered Agent
214 Brazilian Ave
# 200
Palm Beach, FL 33480

Maria Titova
Roman Groysman, Esq.
Law Offices of Roman Groysman, PA
401 East Las Olas Blvd
Suite 1400
Fort Lauderdale, FL 33301-2218

Palm Beach County
Palm Beach County Finance Department
P.O. Box 3977
West Palm Beach, FL 33402-3977

Maria Titova
7400 Wisteria Ave
Parkland, FL 33076-3914

Ryan Black
3930 North Flagler Dr
# 202
West Palm Beach, FL 33407

Palm Beach County
Board of County Commissioners
Palm Beach County
301 North Olive Ave
West Palm Beach, FL 33401

Palm House, LLC
c/o Gerry Matthews, its Managing Member
161 Camp Rd
Middlebury, CT 06762

Joseph Walsh, Sr.
197 South Federal Hwy
Suite 200
Boca Raton, FL 33432

Joseph J. Walsh, Sr.
South Atlantic Regional Center, LLC
9250 Belvedere Rd
Suite 101
West Palm Beach, FL 33411-3630

Ryan Black
1469 South Pine Island Rd
Fort Lauderdale, FL 33328

David Campanaro
339 Eastern St
New Haven, CT 06513-2463

Architectural Precast & Foam, LLC
3716A Interstate Park Rd N
Riviera Beach, FL 33404

David Campanaro
143 North Ivy St
Trailer 11
Branford, CT 06405-6018

James F. Biagi, Inc, P.E., P.S.
1915 Northeast 45th St
#107
Fort Lauderdale, FL 33308

{2234/000/00419687}

Label Matrix for local noticing
113C-9
Case 18-19441-EPK
Southern District of Florida
West Palm Beach
Tue Feb  5 15:09:16 EST 2019

160 Royal Palm, LLC
1118 Waterway Lane
Delray Beach, FL 33483-7156

Architectural Precast & Foam, LLC
c/o Cristopher S. Rapp, Esq.
Kelley Kronenberg, P.A.
1475 Centrepark Blvd.
Suite 275
West Palm Beach, FL 33401-7446

KK-PB Financial LLC
c/o Salazar Law
2000 Ponce de Leon Blvd., Penthouse
Coral Gables, FL 33134-4422

New Haven Contracting South, Inc
2240 Palm Beach Lakes Blvd
Suite 101
West Palm Beach, FL 33409-3403

Other Palm House Investors
c/o Wilson, Elser, Moskowitz, Edelman &
3800 Miami Tower
100 Southeast Second Street
Miami, FL 33131-2100

Palm Beach County Tax Collector
c/o Orfelia M Mayor
POB 3715
West Palm Beach, FL 33402-3715

RREF II Palm House LLC
c/o Bilzin Sumberg Baena Price & Axelrod
1450 Brickell Avenue, 23rd Floor
ATTN:  Jay M. Sakalo & Jeffrey I. Snyder
Miami, FL 33156 United States of America 33131-3456

Town of Palm Beach
c/o Allen R. Tomlinson, Esq.
Jones, Foster, et al.
P.O. Box 3475
West Palm Beach, FL 33402-3475

U.S. Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, NE
Suite 900
Atlanta, GA 30326-1382

Weiss Handler and Cornwell PA
One Boca Place, Suite 218A
2255 Glades Road
Boca Raton, FL 33431-7382

Absolute Plumbing, LLC
917 N. Railroad Avenue
West Palm Beach, FL 33401-3303

Adam G. Heffner
1900 NW CORPORATE BLVD/ 301 W
Boca Raton, FL 33431-8502

Adam G. Heffner, Esquire
1900 N.W. Corporate Blvd.
Suite 301-West Building
Boca Raton, FL 33431-8502

Ali Adampeyra
UAE Dubai, downtown, Burj
Khalifa, Unit 5507
Iran

Ali Adampeyra
c/o Edward A. Marod
777 S. Flagler Drive, Ste. 500 E
West Palm Beach, FL 33401-6121

All Star Equipment
6701 Garden Rd #3
Riviera Beach FL 33404-5900

Alliance Contracting Group
3601 N Dixie Highway
Boca Raton, FL 33431-5929

Allied Interiors
6363 Edgewater Drive
Orlando, FL 32810-4711

Baoping Liu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Bei Zhu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Changyue Liu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Chen Jun
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Cheng Li
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Chengyu Gu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Chunning Ye
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Connect Auto, Inc.
550 Business Park Way
Suite 6
West Palm Beach, FL 33411-1743

Craig T. Galle, Esquire
The Galle Law Group
13501 South Shore Blvd., Suite 103
Wellington, FL 33414-7211

Cuilian Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Daniel A. Hershman, Esq.
2240 Palm Beach Lakes Blvd.
Suite 101
West Palm Beach, FL 33409-3403

Daqin Weng
c/o Edward Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

David Campanaro
c/o Gary Russo, Esq.
The Russo Law Firm
712 US Hwy 1, #300-6
North Palm Beach, FL 33408-4521

David W. Gorman
631 Lucerne Avenue
Lake Worth, FL 33460-3820

Dongsheng Zhu
c/o Edward Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Feng Guo
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Fernando Wong Outdoor Living Design, Inc
1500 Bay Road, Suite 600
Miami Beach, FL 33139-3220

Florida Department of Revenue
P.O. Box 6668
Tallahassee, FL 32314-6668

Gao Yi
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Garry Russo, Esquire
The Russo Law Firm
712 US Hwy 1, #300-6
North Palm Beach, FL 33408-4521

HUFCOR Inc. d/b/a HUFCOR Florida Group
1301 Central Park Drive
Sanford, FL 32771-6644

Halil Erseveen
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Hao Lou
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Henry B. Handler, Esquire
Weiss, Handler & Cornwell, P.A.
2255 Glades Road
Suite 218A
Boca Raton, FL 33431-7392

Henry Handler, Esquire
Weiss, Handler & Cornwell, P.A.
One Boca Plaza
2255 Glades Road, Suite 218-A
Boca Raton, FL 33431-7392

Hongru Pan
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Internal Revenue Service
Attn: Special Procedures
P.O. Box 34045
Stop 572
Jacksonville, FL 32202

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

James F. Biagi PE
555 W Prospect Rd
Oakland Park FL 33309-3931

James F. Biagi, P.E.
Michael E. O'Connor, Esq.
Morgan, Carratt & O'Connor, P.
111 SE 12th Street
Fort Lauderdale, FL 33316-1813

Jeffrey C. Pepin, Esquire
3418 Poinsttia Avenue
West Palm Beach, FL 33407-4804

John C. Randolph, Esquire
Jones, Foster, Johnson, & Stubbs, P.A.
Post Office Box 3475
West Palm Beach, FL 33402-3475

John C. Randolph, Esquire
Jones, Foster, Johnston & Stubbs, P.A.
Flagler Center Tower
505 South Flagler Drive, Suite 1100
West Palm Beach, FL 33401-5950

Jordana L. Goldstein, Esq.
150 South Pine Island Road., Suite 400
Plantation, FL 33324-2667

Jose D. Sosa, Esquire
Law Office of Jose D. Sosa, P.C.
712 US Highway One, 301-16
North Palm Beach, FL 33408

Juewei Zhou
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Junqiang Feng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

KK-PB Financial LLC
13501 South Shore Boulevard
Suite 101
Wellington, FL 33414-7211

KK-PB Financial, LLC
Luis Salazar, Esq.
2000 Ponce de Leon Boulevard, Penthouse
Coral Gables, FL 33134-4422

Kammerer Mariani PLLC
1601 Forum Place, Suite 500
West Palm Beach, FL 33401-8103

Kuang Yaoping
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Lan Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Landmark Construction Companies Inc
6555 Garden Rd
Riviera Beach FL 33404-6318

Li Dongsheng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Li Xiang
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Li Zhang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Lili Zhang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Ling Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Liu Chenglin
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Liu Danqing
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Liyan Feng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

MPC Pools, Inc.
12720 Orange Grove Blvd.
West Palm Beach, FL 33411-8931

Macschmeyer Concrete Company of Florida,
c/o Naomi Stevenson
1142 Watertower Road
Lake Park, FL 33403-2397

Man Mingyue
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

McCabe Rabin
1601 Forum Place, Sutie 201
West Palm Beach, FL 33401-8101

McDonald Hopkins Co., LLC
Accounts Receivable
600 Superior Avenue, E
Suite 2100
Cleveland, OH 44114-2690

McIntosh & Schwartz, PL
888 Southeast Third Avenue, Suite 201
Fort Lauderdale, FL 33316-1159

Michael E. O
Morgan, Carratt & O
111 SE 12th Street
Fort Lauderdale, FL 33316-1813

Michael E. O'Connor, Esq.
111 SE 12th St.
Fort Lauderdale, FL 33316-1813

Michael T. Landen, Esquire
Kluger, Kaplan, Silverman, Katzen &
Levine, P.L.
201 S. Biscayne Blvd., 27th Floor
Miami, FL 33131-4332

Min Cui
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Min Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Mohammad Zargar
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Mohammadreza Sedaghat
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Moore Unique Interiors, Inc.
16889 West Secretariat Drive
Loxahatchee, FL 33470-4035

New Haven Contracting South, Inc.
638 Shore Drive
Boynton Beach, FL 33435-2850

New Haven Contracting South, Inc.
c/o Daniel A. Hershman, Esq.
2240 Palm Beach Lakes Blvd., #101
West Palm Beach, FL 33409-3403

Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

Office of the US Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130-1614

Palm Beach County Tax Collector
P.O. Box 3715
West Palm Beach, FL 33402-3715

Palm House Hotel, LLLP
1201 Hays St.
Tallahassee, FL 32301-2699

Paul Cleary d/b/a Cleary Plumbing Inc.
925 S. Military Trail D11
West Palm Beach, FL 33415-3976

Peter B. Rowell, Esquire
The Barthet Firm
200 S. Biscayne Blvd., Suite 1800
Miami, FL 33131-5333

Place for Tile, Inc
7957 NW 54th Street
Miami, FL 33166-4027

Qingyun Yu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Qiong Deng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Qiongfang Zhu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Quality Concrete Pumping, Inc.
1842 NW 85th Drive
Coral Springs, FL 33071-6256

Ran Chen
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Reza Siamak Nia
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Richard's Woodwork, Inc.
1301
53rd St. #2
West Palm Beach, FL 33407-2244

Ruji Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Rujing Wei
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

SEC Headquarters
100 F Street, NE
Washington, DC 20549-2001

Sanaz Salehin
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Sara Salehin
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Securities and Exchange Commission
801 Brickell Ave., Suite 1800
Miami, FL 33131-4901

Sha Shi
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shahriar Ebrahimian
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shaoping Huang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shaoqing Zeng
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shu Jiang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Shuangyun Wang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Sun Mengyang
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

TWG Enterprises Waterproofing & Painting
c/o Adam G. Heffner, Esq.
1900 NW Corporate Blvd.
Suite 301-West Building
Boca Raton, FL 33431-8502

TWG Enterprises Waterproofing & Paintin
1900 N.W. Corporate Boulevard
Suite 301 - West Building
Boca Raton, FL 33431-8502

Tan Jing
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Tang Cheok Fai
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Tao Xiong
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Tingting Sun
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Tonghui Luan
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Town of Palm Beach
345 South County Rd.
Palm Beach, FL 33480-4443

U.S. Securities and Exchange Commission
Attn: David W. Baddley
950 East Paces Ferry Road, NE
Suite 900
Atlanta, GA 30326-1382

US Attorney Southern District of Florida
500 East Broward Boulevard
Fort Lauderdale, FL 33394-3000

United States Attorney General's Office
US Department of Justice
950 Pennsylvania Avenue
Washington, DC 20530-0001

Van Linda Ironworks, Inc.
3787 Boutwell Road
Boynton Beach, FL 33435

Vivian Doris
2901 Clint Moore Rd.
Suite 213
Boca Raton, FL 33496-2041

Wallace Surveying Corporation
5553 Village Boulevard
West Palm Beach, FL 33407-7910

Wang Jian
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Wang Jing
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Wang Jue
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Wenhao Zhang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Wilson Elser LLP, c/o Robert V. Cornish Jr.
700 11th St NW, Suite 400
Washington DC 20001
Telephone: (202) 626-7686
robert.cornish@wilsonelser.com 20001-4507

Xiang Chunhua
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiang Shu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiao Sun
c/o Edward Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiaonan Wang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xiaoping Zhang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Xpert Elevator Services, Inc
Daniel A Hershman, Esq
2240 Palm Beach Lakes Blvd
Suite 101
West Palm Beach, FL 33409-3403

Xpert Elevator Services, Inc.
550 Business Park Way, Bay #8
West Palm Beach, FL 33411-1743

Yajun Kang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yan Chen
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yawen Li
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yi Zhao
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Ying Fei
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Ying Tan
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yingjun Yang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yuanbo Wang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Yulong Tang
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Zhang Shikun
Wilson Elser LLP, c/o Robert V. Cornish,
700 11th Street NW, Suite 400
Washington, DC 20001-4507

Zhaohui Li (Chaohui Li)
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Zheng Yu
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Zhiling Gan
c/o Edward A. Marod
777 S. Flagler Drive
Suite 500E
West Palm Beach, FL 33401-6121

Ali Adampeyra
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Baoping Liu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Bei Zhu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Bernice C. Lee
2385 NW Executive Center Dr. #300
Boca Raton, FL 33431-8530

Changyue Liu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Chengyu Gu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Christopher Kammerer
1601 Forum Place Suite 500
West Palm Beach, FL 33401-8103

Chunning Ye
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Cuilian Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Daqin Weng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flager Dr #500 E
West Palm Beach, FL 33401-6121

David R. Miller
David Miller and Associates, P.A.
319 Clematis St., Suite 802
West Palm Beach, FL 33401-4622

Dongsheng Zhu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Eric S Pendergraft
Shraiberg, Landau & Page, P.A.
2385 N.W. Executive Center Drive
Suite 300
Boca Raton, FL 33431-8530

Feng Guo
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Gregg H Glickstein
Gregg H. Glickstein, P.A.
54 SW Boca Raton Blvd
Boca Raton, FL 33432-4725

Halil Erseven
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Hao Lou
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Hongru Pan
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Jeffrey S. Brown
Cushman & Wakefield of Georgia, Inc.
1180 Peachtree Street, Suite 3100
Atlanta, GA 30309-7529

Juewei Zhou
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Junqiang Feng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Kuang Yaoping
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Lan Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Larry Richey
Cushman & Wakefield U.S., Inc.
515 E Las Olas Blvd, #900
Fort Lauderdale, FL 33301-4203

Li Dongsheng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Li Zhang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Lili Zhang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Ling Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Liyan Feng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Maria M Yip
Yip Associates
2 S Biscayne Blvd #2690
Miami, FL 33131-1815

Min Cui
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Min Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Mohammad Zargar
c/o Gunster, Yoakley & Stewart, P.A.
777 Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Mohammadreza Sedaghat
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Philip J Landau
2385 N.W. Executive Center Dr # 300
Boca Raton, FL 33431-8530

Qingyun Yu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Qiong Deng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Qiongfang Zhu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 #
West Palm Beach, FL 33401-6121

Ran Chen
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, Fl 33401-6121

Reza Siamak Nia
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, Fl 33401-6121

Robert Matthews
101 Casa Bendita
Palm Beach, FL 33480-3602

Ruji Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Rujing Wei
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr E#500 E
West Palm Beach, FL 33401-6121

Ryan Black
1615 Forum Place
Suite 200
West Palm Bch, FL 33401-2315

Sanaz Salehin
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #400 E
West Palm Beach, FL 33401-6124

Sara Salehin
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Sha Shi
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Shahriar Ebrahimian
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flager Dr #500 E
West Palm Beach, FL 33401-6121

Shaoping Huang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Shaoqing Zeng
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Shu Jiang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Shuangyun Wang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Tang Cheok Fai
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Tao Xiong
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Tingting Sun
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Tonghui Luan
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Wenhao Zhang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiang Chunhua
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiang Shu
 c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiao Sun
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiaonan Wang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Xiaoping Zhang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flager Dr #500 E
West Palm Beach, FL 33401-6121

Yajun Kang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Yan Chen
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flager Dr #500 E
West Palm Beach, FL 33401-6121

Yawen Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Yi Zhao
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Ying Fei
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Ying Tan
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Yingjun Yang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Yuanbo Wang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr E#500 E
West Palm Beach, FL 33401-6121

Yulong Tang
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Zhaohui Li
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Zheng Yu
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

Zhiling Gan
c/o Gunster, Yoakley & Stewart, P.A.
777 S Flagler Dr #500 E
West Palm Beach, FL 33401-6121

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)The Galle Law Group, P.A.

