

**ORDERED in the Southern District of Florida on February 3, 2020.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:                                                  **Case No. 18-19441-EPK**

**160 ROYAL PALM, LLC,**                    **Chapter 11**

    **Debtor.**

_____/

**ORDER GRANTING DEBTOR'S MOTIONS FOR**
**APPROVAL OF SETTLEMENTS WITH CERTAIN EB-5 CREDITORS**

This matter came before the Court upon motions filed by 160 Royal Palm, LLC (the "Debtor")

as follows: (a) *Debtor's Motion for Approval of Settlement with Certain EB-5 Creditors* [ECF No. 1050]; (b)

*Debtor's Motion for Approval of Settlement with Renato Fernando Botelho* [ECF No. 1073]; (c) *Debtor's Motion*

*for Approval of Settlement with Maria Titova and Henrique Faria Brandao* [ECF No. 1127]; and (d) *Debtor's*

*Motion for Approval of Settlement with Thirteen Other EB-5 Creditors* [ECF No. 1467] (collectively, the

"Settlement Motions").[1]    KK-PB Financial, LLC *(*"KK-PB") filed the only objections to the

Settlement Motions.  ECF Nos. 1364, 1493 (the "Objections").

---

[1] The Court held an evidentiary hearing on December 17, 2019 and December 20, 2019 to consider the settlement motions filed at ECF Nos. 1050, 1073 and 1127.  The Court held a non-evidentiary hearing on the settlement motion filed at ECF

The Debtor seeks approval of settlements with 59 individuals residing outside the United States (the "Settling Creditors") who allege they invested about $550,000.00 each toward re-development of the Debtor's hotel property. The terms of the proposed settlements are straightforward. Each Settling Creditor will have an allowed general unsecured claim, for all purposes in this case, equal to 80% of the face value of his or her claim as filed, not including certain treble damages claims. All pending objections to the claims will be overruled. Each Settling Creditor agrees to support confirmation of the Debtor's chapter 11 plan of liquidation so long as it is consistent with the settlement. ECF Nos. 1050, 1073, 1127, and 1467.

The Court has carefully reviewed the Settlement Motions, the Objections, the evidence admitted in connection with the Settlement Motions, and the arguments of counsel made at the hearings in these matters.

<u>Facts</u>

As of 2013, Glenn Straub owned and controlled the Debtor. Mr. Straub was the sole member of the Debtor and was also its manager. The Debtor owned a partially re-constructed hotel in Palm Beach, Florida, known locally as the Palm House Hotel. Mr. Straub negotiated a sale of the hotel property to an entity controlled by Robert Matthews. The original contract was structured as a sale of real estate. Under that contract, the purchase price would be paid partly in cash with the remainder to take the form of seller financing secured by a mortgage on the hotel property. The sale agreement was amended twice. The transaction closed on August 30, 2013. In the end, the transaction took the form of a sale of the equity in the Debtor. Palm House, LLC, an entity beneficially owned by and controlled by Robert Matthews, became the 100% equity owner of the Debtor. The cash portion of the purchase price, after adjustments, was later paid directly to Mr. Straub. The Debtor gave a note

No. 1467 on January 16, 2020. At that hearing, the parties stipulated that the Court may rule on the motion filed at ECF No. 1467 based on the evidence and arguments presented at the evidentiary hearing held on December 17, 2019 and December 20, 2019.

in favor of KK-PB, which is owned and controlled by Mr. Straub, and the note was secured by a mortgage on the hotel. The mortgage was not recorded until about seven months after the closing. As a result of this transaction, the Debtor entity obligated itself on a promissory note and gave a mortgage on its only asset, both in favor of KK-PB, but the Debtor itself received nothing at all. The Court found all of these facts in an order entered at ECF No. 603 (the "Estimation Order"), following a four-day evidentiary hearing during which KK-PB was a principal litigant. While the Estimation Order is now under appeal with the Eleventh Circuit Court of Appeals, it is not stayed.

