

**ORDERED in the Southern District of Florida on February 13, 2020.**



**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:                                                    CASE NO. 18-19441-EPK

**160 ROYAL PALM, LLC,**                        CHAPTER 11

    Debtor.
_____/

### <u>ORDER DENYING EMERGENCY MOTION TO STAY CONFIRMATION ORDER</u>

In *KK-PB Financial, LLC's Emergency Motion to Stay Confirmation Order Pending Appeal* [ECF No. 1588, the "Motion"], KK-PB Financial, LLC ("KK-PB") seeks a stay pending appeal of this Court's order confirming a liquidating chapter 11 plan in this case.

### BACKGROUND

The Court incorporates in full the following orders:

(1) *Order Estimating the Claim of KK-PB Financial, LLC and Denying Ability to Credit Bid*, entered February 26, 2019 [ECF No. 603, the "Estimation Order"];

(2) *Order Denying Motion to Stay Estimation Order Pending Appeal*, entered August 20, 2019 [ECF No. 1056];

(3) *Order Granting Motion to Reset Plan Confirmation Hearing and Hearing on Fee Applications Without Requiring Resolicitation*, entered January 15, 2020 [ECF No. 1495]; and

(4) *Order Confirming Debtor's Third Amended Plan of Liquidation and Establishing Deadline to File Claims for Rejection Damages,* entered February 11, 2020 [ECF No. 1564, the "Confirmation Order"].

KK-PB seeks a stay pending appeal of the Confirmation Order. As KK-PB may seek the same relief from the District Court and from the Eleventh Circuit Court of Appeals, for ease of reference the Court attaches copies of each of the foregoing orders as Exhibits 1 through 4.

In the Estimation Order, the first order listed above, the Court estimated KK-PB's alleged $39.6 million mortgage claim, pursuant to 11 U.S.C. § 502(c), as an unsecured claim at $0 for all purposes in this case. The effect of that ruling is that KK-PB's mortgage claim was disallowed and is not entitled to any distribution in this case.

Nearly a year ago, KK-PB appealed the Estimation Order but did not seek to expedite that appeal (as it did with other appeals). There has been no substantive ruling on the appeal. In the second order listed above, this Court denied KK-PB's motion for stay pending appeal of the Estimation Order because, among other things, the appeal has only a negligible chance of success. ECF No. 1056. In its recent emergency motion asking the Eleventh Circuit to stay the Estimation Order, KK-PB argued (correctly) that confirmation of the debtor's third amended plan would cause the appeal from the Estimation Order to become moot. Shortly before the confirmation hearing, the Eleventh Circuit denied that motion to stay the Estimation Order, on the merits, in a terse order stating only that KK-PB failed to satisfy the required standard. ECF No. 1549. A few days later, the District Court denied a similar motion in a brief, paperless order, in which the District Court drew attention to KK-PB's unsuccessful filing of multiple appeals in this case. ECF No. 1567.

Importantly, the Estimation Order is a final order of this Court, not stayed, enforceable in all regards.  The debtor's third amended plan, and the Confirmation Order, rely on that fact.

KK-PB, alone, opposed the debtor moving forward on confirmation of its third amended plan.  Every other active creditor supported proceeding to confirmation.  In the third order listed above, among other things, the Court overruled KK-PB's objections to the Court setting the plan for confirmation.  ECF No. 1495.

On February 10, 2020, the Court held an evidentiary hearing on confirmation of the debtor's third amended plan.  Creditors voted overwhelmingly in favor of the plan.  KK-PB filed the only rejecting ballot.  Every creditor active in the case, other than KK-PB, affirmatively supported confirmation.  The Court overruled KK-PB's objections, made a detailed ruling on the record, and entered the Confirmation Order, the fourth order listed above.

In each of the orders incorporated above, the Court relied on well established law applied to evidence that overwhelming favored the debtor.  None of these rulings required application of a new or novel theory of law.  In other words, in light of the evidence and circumstances of this case, these rulings were essentially inevitable.

The disallowance of KK-PB's mortgage claim relies on legal theories that apply only in a bankruptcy case.  If this case failed and was dismissed, KK-PB likely could foreclosure its mortgage in a Florida state court, leaving the debtor's actual creditors with nothing.

Since disallowance of its mortgage claim a year ago, KK-PB has done everything in its power to scuttle this case.  It purposefully interfered with the sale process in a blatant attempt to scare away significant bids from qualified parties, disingenuously arguing that it was attempting to improve on a nearly year long, professional marketing process.  Once the Court approved a winning contract, at a price substantially better than the original stalking

horse bid, KK-PB appealed the sale order and did everything it could to cause the purchaser to back out of the deal. It is extremely unusual for this Court to approve a sale in a case such as this and the sale not close immediately. KK-PB's take-no-prisoners litigation tactics are the sole reason it has taken an extra year to confirm a plan, permitting the debtor to finally make distributions to holders of allowed claims.

In the meantime, KK-PB opposed nearly every request for relief by the debtor, including routine administrative matters such as retention of special counsel to oppose KK-PB's appeals (it filed 6 prior notices of appeal). KK-PB's extreme litigiousness has cost the bankruptcy estate millions of dollars in administrative expenses. These costs directly reduced distributions to unsecured creditors, including the 79 individuals defrauded in connection with re-construction of the debtor's hotel property. KK-PB often claimed that it acted in the interest of creditors generally, but all of the other active creditors in this case, meaning the vast majority of the debtor's creditors, consistently supported the debtor and opposed KK-PB. In many instances, KK-PB's sole basis for standing to be heard on matters before this Court was an $11,000 unsecured claim it purchased during this case. It used that small unsecured claim as a sword, slashing at the recovery of unsecured creditors.

At the close of the confirmation hearing, counsel for KK-PB informed the Court that KK-PB intended to appeal the Confirmation Order, when entered, and asked the Court to waive the necessity that KK-PB first seek a stay pending appeal from this Court prior to seeking a stay pending appeal from the District Court. Referencing Fed. R. Bankr. P. 8007, and noting that it is sometimes useful to the District Court to have the benefit of a ruling from this Court, the Court denied that request.

## APPLICABLE LAW

In this matter, Fed. R. Bankr. P. 8007 governs the potential issuance of a stay pending appeal. Unlike Fed. R. Bankr. P. 7062, Rule 8007 does not provide for the granting of a stay

as of right upon the filing of a sufficient bond. Collier on Bankruptcy ¶ 8007.06 (Richard Levin & Henry J. Sommer eds., 16th ed.). The determination of whether to grant a stay pending appeal is left to the discretion of the Court. If a stay pending appeal is warranted, the Court may condition the stay on the posting of "a bond or other security." Fed. R. Bankr. P. 8007(a)(1)(B). The bond or security is intended to protect the opposing party or parties, which may include the bankruptcy estate generally, against loss that may be sustained as a result of a failed appeal. Because there is no stay pending appeal as of right under Rule 8007, the Court must first determine whether a stay is warranted and, if so, determine whether a bond or other security will be required as a condition of the stay.

Ordinarily, the appellant must first seek a stay from this Court and, if unsatisfied, may seek relief from the District Court in which its appeal is lodged. Fed. R. Bankr. P. 8007. "Failure to first seek a stay or other relief in the bankruptcy court will ordinarily deprive the district court or appellate panel (or the court of appeals in the case of a direct appeal) of jurisdiction over a motion seeking a stay." Collier on Bankruptcy ¶ 8007.05 (citations omitted); *Rodriguez v. ALS Commer. Funding, LLC*, No. 19-20452, 2019 U.S. Dist. LEXIS 29651 (S.D. Fla. Feb. 21, 2019); *In re Rivera*, No. 15-04402, 2015 U.S. Dist. LEXIS 151860 (N.D. Cal. Nov. 9, 2015).

"A stay pending appeal is an 'extraordinary remedy' and the party seeking it must show: '(1) a substantial likelihood that they will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury to the[m] unless the [stay] is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest.'" *Woide v. Fannie Mae (In re Woide)*, 730 F. App'x 731, 737 (11th Cir. 2018) (quoting *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000) and citing *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015)).

## LIKELIHOOD OF SUCCESS ON APPEAL

KK-PB has essentially no likelihood of success on its appeal from the Confirmation Order. The evidence offered in support of confirmation was admitted without objection and overwhelmingly supported confirmation. The Court made a detailed ruling on the record, which is set out in its entirety in Exhibit A to the Confirmation Order (and which incorporates, among other things, the Court's prior order at ECF No. 1495). There is nothing remarkable about the Court's application of the law to the evidence in the Confirmation Order.

KK-PB's arguments in the Motion are legal sophistry. Here, as in connection with the disallowance of its mortgage claim and its challenge to the sale, KK-PB presents a cloud of issues apparently intended to distract an appeals court that may have less experience with insolvency matters. The District Court and Eleventh Circuit have not been misled and are unlikely to be misled now.

KK-PB argues that its smaller secured claim treated in class 1 of the debtor's third amended plan should have been deemed impaired, entitling KK-PB to vote on the plan. The confirmed plan provides that KK-PB's lien securing this smaller claim attaches to the cash proceeds from the sale and the claim, if allowed, will be paid in full. In spite of KK-PB's long-winded argument, as its counsel well knows, payment in full is not impairment. Even in the amazingly unlikely event that KK-PB files a petition for writ of certiorari to the Supreme Court, the Supreme Court takes the case, the Supreme Court overturns the sale order, and the Supreme Court orders the sale undone contrary to the explicit prohibition in 11 U.S.C. § 363(m), the Confirmation Order properly relies on the un-stayed sale order, is independently enforceable, has the effect of a contract binding on all creditors, and KK-PB is entitled to payment in full of its smaller secured claim if it is in fact allowed.

But the impairment argument is a red herring. As the Court ruled, even if the Court assumes that KK-PB's claim in class 1 is impaired and that it, and every other member of class 1, voted to reject the third amended plan, payment in full also satisfies the requirements of section 1129(b) and the plan is confirmable. KK-PB suggests that it was somehow prevented from raising this argument in opposition to the plan, yet it did in fact make the argument and the Court overruled the objection. ECF No. 1495 (incorporated in the Confirmation Order).

KK-PB argues that if the sale of the debtor's hotel is somehow undone and the hotel returned to the debtor, leaving the purchaser unable to obtain return of the purchase price because the funds are distributed to creditors under the plan, that the undisputed good faith purchaser should be left with no remedy because it "expressly did not bargain for such right" in the purchase agreement. The absurdity of this argument is apparent simply from its restatement. The third amended plan's provision of a lien to protect the purchaser in this unbelievably remote circumstance is eminently reasonable.

KK-PB continues to argue that the third amended plan must provide treatment for the mortgage claim this Court disallowed in the Estimation Order. This Court, the District Court, and the Eleventh Circuit (specifically in contemplation of the confirmation hearing) all denied motions for stay of the Estimation Order. The debtor is not required to structure its plan to help KK-PB avoid mootness of its appeal from the Estimation Order. As the Court has repeatedly ruled, this would stand on its head black letter law regarding the enforceability of final orders, the need to obtain a stay pending appeal, and mootness.

In the Confirmation Order, the Court also granted the debtor's motion to waive the 14-day stay provided under Fed. R. Bankr. P. 3020(e), permitting the Confirmation Order to become effective immediately. KK-PB argues that this eliminates its ability to prosecute the appeal from the Estimation Order because, if the plan is substantially consummated, that

appeal will be rendered moot. Contrary to its suggestion, the Court did not credit KK-PB's arguments on this issue during the confirmation hearing; KK-PB should not give undue weight to statements made by the Court when challenging the parties during oral argument. After presentation on this issue, the Court took an hour-long recess, during which the Court carefully considered this and other concerns. The Court's ruling was necessitated by KK-PB's own inequitable actions, including repeated attempts to stymie the debtor's efforts, consistent with its fiduciary duty, to sell the hotel for the benefit of its true creditors, coupled with KK-PB's recent activity in state court apparently aimed at permitting KK-PB to improperly interfere with consummation of the plan. The Court's waiver of the stay under Rule 3020(e), which was based on consideration of all of the circumstances of this case, is an exercise of discretion not likely to be overturned on appeal.

### IRREPARABLE INJURY

If the Confirmation Order is not stayed, KK-PB will be injured because the debtor will soon consummate the plan and the appeal from the Estimation Order will be moot. But the Court gives little weight to this potential injury. As both the District Court and the Eleventh Circuit recognized, the appeal from the Estimation Order itself lacks substantial merit.

### HARM TO OTHER PERSONS

Any potential harm to KK-PB is greatly outweighed by the harm to creditors with allowed claims, the actual beneficiaries of this case, who supported entry of the Confirmation Order and who would suffer continued delay and additional administrative expenses, reducing their eventual recovery.

### HARM TO THE PUBLIC INTEREST

KK-PB is disappointed that, nearly a year ago, this Court entered the Estimation Order disallowing its mortgage claim. This Court, the District Court, and the Eleventh Circuit all denied motions to stay that order pending appeal. It is contrary to the public

interest to permit a litigious appellant, intent on scuttling this bankruptcy case apparently at any cost, to prevent consummation of an obviously confirmable liquidating plan that provides a significant distribution to actual creditors, so that it may pursue a doomed appeal.

**ORDER**

For the foregoing reasons, it is ORDERED AND ADJUDGED that *KK-PB Financial, LLC's Emergency Motion to Stay Confirmation Order Pending Appeal* [ECF No. 1588] is DENIED.  The Clerk is directed to transmit a copy of this order to the District Court in connection with the previously docketed appeal from the Confirmation Order.

**###**

Copy to:
John K. Cunningham, Esq.

*John K. Cunningham, Esq. is directed to serve a copy of this order on all appropriate parties and file a certificate of service.*

# EXHIBIT 1



**ORDERED in the Southern District of Florida on February 25, 2019.**

Erik P. Kimball, Judge
United States Bankruptcy Court

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

In re:                                                    CASE NO. 18-19441-EPK

**160 ROYAL PALM, LLC,**                                 CHAPTER 11

      Debtor.

_____/

### ORDER ESTIMATING THE CLAIM OF KK-PB FINANCIAL, LLC
### AND DENYING ABILITY TO CREDIT BID

      This matter came before the Court for evidentiary hearing on January 8, 2019, January 11, 2019, February 15, 2019, and February 19, 2019 upon the *Debtor's Motion to Limit Credit Bids with Respect to Sale of Substantially All of Its Assets* [ECF No. 103] filed by 160 Royal Palm, LLC (the "Debtor"); *Secured Creditor KK-PB Financial, LLC's Motion to Estimate Claim for Purposes of Credit Bidding Pursuant to 11 U.S.C. §§ 502(c) and 363(k)* [ECF No. 133] filed by KK-PB Financial, LLC ("KK-PB"); and *Secured Creditor KK-PB Financial, LLC's Motion to (I) Modify and Terminate Automatic Stay; or (II) Dismiss Chapter 11 Proceeding* [ECF No. 69] filed by KK-PB.  On February 22, 2019, the Court heard closing arguments

from the Debtor, the EB-5 Investors,[1] and KK-PB, and made findings of fact and conclusions of law

on the record as follows:

> The Debtor in this case, 160 Royal Palm, LLC, is the owner of a hotel construction project located in the Town of Palm Beach. The hotel is locally known as the Palm House Hotel.

> The Palm House Hotel has a tortured history. During its reconstruction, ownership of the hotel property has transferred more than once. No owner has been able to complete the project. It sits dormant and neglected.

> It is alleged that the person most recently in control of the Debtor, Robert Matthews, along with others, used the hotel project to solicit investments from foreign nationals under the EB-5 program, enticing investments of more than $500,000 each from dozens of foreign investors based on the promise of eased acquisition of green cards. Those EB-5 Investors, many of whom have filed proofs of claim in this case and have been represented in this particular matter, allege that a substantial portion of the funds they invested ended up flowing through the Debtor and that some of those funds were used as part of the consideration for a 2013 sale of the equity interest in the Debtor. The EB-5 Investors have initiated a suit in the District Court here in West Palm Beach against a number of parties involved in this alleged scheme, including the Debtor in this case and KK-PB Financial, LLC. KK-PB Financial is solely owned and controlled by Glenn Straub, the former equity owner of the Debtor. I mention these parties in particular as they are the focus of the matters now before the Court.

> KK-PB Financial claims a mortgage on the hotel property. KK-PB initiated a foreclosure action in the Florida state courts several years ago. That action was followed by the appointment of a receiver. Eventually, the state court not only authorized the receiver to file a bankruptcy petition, but also authorized that receiver to supplant the Debtor's management. Thus, the Debtor in this case is managed by the former state court receiver, Mr. Cary Glickstein.

> The stated purpose of this bankruptcy case is to facilitate a controlled liquidation of the Debtor's assets. The Debtor filed this case to avoid the loss of all potential equity in its property to the foreclosing creditor. The goal of this case is to preserve that value for the Debtor's other creditors including, in particular, the EB-5 Investors.

> The Debtor sought offers for the hotel property. The Debtor entered into a stalking horse contract with a significant player in the real estate market. The Debtor then filed appropriate motions for approval of an auction procedure, thereby permitting the possibility of higher and better offers for the property. The stalking horse contract presents a tight timeline for the Debtor, requiring that the auction and sale hearing be accomplished in short order. Thus, the matters now before the Court require resolution as quickly as reasonably possible.