(u)West Palm Beach

(d)Architectural Precast & Foam, LLC
c/o Cristopher S. Rapp, Esq.
Kelley Kronenberg, P.A.
1475 Centrepark Blvd., Ste. 275
West Palm Beach, FL 33401-7446

(d)McDonald Hopkins LLC
Accounts Receivable
600 Superior Avenue, E.
Suite 2100
Cleveland, OH 44114-2690

(d)McDonald Hopkins, LLC
Accounts Receivable
600 Superior Avenue, E
Suite 2100
Cleveland, OH 44114-2690

(d)The Place for Tile, Inc.
7957 NW 54th Street
Miami, FL 33166-4027

(d)Town of Palm Beach
345 South County Road
Palm Beach, FL 33480-4443

(u)Craig T. Galle

End of Label Matrix
Mailable recipients    225
Bypassed recipients      8
Total                  233

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of the ___26th___ day of February, 2019 ("Effective Date") between **160 ROYAL PALM, LLC,** a Florida limited liability company (the "Seller") and **LR U.S. HOTELS HOLDINGS LLC**, a Delaware limited liability company (the "Buyer"), recites and provides:

## RECITALS

Seller is the owner of certain real property located at 160 Royal Palm Way, Palm Beach, Florida, which real property is described on **Exhibit "A"** attached hereto, together with all improvements thereon (the "Property"). Seller desires to sell the Property to Buyer and Buyer desires to purchase the Property from Seller on the terms and conditions set forth herein.

Seller filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") on August 2, 2018 thereby initiating Case No. 18-19441-EPK (the "Bankruptcy Case"). The bankruptcy estate of the Seller is referred to herein as the "Estate."

Buyer seeks to acquire the Assets (defined below) through a private sale approved pursuant to 11 U.S.C. Section 363 and submits this Agreement to be considered by the Seller.

Seller believes that it is in the best interests of the Estate to sell the Assets (defined below) to Buyer, and Buyer wishes to purchase the Assets from Seller, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and Buyer agree as follows:

1. **Court Approval.** This Agreement and the Parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval and the entry of a final non-appealable order that does not modify or alter the terms of this Agreement, approving this Agreement and the transaction contemplated herein and containing the findings set forth in Section 8.1 (the "Sale Order"), after notice and a hearing, and the provisions, requirements and limitations of the Sale Order.

2. **Sale and Purchase of Property.** Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall purchase and

acquire from Seller, Seller's right, title and interest in and to the following (collectively, the "Assets"):

   2.1 the Property, including any improvements and fixtures thereon and Seller's interest in rights of way, ingress and egress, easements, rights, privileges, hereditaments and appurtenances belonging thereto or hereafter existing, subject to the Permitted Exceptions (defined below);

   2.2 all tangible personal property and equipment, if any, owned by Seller and located on the Property or stored off-site (if any), including, without limitation, those items described on **Exhibit "B"** hereto, and to the extent in Seller's actual possession, all books, records, correspondence and documents of Seller related to the design, construction or operation of the Property, including any improvements thereon and appurtenances belonging thereto or hereafter existing, and all plans, specifications, floor plans, drawings and renderings of all or any part of the Property (the "Tangible Personal Property");

   2.3 all transferable development rights, consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely in respect of the Property, contract rights, all transferable warranties and guaranties, if any, held by Debtor in connection with the Assets and all trademarks or tradenames associated with the Property and to the extent in Seller's actual possession, all books, records, correspondence and documents of Seller related to the foregoing (collectively, the "Intangible Personal Property;" together with the Tangible Personal Property, the "Personal Property"); and

   2.4 to the extent applicable, any insurance or condemnation awards or proceeds under Section 15.

   3. **Conveyance of Property.** On the Closing Date, subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Assets to the Buyer free and clear of all interests, liens, claims and encumbrances, including without limitation mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, and conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein (including notices or other registrations in respect of any of the foregoing) affecting title to the Assets or any part thereof or interest therein as permitted under section 363(f) of the Bankruptcy Code (collectively, "Liens"), subject to the Permitted Exceptions with such Liens to attach to the proceeds of sale, on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES, except as expressly set forth in section 13.1 of this Agreement:

3.1 Quitclaim Deed (the "Deed") conveying the Property to Buyer, which shall be free and clear of all Liens and Interests (as defined, respectively, herein and in Section 363(f) of the Bankruptcy Code) in accordance with Section 363(f) of the Bankruptcy Code, and subject to the Permitted Exceptions; and

3.2 Bill of Sale and Assignment of Rights (the "Bill of Sale") transferring all right, title and interest of Seller in and to the all Personal Property, which shall be free and clear of all Liens, in accordance with Section 363(f) of the Bankruptcy Code, with the exception of any assumption and assignment of contract rights, which shall be in accordance with Section 365 of the Bankruptcy Code.

4. **Excluded Assets.** The term "Excluded Assets" means the following assets of the Seller, all of which are excluded from the purchase and sale transaction provided for in this Agreement:

4.1 the Purchase Price and all cash, cash equivalents, bank accounts or similar types of investments:

4.2 all tax returns and all tax credits, tax benefits and claims for refunds in respect of any federal, state, local, and/or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real estate, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, severance, estimated or other taxes, including any interest or addition thereto, for periods ending on or before the Closing Date;

4.3 subject to Section 15, any and all right, title and interest in any insurance policy(ies) in connection with the ownership or operation of the Property by the Seller and any and all amounts claimed and/or collected pursuant to such insurance policy(ies) for the period prior to Closing date;

4.4 all rights and properties not owned by the Debtor;

4.5 the membership interests and any other ownership interests in the Debtor, and the company minute books, transfer records, and all other company documents of Debtor;

4.6 all contract rights, rights of action, claims for damages, rights of setoff, rights of recoupment, claims, demands, actions, causes of action, judgments, and pending litigation;

4.7 all rights, claims, defenses and other matters that relate to any construction contracts affecting the Property; notwithstanding anything herein to the contrary, any construction defect or related claims which arose prior to Closing shall be an Excluded Asset;

3

4.8    all rights, claims, causes of action, defenses and other matters that relate or belong to the Debtor, including without limitation any claims, or causes of action which are property of the estate under section 541 of the Bankruptcy Code including those arising under or in connection with Chapter 5 of the Bankruptcy Code;

4.9    any prepaid expenses, advance payments, security deposits, rents and other items related to the Assets that are applicable to the period prior to Closing, or that relate to executory contracts or unexpired leases that are not being assumed by the Seller and assigned to the Buyer.

4.10    any bonds held with or in favor of the Town of Palm Beach relating to the Property;

4.11    the Debtor's accounts receivable; and

4.12    any asset not specifically included in the definition of "Assets".

5.    **Deposit.** Upon execution of this Agreement by the Buyer and Seller, Buyer shall have deposited the sum of Three Million Nine Hundred Sixty Thousand and No/100 Dollars ($3,960,000) equal to ten percent (10%) of the cash portion of the purchase price (with Chicago Title Insurance Company (the "Deposit Agent"), in the form of a Federal Reserve System wire-transfer of immediately available funds, to be held in escrow, as Buyer's deposit under this Agreement (the "Deposit"), which Deposit shall be held without interest and shall be applied against the Purchase Price at Closing, or: (a) returned to Buyer, (as its sole and exclusive remedy with the exception of clause (iv), as to which Buyer shall have the right to seek specific performance as to matters within the control of Seller which can be cured without the commencement of litigation or expenditures in excess of $10,000, provided Seller has such funds available to expend as well as all court authority required for making such expenditures, if (i) the Sale Order is not entered, (ii) this Agreement is not approved by the Bankruptcy Court, or (iii) Seller accepts a RREF Competing Bid (as defined below) and such transaction closes, (iv) at the Buyers option, after Buyers written notice to Seller a 14 day cure period (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), Seller breaches the terms of this Agreement in any material respect, (v) the conditions set forth in Section 9 are not satisfied as of the Closing Date or waived by the Buyer, or (vi) required in accordance with Section 11.1 or Section 15; or (b) paid to Seller if Buyer breaches the terms of this Agreement and, in the event of a breach other than for nonpayment,  does not cure such breach after written notice and a 14 day cure period or such longer time as may be necessary to effectuate a cure provided that Buyer initiates diligent efforts to cure such breach within the initial 14 day cure period, such breach is capable of cure and Buyer diligently pursues such cure thereafter, although the period of time to effect such cure shall not exceed 120 days in the aggregate, or the conditions set forth in Sections 10.2 or 10.3 are not satisfied as of the Closing Date. In the event of such return

of the Deposit this Agreement shall terminate and the parties shall be released from any further rights or obligations hereunder except for those which expressly survive termination.

6.    **Purchase Price.**

6.1    The cash purchase price for the Assets shall be Thirty-Nine Million and Six Hundred Thousand Dollars ($39,600,000.00) (the "Purchase Price"). For the avoidance of doubt, the Purchase Price includes the UST Fee of $250,000 payable upon the distribution of the sale proceeds and the Breakup Fee of $350,000 payable to RREF II Palm House, LLC. At the Closing, Buyer shall pay to Seller the Purchase Price (less the Deposit), and without any other setoff or prorations, except as contemplated in Section 12.1, by wire transfer of immediately available funds to such account(s) as Seller shall designate. This is an "All Cash" transaction that is not subject to any financing, other contingencies, or post contract due diligence.

6.2    In addition to the Purchase Price, Buyer shall assume the following obligations to be funded by Buyer at closing: (i) settlement fees in the amount of $250,000 to the Town of Palm Beach (or if, and to the extent, such settlement fees are paid to the Town of Palm Beach by Seller before Closing, such settlement fees shall be reimbursed to Seller by Buyer at Closing); (ii) any unpaid ad valorem property taxes for 2018 and 2019, as provided in Section 12.1; (iii) real estate brokerage commissions approved by the Court related to the sale up to the amount of $450,000; (iv) any recording and transfer fees owed to any governmental entity associated with the sale of the Property.

7.    **Title.**

7.1    Commitment for Title Insurance. Seller and Buyer acknowledge receipt of that certain title commitment  Order No. 6754332 Revision No. 9 with Commitment Date October 11, 2018 (the "Title Commitment") issued by Greenberg Traurig, P.A. (the "Title Agent"), as agent for Chicago Title Insurance Company (the "Title Company"), binding the Title Company to issue at Closing an Owner's Policy of Title Insurance pursuant to Section 7.2 insuring the marketability of the title to the Property (ALTA Form B) in the full amount of the Purchase Price, subject to (i) easements, covenants, restrictions, declarations, agreements of record, (ii) laws, regulations, resolutions or ordinances, including, without limitation, building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Property currently or hereinafter imposed by any governmental or quasi-governmental body or authority, including claims associated with construction non-conformities by the Town of Palm Beach or City of West Palm Beach (iii) imperfections of title or encumbrances which, individually or in the aggregate, do not have a material adverse effect on the Property, (iv) other exceptions, defects, state of facts, and other matters affecting title to the Property as set forth on **Exhibit "C",** (v) any exceptions caused by Buyer, its agents, representatives or employees, and (vi) any other matters affecting title to the Property reasonably acceptable to Buyer whose acceptance will not be unreasonably withheld, conditioned or delayed (the "Permitted Exceptions"). Seller and Buyer

47850336;1

further acknowledge receipt of all instruments referenced in Schedule B of the Title Commitment. Buyer shall have the right to (a) object to any new exceptions from the last date of the Title Commitment until the Closing Date which exceptions render title unmarketable in accordance with the standards adopted by The Florida Bar and are not Permitted Exceptions (a "New Exception") (b) defer Closing up to thirty (30) days ("Outside Date") until such New Exception(s) are deleted or otherwise remedied to the satisfaction of Buyer in its reasonable discretion, and, (c) in the event that such New Exception(s) are not deleted or otherwise remedied to the reasonable satisfaction of Buyer prior to the Outside Date, Buyer may elect to waive such New Exception(s) and proceed to Closing without further claim against Seller and in which case such New Exceptions shall be deemed Permitted Exceptions or Buyer may terminate this Agreement (other than Buyer's obligations under any provision of this Agreement which, by its terms, is to survive termination), and receive the return of the Deposit, which shall operate to release Seller from any and all liability hereunder other than Seller's obligations under any provision of this Agreement which, by its terms, is to survive termination. Seller shall have no obligation to cure or take corrective action or otherwise incur any expense to remove any New Exception.

7.2     Owner's Policy of Title Insurance. At Closing, the Title Agent shall issue to Buyer, on behalf of the Title Company, at Buyer's expense, a marked commitment or proforma Owner's Policy of Title Insurance (the "Title Policy") covering the Property, in the full amount of the Purchase Price, subject to the Permitted Exceptions. Buyer shall accept title subject to the Permitted Exceptions. Seller shall not be obligated to cause the Title Agent to omit any Permitted Exception.

7.3     Survey. Seller and Buyer acknowledge receipt of that certain survey prepared by Wallace Surveyors, dated February 5, 2014, last updated on January 9, 2018, Job No. 11-1284.11 ("Survey"). Buyer at Buyer's expense may elect to have the Survey updated and/or recertified prior to Closing. If the updated Survey reveals any material encroachment which renders title unmarketable, same shall be treated as a New Exception as set forth in Section 7.1 above. Seller shall not be obligated to cure or take corrective action or otherwise incur any expense with respect to any matters reflected on the Survey or any updates thereto.

8.      **Bankruptcy Court Approval and Competing Transactions.**

8.1     Bankruptcy Court Approval. Seller shall file a motion seeking authority to approve this Agreement and to withdraw the Bid Procedures Motion within two (2) business days from the Effective Date and use diligent efforts to obtain the Sale Order from the Bankruptcy Court approving the sale of the Assets to Buyer pursuant to this Agreement within fourteen (14) days from the Effective Date, which shall contain the following findings:

(a)     Seller prepared and served a motion seeking the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled thereto, and that all parties in interest entitled to such notice received such notice;

47850336;1

(b)      the sale and transfer of the Assets to the Buyer is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;

(c)      the sale of the Assets to Buyer pursuant to this Agreement will, pursuant to Section 363(f) and Section 365 of the Bankruptcy Code, be free and clear of all Liens, with such Liens attaching to the sale proceeds;

(d)      Buyer is not a mere continuation of Seller, there is no continuity of enterprise between Seller and Buyer, Buyer is not a successor to Seller and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or de facto merger of Buyer and Seller;

(e)      Buyer has acted in good faith within the context of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code;

(f)      the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(g)      Buyer is not assuming or acquiring any of the Excluded Assets;

(h)      all Persons who are listed as a creditor in the Seller's bankruptcy schedules or filed a proof of claim in the Seller's bankruptcy case before the entry of the Sale Order, or that otherwise received actual or constructive notice of the relief sought in the sale motion are enjoined from in any way pursuing the Buyer or the Assets by suit or otherwise to recover on any Liens which they may have against Debtor or the Assets as of the Closing Date; and

(i)      the Sale Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(h).

8.2      **Competing Transaction with RREF II Palm House, LLC.** This Agreement is a private purchase and sale offer pursuant to 11 U.S.C. Section 363 that is subject to approval by the Bankruptcy Court and is further subject to the Seller's solicitation of a higher or better competing bid, in the form of **Exhibit "E"** to this Agreement, from RREF II Palm House, LLC, the Seller's existing Stalking Horse Bidder, for a minimum purchase price equal to Forty Million and Six Hundred Thousand Dollars ($40,600,000.00) in cash; and (ii) assumption of the obligations detailed in Section 6.2 herein (the "RREF Competing Bid"). Any RREF Competing Bid must be received from RREF II Palm House, LLC and accepted by the Seller on or before 4:30 p.m. EST on March 4, 2019 (the "RREF Competing Bid Deadline"). Seller's acceptance of any RREF Competing Bid shall be by execution thereof and delivery to RREF II Palm House, LLC and Buyer electronically by email or by any other means authorized in Section 22.3.

8.3      **[Intentionally deleted.]**

47850336;1

8.4    **Right of First Refusal.**    In the event that an RREF Competing Bid is timely accepted by Seller prior to the expiration of the RREF Competing Bid Deadline, Buyer shall have the exclusive right of first refusal to submit an offer greater than any bid accepted by Seller, in the form of **Exhibit "F"** attached to this Agreement.  Buyer shall have, through and including the earlier of 4:30 p.m. EST on March 7, 2019 (the "Right of First Refusal Deadline"), to exercise any right of first refusal under this Section 8.4.  Buyer's exercise of the right of first refusal under this Section 8.4 shall be by execution of a counterpart to **Exhibit "F"** and delivery to Seller electronically by email or by any other means authorized in Section 22.3.

8.5    **Anti-Solicitation**.  In the event the Buyer exercises its right of first refusal prior to the expiration of the Right of First Refusal Deadline, the Seller shall be prohibited from soliciting any further competing offers and shall be required to close any timely offer made by Buyer in compliance with Section 8.4 herein.