From the closing of the equity transaction on August 30, 2013 through the filing of this case on August 2, 2018, Palm House, LLC was the sole equity owner of the Debtor. The corporate documents of Palm House, LLC indicate that its owners are Ryan Black (1%) and Gerry Matthews (99%). But there is competent and credible evidence that Ryan Black and Gerry Matthews were not ultimately in control of Palm House, LLC. Gerry Matthews is the brother of Robert Matthews. Robert Matthews was recently convicted of fraud in connection with the re-development of the Debtor's hotel property. Mr. Black has testified that Palm House, LLC was established for the benefit of Robert Matthews and that Robert Matthews controlled the Debtor and served as its *de facto* owner. Likewise, Marcie Bour, an expert offered by the Debtor, concluded that Gerry Matthews held his interest in the Debtor for the benefit of Robert Matthews. Indeed, this Court previously ruled that Mr. Straub sold his 100% membership interest in the Debtor to an entity beneficially owned by and controlled by Robert Matthews. Based on the evidence before this Court, Robert Matthews obtained control of the hotel, which was at the core of his scheme to defraud investors in the hotel project, by causing accomplices to acquire for his benefit 100% of the equity in the Debtor.

Prior to the filing of this case, Robert Matthews and others solicited investments in the hotel from foreign nationals seeking United States EB-5 visas. Mr. Matthews obtained investments of about $550,000 from each of seventy-nine (79) such investors (the "EB-5 Creditors"), including the fifty-

nine (59) Settling Creditors. Each EB-5 Creditor was told that he or she would receive an EB-5 visa and a return on their investment, or a refund of their investment, none of which occurred. The EB-5 Creditors received nothing in exchange for their investments.

For a decade prior to the filing of this case, the Debtor's hotel sat mostly dormant, to the great dismay of the Town of Palm Beach and the Debtor's many creditors. The Debtor and the hotel became the subject of a Florida state court receivership. The state court authorized the receiver to take full management control of the Debtor and to file this chapter 11 case.

The seventy-nine (79) EB-5 Creditors filed proofs of claim in this case. Among other things, they allege that a substantial portion of the funds they invested flowed through the Debtor or were used for the Debtor's benefit, and that some of those funds were paid to Mr. Straub in exchange for his equity interest in the Debtor.[2] A number of the EB-5 Creditors filed suit in the United States District Court for the Southern District of Florida against several parties involved in this alleged scheme, including the Debtor, Robert Matthews, and KK-PB.

The EB-5 Creditors represent the vast majority of the unsecured claims in this case. Their claims aggregate about $43.5 million at face value (not including certain treble damages claims). The Debtor scheduled all of the EB-5 Creditors' claims as not disputed, unliquidated, or contingent. Absent objection by a party in interest, all such claims would have been allowed in this case. KK-PB objected to the claims of all seventy-nine (79) EB-5 Creditors, asking the Court to disallow them in full, so they would receive no distribution at all in this case. ECF Nos. 1026-1045, 1048.

The Securities and Exchange Commission ("SEC") filed proof of claim 71-2 in this case, in the amount of $34,416,341.04. That claim represented the sum of $30,413,458 that the SEC traced

---

[2] At the evidentiary hearing that resulted in the Estimation Order, the Court admitted competent and credible evidence showing that investment funds from the EB-5 Creditors were received by or used for the benefit of the Debtor and that a portion of such funds were paid to Mr. Straub as part of the consideration for sale of his 100% equity interest in the Debtor. It is not clear whether Mr. Straub knew the EB-5 Creditors were the source of funds paid to him.

to the Debtor from investments made by the EB-5 Creditors, plus $4,002,883.04 in pre-judgment interest through the filing of this case. No party in interest objected to the claim, so it was allowed in the originally filed amount. However, after further review, the SEC determined that the Debtor received a smaller sum from investments of EB-5 Creditors, and the allowed claim was reduced to $27,671,214.35. ECF No. 1416.

After a thorough marketing process, the Court approved the sale of the hotel to LR U.S. Hotels Holdings, LLC for a purchase price of about $40 million. ECF No. 651. The EB-5 Creditors supported the sale process and the sale itself. KK-PB lodged the only objection to the sale. KK-PB appealed the order approving the sale of the hotel. Both the District Court and the Eleventh Circuit affirmed the sale order. ECF Nos. 737 and 1473. KK-PB sought panel rehearing by the Eleventh Circuit, which was denied. The Eleventh Circuit has yet to issue a mandate. While KK-PB's appeal from the sale order technically remains pending, it is extremely unlikely that the sale order will be overturned, particularly as it appears that the Debtor will soon confirm a chapter 11 plan of liquidation and the appeal from the sale order will become equitably moot.[3]

KK-PB is the only creditor objecting to the Settlement Motions. KK-PB's sole source of standing for its objections is a relatively small unsecured claim that it acquired during this case.