---

[1] The EB-5 Investors referred to in this order are the creditors who filed claims 3-1 through 65-1 in this chapter 11 case. Another group of EB-5 claimants, identified in ECF No. 172 as the Other Palm House Investors, filed an objection to KK-PB's motion to estimate claim but did not participate in the evidentiary hearings or closing argument in these matters.

KK-PB Financial claims a mortgage on the property.  Generally speaking, the holder of a lien securing an allowed claim has the right to credit bid its claim in connection with any sale of its collateral proposed under section 363 of the Bankruptcy Code.  KK-PB seeks to exercise that right in connection with the Debtor's proposed auction sale of the hotel property.  The Debtor opposes KK-PB's request to credit bid in connection with any sale.

In furtherance of its request to credit bid in connection with the proposed auction of the hotel property, KK-PB filed a motion to estimate its claim under section 502(c).  That is in the record at ECF number 133.  There are responses at ECF numbers 166, 169 and 174.[2]

Section 502(c) permits the Court to estimate any claim for purposes of allowance where the liquidation of the claim would unduly delay the administration of the case.  The concept behind this provision is that in many circumstances during a bankruptcy case there is not sufficient time to permit extensive discovery and an extended evidentiary hearing to determine a disputed claim.  This case presents exactly such a circumstance.  This Debtor has a limited time to maintain its rights under a significant stalking horse contract for the sale of substantially all of the assets of the estate.  The issues raised in connection with KK-PB's secured claim in this case could require discovery done over a period of months and an extended trial.  It is appropriate to use the claim estimation process under section 502(c) to address allowance or disallowance of KK-PB's claim.  Not only is it important to determine whether KK-PB will be permitted to credit bid on the hotel property, but whether KK-PB has a valid lien may impact its right to object to the proposed sale under section 363.

Estimation under section 502(c) can be for any purpose in connection with a bankruptcy case.  Indeed, the text of that provision states that estimation is for purposes of allowance.  In many instances, the estimated claim is the claim for all purposes including eventual distribution in the case.  In its motion, KK-PB asks the Court to estimate its secured claim solely for purposes of the auction sale of the hotel property.  In its response, the Debtor asks not only that the Court estimate KK-PB's claim for purposes of participating in the auction, but that the Court estimate KK-PB's claim at $0 generally, for all purposes in this case.

It is useful to quote from Collier on Bankruptcy on this issue.  Collier is the leading treatise on bankruptcy law.

"Section 502(c) expressly states that estimation is 'for purpose of allowance under this section'; thus, an estimation under section 502(c) generally should result in an allowed claim for all purposes in the bankruptcy case.  Most subsections of section 502 refer to claims allowed under subsection (a), (b) or (c).  Moreover, the section addressing reconsideration of claims, section 502(j), does not use the term 'estimated claim' but refers instead to a 'claim that has been allowed or disallowed.'  Indeed, nowhere in the Bankruptcy Code is a distinction drawn between claims allowed under subsection 502(a), (b) or (c).  Accordingly, a claim allowed under section 502(c) is on equal footing with other claims allowed under section 502."

Later in the same part of the treatise, it is stated that "[a]s an order applying section 502(c) allows or disallows a claim for all purposes in the case, principles of finality might apply, in

---

[2] In addition, the Court considered the response filed by the Debtor at ECF No. 163.

appropriate circumstances, for the same reasons those principles apply to other orders allowing or disallowing claims under section 502."

In reading these two quotations from Collier I have left out internal quotations and citations. I should note that in a footnote Collier points out that 28 USC section 157(b)(2)(B) and Bankruptcy Rule 3018 both contemplate estimation of claims solely for purposes of confirmation of a chapter 11 plan, but that these are the only instances where estimation for a limited purpose is contemplated in the relevant statutes and rules.

Thus, the Court's estimation of the claim of KK-PB Financial today will result in estimation of that claim for all purposes in this bankruptcy case. That will include plan confirmation and distributions.

The case law in this circuit and elsewhere provides this Court with wide discretion in how to approach estimation from a procedural standpoint. This Court's procedural approach to estimation is subject to appeal on an abuse of discretion standard. Many times an estimation proceeding will focus on documentary evidence, deposition transcripts, and affidavits, and the Court will provide only a truncated hearing. In this case, after consultation with the parties, the Court set four full days of evidentiary presentation followed by an additional half day for closing argument. This has been a particularly fulsome presentation in the context of claim estimation. There were hundreds of proposed exhibits and a number of fact and expert witnesses. It is hard to imagine how an evidentiary hearing on an objection to KK-PB's claim, outside the estimation process, would have been more detailed.

In addition to responding to KK-PB's motion to estimate, the Debtor filed a motion seeking a ruling from the Court that KK-PB should not be permitted to credit bid in connection with the auction of the hotel property. That is on file at ECF number 103. KK-PB responded at ECF number 164. The Debtor's motion is in effect the mirror image of KK-PB's motion to estimate. The Debtor argues that KK-PB's claim is subject to dispute for a variety reasons and also that, even if KK-PB's claim would be allowed as a secured claim, the Court should prohibit KK-PB from credit bidding for cause.

Finally, KK-PB filed a motion for relief from the automatic stay, seeking to continue with its foreclosure action in state court or, in the alternative, for dismissal of this case. That motion can be found at ECF number 69. The Debtor responded at ECF number 102.

All three of these matters, KK-PB's motion to estimate, the Debtor's motion to limit credit bidding, and KK-PB's motion for relief from stay or dismissal, were heard together in a concurrent evidentiary hearing. The Court has considered the evidence admitted during the evidentiary hearing. The Court has considered the arguments of the parties.

Let me begin with KK-PB's motion for relief from stay or for dismissal of the case. KK-PB's goal is to return to state court to complete its foreclosure action. At the evidentiary hearing, KK-PB presented nearly no evidence to support the substantive allegations in this motion nor did counsel point to any such evidence in closing argument. But even if KK-PB's secured claim is allowed in full, there is not cause for relief from stay at this time. The Debtor filed this case in an attempt to realize value for all of its creditors, not just for KK-PB. The Debtor has diligently pursued that sale, entering into a contract with a stalking horse purchaser. This

is an appropriate use of chapter 11. The Court has approved a procedure for the proposed sale consistent with regular practice in this circuit. There is a very short timeline for that sale. The Debtor and other creditors should have the chance to see if the proposed auction will result in a potential distribution to creditors in this case. There is little or no harm to KK-PB under the circumstances, even if it does indeed have an allowed secured claim in this case. The potential harm to other creditors is significant. KK-PB's motion for relief from stay or for dismissal at ECF number 69 will be denied.

I will address the motion to estimate and the motion to limit credit bidding in tandem as the issues relevant to those motions are the same. It is useful first to describe the transaction that lies at the center of the present dispute.

As of 2013, 160 Royal Palm, LLC, the Debtor in this case, was owned and controlled by Glenn Straub. Mr. Straub was the sole member of 160 Royal Palm and was also its manager. Mr. Straub negotiated a sale of the hotel property to Robert Matthews. The proposed sale was documented by a traditional purchase and sale agreement. The Debtor was to sell its real property to an entity formed for the purpose of the transaction. The buyer was to be beneficially owned solely by Mr. Matthews. The negotiated purchase price was $36 million. Of this sum, 25% was to be paid in cash and the remaining amount was to take the form of seller financing secured by a mortgage on the hotel property. In other words, Mr. Straub agreed to sell the hotel property and the consideration was to be partly cash and partly a mortgage obligation.

The 2013 purchase and sale agreement was amended twice. The first amendment is most important for purposes of these matters. In the first amendment, the parties agreed that the purchaser could have the option of acquiring the membership interest in 160 Royal Palm, LLC rather than purchase the real property directly. In the end, the purchaser exercised this option. Thus, rather than a real estate transaction, the transaction took the form of the sale of an equity interest. But the parties preserved all of the other aspects of the transaction as originally contemplated. In order to facilitate the seller financing, it was necessary for Mr. Straub to rely on an entity separate from 160 Royal Palm. Thus, as a result of the closing, the loan obligations were payable to KK-PB Financial, LLC which also received the benefit of the mortgage given by 160 Royal Palm.

The transaction closed at the end of August 2013; specifically, August 30, 2013. The end result of the transaction is that 160 Royal Palm remained the title owner to the hotel property, but Mr. Straub sold his 100% membership interest in 160 Royal Palm to an entity beneficially owned by and controlled by Mr. Matthews. The cash portion of the purchase price, after adjustments, was paid directly to Mr. Straub. 160 Royal Palm itself gave a note in favor of KK-PB Financial, secured by a mortgage on the hotel property.

There was a delay in the payment of the cash portion of the purchase price to be distributed to Mr. Straub. In the motion to limit credit bidding the Debtor seems to make a point of this, but the evidence does not support any negative inference. Likewise, the evidence supports the conclusion that some of the funds paid to Mr. Straub, about $2.6 million, are traceable to funds provided by the EB-5 Investors. But the evidence admitted in these matters would not permit the Court to conclude that Mr. Straub knew this was the case at the time.

There was another, more important delay, following the August 2013 closing. The mortgage given by 160 Royal Palm, securing the hotel property in favor of KK-PB Financial, was not recorded until the following March 2014, about 7 months after the closing. The Debtor argues that this delay was intentional. The Debtor alleges that Mr. Straub was assisting Mr. Matthews and others in misleading potential EB-5 Investors by purposely causing the mortgage not to be recorded so that EB-5 Investors would not know of the existing lien on the hotel property prior to their investments. The Debtor alleges that more than $10 million was invested by EB-5 Investors between the August 2013 closing and the recording of the mortgage in March 2014. Mr. Straub's counsel at the time, Craig Galle, testified credibly that Mr. Straub always intended the mortgage to be recorded immediately, that they were surprised it had not been recorded, and that the failure was due to counsel for Mr. Matthews who also acted as escrow agent for the closing. Based on the evidence admitted in these matters, the Court cannot conclude that Mr. Straub had any bad intent in connection with the delay in recording of the mortgage.

Let me transition now to the claim of KK-PB as presented in this matter. The evidence includes the original purchase and sale agreement and two amendments, and the loan documents including the note and mortgage. KK-PB also offered the testimony of Craig Galle who represented Mr. Straub and KK-PB Financial in connection with the sale transaction and the seller financing. Mr. Galle gave a thorough and credible history of the transaction. Through the testimony of Salvatore Spano, KK-PB also addressed in detail the calculation of its claim as presented in its proof of claim, which was also admitted. There is some dispute as to whether KK-PB's claim as presented in its proof of claim, in the amount of $39,684,844.73, should be reduced by a sum equal to the broker's commission reimbursement included in the claim tabulation and by the amount of one payment on the note. These subtractions would reduce the claim to $37,548,635.30. In the end, it will not matter whether KK-PB's claim as presented is $39.6 million or $37.5 million as will be apparent further along in this ruling.

The Debtor presented a number of arguments in support of its request that KK-PB's claim be deemed unsecured, at a minimum, to that the claim be estimated at $0 and therefore be entitled to no distribution in this case, at the most extreme.

In its motion, the Debtor begins by arguing that the note and mortgage held by KK-PB are not enforceable as there was a complete lack of consideration. The Debtor points out that the Debtor, 160 Royal Palm, undertook the obligation represented by the note and gave a mortgage on its property but that the Debtor, as an entity, received nothing in the transaction. But this argument presents a fundamental misunderstanding of the transaction. At the time of the transaction, 160 Royal Palm was a single purpose entity owned solely by Mr. Straub and controlled by him. For tax purposes, it was a flow-through entity. Likewise, the purchaser for the hotel property under the original purchase and sale agreement was another single purpose entity beneficially owned solely by Mr. Matthews. The purchase and sale agreement, as initially formed, represented a sale of Mr. Straub's indirect ownership of the hotel property to Mr. Matthews. There is nothing unusual about this structure. Commercial real estate transactions often involve entities formed particularly for purposes of the subject property. That the final transaction took the form of a purchase and sale of the membership interest in 160 Royal Palm is also not unusual. Indeed, in years past, before the State of Florida became wise to this practice and relevant laws were amended, it was common for parties to structure real estate transactions as equity sales in order to try to avoid payment of obligations to the state. But

even now there are valid reasons to prefer an equity transaction, not the least of which is preservation of development rights held by the title owner of property.  The Debtor argues that in the end the transaction looks like a leveraged buyout, where the target, the Debtor, ended up with all the baggage in the form of new debt obligations and a lien on its assets but itself received no benefit other than a new owner.  Indeed, this is true.  But that does not mean there is a complete lack of consideration.  That is because the consideration flows between the real parties in interest, Mr. Matthews and Mr. Straub.  That the transaction could be subject to challenge for other reasons does not mean that there was a complete lack of consideration.

In its motion, the Debtor also argues that the note and mortgage are not enforceable as they are unconscionable.  The Debtor argues that Mr. Straub was effectively on both sides of the transaction, because he was the owner of 160 Royal Palm the moment before it agreed to give him, indirectly through KK-PB, a note and mortgage for which 160 Royal Palm would receive nothing.  But to say that this structure represents unconscionable and thus unenforceable obligations would be to say that all leveraged buyouts are automatically subject to challenge for this reason.  The selling equity owners are always the ones that cause the company to undertake the weight for payment for their shares.  The Court is not aware of any case law ruling solely on this basis and the Debtor did not cite any.

The Debtor argues that the claim of KK-PB Financial is subject to equitable subordination as permitted by section 510 of the Bankruptcy Code.  Under 11th Circuit precedent, a claim is subject to equitable subordination if the claimant was involved in inequitable conduct, that conduct resulted in injury to other creditors or conferred an unfair advantage on the creditor, and subordination of the claim is otherwise consistent with the Bankruptcy Code.  The inequitable conduct need not be directly related to acquisition of the creditor's claim.  Equitable subordination applies only to that portion of a claim necessary to remedy the wrong identified by the Court.

The first step in presenting an equitable subordination case is to prove that the creditor in question acted in a manner that requires the Court to exercise its equity powers.  In support of this request for relief, the Debtor argues that Mr. Straub was effectively on both sides of the August 2013 transaction, causing 160 Royal Palm to pay him, and to become obligated on a loan payable to his entity, for Mr. Straub's own equity interest in 160 Royal Palm.  But, again, this argument ignores the purpose of the transaction, which was effectively to transfer control of the hotel property from Mr. Straub to Mr. Matthews, which was accomplished.  The Debtor argues that Mr. Straub knew that 160 Royal Palm would be unable to service the debt owed to KK-PB.  There is no evidence to support the conclusion that Mr. Straub had that subjective understanding at the time of the closing.  Indeed, based on the evidence admitted here, he expected 160 Royal Palm to raise capital to complete the project, pay KK-PB's obligation, and make a success of the hotel.  The Debtor argues that Mr. Straub assisted Mr. Matthews in misleading EB-5 Investors by purposely delaying recording of the mortgage.  As I noted a few minutes ago, the evidence submitted in this matter does not support that conclusion.  Lastly, the Debtor argues that Mr. Straub had an unusually close relationship with Mia Matthews, Mr. Matthews spouse, and that Mr. Straub provided loans and assistance to Mr. Matthews that should cause the Court to infer that Mr. Straub was somehow Mr. Matthews conspirator in all regards.  The evidence admitted in this matter does not support that conclusion.  Without additional proof of inequitable conduct on the part of Mr. Straub, there can be no equitable subordination.

This is an appropriate point to comment on Mr. Straub's credibility as a witness in this matter. I was admitted to the bar more than 28 years ago. Since that time, as a lawyer, as a client representative, and as a judge, I have seen hundreds of evidentiary hearings and trials. It is possible that I have forgotten a noteworthy witness or two. But scanning all of those hearings, I cannot remember a witness who was more evasive than Mr. Straub. Mr. Straub himself and also his counsel suggest that Mr. Straub's approach to answering questions is a symptom of several infirmities. Yet this is not consistent with my experience in watching Mr. Straub testify in this matter. When it suited him, Mr. Straub could answer yes or no and provide a concise explanation. When it did not suit him, Mr. Straub would ramble on at length, seemingly addressing a question other than the one asked. If this was not an intentional act on Mr. Straub's part, it is hard to imagine how he could have capacity to manage the many significant commercial real estate investments that he is solely responsible for overseeing. The Court does not believe that Mr. Straub is unable to answer direct questions. It is clear that Mr. Straub is unwilling to answer questions that he perceives are not to his advantage to answer.

But does Mr. Straub's lack of credibility before this Court mean that he was involved in a conspiracy with Mr. Matthews and others including, among other things, causing the KK-PB mortgage not to be recorded for seven months? Am I suspicious of Mr. Straub's actions in this matter? Yes, I am. Is that suspicion sufficient to support the Debtor's theories based in equity in this matter? No, it is not. There needs to be concrete evidence to support the Debtor's claims based in equity, and the Debtor did not meet its burden on those claims.

Let me be clear that the Court makes no finding that Mr. Straub and/or KK-PB did not have any involvement in the fraudulent scheme described by the Debtor and the EB-5 Investors. The Court is only finding that in the context of this claim estimation procedure, which involves solely the determination of the claim of KK-PB in this bankruptcy case, that the Court has not seen sufficient evidence to support the Debtor's claims in this regard. Today's ruling will have no impact on the ability of the Debtor or the EB-5 Investors or anyone else to pursue their claims against KK-PB, Mr. Straub, and others.

The Debtor has waived the re-characterization argument and so the Court need not address it.

Now we get to the meatiest parts of the Debtor's argument, the components on which the parties spent the most time in the evidentiary hearing and at closing argument.