8.6    **[Intentionally deleted.]**

9.    **Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer in its sole discretion:

9.1    a Sale Order shall have been entered by the Bankruptcy Court within fourteen (14) days from the Effective Date in a form reasonably acceptable to Buyer, whose approval will not be unreasonably withheld, conditioned or delayed and which shall, among other things, approve this Agreement;

9.2    the Sale Order shall be a final order that is not subject to any stay or appeal;

9.3    the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement;

9.4    Seller shall have delivered to Buyer the deliverables set forth in Section 11.3;

9.5    The Amended Settlement Agreements, currently approved by the Bankruptcy Court, between the Debtor and Town of Palm Beach and the Town of Palm Beach Code Enforcement Board ("Settlement Agreements") shall be in force and effect or, if expired, reinstated and (1) the Town of Palm Beach and Code Enforcement Board shall have agreed to extensions of the dates for payment of the respective Settlement Amounts of not less than thirty (30) days after the Closing Date; (2) the Town of Palm Beach shall have agreed to an extension of

8

the date for Development Approval of not less than ninety (90) days after the Closing Date; and (3) the Settlement Agreements shall result in payment obligations to the Town and Code Enforcement Board not to exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) which shall be binding upon the Property and shall be paid by Buyer in accordance and consistent with Section 6.2(i) herein.

        9.6    the Settlement Agreement(s), as may be further amended, shall be approved by the Bankruptcy Court; and

        9.7    the Bankruptcy Court shall have approved the change in ownership of the Property from Seller to Buyer, acknowledging that Buyer is a "Qualified Buyer" pursuant to section 7 of the Settlement Agreements.

If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under any provision of this Agreement that expressly provides for such survival.

10.    **Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller:

        10.1    the Sale Order shall have been entered by the Bankruptcy Court;

        10.2    the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default in any material respect under the provisions of this Agreement; and

        10.3    Buyer shall have paid to Seller the Purchase Price (subject to the adjustments and prorations set forth in Section 12) and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing.

        10.4    Buyer shall have approved the Settlement Agreements.

11.    **Closing.**

        11.1    Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place on or before twenty (20) calendar days after the Sale Order is entered and becomes final and non-appealable (the "Closing Date"). The Seller and Buyer may agree in writing to proceed to Closing at an earlier date provided that the Sale Order contains a waiver of the 14-day stay period in accordance with Fed. R. Bank. P. 6004(h). Notwithstanding anything herein to the contrary, (a) if the Sale Order

has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved, and (b) if the requirements set forth in Sections 9.5, 9.6 and 9.7 have not been satisfied then the Closing Date shall be postponed for a period of up to sixty (60) days to enable Seller to satisfy the requirements of Sections 9.5, 9.6 and 9.7. If the postponement described in clauses (a) and (b) of the previous sentence, as applicable, is longer than sixty (60) days, Buyer shall have the right to terminate this Agreement by giving written termination notice to Seller, in which case Seller shall return the Deposit to Buyer and neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement. If either of such postponements is longer than one hundred twenty (120) days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case Seller shall return the Deposit to Buyer and neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.

11.2    Closing shall be conducted through an escrow arrangement by the Title Company (the "Closing Agent"). Closing shall take place at the offices of Closing Agent (or such other place as the Parties may designate in writing). Each Party shall deliver written closing instructions to the Closing Agent consistent with the provisions of this Agreement.

11.3    At the Closing, Seller shall deliver to Buyer: (a) the transfer instruments provided for in Section 3; (b) Seller's executed countersignature to the closing statement contemplated in Section 11.4(c) below; (c) a FlRPTA Affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act; (d) reasonable evidence of the satisfaction of the requirements set forth in Article 9 other than any that have been waived by Buyer; and (e) such other documents as Buyer or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement; and (e) possession and occupancy of the Property and possession of the Tangible Personal Property.

11.4    At the Closing, Buyer shall deliver to Seller: (a) subject to adjustments and prorations provided for herein and application of the Deposit, the Purchase Price as provided in Section 6; (b) the transfer instruments provided for in Section 3; (c) a closing statement between Seller and Buyer, reflecting the Purchase Price, the Deposit and all closing costs and other expenses, and (d) such other documents as Seller or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement.

11.5    Buyer shall pay, on the Closing Date, all costs of Closing, including, without limitation, the cost of recording the deed and state documentary stamps which are required to be affixed to the instrument of conveyance, the cost of all title examination, lien searches, title commitment, and the issuance of the title insurance policy premium for any owner's title insurance policy (and any loan policy) obtained by Buyer or its lender (if applicable), all costs of any

inspections, examinations, reports, and/or Survey updates, or new surveys undertaken by Buyer or on Buyer's behalf, all settlement fees charged by the Person conducting the Closing, the cost of recording any corrective documents, and all other costs and charges of Closing. Buyer shall also assume and pay any and all costs which are required to be paid to the Town or the Code Enforcement Board under the Settlement Agreements. Each Party shall pay its own attorneys' and other professionals' fees.

12.    **Prorations.**

12.1    Real property taxes and assessments for the 2018 tax year and the 2019 tax year through Closing shall be paid by Buyer. All utility bills shall be apportioned between Buyer and Seller as of the Closing Date, with the Seller's portion of such utility bills being reduced from the Purchase Price as contemplated in Section 6. If final documentation of any such item is not available at the Closing, the required proration shall be made on the basis of the best available documentation.

12.2    Except as contemplated in Section 12.1, there shall be no offset, reduction in closing proceeds, or proration of any kind. Buyer shall be responsible for transferring any and all public utilities on the Closing Date.

12.3    The Parties agree that, after the Closing Date, each shall hold and shall promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements or other property that they may receive on or after the Closing Date which properly belong to the other Party, including any insurance proceeds, and shall account to the other for all such receipts.

13.    **Representations and Warranties.**

13.1    Seller represents and warrants to Buyer that Seller, subject to the entry of the Sale Order without any stay being obtained by any party in interest within the requisite period, has the power and authority to convey the Assets to Buyer pursuant to this Agreement and subject to and in accordance with the provisions of the Sale Order.  Seller makes no other representations and warranties in connection with this Agreement.

13.2    As of the date hereof, Buyer hereby represents and warrants to Seller which representations and warranties shall survive Closing for a period of one (1) year:

(a)    At the time of closing, Buyer will be a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware.

(b)    The execution, delivery and performance by Buyer of this Agreement and the other documents and instruments contemplated hereby are within the power of Buyer and have been duly authorized by all necessary action by Buyer. This Agreement is, and the

47850336;1

other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

(c)     Buyer and the entities or persons signing this Agreement on its behalf are authorized to execute this Agreement and bind Buyer to the terms hereof without the consent or joinder of any other person or entity.

(d)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, nor any rules, regulations, permits, licenses and orders promulgated thereunder.

(e)     Buyer is not insolvent and is able to pay its debts as they mature. No proceeding in bankruptcy or for the appointment of any receiver for all or any portion of Buyer's property, real or personal, has been filed by or against Buyer in any federal or state court.

(f)     There is no litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which would have any material adverse effect on Buyer's ability to perform its obligations under this Agreement.

(g)     The execution of this Agreement and the consummation of the transaction contemplated hereby does not and shall not violate the terms of any agreement or court order which is binding upon Buyer.

(h)     Except as expressly set forth in Section 13.1 of this Agreement, that any and all information (whether expressed, implied oral or past, present or future) provided or made available to Buyer or Buyer's agents or representatives including, without limitation, all marketing and informational materials in connection with the Property or this Agreement are not to be construed by Buyer as a representation or warranty of Seller of any kind, and Buyer has specifically not relied on any such information. Except as expressly set forth in Section 13.1 of this Agreement, Seller is not liable or bound in any manner by any verbal or written statement, representations or information pertaining to the Property or the operation thereof, furnished by any attorney, real estate broker, agent, employee, servant or any other person.

(i)     That Buyer has made its own independent investigation of the accuracy and completeness of any and all information (whether in writing or verbal) provided or made available to Buyer and Buyer is satisfied with all aspects of the Property and Assets which Buyer deems material to its purchase thereof, including, without limitation: marketability and insurability of title to the Property (including, without limitation) any Liens running with the land (other than any liens under Section 363(f) of the Bankruptcy Code); all municipal and other legal requirements (including, without limitation, taxes, assessments, zoning, use permit requirements

12

and building permits); the condition and physical aspects of all buildings and structures located on the Property (including, without limitation, the interior, exterior, structure, basement, parking, paving, utilities, operating equipment, plans and specifications for the Property and all other physical and functional aspects of the Property); the condition of the Property (including, without limitation, any easements, access or use rights or similar matters affecting the Property) and; the availability of utilities, sanitary facilities, permits and other governmental approvals (including, without limitation, the government approvals for Buyer's intended use of the Property and the suitability of the Property for Buyer's intended use.

(j)     That Buyer acknowledges and agrees Seller has not made, did not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements, or guarantees of any kind whatsoever (except as specifically set forth in Section 13.1 of this Agreement) whether expressed or implied, oral or past, present or future, of, as to, concerning or with respect to: the value, nature, quality or condition of the Property; the profit or income believed to be derived from the Property; the suitability of the Property; the compliance of or by the Property with the laws, rules, ordinances or regulations of any applicable governmental authority or body; the habitability, merchantability, marketability, profitability, or fitness for a particular purpose of the Property; the nature or quality of the soils or geology of the Property; the manner, quality, state of repair or lack of repair, of the Property, or any other matter with respect to the Property; the environmental matters or hazards that my affect the Property of any kind of nature; marketability of title including, without limitation, liens running with the land; and the future actions or inactions of any governmental agency in connection with any approvals, permits, entitlements or zoning of the Property after the date of Closing.

13.3    BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT (I) THE ASSETS ARE SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER IN "AS-IS" CONDITION ON A "WHERE-IS" BASIS WITH ALL FAULTS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT, (II) BUYER HAS UNDERTAKEN ALL SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BUYER DEEMS NECESSARY OR APPROPRIATE UNDER THE CIRCUMSTANCES AS TO THE CONDITION OF THE PROPERTY AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE, AND BASED UPON SAME, BUYER IS AND WILL BE RELYING STRICTLY AND SOLELY UPON SUCH INSPECTIONS AND EXAMINATIONS AND THE ADVICE AND COUNSEL OF ITS OWN AGENTS, LEGAL COUNSEL AND OFFICERS; (III) SELLER IS NOT MAKING AND HAS NOT MADE ANY WARRANTY OR REPRESENTATION WITH RESPECT TO ANY MATERIALS OR OTHER DATA PROVIDED BY SELLER TO BUYER OR THE SKILLS, COMPETENCE OR DILIGENCE OF

THE PREPARERS THEREOF OR THE PHYSICAL CONDITIONS OR OF ANY OTHER ASPECT OF ALL OR ANY PART OF THE PROPERTY AS AN INDUCEMENT TO BUYER TO ENTER INTO THIS AGREEMENT AND THEREAFTER TO PURCHASE THE PROPERTY OR FOR ANY OTHER PURPOSE; AND (IV) BY REASON OF ALL OF THE FOREGOING, BUYER, SUBJECT TO SELLER'S REPRESENTATIONS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT AND THE PERFORMANCE BY SELLER OF ITS OBLIGATIONS UNDER THIS AGREEMENT, ASSUMES THE FULL RISK OF ANY LOSS OR DAMAGE OCCASIONED BY ANY FACT. UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS AND, UPON CLOSING, BUYER HEREBY KNOWINGLY AND VOLUNTARILY WAIVES, RELINQUISHES AND RELEASES SELLER FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AT ANY TIME BY REASON OF OR ARISING OUT OF ANY PHYSICAL OR ENVIRONMENTAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS AND ANY AND ALL OTHER MATTERS REGARDING THE PROPERTY EXCLUDING MATTERS WHICH ARE THE SUBJECT OF EXPRESS REPRESENTATIONS OF SELLER AS SET FORTH IN THIS AGREEMENT. BUYER SHALL ACCEPT THE PROPERTY IN ITS "AS IS; WHERE IS" CONDITION AND WITH ALL FAULTS.

14.    **Default and Remedies.**

14.1    If the Closing fails to occur because of a default or material misrepresentation or breach of warranty by Buyer, Seller shall have the right to terminate this Agreement by notice to Buyer, and be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, the parties shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

14.2    If the Closing fails to occur because of a default or material misrepresentation or breach of warranty by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, with 14 days written notice and cure period to Seller (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), then Buyer shall have the right to terminate this Agreement by notice to Seller and Buyer shall be entitled to receive a return of the Deposit or pursue an action for specific performance against Seller.

15.    **Risk of Loss.** Risk of loss to the Property or any part thereof from damage or destruction by fire or other casualty or by reason of condemnation shall remain upon Seller until the Closing. If, between the date hereof and the Closing, any portion of the Property shall be damaged or destroyed by fire or other casualty or be subject to any claim of condemnation, Seller shall notify Buyer in writing of said damage, destruction, casualty or loss and the extent thereof or of such condemnation claim as the case may be. If the cost to repair any such damage exceeds ONE MILLION DOLLARS ($1,000,000.00), or in the event of any such claim for condemnation, Buyer shall have the option, exercisable by notice to Seller given within ten days after Seller's notice to Buyer of said damage, destruction, casualty, loss or condemnation, to either: (a) terminate this Agreement, whereupon the Deposit Agent shall forthwith refund the Deposit to Buyer and upon such refund this Agreement shall terminate and neither party shall have any further liability to the other hereunder (except for any rights and obligations arising under this Agreement which by their terms survive such termination); or (b) elect to proceed with this Agreement and pay the full Purchase Price (less any deductible), in which case Seller shall assign to Buyer any insurance or condemnation proceeds to which Seller or its successors may be entitled as a result of such damage, destruction, condemnation, loss or casualty without Seller replacing or repairing any such damage and Seller will have no further obligations to Buyer in respect of such loss or damage (except for any rights and obligations arising under this Agreement which by their terms survive Closing). If Buyer fails to give such written notice, Buyer shall be conclusively deemed to have chosen option (b). If the cost to repair any such damage is equal to or less than ONE MILLION DOLLARS ($1,000,000.00), Buyer shall proceed to Closing, in which event Seller agrees to pay to Buyer at the Closing all insurance or condemnation proceeds which Seller has received as a result of the same, if any, and assign to Buyer all insurance proceeds payable as a result of the same without Seller replacing or repairing such damage, and Seller will have no further obligations to Buyer in respect of such loss or damage.

16.    **Broker and Broker Commission.** The Broker is Cushman & Wakefield U.S., Inc. (the "Broker"), subject to Bankruptcy Court approval of the listing agreement [ECF No. 19] (the "Listing Agreement"), a copy of which is attached as **Exhibit "D"** hereto and any extension thereof. In accordance with the Listing Agreement, to the extent the Closing occurs, the Broker's fee (the "Commission") in connection with the Closing shall be one and one-half percent (1.5%) of the Purchase Price, but in no event shall exceed FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000.00). The Commission earned by Broker shall be a cost of sale payable by Buyer at Closing in addition to, and not as part of the Purchase Price, in accordance with the Listing Agreement. Neither Seller nor Buyer has engaged any other broker or undertaken an obligation to any other broker in connection with the transaction addressed in this Agreement. To the extent Closing occurs hereunder, upon Closing, Buyer shall pay the Commission to Broker on Seller's behalf in addition to, and not as part of the Purchase Price. Except with respect to any Commission due and owing to the Broker and otherwise pursuant to the Listing Agreement, Seller shall not be responsible for any broker's commissions. Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming through the Buyer other than the Broker,

47850336;1

and indemnify and hold the Seller harmless against any and all liability, loss, cost, damage and expense (including, but not limited to, attorneys' fees) Seller shall incur because of any claim by any broker or agent, other than a claim by the Broker, claiming to have dealt with either Seller or Buyer, whether or not meritorious, for any commission or other compensation with respect to this Agreement or to the purchase and sale of the Property in accordance with this Agreement. The provisions of this Section shall survive the Closing and any termination of this Agreement.

17.    **[Intentionally deleted.]**

18.    **[Intentionally deleted.]**

19.    **Further Assurances.** Each Party shall cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

20.    **Deposit Agent Provisions.**

20.1    If conflicting demands relating to this Agreement are made upon the Deposit Agent, the Parties hereto expressly agree that the Deposit Agent shall have the absolute right to do either or both of the following: (a) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (b) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the Parties to interplead and litigate in such court their several claims and rights amongst themselves. Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the patties under this Agreement, the Deposit Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

20.2    In no event shall Deposit Agent be liable for any act or omission under or in respect of this Agreement except where Deposit Agent's acts or omission is the result of its gross negligence or willful misconduct. Accordingly, Deposit Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Deposit Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Deposit Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

20.3    Buyer and Seller reserve the right, at any time and from time to time, by mutual agreement, to substitute a new escrow agent in place of Deposit Agent. In addition, Deposit Agent reserves the right to resign from its role as escrow agent by giving the Seller and the Buyer written notice of such resignation. If Seller and Buyer have jointly designated a successor escrow agent in writing, then Deposit Agent shall deliver any funds held by Deposit Agent under this Agreement to such successor escrow agent. However, if no such successor escrow agent is designated by Seller and Buyer in writing within ten (10) days after any notice of resignation from Deposit Agent, then Deposit Agent may deliver any such funds to the Bankruptcy Court and interplead Buyer and Seller in connection therewith.