KK-PB presented three claims in this chapter 11 case. KK-PB filed a claim of approximately $40 million, allegedly secured by a mortgage on the hotel property, resulting from the equity transaction described above. The Court disallowed that claim in full in the Estimation Order. ECF No. 603. As noted above, while the appeal of the Estimation Order remains pending with the Eleventh Circuit, the order is not stayed and remains binding on the parties.[4] KK-PB has no standing to object to the Settlement Motions based on its disallowed mortgage claim.

---

[3] For a more complete discussion of this issue, see the Court's orders at ECF Nos. 668, 1495.
[4] It is unlikely the Estimation Order will be overturned on appeal. See order at ECF No. 1056.

KK-PB acquired a second claim of approximately $3.4 million, allegedly secured by a lien on the hotel property.  Claim No. 72-1; ECF No. 671.  No portion of that claim was presented as an unsecured claim.  This second claim is subject to objection by the Debtor, both in this Court and in litigation pending in a Florida state court, and so is not currently an allowed claim.  ECF No. 828, 956.[5]  Even if that claim is ultimately allowed as a secured claim as filed, under the Debtor's proposed plan it would be paid in full from the proceeds of the sale of the hotel.[6]  KK-PB has no standing to object to the Settlement Motions based on this smaller alleged secured claim as the outcome of the Settlement Motions would have no impact on payment of the claim.

KK-PB acquired a third claim of approximately $11,000.  ECF No. 974.  This third claim is a non-priority, unsecured claim that the Debtor scheduled as not disputed, unliquidated, or contingent. Thus, KK-PB holds only one currently allowed claim, an unsecured claim of about $11,000.  During the evidentiary hearing in this matter, KK-PB conceded that this unsecured claim is the sole basis for its standing to object to the Settlement Motions.  As the Court pointed out during the hearing, this claim is grossly outweighed by the apparent cost expended by KK-PB in defending it.

In April 2019, Robert Matthews entered a guilty plea, in the United States District Court for the District of Connecticut, to, among other crimes, conspiracy in violation of 18 U.S.C. § 1349.  In his plea, Mr. Matthews admitted to the following:

> . . . I knew that the EB-5 investors were providing funds that were to be used for the development of the Palm House Hotel, and I knew the investors were told that their funds would be used to develop the hotel in accordance with PPM and Marketing material that was provided to them.
>
> I arranged with others to use and divert portions of the EB-5 funds for my personal benefit beyond what I was entitled to in the PPM. This included using EB-5 funds to obtain real and personal property which was put under the control of myself and others rather than under the control of the hotel and its entities.

---

[5] In a recently filed bankruptcy of the original owner of this claim, it has been suggested that the sale of this claim to KK-PB is also subject to avoidance as a fraudulent transfer.
[6] For a more complete discussion of this issue, see the Court's order at ECF No. 1495.

I also arranged with others to obtain control of my former residence on Lower Church Hill Road in Washington Depot, Connecticut when it was being auctioned by the bank after foreclosure. I knew I could not obtain the property in my own name, so I worked with others so I would be able to regain control of the property and also hopefully make money from the bank sale of the property at a below market price. I knew the bank would not make the sale if it knew I was involved.

Exhibit 64 at 38.

When the court asked the prosecutor if he agreed with Robert Matthew's summary, he responded:

. . . So beginning with Count Ten, the conspiracy to commit bank and wire fraud, your Honor, as Mr. Matthews said, there are really sort of two facets of that which Mr. Matthews worked with others to perpetrate these crimes. And I will begin with the wire fraud, your Honor.

Mr. Matthews provided information that ultimately made their way to EB-5, or foreign, investors, about a project called the Palm House Hotel. And, to be clear, the government has these promotional materials and would rely upon them at trial.

These promotional materials contained material misrepresentations, your Honor. Those material misrepresentations include information about the amount of equity that Mr. Matthews had in the property. They include material misrepresentation as to individuals who are going to be involved and associated with the Palm House Hotel. They include misrepresentations about who would be on the advisory board. And they also included misrepresentations regarding the involvement of Mr. Matthews'[s] brother, Mr. Gerry Matthews, as well, insofar as he was held out as though he was somebody who was managing the property when, in fact, he was not.