The Debtor argues that both the note obligation undertaken by the Debtor in favor of KK-PB Financial in August 2013, and the later recording of the mortgage in favor of KK-PB Financial in March 2014, constitute fraudulent transfers that are avoidable under applicable law.

Under section 544(b)(1) of the Bankruptcy Code, the Debtor may avoid any transfer of an interest of the Debtor in property or any obligation incurred by the Debtor that is voidable under applicable law by a creditor holding an unsecured claim. For applicable law, the Debtor looks to Chapter 726 of the Florida Statutes. The Debtor relies on the actual fraud provisions and both constructive fraud provisions provided under Florida law.

Before getting to the merits of any fraudulent transfer claim, the Court must address the question of whether any fraudulent transfer action could be pursued by the Debtor in this bankruptcy case against KK-PB.  KK-PB argues that this bankruptcy case was commenced more than 4 years after both the August 2013 closing, at which the note was given by the Debtor to KK-PB, and after the mortgage was recorded in March 2014.  KK-PB argues that, under applicable non-bankruptcy law, no claim could be pursued by any creditor as fraudulent transfer claims would be barred by the statute of limitations, and so the Debtor cannot pursue any such claim under section 544.

The Debtor raises two arguments in response to this.  Both arguments have merit.

First, the EB-5 creditors filed their initial complaint in the District Court against various parties, including KK-PB, on November 14, 2016.  That complaint was filed within 4 years after both of the transfers at issue in this case.  That initial complaint included fraudulent transfer counts, but none of those fraudulent transfer counts focus on transfers made by 160 Royal Palm.  The EB-5 creditors' initial complaint included claims against KK-PB based in unjust enrichment and requested an equitable lien on the hotel property ahead of the rights of KK-PB.  In the Court's view, that initial complaint did not contain sufficient factual allegations to support a fraudulent transfer claim against KK-PB to avoid the note obligation undertaken by 160 Royal Palm in August 2013.  However, the factual allegations contained in the EB-5 creditors initial complaint are in fact sufficient to form the basis of a fraudulent transfer claim against KK-PB seeking to set aside the late-recorded mortgage as a fraudulent transfer.  Under Rule 15, the EB-5 Investors have the right to amend the District Court complaint to state a claim based on the facts already stated in the original complaint and arising under a different legal theory, and any such claim would relate back to the original complaint.  Thus, the EB-5 Investors could pursue a fraudulent transfer claim identical to one posed by the Debtor here, seeking to set aside the late-recorded mortgage given by 160 Royal Palm to KK-PB Financial.  From the evidence admitted here, it appears that the EB-5 Investors are in fact pursuing such an amended complaint.

Any fraudulent transfer claim based on the Debtor becoming obligated on the mortgage to KK-PB is now property of the estate in this bankruptcy case.  That claim can only be pursued by the Debtor.  The Debtor could seek to intervene as a plaintiff in the District Court action, solely to pursue that claim, and then ask the District Court to refer the matter to this Court consistent with 28 U.S.C. section 157 and the standing order of reference in this District.

I need to address here a specific point of procedure that may be relevant to this analysis.  A claim under section 544 is a core matter subject to bankruptcy jurisdiction under 28 USC section 1334.  When an action is pending in a United States District Court and that action falls under federal bankruptcy jurisdiction, such an action is not subject to removal to a bankruptcy court as the relevant removal statute applies only to removal of state actions.  Instead, the action is subject to referral to the applicable bankruptcy court.  There is no time limit on such referral.  Thus, the Debtor here is free to seek to have the relevant claims in the EB-5 District Court action specifically referred to this Court.

In summary, the EB-5 Investors brought a claim against KK-PB within 4 years after the transfers at issue.  That claim states facts that would support the same fraudulent transfer claim presented by the Debtor here with regard to avoidance of KK-PB's mortgage.  The EB-5

creditors' complaint could be amended to present a timely fraudulent transfer theory based on the same facts and that fraudulent transfer claim would relate back to the filing of the EB-5 creditors' original complaint. And the resulting claim is property of the estate in this case which only the Debtor can pursue. That claim could then be referred to this Court consistent with federal law and the standing order of reference in this district. While this sounds like a novel analysis, let me point out that this is in fact the purpose of section 544. There are creditors who could indeed pursue a timely fraudulent transfer claim against KK-PB and Congress has given that claim to the Debtor to pursue for the benefit of all of its creditors. This outcome is exactly what was intended by Congress.

But the Debtor has another, also valid, legal argument to support the timeliness of its fraudulent transfer challenges to KK-PB's secured claim, not just the mortgage but also the note obligation. Section 544(b)(1) requires only that there be an unsecured creditor who could pursue a claim under otherwise applicable law. Certain creditors are given special rights to pursue fraudulent transfer claims for an extended period of time. In this case, the SEC is a creditor of the estate. The evidence includes judicial notice of proof of claim number 71 filed by the SEC as well as judicial notice of the District Court complaint filed by the SEC in which the Debtor is named as a relief defendant. In addition, the evidence in this case indicates that a significant amount of EB-5 Investor funds ended up with the Debtor, both before the closing in August 2013 and after that date including before and after the late recording of KK-PB's mortgage. In the SEC's complaint filed in the District Court, the SEC seeks, among other things, disgorgement of all ill-gotten gains as a result of defrauding the EB-5 creditors as well as civil penalties. The Court notes that the SEC's claim is allowed in this bankruptcy case, as no objection to claim has been filed to date. The Court also notes that the SEC is listed in the Debtor's schedules as a creditor holding an unsecured claim against the estate. As the Debtor points out, the SEC has the benefit of an extended statute of limitations for pursuit of fraudulent transfer claims. For the SEC, the period is 6 years, under 28 USC sections 2415(a) and 2416. There is precedent for extension of the fraudulent transfer period for the benefit of the bankruptcy estate in cases where the United States is a creditor. I refer the parties to *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),* 503 B.R. 239, 272-75 (Bankr. S.D.N.Y. 2013) and to *Mukamal v. Citibank N.A. (In re Kipnis)*, 555 B.R. 877 (Bankr. S.D. Fla. 2016). Based on the evidence admitted in this matter, the SEC is both an existing creditor at the time of each of the alleged transfers and also a future creditor, and thus may take advantage of claims under Florida Statutes sections 726.105 and 726.106.

Having ruled that it is possible for the Debtor to bring timely fraudulent transfer claims against KK-PB, it is appropriate to address the merits of the fraudulent transfer claims.

The first step in any claim under section 544(b)(1) is that there must be a creditor with a claim allowable in this case that could also pursue a claim under relevant fraudulent transfer law. This is typically referred to as a triggering creditor. The amount of the claim of a triggering creditor is not relevant. The claim amount need not bear any relation to the transfer a Debtor or trustee seeks to avoid. For claims under section 726.105, the creditor need not have been a creditor at the time of the transfer as that provision includes both existing and future creditors from the point of view of the time of transfer. For claims under section 726.106, the creditor must have been a creditor at the time of the transfer. Section 726.105 includes claims based in actual intent to defraud and constructive fraud claims tied to unreasonably

small assets or intent to incur debts beyond the ability to pay. Section 726.106 includes constructive fraud claims based on insolvency of the Debtor.

The Debtor offered evidence to support the conclusion that there are more than one creditor that may support relief under each of these provisions. These creditors include the EB-5 Investors, whose claims arose partly prior to each of the transfer dates and partly after those dates. These creditors also include the SEC and several parties who provided goods and services to the hotel project. Thus, there are multiple creditors who have claims that are allowable in this case. It does not matter that those claims have not been finally allowed. The fact that they are facially allowable at least in part is sufficient for purposes of these matters.

Thus, the Debtor met its initial burden of showing that there are in fact creditors of this estate who could bring claims under Florida Statutes section 726.105 and 726.106. The Court must now address the elements of those claims.

Before moving to a more detailed analysis of the fraudulent transfer concerns, it is important to note again the context of this ruling. The Court is not now ruling on a fraudulent transfer claim brought by the Debtor against KK-PB by way of complaint. The Court is ruling on a motion to estimate KK-PB's claim and the Debtor has objected to estimation of that claim, in part, on the ground that KK-PB's note and/or the mortgage securing it are subject to avoidance. It is not necessary here for the Court to determine conclusively that there is an absolute right to success on the part of the estate or on the part of KK-PB for that matter. Indeed, there is substantial case law to the effect that, for purposes of estimation, the Court may consider the probability of success or failure of components of a claim or challenges to a claim in estimating the claim.

Let's start with the Debtor's actual fraud argument, based in Florida Statutes section 726.105. The Debtor points to so-called badges of fraud that the Debtor believes support the conclusion that Mr. Straub, controlling 160 Royal Palm up to the moment prior to the closing, had actual intent to defraud creditors of 160 Royal Palm when he caused that entity to become obligated to KK-PB and grant a mortgage to KK-PB. The Debtor argues that Mr. Straub was an insider of the Debtor. This appears obvious as a technical matter, but in the context of the transaction is not significant. The Debtor adds that there was no consideration for the obligations undertaken by KK-PB, but as the Court has already pointed out this is not the case. The Debtor argues that the Debtor became insolvent as a result of the obligation to KK-PB. The Court agrees that this is the case, and will analyze this in more detail in a moment. But insolvency, by itself, does not indicate actual fraud. Finally, the Debtor argues that Mr. Straub caused the mortgage to be concealed for 7 months, misleading EB-5 Investors who invested more than $10 million. But the evidence admitted in this matter does not lead the Court to conclude that Mr. Straub concealed the mortgage. To the contrary, it was in Mr. Straub's best interest that the mortgage be recorded immediately and it appears that this is what his counsel intended. The evidence admitted here does not support a finding that Mr. Straub caused 160 Royal Palm to give the note and mortgage with actual intent to defraud creditors.

For constructive fraud claims under either section 726.105 or 726.106, the transfer must be made without receiving a reasonably equivalent value. The Debtor itself received nothing at

all from the transaction.  No value at all was received by the Debtor on account of the note or the mortgage.  This element is met.

KK-PB argues that the Court should collapse the overall transaction, taking into account that control over the hotel property was transferred in consideration of the note and mortgage obtained by KK-PB.  It is not appropriate to approach the fraudulent transfer analysis in this case from that vantage point.  At the time of the closing, and again when the mortgage was recorded, the Debtor had significant obligations to others that were then unpaid and that remain unpaid now.  To collapse the Debtor with its equity owner for purposes of determining reasonably equivalent value would be to the detriment of those creditors.  The Court is not aware of any case law in this or any other circuit that would permit determination of reasonably equivalent value as KK-PB argues under these circumstances.

The final element for relief under the constructive fraud provision of section 726.105 requires the Debtor to show either that at the time of the transfers the Debtor was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to its business or the Debtor intended to incur or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.  In this case, the evidence supports both conclusions.

The question of whether a Debtor's remaining assets are unreasonably small, in this context, typically requires an analysis of whether at the time of the transfer there was a likelihood of future insolvency or inability to pay debts as they become due.  Based on the evidence admitted in this matter, on the date of the closing, it was very likely that the Debtor would be unable to pay the debt service to KK-PB.  Indeed, it is undisputed that the Debtor was able to make only 3 payments to KK-PB before defaulting.  For the same reason, the evidence supports the conclusion that the Debtor should reasonably have believed that it would be unable to pay KK-PB's note obligation, which was its largest ongoing payment obligation.  The recording of KK-PB's mortgage only increased the Debtor's financial stress by making it less likely the Debtor could obtain additional capital.  Thus all of the elements for relief under section 726.105(1)(b) are satisfied in this case.

The final element for relief under section 726.106 is insolvency.  The Debtor must either have been insolvent at the time of the transfers or was made insolvent by the transfers.  The evidence admitted in this matter indicates that the Debtor was rendered insolvent by the note obligation to KK-PB entered into at the closing in August 2013, and the Debtor remained insolvent at the time the mortgage was recorded in March 2014.

In determining that the Debtor was rendered insolvent by the note obligation and remained insolvent at the time the mortgage was recorded, the Court has relied on expert testimony by Jeffrey Brown, an expert in valuation of hotel properties, and Marcie Bour, a forensic accountant, each offered by the Debtor.  KK-PB did not offer contrary expert testimony.

Mr. Brown presented an extremely thorough analysis of the retrospective value of the hotel property on the relevant dates, based on both the income capitalization approach and the comparable sales approach.  Mr. Brown's assumptions were reasonable and well supported and his analysis well presented, logical, and consistent with industry practice.  KK-PB has suggested that, based on certain of Mr. Brown's testimony on cross-examination, that the

Court should adjust Mr. Brown's calculations to reflect several modified assumptions. Based on Mr. Brown's own testimony, those modifications would not be reasonable. The Court accepts Mr. Brown's opinions of value without modification.[3]

Ms. Bour was equally thorough. With only a few exceptions, Ms. Bour's assumptions were reasonable and well supported. Her analysis was well presented, logical, and consistent with industry practice.

Ms. Bour's discounting of the Debtor's liability to KK-PB is not appropriate under the law. When determining insolvency under Florida law for purposes of fraudulent transfer analysis, liabilities should be included consistent with the legal obligations of the Debtor at the time of valuation and not altered to reflect what alternative financing might be available to the Debtor. This adjustment results in an increase in the Debtor's liabilities on August 31, 2013 by about $6.9 million and on March 29, 2014 by about $6 million.

The Court also takes issue with Ms. Bour including as a liability of the Debtor as of August 31, 2013 the sum shortly thereafter paid to Mr. Straub in cash as part of the purchase price for his equity interest in the Debtor. This was not a legal obligation of the Debtor and should not be included as the Debtor's liability. That the funds flowed through the Debtor makes no difference. This results in a decrease in the liabilities of the Debtor on that date by about $6.2 million.

Finally, the Court also takes issue with Ms. Bour including as an asset in her August 31, 2013 balance sheet a cash balance of about $2.6 million as the evidence shows that those funds were not assets of the Debtor but were parked with the Debtor for later payment to Mr. Straub as part of the equity sale transaction. This results in a decrease in assets of about $2.6 million on August 31, 2013.

KK-PB takes issue with the inclusion of about $832,000 for liens and obligations, about $8,900 for Van Linda Ironworks, and about $5.4 million for New Haven Contracting South, shown on Ms. Bour's August 31, 2013 balance sheet. Based on the evidence admitted in this matter, the Court finds these items are appropriate for inclusion in the solvency analysis. But even if they are not, and they are backed out of the calculation, the Debtor was woefully insolvent on August 31, 2013.

Similarly, KK-PB takes issue with the inclusion of about $832,000 for liens and obligations, about $11,700 for Van Linda Ironworks, about $2.2 million for New Haven Contracting South, about $536,000 for USREDA, about $2.975 million shown on the Debtor's books as retainage received, and about $7.63 million shown as advanced to Galle and Evans. Based on the evidence admitted in this matter, the Court finds all of these items are appropriate for inclusion in the solvency analysis. But even if they are not, the Debtor remained woefully insolvent on March 28, 2014 when the mortgage was recorded.

---

[3] KK-PB offered lay opinion testimony of Mr. Straub, and the Court also heard lay opinion testimony from Mr. Ryan Black, regarding the value of the Debtor's hotel property on relevant dates. The Court gave no weight to this testimony. Mr. Straub and Mr. Black lack the expertise of an appropriate expert witness, such as Mr. Brown. In addition, Mr. Straub's testimony suffered from apparent bias.

Thus, all the elements for relief under section 726.106(1) are satisfied in this case.

Under Florida statues section 726.109(4) a good faith transferee has certain rights equivalent to the value given to the Debtor. But here no value was given to the Debtor itself, and so KK-PB may not take advantage of the good faith defense. Again, as I noted a few minutes ago, given the circumstances of this case, in particular the existence of a number of creditors who would be harmed by such an analysis, the collapsing of the Debtor with its owner for purposes of this defense would not be appropriate. Because KK-PB is the initial transferee of the note and mortgage, it also does not have the benefit of the good faith defense under section 550 of the Bankruptcy Code.

As a result of these rulings, the note obligation would be avoidable under section 544 and the mortgage would also be avoidable under section 544 and would be recoverable for the estate under section 550.

I find that the evidence admitted in this matter proves these claims by a preponderance of the evidence. In other words, if this was a trial on the merits of a complaint presenting the fraudulent transfer claims under section 544, the Debtor would have won.

The result of this analysis is that the Court will estimate the claim of KK-PB, for all purposes in this bankruptcy case, as an unsecured claim and will estimate the claim amount as zero dollars. Because KK-PB has neither a lien nor an allowed claim, KK-PB is not permitted to credit bid under the explicit text of section 363(k). Thus, the Debtor's motion seeking an order prohibiting KK-PB from credit bidding will be granted.

The Debtor also asked the Court to deny KK-PB the right to credit bid under the "for cause" standard in section 363(k). The were two arguments in this regard. First, it was alleged that Mr. Straub committed bad acts and that this constitutes cause. Based on the evidence admitted in these matters, the Court is unable to make such a finding in this case. Second, it was argued that allowing KK-PB to credit bid would chill bidding to the detriment of other creditors. I am aware that there is some case law suggesting that this would be sufficient to constitute cause under section 363(k). I do not agree with that case law. The Supreme Court has repeatedly ruled that state law lien rights are sacrosanct in bankruptcy matters except where Congress has explicitly provided otherwise. The ability of a secured creditor to protect its lien rights by bidding its own claim in a sale of its collateral is a central component of the rights of a lien holder. The credit bid right should be abrogated only under very unusual circumstances. To suggest that a sale process will be easier, more efficient, or more fruitful without one party bidding is simply not enough. This analysis is not necessary to the Court's ruling today, as the Court will grant the Debtor's motion to prohibit KK-PB from credit bidding for other reasons.