20.4    Buyer acknowledges that the Deposit Agent may also serve as Seller's legal counsel in connection with this Agreement, and both Seller and Buyer consent to Deposit Agent serving in such dual capacity. In the event of any actual dispute or adversity between Seller and Buyer, Deposit Agent shall be entitled to resign as Deposit Agent and to represent Seller in such dispute or adversity, and in such case shall deliver any funds held by Deposit Agent pursuant to this Agreement the funds either to a successor escrow agent designated by Seller and Buyer as provided above, or to a court of competent jurisdiction as provided for above.

21.    **Certain Definitions: Rules of Construction.**

21.1    The following terms have the following meanings in this Agreement:

(a)    "Bid Procedures Motion" means Debtor's Motion Entry of an Order (I) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially All of its Assets, (II) Approving the Form and Manner of Notice of Sale, (III) Scheduling an Auction and Sale Hearing and (IV) Approving the Sale of the Assets Free and Clear of Liens, Claims and Encumbrances filed as Document Number 92 in the Bankruptcy Case.

(b)    "Legal Costs" means court costs and attorneys' fees and costs, including the costs of paralegals, whether or not any mediation, arbitration or legal proceeding is filed, or if any mediation, arbitration or legal proceeding is filed, then all such costs incurred at any point in such mediation, arbitration or legal proceeding, including trial and all levels of appeal.

(c)    "Party" or "Parties" mean Seller and/or Buyer, as the context may require.

(d)    "Person" means any individual or any corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or other legal entity or a government or governmental entity.

(e)    **[Intentionally deleted.]**

21.2    As used in this Agreement: (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

21.3    Each Party and its counsel have reviewed this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

22.    **Miscellaneous.**

22.1    This Agreement and the schedules and exhibits to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

22.2    This Agreement, together with any exhibits, schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

22.3    All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or delivered by a recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

**If to Buyer, addressed to:**

Desmond Taljaard
LR U.S. Hotels Holdings LLC
8th Floor, South Block, 55 Baker Street
London W1U 8EW
Tel:    44 (0) 207 563 9013
Fax:    _____
Email: dtaljaard@lrp.co.uk

47850336;1

**With a copy to:**

Andrew Robins
Akerman LLP
1875 NW Corporate Blvd.
Suite 275
Boca Raton, FL 33431
Tel:           (561) 862-4015
Fax:           (561) 368-4668
Email:         andrew.robins@akerman.com

**With a copy to:**

Eyal Berger
Akerman LLP
350 East Las Olas Boulevard
Suite 1600
Fort Lauderdale, FL 33301
Tel:           (954) 463-2700
Fax:           (954) 462-2224
Email:         eyal.berger@akerman.com

**If to Seller, addressed to:**

Cary Glickstein, Manager
160 Royal Palm LLC
1118 Waterway Lane
Delray Beach, FL 33483
Tel:           (561)279-8942
Fax:           (561)279-0440
Email:         cg@ironwoodproperties.com

**With a copy to:**

Marcia H. Langley, Esq.
Greenberg Traurig, P.A.
5100 Town Center Circle

47850336;1

Suite 400
Boca Raton, FL 33486
Tel:          (561) 955-7604
Fax:          (561) 388-7099
Email:        langleym@gtlaw.com


**With a copy to:**

Philip J. Landau, Esq.
Shraiberg, Landau & Page, P.A.
2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Tel:          (561) 443-0800
Fax:          (561) 998-0047
Email:        plandau@slp.law


**If to Title Company, Deposit Agent or Closing Agent:**

Michelle M. Clapp
Senior Commercial Escrow Officer
Fidelity National Title Group
13800 NW 14th Street, Suite 190
Sunrise, FL 33323
Direct: 954-308-3231
Fax: 954-971-2050
Email:        michelle.clapp@fnf.com

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

       22.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile, scanned and electronic signatures shall be accorded the same enforcement rights as an original. Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement.

22.5    Time is of the essence with respect to each Party's obligations hereunder.

22.6    This Agreement shall not be recorded by Buyer and, if recorded by Buyer such recording shall constitute a breach of this Agreement, entitling Seller to the Deposit if the breach is not cured as provided in this Agreement, and Seller may immediately terminate all of its obligations under this Agreement. Buyer shall also pay Seller's Legal Costs in removing this Agreement of record. The provisions of this Section shall survive the Closing.

22.7    If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Palm Beach County, Florida are open for business, but in no case will the extension be for more than three days. For purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in Florida, are closed or are authorized to be closed, including all legal holidays.

22.8    Notwithstanding any other provision of this Agreement, any representation, warranty or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

22.9    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from county public health units.

22.10    The Buyer understands and agrees that Cary D. Glickstein has executed this Agreement as the court approved sole and exclusive manager for the Seller, not in his personal capacity, and there shall be no recourse to Cary D. Glickstein personally for any of the representations, warranties, covenants, communications of any kind, and/or promises, acts, undertakings or omissions, of any type or at any time, made by "Seller" herein or in connection with or arising from this Agreement, the Property or any actions, claims, litigation or proceedings concerning the Seller or the Property, but only against the Estate and only to the extent permitted herein and by the Sale Order.

22.11    The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

22.12   No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

22.13   This Agreement may not be assigned by Buyer, without Seller's prior written consent, which may be withheld in Seller's sole discretion and subject to approval by the United States Bankruptcy Court for the Southern District of Florida West Palm Beach Division. Notwithstanding the foregoing sentence, Buyer may transfer or assign this Agreement to an affiliate without Seller's consent provided that buyer acknowledges its continuing liability for obligations and liabilities pursuant to this Agreement. Any assignment of this Agreement shall not serve to release Buyer from its obligations hereunder. This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the Parties hereto. The Parties neither intend to confer any benefit hereunder on any Person other than the Parties hereto, nor shall any such third party have any rights hereunder.

22.14   This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

22.15   BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

23.      **Property Investigations.** Buyer and/or Buyer's employees, representatives, agents, contractors and any Person acting by, under or through Buyer (collectively, "Buyer's Representatives") shall have access to the Property at all reasonable times subsequent to the Effective Date and prior to the Closing or earlier termination of this Agreement with full right to: (a) inspect the Property, and (b) to conduct any and all inspections, investigations and tests thereon, including, but not limited to, hazardous waste studies, as Buyer may deem reasonably necessary. All costs and expenses in connection with Buyer's investigations of the Property shall be at the sole cost of Buyer. In conjunction with entry upon the Property by Buyer and/or Buyer's Representatives, Buyer shall:

23.1    Fully comply with all laws applicable to the activity to be performed upon the Property and all other activities undertaken in connection therewith;

23.2    Take all actions and implement all protections reasonably necessary to ensure that all actions taken, and the equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, cause no damage to other property of Seller or other persons;

23.3    Promptly repair any damage to the Property caused by the acts or omissions of Buyer and/or Buyer's Representatives and restore the Property to the condition that existed prior to entry thereon by Buyer and/or Buyer's Representatives, at Buyer's sole cost and expense;

23.4    Prior to Buyer and/or Buyer's Representatives' first entry on the Property, maintain or cause to be maintained, throughout the term of this Agreement, at Buyer's expense, a policy of comprehensive general liability insurance, with a broad form contractual liability endorsement covering Buyer's indemnification obligations under Section 23.6, and with combined single limit of not less than One Million Dollars ($1,000,000.00) insuring Buyer and naming Seller as an additional insured, against any injuries or damages to persons or property that may result from or are related to (i) Buyer's and/or Buyer's Representatives' entry upon the Property, and (ii) any and all other activities undertaken by Buyer and/or Buyer's Representatives on or in connection with the Property, in such form and with an insurance company acceptable to Seller and deliver a copy of such insurance policy to Seller prior to the first entry on the Property along with a certificate of insurance confirming that the premium has been paid in full for a period of not less than one (1) year, that the policy will not be terminated, canceled or modified without at least thirty (30) days prior written notice to Seller, and designating Seller as an additional insured thereunder;

23.5    Not allow the activities undertaken by Buyer or Buyer's Representatives to result in any Liens being filed or recorded against the Property or any portion thereof, or any other property of Seller or of its affiliates, and Buyer shall, at its sole cost and expense, within the time permitted to cure a breach by Buyer of this Agreement, discharge of record or escrow with Seller, on terms acceptable to Seller, funds to discharge such Liens that are filed or recorded (including, without limitation, liens for services, labor or materials furnished); and

23.6    Defend and indemnify Seller and its respective employees, agents, partners, members, managers, officers, directors, tenants and invitees (collectively, "Seller's Affiliates"), and hold same harmless from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, Attorneys' Fees (as hereinafter defined) and disbursements, suffered or incurred by same and arising out of or in connection with (i) the entry upon the Property by Buyer and/or Buyer's Representatives, including but not limited to any bodily injury or death of any person or property damage arising out of or in conjunction with same; (ii) any activities conducted thereon by Buyer and/or Buyer's Representatives; (iii) any Liens filed or recorded against the Property or any portion thereof, or any other property of Seller or of Seller's Affiliates, as a consequence of activities undertaken by

23

Buyer and/or Buyer's Representatives; provided, however, that Buyer shall not be required to defend and indemnity Seller and/or Seller's Affiliates for any loss arising out of or in connection with any pre-existing conditions on the Property or the gross negligence, bad faith or willful misconduct of Seller or any of Seller's Affiliates.

Any entry upon the Property in conjunction with the foregoing and all activities related thereto shall be at the sole risk and expense of Buyer and Buyer's Representatives. In no event shall Buyer conduct a Phase II or more invasive inspection or testing of the Property unless recommended by an environmental consultant reasonably acceptable to Seller or otherwise required by Buyer's lender, if any and when Buyer shall obtain Seller's prior written consent. Subject to the requirements of applicable law, in the event Buyer obtains a Phase II environmental site assessment on the Property, the contents of the Phase II environmental site assessment shall not be disclosed in whole or in part by Buyer to any person other than its directors, officers, employees, representatives (including legal and financial advisers, architects, engineers, consultants and lenders) who need to know the information for the purpose of evaluating the acquisition of the Property, and each such person shall be informed of the confidential nature of the contents of any Phase II environmental site assessment. Buyer shall cause such persons to keep the contents of any Phase II environmental site assessment strictly confidential and otherwise to comply with this Agreement with respect to same.

Buyer shall provide to Seller, at Buyer's sole cost and expense, copies of all inspection reports and other items of due diligence including, without limitation, soil tests, environmental audits, surveys and traffic studies obtained by Buyer in connection with its investigation of the Property within five (5) business days after Buyer's receipt of same ("Inspection Reports"), if such receipt is prior to the Closing Date. All items of due diligence that are customarily certified to a buyer, seller, lender or title company in a commercial real estate transaction in South Florida shall be certified to both Buyer and Seller. The provisions of this Section 23 shall survive the Closing and any termination of this Agreement.

24.    **Seller's Covenants.** From the date hereof until the Closing (or earlier termination of this Agreement), Seller covenants and agrees as follows:

24.1    Seller shall cooperate with Buyer's reasonable requests, from time to time, for access to the Property and for access to and/or copies of information and documents related to the Property, including without limitation information as to title matters, parking matters, licenses, permits and zoning, environmental and construction matters; and

24.2    Seller shall continue to maintain insurance on the Property of the amounts and type in place as of the date hereof.

SEE SIGNATURES ON FOLLOWING PAGE

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year last below written.

**BUYER:**

**LR U.S. HOTELS HOLDINGS LLC**
a Delaware limited liability company

By: _____

    Robert Mautner, Vice President of European
    Management Services, Inc., Manager of LR
    U.S. Hotels Holdings LLC

Date: _____February 26, 2019_____

**SELLER:**

**160 ROYAL PALM, LLC,**
a Florida limited liability company

By: _____

    Cary D. Glickstein, solely as Manager of
    160 ROYAL PALM, LLC, a Florida limited
    liability company, and not individually

Date: _____

47850336;1

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year last below written.

<u>**BUYER:**</u>

**LR U.S. HOTELS HOLDINGS LLC**
a Delaware limited liability company

**By:**_____

      Robert Mautner, Vice President of European
      Management Services, Inc., Manager of LR
      U.S. Hotels Holdings, LLC

Date: _____

<u>**SELLER:**</u>

**160 ROYAL PALM, LLC,**
a Florida limited liability company

**By:** _____

Cary D. Glickstein, solely as Manager of
160 ROYAL PALM, LLC, a Florida limited
liability company, and not individually

Date: _____2-26-2019_____

25

## EXHIBIT "A"

## LEGAL DESCRIPTION

Lots 31, 32, and 33, Block F, Revised Map of Royal Park Addition to Palm Beach, Florida, according to the Plat thereof, as recorded in Plat Book 4, Page 1, of the Public Records of Palm Beach County, Florida.

47850336;1

## EXHIBIT "B"

## PERSONAL PROPERTY

Substantially all of the personal property now located on the Property which is shown in Receiver's Initial Inventory dated as of August 17, 2015 without representation or warranty of any kind or nature and subject to the continuing right to remove same at the reasonable discretion of Seller in the ordinary course for safety or security and to avoid further damage to the Property.

1

## EXHIBIT "C"

## PERMITTED EXCEPTIONS

1.  Taxes and assessments for the year 2018 and subsequent years, which are not yet due and payable.

2.  Taxes or assessments which are not shown as existing liens in the public records.

3.  Any outstanding assessments in favor of Palm Beach County, Florida, any special taxing district and any municipality

4.  All matters relating to Code Enforcement Lien as set forth in the Order Assessing Fine in favor of the Town of Palm Beach and against 160 Royal Palm, LLC, recorded in Official Records Book 27315, Page 1368

5.  Any lien provided by County Ordinance or by Chapter 159, Florida Statutes, in favor of any city, town, village or port authority for unpaid service charges for service by any water, sewer or gas system supplying the insured land.

6.  Utility easement as shown on the Plat of REVISED MAP OF ROYAL PARK ADDITION TO PALM BEACH, FLORIDA, recorded in Plat Book 4, Page 1, as conveyed to the Town of Palm Beach, Florida, in Deed Book 173, Page 158.

7.  Reservations for sewer and transmission line Rights-of-Way contained in Deeds recorded in Deed Book 22, Page 381; Deed Book 48, Page 50; and Deed Book 182, Page 237.

8.  Easement in favor of West Palm Telephone Company set forth in instrument recorded in Deed Book 22, Page 113, as assigned to Southern Bell Telephone and Telegraph Company in Deed Book 124, Page 430.

9.  Easement in favor of Florida Power & Light Company set forth in instrument recorded in Official Records Book 575, Page 534.

10. Easement in favor of Florida Power & Light Company set forth in instrument recorded in Official Records Book 17907, Page 1647.

11. Stormwater Management Agreement recorded in Official Records Book 19421, Page 1785.

12. Neighbor Agreement between Royal 160, LLC, a Delaware limited liability company, and Vivian P. Dorris recorded in Official Records Book 21843, Page 896.

47850336;1

13.     Declaration of Use Agreement between the Town of Palm Beach, Florida, and Royal 160, LLC recorded in Official Records Book 21987, Page 499, as amended by the Amendment to Declaration of Use Agreement recorded in Official Records Book 25694, Page 633 and by the Second Amendment to Declaration of Use Agreement recorded in Official Records Book 26251, Page 78.

14.     Heart of Palm Beach Hotel Construction Management Agreement between Royal 160, LLC and the Town of Palm Beach, Florida, recorded in Official Records Book 21987, Page 510.

15.     Any rights, interests or claims arising from the following matters shown on the survey prepared by Wallace Surveyors, dated February 5, 2014, last updated on January 9, 2018, known as Job No. 11-1284.11:

    a.     AT&T pad and FPL transformer pad lying on both sides of the southern boundary line of the subject property.

    b.     Electric box lying partially outside of easement in the southeastern portion of the subject property.

    NOTE: Survey must be signed and sealed.

NOTE: 2017 real property taxes were assessed under Property Control Number 50-43-4323-05-026-0310, in the gross amount of $168,273.50, and were paid on February 16, 2018, in the amount of $166,590.77.

2

**<u>EXHIBIT "D"</u>**

**LISTING AGREEMENT**

LISTING AGREEMENT FOR SALE

## LISTING AGREEMENT
## FOR SALE

**160 ROYAL PALM, LLC** (the "Owner") appoints **Cushman & Wakefield U.S., Inc.** ("C&W") as its sole agent and grants to C&W the exclusive right to sell the real property located at **Palm House, 160 Royal Palm Way, Palm Beach, Florida 33480** (the "Property") as provided below.