In reliance on those misrepresentations, your Honor, we've had the opportunity to, and would expect to call, at least one of – one of these investors to come and testify at trial. Money was invested. And we're talking to the tune of about half a million dollars per foreign investor. Once the money was provided by the foreign investors, it was supposed to be used for development of the Palm House Hotel, but, as Mr. Matthews said, portions of that money were diverted for various different reasons, including personal expenditures and buying different properties.

That incudes, your Honor, a property at 115 Lower Church Hill Road, which bring us to sort of the second prong of the conspiracy count. And so regarding the property at 115 Lower Church Hill Road – again we have the documents that we would introduce at trial to support this – Mr. Matthews lost that house in foreclosure. The bank that foreclosed on it, JPMorgan, would be unwilling to sell that property back to Mr. Matthews, and so Mr. Matthews arranged with others to create a shell entity to buy that home at auction from the bank. Ant that was supposed to be for Mr. Matthews'[s] benefit.

> So there were misrepresentations that were made along the way, your Honor, by others acting in concert with Mr. Matthews, but Mr. Matthews orchestrated the arrangement. So that's Count Ten.

*Id.* at 39-41.

The Debtor's manager, Cary Glickstein, testified in support of the proposed settlements, stating that the proposed settlements are in the best interests of the estate and will eliminate hundreds of thousands of dollars of potential litigation costs that the Debtor would otherwise be required to expend to litigate claims that it reasonably believes are valid.

<u>Applicable Law and Analysis</u>

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure authorizes the Court to approve settlements in bankruptcy cases. *GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*, 336 B.R. 843, 852 (S.D. Fla. 2005). A trustee or debtor in possession may settle claims against the estate even if other parties in interest objected to those claims. *See In re DVR, LLC*, 582 B.R. 507, 522 (Bankr. D. Colo. 2018), *aff'd*, 606 B.R. 80 (D. Colo. 2019) (noting that a creditor's interest in objecting to a claim may not align with the estate's interests; "[t]hus, the trustee's settlement power allows him to protect the interests of the overall estate. To hold otherwise, would permit a creditor to hold the estate hostage to protracted litigation.").

The Court has broad discretion in reviewing a settlement. A proposed settlement will be approved unless it falls below the lowest point in the range of reasonableness. *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993). When considering a compromise, the Court must determine whether it is fair and equitable. *In re Air Safety Int'l, L.C.*, 336 B.R. at 852. The Court need not resolve the ultimate factual issues underlying the dispute. *United States v. Hartog*, 597 B.R. 673, 679 (S.D. Fla. 2019). Put another way, the Court need not determine whether any party to the settlement would meet or would fail to meet its burden of proof if the matter was litigated. Instead, the Court must make a pragmatic decision based on all equitable factors, including whether the estate fiduciary has

exercised reasonable business judgment in reaching the compromise.  *Apps v. Morrison (In re Superior Homes & Invs., LLC)*, 521 F. App'x 895, 899 (11th Cir. 2013); *Hartog*, 597 B.R. at 679.

      The Court considers the following factors when determining whether to approve a settlement: 1) the probability of success in the litigation; 2) the difficulties, if any, to be encountered in the matter of collection; 3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and 4) the paramount interest of the creditors and proper deference to their reasonable views in the premises.  *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990).

<u>Application of Justice Oaks Factors to Proposed Settlements</u>

      <u>The Probability of Success in the Litigation</u>

      The Court must consider the probability of success should the Settling Creditors' claims be litigated, but need not decide the ultimate merits of the claims.  *Id.*

      While the Settling Creditors presented a number of theories for relief in their claims filed in this case, in connection with the proposed settlements the Debtor and Settling Creditors focused on the claims based in conspiracy to commit fraud.[7]  The Debtor argued that the Settling Creditors likely would be able to prove that the Debtor participated in a conspiracy with Robert Matthews and others, aimed at defrauding the EB-5 Creditors (including the Settling Creditors), and that the Debtor likely would be held jointly and severally liable to the Settling Creditors along with the other co-conspirators.

      It is not disputed that Florida law governs the Settling Creditors' claims based in conspiracy to commit fraud.  To prove such a claim, one must show: 1) an agreement between two or more parties to do an unlawful act or to do a lawful act by unlawful means; 2) some overt act in pursuance of the conspiracy; and 3) damage to the claimant as a result of the acts committed under the conspiracy.