New Haven Construction responded at ECF number 169 noting that it holds a lien senior to that of KK-PB, in the approximate amount of $3.3 million, contrary to KK-PB's suggestion that it was in first position. It appears that KK-PB has since acquired that New Haven claim. The Court's ruling today has no impact on that New Haven claim, which appears to be a valid, secured claim that may have credit bid rights.

For the foregoing reasons, the Court will grant the Debtor's motion to limit credit bidding, ECF number 103, and will enter an order prohibiting KK-PB from credit bidding its claim

represented by proof of claim number 70-3 in any sale of the Debtor's hotel property and related assets. With regard to KK-PB's motion to estimate its claim at ECF No. 133 and the Debtor's response thereto, the Court will enter an order estimating the claim as an unsecured claim and estimating its amount as $0, for all purposes in this case. The Court will deny KK-PB's motion for relief from stay or to dismiss this case, found at ECF No. 69. The Court will prepare its own orders.

In the motion to limit credit bidding, the Debtor also requested that Palm House Hotel, LLLP be denied any ability to credit bid in connection with the sale of the Debtor's hotel property and related assets. Palm House Hotel, LLLP was duly served with the motion and the notice of hearing and failed to respond. ECF No. 111. Thus, the Debtor's request to deny any credit bid rights of Palm House Hotel, LLLP will be granted.

For the forgoing reasons, the Court ORDERS and ADJUDGES as follows:

1.     In light of *Secured Creditor KK-PB Financial, LLC's Motion to Estimate Claim for Purposes of Credit Bidding Pursuant to 11 U.S.C. §§ 502(c) and 363(k)* [ECF No. 133] and the *Debtor's Response in Opposition to KK-PB Financial, LLC's Motion to Estimate Claim for Purposes of Credit Bidding Pursuant to 11 U.S.C. §§ 502(c) and 363(k)* [ECF No. 163], the claim of KK-PB Financial, LLC, represented by proof of claim 70-3 as the same may be amended, is estimated as an unsecured claim in the amount of $0.00 for all purposes in this chapter 11 case.

2.     The *Debtor's Motion to Limit Credit Bids with Respect to Sale of Substantially All of Its Assets* [ECF No. 103] is GRANTED. KK-PB Financial, LLC, on account of its claim represented by proof of claim 70-3 as the same may be amended, and Palm House Hotel, LLLP, shall not be permitted to credit bid under 11 U.S.C. § 363(k) in connection with any sale of the Debtor's real property located at 160 Royal Palm Way, Palm Beach, Florida 33480, related assets, or any part thereof.

3.     Nothing in this order shall be construed as a ruling by the Court with regard to proof of claim 72-1 filed by New Haven Contracting South, Inc., or affecting the rights, if any, of the holder of such claim to credit bid at any sale of the Debtor's assets in this case.

4.	*Secured Creditor KK-PB Financial, LLC's Motion to (I) Modify and Terminate Automatic Stay; or (II) Dismiss Chapter 11 Proceeding* [ECF No. 69] is DENIED.

### ###

Copy to:

Philip J. Landau, Esq.

*Philip J. Landau, Esq. is directed to serve a copy of this order on all appropriate parties and file a certificate of service.*

EXHIBIT 2



**ORDERED in the Southern District of Florida on August 19, 2019.**

Erik P. Kimball, Judge
United States Bankruptcy Court

_____

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

In re:                                                    CASE NO. 18-19441-EPK

**160 ROYAL PALM, LLC,**                                  CHAPTER 11

      Debtor.

_____/

### <u>ORDER DENYING MOTION TO STAY ESTIMATION ORDER PENDING APPEAL</u>

In *KK-PB Financial, LLC's Motion to Stay the Estimation Order* [ECF No. 923] (the "Motion"),

KK-PB Financial, LLC ("KK-PB") seeks a stay of this Court's order estimating claim 70-3 at $0 for

all purposes in this case [ECF No. 603; the "Estimation Order"] pending an appeal of the Estimation

Order before the United States District Court for the Southern District of Florida. 160 Royal Palm,

LLC, the debtor in this case, filed a response to the Motion. ECF No. 989.

### BACKGROUND

On October 1, 2018, the debtor filed a motion asking the Court to approve a procedure for

the sale of its hotel property, the debtor's principal asset. ECF No. 92. KK-PB, the alleged holder of

a claim secured by the hotel, filed an objection. ECF No. 101.

The Court held a hearing on the proposed sale procedure on October 10, 2018.  ECF No. 93. Prior to that hearing, the debtor filed a motion asking the Court to deny KK-PB the right to credit bid in connection with the sale of the hotel.  ECF No. 103.  While the credit bid motion was not set for hearing until after October 10, 2018, it was discussed in connection with the debtor's proposed sale procedure.  In addition, at the October 10, 2018 hearing, KK-PB stated that it intended to ask the Court to estimate its secured claim under section[1] 502(c) solely for purposes of the sale of the hotel. At that hearing, a party in interest argued that estimation could not be for a limited purpose, that estimation must instead be for all purposes in the case.  In light of that argument, the Court directed KK-PB to file a proof of claim and directed the debtor to file an objection to that proof of claim, with deadlines intended to permit the parties to address the claim prior to the sale of the hotel.  ECF No. 134.  The Court did this to allow KK-PB and the debtor the opportunity to rely on the traditional claims objection process for determination of KK-PB's claim, rather than the potentially more streamlined claims estimation process, because both would result in final determination of KK-PB's claim.

On October 10, 2018, as its counsel stated during the hearing that same day, KK-PB filed a motion asking the Court to estimate its alleged secured claim "to permit it to credit bid at the auction and sale" of the debtor's hotel property.  ECF No. 133.  The debtor responded, asking the Court to deny the relief requested by KK-PB in the estimation motion and, also, to estimate KK-PB's secured claim at $0.00.  ECF No. 163.   In its response, the debtor raised several substantive arguments.  The debtor argued (a) that the note and mortgage underlying KK-PB's claim were unenforceable, (b) that the note, the mortgage, and the late recording of the mortgage were avoidable as fraudulent transfers, (c) that the claim should be equitably subordinated to all other creditors, and (d) that the claim should be re-characterized as equity.  From the debtor's written response it was apparent that the debtor

---

[1] In this order, the word "section" means the given section of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

would rely in part on fraudulent transfer analysis in seeking disallowance of KK-PB's claim through estimation.

On October 17, 2018, KK-PB filed proof of claim 70 (later amended by claim 70-3), formally presenting a fully secured claim in the amount of $39,684,844.73. The claim was allegedly secured by a lien on the debtor's hotel property as a result of a late-recorded mortgage. On October 22, 2018, both the debtor and certain unsecured creditors filed objections to KK-PB's secured claim. ECF Nos. 178 and 179.

The Court held a preliminary hearing on the estimation of KK-PB's secured claim on October 25, 2018 and set the matter for evidentiary hearing. ECF No 194. In the order setting evidentiary hearing, the Court explicitly offered KK-PB the opportunity to have the Court set the pending objections to claim 70 for evidentiary hearing. KK-PB declined that invitation. The evidentiary hearing on the estimation motion was delayed more than once and was eventually conducted over five days in January and February 2019. ECF Nos. 389, 480, 518, and 569. At no time did KK-PB object to the procedure undertaken by the Court or ask the Court to require the debtor to commence an adversary proceeding.

In the Estimation Order [ECF No. 603], the Court ruled that KK-PB's alleged mortgage is subject to avoidance, the note it secures is subject to avoidance, and the Court disallowed claim 70-3. KK-PB filed an appeal from the Estimation Order with the United States District Court for the Southern District of Florida [ECF No. 644], and that appeal is now fully briefed.

The Court later approved the sale of the hotel. ECF No. 651. KK-PB appealed the Court's orders approving the sale procedure and the sale itself. ECF Nos. 645 and 653. The District Court upheld those orders and KK-PB further appealed to the Eleventh Circuit Court of Appeals, where the matters remain pending. ECF Nos. 737 and 739.

On June 27, 2019, the debtor filed a plan of reorganization that provides for the distribution of the proceeds from the sale of the hotel.  ECF Nos. 818 and 968 (as amended after initial disclosure statement hearing).  The court approved the related disclosure statement on August 5, 2019, and set a confirmation hearing on September 24, 2019.  ECF No. 975.

## TIMELINESS OF PRESENT MOTION

The debtor argues that the Motion is not timely as KK-PB waited about five months after entry of the Estimation Order to file the Motion.  The debtor cites no authority to support this argument.  Fed. R. Bankr. P. 8007 provides no deadline for the filing of a motion for stay pending appeal.  KK-PB's Motion was prompted by the debtor's filing of a liquidating chapter 11 plan aimed at distributing the proceeds from the sale of the debtor's hotel.  The Motion is timely filed.

## APPLICABLE LAW

In this matter, Fed. R. Bankr. P. 8007 governs the potential issuance of a stay pending appeal. Unlike Fed. R. Bankr. P. 7062, Rule 8007 does not provide for the granting of a stay as of right upon the filing of a sufficient supersedeas bond.  Collier on Bankruptcy ¶ 8007.06 (Richard Levin & Henry J. Sommer eds., 16th ed.).  The determination of whether to grant a stay pending appeal is left to the discretion of the Court.  If a stay pending appeal is warranted, the Court may condition the stay on the posting of "a bond or other security."  Fed. R. Bankr. P. 8007(a)(1)(B) (as amended effective December 1, 2018).  The bond or security is intended to protect the opposing party or parties, which may include the bankruptcy estate generally, against loss that may be sustained as a result of a failed appeal.  Because there is no stay pending appeal as of right under Rule 8007, the Court must first determine whether a stay is warranted and, if so, determine whether a bond or other security will be required as a condition of the stay.

Ordinarily, the appellant must first seek a stay from this Court and, if unsatisfied, may seek relief from the District Court in which its appeal is lodged.  Fed. R. Bankr. P. 8007.  "Failure to first

seek a stay or other relief in the bankruptcy court will ordinarily deprive the district court or appellate panel (or the court of appeals in the case of a direct appeal) of jurisdiction over a motion seeking a stay." Collier on Bankruptcy ¶ 8007.05 (citations omitted); *Rodriguez v. ALS Commer. Funding, LLC*, No. 19-20452, 2019 U.S. Dist. LEXIS 29651 (S.D. Fla. Feb. 21, 2019); *In re Rivera*, No. 15-04402, 2015 U.S. Dist. LEXIS 151860 (N.D. Cal. Nov. 9, 2015).

"A stay pending appeal is an 'extraordinary remedy' and the party seeking it must show: '(1) a substantial likelihood that they will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury to the[m] unless the [stay] is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest.'" *Woide v. Fannie Mae (In re Woide)*, 730 F. App'x 731, 737 (11th Cir. 2018) (quoting *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000) and citing *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015)).

## LIKELIHOOD OF SUCCESS ON APPEAL

KK-PB has a negligible likelihood of success on its appeal from the Estimation Order. In the following paragraphs, the Court addresses each of the arguments presented by KK-PB on this most important component of the analysis.

KK-PB argues that it was improperly denied the opportunity to have the dispute addressed via an adversary proceeding rather than through a contested matter. This argument fails for two independent reasons.

First, at no time during consideration of KK-PB's estimation motion and the debtor's response did KK-PB object to the procedure undertaken by the Court or request that the debtor be required to file an adversary proceeding. KK-PB may not raise this argument for the first time on appeal.

Second, no matter the legal theory relied on for estimation of a claim, no adversary proceeding is required. The estimation of a claim under section 502(c) is an equitable process over which this

Court has broad discretion.  The Court is aware of no case law for the proposition that an adversary

proceeding is necessary for estimation of a claim under section 502(c), and KK-PB cites none.

In fact, KK-PB does not argue that it was entitled to an adversary proceeding for estimation

of its claim under section 502(c).  KK-PB's argument is based on the false contention that the Court

ruled on the separate objections to KK-PB's secured claim rather than on KK-PB's motion to estimate

and the debtor's response.  The Court several times offered KK-PB an evidentiary hearing on the

objections to its claim, rather than the estimation motion and the debtor's response, and KK-PB

declined to pursue that alternative course.  In the Motion, KK-PB states that when the Court offered

KK-PB the option of an evidentiary hearing on the objections to claim, "KK-PB respectfully and

repeatedly declined that invitation to waive its right to an adversary proceeding."  This statement

appears intended to give the erroneous impression that KK-PB previously requested an adversary

proceeding on estimation of its claim.  To be clear, KK-PB never stated its reason for declining the

Court's repeated invitation to set an evidentiary hearing on the objections to claim.  More specifically,

KK-PB never asked the Court to require the debtor to file an adversary proceeding to prosecute the

request in its response to disallow KK-PB's claim for all purposes.  In the Estimation Order, the Court

explicitly ruled only on KK-PB's and the debtor's requests for estimation under section 502(c).

KK-PB claims that it was surprised by the Court's ruling that its claim would be estimated for

all purposes in this case rather than solely for the limited purpose of the proposed sale of the debtor's

hotel.  The Court did not on its own expand the scope of the estimation proceeding beyond the limited

purpose requested by KK-PB in its motion as KK-PB contends.

To begin with, as discussed in more detail in the Estimation Order, the law requires this

outcome.  There is nothing in section 502(c) or elsewhere in the Bankruptcy Code or Bankruptcy

Rules that would permit the Court to estimate KK-PB's claim solely for purposes of the sale.

Estimation of a claim under section 502(c) is "for purposes of allowance."  11 U.S.C. § 502(c).  It is a

substitute for the usual allowance process involving litigation of an objection to claim.  To rule otherwise could fly in the face of the concepts of preclusion.  An order estimating a claim often relies on various findings of fact, each of which is entitled to collateral estoppel effect.  The claimant and objecting parties would not be entitled to re-litigate matters determined in the estimation process.

This was no surprise to KK-PB.  KK-PB's ability to seek estimation for the limited purpose of the sale was called into question during the initial hearing on approval of the sale procedure, months before the Court entered the Estimation Order.  After that hearing, recognizing that KK-PB might wish to pursue an evidentiary hearing on objections to its claim rather than estimation, both of which would resolve claim 70-3 on a final basis, the Court required KK-PB to file a proof of claim and the debtor to file a formal objection.  Apparently for strategic reasons, KK-PB chose not to pursue an evidentiary hearing on the objections to its claim.

But even if the law did not proscribe KK-PB's ability to seek estimation for a limited purpose, the debtor requested estimation of KK-PB's claim for all purposes.  In the debtor's response, it asked the Court not only to deny KK-PB's motion for estimation for a single purpose but also to allow KK-PB's claim 70-3 at $0.00 without limiting that request for purposes of the proposed sale.  In other words, the debtor asked the Court to disallow KK-PB's claim in general.  A review of the debtor's response shows that the debtor's arguments against KK-PB's claim are not in any way restricted to the proposed sale of the hotel.

In the Motion, KK-PB makes two patently false statements:

(1)      "Throughout the estimation process, the Court consistently led KK-PB to believe the Estimation Hearing was only to determine the Estimation Motion and the Credit Bid Motion."  At no time did the Court state that estimation of KK-PB's claim would be for the limited purpose of the sale.  Indeed, the Court required KK-PB to file a formal proof of claim and the debtor to file an objection to that claim to provide KK-PB with the opportunity for an

evidentiary hearing on the claim objection, specifically because the claim estimation procedure would be the final ruling on KK-PB's claim 70-3. KK-PB had warning of this issue at the hearing on October 10, 2018.[2]

(2)    "Nonetheless, when this Court announced its oral ruling after closing arguments, it stated – for the very first time – that it would be deciding the Claim Objection as well."

In the Estimation Order, the Court explicitly rules only on KK-PB's motion to estimate and the debtor's response. There is nothing in the Estimation Order that would lead a reasonable person, let alone KK-PB's seasoned counsel, to believe the Court had ruled on any separate objection to claim 70-3.

KK-PB argues that its claim was disallowed "without notice" in violation of its due process rights. The law does not permit estimation under section 502(c) for a limited purpose. KK-PB was warned of the effect of estimation before the first hearing on the matter. But even if KK-PB could have obtained limited-purpose estimation, the debtor separately sought estimation for all purposes in this case. KK-PB declined the Court's repeated invitation to pursue an evidentiary hearing on the objections to its claim. KK-PB had ample notice of the effect of estimation of its claim. Due process was served.

KK-PB challenges the Court's rulings with regard to certain components of fraudulent transfer analysis employed in disallowing KK-PB's claim, namely the Court's rulings on reasonably equivalent value and the good faith transferee defense. The Court's rulings are spelled out in detail in the Estimation Order. In light of Eleventh Circuit precedent and the overwhelming majority of case law

---

[2] Counsel for KK-PB who appeared at the October 10, 2018 hearing has since withdrawn and new counsel now represents KK-PB in this case. However, KK-PB's new counsel purchased a transcript of the October 10, 2018 hearing long before filing the present Motion. ECF No. 766 (and clerk's notation of payment on May 2, 2019). The Court must assume, then, that counsel for KK-PB was aware of the falsity of certain statements in the Motion.

in this circuit and elsewhere, it is extremely unlikely that the Court's rulings on these issues will be overturned on appeal.