1.        Term. The term of this agreement will commence on **July 31, 2018** and will expire on **January 30, 2019.**

2.        Services. C&W will use its efforts to obtain a satisfactory purchaser for the Property at a sale price to be determined by the Owner and on such other terms as are acceptable to the Owner and further defined in **Exhibit A** hereto. C&W will negotiate the business terms of any purchase and sale agreement on behalf of the Owner and in the Owner's best interest, subject to the Owner's review and final approval, except as otherwise directed by the Owner. C&W will cooperate with other licensed real estate brokers.

3.        Intentionally Omitted

4.        Referrals. During the term of this agreement, the Owner will refer to C&W all inquiries and offers received by the Owner with respect to the Property, regardless of the source of such inquiries or offers.

5.        Commission. If, during the term hereof, the Owner sells any interest in the Property, the Owner will pay to C&W a commission in accordance with the attached Schedule of Commissions. Within 10 days after the end of the term, C&W will provide to the Owner a list of prospective purchasers to whom the Property was submitted by any party during the term. If a prospective purchaser, appearing on the list, enters into a purchase and sale agreement within 180 days after the end of the term, and thereafter the sale is closed, the Owner will pay a commission to C&W as provided above. The Owner agrees that such 180-day period will be extended for so long as negotiations with a prospective purchaser are continuing. If, during the term hereof, the Owner sells part, all or any interest in the Property; or contributes or conveys part, all or any interest in the Property to a corporation, partnership, joint venture or other business entity, the Owner will pay to C&W a commission in accordance with the attached Schedule of Commissions.  Notwithstanding anything in this paragraph 5 to the contrary, any terms of sale or agreement for the sale or conveyance of title to the Property shall include or provide that any commission earned hereunder shall be a cost of sale payable by the purchaser at closing, in addition to and not as part of the purchase price.

6.        Bankruptcy Court Approval. On   8 | 2 | 18   , the Debtors filed for bankruptcy relief pursuant to chapter 7 of the Bankruptcy Code (the "Bankruptcy Action"). C&W acknowledges that the bankruptcy court (the "Court") in the Bankruptcy Action must approve the terms of this Agreement between the Owner and C&W. C&W further acknowledges and agrees that once the Court approves the Agreement and C&W is notified of said approval, this Agreement shall become immediately effective.

7.        Cooperating Brokers. C&W and the Listing Team are authorized to solicit and cooperate with other real estate brokers, including Non-Listing Team Agents, who represent prospective purchasers for the Property ("Cooperating Brokers"). C&W shall be responsible to pay the fee or commission due to any such Cooperating Broker, provided such Cooperating Broker (i) represents the prospective purchaser pursuant to a written agreement, a copy of which is furnished to C&W, (ii) executes and delivers to C&W a confidentiality agreement, if required by the Owner and on the Owner's form, and (iii) executes and delivers C&W's standard form Cooperating Brokerage Agreement.

8.        Representation of Purchasers. Owner acknowledges and agrees that C&W may represent potential purchasers and consents to such dual representation, provided C&W timely discloses any such dual representation to Owner.

LISTING AGREEMENT FOR SALE

9.    Fees and Expenses. If either party commences litigation against the other party to enforce its rights under this agreement, the prevailing party will be entitled to recover from the other party the costs and expenses (including reasonable attorneys' fees) incurred.

10.    Authority. Owner represents that it is in fact the Owner of the Property and has the right to sell the Property. The individuals signing below represent that they are authorized to sign this agreement on behalf of the entity indicated.

11.    Professional Advice. C&W recommends that the Owner obtain legal, tax or other professional advice relating to this agreement and the proposed sale of the Property as well as the condition and/or legality of the Property, including, but not limited to, the Property's improvements, equipment, soil, tenancies, title, environmental aspects and compliance with the Americans with Disabilities Act. C&W will have no obligation to investigate any such matters unless expressly otherwise agreed to in writing by Owner and C&W. Owner further agrees that in determining the financial soundness of any prospective purchaser, Owner will rely solely upon Owner's own investigation and evaluation, notwithstanding C&W's assistance in gathering any financial information.

12.    OFAC. Each party represents and warrants to the other party that it, and all persons and entities owning (directly or indirectly) an Ownership interest in it: (a) are not, and will not become, a person or entity with whom a party is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order 13224 Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action; and (b) are not knowingly engaged in, and will not knowingly engage in, any dealings or transactions or be otherwise associated with such persons or entities described in clause (a) above.

13.    Miscellaneous. This agreement shall be governed by the laws of the State of Florida, without giving effect to principles of conflicts of law. This agreement constitutes the entire agreement between the parties regarding the subject matter herein, and no amendments, changes or modifications may be made to this agreement without the express written consent of each of the parties. If any term or provision of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms and provisions of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. No failure or delay by a party in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or prohibit any other or further exercise of any right hereunder. This agreement shall benefit and be binding upon the parties and their respective successors and assigns. This agreement may be executed and delivered (including by facsimile, "pdf" or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

160 ROYAL PALM, LLC

By: _____
Name: Cory Glickstin
Title: Manager
Date: 8/9/16

CUSHMAN & WAKEFIELD, U.S., INC

By: _____
Name: Wanda Riley
Title: Director of Brokerage Services,
Date: Florida    8/5/18

[Schedule of Commissions Follows]

LISTING AGREEMENT FOR SALE

## SCHEDULE OF COMMISSIONS FOR SALE

**Rate:** 1.5% of the total sales proceeds capped at $450,000.

**Alternative Transactions:** If a proposed transaction covered by the Agreement to which this Schedule is annexed turns into any other transaction, including, but not limited to, an exchange, option to purchase, right of first refusal, ground lease or lease, then C&W will automatically, without the necessity of any further acts by Owner or C&W or an amendment to the Agreement to which this Schedule is annexed, be Owner's sole and exclusive agent for such transaction and will be entitled to a commission on such transaction under the terms of the Agreement.

**Time of Payment:** The commission shall be paid in full at the time of the closing or transfer of title to the Property, except in the case of an installment purchase contract, in which case the commission shall be paid in full at the time of full execution and delivery of the installment purchase contract between Owner and purchaser.

**Computation of Total Sales Price:** The commission shall be computed in accordance with the above rates based upon the gross sales price, which shall include any mortgages, loans or other obligations of Owner which may be assumed by purchaser or which purchaser takes title "subject to," and any purchase money loans or mortgages taken back by Owner.

**Purchase Option:** If Owner grants a purchase option, C&W will be paid a commission at the above rate on the option price as and when amounts are payable for the option (and for extensions thereof). Upon closing of the sale, C&W will be paid a commission at the above rate on the total sales price (excluding any amount paid for the option and applied to the sales price).

**Broker Regulatory or Statutory Provisions:** Owner acknowledges that C&W may represent potential purchasers and consents to such dual representation. It is unlawful for either Owner or C&W to discriminate against any persons because of their race, color, religion, national origin, sex, handicap or family status.

**Disclosure:** The Florida Commercial Real Estate Sales Commission Lien Act provides that when a broker has earned a commission by performing licensed services under a brokerage agreement with Owner, the broker may claim a lien against Owner's net sales proceeds for the brokers' commission. The broker's lien rights under the act cannot be waived before the commission is earned.

LISTING AGREEMENT FOR SALE

## EXHIBIT A

### The Marketing Plan

The general terms of the proposed Sale are as follows:

a) The Owner will offer the property for sale to prospective buyers commencing on the date that an order is entered approving this agreement and authorizing C&W to market and sell the Property;

b) To permit due diligence to occur through TBD;

c) Accept non-refundable deposits with any qualifying bids by TBD;

d) To approve qualified bidders no later than TBD;

e) To conduct an auction by TBD;

f) To conduct a hearing to approve the Sale by TBD; and,

g) To complete a closing on the Property on or before TBD, in the context of a final order approving the sale of the Property.

**EXHIBIT "E"**

**RREF COMPETING BID FORM**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of the _____ day of February, 2019 ("Effective Date") between **160 ROYAL PALM, LLC,** a Florida limited liability company (the "Seller") and **RREF II PALM HOUSE, LLC**, a Delaware limited liability company (the "Buyer"), recites and provides:

## RECITALS

Seller is the owner of certain real property located at 160 Royal Palm Way, Palm Beach, Florida, which real property is described on **Exhibit "A"** attached hereto, together with all improvements thereon (the "Property"). Seller desires to sell the Property to Buyer and Buyer desires to purchase the Property from Seller on the terms and conditions set forth herein.

Seller filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") on August 2, 2018 thereby initiating Case No. 18-19441-EPK (the "Bankruptcy Case"). The bankruptcy estate of the Seller is referred to herein as the "Estate."

Buyer seeks to acquire the Assets (defined below) through a private sale approved pursuant to 11 U.S.C. Section 363 and submits this Agreement to be considered by the Seller.

Seller believes that it is in the best interests of the Estate to sell the Assets (defined below) to Buyer, and Buyer wishes to purchase the Assets from Seller, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and Buyer agree as follows:

1.      **Court Approval.** This Agreement and the Parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval and the entry of a final non-appealable order that does not modify or alter the terms of this Agreement, approving this Agreement and the transaction contemplated herein and containing the findings set forth in Section 8.1 (the "Sale Order"), after notice and a hearing, and the provisions, requirements and limitations of the Sale Order.

2.      **Sale and Purchase of Property.** Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall purchase and

1

47850336;1

acquire from Seller, Seller's right, title and interest in and to the following (collectively, the "Assets"):

2.1     the Property, including any improvements and fixtures thereon and Seller's interest in rights of way, ingress and egress, easements, rights, privileges, hereditaments and appurtenances belonging thereto or hereafter existing, subject to the Permitted Exceptions (defined below);

2.2     all tangible personal property and equipment, if any, owned by Seller and located on the Property or stored off-site (if any), including, without limitation, those items described on **Exhibit "B"** hereto, and to the extent in Seller's actual possession, all books, records, correspondence and documents of Seller related to the design, construction or operation of the Property, including any improvements thereon and appurtenances belonging thereto or hereafter existing, and all plans, specifications, floor plans, drawings and renderings of all or any part of the Property (the "Tangible Personal Property");

2.3     all transferable development rights, consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely in respect of the Property, contract rights, all transferable warranties and guaranties, if any, held by Debtor in connection with the Assets and all trademarks or tradenames associated with the Property and to the extent in Seller's actual possession, all books, records, correspondence and documents of Seller related to the foregoing (collectively, the "Intangible Personal Property;" together with the Tangible Personal Property, the "Personal Property"); and

2.4     to the extent applicable, any insurance or condemnation awards or proceeds under Section 15.

3.     **Conveyance of Property.** On the Closing Date, subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Assets to the Buyer free and clear of all interests, liens, claims and encumbrances, including without limitation mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, and conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein (including notices or other registrations in respect of any of the foregoing) affecting title to the Assets or any part thereof or interest therein as permitted under section 363(f) of the Bankruptcy Code (collectively, "Liens"), subject to the Permitted Exceptions with such Liens to attach to the proceeds of sale, on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES, except as expressly set forth in section 13.1 of this Agreement:

47850336;1

3.1     Quitclaim Deed (the "Deed") conveying the Property to Buyer, which shall be free and clear of all Liens and Interests (as defined, respectively, herein and in Section 363(f) of the Bankruptcy Code) in accordance with Section 363(f) of the Bankruptcy Code, and subject to the Permitted Exceptions; and

3.2     Bill of Sale and Assignment of Rights (the "Bill of Sale") transferring all right, title and interest of Seller in and to the all Personal Property, which shall be free and clear of all Liens, in accordance with Section 363(f) of the Bankruptcy Code, with the exception of any assumption and assignment of contract rights, which shall be in accordance with Section 365 of the Bankruptcy Code.

4.     **Excluded Assets.** The term "Excluded Assets" means the following assets of the Seller, all of which are excluded from the purchase and sale transaction provided for in this Agreement:

4.1     the Purchase Price and all cash, cash equivalents, bank accounts or similar types of investments:

4.2     all tax returns and all tax credits, tax benefits and claims for refunds in respect of any federal, state, local, and/or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real estate, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, severance, estimated or other taxes, including any interest or addition thereto, for periods ending on or before the Closing Date;

4.3     subject to Section 15, any and all right, title and interest in any insurance policy(ies) in connection with the ownership or operation of the Property by the Seller and any and all amounts claimed and/or collected pursuant to such insurance policy(ies) for the period prior to Closing date;

4.4     all rights and properties not owned by the Debtor;

4.5     the membership interests and any other ownership interests in the Debtor, and the company minute books, transfer records, and all other company documents of Debtor;

4.6     all contract rights, rights of action, claims for damages, rights of setoff, rights of recoupment, claims, demands, actions, causes of action, judgments, and pending litigation;

4.7     all rights, claims, defenses and other matters that relate to any construction contracts affecting the Property; notwithstanding anything herein to the contrary, any construction defect or related claims which arose prior to Closing shall be an Excluded Asset;

47850336;1

4.8    all rights, claims, causes of action, defenses and other matters that relate or belong to the Debtor, including without limitation any claims, or causes of action which are property of the estate under section 541 of the Bankruptcy Code including those arising under or in connection with Chapter 5 of the Bankruptcy Code;

4.9    any prepaid expenses, advance payments, security deposits, rents and other items related to the Assets that are applicable to the period prior to Closing, or that relate to executory contracts or unexpired leases that are not being assumed by the Seller and assigned to the Buyer.

4.10    any bonds held with or in favor of the Town of Palm Beach relating to the Property;

4.11    the Debtor's accounts receivable; and

4.12    any asset not specifically included in the definition of "Assets".

5.    **Deposit.** Upon execution of this Agreement by the Buyer and Seller, Buyer shall have deposited the sum of Three Million Nine Hundred Sixty Thousand and No/100 Dollars ($3,960,000) equal to ten percent (10%) of the cash portion of the purchase price (with Chicago Title Insurance Company (the "Deposit Agent"), in the form of a Federal Reserve System wire-transfer of immediately available funds, to be held in escrow, as Buyer's deposit under this Agreement (the "Deposit"), which Deposit shall be held without interest and shall be applied against the Purchase Price at Closing, or: (a) returned to Buyer, (as its sole and exclusive remedy with the exception of clause (iv), as to which Buyer shall have the right to seek specific performance as to matters within the control of Seller which can be cured without the commencement of litigation or expenditures in excess of $10,000, provided Seller has such funds available to expend as well as all court authority required for making such expenditures, if (i) the Sale Order is not entered, (ii) this Agreement is not approved by the Bankruptcy Court, or (iii) Seller accepts a RREF Competing Bid (as defined below) and such transaction closes, (iv) at the Buyers option, after Buyers written notice to Seller a 14 day cure period (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), Seller breaches the terms of this Agreement in any material respect, (v) the conditions set forth in Section 9 are not satisfied as of the Closing Date or waived by the Buyer, or (vi) required in accordance with Section 11.1 or Section 15; or (b) paid to Seller if Buyer breaches the terms of this Agreement and, in the event of a breach other than for nonpayment,  does not cure such breach after written notice and a 14 day cure period or such longer time as may be necessary to effectuate a cure provided that Buyer initiates diligent efforts to cure such breach within the initial 14 day cure period, such breach is capable of cure and Buyer diligently pursues such cure thereafter, although the period of time to effect such cure shall not exceed 120 days in the aggregate, or the conditions set forth in Sections 10.2 or 10.3 are not satisfied as of the Closing Date. In the event of such return

4

of the Deposit this Agreement shall terminate and the parties shall be released from any further rights or obligations hereunder except for those which expressly survive termination.

6.    **Purchase Price.**

6.1    The cash purchase price for the Assets shall be $_____ (amount must be equal to or greater than Forty Million and Six Hundred Thousand Dollars ($40,600,000.00)) (the "Purchase Price"). For the avoidance of doubt, the Purchase Price includes the UST Fee of $250,000 payable upon the distribution of the sale proceeds and the Breakup Fee, if due, of $350,000 payable to RREF II Palm House, LLC. At the Closing, Buyer shall pay to Seller the Purchase Price (less the Deposit), and without any other setoff or prorations, except as contemplated in Section 12.1, by wire transfer of immediately available funds to such account(s) as Seller shall designate. This is an "All Cash" transaction that is not subject to any financing, other contingencies, or post contract due diligence.

6.2    In addition to the Purchase Price, Buyer shall assume the following obligations to be funded by Buyer at closing: (i) settlement fees in the amount of $250,000 to the Town of Palm Beach (or if, and to the extent, such settlement fees are paid to the Town of Palm Beach by Seller before Closing, such settlement fees shall be reimbursed to Seller by Buyer at Closing); (ii) any unpaid ad valorem property taxes for 2018 and 2019, as provided in Section 12.1; (iii) real estate brokerage commissions approved by the Court related to the sale up to the amount of $450,000; (iv) any recording and transfer fees owed to any governmental entity associated with the sale of the Property.