---

[7] In its Objections, KK-PB attempts to negate every theory of relief presented by the Settling Creditors in their proofs of claim.  It is not necessary for the Court to address most of those arguments as the Debtor and Settling Creditors based their presentations in these matters solely on the claims arising in conspiracy to commit fraud.

*Alhassid v. Bank of America, N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014). Florida does not recognize an independent cause of action for conspiracy, so a plaintiff must show an underlying illegal act or tort that the conspiracy is based upon. *Id.* Each co-conspirator does not need to take part in the planning, inception, or successful conclusion of a conspiracy; rather, a co-conspirator "need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his co-conspirators." *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987). Circumstantial evidence may be used to infer the existence of a conspiracy and an individual's participation in it. *Id.*

Based on the evidence admitted in these matters, the Settling Creditors have a significant likelihood of success in proving their claims against the Debtor. In the Court's view, rather than the 80% allowance agreed to in the proposed settlements, the Settling Creditors likely would prove the entirety of their filed claims, excluding certain treble damages claims. Robert Matthews, the ringleader of the fraudulent scheme, pled guilty to conspiracy to defraud these very claimants. In exchange for about $550,000 each, the Settling Creditors were promised EB-5 visas and a return on their investment, or a refund, but they got nothing at all. There is substantial evidence that the Debtor, the owner of the hotel that the Settling Creditors believed they were investing in, was used as an instrumentality of Robert Matthews and others in perpetrating this fraud. There is credible evidence that a substantial portion of the funds invested by the Settling Creditors were actually received by or used for the benefit of the Debtor, including as part of the cash payment to Mr. Straub for his equity interest in the Debtor.

KK-PB argues that the Court may not rely on its prior ruling that Robert Matthews was the *de facto* owner of and controlled the Debtor, on the ground that collateral estoppel would not apply. It appears likely that the Court's prior findings would in fact be binding against KK-PB in its objections to the claims of the Settling Creditors. But the Court need not analyze the issue in detail. The question now is not whether the Settling Creditors could rely on this Court's prior ruling, but

whether there is evidentiary support for the Settling Creditors' claims. Based on the evidence before the Court, the Court finds that there is substantial evidence to support the Settling Creditors' claims and that, given the chance to litigate those claims at an evidentiary hearing, the Settling Creditors more likely than not would prove their claims, probably in amounts greater than the proposed settlement.

KK-PB claims that the Debtor should not be allowed to settle claims to which the Debtor itself did not object. To the contrary, as the estate fiduciary, consistent with the Debtor's duty to resolve all claims in an effort to facilitate distributions to the estate's rightful beneficiaries, the Debtor has the power to compromise claims even if the only objections are brought by others. *See In re DVR, LLC*, 582 B.R. at 522.[8]

KK-PB argues that the Settling Creditors lack standing to present their claims directly against the Debtor. KK-PB asserts that, because the Settling Creditors were solicited for investments as limited partners of an entity called Palm House Hotel, LLLP, which entity KK-PB posits would be the creditor of the Debtor, the Settling Creditors should have presented a derivative claim against the Debtor on behalf of Palm House Hotel, LLLP. KK-PB was not able to point to evidence showing that any of the Settling Creditors actually obtained a documented limited partnership interest in Palm House Hotel, LLLP. But even if they had, KK-PB's argument would make a component of the fraudulent scheme itself—the offering of value-less limited partnership interests to lure foreign investors—a shield against liability. Equity does not support elevating form over substance in this manner.

---

[8] At a hearing in these matters, KK-PB suggested that the Debtor's proposed settlements with the Settling Creditors constitute a breach of its fiduciary duty. That the Debtor and the EB-5 Creditors have worked together in this bankruptcy case, and that the proposed settlements resulted from a single offer and acceptance between the parties, does not mean the Debtor breached its duty to creditors. From the start of this case, the Debtor has made it clear that it believes, after appropriate diligence, that the EB-5 Creditors comprise its primary creditor body. Contrary to KK-PB's suggestion, it is eminently consistent with the Debtor's fiduciary duty for the Debtor to attempt to facilitate the efficient distribution of the estate to the parties the Debtor reasonably believes are the rightful beneficiaries of this case.