## IRREPARABLE INJURY

KK-PB's argument on this component of the standard focuses on the effect of confirmation of the debtor's recently proposed liquidating plan, and consummation of that plan through distributions to other creditors.  Because claim 70-3 is disallowed, the plan does not provide for any distribution to KK-PB or for escrow on account of that claim.  If all of the proceeds from the sale of the hotel are distributed to other creditors, KK-PB would have no way to recover from the bankruptcy estate if it is successful on its appeal from the Estimation Order (and is also able to defeat the objections to its claim).  Indeed, KK-PB's appeal from the Estimation Order would become moot. The Court agrees that KK-PB could suffer harm if this Motion is denied.  But failure to stay the Estimation Order will not by itself result in immediate harm to KK-PB, as the harm to KK-PB would only arise after confirmation of the debtor's plan.  In other words, the harm KK-PB complains of depends on the entry of yet another order by this Court, which order itself would be subject to appeal and a request for stay pending appeal.

## HARM TO OTHER PERSONS

KK-PB must show that granting the Motion will result in no substantial harm to other interested persons.  Yet granting the requested stay would undoubtedly result in material delay of distributions to holders of allowed claims and, given KK-PB's scorched earth approach to this case, the needless increase of administrative expenses to the detriment of valid creditors.

## HARM TO THE PUBLIC INTEREST

KK-PB must show that the requested stay will not result in harm to the public interest.  KK-PB's argument on this point is circular.  KK-PB contends that the public interest supports protection of its "constitutionally protected property rights" and ensuring that "the assets of a liquidating chapter

11 case are distributed to its creditors in compliance with the priority scheme of the Bankruptcy Code."

But both of these statements rely on the assumption that KK-PB will be successful in its appeal.

The public interest supports the expedient administration of this case. Granting the requested stay would undoubtedly permit KK-PB to augment its effort to stymie the resolution of this case, to the detriment of every other party in interest.

### ORDER

For the foregoing reasons, it is ORDERED AND ADJUDGED that *KK-PB Financial, LLC's Motion to Stay the Estimation Order* [ECF No. 923] is DENIED. The Clerk is directed to transmit a copy of this order to the District Court in connection with the previously docketed appeal from the Estimation Order [ECF No. 644].

### ###

Copy to:
James N. Robinson, Esq.

*James N. Robinson, Esq. is directed to serve a copy of this order on all appropriate parties and file a certificate of service.*

# EXHIBIT 3



**ORDERED in the Southern District of Florida on January 14, 2020.**

Erik P. Kimball, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:                                              Case No. 18-19441-EPK

**160 Royal Palm, LLC,**                            Chapter 11

     **Debtor.**
_____/

**ORDER GRANTING MOTION TO RESET PLAN CONFIRMATION HEARING AND**
**HEARING ON FEE APPLICATIONS WITHOUT REQUIRING RESOLICITATION**

     This matter comes before the Court on the *Motion to Reset Plan Confirmation Hearing and*

*Hearing on Fee Applications Without Requiring Resolicitation* (ECF No. 1472, the "Motion") filed by 160

Royal Palm, LLC, the debtor in this chapter 11 case (the "Debtor"). In the Motion, the Debtor asks

the Court to rule that the Debtor may move forward with confirmation on the recently filed *Debtor's*

*Third Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (ECF No. 1469, the

"Third Amended Plan") without requiring additional disclosure or solicitation, and to set a

confirmation hearing on the Third Amended Plan.

     In order to understand the context of the present Motion, it is useful to review the relevant

history of this chapter 11 case.

When the Debtor filed this case, it was the owner of a partially reconstructed hotel property in Palm Beach, Florida.  In the decade prior to the petition here, the hotel sat mostly dormant, to the great dismay of the Town of Palm Beach and the Debtor's many creditors.  The individual at the center of the redevelopment of the hotel plead guilty to federal fraud charges relating to solicitation of investments in the hotel project.  Certain of his associates remain subject to prosecution.

The Debtor and the hotel became the subject of a Florida state court receivership.  The state court authorized the receiver to take full management control of the Debtor and to file this chapter 11 case.

Seventy-nine (79) individuals (the "EB-5 Creditors") represent the vast majority of the unsecured claims in this case.  The EB-5 Creditors are citizens of foreign countries who claim to have invested about $550,000 each under the federal EB-5 program toward re-development of the hotel property owned by the Debtor.  These claims aggregate about $43.5 million at face value (not including certain treble damages claims).  The Debtor scheduled all of the EB-5 Creditors' claims as not disputed, unliquidated, or contingent.  Thus, absent objection by another party in interest, all such claims would have been allowed.[1]  The EB-5 Creditors have consistently supported the Debtor.

After a thorough marketing process, the Court approved the sale of the hotel to LR U.S. Hotels Holdings, LLC ("LR") for a purchase price of about $40 million.  ECF No. 651.  The Court's sale order contains extensive findings and approves a specific purchase agreement between the parties.  The EB-5 Creditors were outspoken in their support of the sale process and the sale to LR. KK-PB Financial, LLC ("KK") lodged the only objection to the sale.

KK has presented three claims in this chapter 11 case.  KK filed a claim of approximately $40 million, allegedly secured by a mortgage on the hotel property.  After an evidentiary hearing, the

---

[1] KK, defined below, objected to all claims of the EB-5 Creditors.  The Debtor moved the Court to approve settlement of the EB-5 claims for a sum representing about a 20% reduction in the face amount of the claims.  ECF Nos. 1050, 1073, 1127, 1467.  The Court has yet to rule on those motions.

Court disallowed that claim in full.  ECF No. 603 (the "Estimation Order").  KK appealed the

Estimation Order to the District Court, which transmitted the appeal to the Eleventh Circuit

without ruling on the appeal.  KK's appeal from the Estimation Order remains pending with the

Eleventh Circuit.

Importantly, the Estimation Order is not stayed and thus remains binding on the parties and

on this Court.  Because the Estimation Order is not stayed, the pending appeal has no impact on the

Court's ability to confirm a plan in this case.  As KK's mortgage claim was disallowed, the Debtor's

Third Amended Plan does not provide a reserve for this claim.  If the Third Amended Plan is

confirmed and substantially consummated, there will be no funds available for payment of the claim

and the appeal from the Estimation Order will become moot.  This outcome would be wholly

consistent with prevailing law in this and every other circuit.  In circumstances such as this, the only

sure way to avoid mootness is to obtain a stay of the order pending appeal, which KK failed to do.

KK acquired a second claim of approximately $3.4 million, allegedly secured by a lien on the

hotel property.  Claim No. 72-1; ECF No. 671.  No portion of that claim was presented as an

unsecured claim.  This second claim is subject to objection by the Debtor, both in this Court and in

litigation pending in a Florida state court, and so is not currently an allowed claim.  ECF No. 828,

956.[2]  The Third Amended Plan provides for a disputed claims reserve to protect holders of claims

subject to pending objection, including this claim.  To the extent the claim is allowed as a secured

claim, it would be paid in full.  To the extent the claim is allowed as an unsecured claim, it would be

paid a pro rata distribution as provided to holders of allowed unsecured claims.

KK acquired a third claim of approximately $11,000.  ECF No. 974.  This third claim is a

non-priority, unsecured claim that the Debtor scheduled as not disputed, unliquidated, or

_____

[2] It has recently been suggested that the transfer of this claim to KK is also subject to avoidance as a fraudulent transfer.

contingent.  Thus, KK holds only one currently allowed claim, an unsecured claim of about $11,000.[3]

KK appealed the order approving the sale of the hotel to LR.[4]  Both the District Court and the Eleventh Circuit affirmed the sale order.  ECF Nos. 737 and 1473.  KK sought panel rehearing by the Eleventh Circuit and that request has yet to be acted on.  KK's appeal from the sale order technically remains pending, but the likelihood of an outcome adverse to the Debtor is extremely remote.

Under the sale agreement approved by the Court, LR is not required to close the sale if the sale order is under appeal.  In spite of the fact that no party challenged the good faith of LR in connection with the sale, and pursuant to 11 U.S.C. § 363(m) the validity of the sale if closed can no longer be challenged even if the sale order is overturned on appeal, LR determined not to close the transaction because of KK's appeal.  Instead, the Debtor and LR entered into a so-called post-closing agreement, an agreement not approved by this Court, under which the Debtor issued a deed to LR, which was recorded, and the sale proceeds were placed in escrow, along with a deed back to the Debtor, pending final determination of the appeal.

In August 2019, the Debtor filed its *Debtor's Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (ECF No. 968, later supplemented by ECF No. 1281, the "First Amended

---

[3] As the Court has ruled on several occasions, the $11,000 unsecured claim is often the sole basis for KK's standing in matters before this Court.  Yet KK likely has spent many times that amount in legal fees attempting to stymie the Debtor's diligent efforts, consistent with its fiduciary duty, to sell the hotel and confirm a plan aimed at distributing the sale proceeds to creditors.  Indeed, at a recent hearing where KK's only standing arose from this unsecured claim, the Court confirmed that the cost incurred by KK for just that hearing exceeded the entirety of its allowed unsecured claim. It appears that KK's purchase of the second alleged secured claim and this $11,000 unsecured claim are an attempt to substitute for its failure to obtain a stay of the Estimation Order.  KK has attacked nearly every action taken by the Debtor, ostensibly in the name of protecting the rights of creditors.  But this is belied by the fact that KK is the only party opposing the Debtor.  Every other creditor active in this case supports the Debtor's efforts to distribute the long-awaited proceeds from the sale to the Debtor's rightful creditors.

[4] KK did not appeal the sale order based on its disallowed mortgage claim or its disputed smaller secured claim.  Instead, relying on its standing as the holder of an $11,000 unsecured claim, KK challenged the sale claiming, primarily, that the sale process resulted in an affiliate of KK not being permitted to present a last minute, unsupported bid for the hotel. *See* ECF No. 668.

4

Plan"), along with a related proposed disclosure statement (ECF No. 969, the "Disclosure Statement"). The Court approved the Disclosure Statement and set the First Amended Plan for confirmation. ECF No. 975. The Debtor distributed the approved Disclosure Statement to parties in interest and solicited votes on the First Amended Plan. ECF No. 992. The Debtor obtained overwhelming acceptances from the only two impaired classes under the First Amended Plan. *See* ECF No. 1272.

In the First Amended Plan, the Debtor proposed to distribute the proceeds from the sale of the hotel, plus recoveries on avoidance actions yet to be pursued, to holders of allowed claims consistent with the priorities established under the Bankruptcy Code. However, in light of the Debtor's post-closing agreement with LR, the sale proceeds would not be available for distribution until KK's appeal of the sale order was finally resolved in favor of the Debtor or LR waived that requirement. In connection with solicitation on the First Amended Plan, the Debtor disclosed to parties in interest the possibility that this Court's order approving the sale could be overturned on appeal, that the sale could be voided, the sale proceeds returned to LR, and the Debtor required to start over with the sale process. The Debtor disclosed that if this were to happen, the eventual sale proceeds could be significantly less than contemplated as a result of the sale previously approved by this Court. At the time creditors voted on the First Amended Plan, they were well aware of the risk that there could be materially reduced sale proceeds for distribution to them under the First Amended Plan and that distributions could be substantially delayed.

Because the Debtor did not have access to the proceeds from the sale of the hotel in order to make distributions under the First Amended Plan, the Court declined to go forward with the originally scheduled confirmation hearing. Instead, the Court set a series of status conferences on the First Amended Plan to permit either final affirmance of the sale order on appeal or the waiver of the appeal condition by LR. ECF Nos. 1297, 1349, 1436, 1450.

In December 2019, in an attempt to move the case toward confirmation, the Debtor filed a second amended plan and a motion, similar to the present Motion, asking the Court to set the second amended plan for confirmation without further disclosure or solicitation. ECF Nos. 1445, 1447. KK opposed that motion. ECF No. 1457. On December 20, 2019, the Court held a hearing on the Debtor's motion asking the Court to set a confirmation hearing on the second amended plan. After the Court questioned the Debtor's approach in the second amended plan, the Debtor determined to withdraw the second amended plan.

In a subsequent order, the Court denied as moot the Debtor's request to set the second amended plan for confirmation, and the Court set a deadline for the Debtor to file a third amended plan along with either a motion to approve a supplemental disclosure statement or a motion asking the Court to set such plan for confirmation without the need for additional disclosure or solicitation. ECF No. 1462. The Debtor met that deadline by filing the Third Amended Plan and the present Motion. The Court also set a deadline for objections to the Motion. KK filed the only objection. ECF No. 1481. A number of EB-5 Creditors filed a joinder in the Debtor's Motion and an opposition to KK's objection. ECF Nos. 1489, 1491.

In ruling on the Motion, the Court must determine whether the modifications presented in the Third Amended Plan, as compared with the First Amended Plan that was presented to creditors with the Disclosure Statement, necessitate further disclosure or solicitation of votes. With the Motion, the Debtor included a redline of the Third Amended Plan as compared with the First Amended Plan.

The principal modifications presented in the Third Amended Plan are as follows:

1.    Rather than delay distributions to creditors until after resolution of

KK's appeal from the sale order, the sale proceeds will be available to the Debtor

upon confirmation of the Third Amended Plan and the Debtor may make immediate distributions.

      2.      If the sale order is reversed by the Eleventh Circuit or by the United States Supreme Court <u>and</u> either court directs the hotel be returned to the Debtor <u>and</u> the hotel in fact is returned to the Debtor, then LR will have a lien on the hotel senior to all other parties in interest to secure a claim of about $41.1 million.  This amount represents the reversal of LR's monetary obligations under the sale order and the purchase agreement.  The Third Amended Plan also provides that, if the sale order is reversed and the hotel returned to the Debtor, LR may seek allowance of an administrative expense claim for funds it reasonably expended to preserve, maintain, and develop the hotel property prior to returning it to the Debtor.

There are two aspects of these modifications that are particularly important to this ruling. First, under the Third Amended Plan, LR is never entitled to return of the sale proceeds, even in the unlikely event that the sale order is reversed and the hotel re-transferred to the Debtor.  Once confirmed, the Third Amended Plan is binding on all parties in interest and the sale proceeds must be distributed as provided in the plan.  LR's only protection would be its lien on the hotel.  Second, if the Third Amended Plan is confirmed, the sale is fully consummated and the liens previously attaching to the hotel are transferred to the sale proceeds.  In the extremely unlikely event that title to the hotel is returned to the Debtor, LR would be the only party with a lien on the hotel.  Holders of secured claims would be fully protected by their liens on, and distributions from, the sale proceeds.

Even after creditors have voted on a plan, "a plan proponent may modify a plan before confirmation as long as the plan still satisfies all requirements concerning plan contents and the classification of claims and interests." *Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d

1113, 1117 (11th Cir. 2006). "After notice and a hearing, the bankruptcy court may deem a claim or

interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan

unless the modification materially and adversely changes the way that claim or interest holder is

treated." *Id.* at 1117-18; *see also* Fed. R. Bankr. P. 3019. If so, then that "claim or interest holder is

entitled to a new disclosure statement and another vote." *In re New Power Co.*, 438 F.3d at 1118.  A

modification is material if a creditor or interest holder who accepted the plan, if it knew of the

modification, would be likely to reconsider its acceptance in light of the modification. *In re Am. Solar

King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988).  In order to trigger further disclosure and

solicitation, the modification must be both material and adverse to creditors.

Applying this standard, the Court rules that the modifications presented by the Third

Amended Plan, as compared to the First Amended Plan, do not necessitate additional disclosure or

solicitation.

No creditor is adversely affected by the Third Amended Plan removing the delay and risk

associated with KK's appeal from the sale order and permitting immediate distribution of the sale

proceeds to creditors.  This change is an obvious benefit to the Debtor's true creditors.  That

confirmation and consummation of the Third Amended Plan likely will result in KK's appeal from

the Estimation Order becoming moot does not change this analysis.  This is the risk KK undertook

when it failed to obtain a stay of the Estimation Order.

The proposed lien in favor of LR, which arises only if the sale is undone and the hotel

returned to the Debtor, has no impact at all on creditors.   Following affirmance by the District

Court and the Eleventh Circuit, it is exceedingly unlikely that the sale order will be reversed and the

hotel returned to the Debtor.  The risk of a lien being imposed is so miniscule as to not be material.

But even if this remote event were to happen, creditors are fully protected under the Third

Amended Plan as the entirety of the sale proceeds would still be distributed to creditors.  Holders of

allowed secured claims would be paid in full.  Holders of allowed unsecured claims would receive

their pro rata distributions.  Holders of presently disputed claims would be protected by appropriate

reserves held in a liquidating trust, separate from the Debtor.  No existing lien on the hotel would be

primed as such liens would be transferred to the sale proceeds.

It is hard to imagine how any rightful creditor of the estate, who would be entitled to the

identical distributions provided under the First Amended Plan but without risk or further delay,

could complain about LR obtaining a lien on the hotel should it be forced to return title to the

Debtor.  Based on the approved Disclosure Statement, no reasonable party in interest could have

expected that if the sale was undone the estate would get back the hotel property free of any rights

of LR and would also get to keep and distribute the sale proceeds.

That the Third Amended Plan provides for the possibility of LR seeking allowance of an

administrative expense claim is also not material and adverse to creditors.  First, LR would present

such a claim only in the extremely remote circumstance that title to the hotel is returned to the

Debtor.  Second, the Third Amended Plan does not state that LR would be entitled to allowance of

an administrative expense, but only that it may seek such allowance.  Parties in interest would have

the right to oppose such a request.  Indeed, LR could file such an application even if the Third

Amended Plan did not so provide.