7.    **Title.**

7.1    Commitment for Title Insurance. Seller and Buyer acknowledge receipt of that certain title commitment  Order No. 6754332 Revision No. 9 with Commitment Date October 11, 2018 (the "Title Commitment") issued by Greenberg Traurig, P.A. (the "Title Agent"), as agent for Chicago Title Insurance Company (the "Title Company"), binding the Title Company to issue at Closing an Owner's Policy of Title Insurance pursuant to Section 7.2 insuring the marketability of the title to the Property (ALTA Form B) in the full amount of the Purchase Price, subject to (i) easements, covenants, restrictions, declarations, agreements of record, (ii) laws, regulations, resolutions or ordinances, including, without limitation, building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Property currently or hereinafter imposed by any governmental or quasi-governmental body or authority, including claims associated with construction non-conformities by the Town of Palm Beach or City of West Palm Beach (iii) imperfections of title or encumbrances which, individually or in the aggregate, do not have a material adverse effect on the Property, (iv) other exceptions, defects, state of facts, and other matters affecting title to the Property as set forth on **Exhibit "C",** (v) any exceptions caused by Buyer, its agents, representatives or employees, and (vi) any other matters affecting title to the Property reasonably acceptable to Buyer whose acceptance will not

47850336;1

be unreasonably withheld, conditioned or delayed (the "Permitted Exceptions"). Seller and Buyer further acknowledge receipt of all instruments referenced in Schedule B of the Title Commitment. Buyer shall have the right to (a) object to any new exceptions from the last date of the Title Commitment until the Closing Date which exceptions render title unmarketable in accordance with the standards adopted by The Florida Bar and are not Permitted Exceptions (a "New Exception") (b) defer Closing up to thirty (30) days ("Outside Date") until such New Exception(s) are deleted or otherwise remedied to the satisfaction of Buyer in its reasonable discretion, and, (c) in the event that such New Exception(s) are not deleted or otherwise remedied to the reasonable satisfaction of Buyer prior to the Outside Date, Buyer may elect to waive such New Exception(s) and proceed to Closing without further claim against Seller and in which case such New Exceptions shall be deemed Permitted Exceptions or Buyer may terminate this Agreement (other than Buyer's obligations under any provision of this Agreement which, by its terms, is to survive termination), and receive the return of the Deposit, which shall operate to release Seller from any and all liability hereunder other than Seller's obligations under any provision of this Agreement which, by its terms, is to survive termination. Seller shall have no obligation to cure or take corrective action or otherwise incur any expense to remove any New Exception.

7.2    Owner's Policy of Title Insurance. At Closing, the Title Agent shall issue to Buyer, on behalf of the Title Company, at Buyer's expense, a marked commitment or proforma Owner's Policy of Title Insurance (the "Title Policy") covering the Property, in the full amount of the Purchase Price, subject to the Permitted Exceptions. Buyer shall accept title subject to the Permitted Exceptions. Seller shall not be obligated to cause the Title Agent to omit any Permitted Exception.

7.3    Survey. Seller and Buyer acknowledge receipt of that certain survey prepared by Wallace Surveyors, dated February 5, 2014, last updated on January 9, 2018, Job No. 11-1284.11 ("Survey"). Buyer at Buyer's expense may elect to have the Survey updated and/or recertified prior to Closing. If the updated Survey reveals any material encroachment which renders title unmarketable, same shall be treated as a New Exception as set forth in Section 7.1 above. Seller shall not be obligated to cure or take corrective action or otherwise incur any expense with respect to any matters reflected on the Survey or any updates thereto.

8.    **Bankruptcy Court Approval and Competing Transactions.**

8.1    Bankruptcy Court Approval. If Seller has not already done so, Seller shall file a motion seeking authority to approve this Agreement and to withdraw the Bid Procedures Motion within two (2) business days from the Effective Date and use diligent efforts to obtain the Sale Order from the Bankruptcy Court approving the sale of the Assets to Buyer pursuant to this Agreement within fourteen (14) days from the Effective Date, which shall contain the following findings:

47850336;1

(a)    Seller prepared and served a motion seeking the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled thereto, and that all parties in interest entitled to such notice received such notice;

(b)    the sale and transfer of the Assets to the Buyer is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;

(c)    the sale of the Assets to Buyer pursuant to this Agreement will, pursuant to Section 363(f) and Section 365 of the Bankruptcy Code, be free and clear of all Liens, with such Liens attaching to the sale proceeds;

(d)    Buyer is not a mere continuation of Seller, there is no continuity of enterprise between Seller and Buyer, Buyer is not a successor to Seller and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or de facto merger of Buyer and Seller;

(e)    Buyer has acted in good faith within the context of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code;

(f)    the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(g)    Buyer is not assuming or acquiring any of the Excluded Assets;

(h)    all Persons who are listed as a creditor in the Seller's bankruptcy schedules or filed a proof of claim in the Seller's bankruptcy case before the entry of the Sale Order, or that otherwise received actual or constructive notice of the relief sought in the sale motion are enjoined from in any way pursuing the Buyer or the Assets by suit or otherwise to recover on any Liens which they may have against Debtor or the Assets as of the Closing Date; and

(i)    the Sale Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(h).

8.2    **Asset Purchase Agreement with LR U.S. Hotels Holdings LLC.** This Agreement is a private purchase and sale offer pursuant to 11 U.S.C. Section 363 that is subject to approval by the Bankruptcy Court and is further subject to the Right of First Refusal in favor of LR U.S. Hotels Holdings LLC, as set forth in Section 8.3. Seller has entered into an Asset Purchase Agreement with LR U.S. Hotels Holdings LLC (the "LR APA"), in substantially the same form as this Agreement, which authorizes Seller to enter into this Agreement subject to those terms and conditions specific to the "RREF Competing Bid," as defined in and set forth in the LR APA. For purposes of the LR APA, this Agreement constitutes the RREF Competing Bid. Pursuant to the LR APA, any RREF Competing Bid must be received from RREF II Palm House, LLC and

7

accepted by the Seller on or before 4:30 p.m. EST on March 4, 2019 (the "RREF Competing Bid Deadline").

8.3    **Right of First Refusal.**  In the event that this Agreement is accepted by Seller by the RREF Competing Bid Deadline, LR U.S. Hotels Holdings LLC shall have the exclusive right of first refusal to submit an offer greater than the RREF Competing Bid.  LR U.S. Hotels Holdings LLC shall have, through and including the earlier of 4:30 p.m. EST on March 7, 2019, or an hour prior to the time set by the Bankruptcy Court for the hearing seeking approval of this Agreement (the "Right of First Refusal Deadline"), to exercise any right of first refusal under this Section 8.3.  The exercise of the right of first refusal shall be in the manner provided in Section 8.4 of the LR APA and Seller shall notify Buyer in the event of such exercise electronically by email upon receipt from LR U.S. Hotels Holdings LLC.

9.    **Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer in its sole discretion:

9.1    a Sale Order shall have been entered by the Bankruptcy Court within fourteen (14) days from the Effective Date in a form reasonably acceptable to Buyer, whose approval will not be unreasonably withheld, conditioned or delayed and which shall, among other things, approve this Agreement;

9.2    the Sale Order shall be a final order that is not subject to any stay or appeal;

9.3    the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement;

9.4    Seller shall have delivered to Buyer the deliverables set forth in Section 11.3;

9.5    The Amended Settlement Agreements, currently approved by the Bankruptcy Court, between the Debtor and Town of Palm Beach and the Town of Palm Beach Code Enforcement Board ("Settlement Agreements") shall be in force and effect or, if expired, reinstated and (1) the Town of Palm Beach and Code Enforcement Board shall have agreed to extensions of the dates for payment of the respective Settlement Amounts of not less than thirty (30) days after the Closing Date; (2) the Town of Palm Beach shall have agreed to an extension of the date for Development Approval of not less than ninety (90) days after the Closing Date; and (3) the Settlement Agreements shall result in payment obligations to the Town and Code Enforcement Board not to exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00)

8

which shall be binding upon the Property and shall be paid by Buyer in accordance and consistent with Section 6.2(i) herein.

9.6     the Settlement Agreement(s), as may be further amended, shall be approved by the Bankruptcy Court; and

9.7     the Bankruptcy Court shall have approved the change in ownership of the Property from Seller to Buyer, acknowledging that Buyer is a "Qualified Buyer" pursuant to section 7 of the Settlement Agreements.

If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under any provision of this Agreement that expressly provides for such survival.

10.     **Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller:

10.1     the Sale Order shall have been entered by the Bankruptcy Court;

10.2     the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default in any material respect under the provisions of this Agreement; and

10.3     Buyer shall have paid to Seller the Purchase Price (subject to the adjustments and prorations set forth in Section 12) and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing.

10.4     Buyer shall have approved the Settlement Agreements.

11.     **Clo**sing**.**

11.1     Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place on or before twenty (20) calendar days after the Sale Order is entered and becomes final and non-appealable (the "Closing Date"). The Seller and Buyer may agree in writing to proceed to Closing at an earlier date provided that the Sale Order contains a waiver of the 14-day stay period in accordance with Fed. R. Bank. P. 6004(h). Notwithstanding anything herein to the contrary, (a) if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved, and (b) if the requirements set forth in Sections 9.5, 9.6 and 9.7 have not been satisfied then the Closing

9

Date shall be postponed for a period of up to sixty (60) days to enable Seller to satisfy the requirements of Sections 9.5, 9.6 and 9.7. If the postponement described in clauses (a) and (b) of the previous sentence, as applicable, is longer than sixty (60) days, Buyer shall have the right to terminate this Agreement by giving written termination notice to Seller, in which case Seller shall return the Deposit to Buyer and neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement. If either of such postponements is longer than one hundred twenty (120) days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case Seller shall return the Deposit to Buyer and neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.

11.2    Closing shall be conducted through an escrow arrangement by the Title Company (the "Closing Agent"). Closing shall take place at the offices of Closing Agent (or such other place as the Parties may designate in writing). Each Party shall deliver written closing instructions to the Closing Agent consistent with the provisions of this Agreement.

11.3    At the Closing, Seller shall deliver to Buyer: (a) the transfer instruments provided for in Section 3; (b) Seller's executed countersignature to the closing statement contemplated in Section 11.4(c) below; (c) a FIRPTA Affidavit duly executed by Seller stating that Seller is not a "foreign person" as defined in the Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act; (d) reasonable evidence of the satisfaction of the requirements set forth in Article 9 other than any that have been waived by Buyer; and (e) such other documents as Buyer or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement; and (e) possession and occupancy of the Property and possession of the Tangible Personal Property.

11.4    At the Closing, Buyer shall deliver to Seller: (a) subject to adjustments and prorations provided for herein and application of the Deposit, the Purchase Price as provided in Section 6; (b) the transfer instruments provided for in Section 3; (c) a closing statement between Seller and Buyer, reflecting the Purchase Price, the Deposit and all closing costs and other expenses, and (d) such other documents as Seller or the Closing Agent may reasonably request to consummate the transaction provided for in this Agreement.

11.5    Buyer shall pay, on the Closing Date, all costs of Closing, including, without limitation, the cost of recording the deed and state documentary stamps which are required to be affixed to the instrument of conveyance, the cost of all title examination, lien searches, title commitment, and the issuance of the title insurance policy premium for any owner's title insurance policy (and any loan policy) obtained by Buyer or its lender (if applicable), all costs of any inspections, examinations, reports, and/or Survey updates, or new surveys undertaken by Buyer or on Buyer's behalf, all settlement fees charged by the Person conducting the Closing, the cost of recording any corrective documents, and all other costs and charges of Closing. Buyer shall also

47850336;1

assume and pay any and all costs which are required to be paid to the Town or the Code Enforcement Board under the Settlement Agreements. Each Party shall pay its own attorneys' and other professionals' fees.

12.    **Prorations.**

12.1    Real property taxes and assessments for the 2018 tax year and the 2019 tax year through Closing shall be paid by Buyer.  All utility bills shall be apportioned between Buyer and Seller as of the Closing Date, with the Seller's portion of such utility bills being reduced from the Purchase Price as contemplated in Section 6. If final documentation of any such item is not available at the Closing, the required proration shall be made on the basis of the best available documentation.

12.2    Except as contemplated in Section 12.1, there shall be no offset, reduction in closing proceeds, or proration of any kind. Buyer shall be responsible for transferring any and all public utilities on the Closing Date.

12.3    The Parties agree that, after the Closing Date, each shall hold and shall promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements or other property that they may receive on or after the Closing Date which properly belong to the other Party, including any insurance proceeds, and shall account to the other for all such receipts.

13.    **Representations and Warranties.**

13.1    Seller represents and warrants to Buyer that Seller, subject to the entry of the Sale Order without any stay being obtained by any party in interest within the requisite period, has the power and authority to convey the Assets to Buyer pursuant to this Agreement and subject to and in accordance with the provisions of the Sale Order.  Seller makes no other representations and warranties in connection with this Agreement.

13.2    As of the date hereof, Buyer hereby represents and warrants to Seller which representations and warranties shall survive Closing for a period of one (1) year:

(a)    At the time of closing, Buyer will be a limited liability company, duly organized, validly existing and in good standing under the laws of Delaware.

(b)    The execution, delivery and performance by Buyer of this Agreement and the other documents and instruments contemplated hereby are within the power of Buyer and have been duly authorized by all necessary action by Buyer. This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

11

(c) Buyer and the entities or persons signing this Agreement on its behalf are authorized to execute this Agreement and bind Buyer to the terms hereof without the consent or joinder of any other person or entity.

(d) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, nor any rules, regulations, permits, licenses and orders promulgated thereunder.

(e) Buyer is not insolvent and is able to pay its debts as they mature. No proceeding in bankruptcy or for the appointment of any receiver for all or any portion of Buyer's property, real or personal, has been filed by or against Buyer in any federal or state court.

(f) There is no litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which would have any material adverse effect on Buyer's ability to perform its obligations under this Agreement.

(g) The execution of this Agreement and the consummation of the transaction contemplated hereby does not and shall not violate the terms of any agreement or court order which is binding upon Buyer.

(h) Except as expressly set forth in Section 13.1 of this Agreement, that any and all information (whether expressed, implied oral or past, present or future) provided or made available to Buyer or Buyer's agents or representatives including, without limitation, all marketing and informational materials in connection with the Property or this Agreement are not to be construed by Buyer as a representation or warranty of Seller of any kind, and Buyer has specifically not relied on any such information. Except as expressly set forth in Section 13.1 of this Agreement, Seller is not liable or bound in any manner by any verbal or written statement, representations or information pertaining to the Property or the operation thereof, furnished by any attorney, real estate broker, agent, employee, servant or any other person.

(i) That Buyer has made its own independent investigation of the accuracy and completeness of any and all information (whether in writing or verbal) provided or made available to Buyer and Buyer is satisfied with all aspects of the Property and Assets which Buyer deems material to its purchase thereof, including, without limitation: marketability and insurability of title to the Property (including, without limitation) any Liens running with the land (other than any liens under Section 363(f) of the Bankruptcy Code); all municipal and other legal requirements (including, without limitation, taxes, assessments, zoning, use permit requirements and building permits); the condition and physical aspects of all buildings and structures located on the Property (including, without limitation, the interior, exterior, structure, basement, parking, paving, utilities, operating equipment, plans and specifications for the Property and all other physical and functional aspects of the Property); the condition of the Property (including, without

12

limitation, any easements, access or use rights or similar matters affecting the Property) and; the availability of utilities, sanitary facilities, permits and other governmental approvals (including, without limitation, the government approvals for Buyer's intended use of the Property and the suitability of the Property for Buyer's intended use.

(j)    That Buyer acknowledges and agrees Seller has not made, did not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements, or guarantees of any kind whatsoever (except as specifically set forth in Section 13.1 of this Agreement) whether expressed or implied, oral or past, present or future, of, as to, concerning or with respect to: the value, nature, quality or condition of the Property; the profit or income believed to be derived from the Property; the suitability of the Property; the compliance of or by the Property with the laws, rules, ordinances or regulations of any applicable governmental authority or body; the habitability, merchantability, marketability, profitability, or fitness for a particular purpose of the Property; the nature or quality of the soils or geology of the Property; the manner, quality, state of repair or lack of repair, of the Property, or any other matter with respect to the Property; the environmental matters or hazards that my affect the Property of any kind of nature; marketability of title including, without limitation, liens running with the land; and the future actions or inactions of any governmental agency in connection with any approvals, permits, entitlements or zoning of the Property after the date of Closing.