KK-PB argues that the Settling Creditors failed to allege that the Debtor itself committed fraud or any other independent tort, and so state no claim against the Debtor. Under Florida law, it is not necessary for each conspirator to be involved in every component of the wrong. Nor is it necessary to show that a formal, authorized agent of the Debtor was directly involved in the fraudulent activity. Here, the Settling Creditors brought a fraud claim against Robert Matthews and others. Robert Matthews pled guilty to conspiracy to defraud the EB-5 Creditors, including the Settling Creditors. There is substantial evidence that Mr. Matthews, as the true beneficial owner of the Debtor, used the Debtor as part of the fraudulent scheme that brought harm to the Settling Creditors. Mr. Matthews caused the Debtor to obtain actual value as part of that scheme, in the form of millions of dollars paid to or used for the benefit of the Debtor. Viewing the available evidence as a whole, it is very likely that the Settling Creditors would be able to hold the Debtor liable for the entirety of their claims, not just the 80% proposed in these settlements.

KK-PB argues that the Debtor could not have been a co-conspirator in the fraudulent scheme because the Debtor has elsewhere claimed to be a victim of Robert Matthews's actions. But KK-PB misconstrues the Debtor's claims against parties who received funds from the Debtor. Such claims do not depend on allegations that the Debtor itself was defrauded by Mr. Matthews. Rather than claiming to be a victim of Mr. Matthews, the Debtor relies on traditional bankruptcy avoidance theories in an effort to obtain return of funds it once possessed, in order to make distributions to its valid creditors, including the Settling Creditors.

The potential success of a claimant is accorded significant weight in determining the reasonableness of a settlement of the claim. That the Settling Creditors have a strong likelihood of success on their claims in this case militates heavily in favor of approving the settlements.

<u>The Difficulties, if Any, to be Encountered in the Matter of Collection</u>

Because this matter involves settlement of objections to claims, there is no potential difficulty in collection by the estate.  This factor is not applicable.

<u>The Complexity of Litigation, Expense, Inconvenience, and Delay</u>

If the proposed settlements are not approved, the Debtor will incur many thousands of dollars in legal fees and costs, payable as administrative expenses ahead of unsecured creditors, and the bankruptcy estate will suffer an extensive delay, further pushing off distributions to the Debtor's rightful creditors who have been waiting without recovery for years.

KK-PB argues that it filed the objections to the Settling Creditors' claims and so KK-PB would bear the laboring oar in litigating the objections, thus relieving the Debtor of the need to act.  But this ignores the fact that the Debtor, and its estate, are the subject of the claims.  The Debtor would necessarily be involved in all aspects of the litigation, from discovery through evidentiary presentation and post-trial activity.  The Debtor appropriately points out that failure to approve the proposed settlements would force the Debtor to expend time and funds litigating claims that the Debtor reasonably believes are valid.  That there are 20 similarly situated EB-5 Creditors whose claims remain subject to objection by KK-PB does not change this analysis.  It is likely that those claims will also be settled on similar terms.  Even if the Court eventually holds evidentiary hearings on those claims, there will be 59 fewer claims to consider.

The potential for unnecessary administrative expenses, and the likelihood of significant delay in distributions to creditors, supports approving the proposed settlements.

<u>The Paramount Interest of Creditors and Proper Deference to Their Reasonable Views</u>

It is obvious that a 20% reduction in the amount of the Settling Creditors' claims, claims that likely would be allowed at 100%, is a benefit to the estate.  With only one exception, all of the Debtor's creditors who are active in this case, meaning the vast majority of the Debtor's creditors, explicitly

support approval of the proposed settlements. KK-PB is the only creditor who objected to the Settlement Motions.

The Eleventh Circuit directs the Court to consider the "reasonable" views of creditors regarding a proposed compromise. KK-PB's motivations in objecting to the EB-5 Creditors' claims and in pursuing the Objections here are revealing. KK-PB's only standing in these matters arises from its $11,000 allowed unsecured claim. That claim is overwhelmingly eclipsed by KK-PB's expense in pursuing defeat of the EB-5 Creditors' claims. It appears likely that one of KK-PB's goals is to delay administration of this case in hopes of obtaining a favorable outcome on its appeals from the sale order and the Estimation Order. In this regard, KK-PB's Objections appear to be a substitute for stays pending appeal that it failed to obtain.