The existence of the unauthorized post-closing agreement between the Debtor and LR has

no impact on the Court's analysis.  Confirmation of the Third Amended Plan would supplant and

moot the post-closing agreement.  LR would hold title to the hotel and the Debtor would have full

access to the sale proceeds -- the outcome envisioned under the sale order and the approved

purchase agreement.  In other words, the Third Amended Plan achieves exactly what the Court

authorized.

KK argues that the component of the Third Amended Plan providing a lien to LR if the sale is undone and the hotel returned to the Debtor constitutes a change to the sale order and/or the approved purchase agreement, and that this Court lacks jurisdiction to modify the sale order in light of the pending appeal. But the Third Amended Plan does not modify the sale order or the approved purchase agreement. To the contrary, it reflects full implementation of the sale as approved by this Court. The lien provided in section 3.6 of the Third Amended Plan would arise only if that sale, fully consummated as authorized, is later undone. In the amazingly unlikely event that this occurs, the Third Amended Plan provides to LR exactly what this Court would otherwise provide to an undisputed good faith purchaser who is required to return the purchased assets to the bankruptcy estate without the ability to recover the consideration it paid. As the Court has previously stated, under such circumstances equity would require that the good faith purchaser retain a lien on the asset to secure the consideration not returned to it.

KK argues that the lien in favor of LR, that would arise only in the unlikely event that the sale is undone, is an improper post-petition financing that does not satisfy the requirements of the Bankruptcy Code. The lien proposed in section 3.6 of the Third Amended Plan is not a financing arrangement. It is an attempt by the Debtor to reflect what this Court has already stated it would do to protect the undisputed good faith purchaser of the Debtor's hotel if it is forced to give the hotel back to the Debtor but not have return of the sale proceeds. In making this argument, it appears that KK willfully misunderstands the terms of the Third Amended Plan. There is nothing in the Third Amended Plan even suggesting that LR would ever be entitled to return of the sale proceeds. Indeed, it is presumed that most of the sale proceeds would be immediately distributed to holders of allowed claims and the remainder placed in a liquidating trust separate from the Debtor. LR's only ability to protect itself in the amazingly unlikely event that it must give title back to the Debtor is to have a first priority lien on the hotel. No secured creditor is impaired by this as each allowed

secured claim has a lien on, and a right to distribution from, proceeds from the sale to pay its claim in full, and each creditor holding a presently disputed secured claim, including LR's smaller secured claim, will be protected by deposit of the appropriate amount in the disputed claims reserve. Secured claimants are not entitled to both payment in full from the sale proceeds and a lien on the hotel.

KK argues that the potential lien in favor of LR results in impairment of its smaller secured claim, which is treated in Class 1 of both the First Amended Plan and the Third Amended Plan. Again, it appears that KK purposely misstates the provisions of the Third Amended Plan. Even if the sale is somehow later undone by the Eleventh Circuit or the Supreme Court, LR is not entitled to the return of any of the sale proceeds. If the Third Amended Plan is confirmed, the holders of allowed Class 1 claims will have the right to payment in full from the sale proceeds or there will be funds deposited in the disputed claims reserve, held by a separate trustee, pending resolution of objections. With limited exceptions not applicable here, a creditor that is paid in full or, if disputed, fully reserved for, is not impaired. *See Solow v. PPI Enters. (U.S) (In re PPI Enterps. (U.S.)),* 324 F.3d 197, 205-07 (3d Cir. 2003)); *In re Introgen Therapeutics, Inc.,* 429 B.R. 570, 581 (Bankr. W.D. Tex. 2010). But this argument is a red herring. First, even if Class 1 was deemed impaired and voted to reject the plan, this would not prevent confirmation of the plan. The treatment provided to holders of Class 1 claims, meaning payment or reserve in full, satisfies the requirements of the Bankruptcy Code, and the Debtor has acceptances from two other impaired classes. Second, as noted above, the Third Amended Plan reflects full implementation of the sale as approved by this Court. Any valid liens on the hotel are transferred to the sale proceeds. Thus, KK's lien on account of its smaller secured claim (if any) would attach to the sale proceeds, not the sale assets, whereas LR's lien would attach to the sale assets and not the sale proceeds. KK's rights on account of its smaller secured claim would remain fully protected, leaving it unimpaired.

KK argues that the Court cannot make the determination requested in the Motion without first requiring the Debtor to provide additional disclosure to creditors and fixing a time for creditors to change their votes.  This argument is contrary to the vast majority of the case law on the issue.  It is up to this Court, in the first instance, to determine whether the modifications represented by the Third Amended Plan, as compared to the First Amended Plan, require additional disclosure and solicitation. *See In re Am. Solar King Corp.*, 90 B.R. at 823-24.

In light of the foregoing, the Court finds that the modifications presented in the Third Amended Plan, as compared with the First Amended Plan, do not materially and adversely change the treatment of any creditor or interest holder.  The Debtor may move forward with confirmation of the Third Amended Plan without the need for additional disclosure or solicitation.

For the foregoing reasons, the Court ORDERS and ADJUGES as follows:

1.    The *Motion to Reset Plan Confirmation Hearing and Hearing on Fee Applications Without Requiring Resolicitation* (ECF No. 1472) is GRANTED.

2.    All timely ballots presented in connection with the First Amended Plan shall be considered timely ballots with regard to the Third Amended Plan.

3.    The Court will set the *Debtor's Third Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (ECF No. 1469) for confirmation.  The Debtor is directed to contact the Courtroom Deputy to obtain a date for confirmation and to tender a proposed order setting the Third Amended Plan for confirmation and providing appropriate objection and other deadlines consistent with the Court's usual practice.  The proposed order shall state that the Court will consider previously filed objections to the First Amended Plan and that new objections will be limited to matters arising as a result of modifications presented in the Third Amended Plan as compared to the First Amended Plan.

4.      If the Court confirms the Third Amended Plan, this order shall be deemed

incorporated into any confirmation order.[5]

### ###

Copy to:

Eric S. Pendergraft, Esq.

*Eric S. Pendergraft, Esq. is directed to serve a copy of this order on all appropriate parties and file a certificate of service.*

---

[5] Because the Court's substantive rulings in this order are effective only if and when the Court confirms the Third Amended Plan, this order is not a final order subject to appeal as a matter of right.

# EXHIBIT 4



**ORDERED in the Southern District of Florida on February 11, 2020.**



**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In Re:                                           Case No.  18-19441-EPK

160 Royal Palm, LLC,                             Chapter 11

      Debtor.
_____/

**ORDER CONFIRMING DEBTOR'S THIRD**
**AMENDED PLAN OF LIQUIDATION AND ESTABLISHING**
**<u>DEADLINE TO FILE CLAIMS FOR REJECTION DAMAGES</u>**

**THIS MATTER** came before the Court for hearing on February 10, 2020 (the

"Confirmation Hearing") to consider confirmation of the *Debtor's Third Amended*

*Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 1469]

(the "Plan") filed by 160 Royal Palm, LLC (the "Debtor").

Having considered: (a) the Plan; (b) the *Amended Disclosure Statement for*

*Chapter 11 Plan of Liquidation Proposed by 160 Royal Palm, LLC* [ECF No. 969] (the

"Disclosure Statement"), which the Court previously approved in its Order at ECF No. 975; (c) the *Confirmation Affidavit of Cary Glickstein* [ECF No. 1531] (the "Confirmation Affidavit"); (d) the evidence presented; (e) the proffered testimony of Cary Glickstein; and (f) the statements, arguments, and representations of counsel, the Court, pursuant to Federal Rule of Bankruptcy Procedure 7052, makes the following findings of fact and conclusions of law:

## Findings of Fact and Conclusions of Law

## Adequate Notice and Acceptance of Modified Plan

A.       Adequate and sufficient notice, as required pursuant to the Federal Rules of Bankruptcy Procedure and the Court's *Order (I) Approving Disclosure Statement; (II) Setting Hearing on Confirmation of Plan; (III) Setting Hearing on Fee Applications; (IV) Setting Various Deadlines; and (V) Describing Plan Proponent's Obligations* [ECF No. 975], as well as the Court's *Order: (II) Setting Hearing on Confirmation of Plan; (III) Setting Hearing on Fee Applications; (IV) Setting Various Deadlines; and (V) Describing Plan Proponent's Obligations* [ECF No. 1500], was provided to all known creditors, equity security holders, the Office of the U.S. Trustee, and other parties in interest of: i) the Plan; ii) the deadline to file and serve objections to confirmation of the Plan; iii) the deadline for voting on the Plan; and iv) the hearing on approval of the confirmation of the Plan.  While the Plan was amended from the *Debtor's Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 968] (the "Prior Plan"), for the reasons set forth in the Court's January 15, 2020 *Order Granting Motion to Reset Plan Confirmation Hearing and Hearing on Fee*

*Applications Without Requiring Resolicitation* [ECF No. 1495], the Plan does not require re-solicitation.

### Jurisdiction and Venue

B.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the District Court's general order of reference.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§1408 and 1409.

### 11 U.S.C. § 1129(a)(1)

C.      The Plan complies with the applicable provisions of the Bankruptcy Code, including without limitation 11 U.S.C. §§ 1122, 1123, 1125, and 1129 with respect to all classes of Claims[1] and Interests under the Plan and, therefore, the provisions of 11 U.S.C. § 1129(a)(1) have been satisfied.

### 11 U.S.C. § 1129(a)(2)

D.      The Debtor, the proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(2) have been satisfied.

### 11 U.S.C. § 1129(a)(3)

E.      The Plan has been proposed in good faith and not by any means forbidden by law.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(3) have been satisfied.

---

[1] Unless otherwise defined, any capitalized terms herein shall have the same meaning ascribed to them in the Plan.

**11 U.S.C. § 1129(a)(4)**

F.      Any payments made or to be made by the Debtor and the Liquidating Trustee, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the case, or in connection with the Plan and incident to the case, have been approved by, or are subject to the approval of, this Court as reasonable.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(4) have been satisfied.

**11 U.S.C. § 1129(a)(5)**

G.      The Plan discloses, in Sections 1.42 and 7.3.4, the identity of Cary Glickstein as the Liquidating Trustee, and Mr. Glickstein's affiliations with the Debtor as its Manager and former receiver have been disclosed in the Disclosure Statement accompanying the Plan.  Section 10.1 of the Liquidating Trust Agreement discloses the nature of the Liquidating Trustee's post-confirmation compensation. The appointment of Cary Glickstein as Liquidating Trustee is consistent with the interests of creditors and Liquidating Trust Beneficiaries and consistent with applicable public policy.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(5) have been satisfied.

**11 U.S.C. § 1129(a)(6)**

H.      No governmental regulatory commission has jurisdiction over the rates of the Debtor or the Liquidating Trust.  Accordingly, 11 U.S.C. § 1129(a)(6) is not applicable.

**11 U.S.C. § 1129(a)(7)**

I.      The Plan has four Classes.   The Plan treats Class 1 as Unimpaired.  The Plan treats Classes 2, 3, and 4 as Impaired.  Classes 2 and 3 voted in favor of the Plan and have therefore accepted the Plan.  Class 4 will receive no property or distribution under the Plan.  The distribution of no value whatsoever to holders of Class 4 Interests is not less than the amount such holders would so receive or retain if the Debtor were liquidated under chapter 7 of the United States Bankruptcy Code.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(7) have been satisfied.

**11 U.S.C. §§ 1129(a)(8) and 1129(b)(1)**

J.      Classes 2 and 3 are Impaired and have accepted the Plan.  Class 1 is Unimpaired.  Class 4 is Impaired, will receive or retain no property, and is therefore presumed to have rejected the Plan.  The Plan does not discriminate unfairly with respect to this dissenting class or between any classes.  Furthermore, with respect to Class 4, the Plan is fair and equitable because no holder of a claim or interest that is junior to that of Class 4 will receive or retain any property, distribution, payment, or anything else under the Plan.

**11 U.S.C. § 1129(a)(9)**

K.      The Plan provides that all applicable Allowed Administrative Claims are to be paid upon the latter of: (1) the Effective Date; (2) the date on which such claims becomes payable pursuant to a Final Order of the Court; (3) for Allowed Administrative Claims that represent liabilities incurred by the Debtor in the ordinary course of business after the Petition Date with regard to the Debtor, the date

on which each such Claim becomes due in the ordinary course of such Debtor's business and in accordance with the terms and conditions of any agreement relating thereto; or (4) upon such other dates and terms as may be agreed upon by the Holder of any such Allowed Administrative Claim and the Debtor.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(9) have been satisfied.

### 11 U.S.C. § 1129(a)(10)

L.       Two impaired classes of claims—Classes 2 and 3—have accepted the Plan.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(10) have been satisfied.

### 11 U.S.C. § 1129(a)(11)

M.       The Plan is currently feasible, workable, and has a reasonable likelihood of success. The Plan itself provides for the liquidation, rather than the reorganization, of the Debtor, and such liquidation of all the Debtor's assets that are necessary to fund the Plan has already occurred, with the only remaining extra assets to be liquidated consisting of pending and future litigation claims to which the Liquidating Trust will be adequately equipped and funded to pursue for the additional benefit of holders of Class 3 Claims.  Specifically:

       i.  Section 9.1 of the Plan provides that the Plan's Effective Date shall occur once the following events have occurred: (1) the Court shall have entered this Confirmation Order; (2) the Court shall have approved the Disclosure Statement; (3) the Debtor shall have executed and delivered all documents, agreements and instruments required under the Plan; and (4) the Debtor or

Liquidating Trustee shall have received the Sale Proceeds released by the escrow agent pursuant to Section 7.4 of the Plan. Each of these required events has already occurred or will occur shortly;

ii.   The sale of Sale Assets, including the Debtor's real property located at 160 Royal Palm Way, Palm Beach, Florida (the "Real Property") by the Debtor to LR U.S. Hotels Holdings, LLC ("LR"), has been approved by the Court in its Sale Approval Order and such order has been affirmed by the United States Court of Appeals for the Eleventh Circuit.  Section 7.4 of the Plan provides that the Debtor and LR shall expeditiously execute and transmit all documents and notices required to effectuate the release of the resulting Sale Proceeds from escrow to the Debtor or Liquidating Trust, and provides that any escrow agent shall release such funds on the date this Confirmation Order is entered;

iii.  Claim No. 70-3, which KK-PB Financial, LLC filed as a claim in the amount of $39,684,844.73 secured by the Real Property, was estimated by the Court at $0 and completely disallowed. The Bankruptcy Court's order estimating and disallowing such claim is unstayed and is pending appeal to the United States District Court, following the United States Court of Appeals for the Eleventh Circuit's recent denial of a KK-PB's petition for

permission for direct appeal and the Eleventh Circuit's recent denial of KK-PB's motion for stay pending appeal.  In its own order denying KK-PB Financial, LLC's request for a stay pending appeal in that matter, the Bankruptcy Court determined that "KK-PB has a negligible likelihood of success on its appeal from the Estimation Order;" and

 iv. Finally, the Court's Sale Approval Order states that "As the Court has pointed out, in light of the disallowance of KK-PB's mortgage claim for all purposes in this case, and particularly for purposes of this sale, KKPB is not entitled to any adequate protection of that alleged secured claim and so is not entitled to a lien on the proceeds of sale."  That is, the sale of the Real Property was completely free and clear of Claim No. 70-3, and no part of that Claim has attached to the Sale Proceeds.

Therefore, the Effective Date will occur shortly, and on the Effective Date, the Debtor will have sufficient cash available to make all payments and meet all payment obligations required under the Plan.  Accordingly, the requirements of 11 U.S.C. § 1129(a)(11) have been satisfied.

**<u>11 U.S.C. § 1129(a)(12)</u>**

 N. The Plan provides for payment in full of all U.S. Trustee fees payable under 28 U.S.C. § 1930 and all fees payable under Section 1930 of Title 28.  To the

extent any fees remain due and owing, they will be paid on the Effective Date of the Plan. Accordingly, the requirements of 11 U.S.C. § 1129(a)(12) have been satisfied.

**11 U.S.C. § 1129(a)(13)**

O.      The Debtor has no retirement plan, and the Debtor therefore has no obligation to provide retiree benefits. Accordingly, 11 U.S.C. § 1129(a)(13) is not applicable.

**11 U.S.C. §§ 1129(a)(14) and (15)**

P.      The Debtor is not an individual. Accordingly, 11 U.S.C. §§ 1129(a)(14) and (15) are not applicable.

**11 U.S.C. §§ 1129(a)(16)**

Q.      The Debtor is a Florida for-profit limited liability company. Accordingly, 11 U.S.C. § 1129(a)(16) is not applicable.

**Federal Rule of Bankruptcy Procedure 3020(e)**

R.      Cause exists to waive the fourteen-day stay of this Confirmation Order.

**Prior Order and Oral Findings Incorporated by Reference**

S.      The Court's oral findings of fact and conclusions of law announced on the record at the Confirmation Hearing are attached hereto as **Exhibit A** and incorporated by reference herein. Furthermore, the Court's January 15, 2020 *Order Granting Motion to Reset Plan Confirmation Hearing and Hearing on Fee Applications Without Requiring Resolicitation* [ECF No. 1495] is incorporated herein by reference.