13.3    BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT (I) THE ASSETS ARE SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER IN "AS-IS" CONDITION ON A "WHERE-IS" BASIS WITH ALL FAULTS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT, (II) BUYER HAS UNDERTAKEN ALL SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS BUYER DEEMS NECESSARY OR APPROPRIATE UNDER THE CIRCUMSTANCES AS TO THE CONDITION OF THE PROPERTY AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE, AND BASED UPON SAME, BUYER IS AND WILL BE RELYING STRICTLY AND SOLELY UPON SUCH INSPECTIONS AND EXAMINATIONS AND THE ADVICE AND COUNSEL OF ITS OWN AGENTS, LEGAL COUNSEL AND OFFICERS; (III) SELLER IS NOT MAKING AND HAS NOT MADE ANY WARRANTY OR REPRESENTATION WITH RESPECT TO ANY MATERIALS OR OTHER DATA PROVIDED BY SELLER TO BUYER OR THE SKILLS, COMPETENCE OR DILIGENCE OF THE PREPARERS THEREOF OR THE PHYSICAL CONDITIONS OR OF ANY OTHER ASPECT OF ALL OR ANY PART OF THE PROPERTY AS AN INDUCEMENT TO BUYER TO ENTER INTO THIS AGREEMENT AND THEREAFTER TO PURCHASE THE PROPERTY OR FOR ANY OTHER PURPOSE; AND (IV) BY REASON OF ALL OF THE

47850336;1

FOREGOING, BUYER, SUBJECT TO SELLER'S REPRESENTATIONS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT AND THE PERFORMANCE BY SELLER OF ITS OBLIGATIONS UNDER THIS AGREEMENT, ASSUMES THE FULL RISK OF ANY LOSS OR DAMAGE OCCASIONED BY ANY FACT. UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS AND, UPON CLOSING, BUYER HEREBY KNOWINGLY AND VOLUNTARILY WAIVES, RELINQUISHES AND RELEASES SELLER FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AT ANY TIME BY REASON OF OR ARISING OUT OF ANY PHYSICAL OR ENVIRONMENTAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS AND ANY AND ALL OTHER MATTERS REGARDING THE PROPERTY EXCLUDING MATTERS WHICH ARE THE SUBJECT OF EXPRESS REPRESENTATIONS OF SELLER AS SET FORTH IN THIS AGREEMENT. BUYER SHALL ACCEPT THE PROPERTY IN ITS "AS IS; WHERE IS" CONDITION AND WITH ALL FAULTS.

14.    **Default and Remedies.**

14.1    If the Closing fails to occur because of a default or material misrepresentation or breach of warranty by Buyer, Seller shall have the right to terminate this Agreement by notice to Buyer, and be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, the parties shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

14.2    If the Closing fails to occur because of a default or material misrepresentation or breach of warranty by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, with 14 days written notice and cure period to Seller (or within thirty (30) days after written notice to Seller if such default is not capable of being cured within such fourteen (14) day period, provided Seller promptly undertakes and diligently pursues such cure), then Buyer shall have the right to terminate this Agreement by notice to Seller and Buyer shall be entitled to receive a return of the Deposit or pursue an action for specific performance against Seller.

15.    **Risk of Loss.** Risk of loss to the Property or any part thereof from damage or destruction by fire or other casualty or by reason of condemnation shall remain upon Seller until the Closing. If, between the date hereof and the Closing, any portion of the Property shall be damaged or destroyed by fire or other casualty or be subject to any claim of condemnation, Seller

shall notify Buyer in writing of said damage, destruction, casualty or loss and the extent thereof or of such condemnation claim as the case may be. If the cost to repair any such damage exceeds ONE MILLION DOLLARS ($1,000,000.00), or in the event of any such claim for condemnation, Buyer shall have the option, exercisable by notice to Seller given within ten days after Seller's notice to Buyer of said damage, destruction, casualty, loss or condemnation, to either: (a) terminate this Agreement, whereupon the Deposit Agent shall forthwith refund the Deposit to Buyer and upon such refund this Agreement shall terminate and neither party shall have any further liability to the other hereunder (except for any rights and obligations arising under this Agreement which by their terms survive such termination); or (b) elect to proceed with this Agreement and pay the full Purchase Price (less any deductible), in which case Seller shall assign to Buyer any insurance or condemnation proceeds to which Seller or its successors may be entitled as a result of such damage, destruction, condemnation, loss or casualty without Seller replacing or repairing any such damage and Seller will have no further obligations to Buyer in respect of such loss or damage (except for any rights and obligations arising under this Agreement which by their terms survive Closing). If Buyer fails to give such written notice, Buyer shall be conclusively deemed to have chosen option (b). If the cost to repair any such damage is equal to or less than ONE MILLION DOLLARS ($1,000,000.00), Buyer shall proceed to Closing, in which event Seller agrees to pay to Buyer at the Closing all insurance or condemnation proceeds which Seller has received as a result of the same, if any, and assign to Buyer all insurance proceeds payable as a result of the same without Seller replacing or repairing such damage, and Seller will have no further obligations to Buyer in respect of such loss or damage.

      16.     **Broker and Broker Commission.** The Broker is Cushman & Wakefield U.S., Inc. (the "Broker"), subject to Bankruptcy Court approval of the listing agreement [ECF No. 19] (the "Listing Agreement"), a copy of which is attached as **Exhibit "D"** hereto and any extension thereof. In accordance with the Listing Agreement, to the extent the Closing occurs, the Broker's fee (the "Commission") in connection with the Closing shall be one and one-half percent (1.5%) of the Purchase Price, but in no event shall exceed FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000.00). The Commission earned by Broker shall be a cost of sale payable by Buyer at Closing in addition to, and not as part of the Purchase Price, in accordance with the Listing Agreement. Neither Seller nor Buyer has engaged any other broker or undertaken an obligation to any other broker in connection with the transaction addressed in this Agreement. To the extent Closing occurs hereunder, upon Closing, Buyer shall pay the Commission to Broker on Seller's behalf in addition to, and not as part of the Purchase Price. Except with respect to any Commission due and owing to the Broker and otherwise pursuant to the Listing Agreement, Seller shall not be responsible for any broker's commissions. Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming through the Buyer other than the Broker, and indemnify and hold the Seller harmless against any and all liability, loss, cost, damage and expense (including, but not limited to, attorneys' fees) Seller shall incur because of any claim by any broker or agent, other than a claim by the Broker, claiming to have dealt with either Seller or Buyer, whether or not meritorious, for any commission or other compensation with respect to this

15

Agreement or to the purchase and sale of the Property in accordance with this Agreement. The provisions of this Section shall survive the Closing and any termination of this Agreement.

17.    **[Intentionally deleted.]**

18.    **[Intentionally deleted.]**

19.    **Further Assurances.** Each Party shall cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

20.    **Deposit Agent Provisions.**

20.1    If conflicting demands relating to this Agreement are made upon the Deposit Agent, the Parties hereto expressly agree that the Deposit Agent shall have the absolute right to do either or both of the following: (a) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (b) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the Parties to interplead and litigate in such court their several claims and rights amongst themselves. Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the patties under this Agreement, the Deposit Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

20.2    In no event shall Deposit Agent be liable for any act or omission under or in respect of this Agreement except where Deposit Agent's acts or omission is the result of its gross negligence or willful misconduct. Accordingly, Deposit Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Deposit Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Deposit Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

20.3    Buyer and Seller reserve the right, at any time and from time to time, by mutual agreement, to substitute a new escrow agent in place of Deposit Agent. In addition, Deposit Agent reserves the right to resign from its role as escrow agent by giving the Seller and the Buyer written notice of such resignation. If Seller and Buyer have jointly designated a successor escrow agent in writing, then Deposit Agent shall deliver any funds held by Deposit Agent under this

16

Agreement to such successor escrow agent. However, if no such successor escrow agent is designated by Seller and Buyer in writing within ten (10) days after any notice of resignation from Deposit Agent, then Deposit Agent may deliver any such funds to the Bankruptcy Court and interplead Buyer and Seller in connection therewith.

20.4    Buyer acknowledges that the Deposit Agent may also serve as Seller's legal counsel in connection with this Agreement, and both Seller and Buyer consent to Deposit Agent serving in such dual capacity. In the event of any actual dispute or adversity between Seller and Buyer, Deposit Agent shall be entitled to resign as Deposit Agent and to represent Seller in such dispute or adversity, and in such case shall deliver any funds held by Deposit Agent pursuant to this Agreement the funds either to a successor escrow agent designated by Seller and Buyer as provided above, or to a court of competent jurisdiction as provided for above.

21.    **Certain Definitions: Rules of Construction.**

21.1    The following terms have the following meanings in this Agreement:

(a)    "Bid Procedures Motion" means Debtor's Motion Entry of an Order (I) Approving Bid Procedures and Bid Protections in Connection with the Sale of Substantially All of its Assets, (II) Approving the Form and Manner of Notice of Sale, (III) Scheduling an Auction and Sale Hearing and (IV) Approving the Sale of the Assets Free and Clear of Liens, Claims and Encumbrances filed as Document Number 92 in the Bankruptcy Case.

(b)    "Legal Costs" means court costs and attorneys' fees and costs, including the costs of paralegals, whether or not any mediation, arbitration or legal proceeding is filed, or if any mediation, arbitration or legal proceeding is filed, then all such costs incurred at any point in such mediation, arbitration or legal proceeding, including trial and all levels of appeal.

(c)    "Party" or "Parties" mean Seller and/or Buyer, as the context may require.

(d)    "Person" means any individual or any corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or other legal entity or a government or governmental entity.

(e)    **[Intentionally deleted.]**

21.2    As used in this Agreement: (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and schedules of this Agreement, unless otherwise

17

specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

21.3    Each Party and its counsel have reviewed this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

22.    **Miscellaneous.**

22.1    This Agreement and the schedules and exhibits to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

22.2    This Agreement, together with any exhibits, schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

22.3    All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or delivered by a recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

**If to Buyer, addressed to:**

RREF II Palm House LLC
Michael Winston, Authorized Signatory
60 Columbus Circle
New York, NY 10023
Tel:          (212) 801-1000
Email:          MWinston@Related.com

**With a copy to:**

Jay Sakalo, Esq.
Jeffrey I. Snyder, Esq
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, 23rd Floor
Miami, FL 33131
Tel:          (305)374-7580

47850336;1

Fax:         (305)351-2253
Email:      jsakalo@bilzin.com & jsnyder@bilzin.com

**If to Seller, addressed to:**

Cary Glickstein, Manager
160 Royal Palm LLC
1118 Waterway Lane
Delray Beach, FL 33483
Tel:         (561)279-8942
Fax:         (561)279-0440
Email:      cg@ironwoodproperties.com

**With a copy to:**

Marcia H. Langley, Esq.
Greenberg Traurig, P.A.
5100 Town Center Circle
Suite 400
Boca Raton, FL 33486
Tel:         (561) 955-7604
Fax:         (561) 388-7099
Email:      langleym@gtlaw.com

**With a copy to:**

Philip J. Landau, Esq.
Shraiberg, Landau & Page, P.A.
2385 NW Executive Center Drive, Suite 300
Boca Raton, Florida 33431
Tel:         (561) 443-0800
Fax:         (561) 998-0047
Email:      plandau@slp.law

**If to Title Company, Deposit Agent or Closing Agent:**

Michelle M. Clapp
Senior Commercial Escrow Officer

19

Fidelity National Title Group
13800 NW 14th Street, Suite 190
Sunrise, FL 33323
Direct: 954-308-3231
Fax: 954-971-2050
Email:        michelle.clapp@fnf.com

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

22.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile, scanned and electronic signatures shall be accorded the same enforcement rights as an original. Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement.

22.5    Time is of the essence with respect to each Party's obligations hereunder.

22.6    This Agreement shall not be recorded by Buyer and, if recorded by Buyer such recording shall constitute a breach of this Agreement, entitling Seller to the Deposit if the breach is not cured as provided in this Agreement, and Seller may immediately terminate all of its obligations under this Agreement. Buyer shall also pay Seller's Legal Costs in removing this Agreement of record. The provisions of this Section shall survive the Closing.

22.7    If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Palm Beach County, Florida are open for business, but in no case will the extension be for more than three days. For purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in Florida, are closed or are authorized to be closed, including all legal holidays.

22.8    Notwithstanding any other provision of this Agreement, any representation, warranty or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

22.9    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in

Florida. Additional information regarding radon and radon testing may be obtained from county public health units.

22.10   The Buyer understands and agrees that Cary D. Glickstein has executed this Agreement as the court approved sole and exclusive manager for the Seller, not in his personal capacity, and there shall be no recourse to Cary D. Glickstein personally for any of the representations, warranties, covenants, communications of any kind, and/or promises, acts, undertakings or omissions, of any type or at any time, made by "Seller" herein or in connection with or arising from this Agreement, the Property or any actions, claims, litigation or proceedings concerning the Seller or the Property, but only against the Estate and only to the extent permitted herein and by the Sale Order.

22.11   The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

22.12   No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

22.13   This Agreement may not be assigned by Buyer, without Seller's prior written consent, which may be withheld in Seller's sole discretion and subject to approval by the United States Bankruptcy Court for the Southern District of Florida West Palm Beach Division. Notwithstanding the foregoing sentence, Buyer may transfer or assign this Agreement to an affiliate without Seller's consent provided that buyer acknowledges its continuing liability for obligations and liabilities pursuant to this Agreement. Any assignment of this Agreement shall not serve to release Buyer from its obligations hereunder. This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the Parties hereto. The Parties neither intend to confer any benefit hereunder on any Person other than the Parties hereto, nor shall any such third party have any rights hereunder.

22.14   This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon

47850336;1

such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

22.15    BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

23.    **Property Investigations.**  Buyer and/or Buyer's employees, representatives, agents, contractors and any Person acting by, under or through Buyer (collectively, "Buyer's Representatives") shall have access to the Property at all reasonable times subsequent to the Effective Date and prior to the Closing or earlier termination of this Agreement with full right to: (a) inspect the Property, and (b) to conduct any and all inspections, investigations and tests thereon, including, but not limited to, hazardous waste studies, as Buyer may deem reasonably necessary. All costs and expenses in connection with Buyer's investigations of the Property shall be at the sole cost of Buyer. In conjunction with entry upon the Property by Buyer and/or Buyer's Representatives, Buyer shall:

23.1    Fully comply with all laws applicable to the activity to be performed upon the Property and all other activities undertaken in connection therewith;

23.2    Take all actions and implement all protections reasonably necessary to ensure that all actions taken, and the equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, cause no damage to other property of Seller or other persons;

23.3    Promptly repair any damage to the Property caused by the acts or omissions of Buyer and/or Buyer's Representatives and restore the Property to the condition that existed prior to entry thereon by Buyer and/or Buyer's Representatives, at Buyer's sole cost and expense;

23.4    Prior to Buyer and/or Buyer's Representatives' first entry on the Property, maintain or cause to be maintained, throughout the term of this Agreement, at Buyer's expense, a policy of comprehensive general liability insurance, with a broad form contractual liability endorsement covering Buyer's indemnification obligations under Section 23.6, and with combined single limit of not less than One Million Dollars ($1,000,000.00) insuring Buyer and naming Seller as an additional insured, against any injuries or damages to persons or property that may result from or are related to (i) Buyer's and/or Buyer's Representatives' entry upon the Property, and (ii) any and all other activities undertaken by Buyer and/or Buyer's Representatives on or in connection with the Property, in such form and with an insurance company acceptable to Seller and deliver a copy of such insurance policy to Seller prior to the first entry on the Property along with a certificate of insurance confirming that the premium has been paid in full for a period of not less than one (1) year, that the policy will not be terminated, canceled or modified without at

least thirty (30) days prior written notice to Seller, and designating Seller as an additional insured thereunder;

23.5    Not allow the activities undertaken by Buyer or Buyer's Representatives to result in any Liens being filed or recorded against the Property or any portion thereof, or any other property of Seller or of its affiliates, and Buyer shall, at its sole cost and expense, within the time permitted to cure a breach by Buyer of this Agreement, discharge of record or escrow with Seller, on terms acceptable to Seller, funds to discharge such Liens that are filed or recorded (including, without limitation, liens for services, labor or materials furnished); and

23.6    Defend and indemnify Seller and its respective employees, agents, partners, members, managers, officers, directors, tenants and invitees (collectively, "Seller's Affiliates"), and hold same harmless from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, Attorneys' Fees (as hereinafter defined) and disbursements, suffered or incurred by same and arising out of or in connection with (i) the entry upon the Property by Buyer and/or Buyer's Representatives, including but not limited to any bodily injury or death of any person or property damage arising out of or in conjunction with same; (ii) any activities conducted thereon by Buyer and/or Buyer's Representatives; (iii) any Liens filed or recorded against the Property or any portion thereof, or any other property of Seller or of Seller's Affiliates, as a consequence of activities undertaken by Buyer and/or Buyer's Representatives; provided, however, that Buyer shall not be required to defend and indemnity Seller and/or Seller's Affiliates for any loss arising out of or in connection with any pre-existing conditions on the Property or the gross negligence, bad faith or willful misconduct of Seller or any of Seller's Affiliates.