The support of the vast majority of the Debtor's creditors, in contrast to the sole objection of the holder of a small unsecured claim whose motivations are questionable, greatly favors approval of these settlements.

The SEC Claim is Not Duplicative of the Settling Creditors' Claims

KK-PB argues that the Debtor failed to take into account the SEC's allowed unsecured claim based in disgorgement, which KK-PB contends is duplicative of the EB-5 Creditors' claims and thus is partly duplicative of the Settling Creditors' claims. KK-PB's argument assumes that funds distributed to the SEC on account of its allowed unsecured claim will be distributed to the EB-5 Creditors, thus making the SEC a conduit for recovery by the EB-5 Creditors. KK-PB also assumes that if the Settling Creditors' claims are allowed at 80% of their face amount, as proposed in the settlements, and the Settling Creditors are also entitled to their *pro rata* share of funds distributed to the SEC, then the Settling Creditors may receive an amount greater than the full amount of their claims. Both assumptions are incorrect.

The SEC's allowed unsecured claim in this case is not duplicative of the EB-5 Creditors' filed claims. It is a completely independent claim. See *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). Although it is possible that the SEC will ask the district court to permit some or all funds distributed to the SEC from this case to be paid to EB-5 Creditors, the SEC has not made any such request, the SEC is not required to make that request, and the district court has discretion whether to grant any such request. *Id.* at 1644. It is possible that funds distributed to the SEC on account of its unsecured claim in this case will remain with the United States Treasury. *Id.* The fact that the SEC pursued the Debtor as a relief defendant, rather than a primary fraudster, has no impact on this analysis. *In re Wyly*, 526 B.R. 194, 200-01 (Bankr. N.D. Tex. 2015).

Of course, if any of the EB-5 Creditors receive distributions from the SEC, and those distributions, when combined with distributions from the Debtor's bankruptcy estate on account of the EB-5 Creditors' own claims, would result in any such creditor receiving more than payment in full, further distributions would be curtailed and past distributions might be subject to disgorgement. But this is no different from when a creditor has a right to payment from the debtor and also from a co-obligor, such as a guarantor of the debtor's obligations. The creditor is entitled to full allowance of its claim in the bankruptcy case, even if it could recover elsewhere, but cannot receive distributions that would make it more than whole.

<u>The Proposed Settlements Were Entered Into in Good Faith, Without Fraud or Collusion</u>

KK-PB argues that the proposed settlements did not result from arms-length, good faith negotiations between the Debtor and the Settling Creditors. To support this contention, KK-PB points to two things: the Debtor has consistently supported the claims of the EB-5 Creditors, including the Settling Creditors, and they have often worked in collaboration during this case; and the settlements resulted from a single offer and acceptance rather than a series of counter-offers. These

facts, alone or in combination, are not sufficient to cause the Court to question the good faith of the Debtor and Settling Creditors.

There is ample evidence, including testimony of Mr. Glickstein, supporting the Debtor's reasonable determination that the EB-5 Creditors have valid claims against this estate. In proposing these settlements, the Debtor acts consistent with its fiduciary duty, attempting to obtain the best recovery for those creditors that the Debtor believes are the primary beneficiaries of this case.[9] In this light, it is not surprising that the Debtor has worked closely with the EB-5 Creditors during this case. Likewise, based on the evidence before the Court, there is nothing unseemly about the fact that the proposed settlements resulted from a single offer that was accepted. Under the circumstances of this case, the proposal was reasonable on its face and was responded to as such. KK-PB offered no evidence that would cause the Court to conclude that the proposed settlements were reached as a result of anything other than a good faith attempt to resolve the subject claims and avoid unnecessary expense and delay.

<u>Order</u>

For the foregoing reasons, the Court ORDERS and ADJUDGES that the Settlement Motions [ECF Nos. 1050, 1073, 1127, and 1467] are GRANTED in full.

### 

Copies to:

Eric Pendergraft, Esq.

*Eric Pendergraft, Esq. shall serve a copy of this order on all appropriate parties and file a certificate of service with the Court.*

---

[9] The Debtor's management is unique among debtors-in-possession who typically appear before this Court. Rather than being managed by individuals who were involved in the creation and historic operation of the entity, as is typical, this Debtor is managed by an independent fiduciary, originally appointed by a Florida state court, with no prior involvement in the Debtor or its property. In other words, the Debtor's manager appears more likely than usual to base his business decisions on objective criteria.