## Requirements for Confirmation Satisfied

T.      All of the requirements for Confirmation under 11 U.S.C. § 1129 have been satisfied.  Confirmation of the Plan is in the best interests of the Debtor's Estate, creditors, equity interest holders, and all other parties in interest.

Having considered the foregoing, it is **ORDERED AND ADJUDGED** that:

1.      All objections to confirmation of the Plan, including the objections filed by KK-PB Financial, LLC at ECF Nos. 1327 and 1516, are **OVERRULED**.

2.      The Plan is **CONFIRMED** and **APPROVED** in all respects.

3.      The Findings of Fact and Conclusions of Law set forth above shall constitute findings of fact and conclusions of law of this Court pursuant to Federal Rule of Bankruptcy Procedure 7052.  To the extent any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

4.      Notice was adequate and sufficient under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and Orders of this Court, and the Due Process Clause of the United States Constitution.

5.      The Effective Date shall occur upon the entry of this Confirmation Order and once all other conditions set forth in Section 9.1 are satisfied. The Debtor shall file a Notice of the Effective Date with the Court upon the occurrence of the Effective Date.

6.      All Equity Interests in the Debtor are hereby **EXTINGUISHED**.

7.    Any escrow agent in possession of the Sale Proceeds shall release such funds to the Debtor or Liquidating Trustee, and, if they have not done so already, the Debtor and LR shall expeditiously execute and transmit all documents and/or notices required to effectuate the timely release of such funds.

8.    The appointment of Cary Glickstein as the Liquidating Trustee pursuant to Section 7.3.4 of the Plan is hereby **APPROVED**.  The Liquidating Trustee shall be compensated pursuant to Section 7.3.6(j) of the Plan.  All Estate Professionals employed by the Debtor pursuant to Court approval shall be deemed employed by the Liquidating Trustee pursuant to the same terms and conditions of such previously-approved employment.

9.    The Liquidating Trust Agreement is **APPROVED** and the Debtor is **AUTHORIZED AND DIRECTED** to execute the Liquidating Trust Agreement and to thereby convey and otherwise transfer all of its assets to the Liquidating Trustee to be held in trust for the benefit of the Liquidating Trust Beneficiaries subject to the term and provisions of the Plan and the Liquidating Trust Agreement.

10.    If the Sale Approval Order is reversed by mandate of the United States Court of Appeals for the Eleventh Circuit or the United States Supreme Court **and** either court also mandates that the Sale Assets be re-conveyed back to the Debtor or that title to the Sale Assets shall otherwise re-vest back in the Debtor **and** such re-conveyance/re-vesting actually occurs, then LR—or any successor-in-interest— shall have a priority lien on the Sale Assets that is senior to that of any holder of a Claim or Interest in the Case.  Such priority lien (the "Sale Assets Lien") shall secure a claim

of LR—or any successor-in-interest—not to exceed $41,102,897.75, plus the U.S. Trustee Fee Sum (defined below), if any, for the Court-approved sums actually expended by LR—or any successor-in-interest—for the acquisition of the Sale Assets and specifically comprised of: (a) the $39,600,000 cash purchase price paid by LR to the Debtor and approved by the Court in Paragraphs E and 19 of the Sale Approval Order; (b) the $350,000 breakup fee paid from the Sale Proceeds to RREF II Palm House, LLC pursuant to the Paragraph 17 of the Sale Approval Order; (c) the $450,000 commission to broker Cushman & Wakefield U.S., Inc. paid by LR pursuant to Paragraph 19 of the Sale Approval Order and Section 6.2 of the Asset Purchase Agreement incorporated therein; (d) the $250,000 paid by LR to the Debtor for repayment of the Debtor's advance to the Town of Palm Beach and Town of Palm Beach Code Enforcement Board on behalf of LR pursuant to Paragraph 18 of the Sale Approval Order; (e) the $175,452.65 in 2018 Palm Beach County real estate taxes owed by the Debtor and paid by LR on behalf of the Debtor pursuant to Paragraph 19 of the Sale Approval Order and Section 6.2 of the Asset Purchase Agreement incorporated therein; (f) the $277,445.10  in recording fees and transfer taxes paid by LR to the Palm Beach County Clerk of the Circuit Court pursuant to Paragraph 19 of the Sale Approval Order and Section 6.2 of the Asset Purchase Agreement incorporated therein;  and (g) any United States Trustee's fees owed by the Debtor and paid from the Sale Proceeds (the "U.S. Trustee Fee Sum") pursuant to Paragraph 19 of the Sale Approval Order and Section 6.1 of the Asset Purchase Agreement incorporated therein (the "Sale Assets Claim").  The Sale Assets Claim and the Sale

Assets Lien, as well as any future right by LR—or any successor-in-interest—to ever receive the Sale Assets Claim and the Sale Assets Lien, shall be satisfied, settled, released, extinguished, and discharged upon the earlier of the following events:

    a.   the entry of an order by the United States Supreme Court rejecting or denying any petition for certiorari regarding any decision of the United States Court of Appeals for the Eleventh Circuit affirming the Sale Approval Order in Case No. 19-11402;

    b.   the entry of an order by the United States Supreme Court that, following the grant of a writ of certiorari, dismisses the Supreme Court case involving the review of any decision of the United States Court of Appeals for the Eleventh Circuit affirming the Sale Approval Order in Case No. 19-11402;

    c.   the entry of an order by the United States Supreme Court affirming the Sale Approval Order and/or affirming any lower court order affirming the Sale Approval Order;

    d.   the entry of an order by the United States Supreme Court reversing the Sale Approval Order but otherwise determining that, pursuant to 11 U.S.C. § 363(m), such reversal does not affect the validity of the sale approved in the Sale Approval Order;

    e.   the time upon which the Sale Approval Order reaches the status of not being subject to any further review on appeal or writ of certiorari; or

    f.   the repayment of the Sale Assets Claim.

Such satisfaction, settlement, release, extinguishment, and discharge of the Sale Assets Claim and the Sale Assets Lien shall occur within seven days of the Bankruptcy Court determining the occurrence of one of the foregoing events.

11.    In the event the Sale Approval Order is reversed by mandate of the United States Court of Appeals for the Eleventh Circuit or the United States Supreme Court **and** either court also mandates that the Sale Assets be re-conveyed back to the Debor or that title to the Sale Assets shall otherwise re-vest back in the Debtor **and** such re-conveyance/re-vesting actually occurs, then LR—or any successor-in-interest—shall also have the right to seek allowance of a Post-Confirmation Administrative Claim arising from any funds reasonably expended by LR—or any successor-in-interest—to preserve, maintain, and develop the Sale Assets prior to any requirement to re-convey to, or re-vest the Sale Assets with, the Debtor.

12.    The Debtor or Liquidating Trustee, as applicable, shall execute, file, or record any documents reasonably requested by LR to perfect or further evidence the Sale Assets Lien and the Sale Assets Claim.

13.    The Debtor and/or Liquidating Trustee, as applicable, shall take all necessary action to prosecute/defend any challenges to, or appeals of, the Sale Approval Order and this Court's March 1, 2019 *Order: (I) Granting Expedited Motion Seeking Approval of Procedures for Amended Sale Process and (II) Scheduling Final Hearing to Consider Approval of Sale Assets Free and Clear of Liens, Claims and Encumbrances* [ECF No. 619].

14.     Any and all executory contracts and unexpired leases—other than any director and officer insurance policy—not assumed by the Debtor on or before the entry of this Confirmation Order are **REJECTED**.

15.     **Any party to a contract or lease rejected pursuant to this Order with a claim for rejection damages ("Rejection Claim") may file with the Court a claim within thirty (30) days from the date of entry of this Confirmation Order and serve a copy on the Debtor's counsel ("Rejection Claim Bar Date").  The Debtor shall have thirty (30) days from receipt thereof to file an objection to such Rejection Claim.  ANY CREDITOR WHO FAILS TO FILE A REJECTION CLAIM ON OR BEFORE THE REJECTION CLAIM BAR DATE WILL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH REJECTION CLAIM AGAINST THE DEBTOR, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, OR THE ESTATE, AND THE DEBTOR, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, THE ESTATE, AND PROPERTY OF THE SAME WILL BE FOREVER DISCHARGED FROM ANY AND ALL INDEBTEDNESS OR LIABILITY WITH RESPECT TO SUCH CLAIM.  IN ADDITION, THE HOLDER OF SUCH REJECTION CLAIM SHALL NOT BE PERMITTED TO PARTICIPATE IN ANY DISTRIBUTION IN THE CHAPTER 11 CASES ON ACCOUNT OF SUCH CLAIM, OR RECEIVE FURTHER NOTICES REGARDING SUCH CLAIM.**

16.    Such documents that may be necessary or appropriate to effectuate the Plan are **APPROVED**.

17.    *Cary Glickstein, the Liquidating Trustee, and all professionals employed by the Debtor, the Liquidating Trustee, or the Liquidating Trust, shall neither have nor incur any liability to any person or entity, excluding the Debtor, Liquidating Trust, and Liquidating Trustee, for any and all claims and causes of action arising on or after the Petition Date up through the time this case is closed, involving or relating to any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, or administering the sale of property of the estate, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other post-petition act taken or omitted to be taken in connection with or in contemplation of the administration of the estate; provided, however, that the foregoing provisions of this paragraph shall have no effect on the liability of any person that results from any such act or omission that is determined to have constituted gross negligence, willful misconduct, or fraud; provided further, that nothing contained herein shall preclude any governmental entity from pursuing a criminal, police or regulatory action against any entity.*

18.    *All entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor are, with respect to any such Claims or Equity*

*Interests, permanently, enjoined from and after the Confirmation Date from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum, or any discovery) against or affecting, the Sale Assets, the Liquidating Trustee, or the Liquidating Trust or any of its property, including property of the Estate transferred to the Liquidating Trust pursuant to the Plan; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, order, or encumbrance of any kind against the Sale Assets, Liquidating Trustee, the Liquidating Trust or any of its property, including property of the Estate transferred to the Liquidating Trust pursuant to the Plan; (iii) asserting any right of setoff, directly or indirectly, against any obligation due the Debtor, or any of its property, except as contemplated or allowed by the Plan; (iv) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance or lien of any kind against the Sale Assets, Liquidating Trustee, or the Liquidating Trust or any of its property, including property of the Estate transferred to the Liquidating Trust pursuant to the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the*

*Plan; provided, however, that nothing herein shall constitute a waiver of any rights or defenses of such persons with respect to such actions, provided, further, that this injunction shall neither bar any entity from asserting any defense in an action commenced by or on behalf of the Debtor, nor prohibit any entity from asserting any right expressly preserved or contemplated by the Plan; provided, furthermore,  that nothing contained herein shall preclude the IRS from pursuing an action against any entity, or preclude any governmental entity from pursuing a criminal, police or regulatory action against any entity.*

*Nothing herein shall be construed as enjoining any party's prosecution or defense of any appeal of any order entered by the Court in this Case.*

19.    The Court confirms, for the avoidance of doubt, that: (a) the Plan does not convey any Claims or Causes of Action belonging to any holder of an Allowed Unsecured Claim and not belonging to the Debtor's estate against anyone other than i) the Debtor, (ii) Cary Glickstein, (iii) the Liquidating Trustee, and (iv) the professionals employed by the Debtor, the Liquidating Trust, and the Liquidating Trustee (the "Creditor Claims") to the Liquidating Trust; and (b) nothing in the Plan, as confirmed, is intended to or shall limit the rights of any holder of an Allowed Unsecured Claim to pursue any of the Creditor Claims and Causes of Action, except as provided in paragraphs 10.5 and 10.6 of the Plan against (i) the Debtor, (ii) Cary Glickstein, (iii) the Liquidating Trustee, (iv) the professionals employed by the

Debtor, the Liquidating Trust, and the Liquidating Trustee, (v) the Sale Assets, (vi) property of the Debtor, and (vii) property of the Liquidating Trustee.

20.    Unless otherwise provided in the Plan or this Order, all injunctions or stays provided for in the Bankruptcy Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

21.    The Debtor and Liquidation Trustee are authorized to enter into settlements with respect to any asserted claims, including allowed claims, upon such reasonable terms and conditions as may be approved by the Bankruptcy Court.

22.    The Bankruptcy Court shall retain exclusive jurisdiction to enforce all injunctions or stays provided for under the Plan.

23.    This Order is in recordable form, and shall be accepted by any filing or recording officer or authority of any applicable governmental unit for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

24.    Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer under, in furtherance of, or in connection with the Plan, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments, or any other documents executed in connection with any of the transactions contemplated by the Plan, and related loan

and security documents, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

25.     Under 11 U.S.C. §§ 105(a) and 1142 of the Bankruptcy Code, the Court shall retain exclusive jurisdiction and venue over all matters arising out of arising in, or related to the above-captioned bankruptcy case and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction and venue to determine all discovery, controversies, or disputes arising under or in connection with: (a) any agreement or transaction approved by the Court during the Bankruptcy Case; (b) any prior Order entered by the Court during the Bankruptcy Case, and furthermore, the matters set forth in Article XII of the Plan.

26.     After the Effective Date, the Debtor or the Liquidating Trustee, as applicable, shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  On and after the Effective Date, the Debtor or the Liquidating, as applicable, shall remain obligated to pay 28 U.S.C. § 1930 quarterly fees to the United States Trustee until the earliest of this case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

27.     Notwithstanding Federal Rule of Bankruptcy Procedure 3020(e), this Order shall be immediately effective, subject to the terms and conditions of the Plan.

28.     The Debtor shall serve a copy of this Order upon all parties entitled to notice thereof pursuant to Federal Rule of Bankruptcy Procedure 3020(c), and Local Rules 2002-1(c)(11) and 3020-1(D), and shall file a certificate of service with the Court.

###

Submitted by:

Philip J. Landau, Esq.
Shraiberg, Landau & Page, P.A.
Attorneys for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Tel.: 561-443-0800
Facsimile: 561-998-0047

*Philip J. Landau is directed to serve copies of this Order upon all interested parties and to file a certificate of service with the Court.*

# Exhibit A

EXHIBIT A

In re: 160 Royal Palm, LLC
Case No. 18-19441
Chapter 11

**After an evidentiary hearing held on February 10, 2020 to consider, *inter alia*, confirmation of the *Debtor's Third Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 1469], the Court made the following findings of fact and conclusions of law on the record:**

The Court has before it for confirmation the Debtor's Third Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code, which is in the docket at ECF number 1469.

The Court previously approved the disclosure statement by order entered at ECF number 975. Although the disclosure statement related to a prior filed first amended plan, the Court ruled that the modifications represented by the third amended plan now before the Court for confirmation, as compared with the first amended plan, did not require additional disclosure or solicitation. The Court incorporates in full here its order entered at ECF number 1495.

In support of confirmation, among other evidence, the debtor offered the affidavit of Cary Glickstein, in the form required by the Court, which is filed at ECF number 1531, the certificate on acceptance of the plan and tabulation of ballots, in the form required by the Court, which is filed at ECF number 1528, and the corrected affidavit of Michelle Clapp, which is filed at ECF number 1535.

KK-PB Financial, LLC filed the only timely objections to confirmation. You can find these in the docket at ECF numbers 1327 and 1516. For ease of reference, I will refer to KK-PB Financial, LLC as "KK".

The plan is straightforward. The debtor was the owner of a partially re-constructed hotel project in Palm Beach, Florida. The Court previously approved the sale of the hotel project. Under the plan, the proceeds of the sale will be distributed to pay administrative expenses and to pay creditors consistent with the priority required under the Bankruptcy Code.

Class 1 of the plan includes the secured claims of specified parties. These claims are to be paid in full. Class 1 is not impaired. As the Court previously ruled in the order entered at ECF number 1495, the modifications presented in the third amended plan do not result in impairment of this class.

Class 2 of the plan includes the claims of the Town of Palm Beach. Those claims are to be paid pursuant to a settlement previously approved by the Court. Class 2 is impaired, and so the Town of Palm Beach is entitled to vote on the plan. The Town voted in favor of confirmation. Class 2 is an impaired accepting class.

Class 3 of the plan includes all unsecured claims against the bankruptcy estate. The holders of claims in Class 3 will receive their *pro rata* share of the proceeds from sale of the hotel, after payment of administrative expenses and payment to holders of allowed claims in Classes 1 and 2. Class 3 is impaired, and so holders of claims in Class 3 are entitled to vote on the plan. The holders of claims in Class 3 voted overwhelmingly in favor of confirmation. Class 3 is an impaired accepting class.

Class 4 of the plan includes all equity interests in the debtor. The debtor's equity will receive no distribution under the plan and is therefore deemed to have rejected the plan.

The plan provides for a disputed claims fund to act as a reserve for claims that are subject to objections yet to be ruled on by this Court. The plan provides for a liquidating trust, under a form of trust agreement to be approved by the Court, consistent with typical practice, to oversee pursuit of litigation on behalf of the estate after confirmation, and to administer distributions to creditors, among other things.

The Court set a deadline for the filing of written objections to confirmation of the debtor's plan, and a second objection deadline to permit objections to changes represented in the plan now presented for confirmation as compared with the first amended plan. Any objection not raised in a timely filed written objection was waived.

KK filed two timely written objections to confirmation of the plan.

In its second written objection filed at ECF number 1516, KK incorporated arguments it made in ECF number 1481. The Court overrules these objections for the reasons stated in the order entered at ECF number 1495. The Court's analysis in that prior order is bolstered by the Eleventh Circuit's recent issuance of its mandate on the appeal from the sale order, which was affirmed, and the Eleventh Circuit's denial of a motion to stay the estimation order pending appeal, which motion KK filed specifically to prevent confirmation of the plan today.