Any entry upon the Property in conjunction with the foregoing and all activities related thereto shall be at the sole risk and expense of Buyer and Buyer's Representatives. In no event shall Buyer conduct a Phase II or more invasive inspection or testing of the Property unless recommended by an environmental consultant reasonably acceptable to Seller or otherwise required by Buyer's lender, if any and when Buyer shall obtain Seller's prior written consent. Subject to the requirements of applicable law, in the event Buyer obtains a Phase II environmental site assessment on the Property, the contents of the Phase II environmental site assessment shall not be disclosed in whole or in part by Buyer to any person other than its directors, officers, employees, representatives (including legal and financial advisers, architects, engineers, consultants and lenders) who need to know the information for the purpose of evaluating the acquisition of the Property, and each such person shall be informed of the confidential nature of the contents of any Phase II environmental site assessment. Buyer shall cause such persons to keep the contents of any Phase II environmental site assessment strictly confidential and otherwise to comply with this Agreement with respect to same.

Buyer shall provide to Seller, at Buyer's sole cost and expense, copies of all inspection reports and other items of due diligence including, without limitation, soil tests, environmental audits, surveys and traffic studies obtained by Buyer in connection with its investigation of the Property within five (5) business days after Buyer's receipt of same ("Inspection Reports"), if such receipt is prior to the Closing Date. All items of due diligence that are customarily certified to a buyer, seller, lender or title company in a commercial real estate transaction in South Florida shall be certified to both Buyer and Seller. The provisions of this Section 23 shall survive the Closing and any termination of this Agreement.

24.    **Seller's Covenants.** From the date hereof until the Closing (or earlier termination of this Agreement), Seller covenants and agrees as follows:

24.1    Seller shall cooperate with Buyer's reasonable requests, from time to time, for access to the Property and for access to and/or copies of information and documents related to the Property, including without limitation information as to title matters, parking matters, licenses, permits and zoning, environmental and construction matters; and

24.2    Seller shall continue to maintain insurance on the Property of the amounts and type in place as of the date hereof.

SEE SIGNATURES ON FOLLOWING PAGE

47850336;1

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year last below written.

**BUYER:**

**RREF II PALM HOUSE LLC,**
a Delaware limited liability company


By:_____
          Michael Winston, Authorized Signatory

Date: _____


**SELLER:**

**160 ROYAL PALM, LLC,**
a Florida limited liability company


**By:** _____
          Cary D. Glickstein, solely as Manager of
          160 ROYAL PALM, LLC, a Florida limited
          liability company, and not individually

Date: _____

25

### EXHIBIT "A"

### LEGAL DESCRIPTION

Lots 31, 32, and 33, Block F, Revised Map of Royal Park Addition to Palm Beach, Florida, according to the Plat thereof, as recorded in Plat Book 4, Page 1, of the Public Records of Palm Beach County, Florida.

1

## EXHIBIT "B"

## PERSONAL PROPERTY

Substantially all of the personal property now located on the Property which is shown in Receiver's Initial Inventory dated as of August 17, 2015 without representation or warranty of any kind or nature and subject to the continuing right to remove same at the reasonable discretion of Seller in the ordinary course for safety or security and to avoid further damage to the Property.

1

## EXHIBIT "C"

## PERMITTED EXCEPTIONS

1.    Taxes and assessments for the year 2018 and subsequent years, which are not yet due and payable.

2.    Taxes or assessments which are not shown as existing liens in the public records.

3.    Any outstanding assessments in favor of Palm Beach County, Florida, any special taxing district and any municipality

4.    All matters relating to Code Enforcement Lien as set forth in the Order Assessing Fine in favor of the Town of Palm Beach and against 160 Royal Palm, LLC, recorded in Official Records Book 27315, Page 1368

5.    Any lien provided by County Ordinance or by Chapter 159, Florida Statutes, in favor of any city, town, village or port authority for unpaid service charges for service by any water, sewer or gas system supplying the insured land.

6.    Utility easement as shown on the Plat of REVISED MAP OF ROYAL PARK ADDITION TO PALM BEACH, FLORIDA, recorded in Plat Book 4, Page 1, as conveyed to the Town of Palm Beach, Florida, in Deed Book 173, Page 158.

7.    Reservations for sewer and transmission line Rights-of-Way contained in Deeds recorded in Deed Book 22, Page 381; Deed Book 48, Page 50; and Deed Book 182, Page 237.

8.    Easement in favor of West Palm Telephone Company set forth in instrument recorded in Deed Book 22, Page 113, as assigned to Southern Bell Telephone and Telegraph Company in Deed Book 124, Page 430.

9.    Easement in favor of Florida Power & Light Company set forth in instrument recorded in Official Records Book 575, Page 534.

10.    Easement in favor of Florida Power & Light Company set forth in instrument recorded in Official Records Book 17907, Page 1647.

11.    Stormwater Management Agreement recorded in Official Records Book 19421, Page 1785.

12.    Neighbor Agreement between Royal 160, LLC, a Delaware limited liability company, and Vivian P. Dorris recorded in Official Records Book 21843, Page 896.

47850336;1

13. Declaration of Use Agreement between the Town of Palm Beach, Florida, and Royal 160, LLC recorded in Official Records Book 21987, Page 499, as amended by the Amendment to Declaration of Use Agreement recorded in Official Records Book 25694, Page 633 and by the Second Amendment to Declaration of Use Agreement recorded in Official Records Book 26251, Page 78.

14. Heart of Palm Beach Hotel Construction Management Agreement between Royal 160, LLC and the Town of Palm Beach, Florida, recorded in Official Records Book 21987, Page 510.

15. Any rights, interests or claims arising from the following matters shown on the survey prepared by Wallace Surveyors, dated February 5, 2014, last updated on January 9, 2018, known as Job No. 11-1284.11:

   a. AT&T pad and FPL transformer pad lying on both sides of the southern boundary line of the subject property.

   b. Electric box lying partially outside of easement in the southeastern portion of the subject property.

   NOTE: Survey must be signed and sealed.

NOTE: 2017 real property taxes were assessed under Property Control Number 50-43-4323-05-026-0310, in the gross amount of $168,273.50, and were paid on February 16, 2018, in the amount of $166,590.77.

## EXHIBIT "D"

## LISTING AGREEMENT

47850336;1

4

LISTING AGREEMENT FOR SALE

## LISTING AGREEMENT
## FOR SALE

**160 ROYAL PALM, LLC** (the "Owner") appoints **Cushman & Wakefield U.S., Inc.** ("C&W") as its sole agent and grants to C&W the exclusive right to sell the real property located at **Palm House, 160 Royal Palm Way, Palm Beach, Florida 33480** (the "Property") as provided below.

1.    <u>Term</u>. The term of this agreement will commence on **July 31, 2018** and will expire on **January 30, 2019.**

2.    <u>Services</u>. C&W will use its efforts to obtain a satisfactory purchaser for the Property at a sale price to be determined by the Owner and on such other terms as are acceptable to the Owner and further defined in **Exhibit A** hereto. C&W will negotiate the business terms of any purchase and sale agreement on behalf of the Owner and in the Owner's best interest, subject to the Owner's review and final approval, except as otherwise directed by the Owner. C&W will cooperate with other licensed real estate brokers.

3.    <u>Intentionally Omitted</u>

4.    <u>Referrals</u>. During the term of this agreement, the Owner will refer to C&W all inquiries and offers received by the Owner with respect to the Property, regardless of the source of such inquiries or offers.

5.    <u>Commission</u>. If, during the term hereof, the Owner sells any interest in the Property, the Owner will pay to C&W a commission in accordance with the attached Schedule of Commissions. Within 10 days after the end of the term, C&W will provide to the Owner a list of prospective purchasers to whom the Property was submitted by any party during the term. If a prospective purchaser, appearing on the list, enters into a purchase and sale agreement within 180 days after the end of the term, and thereafter the sale is closed, the Owner will pay a commission to C&W as provided above. The Owner agrees that such 180-day period will be extended for so long as negotiations with a prospective purchaser are continuing. If, during the term hereof, the Owner sells part, all or any interest in the Property; or contributes or conveys part, all or any interest in the Property to a corporation, partnership, joint venture or other business entity, the Owner will pay to C&W a commission in accordance with the attached Schedule of Commissions.  Notwithstanding anything in this paragraph 5 to the contrary, any terms of sale or agreement for the sale or conveyance of title to the Property shall include or provide that any commission earned hereunder shall be a cost of sale payable by the purchaser at closing, in addition to and not as part of the purchase price.

6.    <u>Bankruptcy Court Approval</u>. On     8 | 2 | 18    , the Debtors filed for bankruptcy relief pursuant to chapter 7 of the Bankruptcy Code (the "Bankruptcy Action"). C&W acknowledges that the bankruptcy court (the "Court") in the Bankruptcy Action must approve the terms of this Agreement between the Owner and C&W. C&W further acknowledges and agrees that once the Court approves the Agreement and C&W is notified of said approval, this Agreement shall become immediately effective.

7.    <u>Cooperating Brokers</u>. C&W and the Listing Team are authorized to solicit and cooperate with other real estate brokers, including Non-Listing Team Agents, who represent prospective purchasers for the Property ("Cooperating Brokers"). C&W shall be responsible to pay the fee or commission due to any such Cooperating Broker, provided such Cooperating Broker (i) represents the prospective purchaser pursuant to a written agreement, a copy of which is furnished to C&W, (ii) executes and delivers to C&W a confidentiality agreement, if required by the Owner and on the Owner's form, and (iii) executes and delivers C&W's standard form Cooperating Brokerage Agreement.

8.    <u>Representation of Purchasers</u>. Owner acknowledges and agrees that C&W may represent potential purchasers and consents to such dual representation, provided C&W timely discloses any such dual representation to Owner.

LISTING AGREEMENT FOR SALE

9.    Fees and Expenses. If either party commences litigation against the other party to enforce its rights under this agreement, the prevailing party will be entitled to recover from the other party the costs and expenses (including reasonable attorneys' fees) incurred.

10.    Authority. Owner represents that it is in fact the Owner of the Property and has the right to sell the Property. The individuals signing below represent that they are authorized to sign this agreement on behalf of the entity indicated.

11.    Professional Advice. C&W recommends that the Owner obtain legal, tax or other professional advice relating to this agreement and the proposed sale of the Property as well as the condition and/or legality of the Property, including, but not limited to, the Property's improvements, equipment, soil, tenancies, title, environmental aspects and compliance with the Americans with Disabilities Act. C&W will have no obligation to investigate any such matters unless expressly otherwise agreed to in writing by Owner and C&W. Owner further agrees that in determining the financial soundness of any prospective purchaser, Owner will rely solely upon Owner's own investigation and evaluation, notwithstanding C&W's assistance in gathering any financial information.

12.    OFAC. Each party represents and warrants to the other party that it, and all persons and entities owning (directly or indirectly) an Ownership interest in it: (a) are not, and will not become, a person or entity with whom a party is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order 13224 Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action; and (b) are not knowingly engaged in, and will not knowingly engage in, any dealings or transactions or be otherwise associated with such persons or entities described in clause (a) above.

13.    Miscellaneous. This agreement shall be governed by the laws of the State of Florida, without giving effect to principles of conflicts of law. This agreement constitutes the entire agreement between the parties regarding the subject matter herein, and no amendments, changes or modifications may be made to this agreement without the express written consent of each of the parties. If any term or provision of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms and provisions of the Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. No failure or delay by a party in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or prohibit any other or further exercise of any right hereunder. This agreement shall benefit and be binding upon the parties and their respective successors and assigns. This agreement may be executed and delivered (including by facsimile, "pdf" or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

**160 ROYAL PALM, LLC**

By: _____
Name: _Cory Glickstin_
Title: _Manager_
Date: _8/9/16_

**CUSHMAN & WAKEFIELD, U.S., INC**

By: _____
Name: _Wanda Riley_
Title: _Director of Brokerage Services,_
Date: _Florida    8/9/16_

[Schedule of Commissions Follows]

## SCHEDULE OF COMMISSIONS FOR SALE

**Rate:** 1.5% of the total sales proceeds capped at $450,000.

**Alternative Transactions:** If a proposed transaction covered by the Agreement to which this Schedule is annexed turns into any other transaction, including, but not limited to, an exchange, option to purchase, right of first refusal, ground lease or lease, then C&W will automatically, without the necessity of any further acts by Owner or C&W or an amendment to the Agreement to which this Schedule is annexed, be Owner's sole and exclusive agent for such transaction and will be entitled to a commission on such transaction under the terms of the Agreement.

**Time of Payment:** The commission shall be paid in full at the time of the closing or transfer of title to the Property, except in the case of an installment purchase contract, in which case the commission shall be paid in full at the time of full execution and delivery of the installment purchase contract between Owner and purchaser.

**Computation of Total Sales Price:** The commission shall be computed in accordance with the above rates based upon the gross sales price, which shall include any mortgages, loans or other obligations of Owner which may be assumed by purchaser or which purchaser takes title "subject to," and any purchase money loans or mortgages taken back by Owner.

**Purchase Option:** If Owner grants a purchase option, C&W will be paid a commission at the above rate on the option price as and when amounts are payable for the option (and for extensions thereof). Upon closing of the sale, C&W will be paid a commission at the above rate on the total sales price (excluding any amount paid for the option and applied to the sales price).

**Broker Regulatory or Statutory Provisions:** Owner acknowledges that C&W may represent potential purchasers and consents to such dual representation. It is unlawful for either Owner or C&W to discriminate against any persons because of their race, color, religion, national origin, sex, handicap or family status.

**Disclosure:** The Florida Commercial Real Estate Sales Commission Lien Act provides that when a broker has earned a commission by performing licensed services under a brokerage agreement with Owner, the broker may claim a lien against Owner's net sales proceeds for the brokers' commission. The broker's lien rights under the act cannot be waived before the commission is earned.

## EXHIBIT A

### The Marketing Plan

The general terms of the proposed Sale are as follows:

a)  The Owner will offer the property for sale to prospective buyers commencing on the date that an order is entered approving this agreement and authorizing C&W to market and sell the Property;

b)  To permit due diligence to occur through TBD;

c)  Accept non-refundable deposits with any qualifying bids by TBD;

d)  To approve qualified bidders no later than TBD;

e)  To conduct an auction by TBD;

f)  To conduct a hearing to approve the Sale by TBD; and,

g)  To complete a closing on the Property on or before TBD, in the context of a final order approving the sale of the Property.

## EXHIBIT "F"

## EXERCISE OF FIRST RIGHT OF REFUSAL

Pursuant to Section 8.4 of that certain Asset Purchase Agreement (the "<u>Agreement</u>"), with an Effective Date of February_____, 2019, between 160 ROYAL PALM, LLC, a Florida limited liability company (the "<u>Seller</u>") and LR U.S. HOTELS HOLDINGS LLC, a Delaware limited liability company (the "<u>Buyer</u>"), Section 6 of the Agreement is hereby amended as follows:

**6.      Purchase Price.**

6.1    The    cash    purchase    price    for    the    Assets    shall    be _____($_____) (the "<u>Purchase Price</u>"). For the avoidance of doubt, the Purchase Price includes the UST Fee of $250,000 payable upon the distribution of the sale proceeds and the Breakup Fee of $350,000 payable to RREF II Palm House, LLC. At the Closing, Buyer shall pay to Seller the Purchase Price (less the Deposit), and without any other setoff or prorations, except as contemplated in Section 12.1, by wire transfer of immediately available funds to such account(s) as Seller shall designate. This is an "All Cash" transaction that is not subject to any financing, other contingencies, or post contract due diligence.

6.2    In addition to the Purchase Price, Buyer shall assume the following obligations to be funded by Buyer at closing: (i) settlement fees in the amount of $250,000 to the Town of Palm Beach; (ii) any unpaid ad valorem property taxes for 2018 and 2019, as provided in Section 12.1; (iii) real estate brokerage commissions approved by the Court related to the sale up to the amount of $450,000; (iv) any recording and transfer fees owed to any governmental entity associated with the sale of the Property.

Except as specifically provided in this Exercise of First Right of Refusal, the Agreement remains in full force and effect.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year last below written.

**BUYER:**

**LR U.S. HOTELS HOLDINGS LLC**
a Delaware limited liability company


**By:**_____

          Robert Mautner, Vice President of European
          Management Services, Inc., Manager of LR
          U.S. Hotels Holdings, LLC

Date: _____

1

**<u>SELLER</u>:**

**160 ROYAL PALM, LLC,**
a Florida limited liability company

**By:** _____

Cary D. Glickstein, solely as Manager of
160 ROYAL PALM, LLC, a Florida limited
liability company, and not individually

Date: _____

2