KK argues that the plan does not satisfy the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. Section 1129(a)(11) states: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

In reviewing the feasibility of a plan, the Court considers whether it offers a reasonable prospect of success and is workable. A possibility of failure is not fatal. In cases where the reorganized debtor will continue in operation post-confirmation, the Court considers whether the reorganized debtor will be able to generate sufficient cash flow to make the future payments contemplated under the plan. In this case, we have a liquidating plan. Meeting the feasibility standard is less complex in the case of a liquidating plan. Congress used the word "likely" in section 1129(a)(11). The question for the Court is whether confirmation of the debtor's plan is likely to be followed by further liquidation that is not already contemplated in the plan.

KK argues that the plan does not contemplate the possibility that the debtor could lose either of two pending appeals and that failure to address the possibility of loss in either appeal causes the plan to be infeasible.

KK appealed this Court's orders approving the sale procedure and the sale of the debtor's hotel property. Those rulings were affirmed by the District Court and by the Eleventh Circuit. KK's motion for panel rehearing by the Eleventh Circuit was denied. The Eleventh Circuit issued its mandate on February 6, 2020. Even if KK further challenges the sale procedure and sale orders, by petition for writ of certiorari to the Supreme Court, based on the merits of its arguments it is extremely unlikely it will be successful. And, because the plan effectuates the approved sale of the hotel property and release of the sale proceeds, the sale is protected under section 363(m). KK's continued challenge to the sale, if any, would have no impact on the feasibility of the plan.

KK alleged a claim in the approximate amount of $39.6 million, secured by a mortgage on the debtor's hotel property. In February 2019, the Court entered an order estimating that claim under section 502(c) as an unsecured claim in the amount of $0. The effect of that ruling is that KK's mortgage claim is disallowed.

KK appealed the Court's estimation order by notice of appeal filed in March 2019. In November 2019, the District Court certified the appeal to the Eleventh Circuit. In addition, KK asked the Eleventh Circuit to accept a direct appeal. The Eleventh Circuit recently denied the request for direct appeal and dismissed the appeal for lack of jurisdiction. It appears that the appeal from the estimation order is returned to the District Court. In any case, there has been no substantive ruling on the appeal from the estimation order. Motions for stay pending appeal, including at the Eleventh Circuit, have been denied.

KK argues that the debtor's plan does not contemplate the possibility that it will be successful in overturning the estimation order and that the plan is thus not feasible. This argument turns on its head black letter law with regard to the enforceability of final orders and judgments, the requirement to obtain a stay pending appeal, and mootness of appeals.

This Court's estimation order is a final order subject to appeal as of right, as KK itself acknowledged in its own appeal. As with any final order or judgment, the estimation order is enforceable unless it is overturned or stayed. The estimation order is not stayed. Thus, the estimation order is enforceable.

Consistent with the estimation order, the debtor's plan makes no provision for treatment of KK's disallowed mortgage claim. There is no need for the debtor to reserve for a claim that was disallowed by an un-stayed final order. If the debtor's plan is confirmed, it likely will be substantially consummated soon thereafter, with distributions made to administrative claimants and holders of properly allowed claims. The appeal from the estimation order would then become moot as it would no longer be possible to fashion a remedy that would not materially harm other creditors.

For the applicable mootness standard, I refer the parties to decisions of the Eleventh Circuit. In re Club Associates, a 1992 decision reported at 956 F.2d 1065. In re Holywell Corporation, a 1990 decision reported at 911 F.2d 1539, which was reversed on other grounds.

The fact that KK's appeal from the estimation order may become moot if the debtor's plan is confirmed is the risk it took by not obtaining a stay of the estimation order. The burden is on the party seeking such a stay and KK has not satisfied that burden to the satisfaction of this Court or the Eleventh Circuit, which denied the motion for stay on the merits before dismissing the appeal. To rule as KK requests would eliminate the need to even seek a stay pending appeal.

Even if KK's appeal from the estimation order was somehow not subject to dismissal as moot upon substantial consummation of the debtor's plan, the existence of that appeal does not cause the plan to be infeasible. As the Court previously ruled in its order denying KK's motion for stay pending appeal, in the docket at ECF number 1056, KK has only a negligible likelihood of success in the appeal. Thus, it is not likely -- for the transcript I am stressing the word "likely" -- that confirmation of the debtor's plan would be followed by the need for further liquidation, as contemplated by section 1129(a)(11).

KK also suggests that the plan is not feasible because "there is no indication that LR intends to instruct the escrow agent to release the funds on the confirmation date." By the term "funds" KK refers to the net sale proceeds from the sale of the hotel. But section 7.4 of the plan explicitly provides that the sale proceeds will be released by any escrow agent on the confirmation date and the debtor and LR are required to execute and transmit all necessary documents to accomplish this. LR confirmed on the record today that it is bound by the terms of the plan. In addition, the debtor filed at ECF number 1557 a letter from counsel for LR confirming that LR will join

the debtor and execute a joint instruction to the escrow agent for disbursement of funds held in escrow.

In its second written objection, at ECF number 1516, KK argues that at a hearing on December 20, 2019 this Court recognized that if the estimation order was reversed on appeal and/or KK's disallowed mortgage claim was somehow reinstated, that mortgage claim would be a disputed claim and potentially an allowed claim under the debtor's current plan. Having reviewed the transcript from that hearing, the Court said no such thing. Indeed, on December 20, 2019 the debtor had yet to file the plan set for confirmation today, so no one could have been commenting on the plan now under consideration. In any case, applicable law does not require the plan to treat KK's disallowed mortgage claim as a disputed claim, as the Court has several times ruled, most recently in the order at ECF number 1495.

Nor does the debtor's description of the risks associated with KK's appeal from the estimation order, outlined at pages 28 to 29 of the disclosure statement, support KK's conclusion that success in its appeal from the estimation order would necessitate a reserve for its disallowed mortgage claim. In the disclosure statement, the debtor sets out the worst-case scenario for creditors, not taking into account the mootness standard, which is black letter law. The risks presented by the superseded first amended plan, which did not provide for immediate distribution of sale proceeds, are no longer present in the current plan, which does. Not surprisingly, the current plan explicitly provides that KK's disallowed mortgage claim does not have the benefit of a reserve. KK cites the relevant provisions of the plan in paragraph 4 of its objection at ECF number 1516. It is not necessary for the debtor to give KK the benefit of a stay pending appeal that it has not in fact obtained.

Somewhat disingenuously, KK seeks what it calls clarification that "if the Estimation Order is reversed and/or the Mortgage Claim is reinstated, KK would not be barred from seeking recovery on the Mortgage Claim." KK is not entitled to any such ruling. The mootness of the appeal from the estimation order is exactly the risk KK undertook by not obtaining a stay pending appeal.

It should be noted that certain of KK's arguments on this issue are based on a faulty premise. Even if an order was entered reversing this Court's ruling in the estimation order, the mortgage claim would not be reinstated as it suggests. KK's mortgage claim would still be subject to pending objections which would then be determined by a new evidentiary hearing. But this would happen only if the debtor's plan was not confirmed and substantially consummated prior to reversal; otherwise, the claim objection procedure would also be moot.

As an alternative to its feasibility objection, KK asks the Court to defer confirmation of the plan until the appeal from the estimation order runs its course. In support of this argument, KK cites In re DeMarco, a decision of the Bankruptcy Court in the

Middle District of Florida issued in 2000. You can find the decision reported at 258 Bankruptcy Reporter 30.

In DeMarco, the Bankruptcy Court had issued an order disallowing a secured claim of the IRS. The IRS appealed that ruling to the District Court, but did not obtain a stay pending appeal. From the decision, it appears that the IRS did not even seek such a stay. The chapter 13 debtor then sought to confirm a plan that expressly provided that the IRS would receive nothing and that the debtor would retain the property free of the claimed lien of the IRS. The Bankruptcy Court determined that it would defer confirmation of the debtor's chapter 13 plan because confirmation of the plan might cause the IRS's appeal to become moot, leaving the IRS with no remedy. The effect of the ruling in DeMarco is to give the IRS the benefit of a stay pending appeal that it neither requested nor proved.

The DeMarco decision is an outlier, for obvious reasons. For an analysis in line with the overwhelming majority, I direct the parties to Judge Walrath's well-reasoned decision in In re Washington Mutual, Inc., from 2011, which you can find at 461 Bankruptcy Reporter 200. Judge Walrath later vacated part of this decision addressing a separate matter. Her discussion of this issue is at pages 217 to 220. As Judge Walrath points out, the objecting party could avoid the mootness problem by seeking a stay pending appeal. As she says, to rule otherwise would preclude the court from dealing with confirmation of any plan contrary to an objecting party's position on appeal, possibly stalling the bankruptcy case indefinitely. This outcome would be inconsistent with the basic tenet that an un-stayed final order or judgment is enforceable in spite of an appeal. You can find another useful analysis of this issue in In re Sabine Oil & Gas Corp., a 2016 decision reported at 548 Bankruptcy Reporter 674.

For these reasons, the Court will not defer confirmation so KK can proceed with its appeal from the estimation order.

In its original objection to confirmation, filed at ECF number 1240, KK raised a number of objections to language contained in sections 10.5 and 10.6 of the first amended plan. The amended objection, filed at ECF number 1327, replaced ECF number 1240 and substantially narrows the arguments. While KK mentions section 10.5 in its amended objection, the language it points to appears only in section 10.6 and relates only to the provisions in that section. KK's amended objection makes no argument against implementation of section 10.5 of the plan now before the Court, and any objection to section 10.5 is thus waived.

The entirety of KK's substantive objection to section 10.6 is contained in paragraph 20 of ECF number 1327. KK states that "[t]he language in Section 10.6 of the Plan, deeming receipt of a distribution to be consent, is impermissible. Conditioning a creditor's right to a distribution on the creditor giving up rights pursuant to third

party releases violates fundamental principles of the Bankruptcy Code." In the plan now before the Court, the debtor removed the deemed consent language, and so this objection is moot. Even so, the Court notes that the two decisions cited by KK, Zenith and Conseco, do not apply in this case. Those decisions address releases of non-debtor parties. In contrast, the release at issue here is aimed only at protecting those involved in administration of this case and ensuring the sanctity of the confirmed plan as the sole source of recovery for claims.

Section 10.5 contains an exculpation provision aimed at protecting the debtor's sole manager, the post-confirmation liquidating trustee, and professionals employed by the estate and the liquidating trust, from claims of the debtor's creditors, carving out claims resulting from gross negligence, willful misconduct and fraud. Such an exculpation provision is typical in chapter 11 plans, including liquidating plans such as the one presented today, and has been routinely approved. The provisions addressed to the liquidating trustee and the liquidating trust itself typically are also reflected in the liquidating trust agreement that becomes effective after confirmation of the plan. In both instances, the exclusion of claims resulting from gross negligence, willful misconduct, and fraud is widely considered appropriate. Again, I note that KK's two operative written objections do not even address this provision.

Section 10.6 is even less troubling in its scope. It applies to all holders of claims against and equity interests in the debtor "with respect to any such Claims or Equity Interests." Section 10.6 prohibits holders of claims and equity interests from pursuing the liquidating trustee or the liquidating trust, by any means, in connection with any claim against or equity interest in the bankruptcy estate. The effect of section 10.6 is to limit holders of claims and equity interests to the treatment that is provided in the plan. They are not permitted to try to get a leg up on fellow creditors by suing the liquidating trustee, attempting to place a lien on the liquidating trust, or taking similar action. Section 10.6 explicitly preserves any defenses any holder of a claim or equity interest may have to actions brought on behalf of the estate or liquidating trust, and also explicitly preserves the right of the IRS to pursue other parties and the rights of governmental entities to pursue criminal, police and regulatory actions.

There is nothing unusual about section 10.6. Indeed, it reflects the state of the law regarding the effect of confirmation of a chapter 11 plan. Upon confirmation, the plan has the effect of a contract binding on all parties, supplanting the legal rights that governed prior to confirmation. Creditors may look only to enforcement of the plan and are not permitted to pursue the debtor and its officers, a reorganized debtor or, as in this case, a liquidating trust, other than as provided in the plan itself. Section 10.6 is tailored to achieve this end. Other than KK's objection to language that was removed from section 10.6, now moot, there were no objections to section 10.6, and so any potential objections were waived.

The debtor may include relevant language in a proposed confirmation order mirroring sections 10.5 and 10.6. In addition, the liquidating trust agreement may include language relevant to the trust and the trustee.

There are no other timely objections to confirmation. So that the record is clear, the Court overrules all objections to confirmation of the plan.

Certain of the EB-5 creditors filed motions for clarification, at ECF numbers 1514, 1519, and 1530. The Court confirms that the plan does not in any way convey to the liquidating trust any claims or causes of action, owned by creditors of the debtor, against parties other than the debtor or the bankruptcy estate, or in any way impair the ability of creditors of the debtor to pursue such independent claims, whether already pending or which later may be pursued, against anyone excluding only the specific persons and entities listed in sections 10.5 and 10.6 of the plan. It is the Court's view that the provisions of the plan are clear and that the motions for clarification are not necessary, but it appears that the movants are concerned about potential arguments made by their adversaries elsewhere, and so the Court grants the motions for clarification at ECF numbers 1514, 1519, and 1530. The debtor may include appropriate language in the proposed confirmation order, granting these motions for the reasons stated on the record.

Having reviewed the evidence admitted in support of confirmation, and in light of the provisions of the plan, the Court finds that both the plan and the debtor, as proponent of the plan, have complied with all relevant provisions of the Bankruptcy Code and the plan is confirmed.

In a separate motion filed at ECF number 1522, the debtor asks the Court to waive the 14-day stay that otherwise applies to an order confirming a chapter 11 plan under Bankruptcy Rule 3020(e). Among other things, the debtor argues that, via meritless litigation in state court, KK is trying to obtain control of the Debtor, and that KK will continue its no-holds-barred litigation of every action taken by the debtor in this case, to the material detriment of rightful creditors in this case.

KK responded to the motion at ECF number 1548. Among other things, KK argues that to make the confirmation order immediately effective would permit the debtor to consummate the plan quickly, thus potentially denying KK the ability to seek a stay of the confirmation order and thereby preserve an appeal of the confirmation order.

The Court points out that any move by a creditor, such as KK, to obtain control over the debtor in an attempt to improve the possibility of payment on its claim would be a violation of the automatic stay in this case. In addition, once the plan becomes effective, any such action likely would be a violation of the injunctive provisions of the plan and confirmation order. Such actions could subject the creditor to contempt

of court and sanctions, which could include damages and potentially punitive damages.

The Court's determination whether to shorten or eliminate the stay under Bankruptcy Rule 3020(e) is subject to the exercise of discretion. There is little case law on the issue. In considering the motion, the Court considers all relevant circumstances, which in this case includes the entire course of the case.

Based on presentations at today's hearing, and taking into account the entire history of this case, it appears likely that KK is pursuing litigation in state court against the debtor's sole equity owner for no valid reason other than to interfere with consummation of the plan confirmed today. The equity owner likely has no assets, and so there is no other good reason to pursue an action against it. It is unclear whether KK could obtain relevant relief in that particular state court action in the near term. But the debtor's concerns are well founded. KK's history of extreme litigiousness in this case, objecting to and appealing nearly every substantive ruling requested by the debtor no matter the weakness of KK's positions, was to a great extent aimed at delay and causing increased cost to the estate and creditors. The substantial possibility of further mischief by KK, to the material detriment of the debtor's actual creditors, militates in favor of making the confirmation order immediately effective. Taking into account all the circumstances of this case, equity does not support further delaying consummation of the plan. The Court will exercise its discretion under Bankruptcy Rule 3020(e) to eliminate the 14-day stay of the confirmation order. The motion at ECF number 1522 will be granted. The debtor may address this relief in the proposed confirmation order.

As is the custom in this district and elsewhere, the debtor may present a proposed confirmation order. The proposed order may include typical findings of fact consistent with the evidence admitted in support of confirmation. The Court will review the proposed order to ensure it is appropriate. The proposed confirmation order should specifically incorporate the findings of fact and conclusions of law made by the Court on the record today. My courtroom deputy will provide counsel for the debtor with a document, to be attached to the confirmation order as an exhibit, that includes the entire oral ruling made today.

The debtor filed a proposed confirmation order at ECF number 1539. Although the debtor is not required to tender the proposed confirmation order in exactly that form, I have reviewed that form of order and it is acceptable. I note that the ECF reference for Mr. Glickstein's affidavit, on page 2, should be changed to 1531. The debtor may also wish to update the reference to the appeal of the estimation order, on page 7, as the Eleventh Circuit recently dismissed that appeal after denying a stay pending appeal on the merits.

KK's request that the debtor be required to provide it with a copy of the proposed confirmation order before submitting it to the Court is denied. While a chapter 11 debtor typically provides a proposed confirmation order to the Court, that order when entered is an order of the Court and it is up to the Court to determine what is and is not included. It is not necessary, or customary, for a proposed confirmation order to be provided to an objecting party whose objections have all been overruled. This ruling likely has limited effect, as the debtor has in fact filed a form of proposed order at ECF number 1539, and the final form of proposed order is likely to be very similar.

Congratulations to the debtor. This is a milestone in your effort to provide the best recovery possible to creditors in this case.